# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Brandy Williams, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 15-cv-01744-PHX-DDD |
| | ) | |
| G&K Services, Inc., a | ) | |
| Minnesota corporation, | ) | |
| Jane and John Does | ) | |
| 1-100; Black | ) | |
| Corporation 1-100; | ) | |
| White Partnership | ) | |
| 1-100, | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |

VIDEOTAPED DEPOSITION OF BRANDY LANE WILLIAMS

Phoenix, Arizona
June 14, 2016
9:09 a.m.

CERTIFIED COPY

Reported by:
CARRIE A. CARIATI
Registered Professional Reporter
Certified Realtime Reporter
Certified LiveNote Reporter
Arizona CR No. 50355

CARRIE REPORTING, LLC
Certified Reporters
4032 North Miller Road
Suite A-100
Scottsdale, AZ 85251
(480)429-7573

1                        I N D E X

2    WITNESS:             EXAMINATION                    PAGE

3    BRANDY LANE WILLIAMS

4              BY MS. FRANCIS                              5
               By MR. MILLS                             272
5              By MS. FRANCIS                           283

6

7

8                      E X H I B I T S

9    DEPOSITION
     EXHIBITS           DESCRIPTION                      PAGE
10
     12      Complaint and Demand for Jury Trial         26
11
     13      Medical record from Joseph Brooks, M.D.,    57
12           dated January 16, 2013

13   14      Performance Document - GK perform, Manager  198
             Evaluation, 7/1/12 through 6/30/13
14
     15      Employee Acknowledgement Form              229
15
     16      Company Policy, G&K Individual Treatment   230
16           Policy, Bates Nos. WILLIAMS-000048 through
             51
17
     17      Charge of Discrimination                   234
18
     18      E-mail                                      237
19
     19      E-mail                                      238
20
     20      Series of e-mail                           240
21
     21      E-mail                                      242
22
     22      E-mail                                      245
23
     23      Series of e-mail with attachments,         256
24           Bates Nos. EEOC 0026, 137, and 145

25

1         VIDEOTAPED DEPOSITION OF BRANDY LANE WILLIAMS

2 was taken on June 14, 2016, commencing at 9:09 a.m. at the

3 law offices of Stinson Leonard Street, LLP, 1850 North

4 Central Avenue, Suite 2100, Phoenix, Arizona, before

5 CARRIE A. CARIATI, RPR, CRR, CLR, a Certified Reporter in

6 the State of Arizona.

7

8 COUNSEL APPEARING:

9 For the Plaintiff:

10       Mills + Woods Law, PLLC
      By:  Robert T. Mills
11       5055 North 12th Street
      Suite 101
12       Phoenix, Arizona  85014

13 For the Defendants:

14       Stinson Leonard Street, LLP
      By:  Carrie M. Francis
15       1850 North Central Avenue
      Suite 2100
16       Phoenix, Arizona  85004

17

18

19 Also present:  Holly Rye, videographer
                  Donna Fox

20

21

22

23

24

25

1              VIDEO TECHNICIAN:  We are going on the

2    record at 9:09 a.m.  Today's date is June 14, 2016.  This

3    is the video recorded deposition of Brandy Lane Williams

4    taken by defendant in the matter of Brandy Williams versus

5    G&K Services, Incorporated, Case No. 15-cv-01744-PHX-DDD

6    in the United States District Court for the District of

7    Arizona.

8              This deposition is being conducted at

9    Stinson Leonard Street, LLP, located at 1850 North Central

10   Avenue, Phoenix, Arizona.  The court reporter is Carrie

11   Cariati from the firm of Carrie Reporting, LLC, located at

12   4032 North Miller Road, Scottsdale, Arizona.  The

13   certified legal video specialist is Holly Rye with

14   Litigation Video Specialists, LLC, located at 3219 East

15   Camelback Road, Phoenix, Arizona.

16             Will the attorneys introduce themselves,

17   defendants first, please.

18             MS. FRANCIS:  Carrie Francis from Stinson

19   Leonard Street on behalf of defendant G&K Services, Inc.

20             MR. MILLS:  Bob Mills of Mills + Woods on

21   behalf of the plaintiff Brandy Williams.

22             VIDEO TECHNICIAN:  Any other introductions

23   for people present in the room?

24             MR. MILLS:  Also present with me is Donna

25   Fox, a paralegal in our firm.

1          VIDEO TECHNICIAN:   Thank you, Counsel.

2          Will the court reporter please swear in the

3    witness.

4

5          BRANDY LANE WILLIAMS,

6    a witness herein, having been first duly sworn by the

7    Certified Court Reporter to speak the truth and nothing

8    but the truth, was examined and testified as follows:

9

10          EXAMINATION

11   BY MS. FRANCIS:

12        Q.   Can you state your full name for the record?

13        A.   Brandy Lane Williams.

14        Q.   Is it okay if I call you Brandy throughout the

15   questioning today?

16        A.   Yes.

17        Q.   Have you ever had your deposition taken before?

18        A.   No.

19        Q.   So there is a couple of ground rules since we

20   have the court reporter and the videographer taking down

21   everything.   Typically it would be more of a conversation

22   where you could anticipate what I am asking and answer my

23   question maybe before I finish my question.   But in this

24   situation, we have to be really careful not to talk over

25   each other and to let me finish my question completely

1    before you start your answer.  Is that okay?

2         A.   Yes.

3         Q.   If you don't understand a question I ask you --

4    and I am sure there will be many questions that I could

5    ask better -- feel free to tell me, "I don't understand

6    what you are asking," and I will rephrase the question for

7    you.  Is that okay?

8         A.   Yes.

9         Q.   You also have to give verbal answers so that the

10   court reporter has something to write down.  Were you to

11   nod your head or say "uh-huh," that is not something that

12   she can clearly take down in the record, so I may indicate

13   to you, "Is that a yes or is that a no," just so the court

14   reporter has something to take down.  I am not trying to

15   suggest an answer to you in any way.  I am just trying to

16   get something for the record.  Is that okay?

17        A.   Yes.

18        Q.   Feel free to take a break at any time.  We are

19   going to be here for quite a while because we have a lot

20   of information to go over.  I would just ask that you

21   answer any question that is pending before you take a

22   break.  Is that okay?

23        A.   Yes.

24        Q.   You understand that you are under oath?

25        A.   Yes.

1     Q.    And you understand what that means, that you are

2   under the penalty of perjury if you were to not tell the

3   truth during this deposition today?

4     A.    Yes.

5     Q.    Are you on any medications currently -- are you

6   under the influence of any medications that would affect

7   your ability to recall events?

8     A.    No.

9     Q.    Have you had any prior involvement in court

10   proceedings other than this matter?

11     A.    No.

12     Q.    Have you ever filed for bankruptcy?

13     A.    No.

14     Q.    Have you ever filed a family court matter?

15     A.    No.

16     Q.    Have you ever had a family court case opened

17   against you?

18     A.    No.

19     Q.    Have you ever had an injunction against

20   harassment filed against you or on your behalf?

21     A.    No.

22     Q.    Have you ever been a witness in another case?

23     A.    No.

24     Q.    Have you ever provided testimony like what we

25   are doing here today?

1       A.    No.

2       Q.    What did you do to prepare for your deposition

3    today?

4       A.    Just reviewed my medical documentation as well

5    as my history with G&K.

6       Q.    When you say your history with G&K, what did

7    that entail?

8       A.    My employment date, my termination date, and

9    dates that I was promoted into different positions.

10       Q.    Where did you find that information?

11       A.    I have the copy of my hire letter and then also

12    copies of my agreement of promotion and my letter of my

13    raise.

14       Q.    And are those documentations that have all been

15    provided to your counsel to produce to us in this case?

16       A.    Yes.

17       Q.    Do you have any notes that you took during your

18    employment about events that relate to this lawsuit?

19       A.    Yes.

20       Q.    When did you take those notes?

21       A.    During my employment with G&K as they occurred.

22       Q.    And did you look at those notes for the purposes

23    of refreshing your memory about testimony that you were

24    going to give today?

25       A.    Yes.

1    Q.    How many pages do those notes consist of?

2    A.    Approximately 30 to 40 pages each.

3    Q.    And where are those notes kept?

4    A.    They are kept on my computer.  They were in my

5    e-mail.

6    Q.    So what type of word processing program are they

7    on?

8    A.    It was just a pdf format.  They were just

9    scanned from my printer to my computer.

10    Q.    So you had handwritten notes that were kept in

11    what form originally?  Was it a binder or how did you

12    compile this?

13    A.    Yes, they were just in a -- in a folder.

14    Q.    And you scanned those into a file that you

15    maintain on your computer?

16    A.    Yes.

17    Q.    When did you scan those documents into your

18    computer?

19    A.    At the beginning of my contact with Bob --

20    Q.    And can you approximate a date?

21    A.    -- about approximately March of 2015.

22    Q.    And what is that file on your computer named?

23    A.    G&K.

24    Q.    And to clarify, you looked at those notes

25    yesterday?

1      A.   Yes.

2      Q.   And did you review the notes in their entirety?

3      A.   I scanned through them, but I read quite a few

4  of them.

5      Q.   Have those notes been provided to your counsel

6  for production to the defendant in this case?

7      A.   Yes.

8              MS. FRANCIS:  Have those notes been

9  produced?

10             MR. MILLS:  I believe we produced

11  everything, right?  I am not aware -- I am not aware of

12  anything that we have that you don't have.  I mean,

13  that's --

14             MS. FRANCIS:  Okay.  I don't think we have

15  handwritten notes about the events leading into the

16  complaint.  I think we have handwritten notes about the

17  job issues --

18             MS. FOX:  I think that is what she thinks

19  you are talking about.

20             MS. FRANCIS:  Okay.

21             MS. FOX:  We don't have any handwritten

22  notes in this case.

23             MR. MILLS:  Can I -- let me ask -- this may

24  help clarify.

25             MS. FRANCIS:  Sure.

```
 1                    MR. MILLS:  Are you talking about the
 2    notebook that you gave us with the handwriting in it?
 3                    THE WITNESS:  Yes, just about issues with
 4    work.
 5                    MR. MILLS:  Okay.  Yeah, you have that.
 6    BY MS. FRANCIS,
 7        Q.    Okay.  Those notes consist of actual work
 8    issues, HR issues that you dealt with when you worked
 9    there, correct?
10        A.    Yes.
11        Q.    Do you have any notes about the events
12    concerning your disability or the claims that you are
13    asserting in the lawsuit?
14        A.    No.
15        Q.    Did you make any sort of timeline for purposes
16    of the litigation?
17        A.    No.
18        Q.    What other documents did you review besides the
19    notes that we just talked about and the letters that you
20    described previously for preparation?
21        A.    My complaint to the EEOC and then my rebuttal
22    statement to the EEOC and then as well as my e-mails that
23    I had saved from my employment at G&K.
24        Q.    Did you forward e-mails from your work computer
25    to your personal computer?
```

1       A.    Yes.

2       Q.    Why -- when did you start doing that?

3       A.    As soon as I started to feel that there was

4    retaliation and there was a wantingness for them to not

5    want me in the business anymore.

6       Q.    Can you approximate a date when that first --

7    you first felt that way?

8       A.    Approximately April of 2013.

9       Q.    What happened in April of 2013 to start you to

10    feel that you were being retaliated against?

11       A.    There was an uneasiness with the conversations

12    around me requesting to be off to go to doctors'

13    appointments, and just I was told an overall impression of

14    I am not active in the business.

15       Q.    And who told you that you were not active in the

16    business?

17       A.    Rachael Siggerud.

18       Q.    And who was uneasy with your request for

19    doctors' appointments?

20       A.    Rachael Siggerud.

21       Q.    Is there anyone else that you feel retaliated

22    against you because of your medical issues other than

23    Rachael Siggerud?

24       A.    Jacob Briscoe.

25       Q.    Anyone else?

1      A.    Mitch Rubinoff.

2      Q.    We will talk about that in more detail, but I

3  want to go back to my original question.

4            So around this time frame, April 2013, we

5  will see you starting to send e-mails to your home

6  computer?

7      A.    I -- I don't recall.

8      Q.    But it was because you started to feel that some

9  retaliation was ongoing or starting that you decided to

10 send e-mails to your home computer; is that correct?

11     A.    Yes.

12     Q.    What kind of e-mails would you send to your home

13 computer?

14     A.    Just questions that I was being asked about my

15 engagement in the business or questions around my

16 participation or the time that I was taking off due to my

17 doctors' visits.

18     Q.    So you would only send information to your home

19 computer that related to your medical issues?

20     A.    If I felt it was closely related, yes.

21     Q.    Did you send any competitive or business

22 information of G&K to your home computer?

23     A.    Not -- not unless I was working on a document

24 purposely for G&K.  I did work from home, but I didn't do

25 anything on my personal computer.  I had a G&K-issued

1   laptop, so if I did any work for G&K, I used the

2   G&K-issued laptop and I used their e-mail.

3        Q.   So I want to be specifically clear.  Did you

4   forward any business information of G&K, not information

5   related to your medical issue or leave, to your personal

6   computer?

7        A.   I don't recall.

8        Q.   Have you done an examination of your computer to

9   provide everything to your counsel that relates to G&K so

10  it be can produced in this case?

11       A.   Yes.

12       Q.   Have you preserved all the information that you

13  sent to your home computer from G&K on your home computer?

14       A.   Yes.

15       Q.   Have you deleted anything that relates to G&K

16  from your home computer?

17       A.   I don't recall if anything has been deleted.

18       Q.   Is it possible that you deleted information?

19       A.   My husband has access to the computer, so I -- I

20  wouldn't be able to answer that.

21       Q.   Have you deleted information?

22       A.   I have not.

23       Q.   Where do you keep the e-mails that you forwarded

24  to your home computer on your personal computer?

25       A.   I have a Gmail account.

1      Q.    And in that Gmail account is there any subfiles

2  that relate specifically to e-mails you forwarded from

3  work?

4      A.    No.

5      Q.    So in your Gmail account, generally in your

6  inbox, you have information that relates to your

7  employment at G&K?

8      A.    Yes.

9      Q.    And you can search your inbox for those e-mails?

10     A.    Yes.

11     Q.    Have you done that?

12     A.    Yes.

13     Q.    When did you do that?

14     A.    In the past two to three days.

15     Q.    And what -- did you provide information at that

16  time to your counsel for production?

17     A.    Yes.

18     Q.    Has that information been produced to us?

19     A.    Yes.

20     Q.    And that had to do with the job search efforts

21  that you undertook?

22     A.    Yes.

23     Q.    Okay.  That relates to your job search efforts

24  after G&K -- after leaving G&K, correct?

25     A.    Yes.

1      Q.    Have you done a search of those e-mails in your

2    inbox that relate to the time frame when you were employed

3    at G&K and you were forwarding things to your home

4    computer?

5      A.    No.

6      Q.    I am trying to make sure that we have all the

7    information that you forwarded.  Have you done some type

8    of search to produce everything that you forwarded from

9    your work account?

10      A.    Yes.  Initially when I retained Bob, I printed

11    everything out and gave him everything in person when we

12    had our first meeting.

13      Q.    And that would have been when?

14      A.    That would have been around May of 2013.

15      Q.    And when you reference "Bob," you are talking

16    about your attorney?

17      A.    Yes, my attorney, Bob.

18             MR. MILLS:  You mean 2015.

19             THE WITNESS:  2015, yes, correct, 2015.

20             MR. MILLS:  You said 2013.

21    BY MS. FRANCIS:

22      Q.    Okay.  Did you talk to anyone about preparing

23    for your deposition today --

24      A.    Yes, yes.

25      Q.    -- other than your counsel?

1       A.    No.

2       Q.    I don't want to get into the content of your

3    conversations with your attorneys, but when did you meet

4    to prepare for the deposition?

5       A.    We met over the telephone yesterday, and we met

6    Thursday last week in person.

7       Q.    How long was the in-person meeting?

8       A.    Four hours.

9       Q.    Did you review any documents during that meeting

10   for the purposes of refreshing your testimony -- or your

11   memory so that you can provide testimony today?

12      A.    Yes.

13      Q.    What did you review during that meeting?

14      A.    My medical documentation from my medical

15   providers as well as recorded phone documentation of

16   myself and Rachael Siggerud.

17      Q.    And how many recorded conversations did you

18   review?

19      A.    Two.

20      Q.    Did you record any more than those two phone

21   conversations?

22      A.    No.

23      Q.    Did you review anything else with -- at your

24   in-person meeting with your attorneys?

25      A.    Just the filing of the charge itself.

1     Q.   Anything else you can think of?

2     A.   I don't recall anything else.

3     Q.   And then you said you also had a phone

4 conversation yesterday with your counsel.  How long did

5 that last?

6     A.   Approximately 45 minutes.

7     Q.   And did you review any documents during that

8 call?

9     A.   My medical documentation.

10    Q.   The same documents you had reviewed on Thursday?

11    A.   Yes.

12    Q.   Did reviewing the medical documents refresh your

13 memory about any particular events?

14    A.   Nothing unusual other than the sequence of how

15 everything occurred.

16    Q.   Did you talk to any of your family or friends

17 about your deposition today?

18    A.   I talked to my sister.  I didn't go in depth

19 about what -- about the case itself but just an awareness

20 that I was attending one today.

21    Q.   Have you ever filed a charge of discrimination

22 other than in this case?

23    A.   In what aspect?

24    Q.   You understand what a charge of discrimination

25 is that you file with the EEOC, correct?

1        A.    Oh, okay.

2              No.

3        Q.    You understand what it is though?

4        A.    Yes, I understand.

5        Q.    Have you filed another charge other than in this

6    case?

7        A.    No.

8        Q.    When you worked for G&K, did you keep any type

9    of calendar?

10        A.    I did.

11        Q.    And in what form?

12        A.    It was in Lotus Notes, so it was through my

13    e-mail through G&K.

14        Q.    Do you have a copy of your calendar from when

15    you worked at G&K?

16        A.    No.

17        Q.    Did you forward information from your calendar

18    to your home e-mail account?

19        A.    No.

20        Q.    Did you keep any type of paper calendar during

21    the time that you worked at G&K?

22        A.    No.

23        Q.    If we wanted to know when you had medical

24    appointments or work appointments during the time frame

25    that you worked at G&K, how could we figure that out?

1        A.    From my medical documentation.

2        Q.    What about appointments that you had when you

3   were at G&K, any other way other than the Lotus calendar?

4        A.    No.

5        Q.    Did you print out any parts of your calendar so

6   that we could find a paper copy?

7        A.    No.

8        Q.    During the time that you worked at G&K, did --

9   was the calendar that you used always under the Lotus

10  program, or did that ever change?

11       A.    No, it was always under the same program.

12       Q.    Did you keep a diary during the time that you

13  worked at G&K?

14       A.    No.

15       Q.    Any text messages related to your work?

16       A.    No.

17       Q.    I know you produced one text message with Kaela,

18  correct?

19       A.    Yes.

20       Q.    Do you have additional text messages with Kaela

21  since the one that you produced in this case?

22       A.    No.

23       Q.    When was the last time you talked to Kaela?

24       A.    It was March of 2016.

25       Q.    Did you contact her or did she contact you?

1      A.    She contacted me.

2      Q.    And how did she contact you?

3      A.    She called me on my cell phone.

4      Q.    And what did she say?

5      A.    She was calling to let me know that she was

6  taking a visit to her aunt that lives in Tucson and wanted

7  to know if I would like to meet her for lunch.

8      Q.    And did you?

9      A.    No, I did not.

10     Q.    Why not?

11     A.    I was sick at the time and so I stayed home.

12     Q.    Did you talk with Kaela at all about this

13 lawsuit?

14     A.    No.

15     Q.    To your knowledge, does Kaela know that you have

16 a lawsuit pending against G&K?

17     A.    I am not aware.

18     Q.    You never had a discussion with her about it?

19     A.    No.

20     Q.    She has never asked you about the lawsuit?

21     A.    I -- I don't recall that she has.

22     Q.    And so that conversation you said happened in

23 March of 2016?

24     A.    Yes.

25     Q.    Have you talked to her at all since then in any

1    means, e-mail or anything like that?

2         A.    Not that I recall.

3         Q.    And before you talked to her in March of 2016,

4    when was the last time you had contact with her?

5         A.    The last I can recall is March of 2015.  She

6    takes a trip every year to her aunt's, so ...

7         Q.    And it was the same situation where she called

8    and asked if you would meet?

9         A.    Yes.

10        Q.    And did you in 2015?

11        A.    No.

12        Q.    So when was the last time you physically saw

13   Kaela?

14        A.    I don't recall a date, but it was at the HR

15   summit meeting for G&K in Minnesota.

16        Q.    So when you were both still working there?

17        A.    Yes.

18        Q.    When was the last time you talked to Janelle?

19        A.    I spoke to her last -- the end of last week she

20   called me.

21        Q.    On your cell phone?

22        A.    Yes.

23        Q.    And what did she say?

24        A.    She told me that you had contacted her in

25   regards to giving a deposition.

1       Q.    Anything else?

2       A.    That was it.

3       Q.    And what was your response?

4       A.    I told her that, yes, my attorney was interested

5    in performing a deposition for her.

6       Q.    And what was her response?

7       A.    She stated that she didn't understand why and

8    that she didn't feel comfortable doing that.

9       Q.    Did she say why she didn't feel comfortable?

10       A.    Due to her termination from G&K.

11       Q.    Do you -- did she say specifically what about

12    her termination made her feel uncomfortable?

13       A.    She felt that it was a wrongful termination.

14       Q.    Did she explain to you why?

15       A.    She explained that she felt that it was very

16    last minute and that she was very unaware that it was

17    going to occur.

18       Q.    Anything else?

19       A.    That was it.

20       Q.    Did she mention anything about any medical

21    condition she had?

22       A.    No.

23       Q.    Did she mention anything about maternity leave

24    or medical leave?

25       A.    Yes.

1      Q.   What did she tell you about that?

2      A.   She stated that she was on medical leave in 2013

3   when she had her daughter.

4      Q.   And did she describe whether or not she felt

5   that played a role in her termination?

6      A.   She did.

7      Q.   What did she tell you?

8      A.   She felt that -- that that was the reason behind

9   them terminating her.

10     Q.   Did she explain to you that she would not travel

11   after her return from leave?

12     A.   She did.

13     Q.   And did she explain to you that that had an

14   impact on her ability to service Southern California?

15     A.   No.

16     Q.   What impact did she express that had on the

17   business that she would not travel?

18     A.   I -- I don't recall.

19     Q.   So what did she say to you specifically about

20   not being willing to travel when she returned from

21   maternity leave?

22     A.   She stated that she was having difficulty

23   traveling due to nursing her newborn.

24     Q.   Did she tell you that she would not travel

25   outside of her home site?

1      A.   No.

2      Q.   When she said that she had difficulty traveling,

3  did she give you any details or specifics about what that

4  entailed?

5      A.   No.

6      Q.   And you also said that -- I'm sorry, Janelle

7  told you that she didn't think that she had any

8  information that was relevant to your case.  Did she

9  explain what she meant by that?

10     A.   She didn't say she didn't feel there was no

11  information that was relevant.  She said that -- she

12  stated she didn't feel comfortable giving a deposition due

13  to the fact of her termination.

14     Q.   Did she say anything about not overseeing you or

15  supervising you so that she wouldn't have any information

16  about your performance?

17     A.   No.

18     Q.   Did she oversee your performance in any way?

19     A.   No.  We were peers.

20     Q.   And do you know when her termination occurred?

21     A.   I do not know the exact date.

22     Q.   It was after you left?

23     A.   Correct.

24     Q.   Do you know when she was on maternity leave?

25     A.   She was on maternity leave when I was laid off

1    from G&K, which was September of 2013.

2         Q.   Do you know when her leave started?

3         A.   I don't recall.

4         Q.   And it is your understanding she was terminated

5    after her return from leave?

6         A.   Yes.

7         Q.   Other than Kaela and Janelle, are there any

8    other people that you think did comparable work at G&K as

9    to what you did?

10        A.   There were others, but they were not in the

11   region that -- that we were in together.

12        Q.   So they had different managers?

13        A.   Yes.

14        Q.   So the people that you would compare yourself to

15   would be Kaela and Janelle, correct?

16        A.   Yes.

17        Q.   Did you ever record any conversations with

18   anyone other than Ms. Siggerud?

19        A.   No.

20             MS. FRANCIS:  I think we are at Exhibit

21   No. 12.

22             (Deposition Exhibit No. 12 was marked for

23   identification by the reporter.)

24   BY MS. FRANCIS:

25        Q.   The court reporter is showing you what we marked

1    as Exhibit No. 11 to your deposition -- I'm sorry, 12.

2    Have you seen this document before today?

3         A.   Yes.

4         Q.   When was the last time you saw this document?

5         A.   Thursday, last week.

6         Q.   And did you ever provide revisions to this

7    document?

8         A.   No.

9         Q.   I want to talk about a few specific paragraphs.

10   If you could go to page 2 at paragraph 7 in Exhibit

11   No. 12 -- and tell me when you are there.

12        A.   Okay.

13        Q.   And this -- this paragraph relates to your FMLA

14   leaves, and I know there were a few of them, but I don't

15   think they are in dispute, so I want to just see if we can

16   summarily cover them.  You first requested FMLA leave in

17   July of 2012, correct?

18        A.   Yes.

19        Q.   And that was for the birth of your child,

20   correct?

21        A.   Yes.

22        Q.   And you were granted leave?

23        A.   Yes.

24        Q.   And you were on leave for the birth of your son

25   until October 3rd of 2012, correct?

1      A.   Yes.

2      Q.   And then you returned to your position as an HR

3  representative, correct?

4      A.   Yes.

5      Q.   And then you took another medical leave in

6  December of 2013, correct?

7      A.   No, December of 2012.

8      Q.   Thank you.  That is correct.

9           And that -- at that point in time, you did

10  not have any more FMLA leave time available, correct?

11      A.   Correct.

12      Q.   So you were given a non-FMLA leave of absence,

13  correct?

14      A.   Yes.

15      Q.   And that leave of absence lasted until

16  January 11th of 2013, correct?

17      A.   I don't recall the exact date.

18      Q.   Do you recall how long the medical leave was --

19  the second medical leave that you took lasted?

20      A.   Three to four weeks.

21      Q.   About a month?

22      A.   Yes.

23      Q.   And when you returned from that leave, you again

24  were placed in your position of human resources

25  representative, correct?

```
 1        A.   Yes.

 2        Q.   Do you have any concerns about how those medical

 3   leaves were handled as it relates to this lawsuit?

 4                 MR. MILLS:  Object to the form.

 5                 Go ahead and answer if you understand the

 6   question.

 7   BY MS. FRANCIS:

 8        Q.   I can break it down -- I can break it down

 9   because it is multiple, so ...

10                 MR. MILLS:  Okay.

11   BY MS. FRANCIS:

12        Q.   As it relates to the first leave that you took

13   for -- the leave of absence related to your son, did you

14   complain to anyone that that leave was handled

15   inappropriately?

16        A.   No.

17        Q.   Did you feel that anything about your initial

18   leave of absence for the birth of your child, that G&K did

19   anything wrong related to that leave?

20        A.   No.

21        Q.   So the second time you went on leave, which is

22   non-FMLA because we established that you used your FMLA

23   time for that year, correct?

24        A.   Yes.

25        Q.   And we established that lasted about 30 days.
```

1    You requested leave, correct?

2         A.   Yes.

3         Q.   You were granted leave?

4         A.   Yes.

5         Q.   Did you ever complain to anyone at G&K about how

6    that leave was handled?

7         A.   No.

8         Q.   Do you have any concerns about how that three to

9    four weeks of leave was perceived or handled by G&K?

10        A.   No.

11        Q.   So what we are really focused on for purposes of

12   this lawsuit is the -- the third time you went on medical

13   leave, correct?

14        A.   Yes.

15        Q.   Good.  That narrows it a lot.

16             Now, the -- the third time that you

17   requested medical leave, that would have happened on

18   July 8th of 2013, correct?

19        A.   No.

20        Q.   When did you request leave the third time?

21        A.   It was suggested by Rachael Siggerud after I

22   requested an ADA accommodation that I should request FMLA

23   leave.

24        Q.   The request that you made for an ADA

25   accommodation, that happened on July 8th of 2013, correct?

1       A.   That was the -- the first time I had put it in

2    writing, but not the first time that I had requested an

3    accommodation.

4       Q.   When was the first time that you requested an

5    accommodation?

6       A.   On my return from the general leave in December

7    of 2012.

8       Q.   Who did you request an accommodation with?

9       A.   Rachael Siggerud.

10      Q.   And was this in writing or how did you make this

11   request?

12      A.   It was verbally.

13      Q.   Where were you?

14      A.   I was in the plant location in Phoenix.

15      Q.   And where was Ms. Siggerud?

16      A.   I am unsure.  She travels.  I don't recall.

17      Q.   So this was a phone conversation?

18      A.   Yes.

19      Q.   And was there anyone else present on the call?

20      A.   No.

21      Q.   And what accommodation did you request of

22   Ms. Siggerud on your return from leave in December of

23   2012?

24      A.   To continue to work with my medical providers to

25   attend doctors' appointments or testing as necessary.

1     Q.    And what was Ms. Siggerud's response?

2     A.    That that was fine.

3     Q.    Did you do anything to formalize this request

4  through the HR department at G&K?

5     A.    No.

6     Q.    You understand that there is a formal process to

7  request an ADA accommodation, correct?

8     A.    Yes.

9     Q.    And there are other people involved in that

10  process other than Ms. Siggerud, correct?

11     A.    She reassured me that she would take care of the

12  situation after our conversation.

13     Q.    My question was a little bit more specific.  Do

14  you want the court reporter to read it back?

15     A.    Yes.

16            (The following requested portion of the

17  record was read back by the reporter.)

18            "QUESTION:  And there are other people

19  involved in that process other than Ms. Siggerud,

20  correct?"

21            THE WITNESS:  Yes.

22  BY MS. FRANCIS:

23     Q.    Did you know their names at the time when you

24  were working at G&K?

25     A.    I don't recall.

1      Q.    But there were specific people within the HR

2  department that dealt specifically with accommodation

3  requests, correct?

4      A.    Yes.

5      Q.    And you know that because you were in an HR role

6  for several years?

7      A.    Yes.

8      Q.    When you were working as an HR representative,

9  if an employee requested an accommodation, what would you

10  have done?

11      A.    I would walk through the process with them, and

12  I would give them the documents to request a leave.

13      Q.    And so you were familiar with what those

14  documents were?

15      A.    Yes.

16      Q.    What were those documents?

17      A.    It was a request for FMLA leave.

18      Q.    Was there an actual form that was titled

19  "Request For FMLA Leave"?

20      A.    Yes.

21      Q.    Was there a form that dealt specifically with

22  requests for ADA accommodations?

23      A.    No.

24      Q.    So when an employee requested an ADA

25  accommodation, you would give them the FMLA form?

1      A.   No.

2      Q.   What would you give them when they requested an

3    ADA accommodation?

4      A.   I didn't have anyone request an ADA

5    accommodation.

6      Q.   What would you have done as an HR representative

7    for G&K during this time frame if someone had requested an

8    ADA accommodation?

9            MR. MILLS:  Object to the form.  Calls for

10   speculation.

11           Go ahead.

12           THE WITNESS:  I would have suggested that

13   they put something in writing.

14   BY MS. FRANCIS:

15     Q.   And submit it to who?

16     A.   To myself.

17     Q.   And then what would you have done with it?

18     A.   Would have sent that to our corporate office to

19   benefits.

20     Q.   Who?

21     A.   Our benefits department.

22     Q.   Was there a particular person?

23     A.   I don't recall her name.

24     Q.   But there was a person that you would have sent

25   it to?

1      A.    Yes.

2      Q.    And did that person to your knowledge deal

3  specifically with ADA requests?

4      A.    I don't recall.

5      Q.    Given your experience as an HR representative,

6  is there a reason that you didn't put your request for an

7  accommodation in December of 2012 in writing?

8      A.    Due to the fact that Rachael was supporting me

9  at the time, that was the reason why I didn't put anything

10  in writing initially.  She was -- she was being supportive

11  of my need for a leave.

12      Q.    Did you actually tell Ms. Siggerud that you

13  needed an ADA accommodation or did you use other terms?

14      A.    I don't specifically remember saying I needed a

15  request for ADA.

16      Q.    In December of 2012?

17      A.    Yes.

18      Q.    Is it possible that you just said, "I am going

19  to have some medical appointments that I may need to

20  attend, so I may have to adjust my schedule"?  Is it

21  possible that the conversation went more like that?

22      A.    No.

23      Q.    But you are not sure you used the terms "ADA

24  accommodation"?

25      A.    Correct.

1     Q.   You recall telling her that you needed time to

2   attend appointments?

3     A.   Yes.

4     Q.   And she was okay with that?

5     A.   Yes.

6     Q.   Did you have a set schedule when you worked at

7   G&K --

8     A.   No.

9     Q.   -- in the representative role?

10    A.   No.

11    Q.   In the generalist role, did you have a set

12  schedule?

13    A.   No.

14    Q.   When did you typically come to work -- or I

15  should say start work?

16    A.   Start work, it could vary depending on meetings

17  that we had.  Anywhere from 5:00 a.m. to 6:00 or 7:00 p.m.

18    Q.   That was your start time or that was your

19  typical schedule?

20    A.   That was my typical schedule.  It would vary

21  based on meetings in the business.

22    Q.   Did you have to -- when you worked remotely, did

23  you have to log on to a company remote access site?

24    A.   Yes.

25    Q.   And describe that process for me.  What would

1   you do when you logged on from home?

2        A.   There was a -- it was called a VPN, which is the

3   company website that we had to log into for access.

4        Q.   And when you would work in the office in

5   Phoenix, would you also log in the same way?

6        A.   I would if I needed access to a system, if I was

7   working on something specifically.

8        Q.   But you didn't always log in right when you

9   first started work?

10        A.   No.

11        Q.   Is there any way that we can tell -- because you

12   were an exempt employee, you didn't keep track of your

13   time, correct?

14        A.   Yes.

15        Q.   Is there any way we could tell when you were

16   working and when you were not working?

17        A.   No.

18        Q.   You didn't keep track of your hours

19   separately --

20        A.   No.

21        Q.   -- at any point in time?

22        A.   No.

23        Q.   We talked about the accommodation that you

24   discussed with Ms. Siggerud in December of 2012.  Was the

25   next time that you requested an accommodation the one you

1    submitted in writing on July 8th of 2013?

2        A.    Can you be more specific?

3        Q.    Sure.  When we first started talking, we were

4    trying to set time lines for about when you requested an

5    accommodation, and I suggested that it was with the

6    written request that we know was dated July 8th of 2013.

7    And you told me, "No, I actually requested it earlier in

8    December of 2012" when you came back from leave, correct?

9        A.    Correct.

10       Q.    I am trying to understand.  Was there another

11   time that you requested an accommodation between December

12   of 2012 and July 8th of 2013?

13       A.    No.  It had been ongoing from the first initial

14   request in December of 2012.

15       Q.    Okay.  Did you ever raise the issue of an

16   accommodation with anyone other than Ms. Siggerud?

17       A.    I don't recall.

18       Q.    You don't have a specific memory of telling

19   anyone else outside of the two conversations or the two

20   instances we talked about where you requested an ADA

21   accommodation from anyone at G&K?

22       A.    No.

23       Q.    Did you discuss your medical issues with anyone

24   at G&K other than Ms. Siggerud?

25       A.    No.

1     Q.   So to your knowledge, the only people that --

2   within G&K that are aware of the medical issues that you

3   were going through is Ms. Siggerud?

4     A.   Yes.

5     Q.   Did anyone else at G&K suggest to you that they

6   knew about your medical condition other than Ms. Siggerud?

7     A.   Yes.

8     Q.   Who?

9     A.   Jacob Briscoe.

10    Q.   What did Mr. Briscoe say to you about your

11  medical condition?

12    A.   He didn't say anything specific about my medical

13  condition but just the -- just the awareness of my request

14  for a leave.

15    Q.   And when did this happen?

16    A.   In December of twenty -- 2012.

17    Q.   So on your return from your second leave, that

18  would -- your return from your second leave would have

19  been in January of 2013, correct?

20    A.   Yes.

21    Q.   So you are saying Mr. Briscoe informed you that

22  he was aware of your request for leave when?

23    A.   In December of 2012.

24    Q.   When you first requested your second leave?

25    A.   Yes.

1     Q.    So where were you when this conversation

2   happened?

3     A.    I was in the Phoenix location with him.

4     Q.    And so you were physically present with each

5   other?

6     A.    Yes.

7     Q.    And what did he say to you?

8     A.    That Rachael had told him that I had requested a

9   leave and that she told him that I would be out of the

10  business.

11    Q.    For how long?

12    A.    I don't recall.

13    Q.    And what was your response to him?

14    A.    That, yes, that I would be on leave.

15    Q.    And did he indicate to you that he had any

16  knowledge of what your underlying medical condition was?

17    A.    No.  The only thing he stated was that he

18  understood that it was stemming from the birth of my son

19  from my first leave.

20    Q.    And you had never discussed with Mr. Briscoe

21  that you had medical issues that resulted from the birth

22  of your son, correct?

23    A.    Can you restate that?

24    Q.    Okay.  Did you ever discuss with Mr. Briscoe

25  that you had medical issues that stemmed from the birth of

1    your son?

2         A.    Yes.

3         Q.    And when did those conversations happen?

4         A.    When he told me that Rachael made him aware that

5    I had requested a leave and that I would be gone out of

6    the business for about three to four weeks.

7         Q.    And what did you tell him about your medical

8    issues during that time?

9         A.    I didn't tell him any specifics.  I just told

10   him that I had ongoing issues from the birth of my son.

11        Q.    Did you give him any specifics?

12        A.    No, no.

13        Q.    To the best of your recollection, is that

14   exactly what you said to him?

15        A.    I -- I don't recall if that is exactly what I

16   said.

17        Q.    Okay.  To the best of your memory, what did you

18   specifically tell Mr. Briscoe about your medical

19   condition?

20        A.    That it was just a continuance from what had

21   happened with the birth of my son.

22        Q.    And what was his response?

23        A.    He just said, "Okay."

24        Q.    Did that interaction with Mr. Briscoe cause you

25   to feel like you were being retaliated against or treated

1   differently?

2        A.   Not at that time.

3        Q.   So there was nothing about that conversation

4   that concerned you?

5        A.   No.

6        Q.   On any other occasion, did Mr. Briscoe discuss

7   with you your medical condition?

8        A.   No.

9        Q.   To your knowledge, did he have any additional

10   information other than what you provided to him about your

11   medical condition?

12        A.   I am not aware.

13        Q.   You -- you never heard from anyone that he had

14   additional information or he never suggested to you that

15   he knew more?

16        A.   Rachael told me that she had conversations with

17   him about my leave, but I am not sure of any specifics.

18        Q.   Do you have any reason to believe that any of

19   the confidential medical information that you shared with

20   Ms. Siggerud was not kept confidential?

21        A.   Could you restate that?

22        Q.   Sure.  You provided more detail to Ms. Siggerud

23   about your medical condition, correct?

24        A.   Yes.

25        Q.   And you expected that to be kept confidential?

1        A.    Yes.

2        Q.    Do you have any reason to believe that she

3    didn't keep that information that you provided

4    confidential?

5        A.    I am unsure.

6        Q.    You don't have any knowledge of anything that

7    happened that would lead you to believe she was talking

8    about your medical issues?

9        A.    No.   I am unaware of when they had

10   conversations.

11       Q.    Okay.   But you have not heard anything that

12   would suggest to you that she was disclosing your

13   confidential medical information?

14       A.    Can you restate that?   In -- in what aspect?

15       Q.    Sure.   I am wondering, she set up -- you know,

16   we are having these confidential conversations about your

17   medical issues.   Did you ever learn that she had breached

18   those confidences or somebody came back to you and they

19   knew information that you don't feel they should have

20   known?

21       A.    I am unaware, no.

22       Q.    If you look at paragraph 13 in Exhibit No. 12 --

23   and tell me when you are there.

24       A.    On page 3?

25       Q.    Yes.

1 A. Okay.

2 Q. This paragraph describes that you have a

3 disability.  Do you see that?

4 A. Yes.

5 Q. When did you become disabled?

6 A. Can you explain the question a little more?

7 Q. Paragraph 13 says:  Plaintiff is a qualified

8 individual with a disability.

9   Did I read that correctly?

10 A. Yes.

11 Q. When did you become disabled?  I am looking for

12 a date.

13 A. I applied for Social Security and it was started

14 May of 2015.

15 Q. And what is your disability?

16 A. It was a few different things.  It was due to

17 fibromyalgia, lichen planus, seborrheic dermatitis and

18 anxiety and OCD.

19 Q. And you are 100 percent disabled as of May 2015?

20 A. I am not sure.  They -- they didn't give me a

21 statement of if it was a total disability but -- other

22 than "you are qualified."

23 Q. For benefits?

24 A. Yes.

25 Q. When were you first diagnosed with fibromylagia?

1        A.    Fibromyalgia?

2        Q.    Myalgia.

3        A.    I don't recall the specific date.  I just know

4   which doctor that it was.

5        Q.    Can you estimate for me when you were diagnosed?

6        A.    2015.

7        Q.    And who was the physician?

8        A.    John Tesser, Dr. John Tesser.

9        Q.    And the second medical diagnosis you said was

10  for lichen --

11       A.    Lichen planus.

12       Q.    And what is that?

13       A.    It is an autoimmune skin disorder.

14       Q.    And when were you diagnosed with that?

15       A.    I don't recall the exact date.

16       Q.    Can you estimate for me a year?

17       A.    2014.

18       Q.    And what was the physician that diagnosed you?

19       A.    Dr. Joseph Brooks.

20       Q.    And I don't know what the next thing you said

21  was.  It started with an S.

22       A.    Oh, seborrheic dermatitis.

23       Q.    What is that?

24       A.    It is a skin disorder that is also -- they

25  believe it to be autoimmune-related.

1      Q.    And when were you diagnosed with that?

2      A.    In July of 2012.

3      Q.    And what was the physician's name that diagnosed

4  you?

5      A.    Victor Kissil.

6      Q.    Can you spell the last name?

7      A.    K-i-s-s-i-l.

8      Q.    And you said you also were diagnosed with

9  anxiety?

10     A.    Yes.

11     Q.    And when were you diagnosed with that?

12     A.    I don't recall the exact date.

13     Q.    And can you give me a year though?

14     A.    The psychiatrist I see -- she was not specific

15  on the diagnosis other than us just having conversations

16  around what I needed support with.

17     Q.    And when did you start seeing that psychiatrist?

18     A.    Two -- 2015.

19     Q.    And what is her name?

20     A.    Marianne Hutchison.

21     Q.    Had you been diagnosed by any physician with

22  anxiety prior to Dr. Hutchison?

23     A.    I don't recall.

24     Q.    And you also said you have OCD.  You have been

25  diagnosed with OCD, correct?

```
1        A.    Yes.

2        Q.    And when were you diagnosed with that?

3        A.    I would say 1999.

4        Q.    And who diagnosed you with OCD?

5        A.    The previous counselor that I was seeing.

6        Q.    What was that person's name?

7        A.    I don't recall.

8        Q.    Was it in Arizona?

9        A.    No.

10       Q.    What state?

11       A.    Arkansas.

12       Q.    Do you recall the name of the medical practice?

13       A.    I do not.

14       Q.    Do you recall an address or a street?

15       A.    Oh, no, I do not.

16       Q.    Do you have any medical records related to your

17   original OCD diagnosis?

18       A.    No.

19       Q.    And if you look back at Exhibit No. 12 -- and we

20   are still on paragraph 13 --

21       A.    Um-hum.

22       Q.    -- it says that your disability substantially

23   limits one or more of your major life activities.  Can you

24   tell me what major life activities your disability

25   impacts?
```

1        A.    I am really unaware of what that means.

2        Q.    Are you unable to do anything that regular

3    people that don't have your medical conditions do?

4        A.    No.

5        Q.    Did your OCD prevent you from doing any of your

6    job functions at G&K?

7        A.    No.

8        Q.    Did your -- and I apologize for not being able

9    to say these medical terms -- the skin --

10       A.    I can't even say them.

11       Q.    You are -- you are doing fine.

12             Your -- the skin disorder that you told me

13   about that you were diagnosed with in July of 2012, did

14   that prevent you from doing any of your essential job

15   functions at G&K?

16       A.    No.

17       Q.    Did any -- did any of the medical issues that

18   you had when you were working at G&K prevent you from

19   doing any of your job functions?

20       A.    No.

21       Q.    So I understand the accommodation that you

22   needed was time to attend medical appointments, correct?

23       A.    Yes.

24       Q.    You didn't need an alteration of your job duties

25   in any way?

1          A.    No.

2          Q.    You didn't need an alteration of your goals or

3    any of your performance objectives in any way?

4          A.    No.

5          Q.    Did you ever tell Mr. Briscoe that you had

6    mental health problems?

7          A.    No.

8          Q.    If you look at page 4 at paragraph 26 -- and

9    tell me when you are there --

10         A.    Okay.

11         Q.    -- you received a pay increase in May of 2013,

12   correct?

13         A.    Yes.

14         Q.    And it was around -- a little over the -- strike

15   that.

16               It was an increase of 11.2 percent?

17         A.    Approximately.

18         Q.    Do you have an understanding of why you received

19   that pay increase?

20         A.    Yes.

21         Q.    Tell me why.

22         A.    I was put into a new role of HR generalist.

23         Q.    Didn't your job as a generalist actually start

24   in February of 2013?

25         A.    Yes.

1      Q.    Were you given a pay increase at that time?

2      A.    No.

3      Q.    So after your change to the new role, you only

4    got a pay increase in May?

5      A.    Yes.

6      Q.    Other than being in that new role, do you have

7    an understanding for why you received a pay increase?

8      A.    This pay increase in May?

9      Q.    Yes.

10     A.    I -- I am -- can you restate that question?

11     Q.    Is there any other reason that you think that

12   you got a raise in May of 2013 other than because you were

13   put in a new job?

14     A.    No.

15     Q.    Did your new job have more responsibilities?

16     A.    Yes.

17     Q.    How did your job as a generalist differ from

18   that of a representative?

19     A.    It would require me to travel due to the new

20   locations that I was covering.

21     Q.    Anything else?

22     A.    No.

23     Q.    So if we were to look at a job description for

24   what you did as an HR representative, those would be your

25   same duties as an HR generalist; just you were covering

 1   more locations, correct?

 2                    MR. MILLS:  Object to the form.

 3                    THE WITNESS:  No.

 4   BY MS. FRANCIS:

 5        Q.   Why is -- why is my statement wrong?

 6        A.   The -- the job -- the job requirements were

 7   different.

 8        Q.   In what way?

 9        A.   I -- I -- I am unsure.  It was -- we were --

10   they were in the process of developing the role.

11        Q.   And was it still under development at the time

12   that you left?

13        A.   Yes.

14        Q.   What was your understanding of how the jobs

15   differed?

16        A.   That we would no longer be doing the day-to-day

17   tasks that we were doing as payroll and benefits and just

18   general things that we handled at the -- on a plant level

19   every day, that they were centralizing those things to the

20   corporate office.

21        Q.   And with those functions removed, what were

22   those new functions as a generalist that you were to be

23   working on?

24        A.   To be a strategic partner in the business and to

25   support the managers with any needs or concerns that they

1    had.

2         Q.    And what did that mean to you?

3         A.    Just to continue as I had before with the

4    relationships that I had or to build new relationships

5    with the new locations that I was covering.

6         Q.    When you were a representative, what location

7    were you assigned to?

8         A.    I covered Arizona, so there were four locations.

9    There was Phoenix, Tucson, Prescott Valley and Yuma.

10        Q.    And how did that change after you became a

11   generalist?

12        A.    I was made aware that I would take on new

13   locations and travel to the plant in Santa Fe Springs,

14   which was in Los Angeles; and Ontario, California; Sun

15   Valley, California; and San Diego, California.

16        Q.    And who had previously covered those -- those

17   locations?

18        A.    Leticia Rovero.

19        Q.    And what happened to her job, if you know?

20        A.    She was changed to the position of talent

21   acquisition specialist for recruiting.

22        Q.    Is that a lateral change or a promotion, if you

23   know?

24        A.    Lateral.

25        Q.    So she probably -- well, to your knowledge, she

1    didn't get the pay increase that you got?

2           A.   I am -- I am not aware.

3           Q.   Would you consider your change from a -- a

4    representative to a generalist to be a promotion?

5           A.   No.

6           Q.   But you got a pay increase?

7           A.   Yes.

8           Q.   A significant one?

9           A.   Yes.

10          Q.   But you still see that as a lateral move?

11          A.   Yes.

12          Q.   Did all the representatives get promoted to

13   general -- or changed into the position of generalist?

14          A.   Yes.

15          Q.   How many representatives were there before the

16   HR restructuring?

17          A.   In the company or just in the region I was in?

18          Q.   In your region.

19          A.   Three, including myself.

20          Q.   I thought you just said that there was a woman

21   that also covered Southern California?

22          A.   Oh, prior to the realignment?

23          Q.   Right.

24          A.   Oh, okay.  There were -- there would have been

25   five.

1    Q.    And how many became generalists to your

2  knowledge?

3    A.    Three.

4    Q.    And you don't perceive that to have been a

5  promotion for those three?

6    A.    No.  We were all still in HR.

7    Q.    And the other two, one became a talent

8  acquisition person?

9    A.    Yes.

10    Q.    And what --

11    A.    The others became talent acquisition

12  specialists.

13    Q.    And that is a recruiting position?

14    A.    Yes.

15    Q.    But you don't know if they received a pay

16  increase?

17    A.    I am not aware, no.

18    Q.    Do you talk to any of those two individuals that

19  worked before in the region?

20    A.    No.

21    Q.    At the time that you were transferred into the

22  role of generalist, can you approximate for me how many

23  employees there were in Phoenix that you were responsible

24  for?

25    A.    I would be guessing, but I would say maybe 120.

1        Q.    And how many were there in Prescott to the best

2    of your knowledge?

3        A.    Prescott Valley, there were approximately four

4    to five.

5        Q.    And in Tucson?

6        A.    Oh, I would be guessing on that as well.

7        Q.    I know it is a long time ago, so give me your

8    best estimate.

9        A.    I would say 20 to 25.

10       Q.    And in Yuma?

11       A.    Two.

12       Q.    And how many employees would you estimate there

13    were in Santa Fe Springs?

14       A.    Approximately 200.

15       Q.    And in Ontario?

16       A.    20 to 30.

17       Q.    And in San Diego?

18       A.    Approximately the same.   20 -- 20 to 25 maybe.

19       Q.    And in Sun Valley?

20       A.    I would say about the same.

21       Q.    20 to 30?

22       A.    20 -- yeah, 20 to 30.

23       Q.    And the other generalists were Kaela and

24    Janelle, correct?

25       A.    Yes.

1        Q.   And Kaela covered the Minneapolis area, the

2    Midwest --

3        A.   Yes, Minnesota.

4        Q.   -- mainly?

5        A.   Um-hum.  Yes.

6        Q.   Do you know how many employees she was

7    responsible for dealing with in her assigned locations?

8        A.   I am not aware.

9        Q.   And do you have any knowledge of the number of

10   employees that Janelle was overseeing at her assigned

11   locations?

12       A.   No.

13       Q.   Did you always have Southern California assigned

14   to you after you were a generalist or did that change?

15       A.   Can you restate the question?

16            MR. MILLS:  Object to the form.

17   BY MS. FRANCIS:

18       Q.   Sure.  Did you always have Southern California

19   assigned to you when you were working as a generalist, or

20   when you started, did you not have that and it later

21   became assigned to you?

22       A.   No, I had it immediately.

23       Q.   When Janelle went out on maternity leave, did

24   that affect the number of locations that you oversaw at

25   all to your knowledge?

1          A.   No.

2          Q.   So you were never told that you were covering

3     Southern California for a period of time because Janelle

4     was out on leave?

5          A.   No.

6          Q.   If you look at paragraph 23 in Exhibit No. 12,

7     on January 11th of 2013 after you had requested or

8     indicated that you needed an accommodation in

9     December 2012, you presented Ms. Siggerud with a doctor's

10    note that cleared you to return to work?

11         A.   Yes.

12         Q.   Did that doctor's note indicate that you needed

13    to continue to attend medical appointments?

14         A.   I don't recall.

15              (Deposition Exhibit No. 13 was marked for

16    identification by the reporter.)

17              MR. MILLS:  I am so glad you are doing

18    these sequentially, too.  It drives me nuts when people

19    want to start over at deposition.  It drives me crazy.

20              MS. FRANCIS:  I agree.

21    BY MS. FRANCIS:

22         Q.   The court reporter has handed you what has been

23    marked as Exhibit No. 13.  Have you seen this document

24    before?

25         A.   Yes.

1      Q.    Is this the document that you provided to

2   Ms. Siggerud that is referenced in Exhibit 12 at paragraph

3   23?

4      A.    I don't recall.

5      Q.    Exhibit -- what is Exhibit No. 13?

6      A.    It is a return to work notice.

7      Q.    Did you obtain any other return to work notice

8   that you can recall other than Exhibit No. 13?

9      A.    No.

10     Q.    And did you give Exhibit No. 13 to Ms. Siggerud?

11     A.    Yes.

12     Q.    And this Exhibit 13 indicates that you have no

13  limitations at this time.  Patient is cleared to return to

14  work.

15              Correct?

16     A.    Yes.

17     Q.    And it is dated January 16th of 2013, correct?

18     A.    Yes.

19     Q.    Does it indicate in Exhibit No. 13 that you need

20  an ongoing accommodation of any sort?

21     A.    No.

22     Q.    In Exhibit No. 12 at paragraph 27, it indicates

23  that on July 8th that you requested in writing a medical

24  accommodation; is that correct?

25     A.    Yes.

1    Q.   Why did you feel the need to put this request in

2    writing when in the past you had just spoken with

3    Ms. Siggerud about time that you needed for medical

4    appointments?

5    A.   In the past she had been very supportive, but as

6    the time had gone on and I attended more and more medical

7    appointments, when we would have conversations, I would

8    feel that she would be very short with me or that she

9    would be very agitated just in our conversations of what

10   was going on with my health and the number of appointments

11   that I was attending.

12   Q.   Would you tell Ms. Siggerud when you had medical

13   appointments every time that you were going to an

14   appointment?

15   A.   I don't recall.

16   Q.   But you perceive that Ms. Siggerud was upset

17   about the number of appointments that you had, correct?

18   A.   Yes.

19   Q.   Can you explain to me how -- if Ms. Siggerud

20   didn't know when you were taking medical appointments, how

21   she could be upset about you taking so many appointments?

22             MR. MILLS:  Object to the form.

23             Go ahead.

24             THE WITNESS:  I -- I had an HR calendar or

25   I would e-mail her to let her know.

1    BY MS. FRANCIS:

2         Q.   And when you would e-mail her to let her know,

3    would you do that on every occasion that you took a

4    medical appointment?

5         A.   I don't recall.

6         Q.   It is possible you didn't?

7         A.   I don't recall.

8         Q.   So on occasion you would let her know?

9                   MR. MILLS:  Object to the form.

10                  THE WITNESS:  I -- I don't -- I am -- I am

11   not sure.

12   BY MS. FRANCIS:

13        Q.   Do you have any specific memory of e-mailing

14   Ms. Siggerud and telling her you were taking a medical

15   appointment?

16        A.   Yes.

17        Q.   On how many occasions do you have that specific

18   memory?

19        A.   I don't recall.

20        Q.   Okay.  Well, let's talk about the first one.

21   You said you had a specific memory of telling her you were

22   going on a medical appointment.  What is the first one you

23   recall?

24        A.   It would have been after I returned from leave

25   in January.

1      Q.   Why did you feel the need to discuss this

2  specific appointment with Ms. Siggerud?

3      A.   Because I had just returned from the -- the

4  general leave.

5      Q.   And so this would have been in what time frame?

6      A.   I am -- I am not sure.

7      Q.   In January of 2013 or prior to that?

8      A.   In January of 2013.

9      Q.   And was this done verbally or by e-mail?

10     A.   Verbally.

11     Q.   Let me go back to something else you said.  You

12  said something about having a calendar that you put

13  appointments on, correct?

14     A.   Yes.

15     Q.   When you put appointments for medical -- strike

16  that.

17            Would you put your medical appointments on

18  your work calendar?

19     A.   No.  I wouldn't put them as medical

20  appointments.  I would put them as a meeting, as Rachael

21  instructed me to do.

22     Q.   So there would be no way for anyone to tell by

23  looking at your calendar that you were going on a medical

24  appointment versus an appointment with a manager, correct?

25     A.   I -- I am -- I am unaware.  I am -- I am not

1   sure.

2        Q.   You wouldn't identify that it was a medical

3   appointment on your calendar?

4        A.   I -- I am not sure.

5        Q.   Well, I am getting confused now.  Would you put

6   your medical appointments on your work calendar?

7        A.   No.

8        Q.   So if another employee of G&K was looking at

9   your work calendar -- because other people had access to

10  your calendar, correct?

11       A.   Yes.

12       Q.   The Phoenix plant had access to your calendar?

13       A.   Yes.

14       Q.   They would not be able to tell when you were

15  taking a medical appointment versus when you had some

16  other work-related appointment, correct?

17       A.   I -- I am not unsure if they would know what

18  kind of appointment it was.  It would just say "meeting."

19       Q.   So how would they know it was a medical

20  appointment?

21       A.   I -- I am not sure.

22       Q.   If you don't say it is a medical appointment,

23  how would anyone know at work that it is a medical

24  appointment?

25       A.   Well, in my conversations with Jacob Briscoe, I

1    would let him know that I was leaving the plant.

2    Verbally, I would go to his office and say:  Hey, I'm

3    leaving, going to a doctor's appointment.  I will be back.

4        Q.    So if you told somebody, they would know?

5        A.    Yes.

6        Q.    But by looking at your calendar, no one would --

7    within G&K could tell that you were going to a medical

8    appointment, correct?

9        A.    No.

10       Q.    I am not correct?

11       A.    No, you are correct.  They would not know, not

12   from reading the calendar.

13       Q.    Okay.  So let's go back to your conversation

14   with Ms. Siggerud.  You said you had a specific memory of

15   telling her about certain appointments.  So the first one

16   we said was sometime in January of 2013, correct?

17       A.    Yes.

18       Q.    And this was a verbal conversation --

19       A.    Yes.

20       Q.    -- and over the phone?

21       A.    Yes.

22       Q.    And what did you tell her?

23       A.    I don't recall specifically what I said to her.

24       Q.    To the best of your memory, what did you say?

25       A.    That I had the need to attend a follow-up

1    appointment.

2         Q.   And what was her response?

3         A.   I don't recall.

4         Q.   Was she upset?

5         A.   Not that I recall.

6         Q.   When is the next time you have a specific memory

7    of talking to Ms. Siggerud about taking time off for a

8    medical appointment?

9         A.   I -- I don't recall.  There was -- there was a

10   lot of appointments.

11        Q.   I understand there were a lot of appointments.

12   What I am wanting to talk about is when you told

13   Ms. Siggerud that you had to take time off for an

14   appointment specifically.  You previously testified that

15   you did have a specific memory of that happening.  We

16   talked about one.  Are there more that you have a specific

17   memory of?

18        A.   June of 2013.

19        Q.   And tell me about your memory.  What do you

20   recall?

21        A.   I was going to have surgery, and so I called her

22   to have a conversation with her to let her know that I

23   would need to have that day off to have the surgery

24   performed and then I would return the following day.

25        Q.   And what was her response?

1        A.    I don't recall.

2        Q.    Was the surgery related to the medical issues

3   that you had requested medical leave for?

4        A.    Yes.

5        Q.    So it was one of the ongoing issues from the

6   birth of your son, correct?

7        A.    Yes.

8        Q.    Was Ms. Siggerud upset about your need to take

9   time off for this surgery?

10       A.    She seemed agitated by me requesting to -- to

11   take off to attend the surgery.  She asked me quite a few

12   questions about why and how long, you know, I would be out

13   or how long it would be ongoing.

14       Q.    Why did she -- in what way did you perceive her

15   to be agitated?  What did she say besides asking you those

16   questions that led you to believe she was agitated?

17       A.    She would be very short with me or she would

18   overtalk me when I was trying to explain things to her.

19       Q.    Can you be more specific?

20       A.    If I was trying to explain something -- if she

21   would ask me a question and I would try to explain it to

22   her, she would cut me off and be just short in her words

23   with me, very abrupt with what she was saying, or she

24   would just -- she wouldn't let me finish my sentence or

25   kind of overtalk me.

1        Q.   Did she say anything specific about your medical

2    appointment other than asking you questions about the when

3    and how long, the details of how long you would be out?

4        A.   She stated that she felt that they were becoming

5    more and more common, that I was attending more

6    appointments, and I felt a frustration from her that I was

7    having to attend more doctors' appointments or -- or be

8    out of the business due to the health issues that I was

9    having.

10       Q.   Did you feel that you could complete your job

11   duties irrespective of having to attend these appointments

12   or have this surgery done?

13       A.   Yes.  I was -- I was there every day outside of,

14   you know, the day of having the surgery.  I performed my

15   job every day.  I even worked from home, you know, if

16   there was a -- a task that needed to be completed as well,

17   so ...

18       Q.   Did she permit you to take time off for the

19   surgery?

20       A.   Yes.

21       Q.   And after you returned from work, did she -- or

22   after you returned to work from the surgery, did she make

23   any comments relative to you taking that time off?

24       A.   She -- she -- she did.

25       Q.   What did she say?

1      A.    She called me.  It was in the conversation that
2  was recorded from June.
3      Q.    And during that conversation, she made a comment
4  about your surgery?
5      A.    No, not about the surgery.
6      Q.    Okay.  The -- I was asking specifically, did she
7  ever make any comment about the time you took for the
8  surgery?
9      A.    Yes, she stated that there was an issue with a
10 perception from other managers that I was away from work
11 too much.
12     Q.    Okay.  Did she make a comment specific to the
13 surgery?
14     A.    No.
15     Q.    But you believe when she talked to you about
16 this perception that it was in reference to the time you
17 took off for the surgery?
18     A.    That was one of the times, yes.
19     Q.    She didn't say that specifically; that was your
20 interpretation of what she said, correct?
21     A.    Yes.
22     Q.    Do you have a specific memory of any other
23 conversations with Ms. Siggerud about you needing time off
24 for medical appointments?
25     A.    In July after I requested the ADA accommodation.

1      Q.    You told her that you were going to attend a

2  specific appointment?

3      A.    Yes.

4      Q.    And what was that for?

5      A.    I don't recall.

6      Q.    And how much time were you asking off for?

7      A.    Just an hour.  I normally went on my lunch, so

8  it would normally just be away from the business for about

9  an hour or so.

10     Q.    And this was after you submitted a written

11 request for an ADA accommodation?

12     A.    Yes.

13     Q.    And what did Ms. Siggerud respond?

14     A.    I -- I don't recall.

15     Q.    Was she upset that you asked for this time off?

16     A.    I felt that -- that she was agitated, yes.

17     Q.    Why?

18     A.    I -- I just -- I always get the comment from her

19 that it was becoming an issue and that other managers were

20 having an issue with the amount of time that I was taking

21 away from work, and due to the fact of the time that I was

22 taking away, that they felt that I was not engaged because

23 I was not there when I went to my doctors' appointments.

24     Q.    Did Ms. Siggerud say to you specifically that

25 the number of medical appointments that you were taking

1    was becoming an issue?

2        A.   No.  She said, "The time that you are missing is

3    becoming an issue."

4        Q.   Did she tell you that there was a perception

5    about your availability that was an issue?

6        A.   Yes.

7        Q.   Did she specifically reference the time you were

8    taking for doctors' appointments or that there was a

9    perception that you were unavailable?

10       A.   That there was a perception I was -- I was

11   unavailable.

12       Q.   And you believed that perception to be because

13   of a change in your office space, correct?

14               MR. MILLS:  Object to the form.

15               THE WITNESS:  Not completely.

16   BY MS. FRANCIS:

17       Q.   But you believe the perception started when

18   Mr. Briscoe moved your office location, correct?

19       A.   No.

20       Q.   You don't believe that is when this all started?

21       A.   No.

22       Q.   When did the perception start in your view?

23       A.   Specifically?

24       Q.   Yeah, the perception about you being

25   unavailable.

1     A.    I would say about March of 2013.

2     Q.    And who do you believe had the perception that

3  you were unavailable?

4     A.    Jacob Briscoe and Mitch Rubinoff.

5     Q.    And why do you believe that they had this

6  perception of you in March of 2013?

7     A.    Due to the fact that my role had changed and

8  that I was not completely dedicated to them and that I was

9  supporting other areas as well, and I would be in meetings

10 with Los Angeles or other locations, so I would be in my

11 office a lot and it could be possibly on the phone or

12 working on a project for a different location.

13    Q.    So you believe that they had this perception of

14 you because of your travel --

15    A.    Yes.

16    Q.    -- and because you were supporting people other

17 than them?

18    A.    That and due to the fact of me being out to

19 attend doctors' appointments.

20    Q.    Did Mr. Briscoe or --

21              I think you said his name was Mitch,

22 correct?

23    A.    Um-hum, yes.

24    Q.    -- know when you were attending medical

25 appointments?

1      A.   Did they know?

2      Q.   Yes.

3      A.   Jacob Briscoe knew.

4      Q.   On the occasions that you would have told him,

5  correct?

6      A.   Correct.

7      Q.   How many occasions did you tell Mr. Briscoe you

8  were missing work due to a medical appointment?

9      A.   I don't recall.

10     Q.   Do you have any specific memory of ever doing

11  that?

12     A.   Not specifically, no.

13          THE WITNESS:  Do you mind if we take a

14  restroom break?

15          MS. FRANCIS:  That's fine, yeah.

16          VIDEO TECHNICIAN:  This is the end of media

17  No. 1 in the continuing deposition of Brandy Lane

18  Williams.  Today's date is June 14, 2016.  The time is

19  10:31 a.m.

20          (Recess ensued from 10:31 a.m. until

21  10:43 a.m.)

22          VIDEO TECHNICIAN:  We are back on the

23  record.  This is the beginning of media No. 2 in the

24  continuing deposition of Brandy Lane Williams.  Today's

25  date is June 14, 2016.  The time is 10:43 a.m.

1            MR. MILLS:  Carrie, before we go on, Brandy

2      would like to clarify an answer that she made to a

3      question very early on in the deposition.

4            MS. FRANCIS:  Why don't we do that in

5      redirect?

6            MR. MILLS:  Okay.  That's fine.  Either

7      way.

8            MS. FRANCIS:  Okay.

9      BY MS. FRANCIS:

10        Q.   I want to finish the questioning related to

11     Mr. -- Mrs. Siggerud because we kind of got off on a

12     tangent on Jake, but we were talking before about your

13     specific recollection of having conversations with

14     Ms. Siggerud about taking time off for medical

15     appointments.  Are there any other occasions that you

16     specifically recall talking to her about missing work

17     because of medical appointments that we have not already

18     discussed on the record?

19        A.   Yes.

20        Q.   Okay.

21        A.   I would have conversations with Rachael weekly.

22     We would have our -- what -- what she scheduled as our

23     one-on-one meetings, and I would give her an update about

24     my medical issues and just the appointments the next week

25     that I would be attending.

1      Q.    Did you do that every week?

2      A.    Every time that we would talk, I would give her

3    an update.

4      Q.    And what was her response to that information?

5      A.    "Okay.  Thank you for letting me know."

6      Q.    Did she seem agitated?

7      A.    She seemed frustrated that, you know, I was

8    letting her know that I was having more appointments.

9      Q.    In what way?

10     A.    She would ask me maybe, "How long is this going

11   to last?" or "Do you know how much longer you will have to

12   go to appointments?" or "Have they figured out

13   specifically what is wrong with you," things like that.

14     Q.    Anything that you considered to be derogatory?

15     A.    Just -- just -- just from her saying, you know,

16   "This is happening a lot."  That's how she would say it to

17   me, "This is happening a lot."

18     Q.    She used those specific words to your memory?

19     A.    Yes.

20     Q.    Was this before or after you requested an ADA

21   accommodation in writing?

22     A.    It was before.

23     Q.    After you requested the ADA accommodation in

24   writing, did Ms. Siggerud ever make a comment about you

25   taking a lot of time for medical appointments?

1      A.    Yes.

2      Q.    What did she say specifically?

3      A.    That it was becoming an issue within the Phoenix

4  business with the perception that I was -- was not there

5  because I was attending a lot of appointments or I was

6  missing a lot of work.

7      Q.    And I think we already covered this, but you are

8  saying it again so I want to be clear.  Did Ms. Siggerud

9  specifically say that there was a perception that you were

10 unavailable due to your medical appointments, or did she

11 specifically just talk about there was a perception of

12 your unavailability?

13     A.    When she would tell me about managers and them

14 making complaints that I was not there, it was about their

15 perception.  When she would talk to me specifically about

16 me and her, she would tell me that she felt that I was

17 missing a lot of work due to my -- due to my medical

18 appointments.

19     Q.    So you have a specific memory of her telling you

20 that you were missing too much time from work due to your

21 medical appointments after you requested an ADA

22 accommodation in writing?

23     A.    Yes.  And I told her that I felt concerned and I

24 felt pressured due to my health issues and I felt that I

25 was being forced out of the business due to them always

1  having an issue around me taking time away from work to

2  attend the doctors' appointments.

3      Q.   When you say "they" having an issue, who

4  specifically did you believe had an issue about you taking

5  time off for medical appointments?

6      A.   I believed it to be Jacob Briscoe and Mitch

7  Rubinoff, but in conversations with Rachael, she would not

8  tell me specifically who it was.  She told me that was not

9  important but that it was management in Phoenix.

10     Q.   So Ms. Siggerud told you that she believed that

11 management in Phoenix was having an issue with the time

12 off that you were taking for medical appointments?

13     A.   No, that they had an issue with my time away

14 from work.

15     Q.   Did she say "time away from work," or did she

16 say "the perception of your unavailability"?

17     A.   She would say both.

18     Q.   Did this conversation with Ms. Siggerud that you

19 just described happen in one of your recorded

20 conversations?

21     A.   That was one of the times that we had the

22 discussion, yes.

23     Q.   I want to be specific.  The time that

24 Ms. Siggerud told you that she had a concern herself with

25 the time that you were taking for medical appointments,

1    was that in one of the recorded conversations?

2        A.    That is not how she stated it, no.

3        Q.    Well, that's what you told me she said.

4        A.    Not in the recorded conversation.

5        Q.    Okay.  Well, I want to talk about the

6    conversation that you just described to me --

7        A.    Um-hum.

8        Q.    -- where Ms. Siggerud said to you that she

9    herself had problems with the amount of time that you were

10   taking away from work for medical appointments.  Do you

11   recall telling me that?

12       A.    Yes.

13       Q.    When did that conversation happen?

14       A.    I -- I don't recall a specific date.

15       Q.    And was that one of the conversations that you

16   recorded?

17       A.    No, not that time.

18       Q.    Did that conversation happen after you requested

19   an ADA accommodation in writing?

20       A.    No.

21       Q.    When Ms. Siggerud made the comment to you that

22   she was concerned about the time that you were missing for

23   medical appointments, did she also suggest to you that you

24   request intermittent FMLA leave to deal with that concern?

25       A.    Yes.

1      Q.   And was it after that conversation that you made

2  the formal request for an ADA accommodation in writing?

3      A.   Which conversation specifically?

4      Q.   After this conversation where Ms. Siggerud

5  suggested that in order to deal with the amount of time

6  that you were having to take for medical appointments that

7  you should take intermittent FMLA, did you make the formal

8  ADA request for an accommodation, the one you submitted in

9  writing?

10      A.   I don't understand the question.

11      Q.   Sure.  Let me rephrase it.

12      A.   Okay.

13      Q.   You told me that in the conversation where

14  Ms. Siggerud suggested to you that she was concerned about

15  the time that you were taking for medical appointments,

16  that she also suggested that you apply for intermittent

17  FMLA leave, correct?

18      A.   No, not at that time.

19      Q.   How long after that conversation did she suggest

20  you take FMLA leave?

21      A.   She suggested it when I requested the ADA

22  request in writing, not during that conversation.

23      Q.   How soon after your conversation with

24  Ms. Siggerud about missing time from work for medical

25  appointments did you request the ADA accommodation in

1    writing?

2         A.    I don't recall an exact date.

3         Q.    Can you approximate for me?

4         A.    A week maybe.

5         Q.    Not long after?

6         A.    Not long.

7         Q.    Is it fair to say that is what prompted you to

8    submit the request in writing?

9         A.    What -- what prompted -- I'm sorry?

10        Q.    The conversation with Ms. Siggerud.

11        A.    It was multiple of previous conversations that

12   we had leading up to that point, not specifically that

13   one, but it was our weekly meetings that escalated it to

14   me having a concern of feeling that there was an issue

15   with me missing work due to my appointments.

16        Q.    And so you believe that within a week you

17   submitted that request in writing?

18        A.    If I had to guess.

19        Q.    So it was before your ADA request that

20   Ms. Siggerud took an issue with your attendance, correct?

21        A.    Yes.

22        Q.    And the company granted your request for

23   intermittent FMLA leave, correct?

24        A.    Once they received the documentation from my

25   doctor, yes, they did.

1      Q.   Even though you didn't -- strike that.

2           Even though you were not eligible for FMLA

3   leave at that point in time, correct?

4      A.   I was eligible for FMLA.

5      Q.   Hadn't you used all your FMLA time for the birth

6   of your son?

7      A.   From the year prior.

8      Q.   And when did it start again?

9      A.   It is on a rolling calendar, so every -- every

10  -- every year.

11     Q.   And when does the year start for the company?

12     A.   It would -- it would be from the time that you

13  took the leave.  It wouldn't be from the -- the time with

14  the company.

15     Q.   Hadn't you taken more than three months' time

16  off in the preceding year under FMLA already at the time

17  that you requested your intermittent FMLA leave?

18     A.   Yes.

19     Q.   So you didn't have any more FMLA time, correct?

20     A.   I had just become eligible again.  We were at

21  that year mark for me to become eligible to obtain FMLA

22  again.

23     Q.   Didn't you return from your FMLA leave in

24  October of 2012?

25     A.   Yes.

1      Q.    And you were requesting FMLA leave again on

2    July 8th of 2013, correct, or in that time frame, July of

3    2013?

4      A.    July of 2013.  Rachael told me that she had

5    checked with the benefits department and that they had

6    made her aware that I was eligible for FMLA and she

7    suggested that I request leave.

8      Q.    Was there any concern with how that request for

9    intermittent FMLA leave was handled?

10     A.    Yes.

11     Q.    What were your concerns about how the request

12   for leave was handled?

13     A.    There were questions -- it took them a while to

14   get me the paperwork, and Rachael had made a -- a response

15   to the benefit department that she wanted to follow my

16   leave closely and be very involved in it.

17     Q.    Were you aware that she had made that request at

18   the time that you were submitting your FMLA leave?

19     A.    Yes.

20     Q.    How were you made aware that she had made that

21   comment?

22     A.    She told me that she would work closely with me

23   through the leave and that she would monitor my leave with

24   Marie Smith and Nikki Kietzer.

25     Q.    Did she indicate to you why she wanted to work

1    closely with you through the leave?

2        A.   She wanted to make sure of the length of time

3    that I was taking off and, because it was intermittent, of

4    the number of hours that I was taking to go towards the

5    leave.

6        Q.   Did she indicate any other reason that she

7    wanted to work closely with you to manage the leave?

8        A.   She wanted to make sure that it didn't continue

9    to affect my relationship with the Phoenix management team

10   due to the perception that I was not available in the

11   business due to me going to appointments.

12       Q.   Did she suggest anything -- any other reason

13   that she wanted to closely monitor your leave?

14       A.   No, not that I am aware of.

15       Q.   And did her comment concern you?

16       A.   It did.

17       Q.   Why?

18       A.   I -- I felt that she was looking for a reason to

19   try to get me to quit my job or that she was making it the

20   main point of our conversations when we would have our

21   meetings every week.

22       Q.   Did she say anything else to you that you

23   haven't already told me on the record about your leave

24   that made you uncomfortable?

25       A.   I don't recall.

1        Q.    So she told you that she needed to be aware of

2   when you were taking leave because it was intermittent and

3   she needed to know how to track that for purposes of

4   eligibility, correct?

5        A.    That and to make sure that the Phoenix business

6   knew where I was at all times and that she didn't want

7   them to think that I was not engaged.

8        Q.    Did you believe that her need to track your

9   leave to keep account of the hours that you were using for

10  the intermittent FMLA time was something that she needed

11  to do?

12       A.    I -- I don't feel that it was something that she

13  needed to do specifically.  I felt that I should have had

14  more of that relationship with the benefits department,

15  with the employee relations manager and then the benefits

16  manager.  They kept track of -- of the leave.

17       Q.    How?

18       A.    They would -- they would process the paperwork,

19  and then they would request time of when I would take off.

20       Q.    Would you -- how would you tell the benefits

21  people when you were using your FMLA intermittent leave

22  time?

23       A.    Well, Rachael requested that I tell her and then

24  she would tell them.

25       Q.    Did you object to that at all?

1        A.    No.

2        Q.    Do you think it was important for Rachael to

3    know when you were taking time off for medical

4    appointments?

5        A.    I do think that it was important for her to know

6    where I was.  She was my boss.

7        Q.    Is there a business reason that you can think of

8    that she would need to track that?

9        A.    No.

10       Q.    You don't think that she needs to know when you

11   are working and when you are not working?

12       A.    No, I do believe that she should have known when

13   I was working, when I wasn't.

14       Q.    Do you believe that the business also needed to

15   track when you were using FMLA time?

16       A.    Yes, the benefits department, yes.

17       Q.    Did you ever tell Ms. Siggerud that you would

18   prefer to deal with the benefits department directly?

19       A.    I don't recall.

20       Q.    You don't recall ever doing that?

21       A.    No.  I just did what she instructed me to do as

22   far as requesting the leave and then who she would -- who

23   she wanted me to keep in contact with.

24       Q.    Did you have conversations with Ms. Siggerud

25   about the perception of your unavailability having nothing

1    to do with the time that you were taking off for medical

2    appointments?

3                    MR. MILLS:  Object to the form.

4    BY MS. FRANCIS:

5        Q.   Let me rephrase that.

6                    You said you would usually take these

7    medical appointments during lunch, correct?

8        A.   Yes.

9        Q.   And you would typically only do that once or

10   twice a week, correct?

11       A.   Approximately.

12       Q.   So explain to me how you believe the medical

13   appointments created a perception of your unavailability.

14       A.   They could -- my medical appointments, they

15   would be random.  They -- they could possibly be first

16   thing in the morning or they could be last thing at the

17   very end of the day or most of the time I would take them

18   during my lunch if I could.  It just would depend on the

19   availability of the appointment with the doctor.

20       Q.   Okay.  And if you are doing these medical

21   appointments early in the morning, late in the day and

22   during lunch, can you explain to me why you believe that

23   the medical appointments were creating a perception of

24   your unavailability?

25       A.   Because I would be away from the business for

1  the first part of the day or either the end of the day or

2  if I was gone during the middle of the day.

3      Q.   What time would you typically come in if you had

4  a medical appointment in the morning?

5      A.   I -- I don't recall.

6      Q.   What time would you leave in the afternoon if

7  you had an appointment at the end of the day?

8      A.   Around -- I would have to guess and say 3:30,

9  3:45.

10     Q.   And if you took your appointment during lunch

11 when would you typically leave and return back to the

12 office?

13     A.   It could have been anywhere between 11:00 a.m.

14 and noon.

15     Q.   Did you understand that the perception of your

16 unavailability also had to do with issues apart from you

17 taking time to attend medical appointments?

18     A.   No.

19     Q.   Did Ms. Siggerud discuss with you that people

20 thought you were unavailable because you would accept

21 attendance at meetings and then you wouldn't show up to

22 those meetings?

23     A.   I would show up to the meetings.

24     Q.   Okay.  My question was a little bit more

25 specific.

1          Do you want the court reporter to read it

2     back?

3          A.   Yes.

4               (The following requested portion of the

5     record was read back by the reporter.)

6               "QUESTION:  Did Ms. Siggerud discuss with

7     you that people thought you were unavailable because you

8     would accept attendance at meetings and then you wouldn't

9     show up to those meetings?"

10              THE WITNESS:  I -- I don't really

11    understand the way the question is stated.

12    BY MS. FRANCIS:

13         Q.   Okay.  Let me rephrase it.

14              Did Ms. Siggerud discuss with you that

15    people thought you were unavailable because on your

16    calendar you would say that you were going to attend a

17    meeting and then you wouldn't actually come to the

18    meeting?  Did she discuss that with you?

19         A.   Yes.

20         Q.   And did she tell you that that led to the

21    perception of unavailability?

22         A.   Not that entirely.

23         Q.   But in part?

24         A.   In part, yes.

25         Q.   Did she also discuss with you that when you

1    would be late to meetings that that would lead to the

2    perception of your unavailability?

3         A.   She only discussed with me the perception of

4    being late twice.  There was just two meetings.  That was

5    it.  There was nothing outside of that that I was late

6    for, but she did have a conversation with me around two

7    times, that they felt I was not engaged due to me being

8    about five to ten minutes late for two specific meetings.

9         Q.   And did she discuss with you that she was

10   frustrated because you had failed to attend one-on-one

11   meetings with her and you wouldn't call beforehand and let

12   her know that you were going to be unavailable?

13        A.   Yes.

14        Q.   And you also felt that the perception of your

15   unavailability had to do with the fact that your office

16   was moved, correct?

17        A.   That was part of it, yes.

18        Q.   It was a big part of it?

19        A.   It was a very small part.

20        Q.   Isn't that what you think started this whole

21   perception of your unavailability?

22                  MR. MILLS:  Object to the form.

23                  THE WITNESS:  No.

24   BY MS. FRANCIS:

25        Q.   Why did -- strike that.

1              What did you tell Ms. Siggerud about your

2    office move and how you think it was perceived in

3    relationship to your availability?

4         A.    I told her that I felt that due to my previous

5    health issues and then me also going into the new role

6    that I felt that Jake was removing me from the business by

7    moving my office to the front of the plant.

8         Q.    Do you think the office move to the front of the

9    plant made people think that you were not at work?

10        A.    Yes.

11        Q.    Why?

12        A.    It was very hidden.  It was an office behind a

13   -- like a partition of other, like, cubicles, and you

14   couldn't see my door unless you walked, like, directly

15   behind the partitions.

16        Q.    When you worked throughout the day, did you get

17   up and talk to people?

18        A.    Yes.

19        Q.    Did Jake explain to you why he had moved your

20   office location?

21        A.    Yes.

22        Q.    Why?

23        A.    He stated because my HR function was changing,

24   that he felt that the route manager could more utilize the

25   office that I was in for different -- different support

1  for the service department, because I was in the back by

2  the -- by the service department.  My previous job mainly

3  supported the employees and the drivers, so I would be

4  there when they checked in in the afternoon.

5      Q.   And in your new role, you supported management?

6      A.   Yes, in that location and other locations as

7  well.

8      Q.   So you didn't need to have the direct contact

9  with the employees on a daily basis, correct?

10     A.   No, I still supported the employees if they had

11 an issue with the corporate call center or if they had

12 questions.  My role was still to be engaged with all of

13 the employees in all of the locations.

14     Q.   But would you agree with me that it was more

15 specific, that you were to be strategically partnering

16 with management at the locations, correct?

17     A.   Yes.

18     Q.   You were not processing payroll or keeping track

19 of timecards or those daily functions anymore, correct?

20     A.   I did.  I helped assist with that.  I helped the

21 managers because that became part of their job description

22 and part of their roles, so in part of the transition,

23 that was part of my job to help support them through that

24 time, so if they had an issue with payroll or if an

25 employee had an issue with missing hours, they would still

1    come to me and tell me that they were missing an hour, and

2    I would work with the manager.  So I was still partaking

3    in some of my previous job responsibilities to help

4    everyone.

5        Q.   As you were transitioning those duties to the

6    managers on-site, correct?

7        A.   Yes.

8        Q.   But those were not your direct responsibilities

9    anymore, correct?

10       A.   Correct.

11       Q.   So the person that took your office space was

12   somebody that was directly managing the service

13   department?

14       A.   He was not a manager.  He was just a support

15   admin, and they put him in that office, yes.

16       Q.   And he dealt with the departments that were

17   right outside that office?

18       A.   Yes.

19       Q.   Did you object to the office move to Mr. Briscoe

20   -- or Jake?

21       A.   Yes.

22       Q.   What did you say?

23       A.   I told him that I didn't really want to move,

24   that, you know, I -- I was still going to be helping, you

25   know, everyone and all the employees, and I kind of felt

1    like it was taking me away from everyone.

2        Q.   And what did he say?

3        A.   He told me that he needed more space, and I was

4    not on his payroll anymore.  I was a corporate employee,

5    so he should honestly charge me to rent the office he was

6    putting me in up front.

7        Q.   Anything else?

8        A.   Not that I recall.

9        Q.   Did you think that Mr. Briscoe was moving your

10   office because of your medical appointments or your

11   medical condition?

12       A.   No.

13       Q.   So I want to go back to your discussions with

14   Ms. Siggerud about your medical appointments.  We first

15   started talking about your specific memories and we

16   identified a few, and then after we took a break, you

17   explained that you talked to her about your medical

18   appointments on your one-on-one meetings weekly, correct?

19       A.   Yes.

20       Q.   When did you remember that you had those

21   discussions every week with her?  What refreshed your

22   memory?

23       A.   Just remembering back to when we would meet

24   every week when we would have, you know, conversations

25   just updating each other on what was going on.

1          Q.   Okay.  But it was a change in your testimony

2     between the breaks, and so I just wanted to know, did you

3     look at something specifically that refreshed your memory?

4                    MR. MILLS:  Object to the form.

5                    THE WITNESS:  No, no, I didn't look at

6     anything.  I was just thinking back to your question of,

7     you know, when did I remember talking to her or verbally

8     telling her that -- that I was having these appointments,

9     and then I remembered, oh, yeah, we met every week on the

10    phone as a phone conversation to have a one-on-one and she

11    called it to update each other about what was going on

12    with the business of G&K.

13    BY MS. FRANCIS:

14         Q.   And you would tell her every week about the

15    medical appointments that you had upcoming?

16         A.   If I had one at the time, I would make her aware

17    that I had one.

18         Q.   When were these one-on-one meetings?

19         A.   They were every week.

20         Q.   What day?

21         A.   I don't -- I don't recall.

22         Q.   Were they on the same day every week?

23         A.   I don't believe so, but I don't recall

24    specifically which day.

25         Q.   Okay.  Is it possible that they were on the same

1    day at the same time every week?

2         A.   It could be a possibility but they -- they did

3    change if she was traveling or if she canceled them or if

4    she rescheduled with me.

5         Q.   Or if you rescheduled with her?

6         A.   Right, correct.

7         Q.   But was it typically set for the same day and

8    time every week?

9         A.   I -- I believe so.

10        Q.   You just don't remember what day and time,

11   correct?

12        A.   Right.

13        Q.   When you requested the intermittent FMLA

14   leave -- we talked about the concerns that you believe

15   Ms. Siggerud had about managing closely that leave time.

16   Was there any other reason that you are -- strike that.

17             Other than what we have already talked

18   about with Ms. Siggerud, is there -- were there any other

19   concerns you had with how G&K handled your request for

20   intermittent FMLA leave?

21        A.   I didn't have any concerns, but I felt -- I felt

22   pushed to make that decision by Rachael when she suggested

23   that I -- that I take the leave.

24        Q.   And did that concern you?

25        A.   It did.

1     Q.    Why?

2     A.    Because I felt that I was performing my job as I

3  normally would every day, that I was at work every day and

4  performing my -- my normal job functions and just with the

5  support of, you know, going, you know, to doctors'

6  appointments, you know, on my lunch or, you know, in the

7  morning or in the afternoon, that I could have continued

8  to perform my job as normal just with the support from

9  her.

10    Q.    So you didn't think you needed to have FMLA

11 intermittent leave?

12    A.    I didn't think about it.

13    Q.    But you were concerned that she suggested that

14 you apply for intermittent FMLA leave?

15    A.    I was.

16    Q.    And that's because you didn't think you needed

17 to be on intermittent FMLA leave?

18    A.    No.  I -- I felt that it came from -- because of

19 the fact that I requested an ADA accommodation in writing.

20    Q.    I guess I am having a hard time understanding

21 why that concerned you.

22    A.    Because I could have functioned in my job with

23 an accommodation without taking the leave.

24    Q.    So you didn't think you needed the FMLA

25 intermittent leave?

1    A.    No.

2    Q.    No, I am correct, you didn't think that you

3    needed it?

4    A.    Correct.

5    Q.    Okay.  Did G&K also grant your request for an

6    ADA accommodation after you submitted that request in

7    writing in July?

8    A.    They never really addressed the ADA

9    accommodation.  It pretty much went from "We got your

10   letter for a request" to "You should request FMLA."

11   Q.    I am going to show you what has been previously

12   marked as Exhibit No. 4.

13             MR. MILLS:  No. 4 you said?

14             MS. FRANCIS:  Yes.

15   BY MS. FRANCIS:

16   Q.    Is this -- is Exhibit No. 4 the request for an

17   ADA accommodation that you submitted in writing?

18   A.    Yes.

19   Q.    And you copied somebody named Nikki Kietzer on

20   this request.  Who is Nikki Kietzer?

21   A.    She was in the benefits department at the

22   corporate office.

23   Q.    Do you know what her position was, her job

24   title?

25   A.    I think just benefits specialist.

1      Q.   And what made you submit this request in

2   writing?

3      A.   Just from all of the ongoing conversations with

4   -- with Rachael and just always with -- with the talk of

5   there being an issue around me taking time away from work

6   to go to doctors' appointments.

7      Q.   So that was happening -- those discussions were

8   happening prior to your ADA request?

9      A.   In writing --

10     Q.   No, the discussion --

11     A.   -- but verbally I had requested for her to

12  support me, but we did we have conversations.

13     Q.   So there was conversations about your time off

14  for medical appointments prior to your request for ADA,

15  correct?

16     A.   Yes.

17     Q.   And the accommodation that you requested was

18  time away from work to attend medical appointments,

19  correct?

20     A.   Medical appointments and counseling.

21     Q.   So the accommodation you were requesting was

22  time off from work, correct?

23     A.   Yes.

24     Q.   Or time during the day to take or go to your

25  medical appointments?

1          A.    Yes.

2          Q.    You felt like you could still complete your

3    daily job requirements even when you were taking time to

4    go to the medical appointments, correct?

5          A.    Yes.   I had been since my previous leave.

6          Q.    So you didn't actually want a reduction in your

7    schedule; you just wanted permission to come and go to

8    attend these appointments?

9          A.    Yes.

10          Q.    After you submitted Exhibit No. 4, were you

11    permitted to attend all the medical appointments that you

12    needed to go to?

13          A.    Yes.

14          Q.    Was there ever an occasion where someone at G&K

15    told you you could not have time off to attend a medical

16    appointment?

17          A.    No.   They -- because they were not aware that I

18    was going to medical appointments.   They were just on the

19    calendar as a meeting, so I would say no.

20          Q.    Well, Ms. Siggerud knew because you told her in

21    the one-on-one meetings, correct?

22          A.    Yes.

23          Q.    Did she ever tell you that you couldn't take

24    time to attend a medical appointment?

25          A.    No.

1       Q.    At the time you wrote Exhibit No. 4, did -- had

2    you retained counsel?

3       A.    No.

4       Q.    Did anyone assist you in writing Exhibit No. 4?

5       A.    No.

6       Q.    Did you research or do any online investigation

7    as to what you should put in a request for an

8    accommodation?

9       A.    Yes.

10      Q.    What -- what sites did you go to?

11      A.    I don't remember specific sites, but I just

12   Googled, you know, ADA request in writing or writing an

13   ADA request.

14      Q.    Did you do any other kind of research?

15      A.    Not that I recall.

16      Q.    Did you talk with anyone?

17      A.    No.

18      Q.    And in your role as an HR representative, up to

19   this point in time where you wrote Exhibit No. 4, had you

20   ever received an ADA request from an employee --

21      A.    No.

22      Q.    -- in any of your jobs that you held?

23      A.    No.

24      Q.    To your knowledge, was Mr. Briscoe aware that

25   you had made a formal request for an ADA accommodation?

1      A.    Yes.

2      Q.    How do you know he was aware?

3      A.    Rachael told me that she had a conversation with

4   him.

5      Q.    Did she tell you what specifically she told him?

6      A.    No.

7      Q.    Did he ever discuss with you your ADA

8   accommodation request?

9      A.    Not that I recall.

10      Q.    Did Mr. Briscoe ever talk to you about any of

11   the time you took to attend to medical appointments?

12      A.    Not that I recall.

13      Q.    Did Mr. Briscoe ever make any comment to you

14   about your medical condition that you perceived to be

15   discriminatory or derogatory?

16      A.    Can you restate the question?

17      Q.    Sure.  We talked about when you thought

18   Ms. Siggerud made comments that you believe were

19   derogatory or discriminatory about the time that you were

20   taking for medical appointments.  Did Mr. Briscoe ever say

21   anything like that to you?

22      A.    Yes.  He made a comment previously when I had

23   returned from leave from the birth of my son that -- we

24   were at lunch one day and he stated that he didn't

25   understand how women could juggle a career and having

1    children in the workplace, and he thought that they should

2    make a choice between one or the other because it took too

3    much time away from them at work and that's why he had his

4    wife stay at home.

5         Q.   Did he make any comments about your medical

6    condition?

7         A.   No, not directly.

8         Q.   Any comment about the time you were taking to go

9    to medical appointments that you believed was

10   discriminatory or derogatory?

11        A.   Not directly, no.

12        Q.   When you say "not directly," did he do that

13   indirectly?

14        A.   I -- I am unaware of the conversations he had

15   with Rachael.

16        Q.   But do you believe that somebody told you that

17   he made comments that were discriminatory about your

18   medical condition?

19        A.   Rachael was saying that someone was making --

20   had concerns about the time I was taking away to go to

21   doctors' appointments, but she would not share with me

22   specifically who it was.

23        Q.   So when you said "indirectly," you believe he

24   may have made comments, but not directly.  Is that what

25   you are referring to?

1        A.    Yes.

2        Q.    And did Mitch -- what is Mitch's last name?

3        A.    Rubinoff.

4        Q.    -- Rubinoff make any comments about the time you

5    were taking for medical appointments that you believed was

6    discriminatory or derogatory?

7        A.    Not directly medical appointments, but that, you

8    know, I was -- was not there because I was gone away from

9    the business.

10       Q.    And he made those comments to you?

11       A.    Yes.

12       Q.    What would he say?

13       A.    "Wow, you are sure gone a lot," or "We hardly

14   see you anymore since you had your son," or he would ask

15   me, you know, "Are you doing okay?  You seem to still be

16   having issues, you know, since returning from leave."

17   Just -- just kind of like, you know, casual conversation

18   here and there.

19       Q.    And what would you respond?

20       A.    That I was -- that I was okay, that everything

21   was fine.

22       Q.    Do you believe that his comments were

23   inappropriate?

24       A.    Not that I recall.  I don't recall.

25       Q.    Did you ever tell him that you disliked what he

1   was saying or that he should stop making those kinds of

2   comments?

3       A.   I don't recall.

4       Q.   When he would say to you, "We never see you

5   anymore," could that comment have been about your

6   overseeing other locations and not your medical condition?

7       A.   I am not sure.  I would be reading into what he

8   said.

9       Q.   Well, I asked you specifically about comments

10  relating to your medical condition and then you told me

11  that comment, so you obviously perceived that comment to

12  be about your medical condition, correct?

13      A.   I felt it could have been related to it.

14      Q.   Could it also have been because you were

15  traveling now?

16      A.   It could have been.

17      Q.   Or his comment that we never see you, you are

18  not around or you are gone a lot, those could also be

19  related to your handling of new locations, correct?

20      A.   Possibly.

21      Q.   Did anyone else at G&K make any comments about

22  your medical condition or the time you were taking off

23  work that we have not discussed that you believed was

24  discriminatory or derogatory in any way?

25      A.   Not that I recall, no.

1    Q.   And did you make any notes about when there was

2  a comment made that you felt was inappropriate?

3    A.   No, but I would tell Rachael about them during

4  our one-on-one weekly meetings.

5    Q.   And what was her typical response?

6    A.   "Well, just try to stay positive, you know, have

7  a good relationship with everyone, just reassure them that

8  you are there to support them."

9    Q.   Did you indicate to her that you wanted her to

10  take any action to make sure that those types of comments

11  stopped?

12    A.   I don't recall.

13    Q.   Were you talking about this perception of

14  availability or were you actually complaining of

15  discrimination when you would have these conversations

16  with her?

17    A.   I -- I don't recall.

18    Q.   Did you use the word "discrimination"?

19    A.   I -- I don't recall specific words that I said

20  to her.

21    Q.   Did you ever tell Ms. Siggerud that you thought

22  you were being treated differently because of your medical

23  condition?

24    A.   Yes.

25    Q.   Differently than who?

1   A. Differently than other generalists in the same

2 position as myself.

3   Q. How do you know how generalists in different

4 positions were being treated?

5   A. We would have weekly meetings or the other

6 generalists and I would have conference calls together or

7 we would call each other for support to ask them about

8 ideas of what they are doing in their business and in the

9 new role.

10   Q. Tell me specifically who you think was being

11 treated different than you because of your medical

12 condition.

13   A. Janelle and Kaela.

14   Q. Okay.  How was Janelle treated differently than

15 you?

16   A. I don't feel that they were as discussed as much

17 as being away from the business when Janelle would take

18 appointments to go to maternity appointments or doctors'

19 appointments -- as much with her as it was with me and me

20 taking time away.  Janelle would state to me, "Well,

21 Rachael doesn't really say anything to me when I go to my

22 appointments.  She is fine with them."

23   Q. And do you know how much time off Janelle was

24 taking?

25   A. I -- I do not.

1    Q.   Did you talk with Rachael about that?

2    A.   No.

3    Q.   So did you ever say to Rachael, "I think you are

4  treating me differently than Janelle because Janelle tells

5  me you don't care about the time that she takes off for

6  pregnancy-related appointments"?

7    A.   No, not specifically, but I did tell her that I

8  felt that she was retaliating against me for requesting

9  time away from work.

10   Q.   Okay.  Well, we will get there.

11   A.   Okay.

12   Q.   Because what I am wanting to focus in on now is

13  how you believe that you were being treated differently

14  because of your medical issues, and you just told me you

15  compared yourself to Janelle, and Janelle was taking

16  medical appointments and Rachael apparently didn't have a

17  problem with what Janelle was doing, correct?

18   A.   Correct.

19   Q.   Did you ever tell Rachael that?

20   A.   No.

21   Q.   Did you ever tell anyone at G&K that you thought

22  that was going on?

23   A.   Just Janelle.

24   Q.   And what did Janelle tell you to do?

25   A.   Just to make sure to, you know, make Rachael

1    aware of the appointments I was attending.

2        Q.    Did she suggest that you file a complaint?

3        A.    No.

4        Q.    Did you feel the need to file a complaint?

5        A.    Not right away, no.

6        Q.    In what other way did you feel that you were

7    treated differently because of your medical condition?

8        A.    The requests that I was getting when it came to

9    my performance review, and then also the request to come

10   up with a specific game plan of what I was going to be

11   doing day to day in my job for the general manager, which

12   was Jacob Briscoe in Phoenix.

13       Q.    Let's talk about the performance review first --

14   well, is that the complete list of the reasons that you

15   feel like you were treated differently because of your

16   medical condition?

17       A.    That is the ones that I can recall, yes.

18       Q.    Okay.  If you think of another one while we are

19   going through this deposition, let me know.

20       A.    Okay.

21       Q.    So we already talked about your comparison to

22   Janelle, and you didn't tell Rachael about how you felt

23   with that, correct?

24       A.    Right.

25       Q.    The performance review, why do you think you

1   were treated differently because of your medical condition

2   when it comes to your performance review?

3        A.   I felt that mine was requested to be much more

4   descriptive than theirs -- than theirs were that I felt

5   that mine was a lot more detailed than theirs was.

6        Q.   Did someone tell you that you had to

7   specifically detail items in your performance review?

8        A.   Yes.

9        Q.   Who?

10       A.   Rachael Siggerud.

11       Q.   How did you know that she didn't have that same

12   requirement of the other generalists?

13       A.   I had a meeting and a conversation with Kaela

14   and Janelle, and I was asking them for ideas around --

15   since we were in the same position of -- kind of what they

16   were putting in their performance review, and they just

17   told me that theirs was really vague, and I said, "Well,

18   you are not being specific?"  And they said, "Well, we are

19   just putting just general goals," and I kind of left it at

20   that.

21       Q.   But do you know anything about the conversations

22   that Rachael had with Janelle or Kaela about what should

23   be in their performance review?

24       A.   No.  They just stated to me that she just told

25   them to just put their -- their general goals in of what

1   we were performing as a -- as a generalist.

2       Q.   And you believe she told you something

3   different?

4       A.   Yes.

5       Q.   And she told you that you had to be specific?

6       A.   Sorry, can you restate that?

7       Q.   Sure.  When it comes to your performance review

8   -- this is occurring in 2013, correct?

9       A.   Yes.

10      Q.   And Rachael told you that you had to be specific

11  about your goals?

12      A.   Yes.

13      Q.   Did she --

14      A.   She said, "You need to be as detailed as

15  possible."

16      Q.   But you don't know if she told that same thing

17  to the other generalists and they didn't follow her

18  instruction, correct?

19      A.   I am not aware of the conversation she had with

20  them, no.

21      Q.   Okay.  You get to write your own goals in your

22  performance review, correct?

23      A.   Yes, with the assistance from Rachael.

24      Q.   But they are goals that you established and set

25  for yourself for the upcoming year, correct?

1       A.    With guidance from her.

2       Q.    Right.

3       A.    Sorry.

4       Q.    Did she ask you to revise any draft of your

5   performance review to be more specific?

6       A.    Yes.

7       Q.    Do you have copies of the drafts?

8       A.    I do not.  I saved it as a draft in G&K

9   software, and then she would review it, and then I would

10  update it and then save it.

11      Q.    Did she ever change the language for your goals

12  herself?

13      A.    No.

14      Q.    So all the revisions were done by you?

15      A.    Yes.

16      Q.    Do you recall how many revisions or drafts there

17  were of your 2013 goals?

18      A.    I don't recall.

19      Q.    More than one?

20      A.    More than one possibly.

21      Q.    More than four?

22      A.    No.

23      Q.    Any other reason you think that you were treated

24  differently other than this performance -- strike that.

25              Any other aspects of the performance review

1    for 2013 where you think you were treated differently

2    because of your medical condition?

3         A.   Yes.

4         Q.   What?

5         A.   I was taken out of my role and put into a

6    temporary role and told that I would be able to return to

7    my regular job after my leave was up, and no one else was

8    taken out of their job or their role when they requested a

9    leave.

10        Q.   Okay.  So you believe that your transfer to a

11   recruiting position was because of your medical request?

12        A.   Yes.  Rachael stated that she felt that it would

13   better help accommodate me to attend appointments, and

14   that she felt that it would be a better fit until I was

15   done with my leave.

16        Q.   And when did this conversation happen?

17        A.   Not long after I requested the ADA request in

18   writing.

19        Q.   Was this one of the conversations that you

20   recorded?

21        A.   I am not sure if it specifically includes that.

22        Q.   And you have a specific memory of Rachael

23   telling you that you were being transferred to a

24   recruiting position because it would better allow for you

25   to attend medical appointments?

1    A.   Yes.

2    Q.   And those were her specific words?

3    A.   Yes, because she had initially stated that she

4  felt that I didn't want to be at G&K and that she was

5  going to give me three days to think about whether I

6  wanted to be in that position, or she would assist me in

7  finding a role outside of the business as well if I chose

8  to take that route.

9    Q.   And was that stated in one of the recorded

10 conversations?

11   A.   Yes.

12   Q.   And that is the conversation that you recorded

13 in July?

14   A.   I am not sure which exact one it was.

15   Q.   Well, it was after your ADA request, correct?

16   A.   I don't recall.  I am not sure if it was before

17 or after.

18   Q.   But you believe it was recorded?

19   A.   It was, yes.

20   Q.   And she told you specifically that you had three

21 days to think about it --

22   A.   Yes.

23   Q.   -- otherwise she was going to transfer you?

24   A.   Not that she was going to transfer me, but she

25 felt that I was unhappy, and I reassured her that I was

1    not, that I loved being at G&K and that I wanted to

2    continue my job there, and she stated that she felt that I

3    didn't, and she told me that she was going to give me

4    three days to make that decision of whether I wanted to

5    stay with the business or find a different job.

6        Q.   And so did you respond within the three days and

7    tell her what your decision was?

8        A.   I assured her that I didn't need to have the

9    three days to think about it because I knew that I loved

10   working for G&K and that I loved working with everyone

11   that I worked with because I had great relationships with

12   them.

13       Q.   Did you ever suggest to Ms. Siggerud that you

14   thought you would be interested in working in a

15   recruitment role like some of the other HR representatives

16   had been transferred into?

17       A.   No.  No.

18       Q.   So you never suggested in any way to her that

19   you wanted to transfer?

20       A.   Not that I recall, no.

21       Q.   Were you interested in the recruitment role at

22   all?

23       A.   I didn't feel that I had a -- had an option.

24   Rachael kind of told me this is a temporary position, we

25   are going to put you into it and we will allow you to

1   return to your job afterwards, so I was open to it, just

2   because I didn't want to be combative, you know, with her.

3   I kind of just, you know, wanted to just show her that I

4   was, you know, engaged and I was being supportive of the

5   business, so I told her I was excited about the -- the

6   role to help, you know, with recruiting.

7        Q.   Did you object at all to the transfer?

8        A.   No.

9        Q.   Did you indicate to her that you liked doing

10  recruiting when you were an HR representative?

11       A.   I don't recall.

12       Q.   Did you do recruiting when you were in the

13  representative position?

14       A.   I did.

15       Q.   Did you enjoy that work?

16       A.   I enjoyed the whole position itself.  I did a

17  lot of different tasks, and it -- it was one of the things

18  I did enjoy doing, yes.

19       Q.   Did you ever express that to her?

20       A.   I don't recall.

21       Q.   Did you express to her that you were frustrated

22  with your generalist role because it was undefined?

23       A.   Yes.

24       Q.   Do you think that those types of comments could

25  make Ms. Siggerud think that it would be a better fit for

1    you to be in a recruiting role?

2        A.    No.

3        Q.    If you expressed to her that you don't like your

4    current job -- I know you like working for G&K, but this

5    new job as a generalist isn't really well-defined, people

6    don't know what you do, but you liked what you did before

7    and part of that was recruiting.  That's where the other

8    representatives went.  They didn't go to a generalist

9    position; they went to a recruiting position.  Can you see

10    how Ms. Siggerud would interpret that -- maybe she thinks

11    that you would be a better fit for a recruiting position

12    rather than a generalist position?

13        A.    No, because during our meetings and our

14    conversations and one-on-ones, I told her I was excited

15    about the new role and I was excited to see where it was

16    going to go and I was excited to build new relationships

17    with the new locations that I was being assigned as well,

18    so I was -- I was always positive with her about my new

19    role and -- and what we were doing.  Outside of, you know,

20    stating the frustration of the role.  I always tried to

21    stay positive with it.

22        Q.    I understand.  But you did express to her that

23    you were frustrated with the new role?

24        A.    With the job description of the role, yes.

25        Q.    And how your role was perceived by the managers

1    you were supposed to be working with, correct?

2        A.   Yes.

3        Q.   Because the managers indicated to you they

4    didn't really know what your job function was, correct?

5        A.   Correct.

6        Q.   And that frustrated you?

7        A.   Yes.

8        Q.   And you told that to Ms. Siggerud?

9        A.   Yes.

10       Q.   And you also expressed that some of the

11   functions that you had previously, like recruiting, you

12   enjoyed?

13       A.   Yes, as well as myself and Janelle and Kaela.

14   All of our group, we would have a group meeting, a group

15   conference call with Rachael, and we would all explain to

16   her that we all felt frustrated with the new role, and we

17   were all having issues with the new -- with -- with the

18   managers, that they were confused by what all of us were

19   doing.  So it was -- it was all of us together.

20       Q.   But you had in your one-on-one conversations and

21   in the conversations that you recorded -- which we will go

22   over -- expressed individual frustration with your

23   relationship with the Phoenix plant specifically, correct?

24       A.   All of the locations, not just Phoenix, but Los

25   Angeles as well as Phoenix.

1      Q.   So you were having problems with the managers in

2  forming a new strategic relationship with them in your new

3  role in L.A. and Phoenix, correct?

4      A.   Yes.

5      Q.   And those were your two biggest locations?

6      A.   Yes.

7      Q.   Is there any way that you can think that hearing

8  this information from you led Ms. Siggerud to believe that

9  it might be a better fit for you to work in recruiting?

10              MR. MILLS:  Object to the form.

11              THE WITNESS:  No, no.

12  BY MS. FRANCIS:

13      Q.   No?

14      A.   No.

15      Q.   You don't understand that maybe she thought that

16  was a better position for you?

17      A.   No, no.  I felt like she was taking me away from

18  the role due to me attending my medical appointments and

19  the managers stating that I was not available.  I don't

20  think it had to do with me and my frustration with the

21  position itself.

22      Q.   Okay.  You also said that you felt that you were

23  treated differently because of the game plan that you were

24  asked to develop about your day-to-day job functions with

25  the plant manager in Phoenix; is that correct?

1       A.    I'm sorry.  I hate to ask.  Can we take a break

2   for a moment?

3       Q.    Sure.  Well, we have a question pending.  Can

4   you answer the question and then we will take a break?

5       A.    Okay.

6             Can you restate the question?

7       Q.    I -- I will restate it.

8             So that we know where to pick up when we

9   come back, we were talking about how you felt you were

10  treated differently because of your medical issue, and the

11  one remaining thing we have to cover is the game plan that

12  you were asked to develop with the Phoenix plant manager,

13  correct?

14      A.    Yes.

15      Q.    Is there anything else we need to cover as far

16  as how you feel you were treated differently because of

17  your medical condition?

18      A.    Not that I can think of at this moment.

19            MS. FRANCIS:  Okay.  We can take a break.

20            VIDEO TECHNICIAN:  This is the end of media

21  No. 2 in the continuing deposition of Brandy Lane

22  Williams.  Today's date is June 14, 2016.  The time is

23  11:40 a.m.

24            (Recess ensued from 11:40 a.m. until

25  12:38 p.m.)

1              VIDEO TECHNICIAN:  We are back on the

2    record.  This is the beginning of media No. 3 in the

3    continuing deposition of Brandy Lane Williams.  Today's

4    date is June 14, 2016.  The time is 12:38 p.m.

5    BY MS. FRANCIS:

6         Q.   I want to go back and talk about your transfer

7    to the recruiting position.  So if you could turn to what

8    has been previously marked as Exhibit No. 3, and I am

9    going to talk mainly about the last three pages.

10             If you want to, let your counsel look at

11   those before we begin the questioning.

12             MR. MILLS:  Yes.  Yes.

13   BY MS. FRANCIS:

14        Q.   And I will ask you to read those three pages of

15   notes which we previously identified as Ms. Siggerud's

16   notes, and these that I am pointing you to are titled

17   "Brandy" and then an arrow to the right, "Recruiting

18   Transition."  And let me know when you are done reading

19   those.

20        A.   Okay.

21        Q.   Did you have a conversation with Ms. Siggerud

22   that followed the outline of your recruiting transition

23   that I just had you read?

24        A.   Yes.

25        Q.   Are the items in her notes things that she told

1    you verbally?

2         A.   Some of them.

3         Q.   Okay.  Let's start with point No. 1.  Did she

4    tell you verbally point No. 1?

5         A.   Yes.

6         Q.   Did she tell you verbally point No. 2?

7         A.   Yes.

8         Q.   Point No. 3 captures a comment that she claims

9    you made to her.  Did you make that comment to

10   Ms. Siggerud?

11        A.   No.

12        Q.   Did you ever tell Ms. Siggerud that recruiting

13   holds a strong appeal to you?

14        A.   She asked if I enjoyed recruiting and I said

15   yes.

16        Q.   Did you tell Ms. Siggerud that you would have

17   liked to apply for a job in recruiting if you knew one was

18   open?

19        A.   No, not that I recall.

20        Q.   Did you say something like that to her?

21        A.   She asked me if a position came open in

22   recruiting, would I be interested in helping Michael

23   Hammond.

24        Q.   And what was your response?

25        A.   "Yes, possibly."

1      Q.    Did Ms. Siggerud tell you verbally point No. 4?

2      A.    Yes.

3      Q.    Did she tell you verbally point No. 5?

4      A.    Yes.

5      Q.    Did she tell you verbally point No. 6?

6      A.    Can we go back to No. 5?

7      Q.    Not yet.

8      A.    Okay.  No. 6?

9      Q.    Just -- are you going to change your position

10   that she told you that verbally?

11     A.    Well, I was just going to give you information

12   about it.  Okay.

13     Q.    We will go over each of them.  I just -- I just

14   want to know --

15     A.    Okay.

16     Q.    -- what you agree she did convey to you over the

17   phone.

18     A.    Okay.

19     Q.    So we are on point No. 6.

20     A.    Partially -- part of that, not the complete

21   statement.

22     Q.    Which part did you discuss with her?

23     A.    Stepping away from the team will allow the air

24   to clear and work on the relationship.

25     Q.    She didn't tell that you she was not confident

1    that you would be successful if things remained the same

2    in Phoenix because of the distrust and damage in the

3    relationships?

4         A.   I don't recall.

5         Q.   Is it possible she said that and you just don't

6    recall?

7         A.   It could be possible.

8         Q.   Did she convey point No. 7 to you verbally?

9         A.   She did state that, but I did not request to go

10   into the position.  She offered it.

11        Q.   And you agreed?

12        A.   I didn't feel that I had a choice, because she

13   told me, "Starting Monday, you will be working for Michael

14   Hammond in this temporary role in recruiting."

15        Q.   She offered you the position and you accepted

16   it, correct?

17        A.   Yes.

18        Q.   Did she convey point No. 8?

19        A.   Yes.

20        Q.   And did she convey to you the final point No. 9

21   from her notes?

22        A.   Yes.

23        Q.   Do you recall any other specifics about this

24   conversation that are not captured by Ms. Siggerud's

25   notes?

1    A.    Yes.   I asked her if I would be returning back

2  to my regular role as a generalist after the position, and

3  she stated it would be based on my performance and that we

4  would discuss it once the temporary position had expired.

5    Q.    Anything else that is not captured by her notes?

6    A.    Nothing that I recall.

7    Q.    During this conversation, did Ms. Siggerud make

8  any mention of your medical condition?

9    A.    Yes.

10    Q.    When?

11    A.    When we were having this conversation and she

12  was telling me about me starting this new position the

13  following week, that she felt that it was best due to my

14  health conditions and me having to take time away from

15  work and that this would better fit me than the current

16  position I was in.

17    Q.    Did you also tell her that the stress that was

18  resulting from the complications with the Phoenix branch

19  was detrimental to your health?

20    A.    No.   I told her that the -- the stress from the

21  accusations of me not being at work because I was

22  attending appointments was causing me stress and making my

23  condition worse.

24    Q.    Didn't you tell her that it was the stress --

25  because of your inability to form a relationship with the

1    leadership at Phoenix was causing you stress, not the

2    medical appointment issue?

3         A.   No, no.

4         Q.   Anything else that happened during this phone

5    call that was not captured by the notes?

6         A.   I -- I don't know.  I am not sure.

7         Q.   Nothing that you can recall right now?

8         A.   Nothing that I can recall, no.

9         Q.   Okay.  Let's go back to talk about them.  If you

10   can, flip back to point No. 1.  It says that in

11   Ms. Siggerud's notes:  Still struggling with the HRG role,

12   structure and what activity you can be doing to

13   effectively support your team but especially Phoenix.

14                   What does that mean to you?

15        A.   I was voicing concern as well as Janelle and

16   Kaela.  We were all voicing concern that we were confused

17   around what the job description was, because at this point

18   no -- no -- no written job description had been

19   established or provided to us, and she was telling us that

20   we are responsible for developing the role and what it

21   was.

22        Q.   You understood what your job was as a generalist

23   well enough to describe it to managers, correct?

24        A.   From the direction of the HR team when we had

25   our HR realignment meeting, yes, I portrayed to them what

1    I was -- what information I was given during the -- the

2    meeting about the realignment.

3         Q.   So if Jake asked you, "What are your job

4    duties," you were able to tell him what your job duties

5    were, correct?

6         A.   I was, but they were very vague and very gray,

7    and he stated he was still confused by them because he

8    didn't feel like it was anything concrete of what we were

9    doing.

10         Q.   Okay.  I understand what you believe his

11   perception was, but based on the conversations, even

12   though there was not a written job description, you still

13   had a basic understanding of what you were supposed to be

14   doing as a generalist, correct?

15         A.   I had an idea.

16         Q.   Well, you were able to convey that to the

17   managers when they asked you what your job entailed,

18   correct?

19         A.   I conveyed what -- what they reiterated to us

20   during the meeting, but from my understanding from

21   Rachael, it was a developing role.

22         Q.   I understand it was developing, but you also

23   understood what your duties were because you were told

24   what they were when the role was initiated, correct?

25                   MR. MILLS:  Object to the form.

1    BY MS. FRANCIS:

2         Q.    You are saying what they conveyed to you during

3    a meeting.   Somebody told you what your job duties were,

4    correct?

5         A.    Not necessarily job duties.   They told us how we

6    should help with the transition but that they were still

7    developing the role and we would continue to have meetings

8    over the next several months to learn more about the

9    position and more about what our job really was.

10        Q.    When Jake Briscoe asked you what your job duties

11   were as a generalist, you provided him an answer, correct?

12        A.    I did, and I told him that they were still

13   developing and they would -- more would be added to it and

14   I would be able to give him more information as time

15   passed.

16        Q.    But you were able to describe specific job

17   duties that you were to do as a generalist when Jake asked

18   you what your job entailed?

19        A.    Not specific.   Not specific.   It was -- I would

20   give him very broad answers about what we were working on

21   to support them with.

22        Q.    But you gave him an answer --

23        A.    Yes.

24        Q.    -- which contained a description of your job

25   duties?

1      A.   Yes.

2      Q.   Point No. 2 states:  As of today, there is

3  clearly a breakdown in your relationship with Phoenix, and

4  you demonstrate a lot of animosity towards some people in

5  particular.

6           Did I read that correctly?

7      A.   Yes.

8      Q.   What does this mean to you?

9      A.   I felt it just went back to the managers telling

10 her -- I mean, because she never would tell me

11 specifically.  She would just say "the management group in

12 Phoenix."  But I felt it just went back to me missing time

13 from work but then also combined with them being really

14 confused about what the position itself was.

15     Q.   Is there a specific event that led to the

16 breakdown in your relationship with Phoenix?

17     A.   Can you restate that?

18     Q.   Sure.  Was there a specific event that led to a

19 breakdown in your relationship with the Phoenix management

20 team?

21     A.   It all kind of corresponded at the same time, so

22 me coming back from the leave also occurred at the same

23 time as the realignment of me going into a new position.

24 So I would say that I felt it was both of those things.

25     Q.   Well, you moved into the recruiting role in late

1    July of 2013, correct?

2         A.    Correct.

3         Q.    And you took on the generalist role in February

4    of 2013, correct?

5         A.    Correct.

6         Q.    Was there something that happened in or around

7    July?  Because she says:  As of today, there is clearly a

8    breakdown.

9              Was there something that happened --

10        A.    I think it was all the events leading up to that

11   day, not specifically that day.

12        Q.    So you are not aware of anything that happened

13   in July that led to a breakdown?

14        A.    Other than me requesting an accommodation -- an

15   ADA accommodation, that is what sparked the events of me

16   going into a new role.  There was no talk of going into a

17   different position prior to me requesting an ADA

18   accommodation.

19        Q.    Who did you demonstrate a lot of animosity

20   towards?

21              MR. MILLS:  Object to the form.

22              THE WITNESS:  I am unsure who she was

23   speaking of.

24   BY MS. FRANCIS:

25        Q.    Did you express to her that you disliked anyone

1    in Phoenix?

2         A.   No.

3         Q.   Did you express to her that you didn't want to

4    work with any particular manager in Phoenix?

5         A.   No.

6         Q.   Did you express to her that you felt that Jake

7    was unresponsive to your attempts to develop alliance or

8    strategy within his leadership team?

9         A.   Yes.

10        Q.   And tell me specifically what you told her as to

11   that point.

12        A.   I expressed to her that I -- when I came back

13   from the realignment meeting that I sat down with Jake and

14   tried to give him feedback from the meeting of what we

15   discussed and that he was very confused by why HR had made

16   that turn to go that direction.  And he was frustrated

17   with the fact of we were asking questions about his

18   financials and the business, and he stated that it was his

19   business and he was going to run it the way he saw fit and

20   he didn't understand why HR was questioning him or wanting

21   to get involved with the financial aspect of the location

22   that I was at with him.

23        Q.   And how many times did you have conversations

24   with him about his lack of understanding as to why you

25   were involving yourself in the financial aspects of the

1   plant's business?

2        A.   I don't know the exact times or number of times

3   but it was several times.

4        Q.   You also mentioned earlier that a lot of the

5   functions that you had performed as an HR representative

6   were now being performed by the management team at the

7   location, correct?

8        A.   Yes.

9        Q.   So Mr. Briscoe's management team was having to

10  do a lot of the HR functions that you had previously

11  performed, correct?

12       A.   They were handling payroll.  Anything else would

13  be -- the managers were instructed to have the -- hand the

14  employee a brochure, and there was an employee hotline

15  they could call for assistance instead of contacting me

16  directly at the location.

17       Q.   And you had previously done payroll, correct?

18       A.   Yes.

19       Q.   How time consuming is payroll?

20       A.   It -- it wasn't very time consuming for me

21  because I had experience in it.

22       Q.   When you transitioned that role to the managers

23  in Phoenix, how did that go?

24       A.   They were frustrated by it, that they had to

25  take on more job -- you know, job duties, and they

1    stressed the fact that they felt that an HR person was at

2    the location so they felt that it should still be part of

3    my responsibilities and not theirs.

4         Q.   Did Mr. Briscoe tell you that specifically?

5         A.   He did not but Mitch Rubinoff did.

6         Q.   Were there any other duties that they assumed

7    after the realignment locally that they expressed to you

8    they were frustrated with other than payroll?

9         A.   I want to say it was their duties.  They were --

10   they were frustrated with the change -- the chain

11   management of things.  Instead of being able to talk to me

12   because I was there, they expressed frustration with

13   having to have to call someone and then wait for them to

14   call them back from a centralized location.

15        Q.   What about hiring?  Who did hiring after the

16   realignment at the plant?

17        A.   The talent acquisition specialist of the

18   representatives that were moved into those roles, they

19   would do the screening and the phone interviews, but the

20   managers still continued to do the same role of

21   interviewing the candidates and choosing and then offering

22   the offer of employment.

23        Q.   Did they have any additional work in the hiring

24   process before and after the realignment?

25        A.   Yes.  They were required to do the onboarding

1    portion of new employees as they were hired on their first

2    day.

3         Q.   Did they --

4         A.   So they were required to do their paperwork and

5    fill -- have the new employees fill the documents out and

6    walk them through their training videos and submit all

7    their new-hire paperwork to the corporate office.

8         Q.   And did they express to you that they were

9    frustrated that that was now a job duty that was being

10   placed on them?

11        A.   Yes.  They stated that they were already

12   struggling -- keeping up with their own positions much

13   less having to do HR functions on top of their -- their

14   already original jobs.

15        Q.   Who told you that?

16        A.   The route managers that were at the location and

17   then the service managers, the sales managers.  Everyone

18   pretty much in management in Phoenix and in Los Angeles

19   had concerns about take -- having to do these extra steps

20   or taking extra time out of their day to complete the task

21   whenever -- I was still involved in the location with

22   them.

23        Q.   Did Mr. Briscoe express those concerns

24   specifically?

25        A.   Yes.

1     Q.   And Mitch?

2     A.   Yes.

3     Q.   Were there any other functions or tasks that the

4  local managers had to perform that had traditionally been

5  done by an HR representative after the realignment?

6     A.   I am trying to think.  I believe another thing

7  would have been if -- if an employee had questions about

8  benefits but they -- the manager would just have to

9  recommend for them to call the -- the employee hotline

10 that G&K developed.

11    Q.   But they were the first point of contact where

12 they hadn't previously been on benefits issues?

13    A.   Correct.

14    Q.   Anything else that you think of that they had to

15 do after the realignment?

16    A.   I can't -- I can't recall anything else.

17    Q.   We already talked about No. 3 and 4 and 5.

18         Point No. 6, you said that Ms. Siggerud did

19 convey to you that time away from Phoenix will allow the

20 air to clear and then you can work on the relationships

21 from both sides, correct?

22    A.   Can you -- I'm sorry, can you restate that?

23    Q.   Did Ms. Siggerud convey to you that part of

24 point No. 6?

25    A.   Yes.

1        Q.    And you don't believe she conveyed the top part,

2    the first part of point No. 6 --

3        A.    No.

4        Q.    -- that she was not confident that you would be

5    successful?

6        A.    No, she didn't portray distrust and damage.  She

7    just stated that she felt that it would better the

8    relationship.

9        Q.    Did Ms. Siggerud convey to you that it may be

10   possible for you to stay in the recruiting position if an

11   opening becomes available?

12       A.    She did.  She stated it would be based on my

13   performance and then if something became available.  If

14   not, I would return to my generalist role.

15       Q.    Okay.  One of the other reasons -- going back to

16   where we were before the lunch break -- you said that you

17   felt you were treated differently had to do with you were

18   required to develop a game plan for Phoenix.  Tell me

19   specifically what you were asked to do.

20       A.    Rachael stated that she wanted me to come up

21   with a -- a game plan document, being very specific, along

22   the lines of how I was going to develop these

23   relationships with the -- with the managers, and then how

24   I would show them that I -- I do have engagement, and how

25   I would show them that I was going to continue to support

1    them in a positive way.

2         Q.   And you don't believe anybody else was asked to

3    do that?

4         A.   No one else was.

5         Q.   Do you know if the other generalists were having

6    the same issues with the management team to the level that

7    you were in Phoenix?

8         A.   Yes.

9         Q.   Who was Kaela having the same -- these same

10   issues with?

11        A.   Her plant manager.

12        Q.   Which one?

13        A.   Her -- the one that she was located at in Saint

14   Paul.

15        Q.   Do you know the person's name?

16        A.   I do not recall his name.  Chuck, I think maybe.

17        Q.   And what is this information -- information

18   based on?

19        A.   Conversations in our meetings, our group

20   meetings between Kaela, Janelle and I.

21        Q.   When would you have these group meetings?

22        A.   Just randomly when we were trying to come up

23   with new ideas or new strategies of what to do in this new

24   role.

25        Q.   Was Rachael involved in these conversations?

1      A.    Sometimes she was and sometimes she was not.

2      Q.    Do you have a specific memory of her

3  participating in a call where Kaela expressed that she was

4  having serious issues in forming a relationship with the

5  Saint Paul plant manager?

6      A.    Yes.

7      Q.    When did that occur?

8      A.    I don't recall the exact date.

9      Q.    What did Kaela say?

10     A.    She stated that Chuck was very resistant to the

11 change and that he was being very aggressive with her and

12 very short and very rude and condescending when he was

13 talking to her and that she had to go and get her plant --

14 her general manager involved, Andy.

15     Q.    Did Kaela have a good relationship with Andy?

16     A.    Yes, from what I understand.

17     Q.    And Andy would have been in the same position as

18 Jake Briscoe?

19     A.    Yes.

20     Q.    Do you know if Kaela had any issues in her

21 relationship with any general managers of the locations

22 she supervised?

23     A.    I think she just had Andy, but, no, nothing that

24 I recall.

25     Q.    Okay.  Did Janelle express that she had any

1  relationship issues with any of the general managers at

2  any of the locations she supervised?

3       A.   No.

4       Q.   Do you know what Chuck's position was?

5       A.   He was the plant manager.

6       Q.   And that is a subordinate to the general

7  manager?

8       A.   Yes.

9       Q.   And do you know whether or not Kaela was asked

10 to develop a game plan to deal with Chuck, the plant

11 manager?

12      A.   No, but she did just express that in her

13 conversations with Andy, her GM, that he was also confused

14 about her role and what she was to be doing.

15      Q.   Okay.  I want to talk specifically about the

16 game plan that you were asked to develop by Ms. Siggerud.

17 Did that deal specifically with just Phoenix and Jake

18 Briscoe?

19      A.   She told me that it was for Jake and the Phoenix

20 management team.

21      Q.   And you said "no" to my question before, but it

22 is not a clear answer because of the way the question was

23 posed.  Do you know if Kaela was asked to develop a game

24 plan to deal with Chuck, the plant manager, in Saint Paul?

25      A.   No.

```
1        Q.    You don't know or, "no," she was not asked to do
2   that?
3        A.    She was not asked.  Sorry.
4        Q.    How do you know she was not asked to do that?
5        A.    I asked her.
6        Q.    And she said?
7        A.    "No."
8        Q.    Did she have a requirement to do anything to
9   develop or correct that relationship?
10       A.    No.
11       Q.    Not that you are aware of?
12       A.    When I asked her, she said, "no."
13       Q.    What was done in response to Chuck's behavior,
14  if you know?
15       A.    She told me that he was written up and given a
16  disciplinary.
17       Q.    And did it resolve after that, if you know?
18       A.    I -- I don't recall.
19       Q.    Do you recall when, about, this was happening?
20       A.    I don't know a specific date, no.
21       Q.    Was the discipline issued by Andy, the GM?
22       A.    I am not sure.  I am not sure if she involved
23  Rachael or if it was between her and Andy.
24       Q.    Do you know outside of that one incident that
25  Chuck was written up for whether he had ongoing issues
```

1   with Kaela?

2        A.   I am not sure she -- she expressed to me -- she

3   -- she -- he was always difficult to work with.

4        Q.   Did she give you any more specifics other than

5   that?

6        A.   She didn't give me specific dates or anything,

7   no.

8        Q.   Any specifics about issues she had in the

9   relationship other than this one instance that Chuck was

10  written up for?

11       A.   Not anything I can remember exactly, no.

12       Q.   Can you look at what has been previously marked

13  as Exhibit No. 10?  Do you recognize Exhibit No. 10?

14       A.   Yes.

15       Q.   What is it?

16       A.   My response to the EEOC to the rebuttal

17  statement of G&K.

18       Q.   So you wrote the -- the letter portion, correct?

19       A.   Yes, I wrote the response.

20       Q.   And then you attached exhibits?

21       A.   Yes.

22       Q.   Are all the exhibits that you submitted to the

23  EEOC in your rebuttal present in Exhibit No. 10?  Is it

24  complete?

25                 MR. MILLS:  Take your time and look at it.

1              THE WITNESS:  Yes.

2    BY MS. FRANCIS:

3        Q.   "Yes," it is complete?

4        A.   Yes, it is complete.

5        Q.   The exhibits that you attached then were all

6    e-mails that you had sent to your home e-mail account?

7        A.   My personal e-mail account.

8        Q.   If you look at page 2 in the letter portion of

9    the rebuttal that is labeled Williams, dash, 00089, in the

10   second full paragraph, it -- you talk about your salary

11   increase in May of 2013.  Do you see that?

12       A.   Yes.

13       Q.   You say:  Although G&K is stating that there

14   were performance issues, I was given an increase to come

15   to standard salary of an 11.2 increase from $45,305 to

16   $50,365, May 4, 2013.

17            Did I read that correctly?

18       A.   Yes.

19       Q.   You were given an increase to come to the

20   standard is what you said.

21       A.   Yes.

22       Q.   What does that mean?

23       A.   When they offered me the new role and I started

24   in this position in May, I -- after reviewing documents of

25   our compensation, I noticed that the general position --

1    the generalist position had been posted and that I was not

2    at the minimum starting point at this position, so I was

3    being paid less than the other two generalists.

4        Q.   So actually you got a pay increase when you

5    first moved into the position of generalist, correct?

6        A.   No.

7        Q.   Well, what were you being paid at -- what rate

8    were you being paid at?

9        A.   The same salary that I was as a representative.

10       Q.   So then a generalist position was posted for

11   where?

12       A.   I'm sorry, can you --

13       Q.   You said that you saw a generalist position

14   posted and you realized that you were below what the

15   posting had for a pay level, correct?

16       A.   Yes, the compensation plan.

17       Q.   Okay.  What specifically did you see that led

18   you to believe your compensation was lower than it should

19   be?

20       A.   The -- the minimum starting point in the

21   compensation plan was significantly higher than what I was

22   being paid currently.

23       Q.   Where did you see the minimum compensation?

24   What kind of document was this?

25       A.   It was a shared document on the HR portal, and

1    it was under the compensation plans.

2        Q.   And what was the starting salary minimum for

3    this position?

4        A.   It was the 50,365.

5        Q.   And who did you notify about this discrepancy?

6        A.   Rachael.

7        Q.   And what did she tell you?

8        A.   She told me that she had noticed that and that

9    she had mentioned it to Pelham Chastang and she was glad

10   that I brought it up and that she wanted to discuss it

11   with me.  And she stated that she would review it with

12   Eric -- Eric McNaul and Pelham Chastang, and it also would

13   be based on my current performance, and she would talk to

14   him, and she would get back to me and let me know what

15   their decision would be.

16       Q.   And what did she tell you?

17       A.   A week or two passed by -- we were on a trip

18   together.  We were traveling.  We were in Los Angeles

19   together.  She was introducing me to all the new managers

20   that I would be working with, and she -- we returned home.

21   And it was approximately a week to two weeks later, she

22   called me and told me that she discussed it with Pelham

23   Chastang and that they reviewed my job performance and

24   also they reviewed the compensation plan, and they agreed

25   that I would be raised to the minimum level for the

1   generalist position.

2       Q.   And were any of these conversations documented,

3   or can we find this in e-mails?

4       A.   I don't recall.

5       Q.   If you look at Exhibit M to Exhibit 10, it is a

6   compilation of e-mails that I want to talk about.  So tell

7   me when you are there.  The first page is labeled

8   WILLIAMS 000119.

9       A.   Okay.

10          MS. FRANCIS:  Do you need to look at it,

11  Bob?

12          MR. MILLS:  No.

13  BY MS. FRANCIS:

14      Q.   Do you recognize this document that is within

15  Exhibit No. 10 labeled as WILLIAMS 119?

16      A.   Yes.

17      Q.   What is this document?

18      A.   This was after I had surgery due to the health

19  conditions that I was having, and this was when I had

20  returned to work, and this was the restrictions that I was

21  given from my doctor.

22      Q.   And what is the date of this e-mail?

23      A.   June 14, 2013.

24      Q.   Did you have the surgery on June 13th?

25      A.   I don't recall if it was the 12th or the 13th.

1      Q.    But you returned to work on the 14th, correct?

2      A.    Yes, I returned to work on the 14th.

3      Q.    And you e-mailed Ms. Siggerud at 4:00 p.m. --

4      A.    Yes.

5      Q.    -- to let her know that you were in the office,

6   correct?

7      A.    Yes.

8      Q.    And you told her that you had restrictions of no

9   lifting, pulling, pushing over ten pounds, prolonged

10  standing, no climbing stairs for two weeks, correct?

11     A.    Yes.

12     Q.    And what was her response?

13     A.    I don't recall.

14     Q.    Did you say anything in this document about

15  having to attend follow-up appointments?

16     A.    Yes.

17     Q.    For the next two weeks, correct?

18     A.    Yes.

19     Q.    Did you require any additional appointments

20  related to the surgery outside of the two-week period?

21     A.    No, not related to this specific appointment.

22     Q.    This specific medical procedure?

23     A.    Yes.

24     Q.    So related to the surgery, you only needed

25  follow-up appointments for two weeks, correct?

1     A.    With this doctor.

2     Q.    What other doctor did you need to follow up with

3   other than the surgeon?

4     A.    Dr. Joseph Brooks, he was my primary

5   gynecologist.  He referred me to this surgeon that I had

6   surgery with, and I continued my medical care with him

7   after the surgery.

8     Q.    And was that care ongoing from your condition

9   prior to the surgery, or was that ongoing related to the

10  surgery specifically?

11    A.    It was ongoing from my previous condition.

12    Q.    Okay.  So as it relates just to the surgery, you

13  had two weeks of follow up with your surgeon and then a

14  follow up with your primary care physician and then you

15  would continue your previous treatment, correct?

16    A.    Yes.

17    Q.    If you look at the next page in this exhibit,

18  which is labeled WILLIAMS 120, do you recognize this

19  document?

20    A.    Yes.

21    Q.    What is it?

22    A.    Response from Rachael.

23    Q.    And what does she say?

24    A.    "Thank you for your update."

25    Q.    And does she go on?

1       A.   Yes.

2       Q.   What does she say?

3       A.   "I am glad you are back up and around, and
4    hopefully everything went well."

5       Q.   Did she describe that she was not able to reach
6    you on the phone number you provided?

7       A.   She -- she did state that.

8       Q.   Was that a work phone number or a different
9    phone number?

10      A.   I am not sure what number she tried to reach me
11   at.

12      Q.   It says the voicemail doesn't appear to be
13   active.

14           Does that indicate to you whether that was
15   your personal cell phone or work line?

16      A.   I don't -- I don't know which one she tried to
17   call.  It states:  Is this your G&K phone?

18           So I -- I am not sure she knew which number
19   it was either.

20      Q.   Had you given her a number to contact you?

21      A.   Normally she contacted me on my G&K cell phone
22   that was given to me by the company.

23      Q.   It sounds like you may have provided her a
24   different phone number though, correct?

25      A.   She knew my personal cell phone number also.

1     Q.   Do you recall having any issues with voicemail

2  on either of those accounts in June of 2013?

3     A.   I don't recall.

4     Q.   Do you know if this was the same phone number

5  that other people from G&K would have tried to reach you

6  on?

7     A.   I am not sure what number she was calling, but

8  mostly everyone contacted me on my G&K cell phone.

9     Q.   Did you do anything after receiving this to

10  ensure that people at G&K could reach you?

11     A.   Yes.

12     Q.   What did you do?

13     A.   I checked my e-mail on the company-issued phone

14  to make sure that it was working and to make sure that my

15  voicemail was there.  I called the phone and I listened to

16  my voicemail when it came on to make sure that everyone

17  knew who they were contacting and they could actually

18  leave me a message.

19     Q.   And there were no problems that you encountered?

20     A.   No.

21     Q.   Were there any problems with your cell phone

22  around this time frame that you had to correct?

23     A.   My personal cell phone?

24     Q.   Yes.

25     A.   No.

1       Q.    Did you provide your personal cell phone number

2    to anyone other than Ms. Siggerud at G&K to contact you

3    on?

4       A.    I don't recall.  They might have contacted me

5    from me contacting them from that number.

6       Q.    But there are some people that use their

7    personal cell phone for business regularly.  Was that your

8    practice?

9       A.    No.

10      Q.    Did you have a G&K cell phone?

11      A.    Yes.

12      Q.    So you carried two cell phones?

13      A.    Yes.

14      Q.    Did Ms. Siggerud say anything in her -- in her

15   response about being concerned about your follow-up

16   appointments?

17      A.    She was concerned about how long it would take

18   before I would be back to normal and if it was part of my

19   previous health condition and if that was still ongoing.

20      Q.    Does she say that in WILLIAMS 120?

21      A.    No.  She stated it verbally in a conversation.

22      Q.    After this e-mail exchange?

23      A.    Yes, during our one-on-one I believe.

24      Q.    What did you respond when she expressed concern

25   about how long it would take for you to be back to normal?

1      A.    I reassured her that I, you know, was in the

2   office every day and performing my job and that outside of

3   just going to my doctors' appointments that I was capable

4   of still performing my job as normal.

5      Q.    And did that seem to alleviate her concerns, or

6   was there more discussion about this?

7      A.    I don't recall.

8      Q.    You don't recall talking about the surgery

9   specifically again --

10     A.    No, I don't recall.

11     Q.    -- or the follow-up appointments until you would

12  be back to normal?

13     A.    I -- I don't recall.

14     Q.    If you look at the next page in the groupings of

15  e-mails, it is labeled WILLIAMS 121, and tell me if you

16  recognize this e-mail exchange.

17     A.    Yes.

18     Q.    We only have one page of this e-mail in what you

19  provided to the EEOC in your rebuttal.  Do you recall what

20  Ms. Siggerud's original e-mail was that you were

21  responding to that was about the subject, "flights today"?

22     A.    I don't -- I don't recall.

23     Q.    Was there an occasion where you missed a flight

24  related to work?

25     A.    Yes.

1       Q.   And when was that?

2       A.   It was approximately a week or two before they

3  laid me off.

4       Q.   And tell me what happened.

5       A.   I was very sick, and I had just found out that I

6  was pregnant as well, and I notified Rachael that I was

7  too ill to travel, and I requested to cancel my flight.

8       Q.   And did they cancel the flight?

9       A.   I canceled the flight with the travel agency.

10      Q.   Okay.  So this e-mail about flights today is

11  unrelated to what happened in September, correct?

12      A.   Yes.

13      Q.   Okay.  So you have no idea what the prior e-mail

14  about flights today concerned?

15      A.   At this time, I don't remember, no.

16      Q.   Do you have a memory of missing any other flight

17  other than the one you have already told us about?

18      A.   Work-related, no.

19      Q.   Did you have to change a flight because of a

20  delay or any work issues?

21      A.   I don't recall.

22      Q.   And her response to you -- your e-mail about

23  flights today says:  I put in your vacation time request

24  for last week because I have not seen it come through yet

25  and added today as well.

1                     Did I read that correctly?

2          A.    Yes.

3          Q.    What is she referencing, if you know?

4          A.    Oh, can you restate that?

5          Q.    What, if you know, is Ms. Siggerud referencing

6    when she says that sentence about your vacation time and

7    "added today as well"?

8          A.    Oh, my baby-sitter that I had for my son, her

9    father had passed away -- well, he was passing away in

10   Iowa and she notified me, like, spur of the moment that

11   she could -- could not keep my son for the next two weeks

12   because she was leaving immediately that day to fly to

13   Iowa to be with her father when he passed away.

14         Q.    And so did you take vacation time off of work to

15   cover when your baby-sitter was going to be out of town?

16         A.    Yes.

17         Q.    And how long did that last?

18         A.    I don't recall exactly.  I think it was

19   approximately a week.

20         Q.    It says:  I have put in vacation time request

21   for last week and added today as well.

22                     So it looks like it went longer than a

23   week, correct?

24                     MR. MILLS:  Object to the form.

25                     THE WITNESS:  I don't recall.  It -- it

1    could have possibly been in the middle of one week and

2    carried into the next.

3    BY MS. FRANCIS:

4        Q.    Okay.  But your sitter was away for two weeks,

5    correct?

6        A.    Correct.

7        Q.    And what did you do for coverage when you were

8    not able to take vacation time and stay home?

9        A.    My husband and I tried to share the

10   responsibility.  I took off for part of the time and he

11   took off for the remaining part of the time.  He took

12   vacation as well.

13       Q.    So what is your best estimate of how much time

14   you took off related to this issue?

15       A.    I would say a week.

16       Q.    In her next sentence, Ms. Siggerud says:  I

17   certainly understand that you have some frustrating things

18   happening right now in your personal life with daycare,

19   your health and family illness.

20                   The daycare issue is what we just

21   discussed, correct?

22       A.    Yes.

23       Q.    And we talked about your health issues, correct?

24       A.    Correct.

25       Q.    What were the family illness issues that you

1   were encountering?

2       A.   The only thing that comes to mind is my son.

3   Because he did go to daycare, he stayed ill quite a bit

4   from catching viruses or colds and stuff from the other

5   children in the daycare.

6       Q.   And would you stay home on those occasions when

7   he couldn't go to daycare?

8       A.   Yes.

9       Q.   So he actually went to a daycare facility?

10      A.   When she is speaking of this, those times, he

11  was going to a daycare facility.  Outside of that, I --

12  because he was staying so sick, I tried to alleviate that

13  because of the concerns from Rachael.  That is when I

14  entailed my neighbor down the street to keep him.

15      Q.   So there was a period of time when he was going

16  to a daycare?

17      A.   Yes.

18      Q.   And there was of a period of time where you were

19  having the neighbor that had the ill relative that she had

20  to go to Iowa for, correct?

21      A.   Yes.

22      Q.   When your son was ill and couldn't go to the

23  daycare center, would you take off work to stay with him?

24      A.   Yes.

25      Q.   How often did that happen?

1    A.   I don't recall how often.  But even when I did
2  take off to take care of him, I could still work remotely.
3  I had a G&K issued laptop, so I would still work from
4  home, and I would still perform, you know, functions, or
5  anyone from the office could call me on my G&K phone and I
6  would still help them over the phone or assist in, like,
7  any requests that they had, because I could do it all from
8  my laptop.
9    Q.   Can you estimate for me how many times you had
10  to take off work to stay home with your son when he
11  couldn't go to daycare?
12    A.   I don't recall the exact number.
13    Q.   Can you give me a range of any sort?
14    A.   I -- I really don't remember.
15    Q.   More than ten?
16    A.   No, I wouldn't say it was that many.
17    Q.   More than five?
18    A.   Possibly.
19    Q.   And she says:  However, it is concerning that it
20  always seems to be last minute, and I would like to have
21  some conversation when you return about the impact to our
22  business and team when your plans suddenly change and you
23  are unavailable.
24             Did I read that correctly?
25    A.   Correct.

1      Q.    And is this what you were talking about

2   previously when you said that Ms. Siggerud expressed that

3   she was concerned about the time that you took away from

4   the business for medical appointments?

5      A.    Yes, because she states:  Due to your health.

6      Q.    And did you have a follow-up conversation when

7   you returned from vacation?

8      A.    Yes.

9      Q.    And is that what you have already described to

10   me or is there another conversation?

11      A.    No.

12      Q.    No, that's what you have already described?

13      A.    Correct.

14      Q.    Okay.  I don't want to cover ground we have

15   already covered.

16              Within the same exhibit -- and I think it

17   is under Exhibit N to Exhibit 10 at WILLIAMS 124 -- there

18   is another e-mail.  So let me know when you are there.

19      A.    Okay.

20      Q.    There is kind of a note that is covering part of

21   the text, but do you recognize Exhibit -- I should say do

22   you recognize WILLIAMS 124, which is an exhibit to your

23   rebuttal, Exhibit No. 10?

24      A.    Yes.

25      Q.    And what is that?

1       A.    It was an e-mail requesting help from Rachael of
2    what to write for the -- the performance review.
3       Q.    And Rachael's response to you answers that
4    question about what you should put in your G&K performance
5    document, correct?
6       A.    Correct.
7       Q.    And this is dated June 27th of 2013, correct?
8       A.    Correct.
9       Q.    And she states:  I recommend that you go ahead
10   and update the midyear section with updates based on your
11   original goals for fiscal year '13, then update your
12   year-end with the new goals.
13              Did I read that correctly?
14      A.    Correct.
15      Q.    Does she say in here any way -- does she say in
16   here how specific you should be about your goals?
17      A.    Not in the e-mail.  We had a verbal conversation
18   about it.
19      Q.    And at this time when you are updating your
20   performance document, the midyear section is based upon
21   your original goals, which would have been written when
22   you were still a representative, correct?
23      A.    Correct.  And I was on maternity leave and the
24   goals were never completed.
25      Q.    Okay.  So you would have completed your annual

1    goals in or around July of the prior year, correct?

2         A.   Can you restate that?

3         Q.   In July of 2012 you would put your goals in for

4    2013, correct?

5         A.   Correct, and I was on maternity leave.

6         Q.   So you did not do your original goals, correct?

7         A.   Correct.

8         Q.   And when you returned from maternity leave, did

9    you put in your original goals?

10        A.   No, because we were in the realignment

11   transition.

12        Q.   When you returned to your position -- that would

13   have been in October, correct --

14        A.   Correct.

15        Q.   -- of 2012?

16        A.   Correct.

17        Q.   And you were in that position until February of

18   2013, correct?

19        A.   Correct, outside of the leave in December.

20        Q.   And during that time frame, you didn't establish

21   goals for what you would be doing in 2013 in the

22   representative position?

23        A.   No.  I had mentioned it to Jacob Briscoe, and he

24   stated that we would wait until the realignment and he

25   knew what I would be doing.

1      Q.   After you sent this e-mail to Ms. Siggerud in

2    June of 2013, did you insert goals for the first part of

3    the year where you were a receptionist -- not a

4    receptionist, a representative, sorry.

5      A.   I would have to see the document.  I am not -- I

6    am not sure of when I updated it or -- or placed new goals

7    in there.

8      Q.   Did Mr. Briscoe have input on what your goals

9    were when you were a representative?

10     A.   Yes, we did those together.  He was my direct

11   supervisor.

12     Q.   So you would work on your performance objectives

13   together?

14     A.   Yes.

15     Q.   And then when you were a generalist, you would

16   work on those performance goals with Ms. Siggerud?

17     A.   Correct.

18     Q.   After receiving this e-mail, WILLIAMS 124, did

19   you update your performance objectives?

20     A.   I don't -- I don't recall.

21     Q.   If you could look at WILLIAMS 127 -- still in

22   Exhibit No. 10 -- and tell me, do you recall this e-mail?

23     A.   Yes.

24     Q.   When is it dated?

25     A.   July 16th.

1     Q.   And you are writing to Ms. Siggerud?

2     A.   Yes.

3     Q.   And what do you say?

4     A.   I asked -- I made her aware that I was in

5     Tucson, and I asked her a question about the merit and

6     asked her if I was on a performance improvement plan.

7     Q.   Why did you believe that you were on a

8     performance improvement plan or you might be?

9     A.   From -- because from the time I requested the

10    ADA accommodation, it seemed like every time her and I had

11    a conversation, it was always something around, "You are

12    not engaged," "The management team feels like you are not

13    available, you are not in the business."  It just felt

14    like we couldn't have a normal conversation.  It was -- it

15    was always something around me not being available,

16    although I was there every day.

17    Q.   Didn't those conversations actually start before

18    you requested an ADA accommodation?

19    A.   They -- they began before.

20    Q.   And did Ms. Siggerud tell you whether or not you

21    were on an action improvement plan?

22    A.   Yes.

23    Q.   What did she say?

24    A.   No, not at this time.

25    Q.   When she said, "Not at this time," what did you

1    -- did you indicate -- strike that.

2              When she said, "Not at this time," did that

3    indicate to you that your performance was at a level that

4    it may soon become part of an improvement plan?

5        A.   No.  I just felt that she was leaving it open to

6    potentially have an issue.  I just felt that she kept

7    building upon things after every conversation we would

8    have, and I kind of felt like it was an open-ended answer

9    of "Not right now, but if I continue to have issues with

10   the conversations with you, then maybe potentially."

11       Q.   When you took over Southern California in your

12   new role as generalist, did you undertake or participate

13   in any training specific to California law?

14       A.   No.

15       Q.   You understand that California has complex

16   employment laws?

17       A.   Yes.

18       Q.   And you were starting to provide HR services in

19   California, correct?

20       A.   Yes.

21       Q.   But you didn't feel it necessary to learn any of

22   the specific HR legal requirements?

23              MR. MILLS:  Object to the form.

24              THE WITNESS:  I had done -- okay.

25              MR. MILLS:  Go ahead.

```
 1                        THE WITNESS:  I had done my own self-study.
 2    I had applied to take my PHR, and the information was
 3    included in my previous studies in my HR.
 4    BY MS. FRANCIS:
 5         Q.   What previous studies?
 6         A.   I was studying for the professional human
 7    resources test.  I was studying to -- to be seated for
 8    that test, to get my certification in HR.
 9         Q.   And how -- when were you doing this?
10         A.   I don't recall the exact date.
11         Q.   Was it before you took the original leave for
12    your son's birth?
13         A.   Yes.
14         Q.   And did you ever complete that certification?
15         A.   I tested for it twice I believe.
16         Q.   And did you complete and get that certification?
17         A.   No.
18         Q.   So you tested twice and you didn't pass either
19    time?
20         A.   No.  I didn't pass by, like, two points.
21         Q.   On both occasions?
22         A.   Yes, I believe so.
23         Q.   Other than that certification course, did you do
24    anything to educate yourself about California-specific
25    employment laws?
```

1      A.   No, because I was not handling anything legally

2   or specifically when it came to California laws as in

3   regards to the California leave rules and obligations.

4   The corporate office and the employee hotline was handling

5   all specific issues when it came to anything legally

6   related to a leave of absence or an FMLA or anything --

7   anything of that sort.

8            I was more dealing with the business aspect

9   in regards to financials and sales and being more of a

10  strategic partner and not dealing with any compensation or

11  any benefit plans.  That was all given to the localized

12  office in -- in Minnesota.

13     Q.   How about schedules and meal break periods?

14     A.   The corporate office dealt with that, or Rachael

15  dealt directly with that with the GM.

16     Q.   What about overtime issues?

17     A.   Rachael dealt with that.

18     Q.   Do you know if Janelle had any specialized

19  training in California employment laws?

20     A.   I believe she had a certification in HR.

21     Q.   Do you know if she had any specific training

22  relative to California?

23     A.   I am -- I am unsure.

24     Q.   So you don't know what her California-specific

25  knowledge was?

1        A.    No.

2        Q.    How many years, do you know, had Janelle been

3    working in California in an HR capacity?

4        A.    I believe a year prior to coming to G&K.

5        Q.    Do you know when she started with G&K?

6        A.    She started, I am guessing, a year after I had

7    been there.  I had trained with the previous person in her

8    position when I started prior to her coming on board.

9        Q.    Okay.  So you started before she did?

10       A.    Yes.

11       Q.    But you believe that she came from a California

12   HR-based position prior to working at G&K?

13       A.    I am unsure what position she held.  I was just

14   aware that she worked for a bank.

15       Q.    In California?

16       A.    Yes.

17       Q.    In an HR capacity?

18       A.    I am unsure if it was an HR position.

19       Q.    Do you think that you were more qualified than

20   Janelle to handle HR issues in California?

21       A.    I don't know if I would say "more qualified,"

22   but I -- I performed the position, and I was more -- I had

23   more of a relationship with those individuals in those

24   locations because I had had previous experience with them

25   in my visits.

1     Q.   You mean with the manager -- plant manager in

2     L.A.?

3     A.   Yes.

4     Q.   How would you describe your relationship with

5     her?

6     A.   I didn't have much interaction with -- with her.

7     I more had interaction with their HR representative,

8     Leticia Rovero, because she trained me when I was first

9     initially hired with G&K, and I went and stayed a few days

10    in Los Angeles and met all of their managers, and I worked

11    closely with her when I first started.

12    Q.   And after the realignment, she was in a

13    recruiting position, correct?

14    A.   Correct.

15    Q.   Did she still work in L.A.?

16    A.   Yes.

17    Q.   But once you became a generalist, you were to

18    work more with the management level people in L.A.,

19    correct?

20    A.   Correct.

21    Q.   And so your relationship with the plant

22    manager -- what was her name?

23    A.   His name -- I -- Patrick Lemos was his name.

24    Q.   And how would you describe your relationship

25    with him?

1        A.    Great.  We had a really good relationship.

2        Q.    How often did you go to California once you

3    assumed the generalist role?

4        A.    I had initially went with Rachael.  She asked me

5    to wait till when she could go with me, and she wanted to

6    schedule the business visits around her travel, because

7    she wanted to go with me to introduce me to everyone and

8    just explain the whole realignment of HR to all the

9    managers.

10       Q.    So you went once?

11       A.    I went once with Rachael, and then I went back

12   an additional time to San Diego by myself.

13       Q.    And how long did you stay in San Diego?

14       A.    Approximately three days.

15       Q.    And why were you going to San Diego?

16       A.    To introduce myself to the managers there at the

17   location and to just build on the relationships with them

18   and to start the -- the strategic partnership with them

19   and to discuss talent management and succession planning.

20       Q.    Who was the general manager in San Diego?

21       A.    Tom Dunn I believe.

22       Q.    And so you met with him once for three days,

23   correct?

24       A.    Yes.

25       Q.    And you met with the plant manager in L.A. on

1    one occasion for one day with Rachael, correct?

2         A.    Yes.

3         Q.    Did you make any other trips to California

4    during the time that you were a generalist?

5         A.    Not after that, no.

6         Q.    Did you ever go to Ontario?

7         A.    Yes.

8         Q.    And that is in California, correct?

9         A.    Yes.

10        Q.    When did you do that?

11        A.    When I was with Rachael.  The same trip we went

12   to Santa Fe Springs in L.A., and then we drove to Ontario

13   one day, and then the following day we drove to Sun

14   Valley, California.

15        Q.    So you visited all of the locations once?

16        A.    Correct.

17        Q.    Who was the manager in Ontario?

18        A.    I don't -- I don't recall his name.

19        Q.    And who was the manager in Sun Valley?

20        A.    I don't recall a specific name.

21        Q.    Was there a woman manager in L.A. that you had

22   issues with?

23        A.    The general manager there was Angie Gracyck and

24   I thought we had a great relationship.  I only met her

25   once.

1        Q.    Did you get any feedback from her about what she

2    felt your role should entail or whether or not you were

3    accomplishing your goals?

4        A.    No.

5        Q.    Do you know if she provided any feedback back to

6    Ms. Siggerud about your role?

7        A.    I was not aware of any.

8        Q.    And you said she was the general manager,

9    correct?

10       A.    Yes.

11       Q.    But you told me previously there was a different

12   general manager or was that a plant manager in L.A.?  You

13   said his name was Patrick.

14       A.    Patrick Lemos is the plant manager in Los

15   Angeles.

16       Q.    And Angie was the general manager?

17       A.    Correct.

18       Q.    So Angie would have worked under Patrick,

19   correct?

20       A.    No.  Patrick would have worked under Angie.

21              MS. FRANCIS:  Okay.  Can we take a quick

22   break?

23              MR. MILLS:  Sure.

24              VIDEO TECHNICIAN:  This is the end of media

25   No. 3 in the continuing deposition of Brandy Lane

1    Williams.  Today's date is June 14, 2016.  The time is

2    1:46 p.m.

3                    (Recess ensued from 1:46 p.m. until

4    1:57 p.m.)

5                    VIDEO TECHNICIAN:  We are back on the

6    record.  This is the beginning of media No. 4 in the

7    continuing deposition of Brandy Lane Williams.  Today's

8    date is June 14, 2016.  The time is 1:57 p.m.

9    BY MS. FRANCIS:

10        Q.   Can you look at what has previously been marked

11   as Exhibit No. 8?

12        A.   Okay.  Yes.

13        Q.   Have you seen Exhibit No. 8 before?

14        A.   Yes.

15        Q.   What is it?

16        A.   The phone conversation between Rachael Siggerud

17   and myself.

18        Q.   Have you read the transcript?

19        A.   Not in its entirety.

20        Q.   Have you verified that what is contained within

21   the transcript is an accurate depiction of what was said

22   during your phone call that you recorded with Rachael?

23        A.   A portion of it.

24        Q.   Okay.  Which portion have you confirmed is

25   correct?

1      A.   I think I read the first two or three pages.

2      Q.   And did it appear correct to you?

3      A.   Yes.

4      Q.   Okay.  I would ask -- I need verification that

5   what was said in this transcription is what you said on

6   that call.  So I don't know if we want to take a break and

7   do that off the record, but I am going to ask you that

8   question about both of the transcripts that you provided.

9   So I apologize.  Maybe we can go off the record so that

10  you can do that; otherwise, I am going to have to go

11  through the statements that are within the transcript.  Do

12  you understand?

13     A.   Yes.  I -- I'll take time to read them.

14          MS. FRANCIS:  Okay.

15          VIDEO TECHNICIAN:  We are off the record at

16  1:59 p.m.

17          (Recess ensued from 1:59 p.m. until

18  2:33 p.m.)

19          VIDEO TECHNICIAN:  We are back on the

20  record at 2:33 p.m.

21  BY MS. FRANCIS:

22     Q.   During the break, I asked you to review Exhibits

23  Nos. 8 and 9 that were previously marked in depositions.

24  Have you had a chance to review Exhibit No. 8?

25     A.   Yes.

1          Q.    And is Exhibit No. 8 an accurate transcription

2     of a conversation that you recorded on June 26th of 2013

3     between yourself and Ms. Siggerud?

4          A.    Yes.

5          Q.    I will ask you the same question about Exhibit

6     No. 9.  Is Exhibit No. -- well, have you had an

7     opportunity to review in full Exhibit No. 9?

8          A.    Yes.

9          Q.    Is Exhibit No. 9 an accurate transcription of a

10     conversation that you recorded with Ms. Siggerud and

11     yourself on July 17th of 2013?

12          A.    Yes.

13          Q.    Okay.  Go back to Exhibit No. 8.  On June 26th,

14     why did you decide to record your conversation with

15     Ms. Siggerud?

16          A.    I felt that I was beginning to be retaliated

17     against just for the mere fact that every time we had a

18     conversation, it was around the perception that I wasn't

19     in the business or that I was away from the business.

20          Q.    Did you plan the recording in advance of the

21     call?

22          A.    No.

23          Q.    Did you have a recording device available to you

24     when the call was ongoing?

25          A.    My phone.

1       Q.    You can record on your phone?

2       A.    Yes, my cell phone.

3       Q.    Do you have a special application to do that?

4       A.    It is on every iPhone I think.

5       Q.    What is the program called?

6       A.    Microphone I think or Recorder.  I am not sure.

7       Q.    Did you put Ms. Siggerud on speakerphone?

8       A.    Yes.

9       Q.    And then you recorded what was being said

10   through your iPhone?

11      A.    Yes.

12      Q.    And was this on the G&K phone?

13      A.    Yes.

14      Q.    And do you have an understanding of whether or

15   not -- well, strike that.

16              Did you tell Ms. Siggerud that you were

17   recording the phone call?

18      A.    No.

19      Q.    Why did you choose not to tell her that?

20      A.    In the state of Arizona, I was not aware that

21   you were required to tell the other person.

22      Q.    Where was Ms. Siggerud when you were recording

23   her?

24      A.    I am unaware of where she was.  She traveled a

25   lot so I am unsure where she was.

1      Q.    Do you have a understanding of whether or not it
2  is legal to record interstate phone calls, where one party
3  is outside of Arizona?
4      A.    I am not aware, no.
5      Q.    Have you done any research to determine that as
6  of today?
7      A.    No.
8      Q.    Do you know where Ms. Siggerud was when you
9  recorded the phone call with her on July 16 -- I'm sorry,
10  July 17 of 2013?
11     A.    No.
12     Q.    She was not in the state of Arizona?
13     A.    Not that I am aware of.
14     Q.    And as to the call on June 26 of 2013 that you
15  recorded, Ms. Siggerud wasn't in Arizona when you recorded
16  that phone call either, was she?
17     A.    Not that I am aware of.
18     Q.    You don't know where she was?
19     A.    No.
20     Q.    The recording in Exhibit No. 8 starts at minute
21  number -- strike that.
22            The -- the transcript in Exhibit No. 8
23  starts at minute 33; is that correct?
24     A.    I am unaware what that means.
25     Q.    Where it says "commencement of audio file" on

1   the beginning of the transcription --

2        A.   Um-hum.

3        Q.   -- and it says 33:10:01 -- do you see that?

4        A.   Yes.

5        Q.   -- what does that indicate to you?

6        A.   I don't know.

7        Q.   Are you aware if the transcription starts in the

8   middle of the phone call that you recorded?

9        A.   No.

10       Q.   You believe that the transcription includes the

11  complete portion of the call that you recorded?

12       A.   I don't recall.

13       Q.   Did you record the call from the very beginning

14  of your conversation with Ms. Siggerud?

15       A.   I don't recall.

16       Q.   And you provided the complete audio files for

17  Exhibit No. 8 and 9 to your counsel?

18       A.   Yes.

19       Q.   Do you know if there is a portion of the call

20  that is not included in the transcriptions that we have in

21  Exhibits 8 and 9?

22       A.   No.   I provided everything that was on my phone.

23  I don't have anything else outside of this.

24       Q.   But after reviewing these exhibits, can you tell

25  whether or not there was part of the call that is not

1    included in the transcription?

2         A.    No.

3         Q.    You can't tell?

4         A.    I can't tell.  Not that I am aware of.

5         Q.    If you look at page 19 of Exhibit No. 8 -- and

6    tell me when you are there.

7         A.    Page 17 through 20.

8         Q.    Right.  And then there is a square at the top

9    right that is page 19.

10        A.    Okay.

11        Q.    Are you there?

12        A.    Yes.

13        Q.    At line 13 through 16, Ms. Siggerud is speaking,

14   and she discusses that there was an argument between you

15   and Mitch.  Do you see that?

16        A.    Yes.

17        Q.    What was the argument between you and Mitch?

18        A.    I don't believe that we had an argument.  I

19   believe that maybe he had a perception that we had an

20   argument, but we were just in a discussion about a

21   business matter that he got upset about just from the

22   answer that I was giving him from what he asked me.  But I

23   don't remember getting into an argument with him, no.

24        Q.    Tell me specifically what happened.

25        A.    I don't remember specifically what we were

1    discussing.

2        Q.   What was he upset about?

3        A.   I don't recall.  We were -- we were having a

4    meeting about the Phoenix business, but I don't recall

5    specifically what it was about.

6        Q.   What answer did you give him that was upsetting?

7        A.   That we should be more positive, and that we

8    would -- we would be able to work through these situations

9    together, and he got very upset and said that he was

10   already doing everything that he could do and he couldn't

11   take on any more work and, you know, I think he just

12   became frustrated by me continuing to say that we should

13   be positive.

14       Q.   What work was he going to have to take on that

15   he felt that he couldn't take on any more?

16       A.   I believe the issue was around them responding

17   and following up with their customers through service and

18   the fact that his managers weren't able to perform their

19   jobs due to that they were running routes and delivering

20   goods all the time because they didn't have enough drivers

21   because he had a lot of turnover in his department.

22       Q.   And when you were telling him to stay positive,

23   what did you mean by that?

24       A.   I just felt a lot of pushback just from trying

25   to work with him and help be supportive to him in his

1    role, just to let him know, you know, not to focus on all

2    the negative things and that we would get through those

3    together and I was there to help him and help support him.

4         Q.    And you said he was very upset.  What did he do

5    that indicated to you he was very upset?

6         A.    He just got very loud with me and raised his

7    voice and was yelling at me in front of everyone in the

8    meeting.

9         Q.    How many people were there?

10        A.    Possibly eight.

11        Q.    Do you recall specifically who?

12        A.    It was service, so it was his managers, himself,

13   and then Jake and then our plant manager and myself.  I

14   can't recall everyone that was there though.

15        Q.    There is a suggestion in some of the documents

16   that have been produced that you would critique and point

17   out things that the Phoenix managers were doing wrong and

18   either report on them or tell somebody that they were

19   doing things that were wrong.  Do you agree that that was

20   something that has been said about your relationship with

21   the Phoenix managers?

22        A.    No.

23        Q.    Have you ever heard that before --

24        A.    No.

25        Q.    -- that you pointed out things they were doing

1    wrong instead of partnering them to try and come up to

2    resolutions?  Have you heard that before or anything like

3    that?

4         A.   No.

5         Q.   So you don't have an understanding of what that

6    would have been about?

7         A.   I -- I haven't been told that before previously,

8    no.

9         Q.   Has Mitch ever suggested to you that instead of

10   pointing out things that they are doing wrong that you

11   should work with them to come to solutions?

12        A.   No.  I was always supportive with him.

13        Q.   Did you ever go on routes with the drivers?

14        A.   Possibly once or twice.

15        Q.   And during those trips, did you point out things

16   that the drivers were doing wrong?

17        A.   No.  I was there only on -- to observe.

18        Q.   Did you ever point out any safety issues that

19   the plant was doing wrong?

20        A.   In what aspect?

21        Q.   In any aspect.  Did you ever say that there are

22   these safety things that they were not following at the

23   plant?

24        A.   That was part of my job, yes.

25        Q.   How often did you do that?

1      A.    When I went through a walk-through with the

2   managers of the plant, they asked for everyone to

3   participate in the meeting and that if we saw anything

4   unsafe to bring it to their attention so we could include

5   it in our group notes for our group meetings, so it was

6   everyone's responsibility.

7      Q.    Who are you referring to?

8      A.    Our safety team, our management team at the

9   plant.

10      Q.    So this was something that was specific to

11   Phoenix?

12      A.    Each location had -- had -- had a safety team

13   that involved their location managers.

14      Q.    We already established that you only went to the

15   other locations in California on one occasion each.

16   During those visits did you point out safety issues?

17      A.    No, I was not -- I didn't participate in their

18   safety walk-through.

19      Q.    Okay.  So you only did that in Phoenix?

20      A.    I did it Pittsburg once when I went up for a

21   visit.

22      Q.    And that is California as well?

23      A.    Yes.

24      Q.    And who was the general manager there?

25      A.    Scott.

1      Q.    And how would you describe your relationship

2   with him?

3      A.    We only met maybe on two occasions.

4      Q.    And when you were physically present there?

5      A.    Yes, when I was physically present, yes.

6      Q.    So you went to Pittsburg twice?

7      A.    I believe so, yes.

8      Q.    What was the purpose of your visits?

9      A.    Training, or just shadowing the HR person that

10   was there and just getting ideas from their plant manager

11   to take back to Phoenix.

12      Q.    Was this before you became a generalist?

13      A.    Yes.

14      Q.    After you became a generalist, did you go to

15   Pittsburg, California?

16      A.    I -- I don't recall.

17      Q.    Was that one of your locations?

18      A.    No.

19      Q.    What safety issues do you recall reporting on at

20   the Phoenix plant?

21      A.    Prior to me moving into the generalist role?

22      Q.    After.

23      A.    None.  I -- I didn't point out anything in the

24   generalist role.  I don't recall anything.

25      Q.    Did you point out any issues that the Phoenix

1    management team was doing wrong with the HR functions that

2    were transitioned to them?  Like, we talked about payroll

3    and processing.  Did you point out any errors in what they

4    were doing with the functions that were transferred to

5    them after the realignment?

6         A.   I did, after I was presented the information

7    from Rachael and then also from the corporate office from

8    the department that was having the issue.

9         Q.   What errors did you point out?

10        A.   Payroll errors or getting time sheets in on

11   time.

12        Q.   And who would you report to -- who would you

13   report those errors to?

14        A.   Whichever manager it was that had the -- that

15   had the issue with the payroll.

16        Q.   So was it a local manager or was it somebody in

17   corporate that you reported to?

18        A.   I don't understand the question, sorry.

19        Q.   When you found errors in payroll --

20        A.   Um-hum.

21        Q.   -- who did you report those errors to?

22        A.   I didn't find the errors.  The corporate office

23   would let me know that they found the errors when they

24   processed payroll, and they would ask me to help them with

25   the manager and for me to please have a conversation with

1    them letting them know that we needed some improvement

2    around the time in processing the payroll.

3         Q.   What were the issues specifically with Phoenix

4    in payroll?

5         A.   Turning in the payroll late after payroll had

6    been closed out or turning in a time sheet late or adding

7    on commissions after payroll had been processed or

8    requesting a check request for a separate check outside of

9    payroll.

10        Q.   And how did the management team in Phoenix

11   respond when you brought these issues to their attention?

12        A.   Just as before, that they were frustrated that

13   they, you know, didn't have time to be doing it, and it

14   was just an additional function that HR should be doing,

15   and that's why they felt that they were inadequate in some

16   things because they were not used to doing it and that,

17   you know, it is not something that, you know, they felt

18   should be part of their job function.

19        Q.   Were there any other errors that you pointed out

20   in some of the functions that were transferred to the

21   businesspeople after the realignment other than the

22   payroll that we talked about?

23        A.   Not that I recall, no.

24        Q.   If you look at Exhibit No. 9 on page 14 -- tell

25   me when you are there.

1       A.    Okay.

2       Q.    At lines 20 and 21, you indicate that you had a

3   conversation with Ms. Siggerud on July 9th about the lack

4   of engagement and support.  Do you see that?

5       A.    Yes.

6       Q.    What were you referencing?

7       A.    I am unsure.  I am not really sure of the

8   specific --

9       Q.    Did Ms. Siggerud relay to you on or about

10  July 9th that there was a perception that you were not

11  engaged?

12      A.    Yes.

13      Q.    And what did you understand that to mean?

14      A.    That that was other's opinions or just how they

15  felt around how much I was in the business.

16      Q.    And who are the people that you were discussing

17  that had that perception?

18      A.    From my understanding, she was discussing with

19  me that the Phoenix management group had a perception that

20  I was not engaged or in the business.

21      Q.    And the lack of support, is that a problem that

22  you were bringing to Ms. Siggerud's attention?

23      A.    I am unsure.

24      Q.    Were there complaints that you were not getting

25  support from the Phoenix leaders?

1        A.    Yes.

2        Q.    And you expressed those to Ms. Siggerud?

3        A.    Yes.

4        Q.    And what did you mean when you would tell her

5   you were not getting support from the Phoenix leaders?

6        A.    Just as far as the -- the job duties itself,

7   when -- when her and I would have our one-on-one meetings

8   and she would suggest that I get more involved and ask

9   managers about the financials of the business or ask them

10  to teach me about their role, they would get very

11  defensive about it and very agitated -- of why did HR want

12  to know anything about, you know, financials with the

13  business.  And they -- I think they -- they felt that I

14  was being very intrusive into, you know, their -- their

15  part of the business or their job or like I was

16  questioning them about what they were doing, although this

17  is what Rachael had instructed me to do.  And she told us

18  that was -- part of our job is to -- to learn and -- to

19  learn the business and to just observe and to meet with

20  the managers and follow them or shadow them as much as we

21  could.  But when I asked about it, I felt that they would

22  push back and that they -- they wouldn't involve me in

23  these things.

24       Q.    When you are saying "they," who are you

25  referring to?

1        A.    It would be service, Mitch Rubinoff, and
2   sales -- the sales manager.
3        Q.    Do you recall that person's name?
4        A.    He was very new at the time.  Gary -- I don't
5   remember his last name, but he was -- he was a pretty new
6   sales manager.
7        Q.    And you felt he was giving you pushback about
8   learning his role and function?
9        A.    He was still learning himself, so I think it was
10  kind of hard to follow him or get information from him.
11  Because, you know, I would ask him and he would say,
12  "Well, we could learn together," or, you know, "I would be
13  happy to show you what I would do," but I think, you know,
14  he was still learning too, so I couldn't obtain a lot of
15  information from him.
16       Q.    So who was the pushback coming from other than
17  Mitch?
18       A.    From Jake and from Mitch and from -- from the
19  branch manager in Tucson.
20       Q.    What was that person's name?
21       A.    Andy -- Andy -- Andy Brown, I think.
22       Q.    And when had you gone to Tucson to try and
23  engage with him?
24       A.    That was I think in the other recorded
25  conversation, so it was -- I don't recall the exact date.

1     Q.   But that is discussed in Exhibit No. 8 you are

2   saying?

3     A.   Possibly.  I am not exactly sure.

4     Q.   So you don't know when you went to Tucson but

5   how many times did you engage or attempt to engage with

6   the Tucson manager?

7     A.   He came up for our quarterly business reviews or

8   I would -- I would randomly go down and meet with him and

9   his employees, or prior to the generalist role, I would go

10  down for the benefit meetings or the benefit rollouts, or

11  I would go down and help with the performance reviews at

12  the year-end.  So I had been down for several visits to

13  Tucson and Prescott Valley.

14    Q.   Let's talk about Tucson specifically.  On how

15  many occasions do you think you attempted to engage with

16  the Tucson management team where you received pushback?

17    A.   I would be guessing.  I -- I don't -- I don't

18  know the exact number of times.

19    Q.   Can you estimate for me?

20    A.   More than five.

21    Q.   And what about Prescott Valley?  Did you

22  encounter a similar reaction there where the management

23  team didn't really want you to engage with them?

24    A.   Yes.  They were very frustrated about adding HR,

25  you know, job duties to their -- to their positions also.

1      Q.    So they gave you the same pushback you were

2   feeling in Tucson?

3      A.    Yes.

4      Q.    And how many times did you attempt to engage

5   with them and get that pushback, if you can estimate for

6   me?

7      A.    More than five.

8      Q.    If you look at page 15 in Exhibit No. 9, I think

9   we already talked about the one-on-one meeting that you

10   missed with Ms. Siggerud, correct?

11     A.    Yes.

12     Q.    Did that happen on more than one occasion?

13     A.    No.

14     Q.    At lines 14 through 16, it talks about a

15   worker's comp sharpshooters' meeting and that you were

16   late for that.

17     A.    Yes.

18     Q.    Do you recall what that was about?

19     A.    Yes.

20     Q.    What happened?

21     A.    We were -- I was on an HR support team.  Once

22   the HR realignment had occurred, we were all placed on a

23   support team with other HR individuals outside of the

24   region we were in because they just wanted us to be more

25   diverse and not just have people who were in our region.

1                    And I was on this -- this team with the

2    previous HR person that was in my role prior to her

3    getting promoted, and she helped to train me, but she had

4    set up this meeting and -- in Lotus Notes on our calendar,

5    and I had accepted it.  And the code that she sent us, the

6    code was wrong, and so I had called her and she stated,

7    "Oh, yes, I'm sorry.  I know the code was wrong," and she

8    re-sent it to everyone, and then we all dialed in and we

9    got on the conference call.

10        Q.   So you were not the only one that was late to

11   that call?

12        A.   No.

13        Q.   Did you receive criticism for being late to any

14   other meetings?

15        A.   Two other meetings I believe.

16        Q.   What other meetings?

17        A.   I don't remember specifically what they were

18   about.

19        Q.   Do you remember who they were with?

20        A.   The Phoenix management group.

21        Q.   And they were meetings that you had accepted

22   attendance to?

23        A.   Yes.

24        Q.   And do you recall why you were late to those two

25   meetings?

1      A.   I had gone in and they were all kind of just

2   sitting around -- sitting around chatting and they had not

3   began yet, and so I left out -- I was having a lot of

4   female problems at the time and I was bleeding very

5   heavily, and so I would randomly have to go and change my

6   clothes in the restroom or go to the bathroom or I would

7   go to my office to, you know, get something out of my

8   personal belongings, and they had already started after I

9   had left out the first time, and then when I went back in

10  to join after I got done changing my clothes, they had

11  already began.

12      Q.   And that happened on two occasions?

13      A.   Yes.

14      Q.   And did you let Ms. Siggerud know that was the

15  reason you were late?

16      A.   Yes.

17      Q.   And what was her response?

18      A.   "I understand, but you need to understand that

19  it is everyone's perception that you don't care because --

20  because you are late."

21      Q.   Were there any other meetings that you were

22  criticized for coming late to or not showing up to that we

23  have not talked about?

24      A.   Not that I am aware of, no.

25      Q.   If you could look at page 23 in Exhibit No. 9,

1    at -- starting at line 10, Ms. Siggerud suggests that she

2    is hearing -- what she is hearing you say is that you

3    don't want to work in that generalist role.  She

4    understands the job has changed, and it is not what

5    everybody wants.  And she says:  I would like you to kind

6    of think about it for the next couple of days.

7                     Do you see that part?

8         A.   Yes.

9         Q.   Is this where you contend Ms. Siggerud told you

10   that you had three days to think about whether or not you

11   wanted to stay in your position?

12        A.   Yes.

13        Q.   Where does she give you three days?

14        A.   It was after the -- after the recording had

15   stopped, and we had another conversation about my FMLA

16   leave.

17        Q.   And that happened during this same phone call

18   that you recorded?

19        A.   Not during this recording, no.

20        Q.   Okay.  It was on a different occasion that she

21   gave you the three days?

22        A.   No.  She told me at this time that she wanted me

23   to take time to think about it.

24        Q.   Right.  And I am trying to figure out -- because

25   you said in your complaint and charge that she gave you

1    three days to think about it, so when did that occur?

2         A.    After this conversation.

3         Q.    On this same date?

4         A.    No.

5         Q.    On what date?

6         A.    I don't know the exact date.

7         Q.    It was after this call she said:  I am going to

8    give you three days to think about it.

9                Correct?

10        A.    Yes.

11        Q.    And you were transferred into the recruiting

12   position on July 29th, correct?

13        A.    Yes.

14        Q.    So this conversation is on July -- excuse me --

15   July 17th, correct?

16        A.    Correct.

17        Q.    So the conversation where she gave you three

18   days happened somewhere in between those two dates?

19        A.    Yes.

20        Q.    But you don't recall specifically?

21        A.    No.

22        Q.    In Exhibit No. 9, you tell her you don't need

23   time to think about it, correct?

24        A.    Correct.

25        Q.    And that is consistent with what you testified

1    previously you told her when she offered to give you three

2    days to think about it too?

3         A.   Correct.

4         Q.   If you look at page 25 at line 5, you are

5    speaking in the phone call, and you say that you never

6    planned on leaving the company but I feel like, you know,

7    I should -- I shouldn't continue to stress myself

8    considering the health situation that I am in if it is not

9    going to be beneficial to me.  If I feel that my morale

10   has dropped due to the situation and I feel that I am not

11   wanted, then I don't feel like I should continue to make

12   an effort.

13                  Did I read that correctly?

14        A.   Yes.

15        Q.   Did you make those statements to Ms. Siggerud?

16        A.   Yes.

17        Q.   Look at page 27, please.  If you look at lines 3

18   through 5, Ms. Siggerud is talking during the call, and

19   she says:  Ultimately, it sounds to me that what you are

20   saying, like, you are not quite sure that this is what you

21   want.

22                  Did I read that correctly?

23        A.   Yes.

24        Q.   And she goes on at lines 12 and 13, and she

25   says:  And so if what you are asking for is for transition

1    support --

2                    And you interrupt her at line 14, and say:

3    Yes.

4                    Correct?

5        A.   Yes.

6        Q.   So when she is talking about transition support,

7    she is talking about transitioning you to a different

8    position, correct?

9        A.   I am unaware of what she meant by "transition."

10       Q.   Well, during this phone call -- because you have

11   already read Exhibit No. 9 -- she talks about

12   transitioning you to a different position if you are

13   unhappy in the general -- in the generalist position,

14   correct?

15       A.   Are you asking me if she had previously stated

16   that she was going to move me into a position?

17       Q.   No.  During this -- this phone call that you

18   recorded, that is Exhibit No. 9 --

19       A.   Um-hum.

20       Q.   -- Ms. Siggerud is talking with you about the

21   possibility of a transition to another position if you

22   don't want to work in the generalist job, correct?

23       A.   She had not stated that yet, no.

24       Q.   On page 25 and 26, if you start at line 20 and

25   go to page 26, line 5, isn't Ms. Siggerud talking about if

1    this is not the kind of job that you want if you would

2    rather have a different kind of schedule she understands

3    that and to let her know?

4         A.   Yes.

5         Q.   And didn't you take that to mean if you wanted

6    to do a different job, she would support you in

7    transitioning?

8         A.   No, I don't recall her saying transition.  I

9    just merely remember her saying "support."  So I took it

10   as she would be willing to provide me with more support in

11   my current role, not to move into a different one.

12        Q.   When she asks you to think about what you wanted

13   to do, wasn't part of what she was asking you to think

14   about doing was whether or not you wanted to transition to

15   another position?

16        A.   I am unsure.  She was always very -- very vague

17   in our conversations.  I always had a hard time really

18   understanding what she was -- what she was trying to

19   convey as in, you know, being supportive of me or -- she

20   always made me -- felt like -- like she kind of was

21   pushing me to say I wanted to quit.  I always felt the --

22   the -- like the push from her, just like trying to feed me

23   words or trying to tell me this is -- this is -- this is

24   what you want to do.  "You are not happy, right?"  And I

25   would tell her, "No, I am happy.  I love my job.  I love

1  being here," but she would, you know, keep pushing back

2  and saying, "Well, no, that is not what I am hearing you

3  say," and I would say, "I am not saying that," and she

4  would say, "But, no, that is what you just said, right?"

5       Q.   Look at page 34.

6       A.   Okay.

7       Q.   If you start where Ms. Siggerud is talking at

8  line 19, she says:  I want you to think over this for the

9  next few days if this is what you want.  And if it is not

10  what you want, I am not going to hold it against ya, we

11  will come up with a transition plan.  I will support ya.

12  We can either look for something else within G&K.  I can

13  help you with the transition plan to find something else

14  outside of G&K, but I will work with you -- or ya -- to

15  figure it out.

16            Did I read that correctly?

17       A.   Yes.

18       Q.   So part of the transition plan that she was

19  talking about or the transition support during this call

20  was a transition to another position within G&K, correct?

21       A.   Right.  She stated that after I said "yes" to

22  her question.

23       Q.   And you answered yes, that you would be

24  interested in transition support, correct?

25       A.   That was prior to her making that statement, so

1    no.

2        Q.    But she was referring to transition support and

3    you said yes?

4        A.    That was prior to her explanation though of what

5    she meant within the company or outside of the company.

6        Q.    Well, you understand what transition means,

7    right?

8        A.    I just heard her say "support," so I thought she

9    meant supporting me in my current role.

10       Q.    My question is different.  You understand what

11   "transition" means?

12       A.    Yes.

13       Q.    What does "transition" mean to you?

14       A.    To -- a change.

15       Q.    A change in position in this situation, correct?

16       A.    Yes.

17       Q.    Previously, you told me that you believe the

18   perception of your unavailabilities was related entirely

19   to your medical issues, correct?

20       A.    Yes.

21       Q.    On page 30 starting at line 24 of Exhibit No. 9,

22   you are talking to Ms. Siggerud, and you tell her that you

23   feel like this perception about your unavailability, this

24   "dilemma" you call it, started when Jake decided to move

25   your office, correct?

1        A.    What line is that on?

2        Q.    Page 30, line 24 through 31 of Exhibit 9.

3        A.    I say that I felt that that is where it began,

4    yes.

5        Q.    And you say:  I felt like that's where this

6    dilemma has occurred.

7                    Correct?

8        A.    No.  I said I felt like where this went

9    downhill.

10       Q.    Look at page 31, line 8 and 9.  You state:  I

11   felt like that's where this dilemma has occurred.

12                   Correct?

13       A.    Yes.

14       Q.    And you are referring to the perception in

15   Phoenix about your unavailability, correct?

16       A.    Correct.

17       Q.    And your office move has nothing to do with your

18   medical condition, does it?

19                   MR. MILLS:  Object to the form.

20                   THE WITNESS:  Can you restate that?

21   BY MS. FRANCIS:

22       Q.    Sure.  You are describing here that you believe

23   the perception originated from the office move, correct?

24       A.    That was part of it, yes.

25       Q.    You say that's where this -- you feel like this

1    dilemma has occurred, correct?

2         A.   Yes.

3         Q.   And the office move has nothing to do with your

4    medical condition, does it?

5         A.   No.

6                   MR. MILLS:  Same objection.

7                   MS. FRANCIS:  Did you get an answer?

8                   MS. REPORTER:  The answer was, "No."

9                   THE WITNESS:  Can we take a break?

10                  MS. FRANCIS:  Yes.

11                  VIDEO TECHNICIAN:  We are off the record at

12   3:10 p.m.

13                  (Recess ensued from 3:10 p.m. until

14   3:20 p.m.)

15                  VIDEO TECHNICIAN:  We are back on the

16   record at 3:20 p.m.

17   BY MS. FRANCIS:

18        Q.   You previously mentioned that you missed a

19   flight because you were really sick and you couldn't go on

20   that trip.  Do you recall telling me that?

21        A.   Yes.

22        Q.   Did you ever tell anyone after the July 8th

23   accommodation request at G&K that you needed a different

24   accommodation?

25        A.   No.

1    Q.   Because it sounds like what you are describing

2  is that your medical condition got worse; is that correct?

3    A.   No.

4    Q.   It just had -- you had an issue that it worsened

5  for a short period of time that you could not take that

6  trip?

7    A.   I got sick from my son --

8    Q.   Okay.

9    A.   -- yeah, from him going to daycare.

10    Q.   So that was unrelated to your underlying medical

11  condition that you needed the accommodation for?

12    A.   Correct.

13    Q.   Okay.  Do you recall generally when that

14  happened?  Is it consistent with the time frame in that

15  e-mail?  You said I think two weeks before your

16  termination?

17    A.   Yeah, two weeks before my termination.  It was,

18  like, the first of September, first part of September of

19  2013.

20    Q.   And -- and the only complication that you had

21  was an illness from your son.  It was not that your

22  medical condition worsened, the one --

23            MR. MILLS:  Let me object to the form.

24  BY MS. FRANCIS:

25    Q.   Yeah, let me restate that.  That was horrible.

1    Sorry.

2                   I just want to be clear that your medical

3    treatment that you received the ADA accommodation for to

4    go to ongoing medical appointments -- your medical

5    condition was stable; it didn't get worse during your

6    employment?

7         A.   No.

8         Q.   No, it didn't get worse?

9         A.   No, it didn't, no.

10        Q.   Okay.  So it was stable during the time that you

11   were working?

12        A.   It was the same as it had been from the start.

13        Q.   Okay.

14                   MS. FRANCIS:  Let's mark another exhibit.

15                   (Deposition Exhibit No. 14 was marked for

16   identification by the reporter.)

17   BY MS. FRANCIS:

18        Q.   Do you recognize Exhibit 14?

19        A.   Yes.

20        Q.   What is it?

21        A.   My annual performance document.

22        Q.   For what year?

23        A.   2012 and 2013.

24        Q.   Can you identify for me what parts of the

25   comments you wrote and what part of the comments

1    Ms. Siggerud wrote?

2         A.    I wrote the midyear comment summary.

3         Q.    Section 1?

4         A.    Section 1, yes.

5               And I wrote individual objective 1,

6    individual objective 2, and I wrote the year-end overall

7    review, and I wrote section 4, development goal and

8    relocation preferences.

9         Q.    Which part of the document did Ms. Siggerud

10   write, if you know?

11        A.    She wrote the manager comments after section 3.

12        Q.    Within section 3?

13        A.    In section 3, yes.

14        Q.    Did you also write the individual objective

15   No. 3?

16        A.    Yes.

17        Q.    Did Ms. Siggerud revise any of the parts that

18   you wrote to include a specific performance objective?

19        A.    No.

20        Q.    So I am clear that each of the performance

21   objectives that are set in here and that you have

22   identified as portions that were written by you, those are

23   objections -- objectives that you created for yourself?

24        A.    Her and I created them together.

25        Q.    Is there any specific objective that

1    Ms. Siggerud told you you must have in here?

2        A.    Each one of them were specifics that her and I

3    discussed that she stated I should include in my review.

4        Q.    Were there any that she developed on her own

5    that she told you that you had to do?

6        A.    All of -- the whole document was from --

7    direction from her.

8        Q.    In collaboration with you?

9        A.    Correct.

10       Q.    And I want to know if there was anything --

11   well, let me rephrase the question.

12             Was there any objective that Ms. Siggerud

13   and you discussed and put into the plan that you were

14   uncomfortable with or you felt you couldn't meet?

15       A.    No.

16       Q.    Did you meet the goals that you set for yourself

17   in 2013?

18       A.    Yes.

19       Q.    Did you meet all of them?

20       A.    Yes.

21       Q.    If you look at the manager comments that are

22   within section 3, which is the year-end overall summary,

23   where you indicated those were written by Ms. Siggerud --

24       A.    Yes.

25       Q.    -- she states:  Brandy, I am very disappointed

1   to see that you have not completed anything in your G&K

2   perform document, although we have spoken about it on

3   several occasions over the past month.

4                  Did I read that correctly?

5       A.   Yes.

6       Q.   What did you think she meant?

7       A.   I'm sorry, can you restate that?

8       Q.   When she wrote this and this was given to you as

9   your performance evaluation, what did you believe that

10   Ms. Siggerud was telling you?

11      A.   I was not given this immediately.  Ms. Siggerud

12   didn't complete this approximately until August 28th, two

13   months after I had completed my portion of it, and I was

14   in the -- already the temporary recruiting role.  So we

15   didn't have much conversation around the end -- the

16   overall end of this performance review.

17      Q.   Okay.  Well, I don't think that answers my

18   question, but let's go to the last page where it talks

19   about the audit history so we are clear about when you

20   created this document.

21      A.   Okay.

22      Q.   You created this document on July 26th, correct?

23      A.   That's when I finalized it.

24      Q.   Well, it says:  Created by.

25      A.   But that was the day that I finalized it for her

1    to review it.  I had been working on it since June 27th.

2         Q.    Okay.  So you submitted this document to

3    Ms. Siggerud on July 26th of 2013, correct?

4         A.    No, I finalized it on that date.  We save drafts

5    while we work on it, and we just save it and your manager

6    can review it and make suggestions for you to make

7    changes, and then you have to finalize it to put it into

8    the mode to where the manager can make their comments on

9    it, and I didn't finalize it for her to make her comment

10   until the 26th --

11        Q.    Of July?

12        A.    -- of July.

13        Q.    And then it was last updated and completed on

14   August 28th, correct?

15        A.    By Rachael.

16        Q.    Right.  So it took about a month for her to

17   provide her feedback and input, correct?

18        A.    Correct.

19        Q.    Not two months?

20        A.    From the time that it had been -- that it had

21   been started it was two months.

22        Q.    But you agree you submitted it to her in final

23   form for her comments on July 26th, correct?

24        A.    She had reviewed it prior to that.

25        Q.    I know.  We are not communicating.

1          A.    Okay.

2          Q.    You submitted it in final form on July 26th for

3    Ms. Siggerud to then provide her input and response, yes?

4          A.    Yes, after her suggested changes.

5          Q.    And she provided her response a month later?

6          A.    Correct.

7          Q.    And part of the response that she provided was

8    what we were looking at previously, the manager comments,

9    correct?

10         A.    Correct.

11         Q.    And when Ms. Siggerud said to you, "I am very

12   disappointed to see that you have not completed anything

13   in your G&K perform document," what did you believe that

14   meant?

15         A.    I felt that she went in and changed that when

16   she finalized this document.  She did not really portray

17   that to me, because we had been working on it since June,

18   so I felt like this was put in after the fact when she

19   made the change in August.

20         Q.    Okay.  But when she is telling you that she is

21   disappointed because you have not done something, what is

22   it that she believes you have not done?

23         A.    I am unsure, because I had been working on this

24   document.

25         Q.    What is the G&K perform document?

1        A.    This document here.

2        Q.    Okay.  Did you take that to mean that she didn't

3   believe that she had completed any of the objectives that

4   you had set for yourself?

5        A.    I believe that is what she was telling me.

6        Q.    So the objectives -- the portions that you wrote

7   where you say you are going to do certain things or meet

8   certain goals, Ms. Siggerud believed that you had not met

9   any of that -- those goals, correct?

10                  MR. MILLS:  Object to the form.

11                  THE WITNESS:  I am unaware of what thoughts

12   she had.

13   BY MS. FRANCIS:

14        Q.    But you believe that is what she was telling you

15   in that manager comment section?

16        A.    I didn't really make an assumption about what

17   she was saying.

18        Q.    She is saying that you have not completed

19   anything that you put in your performance document,

20   correct?

21        A.    That is what she stated, yes.

22        Q.    Did you implement any new safety measures to

23   decrease injuries in 2013 when you were a generalist?

24        A.    Where is that located in the document?

25        Q.    In section 1.

1      A.   I'm sorry, I don't see where it states that.

2      Q.   The second to last sentence.

3      A.   In section 1 at the top here?

4      Q.   In the part that you wrote, it says:  We will

5  continue as a team to plan and implement new safety

6  measures to decrease injuries.

7           Do you see that?  It is the second to last

8  line in the paragraph you wrote.

9      A.   Oh, objective 2?  I'm sorry, I am lost on where

10  we are looking at on the document.

11      Q.   (Indicating).

12      A.   Oh, on the first page, okay, in the midyear

13  comments.

14           I stated that we would continue as a team

15  to make those changes together, not that I would

16  individually do those things alone, no.

17      Q.   My question to you was:  Did you implement any

18  new safety measures in 2013 to decrease injuries?

19      A.   As a team we did, yes.

20      Q.   What?

21      A.   We had a safety management team that we met with

22  monthly to all collaborate and come up with new ideas.

23  Together we all did a safety walk through the plant

24  together as the management team or the members of the --

25  the safety team that we had at the Phoenix location, and

1  we would do those things together.

2      Q.   What specific new safety measures were

3  implemented in 2013?

4      A.   There was an issue, I believe, with their swamp

5  coolers, their evaporative coolers in the plant and they

6  had broke down a few times throughout the summer.

7           So as a team, we decided that we would get

8  with the engineering team and make sure that there was

9  regular maintenance being done on those things and it was

10  being documented and that they were being proactive about

11  making sure that they fixed the problem before they broke

12  down so we could keep the employees in the plant location

13  cool in the summertime.

14      Q.   Anything else?

15      A.   I don't recall anything else.  That -- that was

16  our -- I think our biggest challenge.

17      Q.   What was the newly implemented wheel of safety?

18      A.   Oh, that was a game that we played every month

19  as incentive with our employees at the location to get

20  them to join in to have a safe workplace as well as we

21  would give away prizes.  They would -- in our safety

22  meeting with all the employees with the -- with the safety

23  management group, we would let them spin the wheel if

24  their name was drawn.  So we would help to try to get the

25  employees engaged from the plant with the safety as well,

1    and we would have them put in ideas for safety improvement

2    also along with the management team, and whoever put in

3    the most ideas for a safety improvement, then we would

4    draw names, and if we draw -- if we drew their name, they

5    got to spin the wheel of safety, and then they got a prize

6    that was on the wheel.  It was like Wheel of Fortune.

7         Q.   Did you implement any ideas that came from that

8    program?

9         A.   We did it all together as a team.

10        Q.   I am looking for specifics.

11        A.   I don't recall.

12        Q.   What is the Coach to Win model?

13        A.   It was an initiative that came from corporate,

14   and it was just to keep morale up within the business, to

15   coach the employees around their performance or around the

16   business itself or it could be possibly around their job

17   description and to help build their morale and to help

18   them be positive.

19        Q.   Did you use the Coach to Win model in your

20   interactions with the management at the locations you

21   serviced?

22        A.   Yes, and I also did training with the service

23   department with their route managers on the Coach to Win

24   model to help with their employees as well.

25        Q.   Did you develop any programs for classroom

1    training?

2        A.    We were in the midst of working on those things,

3    but we -- I don't believe we had completed and established

4    anything yet, no.

5        Q.    Did you develop any programs for hands-on

6    training with a mentor coach?

7        A.    No.  By the time this was finalized, I was moved

8    into the temporary recruiting role, so I was told by

9    Rachael to not worry about continuing with the -- these

10   generalist goals.

11       Q.    Well, you moved in the end of July of 2013 --

12       A.    Correct.

13       Q.    -- which is the end of the fiscal year for the

14   company, correct?

15       A.    Correct.

16       Q.    So the performance objectives are complete for

17   the year prior.  It would have been July of 2012 to July

18   of 2013, correct?

19       A.    Correct.

20       Q.    So at the time you moved, there is a full year

21   of work to review, correct?

22                  MR. MILLS:  I will object to the form.

23                  THE WITNESS:  No.  We -- we had not

24   implemented these new things until after I transitioned

25   into the generalist position.

1   BY MS. FRANCIS:

2        Q.   So that would have been in February of 2013?

3        A.   Correct.

4        Q.   So the performance that you are being evaluated

5   for is between February of 2013 and July of 2013, correct?

6        A.   Yes.

7        Q.   During that time period, did you develop any

8   programs for hands-on training with a mentor or coach?

9        A.   Yes.

10       Q.   What?

11       A.   I did training with the managers around how to

12   process their payroll.  I did training with managers of

13   how to onboard their new employees into the business.  I

14   think that is kind of what this means, that it was

15   hands-on training with a mentor.

16       Q.   You thought that related to the transition of HR

17   functions?

18       A.   Yes.

19       Q.   Did you develop any training programs that were

20   exposure-based?

21                 MR. MILLS:  Object to the form.

22                 THE WITNESS:  I think this is stating that

23   I would participate in or experience exposure-based

24   training myself with the managers.

25                 So Rachael had given us instructions that

1    it was our new role to learn from the other managers and

2    for not -- for them not to feel that we are being invasive

3    or questioning them about their job, and more so that we

4    were trying to learn from them.

5                 And so that is what all these objectives

6    were was to learn from the managers, to go with them on

7    route rides, or go with them when they go to visit a

8    customer and just how they deal with handling a contract

9    or deal with handling a contract renewal and just to

10   observe, not to tell the customer that we were HR, but

11   just to say that we were part of the management team and

12   just to sit in on a meeting, just to learn from them what

13   their job goal was.

14                That way we could come back together as an

15   HR team and share those ideas with each other as the

16   generalist in the region that we were in so we could come

17   up with ideas for each other as how to better improve the

18   functions that we were experiencing when we were with the

19   managers.

20   BY MS. FRANCIS:

21       Q.   Okay.  You changed my question and then you

22   answered the question that you wanted to answer, so I am

23   going to ask you to try to listen to the question

24   specifically.

25       A.   Okay.

1     Q.   The performance evaluation says another goal is

2 to focus and drive leadership development through

3 developing programs.  That means you developing programs,

4 correct?

5     A.   As a team, not me individually, as the

6 generalist team that I was on.

7     Q.   Does it say anything here about working as a

8 team in this paragraph that we are talking about?

9     A.   No, but it doesn't state that it was me

10 individually.

11     Q.   Okay.  And you told me that you perceived this

12 section to be about learning what management does, and we

13 already talked about the fact that management wasn't

14 receptive to that and you got a lot of pushback, correct?

15     A.   Correct.

16     Q.   So you were not able to do what you are

17 describing you believe this performance goal is, to learn

18 what management does, to attend ride-alongs, to

19 participate in what they are doing for their job duties,

20 correct?

21          MR. MILLS:  Object to the form.

22          THE WITNESS:  Correct.  But Rachael told me

23 to keep trying and to not give up and to keep trying to

24 build a positive relationship with them.

25 BY MS. FRANCIS:

1      Q.    Rachael gave you a 1, and you rated yourself

2   lower for this section.  You rated yourself a 3.

3      A.    That -- that would be higher.

4      Q.    No, I mean lower than you had in other sections.

5   You had given yourself a 5 and 4 previously, correct?

6      A.    Mostly they were all 3s, except for the

7   year-end, which was 4.

8      Q.    Under section 2, you didn't give yourself a 5?

9      A.    That was a group rating.

10     Q.    It says:  Employee rating.

11     A.    In the description, it says:  This is a group

12  rating and will be given to you either by your location

13  manager or through an e-mail for corporate employees.

14     Q.    Okay.  So that was something that was given to

15  you.  That was not set by you?

16     A.    Right, correct.

17     Q.    And then in core values, did you give yourself a

18  4 --

19     A.    Yes.

20     Q.    -- and Rachael gave you a 2?

21     A.    Yes.

22     Q.    Did she explain why she gave you a 2?

23     A.    No.

24     Q.    Did you get to talk to her about this

25  performance evaluation after she put in her comments?

1       A.    No.   I didn't know when she had completed it.

2       Q.    And she never gave it back to you so you could

3    see it?

4       A.    No.   I was well into the temporary role by then.

5       Q.    In individual objective No. 1, she gave you a 1

6    for "not meeting."  Do you see that?

7       A.    Yes.

8       Q.    Do you have an understanding of why she rated

9    you a 1 under this objective?

10      A.    No.   Because I felt that I was performing all of

11   these functions.

12      Q.    Under individual objective 2, did you meet with

13   leaders monthly to review and update 9 Block?

14      A.    Yes.

15      Q.    What is 9 Block?

16      A.    This is a succession planning tool, and it's

17   blocks that you place employees in on how you feel how

18   successful they are.  And so I would meet with the

19   managers monthly, just reviewing and updating on the

20   progress of their employees and if they wanted to move

21   them strategically, if they were going to move them up

22   within the business or if they felt they were going down

23   and out.

24      Q.    And would you have that meeting with each of the

25   leaders at the different locations you serviced monthly?

1    A.    Yes, in Phoenix and the Los Angeles group as
2  well.
3    Q.    What about the other locations?
4    A.    All of Arizona and all of Southern California.
5    Q.    Because we talked about some more remote
6  locations like Yuma and Tucson, did you also have these
7  leader meetings monthly with them?
8    A.    Yes, that was part of our Arizona Phoenix group.
9    Q.    Did you update IDPs for all green box talent
10  with leaders?
11    A.    Yes.
12    Q.    Did you schedule biweekly meetings with leaders
13  to develop assignments for HPEs?
14    A.    Yes, high potential employees.
15    Q.    What did that entail?
16    A.    It would be -- for instance, San Diego, we had
17  an employee that was a route driver, and he was interested
18  in eventually being promoted to a route manager.  So we
19  would periodically take him out of his role and allow him
20  a day to go with the route manager to kind of shadow him
21  to kind of just see what the job was about and somewhat
22  train them ahead of time, just for a role of interest for
23  themselves.
24    Q.    Did you coach your leadership teams on effective
25  performance management?

1       A.    Yes.

2       Q.    Did you identify low performers?

3       A.    Yes.

4       Q.    Did you suggest termination for anyone?

5       A.    We would discuss it.  I wouldn't necessarily

6  make a recommendation.  It would be up to the manager.  I

7  would question them about how they felt the employee was

8  performing, and then I would ask them how they felt what

9  -- what path they felt the employee was on, if they felt

10 that they were going to be sufficient for promotion, or if

11 they felt that they were not going to be, and if they saw

12 them going through a path downward.

13      Q.    What did you do to help assist the low

14 performers?

15      A.    That was not part of my job responsibility

16 directly.  That was the manager's job, and I would give

17 the manager suggestions around ideas of what to do with

18 low performers to help build their morale, or we would

19 have, like, group meetings with the managers to try to

20 support the employees and ask them for their ideas of

21 changes that they thought we could implement to make their

22 environment more positive.

23      Q.    Did you actively participate in weekly growth

24 meetings with your leadership teams?

25      A.    I'm sorry, can you say that again?

 1        Q.    Did you actively participate in weekly growth
 2   meetings to help your leadership teams at the locations
 3   improve their business opportunities and revenue?
 4        A.    Yes, that was every Monday morning at 5:00 a.m.
 5        Q.    With which leaders?
 6        A.    Service and sales.
 7        Q.    From which location?
 8        A.    The Phoenix location.
 9        Q.    And when did you do that with the other
10   locations?
11        A.    I -- I don't -- I am not sure of the -- the Los
12   Angeles location was different than the Phoenix location.
13   I just participated in the Phoenix one because I was
14   physically at the location.  I think the Los Angeles ones
15   were a different day.  They didn't request that I did them
16   weekly.  They requested I attend I believe like once a
17   month, and if I did, it was over the phone.
18        Q.    Did you spend one-on-one time in the field with
19   territory sellers, route manager, route sales reps,
20   service managers, sales managers --
21        A.    Yes.
22        Q.    -- from all those locations?
23        A.    Not all the locations.
24        Q.    And I think previously you described that you
25   only went on two routes, correct?

1    A.    I went out with sales, and I also went out with

2    a service employee.

3    Q.    One occasion each, correct?

4    A.    Yes.

5    Q.    Is that the only time that you spent in the

6    field with these types of employees?

7    A.    I don't recall.  I don't believe so.  I think

8    there was more, but I am not sure of how many times.

9    Q.    But you only recall specifically those two?

10   A.    Correct.

11   Q.    And those were both in Phoenix?

12   A.    Correct.

13   Q.    You never spent time in the field with employees

14   at any of the other locations, correct?

15   A.    Correct.

16   Q.    Do you believe that you had learned the key

17   financials of the business?

18   A.    No.

19   Q.    Do you believe that you had a functional grasp

20   and understanding to support the financial goals of the

21   business?

22   A.    No.

23   Q.    Under objective No. 3, did you expand your

24   knowledge of OFCCP rules?

25   A.    Yes.

1       Q.    How?

2       A.    I had numerous materials at home that I had

3    purchased on my own.  I had -- I have numerous HR

4    publications, or I was a member of the SHRM society so

5    there was publications and I could log in.  I had access

6    to HR tools through their website, which was the national

7    HR society.

8       Q.    Did you educate your leadership teams on OFCCP

9    rules?

10      A.    On -- I'm sorry, can you say that again?

11      Q.    Did you educate your leadership teams on OFCCP

12   rules?

13      A.    We had conversations around it, yes.

14      Q.    Did you develop any training?

15      A.    No, our corporate office did that.  We had a

16   training department.

17      Q.    When you say you had conversations with

18   leadership about OFCCP rules, how many occasions?

19      A.    I don't recall specifically.

20      Q.    And which locations?

21      A.    Both -- all of them.

22      Q.    So you talked with each of the management

23   members from every location about OFCCP rules?

24      A.    No.  It would only come up if they had an issue

25   around it and they had questions about it.

1      Q.   So when you were asked questions, you would

2    answer them about OFCCP issues?

3      A.   I would, and if I didn't know the answer, I

4    would get Rachael involved and I would ask her expertise

5    and her feedback.

6      Q.   Other than being asked questions by the

7    management team, did you do anything to educate the

8    management team about OFCCP rules?

9      A.   I don't -- I don't recall.

10     Q.   Did you educate the leadership teams at the

11   locations about EEOC rules?

12     A.   Yes.

13     Q.   Did you develop anything for educating them

14   about EEOC rules other than answering their questions?

15     A.   There was a management training that I did do

16   with all of the managers in regards to the EEOC and the

17   rights of the employees, yes.

18     Q.   When did you do that?

19     A.   I don't recall the exact date.

20     Q.   Was it when you were a generalist?

21     A.   Yes.

22     Q.   And which locations did you provide that

23   training to?

24     A.   The Phoenix location.

25     Q.   Any others?

1      A.   Not that I recall.

2      Q.   And why did you only provide that training in

3  Phoenix?

4      A.   I don't believe that I had scheduled yet with

5  the Los Angeles group, and I had to wait for travel

6  approval from Rachael.

7      Q.   Did you do any training of the leadership team

8  on union avoidance issues?

9      A.   No.

10     Q.   Did you provide the leadership team with any --

11 teams with any information about the NLRA?

12     A.   Not specifically training, but we would have

13 conversations around all of these issues.

14     Q.   When they would ask you questions?

15     A.   When they would ask me questions.  Or if we were

16 in a group meeting together, I would give them feedback or

17 give them information around all of the -- the HR facets.

18     Q.   When they raised an issue, or did you do

19 affirmative training on these issues?

20     A.   I did not schedule a date and do a specific

21 training no, no.

22     Q.   Okay.  My question was a little more specific.

23 Did you only answer questions and issues that were raised

24 by the management team, or did you go out and proactively

25 educate these leaders about these legal issues?

1     A.   Yes, I did both.

2     Q.   Okay.  What training program other than the EEOC

3  did you develop on the issues we have been talking about?

4  Did you develop something on the NLRA?

5     A.   No, this -- this was -- this would have been

6  information that was provided from our training department

7  at corporate of what they instructed us to help train the

8  managers on.

9     Q.   So did you provide training to your management

10  teams on the NLRA?

11     A.   Not a particular group -- not a particular

12  meeting that was scheduled, no, no.

13     Q.   Did you provide any particular training to your

14  leadership teams on OSHA?

15     A.   No.

16     Q.   We already talk about the safety information.

17          Did you provide any training to your

18  management teams at the locations on the Civil Rights Act?

19     A.   I am unsure what you mean by "training," because

20  it states I will provide knowledge.  It did not state I

21  would provide training.

22     Q.   Okay.  Did you provide any type of knowledge or

23  information to the management teams about the Civil Rights

24  Act?

25     A.   Yes.

1     Q.    And outside of the training that you already

2   described on the EOC -- EEOC issues, did you do any

3   training?

4     A.    Yes.

5     Q.    What training or information did you provide the

6   leadership team on Civil Rights Act issues?

7     A.    I would provide them with information in regards

8   to retaliation and discrimination and anything when it

9   came to an employee's rights within the business and in

10   regards to any of these issues that are listed.

11     Q.    So would you provide that information

12   proactively?  You would print out materials and give it to

13   them, or would you just provide information when they

14   asked you for information?

15     A.    We would have verbal conversations in meetings

16   or at our one-on-ones together.

17     Q.    When were you asked to provide that information,

18   or did you proactively do that?

19     A.    No, I would proactively provide that information

20   during our meetings.

21     Q.    And did you do that at any location other than

22   Phoenix?

23     A.    Yes.

24     Q.    When did you do that in L.A.?

25     A.    When we were on the phone -- when I had phone

1    conversations, if we were discussing a performance or a

2    succession plan for someone, I would give updates if

3    anything had changed, or I would just share knowledge with

4    the managers around any HR issues that I felt were

5    pertinent to any situation that they were currently

6    experiencing.

7        Q.   So if you were discussing an employee's specific

8    situation, you would provide information about any

9    applicable laws?

10       A.   Correct.

11       Q.   Outside of a specific employee situation, did

12   you provide general information outside of the EEOC

13   training we have already talked about to the management

14   teams?

15       A.   What type of general information?

16       Q.   Would you prepare materials for them, updates

17   for them on these laws?

18       A.   On all of these that are listed here?

19       Q.   Any of them.

20       A.   I -- I -- no.  I would only have verbal

21   conversations with them.

22       Q.   I understand that you had verbal conversations

23   with them.  Would you only provide those in response to a

24   specific employee situation, or would you give verbal

25   updates at meetings on these laws?

1      A.    I would do both.

2      Q.    Going back to the manager comments section where

3  Ms. Siggerud is talking, she says:  As you are well aware

4  based on our previous conversations, your performance is

5  below expectations for the role of HR generalist.

6            Were you aware that your performance was

7  below expectations?

8      A.    No.  The only conversations we had was around

9  the perception of them believing I was not engaged or

10  available.

11      Q.    Well, we also know you had conversations about

12  your inability to get a strategic alliance going with the

13  Phoenix management team, correct?

14      A.    Can you restate that?

15      Q.    Sure.  You testified that you got a lot of

16  pushback from the Phoenix management team about working

17  with them strategically, correct?

18      A.    No.

19      Q.    Would Jake let you have information about the

20  financial parts of the business?

21      A.    No.

22      Q.    All right.  Weren't you supposed to partner with

23  him and shadow him and understand what his job entailed?

24      A.    Yes.

25      Q.    And did he let you do that?

1       A.    Not at every occasion, no.

2       Q.    In general, did he let you do that?

3       A.    Not at every occasion.

4       Q.    So you got pushback, we talked about, from the

5   Phoenix management team.  And it was similar with Mitch,

6   correct?

7       A.    Yes.

8       Q.    And it says:  A great part of that deficit is

9   resulting from the ineffective relationship you have with

10  the Phoenix leadership team.

11              Did I read that correctly?

12      A.    Correct.  It was nothing based on my

13  performance.  It was all based on their perception and the

14  relationships.

15      Q.    Do you believe you had an ineffective

16  relationship with the Phoenix leadership?

17      A.    No.

18      Q.    You believe you were effective in working with

19  Jake and his leadership team?

20      A.    I believe my effort was effective, yes.

21      Q.    I understand you believe that you made yourself

22  available to him to do these things, but do you think that

23  you actually accomplished establishing a team relationship

24  with him?

25      A.    No.

1     Q.   She says that you did not complete the game plan

2  document to set expectations for your support of Phoenix

3  and L.A. as we had discussed.

4           I know we talked about the game plan

5  previously.  Is she correct that you did not complete

6  that?

7     A.   She had only requested that I do one for

8  Phoenix, not Los Angeles.

9     Q.   And did you do it?

10    A.   Yes.

11    Q.   Where is that document?

12    A.   I don't have a copy of that.  I e-mailed it to

13  Rachael.

14    Q.   What was it called?

15    A.   Phoenix Game Plan.

16    Q.   How many pages was it?

17    A.   One, I believe.

18    Q.   So when she says here that you didn't complete

19  the game plan document, she is just incorrect?

20    A.   That is incorrect.

21           THE WITNESS:  Do you mind if I go to the

22  restroom?

23           MR. MILLS:  That's fine.

24           MS. FRANCIS:  That's fine.

25           VIDEO TECHNICIAN:  This is the end of --

1    this is the end of media No. 4 in the continuing

2    deposition of Brandy Lane Williams.  Today's date is June

3    14, 2016.  The time is 4:00 p.m.

4              (Recess ensued from 4:00 p.m. until

5    4:09 p.m.)

6              VIDEO TECHNICIAN:  We are back on the

7    record.  This is the beginning of media No. 5 in the

8    continuing deposition of Brandy Lane Williams.  Today's

9    date is June 14, 2016.  The time is 4:09 p.m.

10   BY MS. FRANCIS:

11       Q.   When we took a break, we were talking about

12   Exhibit 14.  Do you still have that in front of you?

13       A.   Yes.

14       Q.   Okay.  If you look to the page that has

15   section 4, development goal and relocation preferences --

16       A.   Yes.

17       Q.   -- under the employee comments section, the

18   paragraph that starts "overall," you state:  I look

19   forward to taking on new tasks and temporarily helping to

20   support recruiting currently.

21              Did I read that correctly?

22       A.   Yes.

23       Q.   And you were referring there to your transition

24   to the recruiting position?

25       A.   Yes.

1       Q.   Because you signed this on July 26th of 2013,

2   correct?

3       A.   Correct.

4       Q.   And you moved to the recruiting position in the

5   end of July?

6       A.   Correct.

7       Q.   I think the 29th, correct?

8       A.   Correct.

9       Q.   And you state:  I currently would be interested,

10   if the opportunity came open, to supporting areas in the

11   Southern areas or certain portion of the mid-Central area.

12   My main interest would be the Gulf Plains or Southeast

13   mainly.

14              And then you list specific states.  Did I

15   read that correctly?

16       A.   Yes.

17       Q.   When was the first time that you saw the

18   completed performance document for 2013 that included

19   Ms. Siggerud's comments?

20       A.   I don't recall the exact date.

21       Q.   Was it when you were still working at G&K?

22       A.   Yes.

23       Q.   And did you have an opportunity to discuss her

24   comments with her?

25       A.   I don't -- I don't recall.  I was -- I was busy

1    working, doing the recruiting, so I -- I don't remember a

2    conversation.

3         Q.   Did she set up a meeting where you were to

4    discuss your performance evaluation?

5         A.   I -- I don't recall.

6         Q.   Did you give her any feedback about her comments

7    in the performance evaluation document?

8         A.   I don't recall that I did.

9         Q.   You never told her that you disagreed with any

10   of her comments?

11        A.   No, not that I am aware of, no.

12        Q.   Do you believe that her comments were

13   retaliatory for your ADA leave?

14        A.   I do.

15        Q.   Did you report that to anyone at G&K?

16        A.   No.  Other than Rachael, no.

17        Q.   You told Rachael that you believed her comments

18   in the performance evaluation were discriminatory?

19        A.   Oh, sorry, no, no.

20        Q.   Did you tell that to anyone at G&K?

21        A.   No.

22        Q.   I am going to mark another exhibit.  I believe

23   we are on 15.

24              (Deposition Exhibit No. 15 was marked for

25   identification by the reporter.)

1    BY MS. FRANCIS:

2         Q.    The court reporter has marked Exhibit No. 15.

3    Have you seen this document before?

4         A.    Yes.

5         Q.    Is that your signature?

6         A.    Yes.

7         Q.    What is Exhibit No. 15?

8         A.    Employee acknowledgment form.

9         Q.    For what?

10        A.    For receiving an employee handbook.

11        Q.    Did you receive an employee handbook?

12        A.    Yes.

13        Q.    When?

14        A.    On 5/16 on my start -- on my hire date.

15        Q.    5/16 of what year?

16        A.    2011.

17               (Deposition Exhibit No. 16 was marked for

18    identification by the reporter.)

19    BY MS. FRANCIS:

20        Q.    The court reporter has marked and provided you

21    with Exhibit No. 16 to your deposition.  Do you recognize

22    that document?

23        A.    Yes.

24        Q.    What is it?

25        A.    The -- G&K's Individual Treatment Policy.

1    Q.   Did you receive this at or around the same time

2    that you received the company employee handbook?

3    A.   No, this is not included in the employee

4    handbook.

5    Q.   Did you receive a copy of Exhibit 16 when you

6    started your employment?

7    A.   I don't recall receiving this that day, no.

8    Q.   How soon after you started do you recall seeing

9    this document?

10   A.   During my HR training.

11   Q.   When would that have been?

12   A.   The first month of my employment at G&K.

13   Q.   Did you have access to this document on an

14   intranet?

15   A.   I -- I did, after I was trained on where all --

16   where all the HR documents were.

17   Q.   And you understood that this policy applied to

18   you as an employee of G&K?

19   A.   Yes.

20   Q.   If you look at the second page, it describes

21   reporting incidents.  Do you see that?

22   A.   Yes.

23   Q.   And it states:  Any employee who feels she has

24   been subject to discrimination, harassment or violence

25   should object to the behavior and report the incident to

1    his or her manager or supervisor immediately.

2                    Did I read that correctly?

3         A.   Yes.

4         Q.   Did you ever report any of the retaliatory or

5    discriminatory conduct that we have talked about in your

6    deposition today to Ms. Siggerud's manager?

7         A.   Not that I recall, no.

8         Q.   Did you report it to any manager at G&K?

9         A.   Rachael Siggerud.

10        Q.   Okay.  Outside of your own manager -- which you

11   believe she was the one discriminating and retaliating

12   against you, correct?

13        A.   Correct.

14        Q.   Did you report her behavior to anyone else at

15   G&K?

16        A.   Not that I recall.

17        Q.   Did you understand that there was a corporate

18   employee relations department within G&K that you could

19   report to?

20        A.   I am trying to remember.  I would say yes.

21        Q.   Did you report any information about any of the

22   treatment that we have talked about which is part of your

23   complaint to the corporate employee relations department?

24        A.   No.

25        Q.   Did you complain to the regional director of

1    human resources?

2         A.    Yes.   That was Rachael.

3         Q.    Above her?

4         A.    No.

5         Q.    Do you understand what the open line program

6    was?

7         A.    Yes.

8         Q.    What was the open line program?

9         A.    It was an anonymous line where you can call and

10   report employee issues or safety concerns anonymously to

11   this number I believe.

12        Q.    Could you also identify yourself if you wanted

13   to?

14        A.    I suppose.

15        Q.    Did you ever call or report any of the incidents

16   that you are complaining about now to this reporting line?

17        A.    No.

18        Q.    Did you understand that it was G&K company

19   policy to comply with the Americans with Disabilities Act?

20                   MR. MILLS:   Object to the form.

21                   THE WITNESS:   I'm sorry?

22   BY MS. FRANCIS:

23        Q.    Did you understand that it was G&K's company

24   policy to comply with the Americans with Disabilities Act?

25                   MR. MILLS:   Same objection.

1                    Go ahead.

2                    THE WITNESS:  Yes.

3                    (Deposition Exhibit No. 17 was marked for

4      identification by the reporter.)

5      BY MS. FRANCIS:

6          Q.    The court reporter has marked Exhibit No. 17 to

7      your deposition.  Do you recall seeing this document?

8          A.    Yes.

9          Q.    Is that your signature on this document?

10         A.    Yes.

11         Q.    Did you read what was written under The

12     Particulars Are section before signing this document?

13         A.    I reviewed it, yes.

14         Q.    Did you declare under penalty of perjury that

15     the above was true and correct?

16         A.    Yes.

17         Q.    Is all the information in the descriptive

18     section titled The Particulars Are correct?

19         A.    Yes.

20         Q.    Did Ms. Siggerud tell you on July 17, 2013, that

21     you had three days to think about resigning?

22         A.    She stated she would give me time to think about

23     it -- or a few days to think about it.

24         Q.    But she didn't tell you you had three days?

25         A.    I misconstrued that with the verbal conversation

1    after the --

2         Q.   Okay.  You --

3         A.   -- recording.

4         Q.   You still contend that at some point she told

5    you you specifically had three days to think about

6    resigning?

7         A.   Yes.

8         Q.   But it didn't happened on July 17th?

9         A.   I -- I don't recall.

10        Q.   Well, we have the tape recording of your

11   conversation with Ms. Siggerud on July 17th that has been

12   marked as Exhibit No. 9, correct?

13        A.   Correct.

14        Q.   And that is not -- that statement is not made by

15   Ms. Siggerud in Exhibit No. 9, is it?

16        A.   No.

17        Q.   So it is your position that you had another

18   conversation with her about this same topic on a later

19   date where she gave you three days to resign?

20        A.   Yes.

21        Q.   It is not possible that she gave you time to

22   think about it or said take a few days to think about it

23   instead of telling you specifically that you have three

24   days to think about resigning?

25        A.   Can you restate that?

1      Q.   Sure.  Is it possible that you misconstrued

2   Ms. Siggerud's statement in Exhibit No. 9 where she said

3   take some time to think about this with the statement that

4   you have in Exhibit No. 17 that Ms. Siggerud specifically

5   gave you three days to think about resigning?

6      A.   I must have gotten the two -- the two

7   conversations confused.

8      Q.   Okay.  And I am not asking you about whether or

9   not there were two conversations now.  I understand that

10   that is your position.  I am just asking you if it is

11   possible that you are mistaken about her giving you

12   specifically three days to resign, and what she really

13   said to you was "Take some time to think about it"?

14                MR. MILLS:  Object to the form.

15                THE WITNESS:  No.  She did state that to

16   me, just maybe not at this particular recorded

17   conversation.

18   BY MS. FRANCIS:

19      Q.   And what was going to happen after the three

20   days?  What was your understanding?

21      A.   That she would help me find a position within

22   the business or she would help me to obtain a position

23   outside of G&K.

24      Q.   And at what -- at what date did she return to

25   you after this three days was up to get your decision?

1    A.   I don't recall.  It was over a weekend I

2  believe.

3    Q.   And did she call you and say:  I have given you

4  your three days.  What is your decision?

5    A.   No, because I reassured her that I didn't need

6  time to think about it, because I enjoyed being there and

7  I didn't want to quit.

8    Q.   So there was no response after you were given

9  the opportunity to think about this for three days?

10   A.   No.

11            (Deposition Exhibit No. 18 was marked for

12  identification by the reporter.)

13  BY MS. FRANCIS:

14   Q.   The court reporter marked Exhibit No. 18 to your

15  deposition.  Do you recognize this document?

16   A.   Yes.

17   Q.   What is it?

18   A.   It appears to be an e-mail to Jacob Briscoe from

19  myself.

20   Q.   Why are you sending this e-mail?

21   A.   Because my son was sick.

22   Q.   Did you take time off to deal with the issue

23  that is reflected in Exhibit 18?

24   A.   I don't recall.

25   Q.   Did Mr. Briscoe object to you taking this time

1   to care for your son?

2       A.   I don't recall.

3            (Deposition Exhibit No. 19 was marked for

4   identification by the reporter.)

5   BY MS. FRANCIS:

6       Q.   The court reporter has marked Exhibit No. 19 to

7   your deposition.  Do you recognize this document?

8       A.   I -- I don't recall this e-mail, no.

9       Q.   Does this e-mail look like it came from your

10  e-mail account?

11      A.   I am not sure.  It just has my name.  It doesn't

12  have an e-mail address.

13      Q.   Well, it is in the same format as Exhibit No. 18

14  that we just looked at, correct?

15      A.   Correct.

16      Q.   And it says from Brandy Williams to J. Briscoe,

17  correct?

18      A.   Correct.

19      Q.   And it is dated 11/29/2012, correct?

20      A.   Correct.

21      Q.   Have you had an opportunity to read the

22  statement within Exhibit No. 19, the e-mail portion?

23      A.   Yes.

24      Q.   Did you write that?

25      A.   I vaguely remember writing it.

1      Q.    So you do have a memory of writing this?

2      A.    Somewhat.

3      Q.    Is there any part of it that you believe you

4    didn't write?

5      A.    No.

6      Q.    Does it sound like something that you would have

7    written?

8      A.    Yes.

9      Q.    And in this e-mail, you tell Mr. Briscoe that

10    you had a doctor's appointment yourself.

11      A.    Correct.

12      Q.    And you say to Mr. Briscoe:  I am dealing with a

13    serious health issue currently that I am trying to get

14    under control.

15              Correct?

16      A.    Correct.

17      Q.    You are saying:  I am currently seeing a

18    specialist that I was referred to.

19              Correct?

20      A.    Correct.

21      Q.    So this is you providing information about your

22    medical condition to Mr. Briscoe, correct?

23      A.    No specifics about my condition but, yes, that I

24    had a medical condition.

25      Q.    And you tell him that you need to take some

1   vacation time, correct?

2        A.   Yes, correct.

3        Q.   Do you recall Mr. Briscoe's response to this

4   e-mail, Exhibit No. 19?

5        A.   No, I do not.

6        Q.   Do you recall him objecting to you taking time

7   off to deal with your health issues that you identified in

8   Exhibit No. 19?

9        A.   No, I do not.

10             (Deposition Exhibit No. 20 was marked for

11   identification by the reporter.)

12   BY MS. FRANCIS:

13        Q.   The court reporter has marked Exhibit No. 20 to

14   your deposition.  Tell me after you have had an

15   opportunity to review it.

16        A.   Can you state that again?

17        Q.   Tell me after you have had a chance to review

18   it.

19        A.   I reviewed it.

20        Q.   Do you recognize the e-mail chain that is in

21   Exhibit No. 20?

22        A.   Yes.

23        Q.   Starting with the first e-mail, which is from

24   you to Ms. Siggerud on August 9, 2013, at 12:11 p.m., you

25   e-mail Ms. Siggerud and tell her that you have a doctor's

1    appointment that you have to go to, correct?

2         A.   Correct.

3         Q.   And you say:  Should I also let Michael know?

4              Michael is the person that you were

5    reporting to in the recruiting position?

6         A.   Correct.

7         Q.   And you said:  I am unsure, but I know you said

8    I am still reporting to you.

9              So even in the recruiting position, you

10   were still reporting to Ms. Siggerud?

11        A.   Yes.

12        Q.   And Ms. Siggerud responds and says that she will

13   let Michael know and asks how long you expect to be out

14   and can you make sure to reschedule any interviews this

15   afternoon, correct?

16        A.   Correct.

17        Q.   And she asks:  So I can let Marie know, is this

18   related to your FMLA leave or is this something different?

19              Correct?

20        A.   Correct.

21        Q.   And what is your response?

22        A.   Something different, I suppose.

23        Q.   And did Ms. Siggerud let you take time off to

24   attend a medical appointment?

25        A.   Yes.  I used my lunch hour to attend.

1      Q.   And did she object at all to you taking that

2  time?

3      A.   No, she didn't object to me using my lunch to go

4  to my appointment, no.

5      Q.   Well, she didn't object to you rescheduling any

6  interviews this afternoon?

7      A.   No.

8      Q.   Did you come back after lunch, or did you take

9  the afternoon off because you were not feeling well?

10     A.   No, I came back, and I worked well into the

11  evening.

12     Q.   So did you have to reschedule any interviews?

13     A.   I don't recall.

14          (Deposition Exhibit No. 21 was marked for

15  identification by the reporter.)

16  BY MS. FRANCIS:

17     Q.   The court reporter has marked Exhibit No. 21 to

18  your deposition.  Do you recognize this document?

19     A.   Yes.

20     Q.   What is Exhibit No. 21?

21     A.   An e-mail to Michael Hammond.

22     Q.   From who?

23     A.   From myself.

24     Q.   What date?

25     A.   February 12th.

1    Q.    I'm sorry?

2    A.    Wait, no, no.  Oh, September 12, 2013.

3    Q.    And why are you writing Mr. Hammond?

4    A.    Because my daughter was sick.

5    Q.    And are you asking for time off work to deal

6    with that issue?

7    A.    Yes.

8    Q.    And did he object to you taking time off work?

9    A.    No, no.

10    Q.    Do you recall how much time you took off this

11    day?

12    A.    I don't recall.  I -- I don't even think I left

13    this day.  I think I asked my neighbor that I had on her

14    emergency list to actually pick her up, so I don't believe

15    that I left this day.

16    Q.    When you were doing recruiting, were you working

17    from home?

18    A.    Yes.

19    Q.    Okay.  So when you are telling Michael that you

20    have to pick up your daughter, you have to stop working to

21    go do that, correct?

22    A.    Correct.

23    Q.    So you are taking time that you would normally

24    be recruiting to go do that?

25    A.    Correct.  But I could do recruiting any hour of

1    the day.

2        Q.    Then why did you feel the need to tell him that

3    you were going to do this?

4        A.    Just to be respectful.  I was working for him.

5    I just wanted to make him aware of what I was doing.

6        Q.    You said you apologize for the inconvenience.

7    Did you have to reschedule anything because of this?

8        A.    I don't recall.

9        Q.    Is it possible that you had to reschedule

10   something?

11                   MR. MILLS:  Object to the form.

12                   Go ahead.

13                   THE WITNESS:  I don't recall.

14   BY MS. FRANCIS:

15       Q.    Okay.  What did you mean when you said that you

16   apologize for the inconvenience?  What was the

17   inconvenience?

18       A.    I just felt from previous conversations with

19   Rachael that any time I took away from the business was

20   inconveniencing managers or giving them a perception that

21   I was not engaged.  So I just felt that with Michael that

22   I wanted to keep a good relationship with him, so I just

23   was letting him know that, you know, I felt bad for having

24   to ask to go get my daughter.

25       Q.    Did Michael object in any way?

1      A.    No.

2            (Deposition Exhibit No. 22 was marked for

3      identification by the reporter.)

4      BY MS. FRANCIS:

5      Q.    The court reporter has marked Exhibit No. 22 to

6      your deposition.  Do you recognize this e-mail?

7      A.    I don't recall this e-mail, no.

8      Q.    It looks like Michael Hammond sent you an e-mail

9      on September 18, 2013, at 4:06 p.m., subject line:  Are

10     you working today, question mark.

11           Do you see that?

12     A.    Yes.

13     Q.    And he says:  Brandy, I am following up to my

14     voicemail.  I am hearing from several managers that they

15     cannot get ahold of you.  If you are not working, I really

16     need to know.  Marissa is out sick today and I sent you a

17     note earlier asking to be her backup.  Please confirm

18     either way if you are working at your earlier [sic]

19     opportunity.

20           Did I read that correctly?

21     A.    Correct.

22     Q.    Did you respond to this e-mail?

23     A.    I don't recall.

24     Q.    You don't recall receiving this e-mail?

25     A.    I -- I don't recall receiving this, no.

1    Q.   Do you recall Mr. Hammond discussing with you

2    that managers couldn't get ahold of you?

3    A.   No, I don't recall.  I do recall him telling me

4    that Marissa was out sick, and he left me a voicemail

5    asking me if I was working.  And I believe that I called

6    him back and we had a conversation, and I did let him know

7    that I was and who I was working with.

8    Q.   Do you know what managers were trying to get

9    ahold of you that couldn't?

10   A.   I do not.  I don't recall.

11   Q.   So you believe after you received this e-mail

12   you had a phone conversation with Mr. Hammond?

13   A.   I believe so.

14   Q.   When you were working in the recruiting

15   position, did you receive any performance feedback?

16   A.   Yes.

17   Q.   Who did you receive performance feedback from?

18   A.   From Rachael.

19   Q.   Was Rachael tracking your recruiting statistics?

20   A.   I am unaware that she was.

21   Q.   Did you receive any information about how many

22   positions you were able to fill compared to other

23   recruiters?

24   A.   No.

25   Q.   Do you know on average how many positions other

1    recruiters were filling?

2         A.   No.

3         Q.   So you didn't receive any feedback specifically

4    about how successful you were at filling positions?

5         A.   Just that I was doing a great job and that they

6    had seen improvement since they put me into the temporary

7    role and that other managers had specifically made

8    comments that I reacted and responded to them in realtime

9    and that they were pleased with my performance.

10        Q.   And that was one e-mail that you recall that

11   feedback in, correct?

12        A.   Correct.

13        Q.   You attached that to your rebuttal statement to

14   the EEOC?

15        A.   Correct.

16        Q.   Other than that one e-mail, did you receive any

17   other feedback about your performance as a recruiter?

18        A.   No.

19        Q.   How many positions did you fill once you started

20   working in the recruiting role?

21        A.   I don't recall.  There was a lot.

22        Q.   Did you tell anyone that you were overwhelmed by

23   the request volume?

24        A.   No.

25        Q.   Did you get any feedback on how many days it

1    took you to fill a particular position compared to other

2    recruiters?

3        A.   No.

4        Q.   Are you aware that one position was open close

5    to 92 days before it was filled?

6        A.   No, I am unaware of that -- any position that

7    was open for that long.

8        Q.   Do you have an understanding of why you didn't

9    stay in the recruiter role?

10       A.   I was told that they decided not to offer me a

11   permanent position based on performance as a recruiter.

12       Q.   Did they give you any specific detail about what

13   performance issues led them not to offer you a permanent

14   position?

15       A.   No.  They just stated they felt I was not a good

16   fit.

17       Q.   Who said that?

18       A.   Rachael told me that that was the conversation

19   she had with Michael.

20       Q.   And when did she tell you that?

21       A.   When they met with me in the Phoenix location on

22   the 24th.

23       Q.   Was that the date of your termination?

24       A.   Yes -- no, my termination was on the 27th but

25   they told me on the 24th of September of 2013 that my last

1    day would be September 27th of 2013.

2        Q.    Okay.  So this was during the termination

3    meeting that they told you you were not going to be

4    offered a permanent recruiting position, correct?

5        A.    Correct.

6        Q.    And they said that was based on performance

7    issues as a recruiter?

8        A.    And that they had reevaluated the region that I

9    was in from the HR realignment, and that they felt it was

10   overstaffed so that they were laying me off.

11       Q.    Did you ever hear from any of the other

12   recruiters that they were -- I'm sorry, not recruiters --

13   the other generalists that they were bored in their

14   position?

15       A.    Yes.

16       Q.    Did you hear that from Kaela?

17       A.    Yes.

18       Q.    What specifically do you recall her saying about

19   being bored?

20       A.    That she didn't understand her role or her new

21   job and she was frustrated and confused by what the job

22   description was or what she was supposed to be doing on a

23   day-to-day basis.

24       Q.    Did she use the term "bored" specifically?

25       A.    Yes.

1      Q.   And did Janelle make that same comment to you?

2      A.   Yes.  They both stated that they basically sat

3   around all day and did nothing.

4      Q.   Now, I know you were part of a termination due

5   to the realignment.  Are you aware if anybody else was

6   terminated as part of this realignment around the same

7   time that you were?

8               MR. MILLS:  Object to the form.

9               THE WITNESS:  No, no one.

10  BY MS. FRANCIS:

11     Q.   Do you know what happened to other regions,

12  whether or not after the realignment there was

13  consideration about, okay, should we have less generalists

14  or more generalists?

15     A.   No.

16     Q.   Do you know in the other regions how many

17  generalists were employed?

18     A.   No.

19     Q.   Did you know that the Northwest region had three

20  generalists and the other regions only had two?

21     A.   No.  I didn't recall how many were in each other

22  territory, no.

23     Q.   But you don't have any reason to dispute that if

24  that is what the managers have said?

25               MR. MILLS:  Object to the form.

```
 1   BY MS. FRANCIS:

 2        Q.   You have no knowledge about how many generalists

 3   were in the other regions?

 4        A.   No.

 5        Q.   And then other than yourself, are you aware of

 6   any other individuals that were terminated as part of the

 7   reorganization?

 8        A.   During which time?

 9        Q.   Around the time that you were terminated.

10        A.   No.

11        Q.   Or within a year of the realignment, did you

12   hear about anyone else being terminated other than

13   yourself?

14        A.   No.

15        Q.   Do you believe that you were the only one that

16   were terminated as part of that reorganization?

17        A.   Yes.

18        Q.   And why do you believe that?

19        A.   Due to the perception of me not being in the

20   business because I was attending medical appointments.

21        Q.   But why do you believe you were the only one

22   that was terminated at this time?

23        A.   Because I was taking time away from work.

24        Q.   I understand that that is why you believe you

25   were terminated.  My question is a little more specific.
```

1    Why do you think you were the only one that was

2    terminated?

3          A.    I -- I am -- I don't know.

4          Q.    Okay.  Because in documents like the complaint,

5    which we can pull back up if we need to, you say that --

6    and I think it is even in the charge -- you make the

7    statement that you were the only one selected for

8    termination, and I am just wondering what your factual

9    basis is for that statement.

10         A.    I was not made aware that there was anyone else

11   that was laid off or terminated but myself.  I was told

12   that I -- that the region was reviewed and that I was the

13   one that was chosen.

14         Q.    Out of the region?

15         A.    Correct.

16         Q.    Do you have an understanding as to whether or

17   not other regions were assessed and different people were

18   let go as part of the same process?

19         A.    I am not aware, no.

20         Q.    So when you say you were the only one let go, it

21   is because you are aware only that you were terminated

22   from the Northwest region at this time?

23         A.    Yes.

24         Q.    Now, at some time after your termination, you

25   became aware that there were positions posted by G&K in

1    the HR department, correct?

2         A.   Correct.

3         Q.   When did you first become aware that there was a

4    position for an HR position -- strike that.

5              When did you first become aware that G&K

6    posted an HR position after your termination?

7         A.   I don't recall the exact date.  It was a few

8    months after I was let go.

9         Q.   And what position was that?

10        A.   HR generalist.

11        Q.   And what location was that position in?

12        A.   It was in the Northwest region.

13        Q.   Did it have a specific site location?

14        A.   No.

15        Q.   It didn't list that it was a position in

16   Minnesota?

17        A.   Not that I recall.  I just recall it stated

18   Northwest region.

19        Q.   Do you know if it was a change in the business

20   operations that required the hiring of another generalist

21   at that point in time?

22        A.   I was no longer employed, so I -- I don't know

23   what changes were made, no.

24        Q.   Do you know whether or not Janelle and Kaela

25   continued to work in their position as generalist after

1    you left?

2         A.    Yes.

3         Q.    For how long?

4         A.    I -- I don't recall.

5         Q.    Do you know if Janelle went out on another

6    medical leave after you were terminated?

7         A.    No.

8         Q.    Do you know if Kaela went out on a leave after

9    you were terminated?

10        A.    No.

11        Q.    Do you have any understanding of why that job

12   was posted for an HR generalist after your termination?

13        A.    No.   As far as I was aware, they were both still

14   working for G&K.

15        Q.    And you believe the position was located where?

16        A.    In the Northwest region, because it was a remote

17   position.  You could do the function from anywhere in that

18   region to support a location.

19        Q.    So to your knowledge, it didn't identify a

20   physical location for where the generalist had to work?

21        A.    No.

22        Q.    And did you apply for that position?

23        A.    Yes.

24        Q.    The first posting that you saw?

25        A.    I believe so.

1    Q.    And what was the response that you received?

2    A.    That the position was closed or canceled I

3    believe.

4    Q.    Isn't it true that you didn't apply for -- the

5    first time you saw a posting, but then there was a posting

6    in December of -- I think years later, there were two

7    positions posted that you applied for, one that was

8    canceled.  Did you only see one -- strike that.

9          Did you only see one posting or more than

10   one posting?

11   A.    More than one posting.

12   Q.    Okay.  And did you apply every time you saw a

13   posting for an HR generalist position?

14   A.    No, not all of them.

15   Q.    Did you apply to the first one you saw?

16   A.    I don't recall if it was the first one.

17   Q.    How many postings do you believe you saw for an

18   HR generalist at G&K?

19   A.    Two to three I believe.

20   Q.    And you only applied for one?

21   A.    Correct.

22   Q.    And you were told that that position or posting

23   had been canceled, correct?

24   A.    I believe so.

25   Q.    Well, you provided documentation to the EEOC

1    that shows the response you received, correct?

2         A.   Correct.

3         Q.   That was part of your rebuttal that you

4    submitted?

5         A.   Yes, correct.

6                   (Deposition Exhibit No. 23 was marked for

7    identification by the reporter.)

8    BY MS. FRANCIS:

9         Q.   Do you recall -- well, the court reporter has

10   marked Exhibit No. 23.  Have you seen this document

11   before?

12        A.   Yes.

13        Q.   Is this information that you sent to the EEOC

14   investigator?

15        A.   Correct.

16        Q.   And you state in your e-mail to the investigator

17   that you saw a G&K position posted on February 12th of

18   2014, correct?

19        A.   Correct.

20        Q.   And you also -- well, strike that.

21                   And you attached a copy of the posting?

22        A.   Correct.

23        Q.   And it states that this is a human resources

24   generalist position, correct?

25        A.   Correct.

1      Q.   And it states that the location of the position

2 is in Minnetonka, correct?

3      A.   Correct, but they all stated that because they

4 were corporate employees.  I was a corporate employee as

5 well, and it stated my location was Minnetonka, Minnesota,

6 even as a generalist.

7      Q.   Even though you were assigned in the Phoenix

8 location?

9      A.   Correct.

10      Q.   So the location didn't specifically provide you

11 any details about where the job would be performed

12 physically?

13      A.   No.  Because it just said supporting a region

14 over -- covering multiple locations in multiple states.

15      Q.   When it says "HR generalist business partner,"

16 do the terms "business partner" have any significant

17 meaning to you?

18      A.   I would compare it to strategic partner.

19      Q.   But do you think that this HR generalist

20 position is the same position you performed, or is it a

21 different position because it says HR generalist business

22 partner?

23      A.   I believe it to be the same just reading the job

24 functions.

25      Q.   Did you apply for the position in Exhibit

1  No. 23?

2      A.   I don't recall if this is the one I applied to.

3      Q.   Were the recruiting -- were postings for

4  recruiting positions also referred to as "HR generalist,"

5  or was the posting different for a recruiting position, if

6  you know?

7      A.   I'm sorry, can you repeat that?

8      Q.   Sure.  If the position was a recruiting position

9  like you had temporarily worked in, would it say "HR

10  generalist," or would it say something different, if you

11  know?

12     A.   It would say something different.

13     Q.   What would you believe a recruiting posting

14  would say?

15     A.   Talent acquisition specialist.

16     Q.   What did you do to find work after you were

17  terminated from G&K?

18     A.   I was initially on unemployment, so I worked

19  with the unemployment department.  I checked their website

20  for job listings that they had posted relating to the

21  field that I was in and also applied through online

22  methods, CareerBuilder, jobing.com or monster.com, other

23  various sites as well.

24     Q.   I'm sorry, I didn't mean to interrupt.

25              Are you finished?

1        A.    Yes.

2        Q.    How many positions do you think you applied for

3   per week?

4        A.    Per week?

5        Q.    On average.

6        A.    15 to 20 probably.

7        Q.    Did you get any job offers?

8        A.    No.

9        Q.    You didn't work for anyone between the time that

10  you were unemployed and you went on permanent or full

11  disability?

12       A.    No -- oh, I did not work for anyone?  I did

13  work, yes.

14       Q.    What job offers did you get?

15       A.    Oh, I worked for -- I am sorry.  I misstated

16  myself.

17              I -- I did get a job offer, I'm sorry, and

18  I -- I worked at the Home Depot.

19       Q.    Did you only get one job offer?

20       A.    I got also an additional job offer at Wells

21  Fargo as a teller.

22       Q.    And did you accept that position?

23       A.    I did initially, yes.

24       Q.    And what was the pay?

25       A.    I don't recall.  Around 9 to $10 an hour.

1       Q.    And you said you accepted it initially.  Did you

2   resign?

3       A.    I did not start training.

4       Q.    Why?

5       A.    I just didn't feel comfortable with the position

6   just coming from my previous job I was in as a generalist.

7   I just was unsure if I would be happy in a different field

8   than what I had been in.

9       Q.    So you were given an offer of employment and you

10  rejected it?

11      A.    I did.

12      Q.    Do you recall when that happened?

13      A.    January of 2015.

14      Q.    And you said you also received a job offer from

15  Home Depot, correct?

16      A.    Correct.

17      Q.    And when did you receive that job offer?

18      A.    January of 2015.

19      Q.    Was it around the same time that you got the

20  Wells Fargo offer?

21      A.    Yes.

22      Q.    And what position was the Home Depot?

23      A.    Cashier.

24      Q.    And what was the pay for Home Depot?

25      A.    $9 an hour, I believe.

1     Q.    And why did you accept the position with Home

2  Depot instead of Wells Fargo?

3     A.    I regretted not accepting the position with

4  Wells Fargo, and then because I continued in my job search

5  and I was not getting any HR calls at the time, so I

6  decided, you know, to take the Home Depot offer.

7     Q.    How much time passed between the Wells Fargo

8  offer and the Home Depot offer?

9     A.    I don't recall.  Approximately maybe a week or

10  so.  I don't really remember.

11     Q.    Did you ever go back to Wells Fargo and say that

12  you would like to reapply?

13     A.    No.

14     Q.    Why not?

15     A.    Because I accepted the position with Home Depot.

16     Q.    And how long did you work at Home Depot?

17     A.    Approximately a month and a half.

18     Q.    And why did you stop working at Home Depot?

19     A.    I was continuing my search for a job in HR, and

20  I just felt that I was not, you know, happy in that

21  position, and just -- it was not equivalent to what I had

22  before.

23     Q.    So you quit?

24     A.    Yes.

25     Q.    Did you get any other job offers after G&K?

1        A.    Not that I recall.

2        Q.    So you had unemployment income during this time

3    frame?

4        A.    Correct.

5        Q.    And did you have unemployment income after Home

6    Depot?

7        A.    No.   I only had unemployment income for I

8    believe three months after I left G&K.

9        Q.    Why did your benefits stop?

10        A.    Because it is based on what you accrue and what

11    you pay in, so the benefit amount that was available to me

12    had ran out.

13        Q.    Okay.   So you received the full benefit amount?

14        A.    Yes.

15        Q.    Did you have any other income?

16        A.    No.

17        Q.    When did you apply for Social Security

18    disability benefits?

19        A.    January of 2015.

20        Q.    So it took five months for you to get those

21    benefits?

22        A.    It took ten months.

23        Q.    I thought you became -- what date did you become

24    disabled under -- strike that.

25                On what date did you start receiving Social

1    Security benefits?

2         A.    November of 2015.

3         Q.    Did you get the determination that you were

4    qualified for benefits on May 1 of 2015?

5         A.    No.  I didn't get it until October I believe.

6         Q.    Of 2015?

7         A.    Correct.

8         Q.    I believe in your expert report on your wage

9    loss it states that you became eligible for Social

10   Security benefits on May of 2015.  Would that be

11   incorrect?

12        A.    That is what -- the Social Security department

13   stated that was the first date they considered me disabled

14   was May of 2015.

15        Q.    Okay.  But you didn't receive benefits until

16   October?

17        A.    Correct, because they wouldn't retro back to

18   May, that they would begin at the time that they gave me

19   the determination.

20        Q.    So it took ten months before you started

21   receiving benefits from the time of your application?

22        A.    Correct.

23        Q.    Do you have documentation concerning that

24   application process?

25        A.    It was done online, so I submitted it online.  I

1  don't think I have any documentation, no.

2      Q.   Do you have an account with Social Security that

3  you could go and get that information?

4      A.   I do have an account.  I am not sure if the

5  application is listed on there.

6      Q.   Okay.  Can you provide information to your

7  counsel so we can subpoena information from Social

8  Security about that application process?

9            THE WITNESS:  I thought we already did

10  that.

11           MR. MILLS:  I don't think so.

12  BY MS. FRANCIS:

13     Q.   I don't think so.

14     A.   We already provided the letter from Social

15  Security from the account.

16     Q.   Right.  I am talking about the application.

17           MR. MILLS:  They want to -- they want to

18  request information directly from Social Security.

19           THE WITNESS:  Oh, okay.

20  BY MS. FRANCIS:

21     Q.   About the application process.

22     A.   Oh, okay.

23     Q.   So if you could give your counsel whatever

24  information you have, that would be helpful.

25     A.   Okay.

1            MS. FRANCIS:  Can we take a break?  I think

2    I am close.

3            MR. MILLS:  Sure.

4            MS. FRANCIS:  How long do you think you are

5    going to have?

6            MR. MILLS:  Not very long.  I will just

7    have a few questions.

8            VIDEO TECHNICIAN:  We are off the record at

9    4:58 p.m.

10            (Recess ensued from 4:58 p.m. until

11    5:04 p.m.)

12            VIDEO TECHNICIAN:  We are back on the

13    record at 5:04 p.m.

14    BY MS. FRANCIS:

15        Q.   When you were in the recruiting position, who

16    covered the locations that you had previously covered when

17    you were a generalist?

18        A.   I believe it was Kaela, Kaela Ellison.

19        Q.   Were you aware that Janelle was out on maternity

20    leave during the time frame you were in the recruiting

21    position?

22        A.   Yes.  And Rachael told me that she would also

23    help cover HR issues as well with Kaela.

24        Q.   Okay.  So Kaela was basically servicing all of

25    the Northwest region by herself when you were in the

1    recruiting role for a period of time?

2         A.   No.  Rachael was also helping with my location

3    also.

4         Q.   But she was the only generalist?

5         A.   She was the only generalist, yes.

6         Q.   Okay.  Do you know how long Kaela was the only

7    generalist working in the Northwest region?

8         A.   I don't recall.

9         Q.   Do you believe that there were any legitimate

10   business reasons that went into the decision to eliminate

11   your position?

12        A.   No.

13        Q.   None at all?

14        A.   No.

15        Q.   After your termination, do you believe that you

16   suffered any medical issues because of the termination?

17        A.   I believe that it aggravated them due to the

18   stress.

19        Q.   Was your stress relieved after the termination

20   because you were no longer struggling with the generalist

21   role?

22        A.   No.

23        Q.   What additional stress did you undergo after the

24   termination?

25        A.   Just not having a job.  I mean, that was a huge

1    thing was to lose such an important job to myself and my

2    family.

3        Q.    And how long do you think that you suffered

4    additional stress because of the termination?

5        A.    I don't recall.  It was quite a while.

6        Q.    Did you suffer any new medical symptoms because

7    of your termination?

8        A.    No.

9        Q.    Did you have other things that were going on in

10   your life after your termination that caused you stress

11   besides your medical condition?

12       A.    No.

13       Q.    Did you have any issues with your marriage?

14       A.    Yes.

15       Q.    And when did those start?

16       A.    When I started having health issues.

17       Q.    When was that?

18       A.    After the delivery of my son in July of 2012.

19       Q.    And those were ongoing after your termination?

20       A.    Yes.

21       Q.    And when did those resolve?

22       A.    They still occur sporadically.  Now it just

23   depends on my, you know, flare-ups or my health state, so

24   it kind of just comes and goes.

25       Q.    I am talking about your -- the stress that is

1   caused by your marital issues.

2       A.   When did that resolve?

3       Q.   Um-hum.

4       A.   I am unsure.

5       Q.   Is it ongoing?

6       A.   It is.

7       Q.   Are you still married?

8       A.   Yes.

9       Q.   Have you applied for or made an application for

10  divorce?

11      A.   No.

12      Q.   Has your husband?

13      A.   Yes.

14      Q.   When did he do that?

15      A.   I don't remember the exact date.  It was a few

16  years ago.  It was before my employment with G&K.

17      Q.   Okay.  But since your employment with G&K, has

18  he filed for divorce?

19      A.   No.

20      Q.   When I asked you at the beginning of the

21  deposition that you had -- strike that.  Start again.

22  Sorry.

23            When I asked you at the beginning of the

24  deposition if you had been involved in any court

25  proceedings, why didn't you tell me about the time that

1    your husband had filed for divorce?

2         A.   Oh, I must not have understood the question.  I

3    thought it meant me filing something directly.  I didn't

4    -- I was not aware if someone else had filed the request.

5         Q.   Okay.  My question was really broad.  Have you

6    ever been involved in any other court proceedings other

7    than this?

8         A.   Yes.

9         Q.   Okay.  Other than the time that your husband

10   filed for divorce, have you been involved in any other

11   court proceedings?

12        A.   I filed a lawsuit before, yes.

13        Q.   Against who?

14        A.   The City of West Memphis.

15        Q.   And where was that filed?

16        A.   In federal court in Arkansas.

17        Q.   What year did you file that case?

18        A.   I don't recall the exact date.  It has been well

19   over ten years.

20        Q.   Who was the defendant?

21        A.   A police officer, Officer Nash.

22        Q.   And what were you claiming in the lawsuit?

23        A.   Assault from the police officer.

24        Q.   And what was the result of that litigation?

25        A.   There was a settlement.

1        Q.    Is that settlement confidential?

2        A.    I don't believe so.

3        Q.    How much money did you receive?

4        A.    The settlement amount was $7,000, but my portion

5    was less due to attorneys' costs.

6        Q.    Have you been involved in any other court

7    proceedings that we have not talked about?

8        A.    Outside of the divorce request from my husband

9    and the City of West Memphis, none that I recall.

10       Q.    Okay.  I want to be clear.  You have not filed

11   for bankruptcy?

12       A.    No, no.

13       Q.    And you never filed an injunction for protection

14   from harassment?

15       A.    Not that I recall, no.

16       Q.    Has anyone ever filed a petition for protection

17   from you for harassment?

18       A.    Not that I recall, no.

19       Q.    Have you received a medical opinion from any of

20   your treating physicians that any medical issue was caused

21   specifically by your termination?

22       A.    Have I received any medical report?

23       Q.    Medical opinion.

24       A.    No.

25       Q.    Have you asked anyone to be a witness for you in

1   this case?

2       A.   No.

3       Q.   Have you asked anyone to assist you with the

4   litigation that has refused?

5       A.   No.

6       Q.   After you talked with Janelle, did she agree to

7   provide a deposition?

8       A.   She stated that she would call you and talk to

9   you about doing the deposition.

10      Q.   Okay.

11      A.   Yes.

12      Q.   She has not returned my calls, just for the

13  record.

14      A.   Yeah, I don't know.

15      Q.   But when she spoke with you, she said she would

16  appear?

17      A.   Correct.

18      Q.   How long ago was that, again?

19      A.   Friday.

20      Q.   Have you understood all the questions that I

21  have asked you when you haven't told me to rephrase?

22      A.   Yes.

23      Q.   Okay.  Is there any changes or modifications

24  that you need to make to any testimony that you provided?

25      A.   Not that I can think of, no.

1             MS. FRANCIS:  Okay.  I don't have any

2    further questions.

3             MR. MILLS:  Okay.  I just have a few.

4

5                      EXAMINATION

6    BY MR. MILLS:

7        Q.   Brandy, if you could turn back to Exhibit 14,

8    which is the performance document, performance review.

9        A.   Okay.

10       Q.   Got it?

11       A.   Yes.

12       Q.   You were asked a series of questions about

13   certain things that you wrote in this document.  Do you

14   recall that?

15       A.   Yes.

16       Q.   And on the first page in the midyear comments

17   summary, you had written about monthly safety meetings

18   with the plant managers.

19       A.   Yes.

20       Q.   And do you recall testifying about that?

21       A.   Yes.

22       Q.   And those meetings occurred?

23       A.   Yes.

24       Q.   Was Rachael Siggerud present at those meetings?

25       A.   No.

1       Q.    Was she present at any of them?

2       A.    No.

3       Q.    Even one?

4       A.    No.

5       Q.    And then at the end of that paragraph, you talk

6  about -- do you remember testifying about the wheel of

7  safety meetings?

8       A.    Correct.

9       Q.    Was Rachael Siggerud present at any of those

10 meetings?

11      A.    No.

12      Q.    Even one?

13      A.    None that I recall.

14      Q.    If you turn to the second page, do you remember

15 testifying about the Coach to Win model?

16      A.    Correct.

17      Q.    Was Rachael Siggerud present at any of your

18 discussions with anyone at the company about the

19 Coach to Win model?

20      A.    No.

21      Q.    And in the second sentence of the individual

22 objective No. 1 where it states hands-on training with a

23 mentor or coach --

24            Do you see that?

25      A.    Yes.

1     Q.    Do you remember giving some testimony about

2  that?

3     A.    Yes.

4     Q.    Was Rachael Siggerud present at any of the times

5  that you gave a training?

6     A.    No.

7     Q.    Go down to the individual objective No. 2.

8     A.    Okay.

9     Q.    Item No. 1:  Meet with leaders monthly to review

10  and update 9 Block.

11              Do you remember testifying about that?

12     A.    Yes.

13     Q.    Was Rachael Siggerud present at any of your

14  discussions about 9 Block?

15     A.    No.

16     Q.    Item No. 3:  Schedule biweekly meetings with

17  leaders to develop assignments for HPEs.

18              Do you remember testifying about that?

19     A.    Yes.

20     Q.    Was Rachael Siggerud present at any of those

21  meetings?

22     A.    No.

23     Q.    Do you recall you testified about meetings that

24  occurred I believe you said Monday mornings at 5:00 a.m.?

25     A.    Yes.

1      Q.   And those were -- what meetings were those?

2   Remind me again.

3      A.   It was -- it was the business financial

4   meetings, service -- it was for service.

5      Q.   You state in individual objective No. 2 -- you

6   have a reference in here to weekly growth meetings to help

7   leaders monitor and improve business opportunities and

8   revenue.  Is that what those meetings were?

9      A.   Yes.

10     Q.   Was Rachael present at any of those meetings?

11     A.   No.

12     Q.   Did those meetings occur in person or were they

13  telephonic?

14     A.   In person.

15     Q.   Okay.  Did she attend even one of those

16  meetings, if you recall?

17     A.   In person, no.

18     Q.   Okay.  Did she ever attend telephonically?

19     A.   I don't recall.

20     Q.   Was Rachael present when you ever provided

21  information to anyone at G&K regarding EEOC rules and

22  claims?

23     A.   No.

24     Q.   Was Rachael Siggerud present when you provided

25  information to anyone at G&K regarding retaliation and

1   discrimination?

2       A.   No.

3       Q.   Was she present when you ever had discussions

4   with anyone at G&K regarding employees' rights?

5       A.   No.

6       Q.   Was she ever present when you provided

7   information or training to anyone at G&K regarding the

8   Civil Rights Act, the state human rights act, the AD --

9   ADA, the ADAAA 2008, the FMLA, the California Medical

10  Leave Act, USSERA and affirmative action?

11      A.   No.

12      Q.   So it sounds like with respect to many, if not

13  most, of the objectives that you put down in Exhibit 14,

14  Rachael Siggerud wouldn't have personal knowledge about

15  whether you complied with that objective or not, would

16  she?

17               MS. FRANCIS:  Object to the form and

18  foundation.

19               THE WITNESS:  No.

20  BY MR. MILLS:

21      Q.   She didn't observe you, did she?

22               MS. FRANCIS:  Same objection.

23               THE WITNESS:  No.

24  BY MR. MILLS:

25      Q.   So she wouldn't have any personal knowledge --

1   strike that.

2              She wouldn't have -- strike that.

3              She wouldn't have any personal knowledge of

4   you performing most of -- most of the objectives that you

5   have listed in this Exhibit 14; is that correct?

6              MS. FRANCIS:  Object to the form and

7   foundation.

8              THE WITNESS:  No.

9   BY MR. MILLS:

10      Q.   Do you recall being asked some questions about

11   the management at Phoenix being resistant or receiving

12   some pushback after you assumed the role of HR generalist?

13      A.   Yes.

14      Q.   Did Jake Briscoe ever say or do anything that

15   suggested to you that he was suspicious of your role as an

16   HR generalist?

17      A.   Yes.

18      Q.   What?

19      A.   That he didn't understand our reasoning behind

20   me needing to be involved in the financials of his

21   business.

22      Q.   Did Jake ever express to you that he didn't

23   think that the financials of the Phoenix plant were any of

24   your business?

25      A.   Yes.

1      Q.    What specifically did he say?

2      A.    He didn't understand why HR needed to know

3  anything about financials.

4      Q.    Now, prior to the time that -- that you became

5  an HR generalist, the financials of the Phoenix plant were

6  handled by Jake?

7      A.    Yes.

8      Q.    Was Mitch involved in that?

9      A.    Yes.

10      Q.    Okay.  And did -- did Mitch express to you that

11  he was not happy that you were now involved in the

12  financials?

13      A.    Yes.

14      Q.    All right.  What did he say?

15      A.    That he didn't understand the new role that I

16  was in or understand why he needed to teach me about the

17  financials or why we needed to know what numbers he was

18  needing in the service department.

19      Q.    Did -- did they say anything to you that

20  indicated that they didn't want you to know what the

21  numbers were?

22      A.    Yes.

23      Q.    What did they say?

24      A.    They would tell me that they felt that it was

25  just HR's job now to be tattletales, to tell on the

1    locations.

2         Q.    And did Jake or Mitch indicate to you that they

3    resented that?

4         A.    Yes.

5         Q.    Which one?

6         A.    Both.

7         Q.    Were there other things that Jake and/or Mitch

8    expressed to you that they resented about your new role as

9    an HR generalist?

10        A.    I don't recall.

11        Q.    Who at -- was there someone at -- at corporate

12   who told you that a part of your job as an HR generalist

13   was to be involved with the financials of the local

14   plants?

15        A.    Yes.

16        Q.    Who?

17        A.    Rachael Siggerud and Eric McNaul.

18        Q.    What specifically did Ms. Siggerud and

19   Mr. McNaul say to you about your involvement in that?

20               MS. FRANCIS:  Object to the form.

21   BY MR. MILLS:

22        Q.    Let's start with Ms. Siggerud.  What did Rachael

23   Siggerud say to you that you were supposed to be doing

24   with respect to the financials at the local plants?

25        A.    That we were part of the management team at each

1   location and that we were just as responsible as the

2   financials of the business because we were a part of the

3   group as everyone else, and that we should learn as much

4   as possible by shadowing managers, and we would be judged

5   on the success of the business in our performance review

6   at the end of the year as well as all the other managers.

7        Q.   What did Mr. McNaul say to you about what --

8   what you were supposed to be doing with respect to the

9   financials at the local plants?

10       A.   Eric McNaul told me that I should be the eyes

11   and ears for the corporate office and that it was my job

12   to make sure legally that the Phoenix business was doing

13   the right thing and that I should report any -- anything

14   that I felt was a concern with the business to the

15   corporate office.

16       Q.   Did you do that in your role as an HR

17   generalist?

18       A.   Yes.

19       Q.   Did you act as the eyes and ears of management?

20       A.   Yes.

21       Q.   Was Jake Briscoe aware that that is what you

22   were doing?

23       A.   Yes.

24       Q.   Did you tell him that is what you were doing?

25       A.   Not in so many words, no.  I told him that we

1    were part of, you know, the management team together.

2        Q.    Did Jake -- did Jake ever say or indicate

3    anything to you that -- that led you to believe that --

4    that he knew that you were there to serve as the eyes and

5    ears of corporate?

6        A.    Yes.

7        Q.    Okay.

8        A.    And he told me that I needed to make sure not to

9    take any concerns or issues to Rachael or Eric until I

10   passed it by him first because it was his business and his

11   decision.

12       Q.    Before the realignment, Jake had been your

13   immediate supervisor --

14       A.    Yes.

15       Q.    -- is that true?

16       A.    Yes.

17       Q.    And after you became an HR generalist, Jake was

18   no longer your supervisor, was he?

19       A.    Correct.

20       Q.    Rachael was now your supervisor?

21       A.    Correct.

22       Q.    But Jake still wanted you to run past him

23   anything that you were going to report back to Rachael or

24   Eric?

25       A.    Yes.

```
 1        Q.    Did you do that?

 2        A.    No.

 3        Q.    Why not?

 4        A.    Rachael told me that she was my direct

 5   supervisor and that I should discuss all concerns with her

 6   and that if there was an issue, then she would discuss

 7   them directly with Jake herself.

 8        Q.    Before you became an HR generalist, Jake had

 9   done your performance reviews?

10        A.    Yes.

11        Q.    And what kind of reviews did you get from him?

12        A.    They were very good.

13        Q.    What kind of relationship did you have with Jake

14   before you became an HR generalist?

15        A.    We had a really good relationship.

16        Q.    Who hired you at G&K?

17        A.    Jake Briscoe.

18        Q.    He interviewed you?

19        A.    Yes.

20        Q.    He was the one that offered you a job as an HR

21   representative?

22        A.    Yes.

23              MR. MILLS:  I think that's all I have.

24              MS. FRANCIS:  Okay.  I just have a few

25   follow-up questions.
```

```
1                        EXAMINATION

2

3    BY MS. FRANCIS:

4        Q.   You had weekly one-on-one meetings with

5    Ms. Siggerud, correct?

6        A.   Correct.

7        Q.   And during the one-on-one meetings, would you

8    discuss with her what work you were doing?

9        A.   Yes.

10       Q.   And so you would provide her details about what

11   you were doing on a weekly basis?

12       A.   Yes.

13       Q.   So Ms. Siggerud knew what tasks you were

14   performing, what trainings you were doing, things of that

15   nature, correct?

16       A.   I would just give her a summary of what things I

17   was working on.

18       Q.   So you would tell her what you were doing?

19       A.   Yes.

20       Q.   So Ms. Siggerud had personal knowledge of the

21   job tasks that you were completing because you would have

22   one-on-one meetings with her --

23                   MR. MILLS:   Object to the form.

24   BY MS. FRANCIS:

25       Q.   -- every week, correct?
```

1      A.    She had an idea, but she was never there to --

2      Q.    Personally observe?

3      A.    -- personally observe me in performing the

4  functions.

5      Q.    Correct.  But you would tell her what you were

6  doing?

7      A.    I wouldn't have specifics on everything, but I

8  would give her a summary on what I was working on, yes.

9      Q.    And she would ask you questions about what you

10 were doing --

11     A.    Yes.

12     Q.    -- and what your plans were to do in the future,

13 correct?

14     A.    Yes.

15            MS. FRANCIS:  Okay.  No further questions.

16            MR. MILLS:  Okay.  We are done I guess.

17            VIDEO TECHNICIAN:  This concludes the video

18 recorded deposition of Brandy Lane Williams.  Today's date

19 is June 14, 2016.  The time is 5:25 p.m.

20            (Proceedings adjourned at 5:25 p.m.)

21

22

23

                         BRANDY LANE WILLIAMS
24

25

```
 1                        CERTIFICATE

 2          I HEREBY CERTIFY that the foregoing deposition
    was taken by me pursuant to notice; that I was then and
 3  there a Certified Court Reporter for the State of Arizona,
    and by virtue thereof authorized to administer an oath;
 4  that the witness before testifying was duly sworn by me to
    testify to the whole truth and nothing but the truth;
 5  pursuant to request, notification was provided that the
    deposition is available for review and signature; that the
 6  questions propounded by counsel and the answers of the
    witness thereto were taken down by me in shorthand and
 7  thereafter transcribed through computer-aided
    transcription under my direction, and that the foregoing
 8  typewritten pages contain a full, true, and accurate
    transcript of all proceedings had upon the taking of said
 9  deposition, all done to the best of my skill and ability.
            I FURTHER CERTIFY that I am in no way related to
10  nor employed by any of the parties hereto, nor am I in any
    way interested in the outcome hereof.
11          I FURTHER CERTIFY that I have complied with the
    ethical obligations set forth in ACJA Sections
12  (J)(1)(g)(1) and (2).
            DATED at Phoenix, Arizona, this 27th day of
13  June, 2016.

14
                        CARRIE A. CARIATI
15                      Registered Professional Reporter
                        Certified Realtime Reporter
16                      Certified LiveNote Reporter
                        Certificate No. 50355
17

18          I CERTIFY that this Registered Reporting Firm
    has complied with the ethical obligations set forth in
19  ACJA Sections (J)(1)(g)(1) and (2).

20
            DATED at Scottsdale, Arizona, this 27th day of
21  June, 2016.

22
                        _____
23                      Registered Reporting Firm R1064
                        CARRIE A. CARIATI, Owner
24

25
```

EXHIBIT  B

Jacob Samuel Briscoe - June 22, 2016                          1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


BRANDY WILLIAMS,                    )
                                   )
          Plaintiff,               )
                                   )
vs.                                ) No.
                                   ) 2:15-CV-01744-
G & K SERVICES, INC., a Minnesota  ) DJH
corporation; JANE AND JOHN DOES    )
1-100; BLACK CORPORATIONS 1-100;   )
WHITE PARTNERSHIPS 1-100,          )
                                   )
          Defendants.              )
_____)


VIDEOCONFERENCE DEPOSITION OF JACOB SAMUEL BRISCOE


Phoenix, Arizona
June 22, 2016
9:00 a.m.


PREPARED BY:

Robin L. B. Osterode, RPR, CSR

Certified Reporter No. 50695

**Coash & Coash, Inc.**
602-258-1440        **www.coashandcoash.com**

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 289 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Jacob Samuel Briscoe
June 22, 2016

---

Page 2

```
 1
 2              VIDEOCONFERENCE DEPOSITION OF JACOB
 3    SAMUEL BRISCOE, commenced at 9:00 a.m., on June 22,
 4    2016, at Phoenix, Arizona, before Robin L. B.
 5    Osterode, RPR, CSR, Arizona Certified Reporter
 6    No. 50695.
 7
 8                        * * *
 9
10
11    APPEARANCES:
12       For Plaintiff:
13          MILLS & WOODS LAW PLLC
            By: Robert T. Mills
14          5055 North 12th Street, Suite 101
            Phoenix, Arizona 85014
15          (480) 999-4556
            docket@millsandwoods.com
16
17       For Defendants:
18          STINSON LEONARD STREET, LLP
            By: Kristin Berger Parker
19          1850 North Central Avenue, Suite 2100
            Phoenix, Arizona 85004
20          (602) 279-1600
            kristin.parker@stinsonleonard.com
21          (Via Videoconference)
22       Also Present:
23          Donna Fox
24
25
```

---

Page 3

```
 1                    I N D E X
 2    JACOB SAMUEL BRISCOE                        PAGE
 3       Examination by Mr. Mills               4, 62
 4       Examination by Ms. Parker                 60
 5
 6
 7
 8
 9
10                 EXHIBITS MARKED
11    EXHIBITS     DESCRIPTION                   PAGE
12    Exhibit 25   Bates stamped documents         15
                   G&K000129 - G&K000132
13
14    Exhibit 26   Bates stamped documents         13
                   G&K000136 - G&K000139
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1    JACOB SAMUEL BRISCOE
 2    called as a witness herein, having been first duly
 3    sworn, was examined and testified as follows:
 4
 5     E X A M I N A T I O N
 6     BY MR. MILLS:
 7    Q.  Please state your full name for the record?
 8    A.  Jacob Samuel Briscoe.
 9    Q.  Good morning, Mr. Briscoe.  My name is Bob
10    Mills and I represent Brandy Williams, and I'm going
11    to be asking you some questions this morning.  Have
12    you ever had your deposition taken before?
13    A.  No.
14    Q.  Okay.  Have you ever been a party to a
15    lawsuit before?
16    A.  No.
17    Q.  Have you ever testified in court as a
18    witness?
19    A.  No.
20    Q.  Have you ever testified in any
21    administrative proceeding as a witness?
22    A.  Administrative as in unemployment, things
23    like that.
24    Q.  Okay.  You have?
25    A.  Yes.
```

---

Page 5

```
 1    Q.  Okay.  That's one -- one of the ground
 2    rules for the deposition is when I ask you a question
 3    you need to answer it verbally.  Sometimes witnesses
 4    have a tendency to either nod or shake their head or
 5    say "uh-huh" or "huh-uh," but the court reporter
 6    can't pick that up, so we need a clear answer.  The
 7    other thing is if you don't understand a question
 8    that I'm asking you, just tell me that you don't
 9    understand it, and I'll try and rephrase it.
10       Otherwise, I'll assume that you did
11    understand it.  And, lastly, you're free to -- I
12    don't think this will take all day, but you're
13    certainly free to take a break whenever you feel like
14    you need one.  The only thing I would ask is if
15    there's a question pending, you answer the question
16    before the break; is that okay?
17    A.  I understand.
18    Q.  Okay.  Where do you live, sir?
19    A.  Currently, I live in Carlisle,
20    Pennsylvania.
21    Q.  How long have you lived there?
22    A.  About 18 months.
23    Q.  Okay.  Are you employed, sir?
24    A.  I am.
25    Q.  By whom?
```

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Jacob Samuel Briscoe
June 22, 2016

---

Page 6

1  A.  Equipment Depot.
2  Q.  And what do you do for Equipment Depot?
3  A.  I'm a general manager.
4  Q.  Are you stationed in Carlisle,
5  Pennsylvania?
6  A.  My office is in Mechanicsburg,
7  Pennsylvania.
8  Q.  And does your job require you to travel
9  from time to time?
10  A.  Very little.
11  Q.  And what are your job duties as a general
12  manager with Equipment Depot?
13  A.  I oversee the service department, which is
14  a group of technicians.  I oversee the sales
15  department.  I oversee the parts department, and
16  general operations of that business.
17  Q.  Okay.  How many employees do you manage?
18  A.  About 75, approximately.
19  Q.  And were you formerly employed by G & K
20  Services?
21  A.  Yes.
22  Q.  From when to when were you employed by --
23  by G & K?
24  A.  For 20 years, so it would have been 1993
25  through 2015, approximately, with a break for

---

Page 7

1  military service in 2003.
2  Q.  Okay.  And after you left G & K in 2015,
3  did you go directly to Equipment Depot or did you
4  work somewhere else in between?
5  A.  I spent three months in my job search
6  before I went to Equipment Depot.
7  Q.  Okay.  But you didn't have any other
8  employment between G & K and Equipment Depot?
9  A.  No.
10  Q.  What positions did you hold at G & K during
11  your 20 years of service there?
12  A.  I started out as a route sales
13  representative.  I was an account manager.  I was a
14  route manager.  I was a service manager.  A branch
15  manager.  A business manager.  And a general manager.
16  Q.  And while -- while you were working for G &
17  K, were you working in Phoenix?
18  A.  For 10 years in Phoenix.
19  Q.  What other locations did you work at?
20  A.  I worked in our Salt Lake, Utah location.
21  Our Ogden branch in Utah.  Also in Seattle,
22  Washington, over various periods of time.
23  Q.  And during what period of time were you the
24  general manager in Phoenix?
25  A.  From 2011 through 2015.

---

Page 8

1  Q.  Is that the position you held when you --
2  when you left G & K?
3  A.  Yes.
4  Q.  And while you were the general manager in
5  Phoenix, who was the manager?
6  MS. PARKER: Objection; form.
7  THE WITNESS: The manager of --
8  BY MR. MILLS:
9  Q.  Of G & K in Phoenix?
10  A.  I don't understand the question.
11  Q.  Okay.  Did you have a manager who was
12  working under you when you were the general manager?
13  MS. PARKER: Objection; form.
14  You can answer.
15  THE WITNESS: Yes, I had multiple managers
16  that worked for me in --
17  BY MR. MILLS:
18  Q.  Okay.
19  A.  -- Phoenix, Arizona.
20  Q.  Okay.  How many?
21  A.  I had a service manager, a sales manager, a
22  plant manager, an office manager, and at one point I
23  had an HR generalist that also worked for me.  She
24  was not a manager.  But those were my direct reports
25  as general manager.

---

Page 9

1  Q.  Who was the HR generalist?
2  A.  Brandy Williams.
3  Q.  How many employees did you manage at the --
4  at the Phoenix location of G & K?
5  A.  There was approximately 90 to 100 in that
6  location.
7  Q.  Okay.  And while you were --
8  A.  And all the --
9  Q.  I'm sorry, go ahead.
10  A.  -- and all the branches that rolled up
11  under that group.
12  Q.  And what -- what were the other branches
13  that rolled up under that group?
14  A.  The Tucson, Arizona branch, so I had a
15  branch manager there that also reported to me and
16  then I had a small location in Yuma, Arizona, and
17  Prescott, Arizona.
18  Q.  So during the time that you were the
19  general manager in Phoenix, you were also general
20  manager for Tucson and Prescott and Yuma?
21  A.  Yes.
22  MS. PARKER: Object to the form.
23  THE WITNESS: Sorry.
24  MS. PARKER: That's all right.
25  THE WITNESS: Yes.

---

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 291 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Jacob Samuel Briscoe
June 22, 2016

Page 10

1       BY MR. MILLS:
2   Q.   You knew Brandy Williams while you were
3   working in Phoenix.  Correct?
4   A.   Yes.
5   Q.   Did you interview Brandy Williams when she
6   applied for a job at G & K?
7   A.   I did.
8   Q.   And are you the individual that hired her
9   to work at G & K?
10  A.   Yes.
11  Q.   You made that decision to hire Brandy.
12  Correct?
13  A.   I did, with input of other individuals that
14  also interviewed her, but I was the hiring manager.
15  Q.   Okay.  And Brandy was in the HR Department,
16  human resources?
17       MS. PARKER: Object to the form.
18       MR. MILLS: Strike that -- let me -- let me
19  rephrase the question.
20  Q.   For what position did you hire Brandy
21  Williams?
22  A.   She was an HR generalist.
23  Q.   You hired her as an HR generalist?
24  A.   Yes.
25  Q.   Okay.  And when was that?

Page 11

1   A.   I don't recall the exact date.
2   Q.   Was it -- would it have been in 2011?  Does
3   that sound right?
4   A.   That sounds right.  It was about four years
5   ago.
6   Q.   And during the -- during the time that you
7   worked with Brandy, did -- did she work in Phoenix as
8   well?
9   A.   Yes, her office was in Phoenix.
10  Q.   And for a time, you were Brandy's direct
11  supervisor.  Correct?
12  A.   Yes.
13  Q.   Was there a period of time when you stopped
14  being her direct supervisor?
15  A.   Yes.
16  Q.   And when was that?
17  A.   Sometime, about -- maybe less than a year
18  after she started.  They changed the HR organization,
19  and she reported to a different manager.
20  Q.   Okay.  And just very general terms, can you
21  tell me your understanding of how they -- how they
22  changed the HR structure?
23       MS. PARKER: Objection; foundation.
24       You can answer, to the extent you know.
25       THE WITNESS: Yeah, they -- they had each

Page 12

1   HR individual report to a regional director and they
2   divvied up the job responsibilities of the generalist
3   amongst that group and made them specialized.
4       BY MR. MILLS:
5   Q.   Okay.  And do you know who Brandy's
6   supervisor was after that reorganization?
7   A.   Yes.
8   Q.   Who was that?
9   A.   Rachel Siggerud.
10  Q.   Had you worked with Rachel Siggerud before?
11  A.   Yes.
12  Q.   In -- in what respect?
13  A.   She was our HR director for the region that
14  I was in.
15  Q.   Okay.  And that was the Northwest Region.
16  Correct?
17  A.   Yes.
18  Q.   During the time that you were Brandy
19  Williams' direct supervisor, did you do her
20  performance reviews?
21  A.   I did the first year that she worked for
22  G & K.
23  Q.   And then did someone else do those reviews?
24       MS. PARKER: Objection; foundation.
25       MR. MILLS: Let me -- let me rephrase the

Page 13

1   question, that was -- that was bad.
2   Q.   During the time that you were her direct
3   supervisor, was there anyone else who did performance
4   reviews of Brandy, to your knowledge?
5   A.   Not directly to my knowledge, no.
6       (Marked for identification Exhibit 26.)
7       BY MR. MILLS:
8   Q.   Okay.  Can you take a look at the document
9   that we premarked as Exhibit 26.
10      MS. PARKER: When you've had a chance to
11  review it, you can just tell him you're done.
12      THE WITNESS: Okay, I've -- I've had a
13  chance to look at this document.
14      BY MR. MILLS:
15  Q.   Okay.  Have -- have you -- sorry, have you
16  seen this document before, sir?
17  A.   Obviously, at some point I have.
18  Q.   Okay.  Is this --
19  A.   It's got my name on it electronically.
20  Q.   Yeah, this is the -- this is entitled a
21  manager evaluation.  Correct?
22  A.   Uh-huh.
23  Q.   Yes?
24  A.   Yes.
25  Q.   And is this an evaluation that you prepared

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 292 of 505

Jacob Samuel Briscoe
June 22, 2016

Page 14

1  regarding Brandy Williams?
2  A.  Not according to my recollection, it shows
3  that the author is Rachel Siggerud.
4  Q.  Okay.  If you go down through the document,
5  let's go down to Section 1, "G & K Performance
6  Objectives."  Do you see that?
7  A.  Yup.  Yes.
8  Q.  And the very -- very last line in the -- in
9  the box says "Last modified by Jacob Briscoe, July
10  26, 2012."  Do you see that?
11  A.  I do.
12  Q.  Do you know what that means that it was
13  last modified by you?
14  A.  I don't, because she didn't report to me at
15  that time, so I don't know why it's got my name on
16  it, other than I may have transferred it or
17  something.
18  Q.  Brandy was not reporting to you during this
19  time period of January 1st, 2012 through June 2012?
20  A.  I don't recall exactly when she moved, but
21  at some point she did move during that year.
22  Q.  Okay.  You don't recall doing this
23  evaluation, though?
24  A.  I'm sure I had some input on this, but I
25  don't remember the details.

Page 15

1  Q.  Is it possible that you're the one that
2  gave the ratings to Brandy, the manager ratings?
3     MS. PARKER: Objection; form.
4     THE WITNESS: I would say it's possible,
5  yes.
6     BY MR. MILLS:
7  Q.  Okay.  And if you read through the actual
8  ratings in the document, all of the manager's ratings
9  appear to be meets expectations.  Correct?
10  A.  That would be correct.
11     (Marked for identification Exhibit 25.)
12     BY MR. MILLS:
13  Q.  Okay.  I'd like for you to take a look at
14  the document that we've premarked as Exhibit 25.  And
15  let me know when you've had a chance to review that.
16  A.  Yup, I've had a chance.
17  Q.  Okay.  You recognize this document?
18  A.  I do.
19  Q.  Okay.  And is this a -- is this a
20  performance review that -- that you prepared with
21  respect to Brandy Williams?
22  A.  Yes, it is.
23  Q.  Okay.  Okay.  And if you turn to page Bates
24  number 129 of Exhibit 25.  That's where the
25  manager -- manager evaluation begins.  Correct?

Page 16

1  A.  Correct.
2  Q.  And in all of the categories in that
3  section, the manager rating is "meets expectations";
4  is that correct?
5  A.  That is correct.
6  Q.  And if you turn to the last page of the
7  document, Bates number G & K 132.
8     THE REPORTER: Mr. Briscoe, you're moving
9  your paper, I think, somewhere near the microphone
10  and it's causing a little bit of ruckus.
11     THE WITNESS: We'll move it.  Thank you.
12     THE REPORTER: You bet.
13     THE WITNESS: Okay.  I'm on page 132.
14     BY MR. MILLS:
15  Q.  Okay.  At the very top of the page, there's
16  a section called manager comments.  Do you see that?
17  A.  I do.
18  Q.  Okay.  And I'm just going to read it.
19  it -- it says, "Brandy, you're very strong when it
20  comes to your understanding of HR issues, and the
21  legal aspects that are often overlooked by line
22  managers.  You're a strong addition to our team and
23  you can help develop the managers in this business
24  become better in their roles as leaders.  Your work
25  on helping drive our pipelines has been critical and

Page 17

1  will be an important aspect in helping us drive
2  strong business performance.  Continue to drive these
3  efforts."  Did I read that correctly?
4  A.  You did.
5  Q.  And are these comments, comments that you
6  wrote?
7     MS. PARKER: We actually couldn't quite
8  hear that last word.
9     BY MR. MILLS:
10  Q.  Oh.  Are these comments --
11     MS. PARKER: Could you read back the
12  question?
13     MR. MILLS: Sure.
14  Q.  The manager comments on page Bates numbered
15  132, are those comments that you made, or that you
16  wrote?
17  A.  These are my comments.
18  Q.  Okay.  Could you describe for me your
19  relationship with Brandy Williams?
20     MS. PARKER: Objection; form.
21     You can answer.
22     THE WITNESS: She was my employee.
23     BY MR. MILLS:
24  Q.  Were you friendly with her?
25     MS. PARKER: Objection; form.

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 293 of 505

Jacob Samuel Briscoe
June 22, 2016

Page 18

1      THE WITNESS: Friendly, as any other
2   employee, no relationship or engagement outside of
3   the office.
4      BY MR. MILLS:
5   Q.  Okay.  Have you spoken with Brandy since
6   she left G & K?
7   A.  No.
8   Q.  During the time that you were her direct
9   supervisor, did you consider to -- her to be a
10   competent employee?
11      MS. PARKER: Objection; form.  Not limited
12   as to time or --
13      THE WITNESS: She was brand new in her
14   role.  She was learning in our organization.  I felt
15   like, as noted in her midyear review, that she was
16   coming along and had things to offer to my team that
17   they needed.
18      BY MR. MILLS:
19   Q.  Okay.  During the time that you were her
20   direct supervisor, did you voice any criticisms or
21   complaints to Brandy, about her job performance?
22   A.  Yes.  There were a few instances where we
23   had issues that I was not pleased with the way she
24   was conducting business.
25   Q.  And what were those?

Page 19

1   A.  An example would be her talking to plant
2   employees and bringing them into her office during
3   working hours as a group, and allowing them to, in a
4   group setting, complain about things they didn't like
5   in the business.  Which in my opinion was not
6   productive and not the proper way for an
7   HR professional to conduct themselves.
8   Q.  And did you -- did you tell Brandy that you
9   didn't think that that was appropriate?
10   A.  I did.
11   Q.  And did she stop doing that after you
12   talked to her?
13   A.  She did not stop doing that after I talked
14   to her.
15   Q.  Okay.  And -- and how frequently did it
16   happen after that?
17   A.  A few times, not -- not -- not on a
18   frequent basis.
19   Q.  Less than five?
20   A.  I believe less than five, yes.
21   Q.  Any other things that you -- that you
22   voiced a criticism or complaint to Brandy Williams
23   about while you were her direct supervisor?
24   A.  Yes.  Her -- her behavior as an HR -- after
25   a period of time that she felt comfortable, she

Page 20

1   started taking on the role of an HR auditor or an
2   HR cop versus an HR partner, business partner,
3   someone there to help.  So she was not engaged in
4   what I considered productive behavior.
5   Q.  What do you mean by "HR auditor" or
6   "HR cop"?
7   A.  She was looking for things to get my
8   managers in trouble or to share with Rachel, who she
9   had a dotted line reporting to at that point, that
10   she felt weren't the proper way to run the business.
11   Q.  At what -- at what point in time did that
12   start?
13      MS. PARKER: Objection; form.
14      THE WITNESS: I would imagine it was
15   sometime after this midyear performance review is
16   when that behavior started to really become an issue.
17      BY MR. MILLS:
18   Q.  Was it after the restructuring of the HR
19   department?
20      MS. PARKER: Objection; form.
21      THE WITNESS: I don't believe it started
22   after that.  I think after that it was more
23   pronounced.
24      BY MR. MILLS:
25   Q.  Did Brandy at some point involve herself in

Page 21

1   or attempt to involve herself in the finances or
2   bookkeeping of the business in Phoenix?
3      MS. PARKER: Objection; form.
4      THE WITNESS: She did not personally
5   involve herself.  That was an objective that was
6   given to her by Rachel as an opportunity to
7   understand the business at a greater level, and so I
8   provided opportunities for her to understand the P&L
9   and the implications of the financials, and more
10   broadly understand the business than she previously
11   did.
12      BY MR. MILLS:
13   Q.  Okay.  When you testified a few minutes ago
14   that you thought Brandy was looking for things to get
15   your managers in trouble, could you be a bit more
16   specific for me and give me some examples of that?
17      MS. PARKER: Objection; form.
18      THE WITNESS: I didn't testify a few months
19   ago, so I don't understand the question.
20      BY MR. MILLS:
21   Q.  A few minutes ago, I'm sorry.
22   A.  Okay.  All right.  Thank you for the
23   clarification.  She was -- she spent time with my
24   service team, and complained about the communication
25   that my managers had with their employees.  She also

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 294 of 505

Jacob Samuel Briscoe
June 22, 2016

Page 22

1 complained about the communication that my plant
2 management had with their employees.
3 Q.   And what, specifically, were her
4 complaints?
5 A.   That they weren't positive enough.
6 Q.   Did you ever tell Brandy that you thought
7 that that behavior wasn't appropriate?
8     MS. PARKER: Objection; form.
9     THE WITNESS: We had many conversations
10 about her interactions with my direct supervise --
11 direct reports.
12     BY MR. MILLS:
13 Q.   And during those conversations or
14 communications, did you say anything to her about her
15 interaction with the managers or employees that you
16 just described?
17 A.   I did.  I -- I explained to her that her
18 role was to be a business partner and not to try and
19 tell them how to do their jobs.  So in order for her
20 to be successful, she needed to find productive ways
21 to help them with their jobs, not -- not come in on
22 the back side and explain what they should have done
23 differently.
24 Q.   When did those conversations occur?
25     MS. PARKER: Objection; form.

Page 23

1     THE WITNESS: I had weekly one-on-ones with
2 all of my employees and it would have occurred mostly
3 in those meetings.
4     BY MR. MILLS:
5 Q.   Would those conversations have occurred
6 after Brandy became -- or strike that.
7     Would those conversations have occurred
8 when Brandy was no longer under your direct
9 supervision?
10     MS. PARKER: Objection; form.
11     THE WITNESS: No, after she didn't report
12 to me anymore and reported to Rachel, I would have
13 shared my concerns with Rachel directly and Rachel
14 would have had those conversations.
15     BY MR. MILLS:
16 Q.   Do you know what Brandy's job title was
17 during -- or strike that.
18     Do you know what Brandy's job title was
19 during the time she was under your direct
20 supervision?
21 A.   I don't recall.
22 Q.   Do you recall that her title was an HR
23 representative?
24 A.   That does sound correct.
25 Q.   And then at some point after the

Page 24

1 reorganization, her title became an HR generalist?
2     MS. PARKER: Objection; foundation.
3     THE WITNESS: That sounds correct.
4     BY MR. MILLS:
5 Q.   There were certain things that -- that the
6 HR representatives, including Brandy did, that the HR
7 generalists did not do; is that correct?
8     MS. PARKER: Objection; foundation.
9     THE WITNESS: Yes, as I mentioned, they
10 broke up the responsibilities of the various
11 HR individuals and specialized their functions.
12     BY MR. MILLS:
13 Q.   The HR representatives handled payroll and
14 benefits.  Right?
15 A.   Correct.
16 Q.   Okay.  And after the -- after the
17 reorganization, the HR representatives no longer
18 handled that.  Right?
19 A.   Those responsibilities primarily moved to
20 corporate employees and the managers individually.
21 Q.   Okay.  Did that create more work for you
22 after the reorganization of the HR department?
23 A.   It did.
24 Q.   And were you unhappy with that?
25 A.   I wasn't unhappy with it, other than it

Page 25

1 took us away from focusing on more important things,
2 so --
3 Q.   Did you -- okay.  Go ahead.
4 A.   So I don't think that's a fair -- fair
5 characterization.  I didn't -- I didn't like it.  I
6 wouldn't say I was not happy with it.
7 Q.   Did you ever voice to anyone at G & K that
8 you were not pleased that you -- you were having to
9 take on more responsibilities after this
10 reorganization in the HR department?
11     MS. PARKER: Objection; form,
12 mischaracterizes prior testimony.
13     You can answer.
14     THE WITNESS: I did.
15     BY MR. MILLS:
16 Q.   And to whom did you voice that?
17 A.   Primarily to my direct supervisor Eric
18 McNaul, and also Rachel Siggerud.
19 Q.   And what, if anything, did they say to you
20 in response to that?
21     MS. PARKER: Objection; form.
22     THE WITNESS: I don't recall the specific
23 comments, other than just generally, you know, we --
24 we understood it was change and we just didn't like
25 the change.

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 295 of 505

Jacob Samuel Briscoe
June 22, 2016

Page 26

1   BY MR. MILLS:
2  Q.   And I take it, then, that after Brandy was
3   no longer under your direct supervision, you no
4   longer did her performance reviews?
5  A.   I did not do her performance reviews after
6   that.
7  Q.   To your knowledge, did you have any input
8   in her performance review after -- after she left
9   your direct supervision?
10     MS. PARKER: Objection; form, foundation.
11     THE WITNESS: In my role as a general
12  manager, my input on all of the regional staff was
13  generally taken by whichever manager they reported
14  to, because they were support structure or support
15  staff for each location.
16     BY MR. MILLS:
17  Q.   Do you know who was doing her performance
18  reviews after she left your direct supervision?
19  A.   It should have been Rachel Siggerud.  I'm
20  assuming that's who it was.
21  Q.   What complaints or criticisms of Brandy
22  Williams' work performance did you voice to Rachel
23  Siggerud?
24     MS. PARKER: Objection; form.
25     THE WITNESS: Shortly after the transition

Page 27

1   to the new role, Brandy began to disengage from the
2   business, and was not quite as available as I would
3   have liked to have seen on multiple occasions.
4      BY MR. MILLS:
5  Q.   Now, when you say that Brandy began to
6   disengage, do you mean that she was not physically
7   present at times?
8      MS. PARKER: Objection; form.
9      THE WITNESS: No, she -- she was not
10  responsive.  She would not respond to messages or
11  e-mails in a timely manner.  Requests from myself or
12  my staff.
13     BY MR. MILLS:
14  Q.   Did you complain -- did you ever complain
15  to Rachel that Brandy was missing work?
16     MS. PARKER: Objection; form.
17     THE WITNESS: Not that she was missing
18  work, but that she was not -- not making herself
19  available.
20     BY MR. MILLS:
21  Q.   Did you ever complain to Rachel that Brandy
22  was late to work or -- or leaving work early?
23  A.   The only time I remember having an issue
24  with her being late to work is when she was late to
25  one of my meetings.

Page 28

1  Q.   And that was just one time?
2  A.   That's the only specific time that I
3   remember.
4  Q.   At some point did you move Brandy's office
5   at the Phoenix location?
6      MS. PARKER: Objection; form.
7      THE WITNESS: At one point we did move her
8   office back to the office that the previous HR
9   individual had used, which was in an office up in the
10  area by my office.
11     BY MR. MILLS:
12  Q.   Okay.  And is that in a location that's
13  more remote from the other employees of G & K?
14     MS. PARKER: Objection; form.
15     THE WITNESS: No, actually, that office is
16  in the center of the building, so it's more central
17  to the entire operation.
18     BY MR. MILLS:
19  Q.   Were you aware of Brandy Williams taking
20  time off work to attend medical appointments?
21     MS. PARKER: Objection; form.
22     THE WITNESS: I'm sure at some point she
23  had medical appointments that she went to that I
24  would have been aware of.
25     BY MR. MILLS:

Page 29

1  Q.   Did she tell you that she was attending
2   medical appointments?
3  A.   I'm sure she did.
4  Q.   Were you aware that Brandy had a medical
5   condition?
6      MS. PARKER: Objection; form.
7      THE WITNESS: Not a specific condition that
8   I'm aware of, no.
9      BY MR. MILLS:
10  Q.   What, if anything, did you know about her
11  medical condition?
12     MS. PARKER: Objection; form.
13     THE WITNESS: Just that she had doctors'
14  appointments, like pretty much everybody else does.
15     BY MR. MILLS:
16  Q.   Other than, as you described it, Brandy
17  beginning to disengage, as you put it, what other
18  criticisms or complaints about Brandy did you voice
19  to Rachel Siggerud?
20  A.   Nothing different than the previous
21  conversations I'd had with Brandy, similar
22  conversations I had with Rachel, about her engagement
23  with my team, and not really being a productive
24  teammate with my direct reports.
25  Q.   Were there any other -- to the best of your

---

Page 30

1  knowledge, were there any other types of complaints
2  or criticisms of Brandy that you voiced to Rachel
3  Siggerud?
4      MS. PARKER: Objection; form.
5      Go ahead.
6      THE WITNESS: Yeah, the -- the -- the
7  biggest one that I remember, and as I mention this
8  has been a while, so almost a lifetime ago, we had a
9  meeting where I brought together my sales management,
10 my service management, my plant management, my office
11 manager, and I invited Brandy to come in for that
12 meeting also, to discuss the on-boarding of our sales
13 and service teams and ways that we can improve that
14 process. We had a significant amount of new sales
15 reps that we were on-boarding. Which obviously
16 brings with it challenges as you on-board new
17 employees. And the service team was going through a
18 significant amount of turnover also.
19     As I mentioned, Brandy came late to that
20 meeting, and we were already mid-conversation, and
21 she immediately jumped into the conversation and
22 began to argue with my service manager, as I recall,
23 about what he was doing wrong in his department. And
24 that the conversation went south pretty fast. She
25 was -- she was pretty hot, and she eventually walked

---

Page 31

1  out of the room. Actually, slammed the door where it
2  reverberated through the office, and never came back
3  to that meeting. So I did talk to Rachel about that
4  specific incident.
5      BY MR. MILLS:
6  Q. Who was the service manager?
7  A. Mitch Rubinoff, which isn't his legal name.
8  His first name's Herbert, but -- since it's a record,
9  I thought I'd mention that.
10 Q. Any other types of -- of criticisms or
11 complaints of Brandy that you would have voiced to
12 Rachel Siggerud?
13 A. Not that I recall.
14 Q. Did you -- did you voice any complaints or
15 criticisms of Brandy to anybody at G & K, other than
16 Rachel or Brandy herself?
17 A. No. No.
18 Q. Did you ever prepare a -- a written
19 complaint or a written criticism of Brandy's job
20 performance?
21     MS. PARKER: Objection; form.
22     THE WITNESS: The answer to that is no.
23 When she was still working directly for me, I wasn't
24 to the point where I felt we were at that point. So
25 no, I did not.

---

Page 32

1      BY MR. MILLS:
2  Q. Did you ever at any point after she was --
3  after she left your direct supervision prepare any
4  sort of written complaint or criticism regarding her
5  job performance?
6      MS. PARKER: Same objection.
7      THE WITNESS: Not that I recall.
8      BY MR. MILLS:
9  Q. Did you ever prepare any -- anything in
10 writing criticizing her for missing time from work?
11     MS. PARKER: Objection; form.
12     THE WITNESS: That's possible. I don't
13 recall.
14     BY MR. MILLS:
15 Q. Okay. Did G & K have procedures for --
16 that you could have utilized -- strike that.
17     Did G & K have procedures in place that you
18 could have utilized to complain about Brandy missing
19 time from work?
20     MS. PARKER: Objection; form, foundation.
21     THE WITNESS: I don't recall a procedure.
22     BY MR. MILLS:
23 Q. Did you ever prepare anything with respect
24 to any other employees missing time from work?
25     MS. PARKER: Objection; form.

---

Page 33

1      THE WITNESS: We -- we did have a document
2  that we used for our line employees that we would
3  track attendance on, but we typically did not track
4  attendance like that for salaried management.
5      BY MR. MILLS:
6  Q. Okay.
7  A. I never did.
8  Q. Was -- did -- did G & K have any sort of
9  form or a procedure that -- that you could utilize
10 to -- to document a complaint about an employee with
11 respect to their job performance?
12     MS. PARKER: Objection; form, foundation.
13     THE WITNESS: Yes, we had performance
14 improvement-type documentation. I don't recall the
15 exact terminology that G & K uses, but there was
16 forms.
17     BY MR. MILLS:
18 Q. Did you ever prepare any sort of
19 performance improvement documentation with respect to
20 Brandy Williams?
21 A. No.
22 Q. Okay. Did you ever request that anybody
23 else do that?
24 A. No.
25 Q. After the restructuring of the HR

---

Page 34

1  department, were there other responsibilities that --
2  that you had to take on that had previously been
3  responsibilities of the HR representative?
4  A.  During the initial transition, I took on
5  the E-Verify process, because I had a new office
6  manager starting and we needed to get her enrolled in
7  that program, and I'd previously had access to that.
8  Q.  Anything else?
9  A.  No, for me specifically, that was the only
10  thing that I really got bogged down in.
11  Q.  Did you ever tell Brandy that you didn't
12  know what her -- her job was as an HR generalist?
13     MS. PARKER: Objection; form.
14     THE WITNESS: I don't recall using that
15  wording at all.  But there was confusion about the
16  new jobs when that started, and so that was a
17  conversation of exactly what their responsibilities
18  were and what they should be focused on.
19     BY MR. MILLS:
20  Q.  And -- and --
21  A.  So there was some --
22  Q.  I'm sorry.  Go ahead.
23  A.  There was some ambig -- ambiguity in what
24  that role was.
25  Q.  And you were -- you were confused as well

Page 35

1  as to what the new role was for the HR generalist.
2  Correct?
3     MS. PARKER: Objection; form.
4     THE WITNESS: Yeah, it was not a clearly
5  defined role, at least from my visibility.
6     BY MR. MILLS:
7  Q.  Did anybody at G & K ever explain to you,
8  or attempt to explain to you, what the role of an HR
9  generalist was going to be going forward?
10     MS. PARKER: Objection; form.
11     THE WITNESS: The answer is yes, it was --
12  it was a topic of discussion multiple times.
13     BY MR. MILLS:
14  Q.  Okay.
15  A.  And I think that got burned up over time,
16  but initially it was not very clear.
17  Q.  And who had those conversations with you?
18  A.  I had conversations with Rachel, but it was
19  also a topic of discussion in some of our general
20  manager meetings, and things like that, both at the
21  regional and corporate level.
22  Q.  Do you ever remember seeing a written job
23  description for an HR generalist?
24  A.  I don't recall ever seeing one, but
25  G & K has very specified job descriptions for every

Page 36

1  role that I've ever hired for, so I'm sure it exists.
2  Q.  Were you ever asked to provide any input as
3  to what the job responsibilities of an HR generalist
4  should be?
5  A.  No.
6  Q.  Did you ever volunteer any input as to what
7  you thought the job responsibilities of an HR
8  generalist should be?
9  A.  No.
10  Q.  Did you ever express to Rachel Siggerud,
11  that you were -- you were confused about what the
12  role of an HR generalist was supposed to be?
13  A.  Yes.
14  Q.  And what -- what did she say to you?
15  A.  She then tried to explain it to me the best
16  that she could, based on her information.  I don't
17  remember the specific conversation, but I know we had
18  the conversation.
19  Q.  Did Rachel tell you that there were other
20  managers who were confused as well?
21     MS. PARKER: Objection; form.
22     THE WITNESS: I do not remember Rachel
23  saying that.
24     BY MR. MILLS:
25  Q.  And can you tell me just in -- in -- in

Page 37

1  very general terms as best you can, how the role of
2  an HR generalist differed from that of an HR
3  representative?
4  A.  The primary difference is basically doing
5  away with the administrative functions and not really
6  focusing on the recruiting functions that the HR
7  representative had previously helped us with, and so
8  it was focused on employee development plans,
9  performance improvement plans, that kind of thing.
10  Really looking at the broader picture versus getting
11  into some of the administrative stuff.
12  Q.  Were you --
13  A.  Such as payroll.
14  Q.  Okay.  Were you in favor of that change?
15     MS. PARKER: Objection; form.
16     THE WITNESS: I -- I don't know that I was
17  in favor or disenfavored [sic] with it.  At the end
18  of the day, it didn't really matter.  As long as the
19  function lived somewhere, I -- I don't really care.
20     BY MR. MILLS:
21  Q.  Did you prefer it when you had an HR
22  representative as opposed to an HR generalist?
23     MS. PARKER: Objection; form.
24     MR. MILLS: Let me -- let me rephrase --
25     THE WITNESS: As a general manager?

Page 38

1      BY MR. MILLS:
2  Q.  Yeah.  Let me rephrase the question.
3      Did you prefer having an HR representative
4  as opposed to an HR generalist?
5  A.  Yeah, as a general manager, of course, I
6  want all my people to report directly to me and have
7  complete control over that.  So --
8  Q.  All right.  Did it become more difficult
9  after Brandy became an HR generalist, in that you
10  would have to communicate with her -- with a
11  different supervisor, Rachel Sig -- Siggerud?
12  A.  No, because I'd always talked with Rachel,
13  too, in her previous role she was over the region
14  anyway, so that communication did not change.
15  Q.  Did you ever meet Rachel Siggerud,
16  personally?
17  A.  Yes, she was in our business on a regular
18  basis.
19  Q.  How many times did she get to Phoenix while
20  you were there?
21  A.  Oh --
22      MS. PARKER: Objection; form.
23      THE WITNESS: There was a period of time
24  where she was probably in the business almost
25  monthly, if not every other month.

Page 39

1      BY MR. MILLS:
2  Q.  How was your relationship with Eric McNaul?
3      MS. PARKER: Objection; form.
4      THE WITNESS: She was his employee and they
5  traveled together on a regular basis.
6      BY MR. MILLS:
7  Q.  Was Eric McNaul your direct supervisor?
8  A.  Yes.
9  Q.  And how did you get along with him?
10  A.  Fine.
11  Q.  How frequently would Eric McNaul come to
12  the Phoenix location?
13  A.  Typically, on a monthly basis.
14  Q.  Did you tell Brandy Williams that you
15  didn't think HR brought any value to the business?
16  A.  No.
17  Q.  Did you ever express that to anybody at --
18  at G & K?
19  A.  No, that's --
20  Q.  Did you ever express to anybody at
21  G & K that you didn't -- you didn't -- you didn't
22  understand what value HR added to the -- to the
23  business?
24      MS. PARKER: Objection; form.
25      THE WITNESS: The answer to that is no.

Page 40

1      MS. PARKER: Can we take a quick break?
2      MR. MILLS: Sure.
3      MS. PARKER: I -- thank you.
4      MR. MILLS: What, like 5, 10 minutes?
5      MS. PARKER: Yeah.
6      (Recessed from 9:53 a.m. until 10:02 a.m.)
7      BY MR. MILLS:
8  Q.  Okay.  Mr. Briscoe, from your perspective,
9  what was Brandy's relationship with Mitch Rubinoff?
10      MS. PARKER: Objection; foundation.
11      You can answer.
12      THE WITNESS: I don't think they liked each
13  other.
14      BY MR. MILLS:
15  Q.  Okay.  Was it a -- was it a personality
16  conflict or how would you describe it?
17  A.  I would describe it as Mitch not
18  appreciating her support or her lack of support in
19  his department.  Meaning that he didn't like the way
20  she engaged with him and his managers.
21  Q.  Okay.  And do you know whether Mitch --
22  Mitch ever told Brandy that?
23  A.  I don't know that he did or didn't.
24  Q.  Did you ever talk to Brandy about that,
25  specifically?

Page 41

1  A.  Bas -- basically, the exact same comments
2  that you and I have already discussed, yes.
3  Q.  Okay.  Do you know whether Mitch is still
4  at G & K?
5  A.  He is not.
6  Q.  When did he leave, if you know?
7  A.  About a year before I left, approximately.
8  Q.  And did he leave voluntarily or was he
9  terminated?
10  A.  Voluntarily.
11  Q.  Do you know where he's at now?
12  A.  I believe he -- he's in California, and I
13  believe he works for Specialty Linen, or something
14  like that.  He works for a different company in
15  California.
16  Q.  Were you aware that Brandy Williams -- let
17  me -- let me rephrase the question.  During the time
18  that you were at G & K, were you aware that Brandy
19  Williams had made a request for accommodation under
20  the Americans with Disabilities Act?
21  A.  No.
22  Q.  Are you aware of that now?
23      MS. PARKER: Objection to form, to the
24  extent it calls for a legal conclusion.
25      THE WITNESS: Based on the comment you just

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 299 of 505

Jacob Samuel Briscoe
June 22, 2016

Page 42

1  made, I'm -- I'm assuming that happened.
2      BY MR. MILLS:
3  Q.  I was just wondering if you know about it
4  from any source, other than from me or from your
5  counsel?
6      MS. PARKER: You're breaking up a little
7  bit, Bob. I'm not sure what we can do about it.
8      MR. MILLS: It's fine on this end, so I'm
9  not really --
10     MS. PARKER: And it's not a lot here, but
11 it's every so often just one word goes blank. So I
12 guess I can't really tell you anything except we may
13 just say, hey, can you read that back. So let's have
14 the court reporter read that question back.
15     (Record read.)
16     MS. PARKER: And so you -- I'll just note
17 for the record you specifically excluded
18 conversations with counsel.
19     MR. MILLS: Yes. Yes.
20     MS. PARKER: Just so you understand,
21 Mr. Briscoe, he's asking if you -- he's not asking
22 about any conversations that you and I have had or
23 you and any other attorneys have had. So did you
24 have any prior knowledge of this?
25     THE WITNESS: No, I didn't have any prior

Page 43

1  knowledge.
2      BY MR. MILLS:
3  Q.  Okay. And by the way, is Ms. Parker
4  representing you as your counsel today?
5  A.  Yes.
6  Q.  Now, you're aware that -- that Brandy
7  Williams' employment with G & K was terminated?
8  A.  Yes.
9  Q.  And that was in September of 2013?
10 A.  I believe so.
11 Q.  Did you play any role in the decision to --
12 to terminate Brandy Williams' employment?
13     MS. PARKER: Objection to form.
14     THE WITNESS: I was not aware that she was
15 leaving until the announcement was made.
16     BY MR. MILLS:
17 Q.  Were you present when the announcement was
18 made or -- that was a bad question. Let me rephrase
19 that.
20     Were you there in the Phoenix location
21 when Brandy was told that she was being terminated?
22 A.  I don't remember if I was in the building
23 that day or not, but I was in Phoenix as an employee
24 at that point.
25 Q.  Did you say anything to Brandy Williams

Page 44

1  after you learned that her employment was being
2  terminated?
3  A.  I don't even recall talking to her after
4  she was terminated.
5  Q.  Do you know when the decision was made to
6  terminate Brandy Williams' employment with G & K?
7      MS. PARKER: Objection; foundation, and
8  asked and answered.
9      THE WITNESS: I don't.
10     BY MR. MILLS:
11 Q.  Did anybody ever tell you that a decision
12 had been made in June 2013 to eliminate Brandy
13 Williams' position at G & K?
14     MS. PARKER: Objection; foundation. And
15 Mr. Briscoe has already testified that he doesn't
16 know about the termination decision.
17     But you can go ahead.
18     THE WITNESS: No.
19     BY MR. MILLS:
20 Q.  Did anybody tell you that a decision had
21 been made in June to terminate Brandy Williams'
22 employment, in particular?
23 A.  No.
24     MS. PARKER: Same objections.
25     BY MR. MILLS:

Page 45

1  Q.  Is that something that you would have
2  expected someone at G & K to have told you if that
3  decision had been made in June 2013?
4  A.  No.
5      MS. PARKER: Objection; form.
6      BY MR. MILLS:
7  Q.  That's something you would have wanted to
8  know as the general manager at the Phoenix location?
9      MS. PARKER: Objection; form.
10     THE WITNESS: No, she was not my employee,
11 so that's not something I would have been involved
12 with directly.
13     BY MR. MILLS:
14 Q.  Did anybody at G & K ever ask you whether
15 you thought that Brandy should be let go?
16     MS. PARKER: Objection; form. Asked and
17 answered.
18     THE WITNESS: The answer is no.
19     BY MR. MILLS:
20 Q.  After Brandy Williams left G & K, was she
21 replaced by another HR generalist?
22     MS. PARKER: Objection; foundation, form.
23     THE WITNESS: They did not hire any new
24 employees after that point that I'm aware of.
25     BY MR. MILLS:

---

Page 46

1 Q. Was there an HR generalist at G & K that
2 you worked with after Brandy had left the company?
3 A. Yes, her -- yes, her -- her
4 responsibilities were transferred to another
5 individual with the same title.
6 Q. And who was that?
7 A. I don't recall her name. She worked in
8 California.
9 Q. Does "Janelle" sound familiar?
10 A. Yes.
11 Q. Did you ever meet Janelle?
12 A. I've traveled to the Sacramento location
13 where she worked, and I'm sure I met her, but not in
14 Phoenix.
15 Q. To your knowledge, did -- did Janelle ever
16 come to the Phoenix location of G & K?
17 A. No. No.
18 Q. To your knowledge, did Janelle go to any of
19 the other Arizona locations of G & K?
20   MS. PARKER: Objection; foundation.
21   BY MR. MILLS:
22 Q. Whether it be Tucson or Prescott or Yuma?
23 A. Not to my knowledge.
24 Q. Did you find Janelle to be accessible as an
25 HR generalist?

---

Page 47

1   MS. PARKER: Objection; form
2   THE WITNESS: I don't recall any issues
3 with Janelle.
4   BY MR. MILLS:
5 Q. Do you recall ever trying to contact
6 Janelle?
7 A. I'm sure I sent her e-mails and asked for
8 information, but I don't recall any specifics.
9 Q. How frequently would you do that?
10 A. As frequently as needed. I don't recall.
11 Q. Was it more frequently than once a month?
12 A. Probably not.
13 Q. Okay. When you were working with Brandy
14 Williams at the Phoenix location, would you
15 communicate with her every day?
16 A. I would communicate probably on a daily
17 basis, at least verbally, if nothing more than a
18 greeting and a good morning, but --
19 Q. Did anybody from the Phoenix location,
20 other than yourself, ever communicate with -- with
21 Janelle after she became the HR generalist?
22   MS. PARKER: Objection; form, foundation.
23   BY MR. MILLS:
24 Q. To your knowledge?
25 A. That information would have been given to

---

Page 48

1 all the department heads and they would have had
2 access directly to Janelle.
3 Q. Was there a period of time when you were at
4 G & K when Janelle stopped serving as the HR
5 generalist, for the Northwest Region?
6 A. Not that I recall.
7 Q. Did you ever express to Janelle any
8 complaints or criticisms regarding her job
9 performance as an HR generalist?
10 A. No.
11 Q. Did you ever voice to Rachel Siggerud any
12 complaints or criticisms about Janelle in her role as
13 an HR generalist?
14   MS. PARKER: Objection; form.
15   THE WITNESS: Not that I recall, no.
16   BY MR. MILLS:
17 Q. And for how long was Janelle serving as an
18 HR generalist while you were the general manager in
19 Phoenix?
20   MS. PARKER: Objection; form, foundation.
21   THE WITNESS: I don't recall the specific
22 dates.
23   BY MR. MILLS:
24 Q. Was Janelle -- was Janelle the HR
25 generalist at the time that you left G & K?

---

Page 49

1   MS. PARKER: Objection; form, foundation.
2   THE WITNESS: I believe so.
3   BY MR. MILLS:
4 Q. And --
5   MS. PARKER: Can we take just a brief --
6 can we just take a brief break?
7   MR. MILLS: Sure.
8   (Recessed from 10:15 a.m. until 10:22 a.m.)
9   THE WITNESS: Can I clarify one thing?
10   MR. MILLS: Sure. Go ahead.
11   THE WITNESS: Primarily, after Brandy left,
12 I dealt directly with Rachel --
13   BY MR. MILLS:
14 Q. Okay.
15 A. -- for all HR matters, at least at my desk.
16 Q. Do you know whether there was an HR
17 generalist assigned to the Phoenix location?
18   MS. PARKER: Objection; relevance.
19   You can go ahead.
20   THE WITNESS: Yes, there -- I'm sure there
21 was. As I mentioned earlier, I can't recall the
22 name.
23   BY MR. MILLS:
24 Q. And that -- and that would have been
25 Janelle?

---

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 301 of 505

Jacob Samuel Briscoe
June 22, 2016

---

Page 50

1      MS. PARKER: Objection; relevance,
2  mischaracterizes prior testimony.  He just said he
3  couldn't recall.
4      BY MR. MILLS:
5  Q.  Well, we've been talking about Janelle for
6  a while, so is it your recollection that Janelle was
7  the -- the HR generalist that was assigned to
8  Phoenix, after Brandy left?
9      MS. PARKER: Objection; foundation.
10     You can answer to the best of your
11  recollection.
12     THE WITNESS: As I said, I didn't recall
13  the name, and you mentioned Janelle.  So I remember
14  Janelle being one of the HR generalists.
15     BY MR. MILLS:
16  Q.  Do you remember --
17  A.  Yeah.
18  Q.  -- that the HR generalist that was assigned
19  to Phoenix was located in California?
20     MS. PARKER: Objection; relevance,
21  foundation.
22     THE WITNESS: So, so -- so over -- over
23  that period of time, of the two years that we're
24  talking about right now, I dealt with Brandy mostly
25  in my location.  I dealt with -- oh, I just went

---

Page 51

1  blank -- of the HR generalists out of St. Paul,
2  Minneapolis probably just as much as Brandy, and then
3  Janelle at some point, potentially, but -- but
4  primarily after -- after Brandy left, I dealt
5  directly with Rachel, until she left the company.
6  Oh, the HR generalist in St. Paul was Kayla.
7      BY MR. MILLS:
8  Q.  And when you say that you dealt primarily
9  with -- with Rachel, what do you mean by that?
10  A.  I would call her and work through her, and
11  then you needed to direct me to whoever she wanted to
12  deal with, whatever issue we were working on.
13  Q.  Would she refer you to an HR generalist?
14  A.  Typically one of the generalists, Kayla was
15  often the generalist that I dealt with.
16  Q.  How frequently did you speak with Kayla?
17     MS. PARKER: Objection; relevance.
18     Go ahead.
19     THE WITNESS: Over the years I've talked to
20  Kayla a lot.  So I don't know if it was every other
21  month or what, but -- and I communicated with Kayla
22  quite a bit.
23     BY MR. MILLS:
24  Q.  So you're thinking maybe every other month
25  you would communicate with Kayla?

---

Page 52

1  A.  Potentially, yes.
2  Q.  And not more frequently than that?
3      MS. PARKER: Object; relevance.
4      THE WITNESS: Occasionally, it could have
5  been more frequently than that, depending on what was
6  going on in the business.
7      BY MR. MILLS:
8  Q.  How frequently did you communicate with
9  Rachel?
10     MS. PARKER: Objection; relevance.
11     Sorry, go ahead.
12     THE WITNESS: Several times a month.
13     BY MR. MILLS:
14  Q.  Was that before or after Brandy left?
15     MS. PARKER: Objection; form, relevance.
16     You can go ahead.
17     THE WITNESS: Before and after.  It was on
18  a pretty consistent basis a couple of times a month.
19     BY MR. MILLS:
20  Q.  Were you aware at some point that Janelle
21  went on maternity leave?
22     MS. PARKER: Objection; relevance.
23     Go ahead.
24     THE WITNESS: No.
25     BY MR. MILLS:

---

Page 53

1  Q.  And do you recall the date when you left
2  G & K?
3  A.  Yes, it was in September of 2014.
4  Q.  So that would have been about a year after
5  Brandy was let go?
6  A.  That -- that sounds correct.
7  Q.  Did you leave voluntarily?
8  A.  I had a separation agreement, so yes, I
9  left voluntarily.
10  Q.  G & K didn't -- did anybody at G & K tell
11  you that you needed to leave?
12  A.  We discussed it, and we agreed to part
13  ways.
14  Q.  And with whom did you discuss parting ways?
15  A.  Eric McNaul.
16  Q.  And did he tell you that you were no longer
17  going to be employed by G & K?
18  A.  He did not use that -- that phrase, no.
19  Q.  But was it clear to you that that's what
20  was happening?
21  A.  Yes.
22  Q.  Do you know why you were being let go from
23  G & K?
24  A.  I do.
25  Q.  And what was that?

---

Page 54

1 A.  Primarily, the -- the financial aspects of
2 the business, the previous few months were not very
3 good.  And I had an employee contact, actually, the
4 CEO of the company, and make a complaint.  HR came in
5 and did an investigation, and ultimately, the
6 allegation that was raised was shown not to be true,
7 but at that point, they decided to let me go, based
8 on a comment I'd made several months before that.
9 Q.  And what was that comment?
10     MS. PARKER: Objection; relevance.
11     You can go ahead.
12     THE WITNESS: I had an employee call HR and
13 I made a comment to one of my managers about putting
14 the name of employees on a wheel that we had for
15 safety bonuses and said we'd spin the wheel to decide
16 who was going to be let go next.
17     BY MR. MILLS:
18 Q.  And that didn't sit well with HR?
19     MS. PARKER: Objection; relevance.
20     Go ahead.
21     THE WITNESS: No, it did not.
22     BY MR. MILLS:
23 Q.  Had you had -- or strike that.
24     Had Eric McNaul ever expressed to you
25 displeasure with the finances at the Phoenix location

Page 55

1 before?
2     MS. PARKER: Objection; form, relevance.
3     Go ahead.
4     THE WITNESS: Of course he had.
5     BY MR. MILLS:
6 Q.  And for -- for how long had that been going
7 on?
8     MS. PARKER: Objection; form, relevance.
9     THE WITNESS: Several months.  I don't know
10 exactly how many months.  I'd have to go back and
11 look at the financials, but --
12     BY MR. MILLS:
13 Q.  Did you disagree with G & K's decision to
14 let you go?
15     MS. PARKER: Objection; relevance.
16     THE WITNESS: Of course I did.
17     BY MR. MILLS:
18 Q.  Did you ever file a -- an EEOC complaint or
19 a grievance against G & K for letting you go?
20 A.  No, I did not.
21 Q.  Have you ever sued G & K?
22 A.  No.
23 Q.  Have you spoken with Eric McNaul since you
24 left G & K?
25 A.  I've spoken to him probably three or four

Page 56

1 times in the last 18 months.
2 Q.  To your understanding, was it -- was it his
3 decision to let you go, or was it somebody else's?
4 A.  My understanding is it was his decision.  I
5 mean, it could have been the CEO's, for all I know, I
6 don't know.
7 Q.  What did you talk to him about, when you
8 talked to him, since you left G & K?
9     MS. PARKER: Objection; form.
10     Go ahead.
11     THE WITNESS: Yeah, I talked to him about
12 the new jobs that I was interviewing for and where I
13 ended up with my employment.
14     BY MR. MILLS:
15 Q.  Anything else?
16 A.  No.  Eric grew up in the part of --
17 actually, he was born in the part of the country that
18 I moved to, so that's what we talked about.
19 Q.  Did you ever talk to him about Brandy
20 Williams or -- or her litigation against G & K?
21 A.  No.
22 Q.  Did you ever talk to anybody else at G & K,
23 since you left the company, regarding Brandy Williams
24 or her litigation against the company?
25     MS. PARKER: Objection; form.

Page 57

1     THE WITNESS: No, the only contact I've had
2 with G & K was being notified that I was going to be
3 contact -- contacted by the lawyers about this
4 deposition.
5     BY MR. MILLS:
6 Q.  Okay.  What did you do to prepare for the
7 deposition?
8 A.  I met with my attorney yesterday.
9 Q.  For how long?
10 A.  Two and a half hours.
11 Q.  Anything else?
12 A.  No.
13 Q.  Did your separation agreement with
14 G & K contain any type of a provision wherein you
15 agreed that you would not disparage G & K's business?
16     MS. PARKER: Objection; form, relevance.
17     THE WITNESS: I don't recall.  I haven't
18 looked at the separation agreement since I signed it.
19     BY MR. MILLS:
20 Q.  Did -- did your separation agreement with
21 G & K contain any sort of a provision that you would
22 cooperate with G & K in any litigation arising from
23 anything in connection with your employment with the
24 company?
25     MS. PARKER: Objection; form, relevance.

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 303 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Jacob Samuel Briscoe
June 22, 2016

Page 58

1    THE WITNESS: Not that I recall.  As I
2  said, I haven't looked at it since I signed it, so
3  it -- it may or may not be in there, I don't know.
4    BY MR. MILLS:
5  Q.  Did you receive some sort of a -- of a
6  severance when you were terminated?
7    MS. PARKER: Objection; form, relevance.
8    THE WITNESS: The answer is yes.
9    BY MR. MILLS:
10 Q.  And how much was that?
11   MS. PARKER: Objection; relevance.
12   THE WITNESS: It was the basic severance
13 package for a layoff, which was like 10 weeks, plus
14 accrued vacation.  It was essentially three months.
15   BY MR. MILLS:
16 Q.  And what were you making at the time you
17 left G & K?
18   MS. PARKER: Relevance.
19   THE WITNESS: Somewhere in the neighborhood
20 of $130,000, before bonuses.
21   MR. MILLS: I think I'm about done.  If you
22 can just give me a minute to look through my notes,
23 and see if there's anything I need to follow up on.
24   (Recessed from 10:34 a.m. until 10:35 a.m.)
25   BY MR. MILLS:

Page 59

1  Q.  Okay.  Mr. Briscoe, are you still there?
2  A.  I am.
3  Q.  Were you ever put on a performance review
4  program at G & K?
5    MS. PARKER: Objection; form, relevance.
6    THE WITNESS: A formal program, no.
7    BY MR. MILLS:
8  Q.  Okay.  Informal program?
9  A.  Not that I recall.
10   MR. MILLS: Okay.  That's all I have.
11 Thank you, sir.
12   MS. PARKER: All right.  Bob, I am going to
13 have a couple questions, but just give us a few
14 minutes.
15   MR. MILLS: Okay.  Do you want to take a
16 break?
17   MS. PARKER: Yes.  Thank you.
18   MR. MILLS: All right.
19   MS. PARKER: 10 minutes.
20   MR. MILLS: Okay.
21   (Recessed from 10:35 a.m. until 10:44 a.m.)
22   MS. PARKER: So I did have some questions
23 for Mr. Briscoe.
24
25

Page 60

1    E X A M I N A T I O N
2    BY MS. PARKER:
3  Q.  You were asked earlier and testified about
4  some -- some comments that you made to Rachel
5  Siggerud regarding Brandy Williams' attendance.  Did
6  any of those comments, with respect to Brandy
7  Williams' attendance, have to do with her medical
8  appointments?
9  A.  No.
10   MR. MILLS: Object to the form.
11   BY MS. PARKER:
12 Q.  Did you ever talk to Rachel Siggerud about
13 Brandy Williams' medical appointments?
14 A.  No.
15 Q.  Did you ever complain to Rachel Siggerud
16 about Brandy Williams' medical appointments?
17 A.  No.
18 Q.  What was the content of your comments to
19 Rachel Siggerud about Brandy Williams' availability?
20 A.  The conversations I had with Rachel were
21 about her -- us knowing when she was at work and when
22 she was not at work, not where -- what she was doing
23 while she wasn't here.  I wasn't sure if she was
24 working from home or traveling, and just knowing
25 where she was, so we knew how to get ahold of her

Page 61

1  when she wasn't responding to us.
2  Q.  Great.  And then I wanted to come back to a
3  question that you were asked earlier about
4  conversations with others regarding Ms. Williams.
5  Did you ever have any discussions with Eric McNaul
6  regarding Brandy Williams' performance?
7  A.  I had conversations with Eric McNaul on a
8  continuous basis, talking about the business, during
9  those conversations if I had issues going on with my
10 employees, I would have discussed, generically, what
11 was going on and let him know my concerns.
12 Q.  And do you recall if you discussed the same
13 topics with Mr. McNaul that you discussed with Rachel
14 Siggerud?
15 A.  Yes, I would have discussed the same
16 issues.
17 Q.  All right.  And then I just had a couple of
18 questions with respect to job description.  In your
19 job at G & K, did you have any responsibility for
20 creating job descriptions?
21 A.  No.
22 Q.  Do you have any knowledge of G & K's
23 process for creating job descriptions for new
24 positions?
25 A.  Not the process, just that it was an

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Jacob Samuel Briscoe
June 22, 2016

---

Page 62

1  HR function.

2  Q.  And during your time at G & K, had you

3  previously hired an employee into a brand-new

4  position?

5  A.  No.

6      MS. PARKER: That's all of my questions.

7      MR. MILLS: Just one question.

8

9      F U R T H E R   E X A M I N A T I O N

10     BY MR. MILLS:

11 Q.  After Brandy became an HR generalist, she

12  was no longer your employee.  Right?

13 A.  Correct.  She was no longer my employee.

14     MR. MILLS: Okay.  That's all I have.

15     THE REPORTER: Ms. Parker, could I get your

16  copy order, please.

17     MS. PARKER: Yeah, so -- well, I'll

18  instruct Mr. Briscoe to read and sign.  And I know

19  we've been doing that.

20     So you'll -- you'll have the opportunity to

21  review the transcript before it's final.

22     THE WITNESS: Okay.

23     MS. PARKER: And we would just like the

24  same format that we've had for other depositions

25  where we've gotten, I think it's the mini and there's

---

Page 63

1  some sort of bundle.

2      THE REPORTER: Okay.

3      MS. PARKER: Does that sound right?

4      THE REPORTER: I -- I can figure that one

5  out.

6      MS. PARKER: All right.  Same format.

7      THE REPORTER: Thank you so much.

8      MR. MILLS: All right.  Thank you everyone.

9      MS. PARKER: Thank you.

10     THE WITNESS: Thank you.

11     (Proceedings concluded at 10:48 a.m.)

12

13

14

15     _____

16     JACOB SAMUEL BRISCOE

17

18

19

20

21

22

23

24

25

---

Page 64

1  STATE OF ARIZONA     )

2  COUNTY OF MARICOPA   )

3          BE IT KNOWN the foregoing deposition was

4  taken by me pursuant to stipulation of counsel; that I was

5  then and there a Certified Reporter of the State of

6  Arizona, and by virtue thereof authorized to administer an

7  oath; that the witness before testifying was duly sworn by

8  me to testify to the whole truth; notice was provided that

9  the transcript was available for signature by the

10 deponent; that the questions propounded by counsel and the

11 answers of the witness thereto were taken down by me in

12 shorthand and thereafter transcribed into typewriting

13 under my direction; that the foregoing pages are a full,

14 true, and accurate transcript of all proceedings and

15 testimony had and adduced upon the taking of said

16 deposition, all to the best of my skill and ability.

17     I FURTHER CERTIFY that I am in no way related to

18 nor employed by any parties hereto nor am I in any way

19 interested in the outcome hereof.

20     DATED at Phoenix, Arizona, this 29th day of

21 June, 2016.

22

23

24          _____
            Robin L. B. Osterode, RPR, CSR
            Certified Reporter No. 50695

25

---

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Jacob Samuel Briscoe
June 22, 2016

**$**

**$130,000 (1)** 58:20

**[**

**[sic] (1)** 37:17

**A**

**access (2)** 34:7;48:2
**accessible (1)** 46:24
**accommodation (1)** 41:19
**according (1)** 14:2
**account (1)** 7:13
**accrued (1)** 58:14
**Act (1)** 41:20
**actual (1)** 15:7
**actually (5)** 17:7;28:15; 31:1;54:3;56:17
**added (1)** 39:22
**addition (1)** 16:22
**administrative (4)** 4:21, 22;37:5,11
**against (3)** 55:19; 56:20,24
**ago (5)** 11:5;21:13,19, 21;30:8
**agreed (2)** 53:12;57:15
**agreement (3)** 53:8; 57:13,18,20
**ahead (15)** 9:9;25:3; 30:5;34:22;44:17; 49:10,19;51:18;52:11, 16,23;54:11,20;55:3; 56:10
**ahold (1)** 60:25
**allegation (1)** 54:6
**allowing (1)** 19:3
**almost (2)** 30:8;38:24
**along (2)** 18:16;39:9
**always (1)** 38:12
**ambig (1)** 34:23
**ambiguity (1)** 34:23
**Americans (1)** 41:20
**amongst (1)** 12:3
**amount (2)** 30:14,18
**announcement (2)** 43:15,17
**answered (2)** 44:8; 45:17
**anymore (1)** 23:12
**appear (1)** 15:9
**applied (1)** 10:6
**appointments (7)** 28:20, 23;29:2,14;60:8,13,16
**appreciating (1)** 40:18
**appropriate (2)** 19:9; 22:7
**approximately (4)** 6:18, 25;9:5;41:7

**area (1)** 28:10
**argue (1)** 30:22
**arising (1)** 57:22
**Arizona (5)** 8:19;9:14, 16,17;46:19
**aspect (1)** 17:1
**aspects (2)** 16:21;54:1
**assigned (3)** 49:17; 50:7,18
**assume (1)** 5:10
**assuming (2)** 26:20; 42:1
**attempt (2)** 21:1;35:8
**attend (1)** 28:20
**attendance (4)** 33:3,4; 60:5,7
**attending (1)** 29:1
**attorney (1)** 57:8
**attorneys (1)** 42:23
**auditor (2)** 20:1,5
**author (1)** 14:3
**availability (1)** 60:19
**available (2)** 27:2,19
**aware (11)** 28:19,24; 29:4,8;41:16,18,22; 43:6,14;45:24;52:20
**away (2)** 25:1;37:5

**B**

**back (8)** 17:11;22:22; 28:8;31:2;42:13,14; 55:10;61:2
**bad (2)** 13:1;43:18
**Bas (1)** 41:1
**based (3)** 36:16;41:25; 54:7
**basic (1)** 58:12
**basically (2)** 37:4;41:1
**basis (7)** 19:18;38:18; 39:5,13;47:17;52:18; 61:8
**Bates (3)** 15:23;16:7; 17:14
**became (5)** 23:6;24:1; 38:9;47:21;62:11
**become (1)** 16:24;
20:16;38:8
**began (3)** 27:1,5;30:22
**beginning (1)** 29:17
**begins (1)** 15:25
**behavior (4)** 19:24; 20:4,16;22:7
**benefits (1)** 24:14
**best (4)** 29:25;36:15; 37:1;50:10
**bet (1)** 16:12
**better (1)** 16:24
**biggest (1)** 30:7
**bit (4)** 16:10;21:15; 42:7;51:22
**blank (2)** 42:11;51:1
**Bob (3)** 4:9;42:7;59:12

**bogged (1)** 34:10
**bonuses (2)** 54:15; 58:20
**bookkeeping (1)** 21:2
**born (1)** 56:17
**both (1)** 35:20
**box (1)** 14:9
**branch (4)** 7:14,21; 9:14,15
**branches (2)** 9:10,12
**brand (1)** 18:13
**brand-new (1)** 62:3
**Brandy (79)** 4:10;9:2; 10:2,5,11,15,20;11:7; 12:18;13:4;14:1,18; 15:2,21;16:19;17:19; 18:5,21;19:8,22;20:25; 21:14;22:6;23:6,8; 24:6;26:2,21;27:1,5,15, 21;28:19;29:4,16,18, 21;30:2,11,19;31:11, 15,16;32:18;33:20; 34:11;38:9;39:14; 40:22,24;41:16,18; 43:6,12,21,25;44:6,12, 21;45:15,20;46:2; 47:13;49:11;50:8,24; 51:2,4;52:14;53:5; 56:19,23;60:5,6,13,16, 19;61:6;62:11
**Brandy's (7)** 11:10; 12:5;23:16,18;28:4; 31:19;40:9
**break (6)** 5:13,16;6:25; 40:1;49:6;59:16
**breaking (1)** 42:6
**brief (2)** 49:5,6
**bringing (1)** 19:2
**brings (1)** 30:16
**BRISCOE (12)** 4:1,8,9; 14:9;16:8;40:8;42:21; 44:15;59:1,23;62:18; 63:16
**broader (1)** 37:10
**broadly (1)** 21:10
**broke (1)** 24:10
**brought (2)** 30:9;39:15
**building (2)** 28:16; 43:22
**bundle (1)** 63:1
**burned (1)** 35:15
**business (21)** 6:16; 7:15;16:23;17:2;18:24; 19:5;20:2,10;21:2,7, 10;22:18;27:2;38:17, 24;39:15,23;52:6;54:2; 57:15;61:8

**C**

**California (4)** 41:12,15; 46:8;50:19
**call (2)** 51:10;54:12

**called (2)** 4:2;16:16
**calls (1)** 41:24
**came (3)** 30:19;31:2; 54:4
**can (25)** 8:14;11:20,24; 13:8,11;16:23;17:21; 25:13;30:13;36:25; 37:1;40:1,11;42:7,13; 44:17;49:5,6,9,19; 50:10;52:16;54:11; 58:22;63:4
**care (1)** 37:19
**Carlisle (2)** 5:19;6:4
**categories (1)** 16:2
**causing (1)** 16:10
**center (1)** 28:16
**central (1)** 28:16
**CEO (1)** 54:4
**CEO's (1)** 56:5
**certain (1)** 24:5
**certainly (1)** 5:13
**challenges (1)** 30:16
**chance (4)** 13:10,13; 15:15,16
**change (4)** 25:24,25; 37:14;38:14
**changed (2)** 11:18,22
**characterization (1)** 25:5
**clarification (1)** 21:23
**clarify (1)** 49:9
**clear (3)** 5:6;35:16; 53:19
**clearly (1)** 35:4
**comfortable (1)** 19:25
**coming (1)** 18:16
**comment (4)** 41:25; 54:8,9,13
**comments (12)** 16:16; 17:5,5,10,14,15,17; 25:23;41:1;60:4,6,18
**communicate (6)** 38:10; 47:15,16,20;51:25; 52:8
**communicated (1)** 51:21
**communication (3)** 21:24;22:1;38:14
**communications (1)** 22:14
**company (7)** 41:14; 46:2;51:5;54:4;56:23, 24;57:24
**competent (1)** 18:10
**complain (6)** 19:4; 27:14,14,21;32:18; 60:15
**complained (2)** 21:24; 22:1
**complaint (6)** 19:22; 31:19;32:4;33:10;54:4; 55:18
**complaints (9)** 18:21;

22:4;26:21;29:18;30:1; 31:11,14;48:8,12
**complete (1)** 38:7
**concerns (2)** 23:13; 61:11
**concluded (1)** 63:11
**conclusion (1)** 41:24
**condition (3)** 29:5,7,11
**conduct (1)** 19:7
**conducting (1)** 18:24
**conflict (1)** 40:16
**confused (3)** 34:25; 36:11,20
**confusion (1)** 34:15
**connection (1)** 57:23
**consider (1)** 18:9
**considered (1)** 20:4
**consistent (1)** 52:18
**contact (4)** 47:5;54:3; 57:1,3
**contacted (1)** 57:3
**contain (2)** 57:14,21
**content (1)** 60:18
**Continue (1)** 17:2
**continuous (1)** 61:8
**control (1)** 38:7
**conversation (5)** 30:21, 24;34:17;36:17,18
**conversations (16)** 22:9,13,24;23:5,7,14; 29:21,22;35:17,18; 42:18,22;60:20;61:4,7, 9
**cooperate (1)** 57:22
**cop (2)** 20:2,6
**copy (1)** 62:16
**corporate (2)** 24:20; 35:21
**correctly (1)** 17:3
**counsel (3)** 42:5,18; 43:4
**country (1)** 56:17
**couple (3)** 52:18;59:13; 61:17
**course (3)** 38:5;55:4,16
**court (3)** 4:17;5:5; 42:14
**create (1)** 24:21
**creating (1)** 61:20,23
**critical (1)** 16:25
**criticism (3)** 19:22; 31:19;32:4
**criticisms (8)** 18:20; 26:21;29:18;30:2; 31:10,15;48:8,12
**criticizing (1)** 32:10
**Currently (1)** 5:19

**D**

**daily (1)** 47:16
**date (2)** 11:1;53:1
**dates (1)** 48:22

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 306 of 505

Williams vs. G & K Services, Inc.                                    Jacob Samuel Briscoe
2:15-CV-01744-DJH                                                         June 22, 2016

**day (4)** 5:12;37:18;
  43:23;47:15
**deal (1)** 51:12
**dealt (6)** 49:12;50:24,
  25;51:4,8,15
**decide (1)** 54:15
**decided (1)** 54:7
**decision (10)** 10:11;
  43:11;44:5,11,16,20;
  45:3;55:13;56:3,4
**defined (1)** 35:5
**department (11)** 6:13,
  15,15;10:15;20:19;
  24:22;25:10;30:23;
  34:1;40:19;48:1
**depending (1)** 52:5
**deposition (4)** 4:12;5:2;
  57:4,7
**depositions (1)** 62:24
**Depot (6)** 6:1,2,12;7:3,
  6,8
**describe (3)** 17:18;
  40:16,17
**described (2)** 22:16;
  29:16
**description (2)** 35:23;
  61:18
**descriptions (2)** 35:25;
  61:20,23
**desk (1)** 49:15
**details (1)** 14:25
**develop (1)** 16:23
**development (1)** 37:8
**differed (1)** 37:2
**difference (1)** 37:4
**different (4)** 11:19;
  29:20;38:11;41:14
**differently (1)** 22:23
**difficult (1)** 38:8
**direct (20)** 8:24;11:10,
  14;12:19;13:2;18:8,20;
  19:23;22:10,11;23:8,
  19;25:17;26:3,9,18;
  29:24;32:3;39:7;51:11
**directly (9)** 7:3;13:5;
  23:13;31:23;38:6;
  45:12;48:2;49:12;51:5
**director (2)** 12:1,13
**Disabilities (1)** 41:20
**disagree (1)** 55:13
**discuss (2)** 30:12;53:14
**discussed (6)** 41:2;
  53:12;61:10,12,13,15
**discussion (2)** 35:12,19
**discussions (1)** 61:5
**disenfavored (1)** 19:17
**disengage (3)** 27:1,6;
  29:17
**disparage (1)** 57:15
**displeasure (1)** 54:25
**divvied (1)** 12:2
**doctors' (1)** 29:13
**document (10)** 13:8,13,

16;14:4;15:8,14,17;
  16:7;33:1,10
**documentation (2)**
  33:14,19
**done (3)** 13:11;22:22;
  58:21
**door (1)** 31:1
**dotted (1)** 20:9
**down (3)** 14:4,5;34:10
**drive (3)** 16:25;17:1,2
**duly (1)** 4:2
**during (19)** 7:10,23;
  9:18;11:6,6;12:18;
  13:2;14:18,21;18:8,19;
  19:2;22:13;23:17,19;
  34:4;41:17;61:8;62:2
**duties (1)** 6:11

**E**

**earlier (3)** 49:21;60:3;
  61:3
**early (1)** 27:22
**EEOC (1)** 55:18
**efforts (1)** 17:3
**either (1)** 5:4
**electronically (1)** 13:19
**eliminate (1)** 44:12
**else (9)** 7:4;12:23;
  13:3;29:14;33:23;34:8;
  56:15,22;57:11
**else's (1)** 56:3
**e-mails (2)** 27:11;47:7
**employed (5)** 5:23;
  6:19,22;53:17
**employee (13)** 17:22;
  18:2,10;33:10;37:8;
  39:4;43:23;45:10;54:3,
  12;62:3,12,13
**employees (15)** 6:17;
  9:3;19:2;21:25;22:2,
  15;23:2;24:20;28:13;
  30:17;32:24;33:2;
  45:24;54:14;61:10
**employment (8)** 7:8;
  43:7,12;44:1,6,22;
  56:13;57:23
**end (2)** 37:17;42:8
**ended (1)** 56:13
**engaged (2)** 20:3;
  40:20
**engagement (2)** 18:2;
  29:22
**enough (1)** 22:5
**enrolled (1)** 34:6
**entire (1)** 28:17
**entitled (1)** 13:20
**Equipment (6)** 6:1,2,12;
  7:3,6,8
**Eric (10)** 25:17;39:2,7,
  11;53:15;54:24;55:23;
  56:16;61:5,7
**essentially (1)** 58:14

**evaluation (4)** 13:21,
  25;14:23;15:25
**even (1)** 44:3
**eventually (1)** 30:25
**E-Verify (1)** 34:5
**everybody (1)** 29:14
**everyone (1)** 63:8
**exact (3)** 11:1;33:15;
  41:1
**exactly (3)** 14:20;
  34:17;55:10
**examined (1)** 4:3
**example (1)** 19:1
**examples (1)** 21:16
**except (1)** 42:12
**excluded (1)** 42:17
**Exhibit (5)** 13:6,9;
  15:11,14,24
**exists (1)** 36:1
**expectations (2)** 15:9;
  16:3
**expected (1)** 45:2
**explain (4)** 22:22;35:7,
  8;36:15
**explained (1)** 22:17
**express (4)** 36:10;
  39:17,20;48:7
**expressed (1)** 54:24
**extent (2)** 11:24;41:24

**F**

**fair (2)** 25:4,4
**familiar (1)** 46:9
**fast (1)** 30:24
**favor (2)** 37:14,17
**feel (1)** 5:13
**felt (4)** 18:14;19:25;
  20:10;31:24
**few (7)** 18:22;19:17;
  21:13,18,21;54:2;
  59:13
**figure (1)** 63:4
**file (1)** 55:18
**final (1)** 62:21
**finances (2)** 21:1;54:25
**financial (1)** 54:1
**financials (2)** 21:9;
  55:11
**find (2)** 22:20;46:24
**Fine (2)** 39:10;42:8
**first (3)** 4:2;12:21;31:8
**five (2)** 19:19,20
**focused (2)** 34:18;37:8
**focusing (2)** 25:1;37:6
**follow (1)** 58:23
**follows (1)** 4:3
**form (63)** 8:6,13;9:22;
  10:17;15:3;17:20,25;
  18:11;20:13,20;21:3,
  17;22:8,25;23:10;
  25:11,21;26:10,24;
  27:8,16;28:6,14,21;

29:6,12;30:4;31:21;
  32:11,20,25;33:9,12;
  34:13;35:3,10;36:21;
  37:15,23;38:22;39:3,
  24;41:23;43:13;45:5,9,
  16,22;47:1,22;48:14,
  20;49:1;52:15;55:2,8;
  56:9,25;57:16,25;58:7;
  59:5;60:10
**formal (1)** 59:6
**format (2)** 62:24;63:6
**formerly (1)** 6:19
**forms (1)** 33:16
**forward (1)** 35:9
**foundation (17)** 11:23;
  12:24;24:2,8;26:10;
  32:20;33:12;40:10;
  44:7;14;45:22;46:20;
  47:22;48:20;49:1;50:9,
  21
**four (2)** 11:4;55:25
**free (2)** 5:11,13
**frequent (1)** 19:18
**frequently (9)** 19:15;
  39:11;47:9,10,11;
  51:16;52:2,5,8
**friendly (1)** 17:24;18:1
**full (1)** 4:7
**function (2)** 37:19;62:1
**functions (3)** 24:11;
  37:5,6

**G**

**gave (1)** 15:2
**general (18)** 6:3,11,16;
  7:15,24;8:4,12,25;9:19,
  19;11:20;26:11;35:19;
  37:1,25;38:5;45:8;
  48:18
**generalist (33)** 8:23;
  9:1;10:22,23;12:2;
  24:1;34:12;35:1,9,23;
  36:3,8,12;37:2,22;38:4,
  9;45:21;46:1,25;47:21;
  48:5,9,13,18,20;49:17;
  50:7,18;51:6,13,15;
  62:11
**generalists (4)** 24:7;
  50:14;51:1,14
**generally (2)** 25:23;
  26:13
**generically (1)** 61:10
**given (2)** 21:6;47:25
**goes (1)** 42:11
**Good (3)** 4:9;47:18;
  54:3
**Great (1)** 61:2
**greater (1)** 21:7
**greeting (1)** 47:18
**grew (1)** 56:16
**grievance (1)** 55:19
**ground (1)** 5:1

**group (6)** 6:14;9:11,13;
  12:3;19:3,4
**guess (1)** 42:12

**H**

**half (1)** 57:10
**handled (2)** 24:13,18
**happen (1)** 19:16
**happened (1)** 42:1
**happening (1)** 53:20
**happy (1)** 25:6
**head (1)** 5:4
**heads (1)** 48:1
**hear (1)** 17:8
**held (1)** 8:1
**help (3)** 16:23;20:3;
  22:21
**helped (1)** 37:7
**helping (1)** 16:25;17:1
**Herbert (1)** 31:8
**herein (1)** 4:2
**herself (5)** 20:25;21:1,
  5;27:18;31:16
**hey (1)** 42:13
**hire (3)** 10:11,20;45:23
**hired (4)** 10:8,23;36:1;
  62:3
**hiring (1)** 10:14
**hold (1)** 7:10
**home (1)** 60:24
**hot (1)** 30:25
**hours (6)** 19:3;57:10
**HR (69)** 8:23;9:1;
  10:15,22,23;11:18,22;
  12:1,13;16:20;19:7,24;
  20:1,2,2,5,6,18;23:22;
  24:1,6,6,11,13,17,22;
  25:10;28:8;33:25;34:3,
  12;35:1,8,23;36:3,7,12;
  37:2,2,6,6,21,22;38:3,4,
  9;39:15,22;45:21;46:1,
  25;47:21;48:4,9,13,18,
  18;51:1,6,13;54:4,12,
  18;62:1,11
**huh-uh (1)** 5:5
**human (1)** 10:16

**I**

**identification (2)** 13:6;
  15:11
**imagine (1)** 20:14
**immediately (1)** 30:21
**implications (1)** 21:9
**important (2)** 17:1;25:1
**improve (1)** 30:13
**improvement (2)** 33:19;
  37:9
**improvement-type (1)**
  33:14
**incident (1)** 31:4

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 307 of 505

**Williams vs. G & K Services, Inc.**
2:15-CV-01744-DJH

Jacob Samuel Briscoe
June 22, 2016

**including (1)** 24:6
**individual (4)** 10:8;
   12:1;28:9;46:5
**individually (1)** 24:20
**individuals (2)** 10:13;
   24:11
**Informal (1)** 59:8
**information (3)** 36:16;
   47:8,25
**initial (1)** 34:4
**initially (1)** 35:16
**input (6)** 10:13;14:24;
   26:7,12;36:2,6
**instances (1)** 18:22
**instruct (1)** 62:18
**interaction (1)** 22:15
**interactions (1)** 22:10
**interview (1)** 10:5
**interviewed (1)** 10:14
**interviewing (1)** 56:12
**into (4)** 19:2;30:21;
   37:11;62:3
**investigation (1)** 54:5
**invited (1)** 30:11
**involve (3)** 20:25;21:1,
   5
**involved (1)** 45:11
**issue (3)** 20:16;27:23;
   51:12
**issues (5)** 16:20;18:23;
   47:2;61:9,16

### J

**JACOB (4)** 4:1,8;14:9;
   63:16
**Janelle (22)** 46:9,11,15,
   18,24;47:3,6,21;48:2,4,
   7,12,17,24,24;49:25;
   50:5,6,13,14;51:3;
   52:20
**January (1)** 14:19
**job (21)** 6:8,11;7:5;
   10:6;12:2;18:21;23:16,
   18;31:19;32:5;33:11;
   34:12;35:22,25;36:3,7;
   48:8;61:18,19,20,23
**jobs (4)** 22:19,21;
   34:16;56:12
**July (1)** 14:9
**jumped (1)** 30:21
**June (4)** 14:19;44:12,
   21;45:3

### K

**Kayla (6)** 51:6,14,16,
   20,21,25
**kind (1)** 37:9
**knew (2)** 10:2;60:25
**knowing (2)** 60:21,24
**knowledge (1)** 13:4,5;
   26:7;30:1;42:24;43:1;

46:15,18,23;47:24;
   61:22
**K's (3)** 55:13;57:15;
   61:22

### L

**lack (1)** 40:18
**Lake (1)** 7:20
**last (6)** 14:8,9,13;16:6;
   17:8;56:1
**lastly (1)** 5:11
**late (4)** 27:22,24,24;
   30:19
**lawsuit (1)** 4:15
**lawyers (1)** 57:3
**layoff (1)** 58:13
**leaders (1)** 16:24
**learned (1)** 44:1
**learning (1)** 18:14
**least (4)** 35:5;47:17;
   49:15
**leave (5)** 41:6,8;52:21;
   53:7,11
**leaving (2)** 27:22;43:15
**left (21)** 7:2;8:2;18:6;
   26:8,18;32:3;41:7;
   45:20;46:2;48:25;
   49:11;50:8;51:4,5;
   52:14;53:1,9;55:24;
   56:8,23;58:17
**legal (3)** 16:21;31:7;
   41:24
**less (3)** 11:17;19:19,20
**letting (1)** 55:19
**level (2)** 21:7;35:21
**lifetime (1)** 30:8
**liked (2)** 27:3;40:12
**limited (1)** 18:11
**line (4)** 14:8;16:21;
   20:9;33:2
**Linen (1)** 41:13
**litigation (3)** 56:20,24;
   57:22
**little (3)** 6:10;16:10;
   42:6
**live (2)** 5:18,19
**lived (2)** 5:21;37:19
**located (1)** 50:19
**location (17)** 7:20;9:4,
   6,16;26:15;28:5,12;
   39:12;43:20;45:8;
   46:12,16;47:14,19;
   49:17;50:25;54:25
**locations (2)** 7:19;
   46:19
**long (5)** 5:21;37:18;
   48:17;55:6;57:9
**longer (7)** 23:8;24:17;
   26:3,4;53:16;62:12,13
**look (5)** 13:8,13;15:13;
   55:11;58:22
**looked (2)** 57:18;58:2

**looking (3)** 20:7;21:14;
   37:10
**lot (2)** 42:10;51:20

### M

**making (2)** 27:18;58:16
**manage (2)** 6:17;9:3
**management (5)** 22:2;
   30:9,10,10;33:4
**manager (43)** 6:3,12;
   7:13,14,14,15,15,15,
   24;8:4,5,7,11,12,21,21,
   22,22,24,25;9:15,19,
   20;10:14;11:19;13:21;
   15:2,25,25;16:3,16;
   17:14;26:12,13;30:11,
   22;31:6;34:6;35:20;
   37:25;38:5;45:8;48:18
**managers (11)** 8:15;
   16:22,23;20:8;21:15,
   25;22:15;24:20;36:20;
   40:20;54:13
**manager's (1)** 15:8
**manner (1)** 27:11
**many (6)** 6:17;8:20;
   9:3;22:9;38:19;55:10
**Marked (2)** 13:6;15:11
**maternity (1)** 52:21
**matter (1)** 37:18
**matters (1)** 49:15
**may (4)** 14:16;42:12;
   58:3,3
**maybe (2)** 11:17;51:24
**McNaul (10)** 25:18;
   39:2,7,11;53:15;54:24;
   55:23;61:5,7,13
**mean (4)** 20:5;27:6;
   51:9;56:5
**Meaning (1)** 40:19
**means (1)** 14:12
**Mechanicsburg (1)** 6:6
**medical (8)** 28:20,23;
   29:2,4,11;60:7,13,16
**meet (2)** 38:15;46:11
**meeting (4)** 30:9,12,20;
   31:3
**meetings (3)** 23:3;
   27:25;35:20
**meets (2)** 15:9;16:3
**mention (2)** 30:7;31:9
**mentioned (4)** 24:9;
   30:19;49:21;50:13
**messages (1)** 27:10
**met (2)** 46:13;57:8
**microphone (1)** 16:9
**mid-conversation (1)**
   30:20
**midyear (2)** 18:15;
   20:15
**military (1)** 7:1
**MILLS (111)** 4:6,10;8:8,
   17;10:1,18;12:4,25;

13:7,14;15:6,12;16:14;
   17:9,13,23;18:4,18;
   20:17,24;21:12,20;
   22:12;23:4,15;24:4,12;
   25:15;26:1,16;27:4,13,
   20;28:11,18,25;29:9,
   15;31:5;32:1,8,14,22;
   33:5,17;34:19;35:6,13;
   36:24;37:20,24;38:1;
   39:1,6;40:2,4,7,14;
   42:2,8,19;43:2,16;
   44:10,19,25;45:6,13,
   19,25;46:21;47:4,23;
   48:16,23;49:3,7,10,13,
   23;50:4,15;51:7,23;
   52:7,13,19,25;54:17,
   22;55:5,12,17;56:14;
   57:5,19;58:4,9,15,21,
   25;59:7,10,15,18,20;
   60:10;62:7,10,14;63:8
**mini (1)** 62:25
**Minneapolis (1)** 51:2
**minute (1)** 58:22
**minutes (5)** 21:13,21;
   40:4;59:14,19
**mischaracterizes (2)**
   25:12;50:2
**missing (5)** 27:15,17;
   32:10,18,24
**Mitch (6)** 31:7;40:9,17,
   21,22;41:3
**modified (2)** 14:9,13
**month (6)** 38:25;47:11;
   51:21,24;52:12,18
**monthly (2)** 38:25;
   39:13
**months (9)** 5:22;7:5;
   21:18;54:2,8;55:9,10;
   56:1;58:14
**more (13)** 20:22;21:9,
   15;24:21;25:1,9;28:13,
   16;38:8;47:11,17;52:2,
   5
**morning (3)** 4:9,11;
   47:18
**mostly (2)** 23:2;50:24
**move (4)** 14:21;16:11;
   28:4,7
**moved (3)** 14:20;24:19;
   56:18
**moving (1)** 16:8
**much (4)** 29:14;51:2;
   58:10;63:7
**multiple (3)** 8:15;27:3;
   35:12
**myself (1)** 27:11

### N

**name (9)** 4:7,9;13:19;
   14:15;31:7;46:7;49:22;
   50:13;54:14
**name's (1)** 31:8

13:7,14;15:6,12;16:14;
**near (1)** 16:9
**need (4)** 5:3,6,14;58:23
**needed (5)** 18:17;
   22:20;34:6;47:10;
   53:11
**neighborhood (1)** 58:19
**new (10)** 18:13;27:1;
   30:14,16;34:5,16;35:1;
   45:23;56:12;61:23
**next (1)** 54:16
**nod (1)** 5:4
**Northwest (2)** 12:15;
   48:5
**note (1)** 42:16
**noted (1)** 18:15
**notes (1)** 58:22
**notified (1)** 57:2
**number (2)** 15:24;16:7
**numbered (1)** 17:14

### O

**Object (4)** 9:22;10:17;
   52:3;60:10
**Objection (79)** 8:6,13;
   11:23;12:24;15:3;
   17:20,25;18:11;20:13,
   20;21:3,17;22:8,25;
   23:10;24:2,8;25:11,21;
   26:10,24;27:8,16;28:6,
   14,21;29:6,12;30:4;
   31:21;32:6,11,20,25;
   33:12;34:13;35:3,10;
   36:21;37:15,23;38:22;
   39:3,24;40:10;41:23;
   43:13;44:7,14;45:5,9,
   16,22;46:20;47:1,22;
   48:14,20;49:1,18;50:1,
   9,20;51:17;52:10,15,
   22;54:10,19;55:2,8,15;
   56:9,25;57:16,25;58:7,
   11;59:5
**objections (1)** 44:24
**objective (1)** 21:5
**Objectives (1)** 14:6
**Obviously (2)** 13:17;
   30:15
**Occasionally (1)** 52:4
**occasions (1)** 27:3
**occur (1)** 22:24
**occurred (3)** 23:2,5,7
**off (1)** 28:20
**offer (1)** 18:16
**office (14)** 6:6;8:22;
   11:9;18:3;19:2;28:4,8,
   8,9,10,15;30:10;31:2;
   34:5
**often (3)** 16:21;42:11;
   51:15
**Ogden (1)** 7:21
**on-board (1)** 30:16
**on-boarding (2)** 30:12,
   15

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Jacob Samuel Briscoe
June 22, 2016

**once (1)** 47:11
**one (17)** 5:1,1,14;8:22;
15:1;27:25;28:1,7;
30:7;35:24;42:11;49:9;
50:14;51:14;54:13;
62:7;63:4
**one-on-ones (1)** 23:1
**only (5)** 5:14;27:23;
28:2;34:9;57:1
**operation (1)** 28:17
**operations (1)** 6:16
**opinion (1)** 19:5
**opportunities (1)** 21:8
**opportunity (2)** 21:6;
62:20
**opposed (2)** 37:22;38:4
**order (2)** 22:19;62:16
**organization (2)** 11:18;
18:14
**others (1)** 61:4
**Otherwise (1)** 5:10
**out (4)** 7:12;31:1;51:1;
63:5
**outside (1)** 18:2
**over (7)** 7:22;35:15;
38:7,13;50:22,22;
51:19
**overlooked (1)** 16:21
**oversee (3)** 6:13,14,15

**P**

**P&L (1)** 21:8
**package (1)** 58:13
**page (5)** 15:23;16:6,13,
15;17:14
**paper (1)** 16:9
**PARKER (110)** 8:6,13;
9:22,24;10:17;11:23;
12:24;13:10;15:3;17:7,
11,20,25;18:11;20:13,
20;21:3,17;22:8,25;
23:10;24:2,8;25:11,21;
26:10,24;27:8,16;28:6,
14,21;29:6,12;30:4;
31:21;32:6,11,20,25;
33:12;34:13;35:3,10;
36:21;37:15,23;38:22;
39:3,24;40:1,3,5,10;
41:23;42:6,10,16,20;
43:3,13;44:7,14,24;
45:5,9,16,22;46:20;
47:1,22;48:14,20;49:1,
5,18;50:1,9,20;51:17;
52:3,10,15,22;54:10,
19;55:2,8,15;56:9,25;
57:16,25;58:7,11,18;
59:5,12,17,19,22;60:2,
11;62:6,15,17,23;63:3,
6,9
**part (3)** 53:12;56:16,17
**particular (1)** 44:22
**parting (1)** 53:14

**partner (3)** 20:2,2;
22:18
**parts (1)** 6:15
**party (1)** 4:14
**Paul (2)** 51:1,6
**payroll (2)** 24:13;37:13
**pending (1)** 5:15
**Pennsylvania (3)** 5:20;
6:5,7
**people (1)** 38:6
**performance (21)**
12:20;13:3;14:5;
15:20;17:2;18:21;
20:15;26:4,5,8,17,22;
31:20;32:5;33:11,13,
19;37:9;48:9;59:3;61:6
**period (7)** 7:23;11:13;
14:19;19:25;38:23;
48:3;50:23
**periods (1)** 7:22
**personality (1)** 40:15
**personally (1)** 21:4;
38:16
**perspective (1)** 40:8
**Phoenix (27)** 7:17,18,
24;8:5,9,19;9:4,19;
10:3;11:7,9;21:2;28:5;
38:19;39:12;43:20,23;
45:8;46:14,16;47:14,
19;48:19;49:17;50:8,
19;54:25
**phrase (1)** 53:18
**physically (1)** 27:6
**pick (1)** 5:6
**picture (1)** 37:10
**pipelines (1)** 16:25
**place (1)** 32:17
**plans (2)** 37:8,9
**plant (4)** 8:22;19:1;
22:1;30:10
**play (1)** 43:11
**Please (2)** 4:7;62:16
**pleased (2)** 18:23;25:8
**plus (1)** 58:13
**point (18)** 8:22;13:17;
14:21;20:9,11,25;
23:25;28:4,7,22;31:24,
24;32:2;43:24;45:24;
51:3;52:20;54:7
**position (4)** 8:1;10:20;
44:13;62:4
**positions (2)** 7:10;
61:24
**positive (1)** 22:5
**possible (3)** 15:1,4;
32:12
**potentially (2)** 51:3;
52:1
**prefer (2)** 37:21;38:3
**premarked (2)** 13:9;
15:14
**prepare (6)** 31:18;32:3,
9,23;33:18;57:6

**prepared (2)** 13:25;
15:20
**Prescott (3)** 9:17,20;
46:22
**present (2)** 27:7;43:17
**pretty (4)** 29:14;30:24,
25;52:18
**previous (4)** 28:8;
29:20;38:13;54:2
**previously (5)** 21:10;
34:2,7;37:7;62:3
**primarily (6)** 24:19;
25:17;49:11;51:4,8;
54:1
**primary (1)** 37:4
**prior (4)** 25:12;42:24,
25;50:2
**probably (5)** 38:24;
47:12,16;51:2;55:25
**procedure (2)** 32:21;
33:9
**procedures (2)** 32:15,
17
**proceeding (1)** 4:21
**Proceedings (1)** 63:11
**process (4)** 30:14;34:5;
61:23,25
**productive (4)** 19:6;
20:4;22:20;29:23
**professional (1)** 19:7
**program (4)** 34:7;59:4,
6,8
**pronounced (1)** 20:23
**proper (2)** 19:6;20:10
**provide (1)** 36:2
**provided (1)** 21:8
**provision (2)** 57:14,21
**put (2)** 29:17;59:3
**putting (1)** 54:13

**Q**

**quick (1)** 40:1
**quite (3)** 17:7;27:2;
51:22

**R**

**Rachel (37)** 12:9,10;
14:3;20:8;21:6;23:12,
13,13;25:18;26:19,22;
27:15,21;29:19,22;
30:2;31:3,12,16;35:18;
36:10,19,22;38:11,12,
15;48:11;49:12;51:5,9;
52:9;60:4,12,15,19,20;
61:13
**raised (1)** 54:6
**rating (1)** 16:3
**ratings (4)** 15:2,2,8,8
**read (8)** 15:7;16:18;
17:3,11;42:13,14,15;
62:18

**really (9)** 20:16;29:23;
34:10;37:5,10,18,19;
42:9,12
**recall (31)** 11:1;14:20,
22,23,21,22;25:22;
30:22;31:13;32:7,13,
21;33:14;34:14;35:24;
44:3;46:7;47:2,5,8,10;
48:6,15,21;49:21;50:3,
12;53:1;57:17;58:1;
59:9;61:12
**receive (1)** 58:5
**Recessed (4)** 40:6;
49:8;58:24;59:21
**recognize (1)** 15:17
**recollection (3)** 14:2;
50:6,11
**record (4)** 4:7;31:8;
42:15,17
**recruiting (1)** 37:6
**refer (1)** 51:13
**regarding (7)** 14:1;
32:4;48:8;56:23;60:5;
61:4,6
**region (4)** 12:13,15;
38:13;48:5
**regional (3)** 12:1;
26:12;35:21
**regular (2)** 38:17;39:5
**relationship (4)** 17:19;
18:2;39:2;40:9
**relevance (19)** 49:18;
50:1,20;51:17;52:3,10,
15,22;54:10,19;55:2,8,
15;57:16,25;58:7,11,
18;59:5
**remember (10)** 14:25;
27:23;28:3;30:7;35:22;
36:17,22;43:22;50:13,
16
**remote (1)** 28:13
**reorganization (5)** 12:6;
24:1,17,22;25:10
**rephrase (7)** 5:9;10:19;
12:25;37:24;38:2;
41:17;43:18
**replaced (1)** 45:21
**report (4)** 12:1;14:14;
23:11;38:6
**reported (4)** 9:15;
11:19;23:12;26:13
**reporter (8)** 5:5;16:8,
12;42:14;62:15;63:2,4,
7
**reporting (2)** 14:18;
20:9
**reports (3)** 8:24;22:11;
29:24
**represent (1)** 4:10
**representative (7)** 7:13;
23:23;34:3;37:3,7,22;
38:3
**representatives (3)**

24:6,13,17
**representing (1)** 43:4
**reps (1)** 30:15
**request (3)** 33:22;41:19
**Requests (1)** 27:11
**require (1)** 6:8
**resources (1)** 10:16
**respect (7)** 12:12;
15:21;32:23;33:11,19;
60:6;61:18
**respond (1)** 27:10
**responding (1)** 61:1
**response (1)** 25:20
**responsibilities (10)**
12:2;24:10,19;25:9;
34:1,3,17;36:3,7;46:4
**responsibility (1)** 61:19
**responsive (1)** 27:10
**restructuring (2)** 20:18;
33:25
**reverberated (1)** 31:2
**review (8)** 13:11;15:15,
20;18:15;20:15;26:8;
59:3;62:21
**reviews (6)** 12:20,23;
13:4;26:4,5,18
**right (15)** 9:24;11:3,4;
21:22;24:14,18;38:8;
50:24;59:12,18;61:17;
62:12;63:3,6,8
**role (15)** 18:14;20:1;
22:18;26:11;27:1;
34:24;35:1,5,8;36:1,
12;37:1;38:13;43:11;
48:12
**roles (1)** 16:24
**rolled (2)** 9:10,13
**room (1)** 31:1
**route (2)** 7:12,14
**Rubinoff (2)** 31:7;40:9
**ruckus (1)** 16:10
**rules (1)** 5:2
**run (1)** 20:10

**S**

**Sacramento (1)** 46:12
**safety (1)** 54:15
**salaried (1)** 33:4
**sales (6)** 6:14;7:12;
8:21;30:9,12,14
**Salt (1)** 7:20
**Same (8)** 32:6;41:1;
44:24;46:5;61:12,15;
62:24;63:6
**SAMUEL (3)** 4:1,8;
63:16
**saying (1)** 36:23
**search (1)** 7:5
**Seattle (1)** 7:21
**Section (3)** 14:5;16:3,
16
**seeing (2)** 35:22,24

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 309 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Jacob Samuel Briscoe
June 22, 2016

sent (1) 47:7
separation (4) 53:8;
  57:13,18,20
September (2) 43:9;
  53:3
service (11) 6:13;7:1,
  11,14;8:21;21:24;
  30:10,13,17,22;31:6
Services (1) 6:20
serving (2) 48:4,17
setting (1) 19:4
Several (3) 52:12;54:8;
  55:9
severance (2) 58:6,12
shake (1) 5:4
share (1) 20:8
shared (1) 23:13
Shortly (1) 26:25
shown (1) 54:6
shows (1) 14:2
side (1) 22:22
Sig (1) 38:11
Siggerud (18) 12:9,10;
  14:3;25:18;26:19,23;
  29:19;30:3;31:12;
  36:10;38:11,15;48:11;
  60:5,12,15,19;61:14
sign (1) 62:18
signed (2) 57:18;58:2
significant (2) 30:14,18
similar (1) 29:21
sit (1) 54:18
slammed (1) 31:1
small (1) 9:16
somebody (1) 56:3
someone (2) 12:23;
  20:3;45:2
Sometime (2) 11:17;
  20:15
Sometimes (1) 5:3
somewhere (4) 7:4;
  16:9;37:19;58:19
sorry (6) 9:9,23;13:15;
  21:21;34:22;52:11
sort (6) 32:4;33:8,18;
  57:21;58:5;63:1
sound (4) 11:3;23:24;
  46:9;63:3
sounds (3) 11:4;24:3;
  53:6
source (1) 42:4
south (1) 30:24
speak (1) 51:16
specialized (2) 12:3;
  24:11
Specialty (1) 41:13
specific (7) 21:16;
  25:22;28:2;29:7;31:4;
  36:17;48:21
specifically (4) 22:3;
  34:9;40:25;42:17
specifics (1) 47:8
specified (1) 35:25

spent (2) 7:5;21:23
spin (1) 54:15
spoken (3) 18:5;55:23,
  25
St (2) 51:1,6
staff (3) 26:12,15;27:12
start (1) 20:12
started (6) 7:12;11:18;
  20:1,16,21;34:16
starting (1) 34:6
state (1) 4:7
stationed (1) 6:4
still (3) 31:23;41:3;59:1
stop (2) 19:11,13
stopped (1) 11:13;48:4
Strike (5) 10:18;23:6,
  17;32:16;54:23
strong (3) 16:19,22;
  17:2
structure (2) 11:22;
  26:14
stuff (1) 37:11
successful (1) 22:20
sued (1) 55:21
supervise (1) 22:10
supervision (6) 23:9,20;
  26:3,9,18;32:3
supervisor (11) 11:11,
  14;12:6,19;13:3;18:9,
  20;19:23;25:17;38:11;
  39:7
support (4) 26:14,14;
  40:18,18
supposed (1) 36:12
sure (13) 14:24;17:13;
  28:22;29:3;36:1;40:2;
  42:7;46:13;47:7;49:7,
  10,20;60:23
sworn (1) 4:3

T

talk (1) 31:3;40:24;
  56:7,19,22;60:12
talked (7) 19:12,13;
  38:12;51:19;56:8,11,
  18
talking (5) 19:1;44:3;
  50:5,24;61:8
team (5) 16:22;18:16;
  21:24;29:23;30:17
teammate (1) 29:24
teams (1) 30:13
technicians (1) 6:14
tendency (1) 5:4
terminate (3) 43:12;
  44:6,21
terminated (6) 41:9;
  43:7,21;44:2,4;58:6
termination (1) 44:16
terminology (1) 33:15
terms (2) 11:20;37:1
testified (6) 4:3,17,20;

21:13;44:15;60:3
testify (1) 21:18
testimony (2) 25:12;
  50:2
thinking (1) 51:24
though (1) 14:23
thought (5) 21:14;22:6;
  31:9;36:7;45:15
three (3) 7:5;55:25;
  58:14
timely (1) 27:11
times (7) 19:17;27:7;
  35:12;38:19;52:12,18;
  56:1
title (5) 23:16,18,22;
  24:1;46:5
today (1) 43:4
together (2) 30:9;39:5
told (3) 40:22;43:21;
  45:2
took (2) 25:1;34:4
top (1) 16:15
topic (2) 35:12,19
topics (1) 61:13
track (2) 33:3,3
transcript (1) 62:21
transferred (2) 14:16;
  46:4
transition (2) 26:25;
  34:4
travel (1) 6:8
traveled (2) 39:5;46:12
traveling (1) 60:24
tried (1) 36:15
trouble (2) 20:8;21:15
true (1) 54:6
try (2) 5:9;22:18
trying (1) 47:5
Tucson (3) 9:14,20;
  46:22
turn (2) 15:23;16:6
turnover (1) 30:18
two (2) 50:23;57:10
type (1) 57:14
types (2) 30:1;31:10
typically (3) 33:3;39:13;
  51:14

U

ultimately (1) 54:5
under (7) 8:12;9:11,13;
  23:8,19;26:3;41:19
understood (1) 25:24
unemployment (1) 4:22
unhappy (2) 24:24,25
up (11) 5:6;9:10,13;
  12:2;24:10;28:9;35:15;
  42:6;56:13,16;58:23
use (1) 53:18
used (2) 28:9;33:2
uses (1) 33:15
using (1) 34:14

Utah (2) 7:20,21
utilize (1) 33:9
utilized (2) 32:16,18

V

vacation (1) 58:14
value (2) 39:15,22
various (2) 7:22;24:10
verbally (2) 5:3;47:17
versus (2) 20:2;37:10
visibility (1) 35:5
voice (7) 18:20;25:7,
  16;26:22;29:18;31:14;
  48:11
voiced (3) 19:22;30:2;
  31:11
voluntarily (4) 41:8,10;
  53:7,9
volunteer (1) 36:6

W

walked (1) 30:25
Washington (1) 7:22
way (5) 18:23;19:6;
  20:10;40:19;43:3
ways (4) 22:20;30:13;
  53:13,14
weekly (1) 23:1
weeks (1) 58:13
weren't (2) 20:10;22:5
wheel (2) 54:14,15
whenever (1) 5:13
wherein (1) 57:14
whichever (1) 26:13
Williams (20) 4:10;9:2;
  10:2,5,21;14:1;15:21;
  17:19;19:22;28:19;
  33:20;39:14;41:16,19;
  43:25;45:20;47:14;
  56:20,23;61:4
Williams' (13) 12:19;
  26:22;43:7,12;44:6,13,
  21;60:5,7,13,16,19;
  61:6
witness (89) 4:2,18,21;
  8:7,15;9:23,25;11:25;
  13:12;15:4;16:11,13;
  17:22;18:1,13;20:14,
  21;21:4,18;22:9;23:1,
  11;24:3,9;25:14,22;
  26:11,25;27:9,17;28:7,
  15,22;29:7,13;30:6;
  31:22;32:7,12,21;33:1,
  13;34:14;35:4,11;
  36:22;37:16,25;38:23;
  39:4,25;40:12;41:25;
  42:25;43:14;44:9,18;
  45:10,18,23;47:2;
  48:15,21;49:2,9,11,20;
  50:12,22;51:19;52:4,
  12,17,24;54:12,21;

55:4,9,16;56:11;57:1,
  17;58:1,8,12,19;59:6;
  62:22;63:10
witnesses (1) 5:3
wondering (1) 42:3
word (2) 17:8;42:11
wording (1) 34:15
work (19) 7:4,19;10:9;
  11:7;16:24;24:21;
  26:22;27:15,18,22,22,
  24;28:20;32:10,19,24;
  51:10;60:21,22
worked (9) 7:20;8:16,
  23;11:7;12:10,21;46:2,
  7,13
working (9) 7:16,17;
  8:12;10:3;19:3;31:23;
  47:13;51:12;60:24
works (2) 41:13,14
writing (1) 32:10
written (4) 31:18,19;
  32:4;35:22
wrong (1) 30:23
wrote (2) 17:6,16

Y

year (5) 11:17;12:21;
  14:21;41:7;53:4
years (6) 6:24;7:11,18;
  11:4;50:23;51:19
yesterday (1) 57:8
Yuma (3) 9:16,20;
  46:22
Yup (2) 14:7;15:16

1

1 (1) 14:5
10 (4) 7:18;40:4;58:13;
  59:19
10:02 (1) 40:6
10:15 (1) 49:8
10:22 (1) 49:8
10:34 (1) 58:24
10:35 (2) 58:24;59:21
10:44 (1) 59:21
10:48 (1) 63:11
100 (1) 9:5
129 (1) 15:24
132 (3) 16:7,13;17:15
18 (2) 5:22;56:1
1993 (1) 6:24
1st (1) 14:19

2

20 (2) 6:24;7:11
2003 (1) 7:1
2011 (2) 7:25;11:2
2012 (3) 14:10,19,19
2013 (3) 43:9;44:12;
  45:3

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Jacob Samuel Briscoe
June 22, 2016

**2014 (1)** 53:3
**2015 (3)** 6:25;7:2,25
**25 (3)** 15:11,14,24
**26 (3)** 13:6,9;14:10

**5**

**5 (1)** 40:4

**7**

**75 (1)** 6:18

**9**

**9:53 (1)** 40:6
**90 (1)** 9:5

# EXHIBIT C

<u>Performance Document - GK perform</u>
# Manager Evaluation

Brandy Williams,
GK perform, 01/01/2012 - 06/30/2012

**Author:** Rachael Siggerud
**Status:** Completed
**Approval:** Not Required

**Role:** Manager
**Due Date:** 08/15/2012

## Employee Data

Years of Service :   1 Years 1 Months

The document status is Completed.

## Section 1 - GK perform Objectives

### Revenue

Description Achieve or exceed the production group's revenue plan
**Employee Rating:** 0 - Not meeting Expectations

| Manager Rating: | 2 - Meets Expectations | | |
|---|---|---|---|
| Weight: | 10% | | |
| Created By : | | Template | 07/26/2012 9:40AM |
| Last Modified By : | | Jacob Briscoe | 07/26/2012 9:41AM |

### Operating Income

Description Achieve or exceed the production group's operating income plan
**Employee Rating:** 2 - Meets Expectations

| Manager Rating: | 1 - Meets Expectations | | |
|---|---|---|---|
| Weight: | 10% | | |
| Created By : | | Template | 07/26/2012 9:40AM |
| Last Modified By : | | Jacob Briscoe | 07/26/2012 9:41AM |

### Customer Focus

Description Consider:
• Customer satisfaction
• NPS®

NPS® - Net Promoter, Net Promoter Score, and NPS are trademarks of Satmetrix Systems, Inc., Bain & Company, Inc., and Fred Reichheld
**Employee Rating:** 3 - Meets Expectations

| Manager Rating: | 2 - Meets Expectations | | |
|---|---|---|---|
| Weight: | 15% | | |
| Created By : | | Template | 07/26/2012 9:40AM |
| Last Modified By : | | Jacob Briscoe | 07/26/2012 9:41AM |

PLAINTIFF'S EXHIBIT
26

G&K000136

## People Development

**Description Consider:**
- Recruit/recruitment metrics
- Develop
- Retain (includes RSR/TSR turnover)
- Foster a diverse workforce
- Internal promotions

**Employee Rating: 3 - Meets Expectations**

**Manager Rating:** 2 - Meets Expectations

**Weight:** 20%

| | | |
|---|---|---|
| Created By : | Template | 07/26/2012 9:40AM |
| Last Modified By : | Jacob Briscoe | 07/26/2012 9:41AM |

## Position Specific

**Description Includes:**
- High ethical standards and openness
- Safety compliance and advocacy
- Commitment to IFW
- HR Assessment & Audit compliance
- Run business activities/projects
- Executes all other key responsibilities of my position
- Achieves/ maintains sales headcount

**Employee Rating: 4 - Exceeds Expectations**

**Manager Rating:** 3 - Meets Expectations

**Weight:** 15%

| | | |
|---|---|---|
| Created By : | Template | 07/26/2012 9:40AM |
| Last Modified By : | Jacob Briscoe | 07/26/2012 9:41AM |

## Individual Objective #1 (1425 characters allowed for descr)

**Description** My goal for FY 12 is to get more directly involved with the sales department and sharpen my skills and knowledge in the sales salary structure, performance and expectation guidelines, and goals. My expectation is to be able to equally provide a percentage of my involvement as an HR support for this department. My goal is to build my relationship with all employees and the sales manager to stive in decreasing turnover, retain quality employees, and provide knowledgeable feedback on impeding concerns and/or questions. Help to drive a high-performance sales team and culture throughout my role and partnership.

**Employee Rating: 3 - Meets Expectations**

**Manager Rating:** 3 - Meets Expectations

**Weight:** 15%

| | | |
|---|---|---|
| Created By : | Template | 07/26/2012 9:40AM |
| Last Modified By : | Jacob Briscoe | 07/26/2012 9:41AM |

## Individual Objective #2 (1425 characters allowed for descr)

**Description** Increase safety awareness within the local business e.g. within plant, office, sales, etc. Strive to find new and innovative ways of portraying company guidelines and safety expectations in a positive and fun environment. Help to make an impact and improve the safety results in our local locations. Partner with location leadership to drive down TCIR and DART.

**Employee Rating: 3 - Meets Expectations**

G&K000137

| Manager Rating: | 2 - Meets Expectations | | |
|---|---|---|---|
| Weight: | 15% | | |
| Created By : | | Template | 07/26/2012 9:40AM |
| Last Modified By : | | Jacob Briscoe | 07/26/2012 9:41AM |

### Individual Objective #3 (1425 character allowed for user)

**Description** This objective is defined by you and your manager.  Your document weights must equal 100% to save properly.

**Employee Rating:** Termination - No rating

**Manager Rating:** Termination - No rating

**Weight:** 0%

| Created By : | | Template | 07/26/2012 9:40AM |
|---|---|---|---|

### GK perform Objectives Summary

**Employee Rating:** 3 - Meets Expectations

**Manager Rating:** 2 - Meets Expectations

**Summary Weight:** 100%

## Section 2 - Year-end Review

### Year-end Review Summary

**Employee Rating:** 3 - Meets Expectations

**Manager Rating:** 2 - Meets Expectations

**Significant Accomplishments and Objectives Missed:**

**Manager Comments:**

## Section 3 - Strengths & Opportunities

### Strengths & Opportunities

**Description** Use this section to list two or three of your strengths and two or three of your development opportunities. Comment on your successes and challenges in these areas.  This section is meant to generate good conversation between manager and employee and should be a starting point for an individual development plan.  Use this time to discuss development; present and future.

**Strengths/Opportunities** I believe a strength of mine is being knowledgeable on GK Policy and Procedures,  continuously developing myself as an individual and staying up to date on HR knowledge and changing laws and regulations. Prioritize and manage my HR role on a daily basis and complete task and functions.  I have built numerous positive and communicative relationships on an individual level within the local employees and management environment.  I have built a strong HR relationship with peers within my region and utilized them on a continous basis for support.

I believe an opportunity of mine is to continously build a pipeline of candidates and provide bench candidates for the sales department in the future.  Work more closely with regional HR recruiting manager on obtaining training and instruction for Oxicon result evaluation and defined recruiting aspects for the sales role.

**Employee Comments:**

| Created By : | | Template | 07/26/2012 9:40AM |
|---|---|---|---|

G&K000138

**Strengths & Opportunities Summary**

Manager
Comments:

<u>Section 4 - eSignatures</u>

**Audit History**

| | |
|---|---|
| Created By : | 07/26/2012 9:40:53AM |
| Last Updated By : | 07/24/2013 5:22:38PM |

G&K000139

# EXHIBIT D

Performance Document - GK perform
# Manager Evaluation

Brandy Williams,
GK perform, 07/01/2011 - 12/31/2011

**Author:** Jacob Briscoe
**Status:** Completed
**Approval:** Not Required

**Role:** Manager
**Due Date:** 02/15/2012

| Employee Data | |
|---|---|
| Years of Service : | 0 Years 7 Months |

The document status is Completed.

## Section 1 - GK perform Objectives

| Revenue | | |
|---|---|---|
| Description Achieve or exceed the production group's revenue plan | | |
| Employee Rating: 2 - Meets Expectations | | |
| Manager Rating: | 2 - Meets Expectations | |
| Weight: | 10% | |
| Created By : | Template | 02/13/2012 11:39AM |
| Last Modified By : | Jacob Briscoe | 05/03/2012 10:08AM |

| Operating Income | | |
|---|---|---|
| Description Achieve or exceed the production group's operating income plan | | |
| Employee Rating: 0 - Not meeting Expectations | | |
| Manager Rating: | 0 - Not meeting Expectations | |
| Weight: | 10% | |
| Created By : | Template | 02/13/2012 11:39AM |
| Last Modified By : | Jacob Briscoe | 05/03/2012 10:08AM |

| Customer Focus | | |
|---|---|---|
| Description Consider: | | |
| • Customer satisfaction | | |
| • NPS® | | |
| NPS® - Net Promoter, Net Promoter Score, and NPS are trademarks of Satmetrix Systems, Inc., Bain & Company, Inc., and Fred Reichheld | | |
| Employee Rating: 2 - Meets Expectations | | |
| Manager Rating: | 3 - Meets Expectations | |
| Weight: | 15% | |
| Created By : | Template | 02/13/2012 11:39AM |
| Last Modified By : | Jacob Briscoe | 05/03/2012 10:08AM |

PLAINTIFF'S
EXHIBIT
25

G&K000129

## People Development

**Description Consider:**
- Recruit/recruitment metrics
- Develop
- Retain (includes RSR/TSR turnover)
- Foster a diverse workforce
- Internal promotions

**Employee Rating:** 3 - Meets Expectations

**Manager Rating:**  3 - Meets Expectations

**Weight:** 20%

| | | |
|---|---|---|
| Created By : | Template | 02/13/2012 11:39AM |
| Last Modified By : | Jacob Briscoe | 05/03/2012 10:08AM |

## Position Specific

**Description Includes:**
- High ethical standards and openness
- Safety compliance and advocacy
- Commitment to IFW
- HR Assessment & Audit compliance
- Run business activities/projects
- Executes all other key responsibilities of my position
- Achieves/ maintains sales headcount

**Employee Rating:** 3 - Meets Expectations

**Manager Rating:**  3 - Meets Expectations

**Weight:** 15%

| | | |
|---|---|---|
| Created By : | Template | 02/13/2012 11:39AM |
| Last Modified By : | Jacob Briscoe | 05/03/2012 10:08AM |

## Individual Objective #1 (1325 character's allowed for desc)

**Description** My goal for FY 12 is to get more directly involved with the sales department and sharpen my skills and knowledge in the sales salary structure, performance and expectation guidelines, and goals. My expectation is to be able to equally provide a percentage of my involvement as an HR support for this department. My goal is to build my relationship with all employees and the sales manager to stive in decreasing turnover, retain quality employees, and provide knowledgeable feedback on impeding concerns and/or questions. Help to drive a high-performance sales team and culture throughout my role and partnership.

**Employee Rating:** 3 - Meets Expectations

**Manager Rating:**  3 - Meets Expectations

**Weight:** 15%

| | | |
|---|---|---|
| Created By : | Template | 02/13/2012 11:39AM |
| Last Modified By : | Jacob Briscoe | 05/03/2012 10:08AM |

## Individual Objective #2 (1325 character's allowed for desc)

**Description** Increase safety awareness within the local business e.g. within plant, office, sales, etc. Strive to find new and innovative ways of portraying company guidelines and safety expectations in a positive and fun environment. Help to make an impact and improve the safety results in our local locations. Partner with location leadership to drive down TCIR and DART.

**Employee Rating:** 2 - Meets Expectations

G&K000130

| Manager Rating: | 3 - Meets Expectations | | |
|---|---|---|---|
| Weight: | 15% | | |
| Created By : | | Template | 02/13/2012 11:39AM |
| Last Modified By : | | Jacob Briscoe | 05/03/2012 10:08AM |

## Individual Objective #3 (1325 characters allowed for descn)

Description This objective is defined by you and your manager.  Your document weights must equal 100% to save properly.

| Employee Rating: | | | |
|---|---|---|---|
| Manager Rating: | | | |
| Weight: | 0% | | |
| Created By : | | Template | 02/13/2012 11:39AM |

## GK perform Objectives Summary

Employee Rating:  2 - Meets Expectations
Manager Rating:   3 - Meets Expectations
Summary Weight:   100%

## Section 2 - Mid-year Review

### Mid-year Review Summary

Employee Rating:  2 - Meets Expectations
Manager Rating:   3 - Meets Expectations

Significant
Accomplishments
and Objectives
Missed:

Manager
Comments:

## Section 3 - Strengths & Opportunities

### Strengths & Opportunities

Description Use this section to list two or three of your strengths and two or three of your development opportunities. Comment on your successes and challenges in these areas.  This section is meant to generate good conversation between manager and employee and should be a starting point for an individual development plan.

Strengths/Opportunities I believe a strength of mine is being knowledgeable on GK Policy and Procedures, continuously developing myself as an individual and staying up to date on HR knowledge and changing laws and regulations. Prioritize and manage my HR role on a daily basis and complete task and functions.  I have built numerous positive and communicative relationships on an individual level within the local employees and management environment.  I have built a strong HR relationship with peers within my region and utilized them on a continous basis for support.

I believe an opportunity of mine is to continously build a pipeline of candidates and provide bench candidates for the sales department in the future. Work more closely with regional HR recruiting manager on obtaining training and instruction for Oxicon result evaluation and defined recruiting aspects for the sales role.

| Employee Comments: | | | |
|---|---|---|---|
| Created By : | | Template | 02/13/2012 11:39AM |

G&K000131

**Strengths & Opportunities Summary**

| Manager Comments: | Brandy - you are very strong when it comes to your understanding of HR issues and the legal aspects that are often over looked by line managers. You are a strong addition to our team and you can help develop the managers in this business become better in their roles as leaders. Your work on helping drive our pipelines has been critical and will be an important aspect in helping us drive strong business performance. Continue to drive these efforts. |
|---|---|

## Section 4 - eSignatures

**Audit History**

| Created By : | 02/13/2012 11:39:33AM |
|---|---|
| Last Updated By : | 05/03/2012  1:25:04PM |
| Acknowledged By : | 05/03/2012  1:25:04PM |
| Completed By : | 05/03/2012 12:27:27PM |

G&K000132

# EXHIBIT E

Performance Document - GK perform
# Manager Evaluation

Brandy Williams.
GK perform 07/01/2 '2 - 06/30 20. 3

Author: Rachael Siggerud                    Role: Manager
Status: Completed                           Due Date: 08/30/2013
Approval: Not Required

The document status is Completed.

## Section 1 - Mid-year Comments

**Significant Accomplishments and Objectives Missed:** After returning from Maternity Leave in October I am working on emersing myself back into the business I have gained updates from all managers and formed a game plan with each department for staffing and support metrics. I have worked on posting requisitions for all open positions to support current business needs. I have supported all employees during open enrollment and the transition to the new model of health plans. My continued goal for year end is to reduce turnover in service and sales and meet headcount goals. My goal is to support the new sales manager with new sellers in the business and through smart start training and ramp up Also, our team is focusing on safety and safety improvements in the business with monthly safety meetings scheduled with the plant manager. We feel there is an opportunity for improvement with safety in service as there have been injuries that could have been prevented with proper safety measures. We will continue as a team to plan and implement new safety measures to decrease injuries by additional training and awareness and using our newly implemented wheel of safety for participation to decrease injuries.

**Manager Comments:**

## Section 2 - GK perform Objectives

Description This is a group rating and will be given to you either by your location's manager or through an email for corporate employees.
Employee Rating: 5 - Outstanding
Manager Rating:          5 - Outstanding
Weight:          25%

| Created By: | Template | 07/26/2013 2:18PM |
| Last Modified By | Rachael Siggerud | 07/26/2013 3:01PM |

Description Customer Focus
Integrity
People Development
Openness
Execution
Employee Rating: 4 - Exceeds Expectations
Manager Rating:          2 - Below Expectations
Weight:          25

| Created By | Template | 07/26/2013 2:18PM |
| Last Modified By : | Rachael Siggerud | 07/26/2013 3:01PM |

Description Leadership Development.
Support and Update Leaders around the coach to win model.  support new leaders and help to gain knowledge around Performance Management  Another goal is to focus and drive leadership development through developing prgrams by providing classroom training, hands on training with a mentor or coach, experience or exposure based training, and cross functional training.

My main goal is to help support managers with Talent Management and to accomplish more through others of our team by sharpening skills on:

-Effective Management Skills
-Conflict Management
-Team Building
-Influence and Negotiation Skills
-Communication Skills
-Time Management
-Interview Skills
-Delegation
-Planning
-Motivation Skills

**Employee Rating: 3 - Meets Expectations**

| Manager Rating: | 1 - Not Meeting Expectations |  |  |
| --- | --- | --- | --- |
| Weight: | 20% |  |  |
| Created By | Template | 07/26/2013  2:15PM |  |
| Last Modified By | Rachael Siggerud | 07/26/2013  3:04PM |  |


Description Talent Management:

1. Meet with leaders monthly to review and update 9 block
2. Update IDP's for all green box talent with leaders
3. Schedule bi-weekly meetings with leaders to develop assignments for HPE's

A continous goal will be to support leaders to drive effective performance management by providing feedback to employees  As a team I will work to ensure that leaders are working with employees to ensure they are on the right track for completion of goals, individual goals are aligned with our organization's goals and core values, and that our team and employee's receive the support they need to be successful. I will continue to coach and provide feedback on effective performance management, development opportunities, help to identify low performers and address and evaluate the impact on the business needs, actively participate in weekly growth meetings to help leaders monitor and improve business opportunities and revenue, spend one on one time in the field with territory sellers, route managers, route sales reps, service manager, sales manager, etc learning the key financials of the business to build my overall relationship and have a functional grasp and understanding to support the financial goals of the business and team as a whole

**Employee Rating: 3 - Meets Expectations**

| Manager Rating: | 2 - Below Expectations |  |  |
| --- | --- | --- | --- |
| Weight: | 15% |  |  |
| Created By : | Template | 07/26/2013  2:18PM |  |
| Last Modified By : | Rachael Siggerud | 08/28/2013  9:22AM |  |


Description Protecting the business:

-Develop Leadership knowledge of OFCCP
-Develop leadership knowledge of EEOC rules and claims

-Develop leadership knowledge on how to avoid Union issues
 a. Summarize and relay information around the NLRA and the importance within a business
-Partner with leaders to ensure we are OSHA ready
a. Attend location safety meetings/committees
b. Provide new ideas and action plans for safety improvement metrics
-Provide knowledge around other important employment laws such as: Civil rights act, state human rights act, ADEA, ADA, ADAAA 2008, FMLA, California Medical Leave Act, USSERA, Affirmative Action.

| | | | |
|---|---|---|---|
| Employee Rating: 3 - Meets Expectations | | | |
| Manager Rating: | 2 - Below Expectations | | |
| Weight: | 15% | | |
| Created By: | | Template | 07/26/2013  2:18PM |
| Last Modified By | | Rachael Siggerud | 08/28/2013  9:22AM |

Description This objective is defined by you and your manager.  Your document weights must equal 100% to save properly

| | | | |
|---|---|---|---|
| Employee Rating: | | | |
| Manager Rating: | | | |
| Weight: | 0% | | |
| Created By | | Template | 07/26/2013  2:18PM |

Description This objective is defined by you and your manager.  Your document weights must equal 100% to save properly

| | | | |
|---|---|---|---|
| Employee Rating: | | | |
| Manager Rating: | | | |
| Weight: | 0% | | |
| Created By | | Template | 07/26/2013  2:18PM |

| | |
|---|---|
| Employee Rating: | 4 - Exceeds Expectations |
| Manager Rating: | 3 - Meets Expectations |
| Summary Weight: | 100% |

## Section 3 - Year-end Overall Review

| | |
|---|---|
| Employee Rating: | 4 - Exceeds Expectations |
| Manager Rating: | 2 - Below Expectations |
| Significant Accomplishments and Objectives Missed: | Overall,  sales headcount has been achieved by adding talent to the sales team and recruiting and filling TSA's positions for bench strength. We also increased effectiveness for staffing purposes in the service department by hiring new talent and developing a new add tional route  This year has been quite a transition and challenge.  I have worked diligently to ensure that all leaders and employees were supported through the transition process and fully understood and had success with the Employee Solutions Center.  I have transitioned to be more of a strategic business partner with leaders of the business.  I hope |

|  | to continue to gain trust and build relationships with the LA and Phoenix groups. |
|---|---|
| **Manager Comments** | Brandy,<br><br>I am very disappointed to see that you have not completed anything in your GKperform document, although we have spoken about it on several occasions over the past month. As you are well aware, based on our previous conversations, your performance is below expectations for the role of HR Generalist. A great part of that deficit is resulting from the ineffective relationship you have with the Phoenix leadership team. You tend to make excuses to explain constructive feedback and are not receptive to coaching. Some specific examples are this document, your GKperform being incomplete, you did not complete the gameplan document to set expectations for your support of Phoenix and LA as we had discussed, you have exhibited ongoing concerns around managing your calendar and accepting invites, being on time, and often take significant prodding to complete tasks. I'm also concerned with the lack of initiative you have demonstrated with respect to bringing new ideas to the table about how to make the HR Generalist position successful and valued. A critical part of this role is creatively seeking to introduce leadership coaching, identifying areas of opportunity and bringing solutions to the table for discussion.<br><br>The changes in our HR organization have not necessarily been easy but so much of what can make or break a transition like ours is the ability of the individual contributors to effectively manage through the change and shepherd their leadership team through the same. If you are to be successful in the HR Generalist role, you must build strong working relationships with your local leadership team in the same way you have done in the past with the employees you interacted with as part of your HRR position. I believe that you have the ability to effect change and be a strategic partner in your locations and will continue to support you on that journey as well as exploring other options should you feel there is another role that is a better fit for your skill set. |

## Section 4 - Development Goal and Relocation Preferences

Description Use this section to list your development goals. Comment on your successes and challenges. Please include if you are willing to relocate, and if so, your geographical preferences.

This section is meant to generate good conversation between manager and employee and should be a starting point for an individual development plan. Use this time to discuss development; present and future.

|  | I will continue to help obtain high potential talent in the business groups, focus on key metrics for financials and objectives for the business. I hope to increase my overall financial understanding of the business when it comes to the Profit and Loss statements of the businesses. I will continue to increase and drive change management within the organization. I feel a challenge I will continue to increase upon is to improve positive employee relation strategies. I will base my efforts on building mutual respect, fair and equitable treatment, mutual trust, and open and honest communication by being continuously engaged. I will continue to build relationships by supporting leaders in making decisions and taking risks. I will demonstrate trust in the the competence of leaders and empower them to take ownership of the work they do. |
|---|---|
| **Employee Comments:** | Overall I thoroughly enjoy my career at G & K and look forward to working with leaders and continuously provide employee support and development! I look forward to taking on new task and temporarily helping to support recruiting currently! I'm excited about the year to come!<br><br>I currently would be interested if the opportunity came open to supporting areas in the southern areas or certain portions of the mid-central area. My main interest would be the gulf plains or southeast mainly (e.g. TN, FL, TX, AR, MS, AL, NC, etc) |

Template      07 16 2013 2:18PM

## Development Goal and Relocation Preferences Summary

**Manager Comments:**

## Section 5 - eSignatures

| | |
|---|---|
| Created By | 07/26/2013 2:18:37PM |
| Last Updated By | 08/28/2013 12:46:43PM |
| Acknowledged By | 08/28/2013 12:46:43PM |
| Completed By | 08/28/2013 12:42:42PM |

EXHIBIT F

Performance Document - GK perform
# Manager Evaluation

Kaela Ellison,
GK perform, 07/01/2012 - 06/30/2013

Author: Rachael Siggerud                    Role: Manager
Status: In Progress                         Due Date: 08/30/2013
Approval: Not Required

Enter ratings and update comments in the review summary, as well as the strengths and opportunities sections. Save entries made by clicking the Save button. Once you have held the employee review, click the Mark Review Held button. This will notify the employee they can acknowledge receipt of the review which completes the process.

## Section 1 - Mid-year Comments

| | |
|---|---|
| **Significant Accomplishments and Objectives Missed:** | Pay cards: Part of the pilot program, but got a late start due to annual enrollment and the holidays. We had some minor issues with system entry at Corporate and a couple hiccups with employee activation and card distribution.

Production Pay: I completed the proposal for plant pay to keep us competitive with the Mpls union. Andy approved, but I haven't heard back from Chuck yet. We discussed rolling it out in July after the new fiscal year planning. This objective is not complete yet.

New Role: I still don't really know a lot about my personal role under the new HR structure, but I have been constantly communicating with all my managers and a little with employees to prepare them for the change. I have been handing out the HR Solution Center number if it's an issue I would have to call them. I'm having the employee call them directly instead. I have been using the Solution Center instead of call people directly.

Annual Enrollment: Probably the biggest change we've had all year. It was a lot more work on my part than it was when we had paper sheets to turn in. I don't think the process was as smooth as it should have been. I think we had a lot of communication/understanding issues on how to enroll and what documents needed to be turned in for verifying dependents which resulted in me helping a lot of people. I did not make the first goal for the HR bonus. I thought the expectations were unrealistic given the time frame, size of our location, and holiday week. Employees were ready to make elections that soon in the process and I was not going to force them into rushed decisions. I did meet the requirements for the second HR bonus and in the end we had really good participation numbers. |
| **Manager Comments:** | I totally agree with your assessment Kaela but would add the following:

1. Solid feedback and leadership as it relates to employee issue resolution, union avoidance and employee development.
2. Key role in Gus development and documentation process
3. Safety lead and incredible assistance.

Will be MASSIVELY MISSED IN YOUR PRIOR ROLE. |

## Section 2 - GK perform Objectives

Description This is a group rating and will be given to you either by your location's manager or through an email for corporate employees.
Employee Rating: 4 - Exceeds Expectations

| | |
|---|---|
| **Manager Rating:** | 4 - Exceeds Expectations |
| **Weight:** | 25% |

| | | |
|---|---|---|
| Created By | Template | 02/08/2013 8:56AM |
| Last Modified By | Rachael Siggerud | 07/31/2013 9:59AM |

**Description** Customer Focus
Integrity
People Development
Openness
Execution
**Employee Rating:** 4 - Exceeds Expectations
**Manager Rating:**      3 - Meets Expectations
**Weight:**      25%

| | | |
|---|---|---|
| Created By | Template | 02/08/2013 8:56AM |
| Last Modified By | Rachael Siggerud | 07/31/2013 1:44PM |

**Description** Successfully transition employees to pay cards
**Employee Rating:** 3 - Meets Expectations
**Manager Rating:**      3 - Meets Expectations
**Weight:**      10%

| | | |
|---|---|---|
| Created By | Template | 02/08/2013 8:56AM |
| Last Modified By | Andrew Johnson | 02/08/2013 9:02AM |

**Description** Simplify production new hire incentive pay
**Employee Rating:** 3 - Meets Expectations
**Manager Rating:**      3 - Meets Expectations
**Weight:**      15%

| | | |
|---|---|---|
| Created By | Template | 02/08/2013 8:56AM |
| Last Modified By | Andrew Johnson | 02/08/2013 9:02AM |

**Description** Understand new role as HR Generalist and help effectively transition employees to the dramatic HR changes.
**Employee Rating:** 3 - Meets Expectations
**Manager Rating:**      3 - Meets Expectations
**Weight:**      5%

| | | |
|---|---|---|
| Created By | Template | 2/08/2013 8:56AM |
| Last Modified By | Andrew Johnson | 2/8/2013 9:02AM |

Description Transition employees to new paperless annual enrollment process
Employee Rating: 4  Exceeds Expectations
Manager Rating: 3 - Meets Expectations
Weight: 10

| | | |
|---|---|---|
| Created By | Template | 02/08/2013  8 56AM |
| Last Modified By | Andrew Johnson | 02/08/2013  9 02AM |

Description Complete 9 block
Employee Rating: 3 - Meets Expectations
Manager Rating: 3  Meets Expectations
Weight: 10%

| | | |
|---|---|---|
| Created By | Template | 02/08/2013  8 56AM |
| Last Modified By | Rachael Siggerud | 07/31/2013  9 59AM |

**Employee Rating:** 4 - Exceeds Expectations
**Manager Rating:** 3 - Meets Expectations
**Summary Weight:** 100%

## Section 3 - Year-end Overall Review

**Employee Rating:** 4 - Exceeds Expectations
**Manager Rating:** 3 - Meets Expectations
**Significant Accomplishments and Objectives Missed:**
**Manager Comments:**
Kaela,
This year has brought a lot of change to your role in HR. While it hasn't been easy or comfortable, change is a part of shaping who we are as professionals and individuals and is a valuable learning experience regardless of the outcome.

With respect to your Objectives #'s 1, 2 & 4; you supported these initiatives well and demonstrated a solid understanding of our compensation practices and needs in the Twin Cities market.

Your biggest area of opportunity over the past six months had really been around support and championing the HR Realignment. I know that the changes were tremendous and that we didn't have the ability to involve everyone in the design phase for the new model. Where your support has been less than enthusiastic, our leaders pick up and carry that message internally and to their teams. Managing the change successfully with our leaders is a significant part of having a successful transition and in order to do so, I need to you be a positive champion for the process while helping to facilitate improvements where they come to light. I have seen a positive shift in your leadership since we spoke on this topic and I look forward to your support in the next fiscal year as well.

Some of your accomplishments that stand out for me in this second half of the year include

completing your Master's degree while working full-time (no small feat), developing a full training around "It's My Company Too" and facilitating it throughout the MN businesses, developing and presenting your "Giraffe in the Refrigerator" deck and your ongoing work on safety culture. I continue to be so impressed by your creativity and initiative!

I look forward to having you as a part of the Generalist team in FY14 as we continue to develop and define the role as a strategic business contributor and partner.

## Section 4 - Development Goal and Relocation Preferences

**Description** Use this section to list your development goals  Comment on your successes and challenges  Please include if you are willing to relocate, and if so, your geographical preferences.

This section is meant to generate good conversation between manager and employee and should be a starting point for an individual development plan.  Use this time to discuss development, present and future.

**Employee Comments:**

| Created By | | 02/08/2013 8 56AM |
| --- | --- | --- |

**Manager Comments:**   I would absolutely bless you for a immediate promotion - you are incredible and highly talented. I will miss your consistent engagement and selfishly wish you could remain on my team BUT I realize my loss is the companies gain and businesses like St Cloud, Mpls Industrial and Linen will greatly benefit from your expertise

Best of luck.

## Section 5 - eSignatures

| **Created By** | Andrew Johnson | 02/08/2013 8 56 10AM |
| --- | --- | --- |
| **Last Updated By** . | | 07/31/2013 1:14:21PM |

# EXHIBIT G

Performance Document - GK perform
# Manager Evaluation

Janelle Bonacua,
GK perform, 07 01 2012 - 06 30 2013

**Author:** Rachael Siggerud          **Role:** Manager
**Status:** In Progress               **Due Date:** 08/30/2013
**Approval:** Not Required

Enter ratings and update comments in the review summary, as well as the strengths and opportunities sections. Save entries made by clicking the Save button. Once you have held the employee review, click the Mark Review Held button. This will notify the employee they can acknowledge receipt of the review which completes the process

## Section 1 - Mid-year Comments

| | |
|---|---|
| **Significant Accomplishments and Objectives Missed:** | -Recruiting - Had all positions/needs filled as requested throughout location<br>-JJ Keller - brought JJ Keller percentage up to 100% for both Hayward/Pittsburg location<br>-Safety compliance-Helped to drive Safety Awareness through strategic planning and projects (part of the safety committee) improved our overall metrics. Under the 2.5 TCIR Rating for company wide.<br>-Successfully organized and planned events throughout the midyear, flu clinic, 100% annual enrollment rollout, FY2013 event<br>-Location organization-effectively assisted weekly/monthly activities for location for organization purposes, such as reports (vacation/payroll), (Learning and Development-course completion)<br><br>Work in Progress-<br>Needs improvement on Pcard, still work in progress-final goal is to streamline pcard approval system and remove violations .. |
| **Manager Comments:** | Janelle, thanks for organizing important employee functions, ie Flu Shots and Annual Enrollment. Payroll accuracy has improved over your tenure. There is still room to improve sales commission sheets each month so that they are correct the first try. You started off well with recruiting when you first started but when we needed strong activity most recently your attention to recruiting softened and today (Feb) it has ceased well before the transition of Feb 25th. I want you to speak up when you are unable to complete a task or directive rather than not do what you are told then explain yourself if it comes up later. You play an important role on our team and everyone counts on your influence and contribution. I'm looking forward to your influence in the second half with upcoming changes in your role and how you will help us grow. I'm asking all department heads to engage you with stronger developmental plans for their teams, specific by individual employee that targets reel actions to improve skills and raise our team performance. This commitment is ongoing and a basic building block to support promotions from within and ultimately grow our organization. |

## Section 2 - GK perform Objectives

Description This is a group rating and will be given to you either by your location's manager or through an email for corporate employees
Employee Rating: 1 - Not Meeting Expectations

| **Manager Rating:** | 1 - Not Meeting Expectations |
|---|---|
| **Weight:** | 25% |

| Created By | | :mplate | 02 14/2013 7 572M |
|---|---|---|---|
| Last Modified By | | · ott Hardesty | 02/15 2013 11 58 AM |



EXHIBIT
H

**Description** Customer Focus
Integrity
People Development
Openness
Execution
**Employee Rating:** 3 - Meets Expectations
**Manager Rating:** 4 - Exceeds Expectations
**Weight:** 25%

| | | |
|---|---|---|
| Created By | Template | 02/14/2013 7:57PM |
| Last Modified By | Rachael Siggerud | 07/25/2013 12:56PM |

**Description** Recruiting-New goal, TSR and Service Staffing
**Employee Rating:** 3 - Meets Expectations
**Manager Rating:** 3 - Meets Expectations
**Weight:** 10%

| | | |
|---|---|---|
| Created By | Template | 02/14/2013 7:57PM |
| Last Modified B | Rachael Siggerud | 07/25/2013 12:56PM |

**Description** Leadership development - New Role
Serve as a liason between employee and manager to support them with bringing forward talent. Provide with the tools necessary for succeeding
**Employee Rating:** 3 - Meets Expectations
**Manager Rating:** 4 - Exceeds Expectations
**Weight:** 1%

| | | |
|---|---|---|
| Created By | Template | 02/14/2013 7:57PM |
| Last Modified By | Rachael Siggerud | 07/25/2013 12:56PM |

**Description** New after Realignment Route and sales ridealongs - Learn more about the positions to fully engage into training and development
**Employee Rating:** 3 - Meets Expectations
**Manager Rating:** 3 - Meets Expectations
**Weight:** 10%

| | | |
|---|---|---|
| Created By | Template | 02/14/2013 7:57PM |
| Last Modified By | Rachael Siggerud | 07/25/2013 12:56PM |

**Description** Continue to improve safety metrics throughout location. Improved as a location prior to the previous year Helped drive more safety awareness through safety team projects, accountability, our location was removed out of the

bottom 10.
**Employee Rating:** 3 - Meets Expectations
**Manager Rating:** 3 - Meets Expectations
**Weight:** 10%

| Created By | | Template | 02/14/2013 7.57PM |
|---|---|---|---|
| Last Modified By | | Scott Hardesty | 02/15/2013 11.58AM |

Description Succession planning-Workforce planning partnering up with recruiters in new HR Model to ensure stable teams and fill positions.
**Employee Rating:** 3 - Meets Expectations
**Manager Rating:** 4 - Exceeds Expectations
**Weight:** 10%

| Created By | | Template | 02/14/2013 7.5 PM |
|---|---|---|---|
| Last Modified By | | Rachael Siggerud | 07/25/2013 12.56PM |

**Employee Rating:** 3 - Meets Expectations
**Manager Rating:** 3 - Meets Expectations
**Summary Weight:** 100%

## Section 3 - Year-end Overall Review

**Employee Rating:** 3 - Meets Expectations

**Manager Rating:** 4 - Exceeds Expectations

**Significant Accomplishments and Objectives Missed:** Helped to drive iGrow participation in location, overall two out of 3 RM's achieved growth goal and three RSR's as well hit their bonus.

Safety metric improvement.

Facilitated in Onboarding process.

Constant recruiting support.

Helped to identify root cause turnover problems throughout location.

**Manager Comments:** Janelle, I have been very impressed with your growth as an HR professional since you came on board with G&K. Although the HR Realignment was a challenging transition for our whole company you have been a very strong partner for your locations both before the transition and today and you are a valued part of our regional team!

I continue to be impressed by the initiative you demonstrate on a frequent basis, including (but not limited to) much of the work you did around driving the iGain and iGrow initiatives, taking developmental HR classes, partnering closely with recruiting to help the businesses get to headcount but with the right people and really driving the changes around our RSR SMART Start/training and onboarding process to ensure that our folks are off to the right start! Continue to focus on building your confidence in working with leaders, you are very capable and provide tremendous insight and support to your teams and they recognize it!

With the leadership changes in NorCal, lets continue to focus on building a really strong

understanding of our financial picture for the consolidated businesses and becoming more integrated into the Sacramento team - you are off to a great start, so let's keep building on that progress.

I truly enjoy having you on my team and look forward to FY14! Thank you for all of your diligant and hard work this year!

## Section 4 - Development Goal and Relocation Preferences

Description Use this section to list your development goals. Comment on your successes and challenges. Please include if you are willing to relocate and if so, your geographical preferences.

This section is meant to generate good conversation between manager and employee and should be a starting point for an individual development plan. Use this time to discuss development, present and future.

Develop more as a HR Business partner to support the needs of the business throughout. Improve the overall process and workflow of the businesses through streamlining.

**Employee Comments:** Continue to participate in ongoing internal training provided by the company as well as external resources, build knowledge on HR Business Partner role and strengthen experience.

Improve turnover ratings in Northern CA through exit interview assessment, coaching vs. discipline.

| Created By: | Template | 02/14/2013 7:57PM |
|---|---|---|

**Manager Comments:** Janalle, I am happy that you joined our team. I'd like you to work closer with the department head leaders. This is your peer group and much of our success hinges on their partnership with you to drive performance across the business.

## Section 5 - eSignatures

| | |
|---|---|
| **Created By** | 02/14/2013 7:57:00PM |
| **Last Updated By** | 07/25/2013 12:56:47PM |

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Court File No. 2:15-cv-01744-DJH

- - - - - - - - - - - - - - - - - - - - - - - - -

Brandy Williams,

Plaintiff,

vs.

G & K Services, Inc., a Minnesota
corporation, Jane and John Does 1-100,
Black Corporations 1-100, White
Partnerships 1-100,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - - - - - -
VIDEOTAPED DEPOSITION OF
RACHAEL SIGGERUD RASKOVICH
May 11, 2016
- - - - - - - - - - - - - - - - - - - - - - - - -

Prepared by:
By Kelly A. Herrick
Notary Public

**Coash & Coash, Inc.**
602-258-1440          www.coashandcoash.com

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 339 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

Page 2

```
 1   APPEARANCES:
 2
 3   MILLS + WOODS LAW PLLC
     5055 N. 12th Street
     Suite 101
 4   Phoenix, Arizona  85014
     Phone:  80.999.4556
 5   Email: Rmills@millsandwoods.com
 6   By:  Robert T. Mills
          For the Plaintiff
 7
 8   STINSON, LEONARD, STREET
     150 South Fifth Street
 9   Suite 2300
     Minneapolis, Minnesota  55402
10   Phone:  612.335.1770
     Email:  Kristin.parker@stinson.com
11
12   By:  Kristin Parker
          For the Defendant
13
14   Also present:  Joe Mildenberger,
                    Videographer
15                  Donna Fox
                    Carrie Hund
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   Examination by Mr. Mills              5
 3   Examination by Ms. Parker            214
 4
 5   INDEX OF EXHIBITS
 6   NUMBER   DESCRIPTION              PAGE
 7   Exhibit 01  Compilation exhibit    40
 8   Exhibit 02  Handwritten notes     111
 9   Exhibit 03  G&K000302-326         118
10   Exhibit 04  G&K000437             144
11   Exhibit 05  G&K000261             149
12   Exhibit 06  (Withdrawn)
13   Exhibit 07  G&K000259-60          165
14   Exhibit 08  Transcript of conversation from
                 June 26, 2013         171
15   Exhibit 09  Transcript of conversation from
                 July 17, 2013         179
16
17   Exhibit 10  Williams-00088-128    188
18   Exhibit 11  G&k000273             207
19
20
21
22
23
24
25
```

09:19-09:23

Page 4

```
 1  THE DEPOSITION OF RACHAEL SIGGERUD RASKOVICH
 2  is taken on this 11th day of May, 2016, at
 3  Stinson, Leonard, Street, 150 South Fifth
 4  Street, Suite 2300, Minneapolis, Minnesota,
 5  commencing at 9:22 a.m.
 6      THE VIDEOGRAPHER: We are on the
 7  record.  The time on the video monitor is
 8  9:22 a.m.
 9      Here begins Volume 1, Video
10  Number 1, in the deposition of Rachael
11  Raskovich in the matter of Brandy Williams
12  versus G & K Services, et al., in the United
13  States District Court for the District of
14  Arizona.
15      Today's date is May 11, 2016.  Our
16  court reporter is Kelly Herrick.  My name is
17  Joe Mildenberger, certified videographer
18  representing Coash & Coash.
19      The video deposition is taking
20  place at Stinson Leonard Street Law Firm in
21  Minneapolis, Minnesota.
22      Counsel, please identify yourselves
23  and state whom you represent.
24      MR. MILLS: Bob Mills of
25  Mills + Woods.  We represent Plaintiff,
```

09:23-09:24

Page 5

```
 1  Brandy Williams.
 2      MS. PARKER: Kristin Parker of
 3  Stinson, Leonard, Street representing G & K
 4  Services as well as Ms. Raskovich.
 5      MS. HUND: Also present, Carrie
 6  Hund.
 7      THE VIDEOGRAPHER: Would the court
 8  reporter please swear in the witness.
 9      RACHAEL SIGGERUD RASKOVICH,
10  A witness in the above-entitled action,
11  after having been first duly sworn,
12      testifies and says as follows:
13      EXAMINATION
14      BY MR. MILLS:
15  Q.  Good morning.
16  A.  Good morning.
17  Q.  Could you please state your name for the
18      record.
19  A.  It's Rachael Raskovich.
20  Q.  Were you formerly known as Rachael Siggerud?
21  A.  I was.
22  Q.  And when did your name change?
23  A.  In 2010.
24  Q.  2010?
25  A.  Correct.
```

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

1  Q.   Okay.  And have you ever given a deposition
2  before?
3  A.   I have.
4  Q.   Okay.  How many times?
5  A.   Once.
6  Q.   And can you give me a general description of
7  what that case was about?
8  A.   It was an employment case.
9  Q.   Did it involve G & K?
10  A.   It did.
11  Q.   When was that deposition taken?
12  A.   2010.
13  Q.   And where was the case pending?
14  A.   In Minnesota.
15  Q.   Were you a party to that lawsuit?
16  A.   I don't believe so.
17  Q.   Was G & K?
18  A.   Yes.
19  Q.   Do you recall who the lawyers were?
20  A.   I don't recall offhand.  I'm sorry.
21  Q.   Do you know whether Stinson Leonard was
22  involved in it?
23  A.   I believe Leonard, Street & Deinard, at the
24  time, was involved.
25  Q.   Okay.  Do you recall whether it was a

1      MS. PARKER: Objection:  Relevance.
2      THE WITNESS: Yes.
3  BY MR. MILLS:
4  Q.   What was the name of the Plaintiff?
5  A.   James Dubiel.
6  Q.   Spell the last name.
7  A.   D-U-B-I-E-L, maybe.
8  Q.   Was it a jury trial?
9  A.   Yes.
10      MS. PARKER: Objection:  Relevance.
11  BY MR. MILLS:
12  Q.   Do you recall how much money the jury
13  awarded?
14      MS. PARKER: Objection:  Relevance.
15      THE WITNESS: I don't.
16  BY MR. MILLS:
17  Q.   Have you ever testified in any other case
18  other than that one?
19  A.   I don't -- no, I have not.
20  Q.   Since it's been a little while, I'll go
21  over, just very briefly, a couple of ground
22  rules for the deposition.
23      The first one is if I ask you a
24  question and you don't understand it, just
25  tell me you don't understand and I'll try

1  lawsuit that was brought by an employee of
2  G & K or a former employee of G & K?
3  A.   Yes, I do.
4  Q.   And what's your recollection as to what the
5  allegations were in the lawsuit?
6  A.   Oh, my goodness.  I believe that it -- I
7  don't remember.  I think it was potentially
8  wrongful termination.  It's been quite a few
9  years.
10  Q.   Did the case get -- strike that.
11      Did the case go to trial, do you
12  recall?
13  A.   Yes, it did.
14  Q.   Did you testify at trial as well?
15  A.   I did.
16  Q.   And was that in State Court or Federal
17  Court?
18  A.   I believe it was in State Court.
19  Q.   Do you recall how that turned out?
20  A.   Yes, I do.
21  Q.   How?
22  A.   G & K did not win.
23  Q.   G & K did not win?
24  A.   Correct, or the other person did win.
25  Q.   Do you recall the name of the Plaintiff?

1  and rephrase it if I can.
2  A.   Okay.
3  Q.   Otherwise, I'll assume that you understood
4  it when you answer.
5      And the only other one is, if at
6  any time you need to take a break, that's
7  fine.  This is not an endurance contest
8  so -- the only thing I would ask is that, if
9  there's a question pending, that you answer
10  the question before you take a break.
11  A.   Okay.
12  Q.   Okay?
13  A.   Sounds fair.
14  Q.   Are you currently employed, ma'am?
15  A.   Yes.
16  Q.   By whom?
17  A.   St. Jude Medical.
18  Q.   Here in Minneapolis?
19  A.   St. Paul.
20  Q.   And what do you do for them?
21  A.   I work in human resources.
22  Q.   How long have you worked for St. Jude
23  Medical?
24  A.   Since October of 2013.
25  Q.   Do you have a job title there?

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

| 09:28-09:30 | Page 10 |
|---|---|

1   A.   I do.
2   Q.   What is that?
3   A.   Human resources business partner.
4   Q.   What are your essential job duties there?
5   A.   Provide HR general support to corporate
6   client groups.
7   Q.   How many people do you supervise at St. Jude
8   Medical?
9   A.   Two.
10   Q.   Where did you work before St. Jude Medical?
11   A.   G & K Services.
12   Q.   When did you start working for G & K?
13   A.   April 2005.
14   Q.   What was your job title when you first got
15   hired at St. Jude Medical?
16   A.   Human resources representative.
17   Q.   What other positions did you hold while you
18   were employed at G & K?
19   A.   Senior human resources representative,
20   HR manager, and regional HR director.
21   Q.   When did you become a regional director?
22   A.   Approximately 2011.
23   Q.   Did you work anywhere before G & K?
24   A.   Yes.
25   Q.   Where did you work?

| 09:30-09:31 | Page 11 |
|---|---|

1   A.   I worked for a company called Superior
2   Search.
3   Q.   What's that company -- what does it do?
4   A.   Recruiting.
5   Q.   How long did you work with them?
6   A.   About five months.
7   Q.   And before that?
8   A.   I worked for Menard's, Incorporated.
9   Q.   What do they do?
10   A.   Building materials, sales to consumers.
11   Q.   And before that?
12   A.   I worked for Macy's, Incorporated.
13   Q.   What did you do for Macy's?
14   A.   I was an intern.
15   Q.   Pardon me?
16   A.   I was an intern.
17   Q.   In what department?
18   A.   The computer-based training HR organization.
19   Q.   And before that?
20   A.   I worked for Famous Dave's of America.
21   Q.   What did you do for them?
22   A.   I was a server.
23   Q.   And before that?
24   A.   I worked for Abercrombie & Fitch.
25   Q.   Let me ask you this: Have we covered all

| 09:31-09:33 | Page 12 |
|---|---|

1   the jobs you've had since college?
2   A.   Yes.
3   Q.   Okay. Why did you leave G & K to go to
4   St. Jude Medical?
5   A.   I was looking for a different set of
6   experiences to broaden my HR career.
7   Q.   And did you go to college?
8   A.   Yes, I did.
9   Q.   Where did you go to college?
10   A.   I went to the University of Minnesota.
11   Q.   When did you graduate?
12   A.   In 2004.
13   Q.   What's your degree?
14   A.   Bachelor's of science in business with a
15   major in human resources and industrial
16   relations.
17   Q.   Did you go to law school?
18   A.   I did.
19   Q.   Where did you go to law school?
20   A.   William Mitchell College of Law.
21   Q.   When did you graduate from there?
22   A.   December of 2010, I believe.
23   Q.   What made you decide to go to law school?
24   A.   I debated between going back for a Master's
25   in HR from the University of Minnesota and

| 09:33-09:34 | Page 13 |
|---|---|

1   going to law school, and ultimately
2   determined that it was a slightly different
3   way to enhance my skill set in HR to go to
4   law school.
5   Q.   And are you licensed to practice law?
6   A.   No.
7   Q.   Have you ever been licensed to practice law?
8   A.   Yes.
9   Q.   In Minnesota?
10   A.   Yes.
11   Q.   Any other states?
12   A.   No.
13   Q.   Any other jurisdictions?
14   A.   No.
15   Q.   And why are you no longer licensed to
16   practice law in Minnesota?
17   A.   I don't practice -- I work in HR, so it's
18   irrelevant to what I do.
19   Q.   Well, did you let your license lapse?
20   A.   Yeah, yep, yep.
21   Q.   When did that happen?
22   A.   Probably beginning of this year.
23   Q.   When you were the regional director of human
24   resources at G & K, could you just give me a
25   general description of what your duties and

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 342 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

09:34-09:36                                      Page 14

 1   responsibilities were.
 2   A.   Sure.  I supported a region of G & K
 3   Services in the HR space, including
 4   everything from union negotiations to
 5   organizational development and design,
 6   employee relations, project work.
 7   Q.   Anything else?
 8   A.   Lots of things.  So, I mean, I could
 9   probably get my resume, but it's general HR
10   work, so --
11   Q.   And you were -- you were in charge of the
12   Northwest Region; is that correct?
13   A.   That's correct.
14   Q.   What does the Northwest Region consist of?
15   A.   So, it consists of locations in Minnesota,
16   North Dakota, Wisconsin, and South Dakota,
17   and then California and Arizona.
18   Q.   And how many people did you supervise when
19   you were the regional director of human
20   resources?
21   A.   It varied.  The most I supported was eight.
22   Q.   At what point did you support eight?
23   A.   When I first started in that role.
24   Q.   That would have been in about 2011?
25   A.   Correct.

09:36-09:37                                      Page 15

 1   Q.   Let me back up one second and ask you:
 2   Other than law school, have you had any
 3   other formal education since college?
 4   A.   No.
 5   Q.   So, at some point after you became the
 6   regional director of human resources for the
 7   Northwest Region at G & K, there was a
 8   restructuring of the HR department at G & K?
 9   A.   That's correct.
10   Q.   When was that?
11   A.   It was effective in, I believe, the
12   beginning of 2013.  The project work started
13   in 2012.
14   Q.   And explain to me what the restructuring
15   was.
16   A.   It was -- we had a new vice president of HR
17   who came in and decided that it would make
18   sense to evaluate our model, and so we
19   undertook a project to determine the best
20   way to support the employees and the company
21   and the leaders by potentially looking at
22   ways to change the way our HR organization
23   was structured.
24   Q.   Who was the new vice president of HR?
25   A.   Randy Ross.

09:37-09:38                                      Page 16

 1   Q.   And could you describe for me generally what
 2   the restructuring consisted of.
 3   A.   So, we undertook a project -- we met as a
 4   leadership team within the HR organization,
 5   we solicited feedback from our partners in
 6   the field and at corporate to understand the
 7   needs of the organization and the employees
 8   of the company.
 9       We looked at what other
10   organizations our size, as well as larger,
11   were doing, from an HR perspective, and how
12   their HR teams were structured, and then we
13   looked at changes within our own
14   organization based on those -- that work.
15   Q.   And how was the -- how was the HR department
16   restructured?  How did that actually come
17   about?  Or strike that.  Let me rephrase the
18   question.
19       What was the result of the
20   restructuring in the HR department?
21   A.   We went to a model that was based more on
22   centers of excellence, or COEs, so we had a
23   recruiting team and an employee services
24   team, and then HR generalists, instead of
25   having a person in each location that had to

09:38-09:39                                      Page 17

 1   be kind of a master of all trades.
 2   Q.   Prior to restructuring, did G & K have an H
 3   and R representative -- or an HR
 4   representative at each location where they
 5   do business?
 6   A.   There was an HR representative or an HR
 7   administrator at each plant location, yes.
 8   Q.   And, then, after the restructuring, there
 9   wasn't necessarily an HR representative at
10   each plant, correct?
11   A.   Correct.
12   Q.   And at that point you had a structure
13   whereby you would have an HR representative
14   that was responsible for multiple plants,
15   correct?
16       MS. PARKER: Objection to form.
17   I'm not sure what that point is.
18       MR. MILLS: After the
19   restructuring.
20       THE WITNESS: Correct.  Well, it
21   wasn't really an HR representative anymore,
22   it was a different role, but they have a
23   scope of multiple locations, yes.
24       BY MR. MILLS:
25   Q.   And what was the different role?

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

---

09:39-09:41                                      Page 18

1  A.  It was an HR generalist role.
2  Q.  So, the HR generalists would be responsible
3   for multiple locations, correct?
4  A.  Correct.
5  Q.  So, I take it that the restructuring then
6   resulted in some layoffs of employees at
7   G & K?
8  A.  I believe it may have.
9  Q.  Do you know how many?
10 A.  I don't.
11 Q.  Did anybody working with you in the HR
12  department get laid off as a result of the
13  restructuring?
14 A.  I believe there was one in the Northwest
15  Region.
16 Q.  Do you know what location that person was
17  servicing?
18 A.  Yes.
19 Q.  What was that?
20 A.  St. Cloud, Minnesota.
21 Q.  When you were serving as regional director
22  of Human Resources, did you have a
23  supervisor?
24 A.  Yes.
25 Q.  Who was that?

---

09:41-09:42                                      Page 19

1  A.  Pelham Chastang.
2  Q.  Was that during the entire period of time
3   that you were a regional director?
4  A.  When I started, I would have reported to
5   Eric McNual, who was the regional vice
6   president.
7  Q.  And how many people did you supervise in the
8   year 2013?
9  A.  Two.
10 Q.  And who were they?
11 Q.  So, at the end of 2013 or the beginning?
12 Q.  Let's -- well, let's start at the beginning
13  and then tell me -- explain to me how it
14  changed, if it changed at all.
15 A.  Sure.  So, it would have been eight at the
16  beginning, and then three following February
17  of 2013, and then two at the end of 2013.
18 Q.  And I take it that it went from eight to
19  three as a result of the restructuring?
20 A.  That is correct.
21 Q.  And the three there were Brandy Williams and Kaela
22  Ellison and Janelle Bonacua or --
23 A.  Correct.
24 Q.  And at the end of 2013, it was just Janelle
25  and Kaela, correct?

---

09:42-09:43                                      Page 20

1  A.  Correct.
2  Q.  And those three were all HR generalists?
3  A.  Correct.
4  Q.  How many plants did G & K have in the
5   Northwest Region when you were acting as
6   regional director?
7  A.  Eight.
8  Q.  Eight plants?
9  A.  Correct.
10 Q.  Did it have business locations other than
11  plants?
12 A.  Yes.
13 Q.  What were those?
14 A.  Branches.
15 Q.  What's the difference between a plant and a
16  branch?
17 A.  A plant processes the items and then
18  distributes them to the branches, and the
19  branches deliver the products to the
20  customers.
21 Q.  How many branches did G & K have in the
22  Northwest Region?
23 A.  That is a good question that I,
24  unfortunately, don't have an exact number.
25  Each plant had potentially one to four.

---

09:43-09:45                                      Page 21

1  Q.  Do you recall how many total employees G & K
2   had back in 2013?
3  A.  7,800.
4  Q.  And how many did it have in the Northwest
5   Region?
6  A.  About 1,800 to 2,000, I would estimate.
7  Q.  Did each plant have a manager?
8  A.  Yes.
9  Q.  How about the branches, did they have a
10  manager as well?
11 A.  Yes.
12 Q.  Were there regional managers in addition to
13  the plant, the branch managers?
14 A.  Regional managers or regional --
15 Q.  Regional managers?
16 A.  No, I don't believe so.
17 Q.  Who would -- and let's stick with the time
18  period after the restructuring.
19    Who would the plant managers report
20  to?  Who were their immediate supervisors?
21 A.  I believe the plant managers reported to the
22  general managers.
23 Q.  Where were the general managers located?
24 A.  In the plants.
25 Q.  Each plant had a general manager as well?

---

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 344 of 505

Rachael Siggerud Raskovich
May 11, 2016

| 09:45-09:46 | Page 22 |
|---|---|

1 A.   Correct.
2 Q.   And, then, who would the general manager
3    report to?
4 A.   To the regional vice president.
5 Q.   And where was the regional vice president
6    located?
7 A.   In St. Paul, Minnesota.
8 Q.   All the regional vice presidents were in
9    St. Paul?
10 A.   No.
11 Q.   Just for the Northwest Region?
12 A.   Correct.
13 Q.   How many regions did G & K have?
14 A.   Four or five, and Canada.
15 Q.   Did you ever work in any region of Canada
16    other than the Northwest Region?
17 A.   I did not.
18 Q.   Now, in your role as regional director, what
19    was your relationship with the general
20    managers and the managers of the plants?
21 A.   I supported them, from an HR perspective,
22    and their employees.
23 Q.   Was there ever a point during your tenure at
24    G & K in which the plant managers or general
25    managers reported directly to you?

| 09:46-09:48 | Page 23 |
|---|---|

1 A.   No.
2 Q.   When was the position of HR generalist
3    introduced at G & K?
4 A.   February of 2013.
5 Q.   What were the job duties of an HR generalist
6    when the job was introduced in February
7    2013?
8 A.   It was a higher level HR role than G & K had
9    had in the past, so strategically partnering
10    with the locations that the person was
11    assigned to for purposes of working on
12    things like special projects, organizational
13    development and design, partnering with the
14    other COEs, talent development, talent
15    acquisition, staffing, being a part -- the
16    strategic picture for their locations from
17    an HR perspective.
18 Q.   When the -- when the position of
19    HR generalist was introduced in February
20    2013, was there a written job description
21    for that position?
22 A.   I believe so, but I don't recall.
23 Q.   Did you play any role in preparing a written
24    job description for HR generalist?
25 A.   I don't remember.  I was part of the project

| 09:48-09:49 | Page 24 |
|---|---|

1    team, however, and I'm certain I may have
2    provided input as to what the job duties
3    should be.
4 Q.   Did you or G & K ever provide any written
5    materials to the HR generalists --
6       MS. PARKER:  Objection:  Form;
7    compound.
8       MR. MILLS:  I wasn't finished but
9    I'll rephrase the question.
10       BY MR. MILLS:
11 Q.   Did you ever provide any written materials
12    to the HR generalists as to what their job
13    duties were?
14 A.   I don't recall specifically.  Honestly, I
15    don't.
16 Q.   Do you know whether anybody else at G & K
17    ever provided any written materials to the
18    HR generalists as to what their job duties
19    were?
20 A.   It's very possible.
21 Q.   Do you recall seeing any such written
22    materials?
23 A.   Offhand, no, but it's been three years, so
24    it's very possible.
25 Q.   Do you recall, after February 2013, there

| 09:49-09:50 | Page 25 |
|---|---|

1    being some confusion among the
2    HR generalists as to what their duties were?
3 A.   Yes.
4 Q.   What do you recall about that?
5 A.   I recall that it was a new role for G & K
6    and, as we were trying to learn how to
7    support the business and approach it in a
8    different way, there were questions from
9    both business and from the HR team as to how
10    we approached our roles differently.
11 Q.   Do you recall there being concerns expressed
12    to you that the plant managers or the branch
13    managers didn't understand the role of
14    HR generalist?
15 A.   Yes.
16 Q.   And who expressed those concerns to you?
17 A.   Multiple leaders that had questions.
18 Q.   Were those things that were expressed to you
19    by the plant managers themselves?
20 A.   The plant managers?
21 Q.   Um-hmm.
22 A.   Not necessarily the plant managers, no.
23 Q.   How about the branch managers?
24 A.   Branch managers, I don't recall.
25 Q.   So, it was the HR generalists, themselves,

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 345 of 505
Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

09:50-09:51                                        Page 26

1   who were telling you that they were
2   concerned that the managers didn't
3   understand their role?
4       MS. PARKER: Objection to form.
5       THE WITNESS: The HR generalists
6   did --
7       BY MR. MILLS:
8   Q.  Let me rephrase the question.  That was a
9   bad question.
10      It was the HR generalists
11  themselves who were expressing to you
12  concern that the managers didn't understand
13  the role of the HR generalist?
14  A.  Yes, they expressed those concerns.
15  Q.  And all three of them expressed those
16  concerns to you?
17  A.  I don't recall if all three did.
18  Q.  Do you recall Kaela expressing those
19  concerns to you?
20  A.  I believe Kaela did.
21  Q.  And Brandy?
22  A.  Yes.
23  Q.  Did you at any time ever meet with the --
24  any of the plants or branch managers and
25  explain to them what the role of the HR

09:51-09:53                                        Page 27

1   generalist was?
2   A.  I don't recall specifically, but there would
3   have been roll-up calls as a part of the HR
4   reliant process.
5   Q.  What kind of calls?
6   A.  Like a roll-up call or introduction call.
7   Q.  And what did those consist of?
8   A.  Talking about how our HR organization was
9   changing, and specific roles, and how they
10  would access different roles in the future.
11  Q.  Do you recall any of those conversations
12  specifically?
13  A.  I don't.
14  Q.  Do you know whether anybody else at G & K
15  ever had any communication with the managers
16  regarding the role or the functions of the
17  HR generalists?
18  A.  I can't speak for anybody else, no, I don't
19  know.
20  Q.  Prior to 2013, did you work with Brandy
21  Williams?
22  A.  Yes.
23  Q.  And what was your relationship with Brandy
24  Williams within G & K prior to -- prior to
25  2013?

09:53-09:54                                        Page 28

1   A.  She was my direct report.
2   Q.  Your --
3   A.  Direct report.
4   Q.  Okay.  Meaning she directly reported to you?
5   A.  Correct.
6   Q.  And do you recall what her job title was
7   prior to February 2013?
8   A.  HR representative.
9   Q.  How does an HR representative differ from an
10  HR generalist?
11  A.  Actually, she may have reported to the
12  general manager.  There was a point where
13  the HR representatives reported to the
14  general managers, and then there was a point
15  where they reported to the HR directors, so
16  I'm not exactly recalling when that
17  transition happened, so --
18  Q.  So, it's possible that you may not have --
19  or strike that.
20      It's possible that you may have
21  become Brandy's direct supervisor only after
22  she became an HR generalist?
23  A.  No.
24  Q.  At what -- explain to me, then, during what
25  periods you would have been her direct

09:54-09:55                                        Page 29

1   supervisor.
2   A.  I just can't say for -- so, when I started
3   as an HR representative, I reported to the
4   general manager.  I just don't remember if
5   Brandy reported to the general manager
6   because she wasn't in -- I wasn't in the
7   role when she was hired.
8   Q.  In other words, at some point you held,
9   basically, the same position that Brandy did
10  as an HR representative?
11  A.  Correct.
12  Q.  And during that period of time when you held
13  that position, you were reporting to a
14  general manager?
15  A.  Correct.
16  Q.  And that would have been a general manager
17  at the plant or branch, right?
18  A.  Correct.
19  Q.  You weren't directly reporting to someone
20  within the HR department, right?
21  A.  Correct.
22  Q.  And, then, at some point that changed?
23  A.  Yes.
24  Q.  And then the HR generalists were reporting
25  to someone within the HR department?

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

---

09:55-09:56                                                    Page 30

1  A.  Yes.
2  Q.  Okay.  Got it.
3      Did you ever hear any complaints or
4  concerns expressed by the general managers
5  that they were no longer having direct
6  supervision over HR representatives?
7  A.  I don't recall specifically.
8  Q.  Do you recall generally any concerns about
9  that?
10     MS. PARKER: Objection to form.
11     THE WITNESS: I don't recall
12  specifically.  It's possible, but I don't
13  recall any.
14     BY MR. MILLS:
15  Q.  Do you recall what the rationale was for
16  taking direct supervision of the HR
17  representatives away from the general
18  managers?
19     MS. PARKER: Objection:  Form and
20  foundation.
21     THE WITNESS: It's a more typical
22  HR structure in the organizations that we
23  studied where the HR reporting lines roll
24  through an HR function.
25     BY MR. MILLS:

---

09:57                                                          Page 31

1  Q.  Did you supervise Brandy Williams in any of
2  her roles other than HR generalist or HR
3  representative?
4  A.  No.
5  Q.  And, again, you're not sure whether you even
6  supervised her as an HR representative,
7  correct?
8  A.  I believe I did.  I just don't recall when
9  the official transition would have happened,
10  but there would have always been a matrix
11  relationship.
12  Q.  Would that transition have been part of the
13  restructuring or was that something
14  different?
15  A.  I don't believe so.  I think it was before
16  that.
17  Q.  You think it was before that?
18  A.  I believe so.
19  Q.  Do you recall how long before that?
20  A.  I don't.
21     MS. PARKER: Objection:  Asked and
22  answered.
23     THE WITNESS: I don't,
24  unfortunately.
25     BY MR. MILLS:

---

09:58-09:59                                                    Page 32

1  Q.  During the time that you were Brandy
2  Williams' supervisor in any capacity, Brandy
3  was located in Phoenix, right?
4  A.  Correct.
5  Q.  She worked out of G & K's Phoenix facility?
6  A.  Correct.
7  Q.  Was that a plant or a branch that she worked
8  out of?
9  A.  It was a plant.
10  Q.  And Brandy became an HR generalist at G & K,
11  correct?
12  A.  Yes.
13  Q.  And she supported -- strike that.
14     Brandy supported facilities in
15  addition to Phoenix, right?
16     MS. PARKER: Objection:  Form.
17     THE WITNESS: Correct.
18     BY MR. MILLS:
19  Q.  And she did that in her capacity as an HR
20  generalist, right?
21  A.  Yes.
22  Q.  And she supported G & K locations in Tucson
23  as well?
24  A.  Yes.
25  Q.  And Prescott Valley?

---

09:59                                                          Page 33

1  A.  Yes.
2  Q.  And Yuma?
3  A.  Yes.
4  Q.  And San Diego?
5  A.  Yes.
6  Q.  And Los Angeles?
7  A.  Correct, yes.
8  Q.  And Ontario, California?
9  A.  Yes.
10  Q.  And Sun Valley, California?
11  A.  Yes.
12  Q.  Okay.  And this was all during the time that
13  you were her supervisor, correct?
14  A.  So, the California locations were only in
15  her role as an HR generalist.
16  Q.  Okay.  But during the time she was an HR
17  generalist -- strike that.
18     During the time that you were
19  supervising her as an HR generalist, she was
20  covering all those locations?
21  A.  Yes.
22  Q.  And during that time that you were Brandy's
23  supervisor, you were located in Minnesota?
24  A.  Yes.
25  Q.  Did you ever visit the Phoenix location of

---

1  G & K?
2  A.  I did.
3  Q.  How frequently would you get out there?
4  A.  Several times a year.
5  Q.  How many, on average?
6  A.  It really depended on the year, three, four,
7  five.
8  Q.  Is it fair to say that, during the time that
9  you were supervising Brandy Williams as an
10  HR generalist, that you were supervising her
11  remotely?
12  A.  Yes.
13  Q.  In other words, you weren't physically
14  onsite observing her job performance on a
15  day-to-day basis, correct?
16  A.  Correct.
17  Q.  So, Brandy didn't -- during the time that --
18  strike that.
19    During the time that Brandy was an
20  HR generalist, she did not have a direct
21  supervisor onsite in Phoenix, correct?
22  A.  Correct.
23  Q.  Or at any of the other locations that she
24  was supporting as an HR generalist, correct?
25  A.  Correct.

1  Q.  Do you know how many HR generalists are
2  supporting the Northwest Region now?
3  A.  Yes.
4  Q.  How many?
5  A.  One.
6  Q.  Who is that?
7  A.  I don't know his name, unfortunately.
8  Q.  But it's not any of the -- it's not any of
9  the three that you were supervising while
10  you were at G & K?
11  A.  Correct.
12  Q.  G & K does performance reviews of its
13  employees?
14  A.  Yes.
15  Q.  Who did Brandy Williams' performance review
16  while she was HR generalist?
17  A.  I did the 2013 performance review.
18  Q.  Do you know whether anybody else at G & K
19  did a performance review of Brandy's work as
20  an HR generalist?
21  A.  I don't know.  It's possible there was
22  others.
23  Q.  Do you have any idea who else would have --
24  might have done that?
25  A.  The general manager may have.

1  Q.  But, again, the general manager, at that
2  point in time when she was an HR generalist,
3  was not her supervisor, right?
4  A.  Correct.
5  Q.  Prior to the time that Brandy became an HR
6  generalist, who did her performance reviews?
7    MS. PARKER: Objection:
8  Foundation.
9    THE WITNESS: It would have
10  typically been the general manager, if she
11  was reporting to the general manager.
12    BY MR. MILLS:
13  Q.  Did you -- let me ask you this:  Did you
14  ever do a performance review of Brandy in
15  any capacity other than as an HR generalist?
16  A.  No.
17  Q.  Do you recall seeing any written performance
18  reviews that were done by any of the
19  managers or general managers in Phoenix
20  regarding Brandy Williams?
21  A.  I don't.
22  Q.  And I'm referring to, like, at any period of
23  time, do you recall seeing any of them?
24  A.  I just don't recall.
25  Q.  When -- prior to the time that Brandy would

1  become an HR generalist, where were her
2  performance reviews have gone within G & K?
3    MS. PARKER: Objection:
4  Foundation.
5    THE WITNESS: I'm not sure I
6  understand that question.
7    BY MR. MILLS:
8  Q.  That's a bad question.  Let me ask it
9  differently.
10    Who was -- who was evaluating her
11  performance reviews at G & K, just in
12  general?
13    MS. PARKER: Objection:  Form and
14  foundation.
15    THE WITNESS: I'm also not sure I
16  understand the question, I'm sorry.
17    BY MR. MILLS:
18  Q.  Who evaluated the performance reviews of the
19  HR representatives?
20    MS. PARKER: Objection:
21  Foundation.
22    BY MR. MILLS:
23  Q.  If you know.
24  A.  I don't -- I'm sorry, I don't know that I'm
25  understanding your question.

1  Q.  Let's say that, during the period of time
2  that Brandy was an HR representative and she
3  was got a written review from a general
4  manager --
5  A.  Okay.
6  Q.  -- what happened with that general review?
7      MS. PARKER: Objection:
8  Foundation.
9      THE WITNESS: What happened to it
10 physically?
11     BY MR. MILLS:
12 Q.  Do you know where it went?  Do you know who
13 evaluated it?  Do you know where it went?
14 Do you know what G & K did with it?
15     MS. PARKER: Objection:  Compound.
16     THE WITNESS: They are housed in
17 the system.  I don't know.  I'm sorry.
18 Maybe I don't understand the question.
19     BY MR. MILLS:
20 Q.  If a general manager did a review of Brandy
21 Williams while she was -- or let me rephrase
22 that.
23     If a manager or a general manager
24 had done a review of Brandy Williams while
25 she was an HR representative, would that

1  the HR generalists the only people that you
2  were supervising?
3  A.  Yes.
4  Q.  Were they the only people that you reviewed?
5  A.  Yes.
6  Q.  Did you ask for reviews of the
7  HR generalists from anybody else at G & K?
8  A.  So, review -- help me understand what you
9  mean by "review."
10 Q.  Did you ask anybody else at G & K to do
11 performance reviews of anybody that was an
12 HR generalist in the Northwest Region?
13 A.  Performance reviews, no.
14 Q.  Any other types of reviews?
15 A.  Not that I recall, no.
16     MS. PARKER: Just give me a second.
17 I'm going to grab a water.
18     MR. MILLS: Sure.  No problem.
19     That's 1.
20     (Exhibit 1 was marked.)
21     BY MR. MILLS:
22 Q.  Okay.  I'm going to hand you a document that
23 we've marked as Exhibit 1 and I'll just ask
24 you to take a look at that.
25     My first question is going to be:

1  review have been sent to someone in the HR
2  department?
3      MS. PARKER: Objection:  Compound;
4  form; calls for speculation.
5      THE WITNESS: I don't know.
6      BY MR. MILLS:
7  Q.  After the restructuring in February 2013
8  going forward, Kaela Ellison was working in
9  Minnesota, right?
10 A.  Correct.
11 Q.  Did you -- did you see her every day?
12 A.  No.
13 Q.  Where was her office located in comparison
14 to yours?
15 A.  In St. Paul, in an attached building.
16 Q.  But you would have seen her more frequently
17 than you saw Janelle or Brandy?
18 A.  Sure.
19 Q.  Do you recall how much more frequently you
20 would have seen her?
21 A.  It depended on my travel schedule and her
22 travel schedule and -- I mean, I really
23 can't recall specifically.
24 Q.  During that period of time after February
25 2013 up until the time you left G & K, were

1  Have you seen that before?
2  A.  I haven't.
3  Q.  Pardon me?
4  A.  I have not.
5  Q.  You haven't seen that document before?
6  A.  No.  I don't -- it's, like, lots of pages,
7  though, so I could review it if you want.
8  Q.  Take a look at the first four pages of the
9  document.  You don't have to -- I mean, you
10 don't have to go on, but just tell me if
11 you're familiar with those.
12     MS. PARKER: Objection:  She
13 indicated she has not seen this before.
14     THE WITNESS: I don't recall seeing
15 it specifically, I'm sorry.
16     BY MR. MILLS:
17 Q.  I'll represent to you that this is a
18 document that we received as G & K's
19 position statement in response to a charge
20 of discrimination that was made by Brandy
21 Williams.
22 A.  Okay.
23 Q.  And it's dated April 1, 2014, you see at the
24 top of the first page.
25 A.  Are you asking?

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

| 10:10-10:11 Page 42 |
|---|

1  Q.  Yes.  Do you see --
2  A.  Yes, I do.
3  Q.  I'm just looking back through my notes.
4     Were you -- were you gone from
5  G & K by April 1, 2014?
6  A.  Yes.
7  Q.  By how -- by how many months?
8  A.  Six.
9  Q.  Did anybody at -- did anybody at G & K
10  contact you and explain to you that they
11  were responding to a discrimination charge
12  that was filed by Brandy Williams and ask
13  you for information?
14     MS. PARKER: Objection to the
15  extent that this calls for information
16  seeking -- seeking information regarding
17  attorney/client privileged conversations.
18     THE WITNESS: I recall having a
19  conversation.  I don't recall specifically
20  why.
21     BY MR. MILLS:
22  Q.  Do you recall when that conversation
23  occurred?
24  A.  I don't.
25  Q.  Was it after you had left G & K?

| 10:11-10:12 Page 43 |
|---|

1  A.  Oh, yes.
2  Q.  And who was the conversation with?
3  A.  It was with Marie Smith.
4  Q.  Who is Marie Smith?
5  A.  She was an employee relations manager.
6  Q.  And how long -- do you recall how long that
7  conversations lasted?
8  A.  I don't.
9  Q.  What can you tell me as best as you can
10  specifically about the conversation?
11     MS. PARKER: I'll object here to
12  the extent that this calls for information
13  that's protected by the attorney/client
14  privilege or the work product privilege and
15  I'll instruct you not to answer with respect
16  to the specifics of the conversation.
17     THE WITNESS: Could you repeat the
18  question?
19     MS. PARKER: Well, I'm instructing
20  you not to answer.
21     THE WITNESS: Oh, okay.
22     BY MR. MILLS:
23  Q.  Are you going to follow your counsel's
24  instructions?
25  A.  Yes.

| 10:12-10:13 Page 44 |
|---|

1     MR. MILLS: Okay.  Let's mark the
2  question.
3     BY MR. MILLS:
4  Q.  Well, then, let me back up for a second and
5  ask you this:  Did you -- did you draft any
6  portion of this document, Exhibit 1?
7  A.  I don't know.  There's like 50 pages here.
8  Q.  Let me ask you this:  Did you draft any
9  portion of the first four pages of
10  Exhibit 1?
11     MS. PARKER: And, again, I'll
12  object to the extent that this inquires as
13  to attorney/client privileged
14  communications.
15     THE WITNESS: I don't know, not
16  that I remember.
17     BY MR. MILLS:
18  Q.  Is it possible you could have drafted any
19  portion of them?
20     MS. PARKER: Objection:  Calls for
21  speculation.
22     THE WITNESS: I didn't sign it, so
23  no, and I didn't work there when it was
24  dated.
25     BY MR. MILLS:

| 10:13-10:14 Page 45 |
|---|

1  Q.  Who is Ruth Timm?
2  A.  Ruth Timm is senior corporate counsel per
3  her signature line.
4  Q.  Did Ruth Timm supervise Brandy Williams?
5  A.  No.
6  Q.  Did Ruth Timm work with Brandy Williams, to
7  your knowledge?
8  A.  I don't know.
9  Q.  Do you know whether Ruth Timm ever even met
10  Brandy Williams, to your knowledge?
11  A.  I don't know.  I don't know.
12  Q.  Did Marie Smith supervise Brandy Williams?
13  A.  No.
14  Q.  Do you know whether Marie Smith worked with
15  Brandy Williams?
16  A.  I don't know.
17  Q.  Where is Marie Smith located?
18  A.  I -- not in Minnesota.
19  Q.  So, if G & K were looking for information
20  about Brandy Williams and her Complaint,
21  Ruth Timm would probably not be the first
22  choice of someone to go to for that
23  information, right?
24     MS. PARKER: Objection:  Form, and
25  calls for speculation.

| 10:14-10:16 | Page 46 |
| --- | --- |

1    THE WITNESS: I don't know.  I
2  can't --
3    BY MR. MILLS:
4  Q.  You, as Brandy Williams' supervisor,
5  would -- you would expect to know a lot more
6  about that than Ruth Timm, right?
7    MS. PARKER: Object to form.
8    THE WITNESS: I think it depends on
9  what they were looking for.
10    BY MR. MILLS:
11  Q.  Do you recall anybody ever asking you to
12  review the first four pages of Exhibit 1?
13    MS. PARKER: I'm going to object
14  again that this calls for attorney/client
15  privileged communications.
16    THE WITNESS: No.
17    BY MR. MILLS:
18  Q.  If you turn to the second page of the
19  document, right in the middle of the page
20  there's a statement that's underlined, it
21  says Charge, and it says:  On May 10, 2013,
22  a performance issue was brought to
23  Ms. Williams' attention stating that she was
24  missing too much work.
25    Do you see that?

| 10:16 | Page 47 |
| --- | --- |

1  A.  Yes.
2  Q.  And then the response says, "In June 2013,
3  Rachael Siggerud, Regional HR Director, did
4  speak with Ms. Williams regarding her
5  performance, including providing feedback
6  from the managers that Ms. Williams
7  supported."
8    Did I read that correctly?
9  A.  Yes.
10  Q.  Do you know where G & K got that information
11  from?
12    MS. PARKER: I'm going to object
13  again to the extent that this calls for any
14  exposure regarding attorney/client
15  privileged communication, and I also object
16  because it calls for speculation.
17    BY MR. MILLS:
18  Q.  All of my questions are based on what you
19  know.  I'm not asking you to speculate.
20    THE WITNESS: Should I answer?
21    MS. PARKER: You can answer to the
22  extent that it doesn't go into
23  attorney/client privileged communications,
24  to the extent that you know.
25    BY MR. MILLS:

| 10:16-10:18 | Page 48 |
| --- | --- |

1  Q.  And this is a document that was filed with
2  the EEOC, so --
3  A.  I don't know.
4  Q.  Do you recall speaking with Ms. Ruth Timm or
5  Marie Smith about a conversation that you
6  had with Brandy Williams regarding feedback
7  from managers?
8    MS. PARKER: And I'm going to
9  object that, again, this is perilously close
10  to asking for the content of attorney/client
11  privileged communications.
12    So, I'm instructing you not to
13  answer with respect to the content -- and
14  I'm about to instruct her to just not answer
15  these questions with respect to granular
16  pieces of information that she may or may
17  not have had attorney/client privileged
18  discussions regarding.
19    MR. MILLS: Well, I'm just trying
20  to find out where the information came from
21  that's in this document.  It's something
22  that was filed with the EEOC.  Certainly
23  G & K would have had some basis for saying
24  the things that are in here.
25    MS. PARKER: This is all attorney

| 10:18 | Page 49 |
| --- | --- |

1  work product and --
2    MR. MILLS: How can you say it's
3  work product?  It went to the EEOC.  We got
4  it from the EEOC.
5    MS. PARKER: The underlying -- the
6  underlying investigation is work product and
7  privileged.
8    MR. MILLS: Okay.
9    MS. PARKER: So, you can ask her
10  what she knows, but I don't think it's
11  proper to ask her precisely what discussions
12  she had with counsel or those working under
13  the direction of counsel in connection with
14  the preparation of this statement.
15    BY MR. MILLS:
16  Q.  Well, let me ask you -- let me ask you this
17  question:  Do you recall having any
18  conversations with anyone at G & K regarding
19  the preparation of Exhibit 1?
20    MS. PARKER: And, again, I'll
21  object to the extent that this calls for
22  inquiry into the attorney/client privileged
23  communications.  You can respond just with
24  respect to whether there were conversations
25  about this charge generally.

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 351 of 505
Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

10:19-10:20                              Page 50

1    THE WITNESS: I don't recall that
2  they were specifically noted as being a part
3  of the charge.
4    BY MR. MILLS:
5  Q.  How many conversations -- and what's --
6  what's the "they" that you were referring
7  to?
8  A.  I -- I don't know.  Am I supposed to --
9    MS. PARKER: You can respond as to
10 who you may have had a conversation with and
11 the number of conversations, just not the
12 content.
13   THE WITNESS: Okay.  So, I spoke
14 with Marie Smith one time, I believe, but I
15 don't remember 100 percent because it's been
16 three years, so I do remember speaking with
17 Marie Smith.
18   BY MR. MILLS:
19 Q.  Do you remember speaking with anybody else?
20 A.  I honestly don't, I'm sorry.
21 Q.  Did you -- do you remember, from the time
22 that you left G & K, do you remember talking
23 to anybody else at G & K regarding Brandy
24 Williams, other than Marie Smith, and other
25 than conversations that you had with

10:20-10:37                              Page 51

1  counsel?
2  A.  Not really, no.
3  Q.  Have you had any contact with Brandy
4  Williams since you left G & K?
5  A.  I don't think so, no.
6  Q.  And by "contact," I mean any communications,
7  emails, phone calls, anything.
8  A.  Not that I -- I don't believe so.  I think
9  we were connected on Linked In but --
10   MR. MILLS: We need to change the
11 tape.
12   THE VIDEOGRAPHER: We are off the
13 video record.  The time on the video monitor
14 is 10:20 a.m.
15   (A recess was taken.)
16   THE VIDEOGRAPHER: We are back on
17 the video record.  The time on the video
18 monitor is 10:37 a.m.
19   BY MR. MILLS:
20 Q.  Okay.  We're looking at Exhibit 1.  Would
21 you take a look at the second page of that,
22 that's where we were looking at before, same
23 paragraph that we were talking about just
24 before the break.
25   The second sentence reads, quote,

10:37-10:39                              Page 52

1  "A portion of that feedback was that the
2  managers were concerned that they could not
3  contact Ms. Williams and, because of this,
4  the managers perceived her as being
5  ineffective," end quote.
6    Did I read that correctly?  Did I
7  read that correctly?
8  A.  Oh, I'm sorry, I couldn't hear you.  Yes.
9  Q.  Do you have any idea what managers this is
10 referring to?
11 A.  I believe it was the managers in the Phoenix
12 location.
13 Q.  Who were they?
14 A.  There were a variety, and I can't recall all
15 of their names -- or many of their names.
16 Q.  Do you recall someone named Jacob Briscoe?
17 A.  Yes.
18 Q.  Do you remember any other managers?
19 A.  I don't, unfortunately, remember their
20 names.
21 Q.  And do you specifically recall any managers
22 expressing concern that they couldn't get
23 ahold of Brandy?
24 A.  Yes.
25 Q.  And, again, those were the managers at

10:39-10:40                              Page 53

1  Phoenix?
2  A.  Yes.
3  Q.  Did you document any of the concerns that
4  they expressed?
5  A.  I don't recall.  I may have taken notes but
6  I don't have them.
7  Q.  Is that something you would typically do, if
8  a manager expressed a complaint or a concern
9  to you, would you document that somehow?
10   MS. PARKER: Objection:  Form.
11   THE WITNESS: Typically, it's
12 possible.
13   BY MR. MILLS:
14 Q.  So, typically you would, or typically you
15 wouldn't?
16   MS. PARKER: Objection:  Form.
17   THE WITNESS: Typically -- I guess
18 I can't say typically.  I may have.  I may
19 have.
20   BY MR. MILLS:
21 Q.  And do you recall the concerns being that --
22 or strike that.
23   Do you recall that the managers at
24 Phoenix were saying that Brandy was coming
25 in late and leaving early?

| 10:40-10:41 | Page 54 |
| --- | --- |

1      MS. PARKER: Objection to form;
2  characterization.
3      THE WITNESS: I don't recall
4  specifically what the concerns were,
5  unfortunately, at this point.
6      BY MR. MILLS:
7  Q.   What -- let me just ask you:  What do you
8  recall, as best as you can, about the
9  concerns that were being expressed?
10     MS. PARKER: Objection to form.
11     THE WITNESS: I recall that
12  managers were expressing concerns that they
13  could not -- so Brandy wasn't in her office
14  or, if they called, she wasn't answering,
15  and that she wasn't responsive on email,
16  things like that, so that's -- that's what I
17  remember.
18     BY MR. MILLS:
19  Q.   Was the concern around her missing too much
20  work?
21     MS. PARKER: Objection:  Form.
22     THE WITNESS: No.  No.
23     BY MR. MILLS:
24  Q.   And did you receive any expressions of
25  concern by any manager or any general

| 10:41-10:43 | Page 55 |
| --- | --- |

1  manager from any of the other locations that
2  Brandy was supporting?
3      MS. PARKER: Objection to form.
4      THE WITNESS: I don't recall at
5  this time.
6      BY MR. MILLS:
7  Q.   Is that something you would have documented?
8      MS. PARKER: Objection to form.
9      THE WITNESS: It may have been.
10     BY MR. MILLS:
11  Q.   Do you recall any specific conversations
12  that you had with Jacob Briscoe regarding
13  Brandy Williams' performance?
14  A.   Specific conversations, no.  I remember
15  having conversations.
16  Q.   What do you recall about the conversations
17  that you had?
18  A.   I recall that Jake had concerns about the
19  role that Brandy was playing in the
20  business, so how she supported the business,
21  what her new generalist role was, that there
22  were times when she was late to meetings, I
23  do recall that, that he felt that the way
24  she approached managers and ride-alongs
25  sometimes was more to find fault and point

| 10:43-10:44 | Page 56 |
| --- | --- |

1  out things that they were doing wrong
2  instead of partnering.
3  Q.   What was -- what was Jacob Briscoe's title?
4  A.   General manager.
5  Q.   That was during the time that Brandy was an
6  HR generalist?
7  A.   Yes.
8  Q.   And before Brandy became an HR generalist,
9  Jacob Briscoe was her direct supervisor,
10  right?
11  A.   At some point, I believe so.
12  Q.   And did Jacob Briscoe prepare performance
13  reviews of Brandy --
14     MS. PARKER: Objection:
15  Foundation.
16     BY MR. MILLS:
17  Q.   -- prior to the time that she became the
18  HR generalist?
19  A.   I don't have any way of knowing.
20  Q.   Do you recall ever having seen those?
21  A.   I don't.
22  Q.   Other than -- and I'm -- I want you to give
23  me your best recollection.
24     Other than Jacob Briscoe, do you
25  recall the names of any other managers or

| 10:44-10:46 | Page 57 |
| --- | --- |

1  general managers within G & K who expressed
2  concern to you about Brandy Williams being
3  inaccessible?
4      MS. PARKER: Objection to form;
5  compound.
6      THE WITNESS: I'm sorry, I can't
7  remember names.  I know there were other
8  managers in Phoenix at the time.  I just
9  don't remember their names.
10     BY MR. MILLS:
11  Q.   Let me ask you this: Do you recall
12  receiving any such expressions of concern
13  from any managers outside of Phoenix?
14     MS. PARKER: Objection to form.
15     THE WITNESS: It's very possible.
16     BY MR. MILLS:
17  Q.   You don't recall anything specifically?
18     MS. PARKER: Objection to form.
19     THE WITNESS: I don't recall a
20  specific person, if that's what you're
21  asking.
22     BY MR. MILLS:
23  Q.   So, you can't give me -- you can't -- strike
24  that.
25     You can't recall the name of any

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

---

10:46-10:47                                              Page 58

1   manager outside of Phoenix who expressed
2   concern regarding Brandy being inaccessible?
3       MS. PARKER: Objection to form.
4       THE WITNESS: I'm sorry, it's been
5   three years and I just don't remember.  I
6   don't remember names.
7       BY MR. MILLS:
8   Q.  And you don't remember whether there
9   actually were any outside of Phoenix who
10  expressed concerns about Brandy being
11  inaccessible, right?
12  A.  I don't recall.
13  Q.  If you turn to the third page of the
14  document, Exhibit 1, there is -- about the
15  middle of the page, there is a paragraph
16  that begins Response, underlined.
17      And the second sentence of that
18  Response includes the statement that, quote,
19  "In August 2013, it was determined that the
20  Northwest Region was overstaffed by one
21  HR Generalist."
22      Did I read that correctly?
23  A.  Yes.
24  Q.  Do you recall -- or do you recall there
25  being a determination that the Northwest

---

10:47-10:49                                              Page 59

1   Region was overstaffed?
2   A.  Yes, but prior to August.
3   Q.  When do you recall that determination?
4   A.  In June.
5   Q.  In June?
6   A.  Um-hmm, yes.
7   Q.  So, in June 2013, G & K decided that they
8   were overstaffed with HR generalists in the
9   Northwest Region, correct?
10  A.  Yes.
11  Q.  And was it also in June of 2013 that G & K
12  decided to eliminate a position?
13      MS. PARKER: Objection to form.
14      THE WITNESS: Yes.
15      BY MR. MILLS:
16  Q.  And let me ask you first:  Who was involved
17  in the determination that G & K was
18  overstaffed with HR generalists in the
19  Northwest Region?
20  A.  Myself and Pelham Chastang and Eric McNaul,
21  to the best of my knowledge.
22  Q.  And what brought about that determination?
23  A.  It was feedback from the generalists
24  themselves, feedback from the business,
25  feedback from -- as we went through the

---

10:49-10:50                                              Page 60

1   budgeting process, looking at our overall
2   expenses as well, but a significant amount
3   came from the generalists.
4   Q.  What feedback from the generalists did you
5   receive that led to the determination that
6   you were overstaffed with generalists?
7   A.  That, following the HR reliant, they didn't
8   have enough work to do.
9   Q.  Who told you that?
10  A.  I actually heard that from all three.
11  Q.  And did you hear from anyone other than the
12  generalists themselves that the generalists
13  didn't have enough work to do?
14  A.  Not specifically that they didn't have
15  enough work to do.
16  Q.  What were you hearing?
17      MS. PARKER: Objection to form.
18      THE WITNESS: I think ongoing
19  questions about the clarity about the role
20  would be the best way to categorize it.
21      BY MR. MILLS:
22  Q.  Were you hearing that with respect to all
23  three of the HR generalists that you were
24  supervising?
25  A.  Yes.

---

10:50-10:51                                              Page 61

1       MS. PARKER: Objection to form.
2       BY MR. MILLS:
3   Q.  And when you say "ongoing questions about
4   the clarity of the role," does that mean
5   that the managers were expressing to you
6   that they didn't really understand what the
7   role was?
8       MS. PARKER: Objection to form.
9       THE WITNESS: More that there were
10  things that the HR representatives did that
11  the HR generalists didn't do, and that there
12  was a small amount of -- there was a small
13  amount of what they used to do that they
14  weren't supposed to do now versus all of the
15  other buckets of work that they weren't
16  doing anymore.
17      BY MR. MILLS:
18  Q.  Can you give me some examples of things that
19  they were saying that the HR representatives
20  used to do that the generalists were not
21  doing?
22  A.  Sure.  So, in one of our locations, the
23  HR generalist managed the shoe program and
24  the cell phone program.  All of the
25  HR generalists managed onboarding -- all of

---

---

10:51-10:52                                    Page 62

1  the HR representatives, I should say.
2      All of the HR representatives used
3  to perform all of the payroll processing,
4  they used to all the benefits enrollment,
5  annual enrollment process, all of the
6  onboarding for new employees, all of the
7  recruiting for new employees for their
8  assigned locations, any type of employee
9  relations, any type of labor, responses that
10 were needed, depending on the location,
11 pretty much everything, and then managing
12 programs and processes and conducting
13 training.
14 Q.  And these are things that the generalists
15 were not doing?
16 A.  Correct.
17 Q.  Did Jacob Briscoe ever express to you
18 concern or displeasure that Brandy was not
19 doing the things that she used to do as an
20 HR representative?
21     MS. PARKER: Objection to form.
22     THE WITNESS: I don't recall if it
23 was specifically that Brandy wasn't. I
24 recall that there was some of the work that
25 was distributed back to the location

---

10:52-10:53                                    Page 63

1  managers and that wasn't necessarily
2  favored.
3      BY MR. MILLS:
4  Q.  Do you recall that Jacob Briscoe was not
5  happy about having his responsibilities put
6  back on the managers?
7      MS. PARKER: Objection to form.
8      THE WITNESS: I think that's a fair
9  statement.
10     BY MR. MILLS:
11 Q.  And do you think that that -- that could
12 explain Mr. Briscoe's concern regarding
13 Brandy's accessibility?
14     MS. PARKER: Objection:  Calls for
15 speculation.
16     THE WITNESS: He never said
17 anything like that.  It was more just the
18 question of, you know, why -- why are we
19 doing this now instead of someone else?
20     BY MR. MILLS:
21 Q.  Did he ever express to you that he didn't
22 see the need for an HR generalist if they
23 were no longer performing the functions that
24 the representatives did?
25 A.  Not that I recall, no.

---

10:53-10:54                                    Page 64

1  Q.  Did he ever express to you that he didn't
2  think that the HR generalists were adding
3  any value to the company?
4  A.  Generally speaking, no.  No.
5  Q.  But, again, he did express to you that he
6  was not happy that certain of the functions
7  that Brandy had been performing as a
8  representative were now put back on him as a
9  manager?
10     MS. PARKER: Objection to form and
11 characterization of prior testimony.
12     THE WITNESS: So, again, it was a
13 very small portion of what the generalists
14 did that went back to the business, but that
15 was a question, certainly.
16     BY MR. MILLS:
17 Q.  Did he ever say anything to you like, well,
18 you know, if she's no longer going to be
19 doing these things, then what does she do?
20     MS. PARKER: Objection to form.
21     THE WITNESS: Not that I recall,
22 no.
23     BY MR. MILLS:
24 Q.  How frequently did you talk to Jacob
25 Briscoe?

---

10:54-10:56                                    Page 65

1  A.  As I sit here today, I recall maybe a couple
2  times a month, a few times.
3  Q.  And those were typically on the phone?
4  A.  Typically.
5  Q.  Would that be about the same with respect to
6  the managers at the other plants or
7  branches?
8  A.  To the best of my recollection, that's
9  probably about right, perhaps a little more
10 in the St. Paul business.
11 Q.  Was there anybody else -- I know we asked --
12 I apologize if I asked you previously.
13     Was there anybody else at G & K,
14 other than the generalists themselves, who
15 expressed to you as part of this process
16 that they didn't think the generalists had
17 enough work to do?
18 A.  I don't remember.
19 Q.  Do you recall what Mr. Pelham had to say --
20 I'm sorry, that's his first name, right?
21 A.  Yes.
22 Q.  What's his last name, Pelham --
23 A.  Chastang.
24 Q.  Chastang.
25     Do you recall what Mr. Chastang had

---

| 10:56 | Page 66 |
|---|---|

1  to say about whether the generalists had
2  enough work to do?
3  A.  So, when you say "generalists," are you
4  generalizing about generalists or are you
5  referring to the generalists in the
6  Northwest Region?  Because my answers would
7  be different.
8  Q.  That's a fair point.  That's a fair point.
9  My questions -- you can assume that my
10  questions for you are limited to the
11  Northwest Region, okay?
12  A.  Okay.
13  Q.  And what do you recall Mr. Chastang saying
14  about the HR generalists not having enough
15  work to do?
16  A.  He agreed with me.
17  Q.  Were you the one that brought up the point
18  that the generalists didn't have enough work
19  to do?
20  A.  I don't recall if I specifically raised it
21  but I know we talked about it.
22  Q.  What did Mr. McNaul have to say about
23  whether the generalists had enough work to
24  do?
25  A.  He agreed with me as well.

| 10:56-10:57 | Page 67 |
|---|---|

1  Q.  Did either Mr. Chastang or Mr. McNaul
2  express to you that they had had any
3  experiences with the generalists that led
4  them to believe that they didn't have enough
5  work to do?
6  A.  I -- not that I recall, but you would have
7  to ask them.
8  Q.  Did either of them work directly with the
9  HR generalists --
10  MS. PARKER: Objection:
11  Foundation.
12  BY MR. MILLS:
13  Q.  -- in the Northwest Region?
14  A.  Yes.
15  Q.  And which -- who?
16  A.  Who --
17  Q.  Did Mr. Chastang work directly with the
18  HR generalists in the Northwest Region?
19  MS. PARKER: Objection:
20  Foundation.
21  THE WITNESS: I believe he -- yes.
22  BY MR. MILLS:
23  Q.  In what way?
24  A.  In projects that they were both on or --
25  Q.  How about Mr. McNaul, did he work directly

| 10:57-10:59 | Page 68 |
|---|---|

1  with the generalists in the Northwest
2  Region?
3  MS. PARKER: Same objection.
4  THE WITNESS: Yes.
5  BY MR. MILLS:
6  Q.  In what way?
7  A.  More in the course of business.
8  Q.  And who all was involved in the
9  determination to eliminate one of the
10  HR generalist positions?
11  A.  I was involved, Pelham was involved, Eric
12  was involved.  I don't recall if anybody
13  else was at this time.
14  Q.  I think you had said that that decision was
15  made in June 2013 as well?
16  A.  Yes.
17  Q.  Do you know whether any of the other regions
18  eliminated HR generalist positions?
19  MS. PARKER: Objection:
20  Foundation.
21  THE WITNESS: I don't recall, but
22  the Northwest had more than all of the other
23  regions.
24  BY MR. MILLS:
25  Q.  What did the other regions have, as best you

| 10:59-11:00 | Page 69 |
|---|---|

1  can recall?
2  A.  One or two, to the best of my recollection.
3  Q.  And how did the decision come about to
4  eliminate a position?
5  MS. PARKER: Objection to form.
6  BY MR. MILLS:
7  Q.  What was the process whereby you came by
8  that decision?
9  MS. PARKER: Same objection.
10  THE WITNESS: So, we just simply
11  discussed that there had been feedback that
12  -- from the generalists themselves that they
13  were not -- they didn't have enough work to
14  do, that they were bored, that -- that --
15  and then we reflected on our structure
16  overall, and whether it made sense to have
17  three people supporting all of the plants or
18  whether it was more appropriate to have two,
19  and if we thought that that would
20  potentially solve kind of the hours or the
21  work -- the amount of work that was needing
22  to be completed and filling out their days a
23  little bit more.
24  And, remember, it was a completely
25  different role than what it had been before,

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 356 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

| | |
|---|---|
| **11:00-11:01** Page 70 | **11:02-11:04** Page 72 |

**11:00-11:01** — Page 70

1  so we went into it thinking that it would be
2  better to be nice and heavy and have plenty
3  of HR generalist support, but then realized
4  that, in fact, we probably overestimated how
5  many we needed, and that was unfortunate.
6      BY MR. MILLS:
7  Q.  During -- from February 2013 on, were the
8  HR generalists themselves supervising any
9  employees?
10  A.  I don't believe so.
11  Q.  Who was involved in the decision as to which
12  HR generalist position to eliminate?
13  A.  That would have been myself and Pelham and
14  Eric again.
15  Q.  Anybody else involved in that?
16  A.  Not that I recall today.
17  Q.  And when was the decision made as to whose
18  position to eliminate?
19      MS. PARKER: Objection:  Asked and
20  answered.
21      THE WITNESS: In the June 2013
22  timeframe.
23      BY MR. MILLS:
24  Q.  So, it's your testimony that, in June 2013,
25  you decided to eliminate Brandy Williams'

**11:01-11:02** — Page 71

1  position?
2      MS. PARKER: Objection:  Asked and
3  answered.
4      THE WITNESS: If I recall
5  correctly, yes.
6      BY MR. MILLS:
7  Q.  Did you tell Brandy Williams in June 2013
8  that you had decided to eliminate her
9  position?
10  A.  No.
11  Q.  In fact, she wasn't terminated until
12  September, correct?
13  A.  That is correct.
14  Q.  Are you aware -- or strike that.
15      Are you aware of any documentation
16  of a decision having been made in June 2013
17  to eliminate Brandy Williams' position as an
18  HR generalist?
19      MS. PARKER: Objection to form.
20      THE WITNESS: Not that I know of,
21  no.
22      BY MR. MILLS:
23  Q.  You certainly didn't document it, right?
24      MS. PARKER: Objection to form.
25      THE WITNESS: Not that I recall,

**11:02-11:04** — Page 72

1  no.
2      BY MR. MILLS:
3  Q.  So, if the decision were made in June 2013
4  to eliminate Brandy's position of
5  HR generalist, why is it that her job was
6  not terminated until September 2013?
7      MS. PARKER: Objection to form.
8      THE WITNESS: So, the decision was
9  made, but not a decision on the timing, and
10  then there was an opportunity for Brandy to
11  actually try a different role within
12  St. Jude Medical at her request, so we
13  wanted to give her a full opportunity to
14  explore that position and see if it would be
15  a good fit potentially longer term, which
16  would then result in us not having to
17  terminate her.
18      BY MR. MILLS:
19  Q.  You said at St. Jude Medical.
20  A.  I'm sorry, at G & K Services.
21  Q.  And that position was a recruiting position?
22  A.  That is correct.
23  Q.  But that position didn't come up until the
24  end of July, right?
25      MS. PARKER: Objection to form.

**11:04** — Page 73

1      THE WITNESS: I don't recall
2  specifically when those discussions started
3  happening.
4      BY MR. MILLS:
5  Q.  And you don't recall anybody at G & K ever
6  saying anything to Brandy like, hey, you
7  need to start looking for another job?
8      MS. PARKER: Objection to form.
9      THE WITNESS: No, not that I
10  recall.
11      BY MR. MILLS:
12  Q.  Well, certainly at the end of September you
13  did?
14      MS. PARKER: Objection to form.
15  Bob, I have a lot of leading questions, but
16  we're not in background anymore.
17      MR. MILLS: Well, I'm entitled to
18  lead this witness. I mean, how am I not
19  entitled to lead?  You can make your
20  objections but --
21      THE WITNESS: I don't recall ever
22  telling anybody that they needed to start
23  looking for another job.
24      BY MR. MILLS:
25  Q.  Even after you made -- even after, according

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

| 11:04-11:07 | Page 74 |
| --- | --- |

1 to your testimony, you had made the decision
2 that Brandy was going to go, correct?
3 A. Correct.
4 Q. Let's go to the very -- look at Exhibit B to
5 the -- to Exhibit 1. I know this is getting
6 confusing. There's a chart called
7 Generalists. Got it?
8 A. I do.
9 Q. Okay. Just take a look at that and tell me
10 if this accurately reflects the structure of
11 the generalists at G & K in 2013.
12 A. So, when you say "generalists," are you
13 referring to the Northwest?
14 Q. To the Northwest, yes.
15 A. Yes, this is an accurate representation.
16 Q. All right. Let's take a look back at --
17 towards the end of the document. I want to
18 direct your attention to the -- not the last
19 page, but the fifth from the last page.
20 A. Okay.
21 Q. Okay. And the top of the page reads
22 "Performance Document - GK perform," right?
23 A. Yes.
24 Q. And is this the standard form that G & K
25 used for performance evaluations of the

| 11:07-11:08 | Page 75 |
| --- | --- |

1 HR generalists?
2    MS. PARKER: Objection to form.
3    THE WITNESS: It appears to be.
4    BY MR. MILLS:
5 Q. This is something that you have worked with
6 before?
7 A. Yes.
8 Q. If you turn to the second page of that
9 evaluation, at the very top it says,
10 "Description Leadership Development."
11    Do you see that?
12 A. Yes.
13 Q. And then there's some texts -- or some text
14 that reads, quote, "Support and Update
15 Leaders around the coach to win model,
16 support new leaders and hope to gain
17 knowledge around Performance Management.
18 Another goal is to focus and drive
19 leadership development through developing
20 programs by developing classroom training,
21 hands on training with a mentor or coach,
22 experience or exposure based training, and
23 cross functional training," correct?
24    Did I read that correctly?
25 A. Yes, you did.

| 11:08-11:09 | Page 76 |
| --- | --- |

1 Q. And it goes on and lists some -- quote, "My
2 main goal is to help support managers with
3 Talent Management and to accomplish more
4 through others of our team by sharpening
5 skills on," and there's then there's a list
6 of several specific tasks, right?
7 A. Correct.
8 Q. And this text beginning after the heading
9 "Description Leadership Development" down to
10 "Employee Rating," that was written by
11 Brandy Williams, right?
12 A. I don't know.
13 Q. Well, this is -- if you take a look back at
14 the first page, this is an evaluation of
15 Brandy Williams, right?
16 A. Correct.
17 Q. And these objectives, the text that was
18 objectives, these were written by the
19 generalists themselves, right?
20    MS. PARKER: Objection:
21    Foundation.
22    THE WITNESS: That would be the
23 typical process but I can't say whether
24 Brandy wrote that or not. Brandy would have
25 to state that.

| 11:09-11:11 | Page 77 |
| --- | --- |

1    BY MR. MILLS:
2 Q. You didn't write them, did you?
3 A. Not that I recall.
4 Q. Did you typically ask the HR generalists to
5 write their own objectives for the fiscal
6 year?
7 A. Yes.
8 Q. If you back up to the document toward the
9 end, it's called Exhibit H. And I
10 apologize, I think that Brandy's review is
11 part of Exhibit H attached to this document.
12 A. About where might that be?
13 Q. That's about, oh, 12, 15 pages from the end.
14 A. Okay.
15 Q. And, again, the page is entitled
16 "Performance Document - GK perform,"
17 correct?
18 A. Correct.
19 Q. This appears to be an evaluation of Janelle
20 Bonacua, correct?
21 A. Correct.
22 Q. Take a look at the second page of that
23 document. Right in the middle of the page
24 there's a heading that says Description
25 Leadership development New Role," right?

1   A.  Yes.
2   Q.  And the text says, quote, "Serve as a
3   liaison between employee and manager to
4   support them with bringing forward talent.
5   Provide with the tools necessary for
6   succeeding," unquote.
7       Did I read that right?
8   A.  Yes.
9   Q.  What tools was she referring to?
10      MS. PARKER: Objection to
11  foundation.
12      THE WITNESS: That would be a
13  variety of internal tools that we already
14  had at G & K at the time, as well as new
15  tools that the generalists identified or
16  developed.
17      BY MR. MILLS:
18  Q.  Did you write this text?
19  A.  Not that I recall.
20  Q.  And how do you know that those are the tools
21  that Janelle was referring to?
22  A.  I'm speculating.
23  Q.  What does it mean to serve as a liaison
24  between employee and manager to support them
25  with bringing forward talent?

1       MS. PARKER: Objection:
2   Foundation.
3       THE WITNESS: I think the question
4   is unclear.  Do you want my opinion or do
5   you want what Brandy meant when she wrote
6   it?
7       BY MR. MILLS:
8   Q.  Well, Brandy didn't write this portion,
9   right --
10  A.  I'm sorry, Janelle.
11  Q.  -- Janelle.
12      What was your understanding as of
13  the time that you reviewed Janelle as to
14  what she meant by that?
15  A.  So, working with our leadership group and
16  with our employees to identify
17  high-potential talent, to identify
18  development needs.  This is all
19  organizational effectiveness.
20  Q.  Did you ever ask Janelle what she meant by
21  that?
22  A.  I don't recall, I may have.
23  Q.  What specifically did she do to act as a
24  liaison?  I'm referring to Janelle.
25  A.  On an ongoing basis or -- generally?

1   Q.  What's being referred to here in this
2   review?
3   A.  It's been a lot of time so, unfortunately, I
4   don't remember what specifically this might
5   have referred to.
6   Q.  Do you know whether you ever would have
7   specifically known what she was doing?
8   A.  Certainly.
9       MS. PARKER: Objection to form.
10      BY MR. MILLS:
11  Q.  And your -- your rating of Janelle -- strike
12  that.
13      Under these various goals in this
14  review where it says Manager Rating, do you
15  see that?
16  A.  Yes.
17  Q.  Those are the ratings that you assigned?
18  A.  I don't know that I can confirm that.
19  Q.  You don't know whether you were the one
20  rating her?
21  A.  I don't, because I don't know what I'm
22  looking at as far as there were -- this was
23  a cross-over year, so I don't know that I
24  gave her these ratings versus ratings from
25  earlier in the year.

1   Q.  Do you remember seeing this document before,
2   Exhibit H to Exhibit 1?
3   A.  I don't, but it's been several years, so --
4   Q.  Do you recall what basis you might have had
5   for indicating that Janelle exceeds
6   expectations on the objective of leadership
7   development?
8       MS. PARKER: Objection to form.
9       THE WITNESS: It would have been
10  based on her activities throughout the
11  course of the time that she was an HR
12  generalist.
13      BY MR. MILLS:
14  Q.  Will you turn back to the page we were
15  looking at before with Brandy Williams under
16  Leadership Development towards the end.
17  A.  Okay.  Where are we?
18  Q.  We are the fifth -- or fourth page from the
19  end.
20  A.  Okay.
21  Q.  Very top of the page says Description
22  Leadership Development.
23      Are you there?
24  A.  Yes.
25  Q.  And the Manager Rating was 1 - Not Meeting

1    Expectations.
2        Do you see that?
3  A.   Yes.
4  Q.   Is that a rating that you gave?
5  A.   Again, I don't recall.
6  Q.   It's possible that you didn't give her that
7    rating?
8  A.   It's possible that I didn't.  I don't know,
9    without having a system record, if these are
10   the ratings I assigned.
11 Q.   Do you recall whether you would have had any
12   basis for saying that Brandy was not meeting
13   expectations with respect to the objectives
14   that she listed under Leadership
15   Development?
16       MS. PARKER: Objection to form.
17       THE WITNESS: Yes.
18       BY MR. MILLS:
19 Q.   And what do you recall?
20 A.   I recall that Brandy struggled with any type
21   of development, actually, of the leadership
22   team, and that was -- she didn't do anything
23   to identify new programs or look for
24   curriculum, or materials, or ways to really
25   insert herself into the business, and kind

1    of develop using the tools and materials
2    that were in place at the time at G & K, or
3    those that she identified.
4  Q.   Did you ever talk to her about those things?
5  A.   Yes.
6  Q.   Did you ever document your conversations
7    with her?
8  A.   I don't recall.
9  Q.   Did you ever talk to Brandy and tell her
10   that she was not meeting expectations
11   regarding Support and update leaders around
12   the coach to win model?
13 A.   I don't recall specifically if we talked
14   about coach to win.
15 Q.   Do you recall any manager ever expressing to
16   you any criticism or concern that Brandy was
17   not meeting expectations regarding Support
18   and update leaders around the coach to win
19   model?
20       MS. PARKER: Objection to form.
21       THE WITNESS: I don't remember what
22   the coach-to-win model is, but specific to
23   these other things, I do.
24       BY MR. MILLS:
25 Q.   Okay.  Tell me what you recall.

1  A.   I recall that I received feedback that, when
2    she went on ride-alongs with the managers,
3    that she looked for things to criticize,
4    that she struggled with building
5    relationships with the leaders, that she
6    came from a place of putting people on the
7    offensive by picking out things that they
8    weren't doing well instead of coming in and
9    listening, so jumping to conclusions.
10 Q.   And those are things you heard from Jacob
11   Briscoe?
12       MS. PARKER: Objection to form.
13       THE WITNESS: Yes.
14       BY MR. MILLS:
15 Q.   Anybody else?
16 A.   Yes.
17 Q.   Who?
18 A.   The other managers in Phoenix, as well as
19   managers in Los Angeles.
20 Q.   Who in Los Angeles?
21 A.   Angie Graczyk.
22 Q.   What did Angie tell you?
23 A.   That she did not find value in the work that
24   had been done -- or the work that Brandy was
25   doing or supposed to be doing with her

1    group, which included the same bucket of
2    work we're talking about here (indicating).
3  Q.   Other than Phoenix and Angie, any other
4    feedback from any of the other managers
5    regarding any of the things that are listed
6    in the text under Leadership Development?
7        MS. PARKER: Objection to form.
8        THE WITNESS: So, Phoenix and Angie
9    are all that I can recall right now.
10       BY MR. MILLS:
11 Q.   Did you ever document anywhere Angie's
12   conversation with you in that regard?
13 A.   I may have made some notes but I don't
14   recall today.
15 Q.   And look down in the next category, it says
16   "Description Talent Management."
17 A.   Yes.
18 Q.   Did you write in the text below that
19   heading?
20 A.   I don't know.  I don't recall.
21 Q.   Do you recall ever having any discussion
22   with Brandy and telling her that she was
23   not -- or that she was below expectations
24   with respect to Meeting with leaders monthly
25   to review and update 9 block?

| 11:21-11:22 | Page 86 |
|---|---|

1    MS. PARKER: Objection to form.
2    THE WITNESS: Specifically, no, I
3  don't recall.
4    BY MR. MILLS:
5  Q.  What's 9 block?
6  A.  It's a way to place employees on a grid
7  that, basically, assesses performance and
8  potential.
9  Q.  How did -- how did G & K use these
10  performance ratings?
11    MS. PARKER: Objection:
12  Foundation.  You can answer as far as you
13  know.
14    THE WITNESS: I don't know what
15  they were used for.
16    BY MR. MILLS:
17  Q.  Do you know whether they were used in
18  connection with terminating Brandy Williams'
19  employment with G & K?
20  A.  The ratings, no, I don't know.
21  Q.  Is the manager rating on these evaluations
22  based upon whether the employee has met the
23  objectives that the employee set for
24  herself?
25  A.  Yes.  Also, though, if you're referring to

| 11:23-11:24 | Page 87 |
|---|---|

1  the overall rating -- or are you referring
2  just to sections?
3  Q.  I'm referring to both.
4  A.  So, there are business objectives as well,
5  and those are not objectives that the
6  employee sets themselves.
7  Q.  But you would agree with me that the
8  description under Leadership Development in
9  Brandy's evaluation, the objectives, are
10  vastly different than the description of the
11  objectives under Leadership Development in
12  Janelle's evaluation, right?
13    MS. PARKER: Objection to form.
14    THE WITNESS: They are different,
15  sure.
16    BY MR. MILLS:
17  Q.  Well, Brandy's objections are far more
18  detailed, right?
19    MS. PARKER: Objection to form.
20    THE WITNESS: Yes.
21    BY MR. MILLS:
22  Q.  Therefore, more focused, right?
23  A.  Yes.
24    MS. PARKER: Objection to form.
25    BY MR. MILLS:

| 11:24 | Page 88 |
|---|---|

1  Q.  And they are more onerous than the ones that
2  are in Janelle's, right?
3    MS. PARKER: Objection to form.
4    THE WITNESS: I don't know that
5  "onerous" is the right word.
6    BY MR. MILLS:
7  Q.  All Janelle's says is "serve as a liaison,"
8  right?
9  A.  There's more detail in Brandy's.  It doesn't
10  necessarily mean it's more onerous.
11  Q.  Would you agree with me that an employee who
12  includes a more detailed objective will have
13  a more difficult time meeting that objective
14  than an employee who puts down a very vague
15  objective?
16    MS. PARKER: Objection to form.
17    THE WITNESS: No.
18    BY MR. MILLS:
19  Q.  Why not?
20  A.  Because it's about the spirit of the
21  objective.
22  Q.  What do you know about the spirit of
23  Janelle's objective?
24  A.  I can speak to Brandy putting a list of
25  things in here, and you don't go through and

| 11:24-11:26 | Page 89 |
|---|---|

1  checkmark yes, you did this, and no, you
2  didn't, and if you didn't do one of them,
3  then you don't meet expectations.  That's
4  not how it works.
5  Q.  So, how does it work?
6  A.  It's a balancing act.  You look through the
7  objectives.  These are some things that
8  could be considered.  They are tools.  These
9  are common tools, though, that we would
10  expect all of our generalists to work with
11  our leaders to develop.
12  Q.  What are the business objectives that you
13  say you considered?
14  A.  The business objectives are listed at the
15  beginning of the form.
16  Q.  Where?
17  A.  Under GK Objectives, I believe.
18  Q.  Okay.  Which are the -- which are the
19  business -- you're going to have to help me
20  with this one.
21    Which are the GK business
22  objectives?
23  A.  If you like, I can go through and find
24  them --
25  Q.  Let's just focus on Brandy's evaluation, the

| 11:26-11:27 | Page 90 |
|---|---|

1  one we were just looking at, okay?
2      And it says GK performance
3  objectives on the first page?
4  A.  Yes.
5  Q.  Okay.
6  A.  So, there are objectives that are not in
7  this copy.
8  Q.  So, is this document incomplete?
9  A.  There are objectives that relate to the
10  business, revenue and operating income and
11  other measures.
12  Q.  Well, where?
13  A.  I don't know.  I didn't produce the
14  document.
15  Q.  I didn't either.  I mean, where -- I'm
16  really trying to understand what's missing
17  from this document.
18      You said that there were objectives
19  that don't appear on this document.
20      What's not in here that you recall
21  being in the reviews that you did?
22  A.  I recall there being performance objectives
23  for the business, so anybody that was a part
24  of the business had the same rating, so
25  things like revenue, operating income, NPS,

| 11:27-11:28 | Page 91 |
|---|---|

1  I think, maybe was part of it.
2  Q.  But you don't see any of that in this
3  performance review form, right?
4  A.  Not in this one, no.
5  Q.  Do you know whether it would have been in
6  the performance review as it was originally
7  prepared regarding Brandy Williams?
8  A.  I don't know.
9  Q.  You would have expected it to be, wouldn't
10  you?
11  A.  Well, I don't know.  I don't -- again, I
12  don't know exactly what this is
13  (indicating).
14      MS. PARKER: Rachael, do you need
15  to take some time to read it more
16  thoroughly?
17      THE WITNESS: I think that would be
18  helpful.
19      MR. MILLS: Okay, that's fine.
20      THE WITNESS: It's a 50-page packet
21  so --
22      BY MR. MILLS:
23  Q.  Yeah, but I'm really -- right now, I'm just
24  focused on these performance reviews at the
25  very end that's Exhibit H.  If you want to

| 11:28-11:29 | Page 92 |
|---|---|

1  take a couple minutes and read through
2  those, that's fine with me.
3  A.  Okay.  (Perusing.)  It's the copy.
4  Q.  It's what?
5  A.  It's the quality of the copy that's missing.
6  Q.  What does that mean?
7  A.  There's stuff that's not on here that's
8  missing.
9  Q.  Can you tell where it's missing from?
10  A.  Under Section 2 - GK Perform, there's no
11  headings.  As far as I can tell, there's
12  potentially --
13  Q.  Well, I can -- yeah, I mean, I can see under
14  GK Perform Objectives, there's like -- right
15  underneath it there's some -- I don't know,
16  a blob or something that's --
17  A.  "Description This is a group rating and will
18  be given to you either by your location's
19  manager or through an email for corporate
20  employees."
21      Clearly, that refers to something
22  but it's not on here, so I don't know what
23  that means.
24  Q.  And the same would be true under -- or in
25  connection with Customer Focus?

| 11:29-11:31 | Page 93 |
|---|---|

1  A.  I believe so, yes.
2  Q.  So, would it be wrong to base an employee's
3  performance evaluation solely on the
4  objectives that the employee set for herself
5  for the fiscal year?
6      MS. PARKER: I'm going to object to
7  form.
8      THE WITNESS: Wrong in what
9  respect?
10      BY MR. MILLS:
11  Q.  Would you agree with me that a performance
12  rating of an employee should be objective?
13  A.  Yes.
14  Q.  And would you also agree with me that, if
15  you were to base the rating solely on what
16  -- the objectives that the employee set for
17  herself, that's not objective?
18      MS. PARKER: Objection to form.
19      THE WITNESS: I don't know that
20  it's not objective.  So, again, there's --
21  if somebody puts an exhaustive list of
22  things down, I'm not going to say that, if
23  they didn't meet one of those list of 10
24  things that's minor, that they should be not
25  meeting expectations.

Williams vs. G & R Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

1       BY MR. MILLS:
2   Q.   But you would agree with me that various
3   employees can put very different statements
4   of objectives for their fiscal year
5   performance review, right?
6       MS. PARKER: I'm going to object to
7   form.
8       THE WITNESS: Yes.
9       BY MR. MILLS:
10  Q.   And that any given employee's performance
11  rating for the fiscal year shouldn't be
12  based solely on what that employee set as
13  her own objectives, right?
14      MS. PARKER: Objection to form. I
15  think this mischaracterizes prior testimony.
16      THE WITNESS: Can you repeat that
17  question?
18      BY MR. MILLS:
19  Q.   Yeah.  And any individual employee's
20  performance rating for the year shouldn't
21  just be based on the objectives that she
22  wrote down for herself at the beginning of
23  the year, right?
24      MS. PARKER: Same objection.
25      THE WITNESS: What else would it be

1   based on?
2       BY MR. MILLS:
3   Q.   Well, you just told me that there were
4   company objectives that were missing from
5   this document, right?
6   A.   Well, they are, I'm assuming, on this
7   document, but the copy isn't reflecting
8   them.
9   Q.   You wouldn't base an employee's rating
10  solely on what the employee set as her
11  objectives at the beginning of a fiscal
12  year, would you?
13  A.   Solely on their objectives, no, because the
14  company objectives are part of the overall
15  rating.
16  Q.   Why wouldn't you base it solely on the
17  employee's objectives?
18      MS. PARKER: Again, objection to
19  form.
20      THE WITNESS: Because the company
21  objectives are part of the overall
22  calculated rating.
23      BY MR. MILLS:
24  Q.   As the company objectives that might --
25  strike that.

1       It's also because, if you based
2   this solely on the employee's objectives
3   alone, that would not be an objective
4   evaluation, right?
5       MS. PARKER: Objection to form.  It
6   mischaracterizes her prior testimony.
7       THE WITNESS: I think that
8   doesn't -- I'm not sure I understand.
9       BY MR. MILLS:
10  Q.   How would you rate an employee who didn't
11  put anything down as their objectives for a
12  fiscal year?
13      MS. PARKER: Objection:  Calls for
14  speculation.
15      BY MR. MILLS:
16  Q.   That they exceed expectation?
17  A.   It's a business, exceeded expectations, and,
18  hypothetically, an employee had absolutely
19  no goals written down, hypothetically, the
20  way the system works, the person could
21  potentially have exceeds expectations.
22  Q.   But that's regardless of the objectives that
23  he wrote down, or she wrote down, for
24  herself, right?
25      MS. PARKER: Again, I'm going to

1   object that this calls for speculation.
2   This is not a circumstance that we have.
3   There's --
4       THE WITNESS: This is -- I'm
5   unclear about what you're asking.
6       BY MR. MILLS:
7   Q.   Let me just ask you this really
8   specifically:  You evaluate -- you did a
9   performance rating of Brandy Williams,
10  didn't you?
11  A.   I believe so, yes.
12  Q.   Okay.  Did you base that on -- did you --
13  strike that.
14      Did you base your performance
15  rating of Brandy Williams on her
16  descriptions of her objectives as are stated
17  in the GP Perform document?
18      MS. PARKER: Objection:  Form.
19      THE WITNESS: Did I rate her on her
20  descriptions?  No.  I rated her on her
21  performance against the objectives that she
22  set.
23      BY MR. MILLS:
24  Q.   Anything else?
25  A.   Did I rate her on anything else?  No.

1  Q.  Did you rate her -- did you rate her on
2  anything other than objectives that she set
3  for herself?
4  A.  Did I personally?  No.
5  Q.  So, but your rating of Ms. Williams was
6  based -- for example, under the category
7  Leadership Development, would have been
8  based solely on her own statement of
9  objectives and how well she was able to
10  achieve her own stated objectives?
11      MS. PARKER: Form; asked and
12  answered.
13      THE WITNESS: Yes.  So, this is her
14  objective.  I rated her against her
15  objective.
16      BY MR. MILLS:
17  Q.  And nothing else?
18  A.  For the objective, correct.
19  Q.  So, under Leadership -- I just want to make
20  sure this is crystal clear for the record.
21      So, under Leadership Development,
22  if you rated Brandy Williams, and that is,
23  in fact, your rating as not meeting
24  expectations, that's based solely on
25  Brandy's description of her objectives for

1  the fiscal year ending June 30, 2013 --
2      MS. PARKER: Objection to form.
3      BY MR. MILLS:
4  Q.  -- that is appearing in the text below the
5  heading Description Leadership Development,
6  correct?
7      MS. PARKER: This question has been
8  asked and answered; it mischaracterizes her
9  prior testimony.  It's not crystal clear.
10  Her prior testimony --
11      BY MR. MILLS:
12  Q.  You can answer the question.
13  A.  I think you are misstating what I said,
14  so --
15  Q.  Help me out.
16  A.  -- you're trying to tell me -- or you're
17  trying to get me to say right now that I
18  rated her on exactly what is written here,
19  and I've told you, this -- her bucket is
20  Leadership Development, okay, that is the
21  bucket of the goal.
22      If somebody, for instance, misses
23  one thing on here, so she wrote a really
24  specific list, I'm not going to penalize
25  somebody if they achieve every single thing

1  on this list except for one because that's
2  overly harsh.
3  Q.  But are you using any other criteria to
4  evaluate Brandy's performance other than the
5  objectives that she, herself, wrote in this
6  form?
7      MS. PARKER: Again, objection to
8  form.
9      THE WITNESS: Am I using -- I can
10  see the ratings that I gave here.  I haven't
11  had time to review the document.  Is there
12  anything else listed in there --
13      BY MR. MILLS:
14  Q.  Please sit and read it --
15  A.  -- description?
16  Q.  I want you to sit and read it because I want
17  this to be very clear.
18      MR. MILLS: Actually, we need to
19  change the tape so it's a perfect
20  opportunity.
21      THE VIDEOGRAPHER: We're off video
22  record.  The time on the video monitor is
23  11:37 a.m.
24      (A recess was taken.)
25      THE VIDEOGRAPHER: We are back on

1  video record.  The time on the video monitor
2  is 12:37 p.m.
3      MR. MILLS: Good afternoon.
4      Before we broke, we had had a
5  question regarding the review of Brandy
6  Williams.  I'm going to ask the court
7  reporter if you could go back and read that
8  back because I think, in response to the
9  question, you indicated you needed to look
10  at the document, so --
11      (Question read back as requested as
12  follows:
13      "Q.  But are you using any other
14  criteria to evaluate Brandy's performance
15  other than the objectives that she, herself,
16  wrote in this form?")
17      MS. PARKER: Is there an answer?
18  Or was there an answer?
19      (Testimony read back as requested
20  as follows:
21      "MS. PARKER: Again, objection to form.
22      "THE WITNESS: Am I using -- I can see
23  the ratings that I gave here.  I haven't had
24  time to review the document.  Is there
25  anything else listed in there --

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 364 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

**12:38-12:39**                                              Page 102

1       "Q.  Please sit and read it --
2       "A.  -- description?")
3       BY MR. MILLS:
4    Q.  So, I'll re-ask the question now.
5       Were there any other criterion
6    other than the objectives that Brandy wrote
7    herself in her performance review that you
8    used in order to rate her performance?
9    A.  Yes.  So, after having a chance to review,
10   Brandy didn't rate her -- she didn't write
11   any comments in here, so she actually did
12   not complete her GP Perform, so that was
13   something that she and I talked about on
14   multiple occasions, so that would have
15   started the overall rating that I gave her.
16      The other comments in here, I
17   think, tie back to the objectives that she
18   gave herself.
19      So, again, like I mentioned, it's
20   more of the totality of the performance, not
21   necessarily checking off a box to say yes,
22   you did these 10 things, because each
23   person -- I have the same expectations for
24   each generalist, but they might write it
25   differently in here.

**12:39-12:40**                                              Page 103

1       I expect them all to work through
2    leadership development and coaching and to
3    develop materials and training and support
4    their team.
5    Q.  Were there any objective criteria, other
6    than the objectives that Brandy, herself,
7    wrote down that you used to give her a
8    rating?
9       MS. PARKER: Objection to form.
10      THE WITNESS: Can you define
11   "objective" as you're asking the question?
12      BY MR. MILLS:
13   Q.  My understanding -- and you can correct me
14   if I'm wrong.
15      My understanding of your testimony
16   is that you looked at the objectives that
17   Brandy wrote down for herself --
18   A.  Sure.
19   Q.  -- for the fiscal year.
20      And then you rated her based on
21   whether she met those objectives or not,
22   right?
23      MS. PARKER: I object that this
24   mischaracterizes the testimony.  I think the
25   testimony was that that was only one part.

**12:40-12:41**                                              Page 104

1       THE WITNESS: Correct, so I rated
2    her against the be objectives that she
3    wrote, and then against things like the fact
4    that she didn't complete her review.
5       There were also a category of
6    objectives that are related to the
7    business's performance as well.
8       BY MR. MILLS:
9    Q.  If I were to want to look at those
10   categories of objectives for the business
11   itself, where would I find them?
12   A.  They would be on here if the copy came
13   through.
14   Q.  Do you believe that they've been redacted
15   from this document?
16   A.  No, I don't.
17   Q.  Why not?
18   A.  I don't know.  It doesn't say that they've
19   been redacted.
20   Q.  But they don't appear on this document,
21   right?
22   A.  Well, they are here.  The copy is just --
23   the photocopy quality is not good so you
24   can't see it.
25      There are headings here that you

**12:41-12:42**                                              Page 105

1    can't see, and I believe those to be, to the
2    best of my recollection, where the business
3    objectives would sit.
4    Q.  When you said that Brandy didn't provide any
5    comments on this, if you look at the first
6    page of her performance review --
7    A.  Yes.
8    Q.  -- there's a section Mid-year Comments?
9    A.  Correct.
10   Q.  Is the text of that section something that
11   was drafted by Brandy, to your knowledge?
12   A.  So, if this is midyear comments, this is not
13   what I was referring to in the year-end
14   evaluation.
15      So, this is before -- this would be
16   before the job changed, so this would have
17   been relevant to her job as an HR
18   representative.
19   Q.  What criteria did you and the others at
20   G & K use to determine that Brandy Williams'
21   position, in particular as a G & K
22   generalist, would be eliminated?
23      MS. PARKER: Objection:
24   Mischaracterizes prior testimony.
25      BY MR. MILLS:

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

| 12:42-12:43 | Page 106 |
|---|---|

1  Q.  Do you understand my question?
2  A.  I believe so.  Maybe not.
3     MS. PARKER: Maybe I didn't
4  understand it.
5     BY MR. MILLS:
6  Q.  All right.  You had testified before
7  lunch --
8  A.  Yes.
9  Q.  -- that a determination was made, I believe
10  in June, according to your testimony, that
11  Brandy Williams' position was going to be
12  eliminated, right?
13  A.  Correct, yes.
14  Q.  Okay.  My question to you now is:  What
15  criterion did you and others at G & K use to
16  make the determination that it was her
17  position that was going to be eliminated?
18  A.  Okay.  I think I understand.
19     So, based on the way the region was
20  laid out, there was a generalist in
21  Minnesota, and there are four plants in
22  Minnesota, and there was a generalist in
23  Northern California, and that was Janelle,
24  and there were two plants in Northern
25  California, and all of their associated

| 12:43-12:44 | Page 107 |
|---|---|

1  branches.
2     And then there was the Phoenix
3  plant and the LA plant, so kind of
4  collectively split between the three.
5     Kaela sat in St. Paul, and that is
6  the business that she has supported since
7  she started with G & K, and there were some
8  unique things about those businesses
9  specifically related to labor agreements and
10  some of the unions, she knew the business
11  really well, the business relied on her.
12     And so, she also sat there, so she
13  could pretty much be at any of the three
14  Twin Cities plants or the St. Cloud plants
15  as needed without having to get on an
16  airplane.
17     So, geographically, it made logical
18  sense for Kaela to stay in St. Paul.  And
19  then, with Janelle sitting in one of the two
20  Northern California plants, obviously,
21  that's a benefit, but also Janelle had
22  worked in HR in California for a number of
23  years.
24     And, as I'm guessing you're aware,
25  being a neighbor of California, California

| 12:44-12:45 | Page 108 |
|---|---|

1  employment law can be a little tricky,
2  however, they call it the great country of
3  California.
4     So, for me, having somebody who was
5  very familiar with California employment
6  law, and had a long history of working with
7  California and employment issues, and such,
8  was also really important.
9     So, it made sense, as we looked at
10  how to divide the region up, that Janelle
11  would pick up California, which would
12  include Los Angeles and its branches, and
13  then Phoenix would just be the outlier, and
14  Brandy -- or Kaela would pick up Phoenix.
15  Q.  Were there any criteria -- strike that.
16     Were there any other criteria that
17  you or anybody else at G & K used to
18  determine that Brandy's position would be
19  the one eliminated?
20  A.  That was the primary criteria.  Secondary to
21  that, she struggled more than the others
22  with the generalist role.  Her performance
23  wasn't where -- her performance wasn't
24  necessarily meeting expectations.
25  Q.  Do you recall what the Performance

| 12:45-12:46 | Page 109 |
|---|---|

1  Improvement Program was at G & K?
2  A.  Yes.
3  Q.  And what was it?
4  A.  What was it at G & K?
5  Q.  Yes.
6  A.  It was a Performance Improvement Program
7  that people who weren't performing could be
8  placed on a written Performance Improvement
9  Plan.
10  Q.  Was that typically something that was done
11  before an employee was terminated due to
12  performance?
13  A.  Typically, yes, although if somebody did
14  something that was extremely egregious,
15  there wouldn't be a performance improvement
16  process.
17  Q.  Let me put it this way:  Was it G & K's
18  policy to put someone on a Performance
19  Improvement Program before terminating them?
20     MS. PARKER: Objection to form.
21     THE WITNESS: If someone was
22  terminated with poor performance, typically
23  yes.
24     BY MR. MILLS:
25  Q.  Was Brandy Williams ever put on a

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 366 of 505

Rachael Siggerud Raskovich
May 11, 2016

12:46-12:48                                   Page 110

1   Performance Improvement Plan?
2   A.   No.
3   Q.   To your knowledge, was Brandy Williams ever
4   written up for being absent or tardy at
5   G & K?
6   A.   Not that I know of.
7   Q.   And how many -- how many plants or branches
8   was Janelle supporting in Northern
9   California during the same time that Brandy
10  was an HR generalist?
11       MS. PARKER: Objection to form.
12  Plants and branches, I'm not sure if you
13  mean that conjunctively or disjunctively.
14       MR. MILLS: I mean it conjunctively
15  because --
16       BY MR. MILLS:
17  Q.   Strike that.
18       This morning we talked about there
19  being a difference between a plant and a
20  branch, right?
21  A.   Yes.
22  Q.   How many total plants and branches combined
23  were there in the Northern California area
24  that Janelle was servicing during the same
25  time that Brandy was servicing Phoenix?

---

12:48-12:50                                   Page 111

1        MS. PARKER: Objection to form.
2        THE WITNESS: There were two plants
3   and at least two branches, but I can't
4   recall if there were more than that.
5        BY MR. MILLS:
6   Q.   But you would agree with me that, during the
7   time that she was an HR generalist in the
8   Northwest Region, that Brandy Williams was
9   supporting more than three locations?
10       MS. PARKER: Objection to form.
11       THE WITNESS: "Locations"
12  defined --
13       BY MR. MILLS:
14  Q.   As a branch or a plant.
15  A.   Yes.
16  Q.   She was supporting more than three?
17  A.   Yes.
18       MS. PARKER: Again, objection to
19  form.
20       BY MR. MILLS:
21  Q.   Let's move on.
22       MR. MILLS: Let's mark this as 2, I
23  guess.
24       (Exhibit 2 was marked.)
25       BY MR. MILLS:

---

12:50-12:52                                   Page 112

1   Q.   Ma'am, I've handed you a document that's
2   been marked as Exhibit 2.  And I'm going to
3   call your attention to the first one, two,
4   three, four pages of the document.  It's
5   Bates numbered G & K 448 through 451.  If
6   you could take a minute to look at those.
7   A.   (Perusing.)  Just through 451?
8   Q.   Let's focus on the first few pages for now.
9        Do you recognize the handwriting?
10  A.   I do.
11  Q.   Is it yours?
12  A.   It is.
13  Q.   Okay.  These are your notes?
14  A.   Yes, they are.
15  Q.   Okay.  And are these notes that you made
16  during your tenure at G & K?
17  A.   I believe so, yes.
18  Q.   And why did you make these notes?
19  A.   I just made them in the course of business.
20  Q.   Do you typically take notes -- or strike
21  that.
22       Did you typically take notes during
23  the course of your business at G & K?
24  A.   Yes.
25  Q.   Did you do that every day?

---

12:52-12:53                                   Page 113

1   A.   I don't recall if I made notes every day.
2   Q.   What types of things would prompt you to
3   take notes?
4   A.   I would take notes from the one-on-ones that
5   I had with employees, if I had a meeting
6   with a manager, I would take notes about
7   employee calls, just general things that I
8   thought were relevant.
9   Q.   What's one-on-one?
10  A.   One-on-one is a meeting with one other
11  employee, typically someone that reports to
12  you but one-on-one meeting.
13  Q.   Would you turn to the second page of the
14  exhibit Bates numbered 449?
15  A.   Yes.
16  Q.   And the writing appears to say "Kaela
17  one-on-one," right?
18  A.   Correct.
19  Q.   Is that referring to Kaela Ellison?
20  A.   Yes.
21  Q.   And that's dated June 13, 2013?
22  A.   Yes, it is.
23  Q.   Okay.  And then there is a paragraph
24  numbered 1 that reads -- and correct me if I
25  get this wrong -- quote, "Bored, miss the

| 12:54-12:55 | Page 114 |
| --- | --- |

1   connection to our employees, don't feel like
2   I have an impact, managers don't know what I
3   do.  I hate my job."
4     Did I read that right?
5   A.  Yes.
6   Q.  Are those statements that Kaela was making
7   to you?
8   A.  They would be kind of the general -- general
9   statements that she was making.
10   Q.  Did you have any response to Kaela telling
11   you that she was bored?
12   A.  Other than I know we looked at -- so, again,
13   specifically to this Note Number 1 at this
14   particular time, I don't remember.
15   Q.  Had Kaela told you on other occasions that
16   she was bored?
17   A.  Yes.
18   Q.  How frequently did she do that?
19   A.  Pretty much weekly.
20   Q.  And did you ever tell her anything that she
21   could do to alleviate her boredom?
22   A.  Yes.
23   Q.  What did you say?
24   A.  I asked her to continue looking for
25   additional opportunities to engage with the

| 12:55-12:56 | Page 115 |
| --- | --- |

1   business, to get out and meet with the
2   managers, to go on ride-alongs, to engage,
3   to understand what the business needs were,
4   and then to come up with suggestions that
5   she had to address those needs, either with
6   the existing tools that were in place or
7   tools that she created.
8   Q.  Did you say anything to Kaela that you
9   recall in response to her statement that she
10   hated her job?
11   A.  Did I?
12   Q.  Yes.
13   A.  I don't recall.
14   Q.  Did it concern you that she said that she
15   hated her job?
16   A.  Not necessarily.  So, it was one-on-one with
17   an employee, and I encouraged my employees
18   to be very candid with me.
19     So, if there's something that, you
20   know, that they can tell me that we can work
21   to fix, then yes, but I think you always
22   need to remember --
23   Q.  Do you recall whether she told you why she
24   hated her job?
25   A.  The things listed in this paragraph.

| 12:56-12:57 | Page 116 |
| --- | --- |

1   Q.  Including that she was bored?
2   A.  She was bored, the job had changed.  So,
3   remember, this is the generalist job, not
4   the HR representative job.
5   Q.  And the managers didn't know what she was
6   doing?
7   A.  She felt that.
8   Q.  Had you heard any feedback from her managers
9   that they didn't feel like they understood
10   what her role was as an HR generalist?
11   A.  I don't recall that I heard specifically
12   from her managers that they didn't know.
13     I may have heard -- there was
14   general feedback from managers in the region
15   that they didn't understand what the
16   generalist role was.
17   Q.  Did Kaela ever express to you that she
18   didn't understand what her role was as an HR
19   generalist?
20   A.  I don't remember if she said she didn't
21   understand.  I know the entire time we went
22   through the HR realignment, kind of,
23   post-implementation we were all kind of
24   seeking to understand and, really, define
25   what those roles are.

| 12:57-12:58 | Page 117 |
| --- | --- |

1     It's one thing to say this is what
2   you do on paper, and it's a completely
3   different things to kind of shift a mind-set
4   and start kind of showing up in a different
5   way and acting in a different way and
6   working in a different way than you have in
7   the past.
8   Q.  Did Kaela ever express to you that she felt
9   that the managers were unhappy because they
10   didn't understand what her role was as an HR
11   generalist?
12   A.  No, not specifically, no.
13   Q.  Or anything suggesting that generally?
14     MS. PARKER: Objection to form.
15     THE WITNESS: Not that I remember.
16   BY MR. MILLS:
17   Q.  Did Brandy Williams ever tell you that she
18   was bored with her job?
19   A.  I don't ever recall her using the word
20   "bored."
21   Q.  Do you recall Brandy Williams ever telling
22   you that she hated her job?
23   A.  In those specific words, no.
24   Q.  In similar words?
25   A.  Yes.

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 368 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

12:58-12:59                                    Page 118

1 Q.  What do you recall?
2 A.  I recall her expressing, on multiple
3    occasions, that she felt that people didn't
4    know what she did, and that she didn't feel
5    like she was contributing to the business,
6    and she didn't know if she was happy.  Yes,
7    in those words, yes.
8 Q.  And did she express to you that her
9    unhappiness was based on what she was
10   hearing from other people?
11 A.  No, not that I recall.
12 Q.  Do you recall Brandy telling you that she
13   felt like the managers didn't understand
14   what her role was as an HR generalist?
15    MS. PARKER: Objection to form.
16    THE WITNESS: I don't remember it
17   specifically but it wouldn't surprise me.
18    BY MR. MILLS:
19 Q.  But Kaela had expressed similar concern that
20   managers didn't understand what this new
21   role was?
22 A.  Yes, yes.
23    (Exhibit 3 was marked.)
24    BY MR. MILLS:
25 Q.  I'm handing you a document that's been

01:00-01:01                                    Page 119

1    marked as Exhibit 3, and I'm going to ask
2    you to take a quick look at it and tell me
3    if you can identify this document as
4    containing your handwritten notes.
5    MS. PARKER: So, I'm -- maybe this
6    is supposed to be separate.  I have another
7    document.  (Handing.)
8    MR. MILLS: Yeah, that doesn't go
9    with that.
10    MS. PARKER: And I was just going
11   to ask, because I wonder if Exhibit 2 -- was
12   it supposed to have all these emails in it?
13    MR. MILLS: Yes, because we were --
14   yeah.
15    MS. PARKER: Okay.  We didn't get
16   to how they belong together.
17    MR. MILLS: No.
18    THE WITNESS: Can I ask you
19   something super quick?
20    MS. PARKER: On -- off the record?
21    THE WITNESS: Yeah.  Is that
22   possible and something that I just -- I saw
23   in here that I don't know if it should be in
24   here, if these are going to be public or
25   published.

01:01-01:05                                    Page 120

1    MS. PARKER: We have a concern
2    about redaction -- is it in --
3    THE WITNESS: It was in the first
4    set, too.
5    THE VIDEOGRAPHER: We're off the
6    video record.  The time on the monitor is
7    1:01 p.m.
8    (Discussion off the record.)
9    THE VIDEOGRAPHER: We are back on
10   the video record.  The time on the monitor
11   is 1:04 p.m.
12    MS. PARKER: All right.  So, our
13   off-the-record discussion was with respect
14   to G & K 000450, the third page of
15   Exhibit 2.
16    And we are requesting to redact the
17   paragraph numbered 2, which is regarding an
18   individual who is not Kaela and contains
19   some confidential personnel information, and
20   I think we have a stipulation.
21    MR. MILLS: I will stipulate on the
22   record to that.
23    MS. PARKER: Thank you.
24    MR. MILLS: So, let's move on to
25   Exhibit 3.

01:05-01:06                                    Page 121

1    BY MR. MILLS:
2 Q.  And my question is:  Are these your -- is
3    this a copy of your handwritten notes?
4 A.  It looks to be, yes.
5 Q.  Have you had an opportunity to review them
6    prior to the deposition?
7 A.  To some extent, yes.  I would say I don't
8    have them memorized, though.
9 Q.  By the way, what did you do to prepare for
10   your deposition?
11 A.  Well, I turned over my notebook that I
12   found, which is where these notes were, and
13   then I just met with Kristin and Jenny.
14 Q.  How long did you meet with them?
15 A.  Probably about a half day.
16 Q.  Can you tell by looking at these notes when
17   they start?  And by that I mean, what's the
18   earlier date you see in here on your notes?
19 A.  Do you want me to go through them all and
20   look or are they in chronological order?
21 Q.  I don't know.  I mean, there are some --
22 A.  Okay.  I would have to -- honestly, I would
23   have to go through and look at them all to
24   see if they are in order.
25    MS. PARKER: You can take your

| 01:06-01:13 | Page 122 |
|---|---|

1   time.
2       BY MR. MILLS:
3   Q.   I would kind of like you to do that because
4   there's some pages that don't have any date
5   on them so I want to know -- I kind of want
6   to know what the timeframe is that we're
7   dealing with here.
8   A.   Okay. (Perusing.)
9       MS. PARKER: While Ms. Siggerud is
10   reviewing this document, it's been brought
11   to my attention there are two additional
12   instances that are similar to the redaction
13   we just discussed.
14       MR. MILLS: Okay.
15       MS. PARKER: On G & K page 000310,
16   the last line of paragraph 7 contains
17   medical information. It's literally the
18   last line on that page.
19       MR. MILLS: I will stipulate that
20   can come out.
21       MS. PARKER: Great. And then page
22   319, there is this -- the paragraph 1, the
23   first two lines contain medical information.
24   There's other confidential information in
25   that paragraph 1.

| 01:13-01:14 | Page 123 |
|---|---|

1       MR. MILLS: I'm sorry, what page
2   are you on, 3 --
3       MS. PARKER: 319, and the numbers
4   are a little bit hard to read, I apologize.
5   This is the note 7/2/13, Brandy one-on-one,
6   that same discussion of an employee's
7   medical condition -- you know, the
8   employee's name -- the last name is
9   redacted, I think we could just redact the
10   employee's first name.
11       MR. MILLS: Can I ask the witness a
12   question?
13       MS. PARKER: Sure.
14       BY MR. MILLS:
15   Q.   Ma'am, this information on page Bates
16   numbered 319 in paragraph 1, is this your
17   documentation of a conversation you had with
18   Brandy Williams?
19   A.   It would have been out of a conversation, so
20   I don't know if I was taking notes or
21   capturing what I was sharing with her or
22   what she was sharing with me.
23   Q.   Okay. But this individual that's referenced
24   in paragraph 1, is that an employee --
25   A.   Yes.

| 01:14-01:15 | Page 124 |
|---|---|

1   Q.   -- of G & K?
2   A.   Yes.
3   Q.   And that would have been a topic of your
4   discussion with Brandy?
5   A.   Yes.
6       MR. MILLS: I'll stipulate that
7   that can come out.
8       MS. PARKER: Thank you.
9       THE WITNESS: All right. I think
10   they are in order. The only one I don't
11   100 percent have a date on --
12       BY MR. MILLS:
13   Q.   What's the Bates number on that page?
14   A.   313.
15   Q.   313. Okay. And you think that, other than
16   that, that these notes are in chronological
17   order?
18   A.   I believe so.
19   Q.   What's the earliest date on any of these
20   notes?
21   A.   On any of these notes, May 1st of 2013.
22   Q.   Okay. And that reflects one-on-one with
23   Brandy?
24   A.   That is correct.
25   Q.   Why do they start in May of 2013?

| 01:15-01:16 | Page 125 |
|---|---|

1   A.   I don't know without having the notebook.
2   It may have been the beginning of a new
3   notebook.
4   Q.   Did you have notes regarding Brandy prior to
5   May 2013?
6   A.   I would have, yes.
7   Q.   Do you know where those are?
8   A.   I do not.
9   Q.   I mean, do you have them in your possession?
10   A.   I do not.
11   Q.   Did you give them to counsel?
12   A.   No.
13   Q.   How many notes did these -- or how many
14   notebooks did these notes that constitute
15   Exhibit 3 come out of?
16   A.   One.
17   Q.   And did you have that notebook in your
18   possession?
19   A.   I did.
20   Q.   And what happened to the other notebooks?
21   A.   I have no idea. They were probably thrown
22   away.
23   Q.   Did you -- well, did you leave them at
24   G & K?
25   A.   Some may have been left at G & K, some I

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

| 01:16-01:17 | Page 126 |
| --- | --- |

1  probably took with and threw away at a later
2  date when I cleaned my house.
3  Q.  Why did you take notes?
4  A.  I take notes to keep -- just to kind of keep
5  my thoughts relevant, so if I need to go
6  back and look at something, then I can
7  remember it, so --
8  Q.  Do you know why you would have thrown away
9  any of the notebooks?
10  A.  Because they -- I didn't need them anymore.
11  Q.  Why did you -- why did you happen to have
12  this one out of which we have Exhibit 3?
13  A.  I didn't realize I had it until I cleaned my
14  basement, and then I found it.  So, I really
15  didn't think I had it anymore.
16  Q.  Were you looking for it?
17  A.  No, I wasn't, actually.
18  Q.  Had anybody asked you to look for it?
19  A.  No, I don't think so, no.
20  Q.  And what did you do when you found it?
21  A.  When I found it, I let -- I don't know if I
22  should --
23       THE WITNESS:  I spoke with G & K
24  about it.
25       MS. PARKER:  Not -- again, not like

| 01:17-01:19 | Page 127 |
| --- | --- |

1  the whole discussion but the fact that
2  you --
3       THE WITNESS:  I notified G & K that
4  I had found notes.
5       BY MR. MILLS:
6  Q.  Why did you notify them about that?
7  A.  I notified them of that because I was aware
8  of conversations that I had had with Marie
9  Smith dating back to the date, early April,
10  or before, asking if I had any notes.
11  Q.  Do you recall when it was that you gave the
12  notebook to G & K?
13  A.  Exactly, no.
14  Q.  Did you become aware at some point that
15  Brandy Williams had filed a lawsuit against
16  G & K?
17  A.  Yes.
18  Q.  When did you learn that?
19  A.  Within the past couple of months, or so.
20  Q.  Before or after you found the notebook?
21  A.  After, it was after I found the notebook.
22  Q.  And after you turned it over to G & K?
23  A.  No.  I turned -- I found out that I had the
24  notebook, and I let G & K know that I had
25  found it because Marie Smith had asked about

| 01:19-01:20 | Page 128 |
| --- | --- |

1  it kind of a couple years ago and I was
2  unsure of the status of the EEOC charge or
3  anything, so I let them know that I had it,
4  and then they requested that I give it to
5  them, so I did.
6  Q.  And they requested it after you learned the
7  lawsuit had been filed?
8  A.  I don't remember when I found -- yeah, I
9  assume so.  I just -- I don't remember the
10  exact timing.
11  Q.  Is it possible that you left some of your
12  notebooks at G & K when you left?
13  A.  It's possible.
14  Q.  Where would they be if you had left them
15  there?
16  A.  They would have been in my office.
17  Q.  I guess the better question is:  Where would
18  you have left them?
19  A.  I can tell you if I did leave them, it would
20  have been in my office.
21  Q.  Do you know who took over your position at
22  G & K when you left?
23  A.  It was empty for a while.
24  Q.  The regional manager's position was empty
25  for a while?

| 01:20-01:22 | Page 129 |
| --- | --- |

1  A.  The regional director, yes.
2  Q.  Regional director, sorry.  Is there anybody
3  in that position now?
4  A.  I think there is, yes.
5  Q.  Do you know who that is?
6  A.  I think her name is Julie.
7  Q.  Did you recall Brandy telling you that she
8  felt like she wasn't getting any feedback
9  from Jake Briscoe in Phoenix?
10  A.  At any particular point or --
11  Q.  At any -- at any time.
12  A.  I don't recall her saying that.  If it's in
13  my notes, it's possible that she did and I
14  just don't remember it.
15  Q.  Do you recall ever having a conversation
16  with Jake Briscoe about giving feedback to
17  Brandy in her role as an HR generalist?
18  A.  I don't remember.  If there's a more
19  specific instance you're asking about, I
20  might be able to give more information.
21  Q.  Did either Janelle or Kaela ever express to
22  you concern that they weren't getting
23  feedback from managers?
24  A.  I don't recall.  I honestly just don't
25  remember as of today, unless it's in my

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

1    notes, then I could refresh myself.  I don't
2    know.  Is it feedback about something
3    specific?
4    Q.  About their -- about their role as an HR
5    generalist.
6        MS. PARKER: Objection to form.
7        THE WITNESS: So, I think -- I
8    mean, that's kind of what we've talked about
9    in the past today, so getting feedback about
10   things like lack of role clarity; is that
11   kind of what you're asking?
12       BY MR. MILLS:
13   Q.  Did you ever have any conversations about --
14   with any of the managers about what they
15   would -- what they wanted to see the
16   HR generalists doing?
17       MS. PARKER: Objection to form.
18       THE WITNESS: Yes.
19       BY MR. MILLS:
20   Q.  Okay.  And do you recall what managers you
21   had that conversation with?
22       MS. PARKER: Objection to form.
23       THE WITNESS: Yes.
24       BY MR. MILLS:
25   Q.  Okay.  Who?

1    A.  I had a conversation with Rich Pland.
2    Q.  Where is he?
3    A.  He is in Sacramento.
4    Q.  Okay.
5    A.  And I had a conversation with Charles
6    Wilson.
7    Q.  Okay.  Where was he?
8    A.  St. Paul.  I had multiple conversations with
9    Eric McNaul.
10   Q.  Okay.
11   A.  Conversations with Angie Graczyk.
12   Q.  Okay.
13   A.  With Jake.
14   Q.  Jake Briscoe?
15   A.  Correct.  With Loren Bayer.
16   Q.  Where was that?
17   A.  St. Cloud.
18   Q.  Okay.  Anybody else that you can recall?
19   A.  Yes, Greg Gibson.
20   Q.  Okay.  Where was he?
21   A.  Minneapolis.
22   Q.  Anybody else?
23   A.  Robert de St. Aubin.
24   Q.  Where was he?
25   A.  Minneapolis.

1    Q.  Okay.  Anybody else you can recall?
2    A.  I can recall a lot of people.  Generally, we
3    talked about what the role should be and how
4    we wanted the role to --
5    Q.  All right.  Let me ask you this:  What
6    feedback were you getting from them, from
7    the managers, as to what they thought the
8    HR generalists should be doing?
9        MS. PARKER: Objection:  Form;
10   compound; and not defined as to time.
11       THE WITNESS: I got a variety of
12   feedback.
13       BY MR. MILLS:
14   Q.  Can you give me some examples.
15   A.  Sure.  I got --
16       MS. PARKER: Objection to form.
17       THE WITNESS: -- feedback that what
18   the business really needed was a higher
19   level HR role, more of a strategic partner,
20   somebody who could move the needle on things
21   like org design, partnering with recruiting,
22   staffing models, helping with talent
23   development, leadership coaching, driving a
24   service-excellence culture, so --
25       BY MR. MILLS:

1    Q.  Did you have any discussions with the
2    HR generalists about what the -- what you
3    were hearing from the managers?
4        MS. PARKER: Objection:  Form.
5        BY MR. MILLS:
6    Q.  In terms of what they would like to see in
7    their role as an HR generalist?
8        MS. PARKER: Same objection.
9        THE WITNESS: Yes.
10       BY MR. MILLS:
11   Q.  And what -- what were those conversations?
12   A.  Much the same as what I just said, so --
13   Q.  I want you to turn to page Bates number 314,
14   Exhibit 3.
15       And can you tell me what the date
16   is in connection with these notes?
17   A.  I don't have an exact date.  This is
18   preparation for one-on-one that I had with
19   Brandy, I believe it was in June.  I believe
20   it's a call that she recorded, so I expect
21   that you have the date somewhere.
22   Q.  Does June 26th sound right?
23   A.  It does.
24   Q.  And if you look down like the one, two,
25   three, fourth paragraph, you write, How your

---

01:28-01:29                                              Page 134

1   partners/ -- or I'm sorry, How your partners
2   perceive you.
3      Did I read that right?
4 A.   Yes, "and I."
5 Q.   "How your partners and I perceive you,"
6   thank you.
7      And are you recording here what you
8   told Brandy during your one-on-one?
9 A.   No.  I was preparing for what I wanted to
10  talk with her about during that one-on-one.
11 Q.   And you wanted to talk to her about that
12  managers don't know where she is and issues
13  with getting to her on the phone?
14 A.   So, it was a perception.  So, how they
15  perceived her.  There was a perception that
16  they couldn't get her on the phone or they
17  couldn't find her or she wasn't responsive.
18 Q.   Was there also a perception that she was
19  coming in late and leaving early?
20 A.   Yes, per the notes, there was.
21 Q.   And did you talk to Brandy about that, her
22  coming in late and leaving early was causing
23  friction with the managers in Phoenix?
24      MS. PARKER: Objection to form.
25      THE WITNESS: Not coming in late

---

01:29-01:30                                              Page 135

1   and leaving early.  More that they didn't
2   know when she was there.
3      So, it wasn't a consistent
4   schedule, so there wasn't any kind of
5   out-of-office -- or they weren't sure if she
6   was in a branch that day, or if she was
7   going to be in Phoenix, so it was just an
8   accessibility question.
9      BY MR. MILLS:
10 Q.   Was that the typical concern that you heard
11  from the managers in Phoenix?
12      MS. PARKER: Object to the form.
13      THE WITNESS: No, that was one of
14  the concerns, but that was probably not the
15  biggest one, no.
16      BY MR. MILLS:
17 Q.   What was the biggest concern?
18 A.   The biggest concern was really around her
19  partnership and being able to kind of step
20  up into that more strategic role.
21 Q.   And what specifically were you hearing from
22  any of the managers in Phoenix about that?
23 A.   That they didn't necessarily see her as a
24  resource, that they felt that she was -- she
25  would come out and go on route rides, but

---

01:30-01:31                                              Page 136

1   then she would turn around and kind of try
2   to pick apart what was wrong versus my
3   expectation which was go out and listen and
4   understand and be a facilitator.
5      It's not her job to solve the
6   problems.  It's her job to kind of help
7   connect the business, to help support the
8   business, to help guide your leaders in
9   finding a resolution.
10      So, if a manager says, hey, I have
11  this issue, I'm really struggling with XYZ,
12  it's not the HR generalist's job to go tell
13  that person's manager.
14      It's the HR generalist's job to
15  say, hey, let's talk about how you can
16  strengthen your leadership skills.  Let's
17  talk about how that conversation might go.
18 Q.   Who specifically told you that?
19 A.   Told me what?
20 Q.   What specific managers were telling you
21  about Brandy?
22      MS. PARKER: Objection to form.
23      THE WITNESS: So -- sorry.
24      BY MR. MILLS:
25 Q.   Go ahead.

---

01:31-01:32                                              Page 137

1 A.   Jake gave me that feedback, other managers
2   in the Phoenix business, which now, as I'm
3   reading, Mitch Rubinoff is another person
4   who had some feedback.
5 Q.   What was Mitch's last name?
6 A.   Rubinoff, I think.
7 Q.   Did you ever talk directly with Mitch?
8 A.   I did.
9 Q.   How frequently would you speak with him?
10 A.   Infrequently.
11 Q.   Less frequently than with Jake?
12 A.   Yes.
13 Q.   Did you ever talk to Mitch about Brandy
14  Williams?
15 A.   I -- yes, I believe I did.
16 Q.   Do you recall how many times?
17 A.   I don't.
18 Q.   Was it more than one?
19 A.   I honestly don't recall.
20 Q.   Do you recall what was said?
21 A.   I wanted to set expectations with him, so
22  yes, I do.  I was trying to set expectations
23  with him about including Brandy, and how I
24  expected her role in the business to kind of
25  transpire to unfold, so this is -- you know,

---

| 01:32-01:34 | Page 138 |
|---|---|

1  me now is leading this group of generalists
2  into this new space, so setting my
3  expectations for how I thought the role
4  should participate in the business and how I
5  wanted them, in turn, to interact with her
6  and to not be surprised if she says she
7  wants to come on a route ride, or if your
8  partner wants to come to a staff meeting and
9  they haven't been there before, and just an
10  expectation that we were going to be
11  elevating the activities.
12  Q.  Do you recall how Mitch responded to what
13  you were telling him?
14  A.  He responded favorably.
15  Q.  Look at the -- going back to Exhibit 3, and
16  on page Bates number 314 again, the
17  paragraph just above the one that we were
18  talking about, and you write here, quote, "I
19  want you to be successful here but I need to
20  talk through some things that I think are
21  standing in your way," unquote.
22      Did I read that correctly?
23  A.  Yes.
24  Q.  And those -- here you're documenting
25  something you want to talk to Brandy about,

| 01:34-01:36 | Page 139 |
|---|---|

1  right?
2  A.  Yes.
3  Q.  By this time, June 26th, you had already
4  decided that you were going to eliminate her
5  position; isn't that true?
6  A.  We had decided that we were going to
7  eliminate the position in the June
8  timeframe.  I don't know exactly when.  I
9  can't give a specific answer.
10  Q.  It's likely that it was prior to June 26th,
11  though, right?
12  A.  I can't say for certain.  I don't know the
13  exact date.
14  Q.  Can you turn to page Bates numbered 322.
15  A.  Okay.
16  Q.  And can you tell me what -- generally what
17  these notes are about?  And the reason I'm
18  asking is because it doesn't have one of
19  the -- I don't see a name associated with
20  them, so --
21  A.  So, it looks to be notes about the LA office
22  redesign, hosting for a role, and then notes
23  from a conversation which I believe was with
24  Brandy.
25  Q.  Where do those begin?

| 01:36-01:38 | Page 140 |
|---|---|

1  A.  They begin with -- well, I think the entire
2  conversation was with Brandy.
3  Q.  How can you tell that?
4  A.  Because she recorded it and I have seen the
5  transcript.
6  Q.  And this is on July 17, 2013?
7  A.  That's the date that I have on the top, yes.
8  Q.  Okay.  Did you recall Brandy telling you
9  that she was very stressed about her role as
10  an HR generalist?
11  A.  I remember her being stressed, yes.
12  Q.  Do you recall her telling you why she was
13  stressed?
14  A.  She felt like she wasn't making any progress
15  in her role.
16  Q.  Did she say that people were -- strike that.
17      Did she express to you any stress
18  that people had been treating her
19  differently recently?
20      MS. PARKER: Objection to form.
21      THE WITNESS: She said that she
22  felt that people were treating her
23  differently based on -- let's see, based on
24  her medical issues.
25      BY MR. MILLS:

| 01:38-01:39 | Page 141 |
|---|---|

1  Q.  And did you have an understanding as to why
2  they were treating her differently?
3      MS. PARKER: Objection to form and
4  mischaracterizing prior testimony.
5      THE WITNESS: So, she never did
6  give me anything specific to back up her
7  concerns that others were treating her
8  differently or perceiving her differently
9  because of stated medical issues, which also
10  wasn't defined.
11      BY MR. MILLS:
12  Q.  Did you do any investigation into her claim
13  that she was being treated differently
14  because of her medical issues?
15  A.  I tried to understand, not in necessarily
16  this conversation, but tried to understand
17  kind of what that meant, so what did she
18  mean by that she was being treated
19  differently, and she couldn't really give me
20  any specific things to investigate.
21      MR. MILLS: Sorry, we have to
22  change the tape.
23      THE VIDEOGRAPHER: We're off video
24  record.  The time on the video monitor is
25      1:39 p.m.

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

---

01:47-01:53                                        Page 142

1      (A recess was taken.)
2      THE VIDEOGRAPHER: We are back on
3   the video record.  The time on the video
4   monitor is 1:52 p.m.
5      BY MR. MILLS:
6   Q.  Okay.  Do you recall Brandy Williams going
7   into a temporary role in recruiting in the
8   summer of 2013?
9   A.  I do.
10  Q.  And did you tell Brandy, at the time that
11  she went into the recruiting role, that when
12  that temporary position was over, that she
13  could come back and be an HR generalist?
14  A.  I don't recall if we said come back and be
15  an HR generalist.  I think there was also a
16  possibility that she might stay permanently
17  in a recruiting role.
18  Q.  But do you -- but you told her that, if she
19  didn't stay in the recruiting role, that she
20  could come back and be an HR generalist,
21  right?
22     MS. PARKER: Objection.
23     THE WITNESS: Yes.
24     BY MR. MILLS:
25  Q.  Is it yes?

---

01:53-01:55                                        Page 143

1   A.  Yes.
2   Q.  And, again, you would have told her that
3   after you had, according to your testimony,
4   determined that you were going to eliminate
5   her position?
6   A.  Yes.
7   Q.  Why would you tell her that?
8   A.  Because there hadn't been a date set for a
9   position elimination, so we had determined
10  that we were going to eliminate it, it would
11  likely be Brandy, based on geography, but
12  there hadn't been a final date set.
13  Q.  Does that typically happen at G & K where
14  you have an open-ended termination date?
15  A.  Not necessarily an open-ended termination
16  date.
17  Q.  You testified that you guys had decided in
18  June to eliminate her position.
19  A.  Correct.
20  Q.  But here we are in July going into August
21  and there is still no -- is it still your
22  testimony that there was no decision as to
23  when she was going to be terminated?
24  A.  Yes.
25     MS. PARKER: And I'll object just

---

01:55-01:57                                        Page 144

1   on the kind of double negative -- the form.
2      BY MR. MILLS:
3   Q.  Is that correct?
4   A.  Yes, I think.
5      (Exhibit 4 was marked.)
6      BY MR. MILLS:
7   Q.  I've handed you what's been marked as
8   Exhibit 4.  It's Bates number G & K 000437.
9      You've seen this document before?
10  A.  Yes.
11  Q.  And this is a letter from Brandy Williams to
12  G & K, specifically addressed to you, dated
13  July 8, 2013, correct?
14  A.  What was the date again?
15  Q.  July 8, 2013.
16  A.  Yes.
17  Q.  The first sentence of the body of the
18  letter, she writes, quote:  I know you are
19  aware that I have been experiencing
20  significant health problems since the birth
21  and delivery of my son on July 11, 2012 and
22  they have taken me away from the business,
23  end quote.
24     You were aware that Brandy had been
25  experiencing health problems for some time,

---

01:57-01:58                                        Page 145

1   right?
2   A.  Yes.
3   Q.  What was your understanding of the health
4   problems that she was experiencing?
5   A.  I didn't have a specific understanding, just
6   that it was related to the birth of her son.
7   Q.  Do you recall Brandy ever explaining to you
8   specifically what was going on with her
9   health?
10  A.  I remember her, on a couple of occasions,
11  sharing some detailed information.  I don't
12  know that we ever sat down and had a really
13  in depth conversation about all of the
14  nuances, but that would have --
15  Q.  Just tell me as best you can what you can
16  recall specifically about what she told you
17  about her health conditions.
18  A.  I just remember it being related generally
19  to -- we'll call it pelvic health.
20  Q.  Anything else?
21  A.  That was -- so, that was what she and I
22  talked about was just ongoing kind of
23  medical concerns related to the birth of her
24  son in the kind of pelvic health category.
25  Q.  Did you have any reason to doubt that she

---

---

01:58-01:59                                    Page 146

1   was actually experiencing these health
2   problems?
3   A.   No, no, not at all.
4   Q.   And you are aware that she was being treated
5   during this timeframe, July 2013?
6   A.   I was -- yes, I was aware that she had
7   medical appointments and things like that,
8   yeah.
9   Q.   And you are aware that, from time to time,
10  she had to miss work to go to medical
11  appointments?
12  A.   Yes.
13       MS. PARKER: Objection to form with
14  respect to when.
15       BY MR. MILLS:
16  Q.   After the birth of her son.
17  A.   Yes.
18       MS. PARKER: Same objection.
19  It's -- there's a relatively lengthy period
20  of time.
21       BY MR. MILLS:
22  Q.   And you were also aware, as of the time of
23  this letter, July 8, 2013, that Brandy had
24  been experiencing a significant amount of
25  mental stress, right?

---

01:59-02:01                                    Page 147

1   A.   Just -- well, I could look at the date of
2   the notes.  Would that -- okay.
3   Q.   Yeah, feel free to refer to whatever you
4   want to.
5   A.   Was it 6/26?  Was that the date of that
6   conversation or was it later?  The one
7   where -- actually, I think it was the 7/17
8   call, so that would have been after this
9   letter.
10  Q.   She states in this letter at the very last
11  sentence of the first paragraph, quote,
12  "This has also taken a toll on me mentally
13  as well and I am also working with a mental
14  health provider for support," period
15  unquote, correct?
16  A.   That's what it says, yes.
17  Q.   Do you recall Brandy telling you prior to
18  the time of this letter that she was
19  experiencing mental health issues as well?
20  A.   I, honestly, I don't remember as we sit here
21  today.
22  Q.   And then, in the letter, Brandy goes on and
23  requests an ADA accommodation, correct?
24  A.   Yes, that is what it says.
25  Q.   ADA, meaning the Americans With Disabilities

---

02:01-02:02                                    Page 148

1   Act, correct?
2   A.   That's what this says, yes.
3   Q.   You've had other employees make ADA
4   requests?
5   A.   Yes.
6   Q.   At G & K -- other employees at G & K have
7   made ADA requests?
8   A.   Yes.
9   Q.   Who typically handled the ADA requests at
10  G & K?
11  A.   So --
12       MS. PARKER: Objection to
13  foundation.
14       THE WITNESS: So, it would have
15  been the employee relations group at -- so
16  that -- yeah, so it would have been the
17  employee relations group at this time.
18       BY MR. MILLS:
19  Q.   And do you recall who specifically at the
20  employee relations group would have handled
21  ADA requests?
22  A.   It would have been somebody in the group.
23  There were multiple employees.
24  Q.   How many employees were in the group at that
25  time?

---

02:02-02:04                                    Page 149

1   A.   At least two, but maybe more.
2   Q.   Do you remember names?
3   A.   Well, Nikki Kietzer, and then Marie Smith.
4   Q.   Okay.  But you're not the one who would
5   typically handle an ADA request?
6   A.   No, no.
7   Q.   Did it annoy you that Brandy Williams had
8   requested an ADA accommodation?
9        MS. PARKER: Objection:  Form.
10       THE WITNESS: Of course not, no.
11       BY MR. MILLS:
12  Q.   Were you angry that she had requested an ADA
13  accommodation?
14       MS. PARKER: Objection.
15       THE WITNESS: Absolutely not.
16  (Exhibit 5 was marked.)
17       BY MR. MILLS:
18  Q.   Ma'am, we've handed you a document that's
19  been marked as Exhibit 5, and I'll ask if
20  you can identify that as an email that you
21  sent to Marie Smith on or about July 8,
22  2013.
23  A.   That is what the time stamp says, yes.
24  Q.   Again, July 8th is the date of Brandy's
25  letter making the ADA request, Exhibit 4?

---

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

| | |
|---|---|
| 02:04-02:05      Page 150 | 02:06-02:07      Page 152 |

**Page 150**

1  A.  Yes.
2  Q.  And in the first paragraph you refer to,
3  quote, "some strong performance
4  conversations with Brandy lately," unquote;
5  is that right?
6  A.  That is what it says.
7  Q.  Then you go on to say, "I also believe that
8  she is out of FMLA time"; is that right?
9  A.  That is what it says.
10 Q.  And FMLA is the Family Medical -- Family
11 Medical Leave Act, correct?
12 A.  Correct.
13 Q.  And then you state to Marie that, "she has
14 been consistently missing work or coming in
15 late," right?
16 A.  That is what it says.
17 Q.  Then in the next paragraph -- and this is
18 you writing this, right, the text of this
19 email is -- you wrote this?
20 A.  Yes.
21 Q.  Okay.  The next paragraph you write, quote,
22 "I would like to manage this request very
23 closely and would like your assistance in
24 determining the best way of doing so."
25     Did I read that right?

**Page 152**

1  request"?
2  A.  I don't know that I was asking to manage it
3  closely, or if I was asking for Marie's
4  assistance.
5  Q.  Well, that's what you said, isn't it, quote,
6  "I would like to manage this request very
7  closely."
8     Aren't those your words?
9  A.  This is written here.
10 Q.  Those are your words, right?
11 A.  They are.
12 Q.  You chose those words, right?
13 A.  I did.
14 Q.  And words mean things, don't they?
15 A.  They do.
16 Q.  And when you say, "I want to manage this
17 request very closely," you're conveying
18 something to Marie, weren't you?
19 A.  I was.
20 Q.  You're conveying to her that you want to be
21 very involved in this request, right?
22     MS. PARKER: Objection to form;
23 mischaracterizes the prior testimony.
24 You're not even reading the full sentence.
25 She just said she was asking Marie for

| | |
|---|---|
| 02:05-02:06      Page 151 | 02:07-02:08      Page 153 |

**Page 151**

1  A.  Yes.
2  Q.  And the reason you wanted to manage this
3  request very closely is that you were
4  unhappy with Brandy for having made an ADA
5  accommodation request; isn't that true?
6     MS. PARKER: Objection to form;
7  argumentative; mischaracterizes.
8     THE WITNESS: Absolutely not.
9     BY MR. MILLS:
10 Q.  But you just testified a few moments ago
11 that you're not typically involved in ADA
12 requests; isn't that true?
13     MS. PARKER: Objection to form.
14     BY MR. MILLS:
15 Q.  Isn't that what you said?
16 A.  As the manager of an employee, the manager
17 is typically involved.
18 Q.  But you testified earlier -- and I can have
19 the court reporter read it back -- that
20 you're not typically involved in handling
21 ADA requests, right?
22 A.  Other than in my role as a manager, yes.
23 Q.  How many other employees -- strike that.
24     How did you plan to, quote, "very
25 closely manage Brandy's ADA accommodation

**Page 153**

1  assistance.
2     MR. MILLS: Yeah, she --
3     BY MR. MILLS:
4  Q.  You want Marie to help you in managing this
5  request very closely, don't you?
6  A.  I would like Marie's consultive advice.
7  Q.  In how to manage this request very closely;
8  isn't that true?
9  A.  In her request.  This is a request.  It
10 isn't the ongoing accommodation.
11 Q.  Why did you feel the need to manage this
12 request very closely?
13 A.  Because, as the first paragraph states,
14 there had been a number of situations where
15 Brandy had been coming in late or missing
16 work without any notice for unrelated
17 reasons.
18 Q.  How did you know that they were unrelated
19 reasons?
20 A.  Because she told me that they were.  As it
21 says in here, "she has been consistently
22 missing work or coming in late without
23 notice and for reasons unrelated to her
24 medical condition.  (No babysitter, sick
25 aunt/cancelled flight, flat tire, etc.)"

| 02:08-02:09 | Page 154 |
| --- | --- |

1  Q.  Did you document anywhere in your notes or
2  anywhere else, or in her personnel file,
3  that she had missed work because of no
4  baby-sitter, sick aunt, cancelled flight,
5  flat tire, et cetera?
6  A.  She fell off her bike as well.  Yes, I did.
7  Q.  Where?
8  A.  It was in my Lotus Notes calendar.
9  Q.  In your what?
10 A.  My Lotus Notes calendar.
11 Q.  Do you still have those?
12 A.  I do not.
13 Q.  Do you know where they are?
14 A.  I have no idea.
15 Q.  Do you know whether they still exist?
16 A.  I do not know.
17 Q.  And if I wanted to look at those, who should
18 I ask?
19 A.  The IT department.
20 Q.  At G & K?
21 A.  Yes.
22 Q.  Did you ever manage any other ADA
23 accommodation requests?
24 A.  Yes.
25 Q.  Under what circumstances would you do that?

| 02:09-02:10 | Page 155 |
| --- | --- |

1  A.  As the regional HR director prior to the HR
2  realignment.
3  Q.  How many times had you managed an ADA
4  request?
5  A.  Multiple times.
6  Q.  But your intent was to manage Brandy's ADA
7  request more closely than you would manage a
8  request for an ADA accommodation from some
9  other employee, right?
10 A.  I can't speculate as to that.  So, the
11 process clearly had changed since prior to
12 the HR realignment, and this is the first
13 ADA request that I received from anybody in
14 my region following the HR realignment.
15 Q.  This was the first ADA request you had seen
16 since the realignment?
17 A.  Following the realignment, yes.
18 Q.  The realignment in February 2013, right?
19 A.  I believe this is the first -- I believe it
20 was.
21 Q.  The realignment was in February; this
22 request was in July, right?
23 A.  I believe it was the first one.  There may
24 have been others but I believe it was the
25 first one.

| 02:10-02:11 | Page 156 |
| --- | --- |

1  Q.  And up until that point you don't recall
2  having been involved in any other ADA
3  requests, do you?
4  A.  That's not what I said.  What I said was
5  following the realignment, so I was
6  previously involved in managing ADA claims.
7  Q.  Okay.  From the time of the realignment up
8  until July 2013, you hadn't been involved in
9  any other ADA requests; is that true?
10 A.  Correct, but I wasn't managing any other
11 employees that requested an ADA
12 accommodation.
13 Q.  So, after the realignment, the first ADA
14 request you received was from Brandy
15 Williams, correct?
16 A.  As far as I can remember, sitting here
17 today, yes.
18 Q.  And that's typically something that you
19 would pass off to either Marie Smith or
20 Nikki Kietzer, right?
21    MS. PARKER: Objection as to form.
22    THE WITNESS: That's the way the
23 process, I believe, was designed to work.
24    BY MR. MILLS:
25 Q.  But this one you wanted to manage yourself

| 02:11-02:12 | Page 157 |
| --- | --- |

1  very closely, right?
2    MS. PARKER: Objection to form.
3    THE WITNESS: No, I didn't say that
4  I wanted to manage it myself.
5    BY MR. MILLS:
6  Q.  Well, you said -- again, these are you are
7  your words:  "I would like to manage this
8  request very closely," correct?
9    MS. PARKER: Objection to form.
10    THE WITNESS: That's what the words
11 say but I wasn't implying that I, myself,
12 wanted to manage it.
13    BY MR. MILLS:
14 Q.  Well, the I -- the, quote-unquote, "I" is
15 referring to you, isn't it?
16    MS. PARKER: Objection to form;
17 argumentative.
18    THE WITNESS: "I" is me, yes.
19    BY MR. MILLS:
20 Q.  "I" is not Marie, right?
21    MS. PARKER: Objection to form.
22    THE WITNESS: There is an "I" in
23 Marie.
24    BY MR. MILLS:
25 Q.  The "I" is not referring to Marie, is it?

**Coash & Coash, Inc.**
602-258-1440    www.coashandcoash.com

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

| 02:12-02:13 | Page 158 |
| --- | --- |

1  A.  So, it wasn't referring to I am asking to
2  manage this request very carefully.  I'm
3  saying, I would like us as, as an
4  organization, as an entity, as you, as
5  whomever, to manage this request carefully.
6  Q.  Did you ever say that about any other
7  employees?
8  A.  I didn't manage any other -- I hadn't
9  submitted any other ADA accommodation
10  requests to Marie in the new process, as far
11  as I recall.
12  Q.  Then you go on to say in the next sentence,
13  quote, "In light of my last conversation
14  with Brandy, I would like to look at having
15  her work at least 8 hours in the office
16  either before or after her appointments
17  because I have previously experienced
18  situations where an appointment 'first thing
19  in the morning' means she doesn't roll in
20  until noon."
21      Then you say, "Think that is
22  acceptable?"
23      Did I read that correctly?
24  A.  Yes, I think that's what it says.
25  Q.  Well, wouldn't having her work at least

| 02:13-02:14 | Page 159 |
| --- | --- |

1  eight hours before or after her appointments
2  defeat the purpose of the accommodation?
3  A.  Not necessarily.
4  Q.  What was the accommodation that Brandy was
5  asking for?
6  A.  I believe that she was asking for time off
7  to attend appointments.
8  Q.  Okay.  And G & K, in fact, granted her
9  request for an accommodation, right?
10  A.  Yes, we've been granting it all along.
11  Q.  Okay.  And the accommodation was that she
12  would need to take, say, an hour and go to a
13  doctor's appointment, right?
14  A.  It would be whatever time was needed to go
15  to the doctor's appointment.
16  Q.  But wouldn't having her work eight hours
17  before or after that appointment defeat the
18  purpose of the accommodation?
19  A.  Not necessarily.  Exempt employees aren't
20  held to an eight-hour schedule.
21  Q.  Was Brandy an exempt employee?
22  A.  Yes.
23  Q.  So, she wasn't held to an eight-hour
24  schedule, right?
25  A.  Exactly.

| 02:14 | Page 160 |
| --- | --- |

1  Q.  So, forcing her to work eight hours before
2  or after an appointment would be treating
3  her different than other exempt employees;
4  isn't that true?
5      MS. PARKER: Objection to form.
6      THE WITNESS: I don't know.  We --
7  I was asking Marie for her advice.  I didn't
8  know.
9      BY MR. MILLS:
10  Q.  You didn't have any other exempt employees
11  that you required to work eight hours, did
12  you?
13      MS. PARKER: Objection to form.
14      THE WITNESS: That are required to
15  work eight hours period?
16  BY MR. MILLS:
17  Q.  Um-hmm.
18  A.  That's --
19  Q.  You just told me that it wasn't a
20  requirement.
21  A.  Employees aren't -- exempt employees aren't
22  held to an eight-hour schedule.  Exempt
23  employees are expected to work the number of
24  hours needed to get the work done.
25      So, typically in this business

| 02:14-02:15 | Page 161 |
| --- | --- |

1  means like 55 hours a week, so --
2  Q.  But you're proposing her to have -- require
3  Brandy to work eight hours, right?
4  A.  I was asking if we could have her work on
5  either side of the appointment, but I was
6  asking Marie for her opinion.
7  Q.  You wanted to have her work eight hours
8  either before or after the appointment,
9  didn't you?
10  A.  No.  I was asking Marie for her opinion.
11  Q.  But this wasn't Marie's idea to have Brandy
12  work eight hours before or after an
13  appointment, was it?
14      MS. PARKER: Objection:
15  Argumentative; asked and answered.
16      THE WITNESS: No, it was my
17  question.
18      BY MR. MILLS:
19  Q.  It was your idea, right?
20  A.  It was a question to Marie asking for her
21  advice.
22  Q.  You're the one that posed the question,
23  right?
24  A.  Yes.
25  Q.  You're the one that came up with the idea of

| 02:15-02:16 | Page 162 |
|---|---|

1  having Brandy work eight hours before or
2  after an appointment, right?
3     MS. PARKER: Objection:  Asked and
4  answered.
5     THE WITNESS: It was a question of
6  whether or not that was appropriate.
7     BY MR. MILLS:
8  Q.  And you're asking this question regarding
9  Brandy at the same time that Kaela is
10  telling you that she's bored; isn't that
11  true?
12  A.  I would have to look back at a timeline.
13  Q.  And that she doesn't have enough work to do;
14  isn't that right?
15  A.  I believe Kaela started telling me she was
16  bored much earlier than July 8th.
17  Q.  Things didn't get better, did they?
18  A.  What things?
19  Q.  With Kaela.
20     MS. PARKER: Objection to form.
21     THE WITNESS: What --
22     BY MR. MILLS:
23  Q.  In terms of her boredom.
24  A.  I don't know how to answer that.  Could you
25  rephrase the question?

| 02:16-02:18 | Page 163 |
|---|---|

1  Q.  No.
2     Before I go on, let's back up.
3     Can you take another look at
4  Exhibit 1.  I had written down a question I
5  forgot to ask.
6     And, again, referring to the Brandy
7  Williams review at the very end of the
8  document.  It's part of, I think, Exhibit H
9  to that document.
10  A.  Okay.
11  Q.  Can you tell when you did Brandy's review?
12  A.  I actually can't.  I'm not sure how the
13  system stamp works.
14  Q.  Okay.  Okay.  Let's see.  There are -- if
15  you turn to the last page of that
16  document, there's just a block at the top
17  that says, created by, last updated.
18     Do you see that?
19  A.  Yes.
20  Q.  Does that give you any more insight as to
21  when you would have done the review of
22  Brandy?
23  A.  Honestly, no.  There's no names in here and
24  I don't -- I can't even begin to try to
25  understand how the system works.

| 02:18-02:21 | Page 164 |
|---|---|

1  Q.  Turn to the third to the last page.  Up
2  towards the top, the top paragraph, there's,
3  at the bottom of that, a statement "Created
4  by template on July 26, 2013."
5     Do you see that?
6  A.  Yes, yep.
7  Q.  Then it becomes -- then the next line is
8  "Last modified by Rachael Siggerud
9  August 28, 2013."
10  A.  Yes, I do see that.
11  Q.  Okay.  Is August 28th when you would have
12  completed your review of Brandy?
13  A.  I honestly don't know.  What I don't know is
14  whether that was sending a review to a
15  different status, if it was updating -- I
16  honestly don't have any idea.  This doesn't
17  mean anything to me by looking at it.
18     (Exhibit 6 was marked.)
19     BY MR. MILLS:
20  Q.  Okay.  I've handed you what's been marked as
21  Exhibit 6 and I'll ask you if you can
22  identify that document.
23  A.  Identify it in what respect?
24  Q.  Have you seen this before?
25  A.  No.

| 02:21-02:22 | Page 165 |
|---|---|

1  Q.  Okay.  Did you play any role, to your
2  knowledge, in the preparation of this
3  document?
4  A.  No.
5  Q.  The document appears to be a G & K job
6  description, correct?
7  A.  It appears to be.
8  Q.  And then towards the top it says:  Effective
9  date:  May 17, 2014, HR generalist, correct?
10  A.  That's not what mine says.
11  Q.  Okay.  What does your say?
12  A.  Well, it says --
13  Q.  You know what, I gave you the wrong exhibit.
14     MS. PARKER: This one is different.
15     MR. MILLS: What I handed you is
16  different from what I'm looking at.  Never
17  mind.
18     THE WITNESS: There you go.
19     MS. PARKER: So, which one do you
20  want her to have?
21     MR. MILLS: Exhibit -- what will
22  be 7.
23     (Exhibit 7 was marked.)
24     MS. PARKER: Sorry, I need a copy
25  of Exhibit 7.

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 380 of 505

Rachael Siggerud Raskovich
May 11, 2016

02:22-02:23                                      Page 166

1    MR. MILLS: I think -- can I see
2  what you have?
3    MS. PARKER: I have Exhibit -- oh,
4  maybe this is Exhibit 7.
5    MR. MILLS: This is actually what's
6  going to be Exhibit 7.
7    MS. PARKER: So, I don't have 6.
8    MR. MILLS: Okay.
9    THE WITNESS: (Perusing.)
10    MS. PARKER: So, we're on 7?
11    MR. MILLS: We're on 7, yeah.  6 is
12  withdrawn.
13    BY MR. MILLS:
14  Q.  All right.  Now, could you take a look at
15  Exhibit 7 and tell me if you recognize this
16  document.
17  A.  I still don't, I'm sorry.
18  Q.  To your knowledge, did you play any role in
19  the creation of this document?
20  A.  Not that I recall.
21  Q.  And it appears to be a G & K job
22  description?
23  A.  It does.
24  Q.  And it has an effective date of May 17, 2014
25  and refers to an HR generalist, right?

02:23-02:25                                      Page 167

1  A.  That is what this says (indicating).
2  Q.  And then it says, "Prepared by," and there's
3  nothing next to that, but it does have a
4  date of April 29, 2014, correct?
5  A.  That's what it says here.
6  Q.  And you were gone from G & K by April 29,
7  2014?
8  A.  Yes.
9  Q.  If you go down about the middle of the page,
10  there's a section that begins, "Essential
11  Job Functions and % of Time Spent On Each,"
12  correct?
13  A.  I see that section, yes.
14  Q.  And then there's a list of essential job
15  functions after that?
16  A.  Yes, there are.
17  Q.  Had you seen a written job description for
18  the position of HR generalist prior to the
19  time you left G & K?
20  A.  I don't recall.
21  Q.  Had you seen anything like this document
22  pertaining to an HR generalist prior to the
23  time you left G & K?
24  A.  I don't recall.
25  Q.  Had you seen other job descriptions for

02:25-02:26                                      Page 168

1  other jobs at G & K during your tenure?
2  A.  Yes.
3  Q.  But you don't recall seeing anything
4  specific to an HR generalist?
5  A.  Not that I recall, no.
6  Q.  Is it possible that there was no written job
7  description for an HR generalist prior to
8  April 29, 2014?
9  A.  I have no way of knowing that.
10  Q.  It's possible, that's true?
11  A.  Anything is possible, I guess, right?  I
12  don't know, though.  I don't know.  I would
13  assume that there were other roles that were
14  recruited for at some point, so there
15  probably was one.
16  Q.  Was one --
17  A.  A job description.  I just don't know.
18  Q.  Did you play any -- or strike that.
19    During your tenure at G & K, did
20  you play any part in preparation of job
21  descriptions for the company?
22  A.  During my entire tenure, yes.
23  Q.  And just -- what did you do?
24  A.  I would have updated job descriptions from
25  time to time.  The HR representative job,

02:26-02:28                                      Page 169

1  which was the pre-HR realignment job, was
2  responsible for recruiting, for talent
3  acquisition.
4    So, in that role, then, things like
5  posting job descriptions, ensuring that they
6  were updated, had the correct heading,
7  things like that would have been part of
8  that role.
9  Q.  Okay.  If you look at the -- refer back to
10  the Essential Job Functions in the middle of
11  the page on Exhibit 7.
12    I'd like for you to read those
13  over, if you haven't had a chance to read
14  them yet, and my question to you when you're
15  done is going to be:  Are you aware of
16  anything about Brandy Williams' medical
17  condition that would have prevented her from
18  performing any of these tasks?
19    MS. PARKER: Objection:
20  Foundation.  Objection: Form.
21    THE WITNESS: (Perusing.)
22    BY MR. MILLS:
23  Q.  Have you had a chance to read over them?
24  A.  Yes.
25  Q.  Okay.  My question is:  Are you aware of

| 02:28-02:51 | Page 170 |
|---|---|

1    anything about Brandy Williams' medical
2    condition that would have prevented her from
3    performing any of these essential job
4    functions?
5        MS. PARKER: Same objections.
6        THE WITNESS: I don't think that's
7    something I can answer because this is
8    beyond the time when I worked at G & K
9    Services, so --
10        BY MR. MILLS:
11   Q.   Was there anything about Brandy Williams'
12   medical condition that prevented her from
13   performing the essential job functions of an
14   HR generalist during your tenure as -- as
15   the regional director of the Northwest
16   Region?
17        MS. PARKER: Objection to
18   foundation.
19        THE WITNESS: No, not that I know.
20        MR. MILLS: Can we go off the
21   record for a second.
22        THE VIDEOGRAPHER: We're going off
23   the record.  The time on the video monitor
24   is 2:29 p.m.
25        (A recess was taken.)

| 02:51-02:52 | Page 171 |
|---|---|

1        (Exhibit 8 was marked.)
2        THE VIDEOGRAPHER: We are back on
3    video record.  The time on the video monitor
4    is 2:51 p.m.
5        BY MR. MILLS:
6    Q.   Ma'am, do you recall having a telephone
7    conversation with Brandy Williams on
8    June 26, 2013?
9    A.   I do now.
10   Q.   Okay.  Are you aware that that conversation
11   was recorded?
12   A.   No, I was not.
13   Q.   Are you aware of that now?
14   A.   Yes, I am.
15   Q.   Have you listened to the recording?
16   A.   I have not.
17   Q.   Have you seen a transcript of the recording?
18   A.   I have seen this (indicating) transcript and
19   then I believe some other version.
20   Q.   Okay.  We've put in front of you Exhibit 8,
21   which is -- I will represent to you is a
22   transcript of a recording that we, at my
23   office, had done, so --
24        MS. PARKER: Before we get into
25   Exhibit 8, I'd just like to put our

| 02:52-02:53 | Page 172 |
|---|---|

1    objection on the record to using this
2    transcription.
3        This transcript that's Exhibit 8 is
4    28 pages of reported conversation, which we
5    received a corrupted file last night, and
6    the corrected file -- I'm not sure if I even
7    received it before this, so I'm just now
8    looking at the transcript for the first
9    time.
10        We did review the recording and had
11   some notes of the recording, but I haven't
12   had a chance to compare them to determine
13   whether there are any discrepancies in terms
14   of the way it was transcribed.
15        And, as we know, transcription is
16   an art, and I think that it would be more
17   accurate and preferable to use the
18   recording.  I understand you're not prepared
19   to do that today, but I think that would be
20   better.
21        And not listening to the recording
22   may elicit a different recollection of how
23   the conversation occurred.
24        BY MR. MILLS:
25   Q.   As we -- as I reference things in here, if

| 02:53-02:55 | Page 173 |
|---|---|

1    you see anything that you think -- or
2    strikes you as being inaccurate, you know,
3    just tell me.  Don't feel like --
4        MS. PARKER: Again, this is a
5    three-year old conversation.
6        THE WITNESS: I wouldn't have any
7    way, probably, of telling if there's
8    something specific that's inaccurate.
9        MS. PARKER: And we miss the
10   subtleties of tone when we don't have the
11   audio recording.
12        BY MR. MILLS:
13   Q.   I've put in front of you Exhibit 8 which, as
14   I represented to you, is our transcription
15   of a telephone conversation between you and
16   Brandy Williams on June 26, 2013.
17        And I want to draw your attention
18   to page 5, beginning at line -- line 8.
19        MS. PARKER: Does the -- are we
20   going to pick up the sound on the recording?
21        MR. MILLS: Use my mic.
22        MS. PARKER: So, I wanted to make
23   sure that the sound of the audio would be
24   picked up on the recording, and right now we
25   are using a microphone to pick it up and so

---

02:55-02:57                                          Page 174

1   just let us know if the sound quality is --
2   if you can't hear it.
3       THE VIDEOGRAPHER: We're off the
4   video record.  The time on the video monitor
5   is 2:55 p.m.
6       (Discussion off the record.)
7       THE VIDEOGRAPHER: We are back on
8   the video transcript.  The time is 2:56 p.m.
9       (Audio played.)
10      MS. PARKER: We can't find it on
11  the recording, so --
12      MS. FOX: You can't search
13  line-by-line on the recording --
14      MR. MILLS: So it doesn't do any
15  good.
16      MS. PARKER: Are we reading it?
17      BY MR. MILLS:
18  Q.  I'll read it into the record.  Beginning
19  with line 8 you state, "some of the
20  perceptions that I've been consistently
21  hearing is that there's -- you know, it's
22  that people don't really know where you are.
23  You know, the issue is getting a hold [sic]
24  of you."
25      My question is:  Who have you

---

02:57-02:59                                          Page 175

1   been -- who had you been purportedly hearing
2   that from?
3   A.  So, I know it would have been management,
4   leaders within the -- the Phoenix location.
5   I'm not sure if it extended to Los Angeles.
6       It was something I had also been
7   struggling with.  She and I had talked about
8   it in the past.  She didn't answer her work
9   phone.  She wouldn't answer her work cell
10  phone.
11  Q.  And then you go on and state that you're
12  hearing that she comes in late and leaves
13  early, correct?
14  A.  So, that's what -- do you want me to read
15  it, or are you reading it, or --
16  Q.  I'm just asking you the question.  I mean,
17  that's --
18  A.  Okay, so, as I was talking about some of the
19  perceptions that the business had of her,
20  one of the perceptions that the business had
21  was that she was coming in late and leaving
22  early.
23  Q.  And do you know whether she was, in fact,
24  coming in late or leaving early?
25  A.  I don't know how many times.  I know there

---

02:59-03:00                                          Page 176

1   were times where she was coming in late and
2   leaving early.
3   Q.  Do you recall specifically which managers at
4   Phoenix were telling you that Brandy was
5   coming in late and leaving early?
6   A.  I don't know that I could recall
7   specifically.  I know I had multiple
8   conversations, though, about that particular
9   topic.
10  Q.  Do you recall anybody other than Jake
11  Briscoe?
12  A.  I believe that Mitch and I also had a
13  conversation about it.
14  Q.  Do you recall Brandy telling you that Jake
15  had moved her office to a location within
16  the Phoenix facility where she wasn't around
17  the managers all day?
18  A.  I don't recall her saying that specifically.
19  I recall her office moving, but it was still
20  in the office area, though.
21  Q.  Do you recall Brandy telling you that she
22  was actually physically present, but that
23  people didn't see her because her office had
24  moved?
25  A.  She talked about that, yes, in this

---

03:00-03:02                                          Page 177

1   conversation, I believe.
2   Q.  Did you ever talk to Jake about that?
3   A.  Yes.
4   Q.  Or to Mitch?
5   A.  Um-hmm.
6   Q.  And what did they say?
7   A.  That they were -- they stood by the fact
8   that they would go and she wasn't there, or
9   that she would leave early, or she wouldn't
10  be there in the afternoon if they had things
11  that they needed to talk with her about.
12  Q.  Any other complaints or concerns about
13  Brandy from the folks in Phoenix other than
14  that she was late to meetings or that she
15  was coming in late, leaving early?
16  A.  That's sort of a general question.  Other
17  complaints about anything or related to this
18  paragraph?
19  Q.  Did you discuss with Brandy that there were
20  any -- any concerns by managers in Phoenix
21  about anything other than her coming in
22  late, leaving early, missing meetings,
23  things like that --
24      MS. PARKER: Objection.
25      BY MR. MILLS:

---

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

---

03:02-03:03        Page 178

1 Q. -- inaccessibility?
2    MS. PARKER: Asked and answered.
3    THE WITNESS: I guess, could you
4 provide more clarity as to the specific
5 timeframe or --
6    BY MR. MILLS:
7 Q. At the time you were having this
8 conversation with her on June 26th.
9 A. Okay, that's helpful.
10    I believe that this actually is the
11 conversation that my notes referred to. So,
12 if I recall correctly, we talked about -- a
13 lot about perceptions, right, so perceptions
14 kind of being reality, so whether or not
15 you're 15 minutes or 20 minutes late or 5
16 minutes late, there's a perception that it
17 doesn't matter, it's not important enough to
18 you to be here on time.
19    I believe we talked about
20 partnering and trying to be a good partner
21 to the business, and to understand their
22 needs, but without kind of picking them
23 apart and coming in all of a sudden with
24 something that they are doing wrong and
25 jumping straight to saying, you know, that

---

03:03-03:04        Page 179

1 they should change what they are doing, more
2 about listening, and that would help them
3 feel more comfortable, having her out and
4 spending time with the business.
5    Other than that, I would have to,
6 honestly, probably read the whole transcript
7 in order to say if there were other things
8 that we talked about, or refer back to my
9 notes.
10 Q. Is it fair to say that the principal
11 concerns or complaints that you say you
12 heard from the managers in Phoenix had to do
13 with Brandy's accessibility?
14 A. No, not at all.
15    MR. MILLS: All right. Let's mark
16 this one.
17    (Exhibit 9 was marked.)
18    BY MR. MILLS:
19 Q. Okay. Handing you a document that's been
20 marked as Exhibit 9, and I'm going to
21 represent to you that this is also a
22 transcript of an audio recording of a
23 telephone conversation.
24    Do you recall having a telephone
25 conversation with Brandy Williams on

---

03:04-03:06        Page 180

1 July 17, 2013?
2 A. I do now.
3 Q. Have you listened to the audio recording of
4 that conversation?
5 A. I have not.
6 Q. And, let's see. Do you recall Brandy
7 telling you that she was not being well
8 perceived in Phoenix because of her health
9 issues and her requests for an ADA
10 accommodation?
11 A. She -- go ahead.
12    MS. PARKER: Objection: Form.
13    BY MR. MILLS:
14 Q. Go ahead.
15 A. I believe she said that, yes.
16 Q. And how did you respond to that?
17 A. I asked her for more information because the
18 business in Phoenix had no reason to know
19 anything about her medical issues,
20 absolutely none, unless I told them, which
21 she said she didn't, so certainly they had
22 no reason.
23    We talked about how she could put
24 meetings on her calendar that just said
25 offsite meeting, so anybody that had

---

03:06-03:07        Page 181

1 visibility to her calendar wouldn't know
2 what -- but she was unable to give any
3 specifics or reasons why she felt that way.
4 Q. Did you ever discuss with Jake, or any of
5 the other managers in Phoenix, Brandy's
6 concern that she was being perceived less
7 favorably because of her medical condition
8 and because of her request for an ADA
9 accommodation?
10 A. I don't know that I specifically asked about
11 that because I don't know that the business
12 knew about her medical condition, and I
13 don't think that that's appropriate for a
14 manager to share with anybody else.
15    So, if she hadn't shared that
16 information, I certainly wasn't going to
17 share it and open a door that should have
18 been closed.
19 Q. Do you recall Brandy telling you during this
20 conversation that she was stressed out?
21 A. I recall from -- after, yes, reading the
22 transcript, I do.
23 Q. Do you recall Brandy telling you that she
24 felt like she was being pushed out of the
25 business?

---

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 384 of 505

Rachael Siggerud Raskovich
May 11, 2016

---

**03:07-03:08** — Page 182

1  A.  From reading the transcript, yes, that's in
2  here.
3  Q.  Do you have a general recollection of that?
4  A.  I have a general recollection of the call.
5  Honestly, that's all I have, but I don't
6  remember all of the specifics, no.
7  Q.  Brandy didn't tell you during this phone
8  call that she wanted to resign, did she?
9  A.  She didn't say that she wanted to resign but
10  she started making overtures that made me
11  concerned about whether she wanted to still
12  be part of the team, whether she wanted to
13  be in the HR generalist role, and it was
14  things like -- and they are in here, but I'm
15  not sure that this is the right fit for me.
16      Obviously, in the transcript, it
17  talks about her concerns about her health,
18  the struggles that she had had to kind of
19  make some headway with the Phoenix team, and
20  continue to make relationships, but she
21  opened the door to kind of saying she didn't
22  know if it was the right fit.
23  Q.  Well, I think, as I read the transcript,
24  what she was telling me -- what she's saying
25  is that she's -- she's concerned that others

---

**03:08-03:10** — Page 183

1  think that she's not the right fit; is that
2  correct?
3      MS. PARKER: Objection to form.
4      THE WITNESS: That's not how I read
5  the transcript, but --
6      BY MR. MILLS:
7  Q.  Well, if you look at -- let's go to page 13,
8  beginning on line 6, the sentence that
9  begins in that line.
10      And this is Brandy speaking, quote,
11  "Because I kinda feel like with, you know,
12  my health issues and the accommodations that
13  I've asked for might not be that well
14  perceived by everyone.  And then I feel,
15  like, with that, that you guys might not
16  have confidence in me that I'm a good fit
17  anymore."
18      Did I read that right?
19      MS. PARKER: And I'll object to
20  form, and that -- just renew the objections
21  I made in Exhibit 8, that this, actually, in
22  this case, is a 38-page transcript -- or
23  37-page transcript, and that we received
24  this just last night, and there's a lot more
25  context to the whole thing.

---

**03:10-03:11** — Page 184

1      So, between that and not having the
2  recording, I think it's challenging to take
3  excerpts.
4      But, with that, you can answer.
5      THE WITNESS: I'm sorry, what was
6  the question?
7      BY MR. MILLS:
8  Q.  Let me ask you a different question.
9      Do you recall, at any time during
10  this conversation, Brandy saying to you that
11  she didn't think she was a good fit at G & K
12  anymore?
13  A.  I recall Brandy talking about whether or not
14  she -- if I remember correctly, again, so I
15  don't have the specific words in front of me
16  -- I can find them, I'm sure -- but feeling
17  like she wasn't sure that it was the right
18  fit for her -- it was the role -- I don't
19  know necessarily that it was G & K, but it
20  was the role, the business, that she didn't
21  know if it was the right fit for her on an
22  ongoing basis.
23  Q.  Do you recall her telling you why she felt
24  that way?
25  A.  It was -- I think it had to do with her

---

**03:11-03:12** — Page 185

1  stress.  She felt stressed, she felt like
2  her health was important, and that maybe her
3  health was, you know, not recovering, or
4  that she wasn't able to recover because of
5  stress and --
6  Q.  Do you recall her telling you that she was
7  stressed because she was worried about
8  losing her job?
9  A.  No, I don't recall her ever saying that.
10  Q.  Do you recall her saying to you that she
11  felt like she was being pushed out of the
12  company?
13  A.  I don't recall her specifically saying that,
14  but if she did, I'm sure I would have
15  responded.  People can say a lot of things,
16  but it's about kind of helping understand
17  the context of the statements and what it
18  means.
19  Q.  What -- do you remember saying any -- or --
20  strike that.
21      Do you remember saying anything to
22  Brandy about whether she was being pushed
23  out of the company?
24  A.  I don't remember.  I could read the
25  transcript and tell you.  You know, at the

---

03:12-03:14                                    Page 186

1   time, I would -- I mean, but I'm sure I
2   spoke about it, but I don't know what
3   exactly specifically I said.
4   Q.  Let's take a look at page 30, beginning with
5   Brandy's comments beginning on line 21.  Did
6   you find it?
7   A.  Yes, I found line 21.
8   Q.  Okay.  I'm just going to read it.  You can
9   follow along.  "MS. WILLIAMS:"  Quote, "Yes.
10  It's a very big dis- -- a very business
11  disconnect.  Because how can people not know
12  I'm here if they never come to this office.
13      "I mean, you know, honestly, this
14  all went downhill when Jake decided to move
15  me out of this office because no one comes
16  up front.  And if no one comes up front, no
17  one knows that I'm here in this office and
18  they perceive that I'm not here.  But when I
19  was in the back it was never an issue of
20  whether Brandy's here because I was there, I
21  was interacting with every single person,
22  every single day.  Everyone knew where to
23  find me.  And it's like since I've been
24  taken out of the realm of things, I felt
25  like that's where this dilemma has

03:14-03:15                                    Page 187

1   occurred."
2       Did -- would you agree with me
3   that, if a person's office is away from
4   where the managers are, that that might
5   affect their perception of whether the
6   person is there?
7   A.  Generally speaking?
8   Q.  Yes.
9   A.  Yes.
10  Q.  Do you know where Brandy's office was in
11  relation to where the manager's offices
12  were --
13  A.  Yes --
14  Q.  -- at the Phoenix location?
15  A.  -- I do.
16  Q.  Where was it?
17  A.  It was kitty corner to the general manager's
18  office and kitty corner to the office
19  manager.  It was also next to the hallway
20  that led to the plant.
21  Q.  And was this -- were you aware at some point
22  of a move that Jake had moved your office
23  from someplace to another place within the
24  facility?
25  A.  So, that was the final office location,

03:15-03:27                                    Page 188

1   which I believe was the office location for
2   the prior HRR as well.
3       I think before that her office was
4   in the service room, so in the room where
5   just the service team sat.  So, there was no
6   office employees in there, not near the
7   general manager, not very near the plant
8   manager.  So, it was very, kind of,
9   singularly focused on just the service team.
10      So, the front office location was
11  actually more accessible to a wider group of
12  managers without having to go back into the
13  service room.
14      THE VIDEOGRAPHER:  We're off video
15  record.  The time is approximately 3:16 p.m.
16      (Discussion off the record.)
17      (Exhibit 10 was marked.)
18      THE VIDEOGRAPHER:  We are back on
19  video record.  The time on the video monitor
20  is 3:27 p.m.
21      BY MR. MILLS:
22  Q.  Okay.  I've placed in front of you an
23  exhibit, Exhibit 10.
24      Have you seen this before?
25  A.  No.

03:27-03:29                                    Page 189

1   Q.  It's a document that's Bates numbered
2   beginning Williams-000088 through 128.
3       And I'm going to -- I guess the way
4   I should ask it is:  Have you seen any of
5   the first pages of the document Bates
6   numbered 88 through 93?
7   A.  Not that I recall.
8   Q.  Turn to page Bates number 99.  And page
9   Bates number 99 appears to be an email from
10  you to Brandy Williams, cc:  Michael
11  Hammond, dated August 14, 2013, correct?
12  A.  That is correct.
13  Q.  Who is Michael Hammond?
14  A.  Michael Hammond is -- or was a member of the
15  recruiting organization.  He was a
16  recruiting manager.
17  Q.  And in this email, you state, "Hi Brandy, I
18  just wanted to share some feedback from the
19  NorthWest RDO called today."
20      What is the NorthWest RDO?
21  A.  It's not a thing, it's a call.  RDO is
22  regional director of operations.
23  Q.  Okay.  And in here you tell Brandy that
24  "Tony said that he has been very happy with
25  the increased recruiting support in the

| 03:29-03:31 | Page 190 |
|---|---|

1    region and Frank Gomez specifically said
2    that you do a great job of communicating
3    with him in real time.  Thank you for your
4    help - It's clearly having a positive impact
5    on our region!"  Correct?
6  A.   That is what it says.
7  Q.   And that's what you wrote to Brandy?
8  A.   I think I did, yes.
9  Q.   Turn to the next page Bates numbered 100.
10   And this is dated -- it's a memorandum dated
11   September 24, 2013.
12       Have you seen this before?
13  A.   I believe I have, although I can't recollect
14   it specifically, but --
15  Q.   Did you prepare this memorandum?
16  A.   No, I did not.
17  Q.   Do you know who did?
18  A.   I don't specifically know.
19  Q.   At what point -- or strike that.
20       At some point, was there a decision
21   made about the date on which Brandy was
22   going to be terminated from G & K?
23  A.   Yes.
24  Q.   When did that occur?
25  A.   Approximately two weeks prior to her final

| 03:31-03:33 | Page 191 |
|---|---|

1    day.
2  Q.   So, that would have been in September 2013?
3  A.   Yes.
4  Q.   And who was involved in making the
5    determination as to the date that her
6    termination would occur on?
7  A.   If I remember accurately, it would have been
8    in making the actual decision, me, myself,
9    Pelham Chastang, and Eric McNaul.
10  Q.   And why was that particular date selected?
11  A.   I don't recall why that particular date was
12   selected.  I really don't.
13  Q.   When did you tell Brandy that her employment
14   at G & K was going to be terminated?
15  A.   It would have been on her last day of
16   employment.
17  Q.   Which was September 24th?  23rd?
18  A.   I don't recall.
19  Q.   Okay.  Who was it that informed Brandy that
20   her employment was terminated?
21  A.   Eric McNaul and me.
22  Q.   And where -- where did you inform her of
23   that?
24  A.   In Phoenix.
25  Q.   Did you fly out to Phoenix for that purpose?

| 03:33-03:34 | Page 192 |
|---|---|

1  A.   I don't recall if it was specifically for
2    that purpose alone, but we did go to
3    Phoenix.
4  Q.   Eric was stationed in Minneapolis -- or
5    St. Paul?
6  A.   Yes.
7  Q.   Do you recall that it was September 29th was
8    Brandy's last day?
9  A.   I don't recall.
10  Q.   Was there anybody else present during the
11   meeting you had with Brandy to tell her that
12   her employment was terminated?
13  A.   No.
14  Q.   And where specifically did that conversation
15   take place?
16  A.   In the conference room in the Phoenix plant.
17  Q.   Take a look at the next page, Bates number
18   101.  It's a document that is entitled
19   Confidential Separation Agreement and
20   General Release, correct?
21  A.   That is the heading, yes.
22  Q.   Is this something that you presented to
23   Brandy at the meeting in which you told her
24   that her employment was terminated?
25  A.   It looks like what I presented.

| 03:34-03:36 | Page 193 |
|---|---|

1  Q.   Is this a form of a -- strike that.
2       Is this a form Separation Agreement
3    and General Release that's used by G & K?
4  A.   I believe it is, but I can't -- I didn't
5    prepare them, so I don't know.
6  Q.   Did you have any input in the preparation of
7    this -- this document?
8  A.   I don't believe so, no.
9  Q.   Had you been present before when other
10   employees of G & K were terminated from the
11   company?
12  A.   Yes.
13  Q.   How many times?
14  A.   A fair number, upwards of probably 150.
15  Q.   And were all employees who were terminated
16   from the company asked to sign a Separation
17   Agreement and General Release?
18  A.   No, only those whose positions were
19   eliminated.
20  Q.   Had you been present before at the
21   termination of employees whose positions had
22   been eliminated?
23  A.   Yes.
24  Q.   How many times?
25  A.   Probably 20, 30.

| 03:36-03:37 | Page 194 |
| --- | --- |

1  Q.   And were those employees asked to sign a
2  Separation Agreement and General Release?
3      MS. PARKER: Objection to
4  relevance.  You can answer.
5      THE WITNESS: Okay, yes.
6      BY MR. MILLS:
7  Q.   Did G & K have different forms that it used
8  for a Separation Agreement and General
9  Release?
10     MS. PARKER: Objection to
11 relevance.
12     THE WITNESS: I have no idea.
13     BY MR. MILLS:
14 Q.   If you take a look at page Bates number 103,
15 there's a very long paragraph at the top of
16 the page that's actually a continuation of
17 the paragraph that begins on the previous
18 page.
19     And I'm going to read just a
20 portion of it beginning 10 lines down from
21 the top.
22     And it reads, quote, "This total
23 and complete release and waiver includes,
24 without limitation, claims which have or
25 could arise under the National Labor

| 03:37-03:38 | Page 195 |
| --- | --- |

1  Relations Act, Title VII of the Civil Rights
2  Act of 1964, the Employment Retirement" --
3  "the Employee Retirement Income Security Act
4  of 1974, the Age Discrimination in
5  Employment Act of 1967 as amended by the
6  Older Workers Benefit Protection Act, the
7  Equal Pay Act, 42 U.S.C. Section 1981, the
8  Sarbanes-Oxley Act, the Dodd-Frank Wall
9  Street Reform and Consumer Protection Act,
10 the Fair Credit Reporting Act, the
11 Vocational Rehabilitation Act, the Family
12 and Medical Leave Act, the Workers
13 Adjustment and Retraining Notification Act,
14 the Fair Labor Standards Act, the Lily
15 Ledbetter Fair Pay Act of 2009, the
16 Americans with Disabilities Act, the
17 Rehabilitation Act of 1973, the Genetic
18 Information Nondiscrimination Act,
19 Immigration Reform and Control Act of 1986,
20 the Civil Rights Act of 1991, the
21 Occupational Safety and Health Act, the
22 Consumer Credit Protection Act, the American
23 Recovery and Reinvestment Act of 2009, the
24 Asbestos Hazard Emergency Response Act, the
25 Employee Polygraph Protection Act, the

| 03:38-03:39 | Page 196 |
| --- | --- |

1  Uniformed Services Employment and
2  Reemployment Rights Act."
3      Were other employees of G & K whose
4  positions had been eliminated asked to
5  release claims under all these statutes?
6      MS. PARKER: Objection:
7  Foundation; relevance.
8      THE WITNESS: I would have to look
9  at all of their individual agreements to see
10 if they matched exactly, but this is
11 pretty -- pretty standard language.
12     BY MR. MILLS:
13 Q.   Do you know who came up with this language?
14     MS. PARKER: Objection:  Relevance;
15 foundation; and to the extent it would call
16 for any sort of inquiry into attorney/client
17 privilege.
18     THE WITNESS: I have no idea.
19     BY MR. MILLS:
20 Q.   Did Brandy sign this general release?
21 A.   I don't believe so.
22 Q.   Did any other employees of G & K ever sign a
23 general release like this?
24     MS. PARKER: Objection:  Relevance;
25 foundation.

| 03:39-03:40 | Page 197 |
| --- | --- |

1      THE WITNESS: Yes.
2      MS. PARKER: You can answer if you
3  know.
4      THE WITNESS: Yes.
5      BY MR. MILLS:
6  Q.   Did any refuse?
7      MS. PARKER: Objection:  Relevance;
8  foundation.  You can answer if you know.
9      THE WITNESS: Not that I know of.
10     BY MR. MILLS:
11 Q.   What did -- what did Eric McNaul say to
12 Brandy during the meeting in which you
13 informed her that her employment was being
14 terminated?
15 A.   I don't specifically recall.
16 Q.   Who is the one that told her that this was
17 happening?  Was that you?
18 A.   I believe it was me.
19 Q.   Do you remember what you said?
20 A.   I don't specifically recall, no.
21 Q.   Do you recall how Brandy reacted?
22 A.   I recall that she didn't really have much of
23 a reaction at all.
24 Q.   Did you tell her when the decision had been
25 made to eliminate her position?

03:40-03:43                                              Page 198

1  A.  I don't recall specifically, no.
2  Q.  Do you recall telling Brandy why she was
3  being let go from G & K?
4  A.  Specifically, no, but typically a
5  conversation like that just includes general
6  information that a position -- your position
7  has been eliminated.
8  Q.  Do you recall her asking why it had been
9  eliminated?
10 A.  No, I don't recall her asking.
11 Q.  Do you recall anything else about that
12 conversation with Brandy and Eric in which
13 Brandy was informed that her position was
14 being terminated?
15 A.  I don't -- I don't recall anything else.  It
16 was very short.
17 Q.  Was Brandy escorted out of the office?
18 A.  I don't recall.
19 Q.  Were employees typically escorted out of the
20 office when she was informed that their --
21 A.  Typically, yes.
22 Q.  -- position was terminated?
23 A.  Typically, yes.
24 Q.  Take a look at page Bates numbered 126.
25 It's toward the very end.  And this appears

03:43-03:44                                              Page 199

1  to be an email from Brandy to you dated
2  July 29, 2013, correct?
3  A.  It appears to be, yes.
4  Q.  And in here she's asking you what the
5  temporary change -- or I'll just read it,
6  beginning the second sentence, she says,
7  quote, "I was curious what this temporary
8  change of what my GK Perform should include.
9  Should I make changes away from what we
10 discussed before of protecting business,
11 etc??"
12    Do you know what she means by
13 "protecting the business"?
14 A.  Protecting the business, if I remember
15 correctly, was there were some main kind of
16 general goals for the HR organization that
17 must protect the business.  It's like
18 customer focus, protect the business.
19 Q.  What does it mean to protect the business?
20 Let me rephrase that.
21    In the context of G & K, what did
22 it mean to, quote-unquote, "protect the
23 business"?
24 A.  That, I probably can't comment on anymore.
25 It's been a really long time.

03:45-03:46                                              Page 200

1  Q.  Did you know at one time?
2  A.  I'm sure I did.
3  Q.  Was it -- was it a job duty or
4  responsibility of the HR generalists to
5  quote-unquote, "protect the business"?
6  A.  So, protect the business was an umbrella,
7  and, again, I'm not sure it even just
8  applied to HR, but it would have been, you
9  know, kind of, what can you do in your role
10 to protect the business, right?
11    So, that means lots of different
12 things, but with respect to kind of her
13 particular goals, I don't remember what it
14 meant in the HR context.  This is shortly
15 before I left as well, so --
16 Q.  Did protecting the business include the
17 HR generalists reporting back to you or
18 anybody else within G & K about the
19 performance of the managers?
20    MS. PARKER:  Objection:
21 Foundation.  She said she didn't know.
22    THE WITNESS:  I don't remember.
23    BY MR. MILLS:
24 Q.  Do you recall any of the managers
25 complaining or expressing concern that they

03:46-03:48                                              Page 201

1  were being overseen the HR generalists?
2  A.  No.
3  Q.  Do you recall anyone expressing any concern
4  or complaint that the HR generalists were,
5  essentially, spying on the managers?
6  A.  Heavens, no.  No.
7  Q.  How closely did you work with Eric McNaul?
8  A.  It was part of the Regional Leadership Team.
9  Q.  Did you work -- I'm sorry, go ahead.
10 A.  So, I sat in the same office.
11 Q.  Did you work with him every day?
12 A.  Not every day, but most days.
13 Q.  And he oversaw your activities?
14 A.  Can you clarify what you mean by "oversaw"?
15 Q.  Did he supervise your activities?
16 A.  At what point?
17 Q.  After February 2013.
18 A.  No, he did not.
19 Q.  That would have been Pelham at that point?
20 A.  Correct.
21 Q.  Why was Eric McNaul involved in the decision
22 to eliminate Brandy's position?
23 A.  She was still part of the regional
24 leadership -- the regional HR organization.
25 Q.  Did Eric know Brandy personally?

---

03:49-03:50 — Page 202

1 A. I don't know.
2 Q. Did Pelham?
3 A. I don't know. You'd have to ask them.
4 Q. Did either Eric or -- strike that. Let's
5 start with Eric.
6    Did Eric ever tell you anything
7 about Brandy?
8 A. Anything --
9 Q. Anything.
10 A. I assume so, at some point.
11 Q. Like what?
12 A. I have no idea. She was a part of my team,
13 so --
14 Q. Did Eric ever say anything to you about
15 Brandy's performance at G & K?
16 A. I don't recall.
17 Q. Is it possible that he did?
18 A. It's possible.
19 Q. And how frequently did Eric get out to
20 Phoenix?
21 A. I don't know.
22 Q. Do you know whether Eric talked to Jake or
23 any of the other managers in Phoenix?
24 A. I expect that he did.
25 Q. During what time period?

---

03:50-03:51 — Page 203

1 A. Well, when he managed them.
2 Q. Prior to the restructuring?
3    MS. PARKER: Objection:
4 Foundation.
5    THE WITNESS: Yes.
6    BY MR. MILLS:
7 Q. What about after the restructuring?
8 A. Yes.
9 Q. Okay. Did Pelham ever tell you anything
10 about Brandy?
11 A. I don't recall.
12 Q. As part of the process of determining that
13 Brandy's position at G & K would be
14 eliminated, was anybody else other than you
15 and Pelham and Eric consulted?
16 A. Not that I recall.
17 Q. Are you aware of Brandy at any time
18 reapplying for a position at G & K after
19 September 2013?
20    MS. PARKER: (Indicating.)
21    THE WITNESS: I thought you were
22 going to say something.
23    MS. PARKER: No, that wasn't a
24 signal, or objection.
25    THE WITNESS: I am aware but I'm

---

03:51-03:53 — Page 204

1 aware through this (indicating) process, so
2 I don't know if I can say that or not.
3    BY MR. MILLS:
4 Q. Is it something that you learned through
5 consultation with counsel?
6 A. Yes.
7 Q. Okay. Then I'll leave it alone.
8    Was Eric McNaul involved in any way
9 in Brandy's request for an ADA accommodation
10 in July 2013?
11 A. No.
12 Q. How about Pelham, was he involved?
13 A. Not that I recall.
14 Q. Was there anybody else, other than you and
15 Marie and -- who is the other individual you
16 mentioned earlier? Nikki? Anyone other
17 than you or Marie or Nikki that was involved
18 in that request?
19 A. I don't know. I don't know.
20 Q. Did you ever have any conversation with any
21 of the managers at Tucson regarding Brandy's
22 performance?
23 A. I don't recall specifically.
24 Q. Would you have documented those
25 conversations if they occurred?

---

03:53-03:54 — Page 205

1 A. I may have.
2 Q. Do you recall having any conversations with
3 any of the managers at Yuma regarding Brandy
4 Williams?
5 A. I don't think there was a manager in Yuma.
6 Q. What was in Yuma?
7 A. One route.
8 Q. Was there a physical facility in Yuma?
9 A. There -- actually, I don't even know if
10 there was. There may have been, but it was,
11 I think, one route, maybe two. It was not
12 even a branch, really.
13 Q. How about in the -- in Prescott Valley, did
14 you talk to any of the managers there about
15 Brandy's performance?
16 A. I don't recall that there was a manager
17 there either. I could be wrong. It was
18 similar to Yuma where it was a very, very
19 small location.
20 Q. How about San Diego, did you ever talk to
21 any of the managers there about Brandy's
22 performance?
23 A. I don't recall.
24 Q. Would you have documented that if you did?
25 A. Very likely, yes.

---

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

| | |
|---|---|
| 03:54-03:56     Page 206 | 03:57-03:59     Page 208 |

03:54-03:56     Page 206

1   Q. And is that also true with Ontario,
2   California?
3   A. Yes.
4   Q. And Los Angeles?
5   A. Yes.
6   Q. And how about Sun Valley, do you recall
7   having any conversations with any of the
8   managers at Sun Valley?
9   A. I don't.
10   Q. About Brandy?
11   A. I was going to say -- I don't.
12   Q. Would you likely have documented those
13   conversations if you had them?
14   A. I may have.
15   Q. Okay. Do you recall the names of any of the
16   managers at Ontario or Sun Valley?
17   A. George, but I don't know if that's right. I
18   don't know.
19   Q. You don't recall last name?
20   A. I don't even know if it was George. That
21   came into my head, so I could be totally
22   wrong.
23   Q. How about Tucson?
24   A. I can't remember his name.
25   Q. You don't remember the name?

03:57-03:59     Page 208

1   asking her if recruiting wasn't prepared to
2   make her a permanent job offer, if we should
3   still move forward with the original date
4   that we had scheduled in late September or
5   whether we should wait to see if, on a
6   temporary role, or in a temporary role, she
7   performed and they chose then -- I don't
8   know, I'm reading it, but -- so, asking
9   about whether or not -- if we should wait or
10   delay.
11   Q. If recruiting had offered Brandy a permanent
12   position, would you still have terminated
13   her?
14   A. I would have eliminated her position, but
15   she would no longer have been in it.
16   Q. Could she have continued working in
17   recruiting if they had offered her a
18   permanent position?
19   A. Presumably, yes, and if she had accepted it.
20   Q. Did you have any involvement in the decision
21   whether to offer Brandy a permanent position
22   in recruiting?
23   A. No, I just encouraged them to make an offer.
24   Q. Do you know who was involved with that
25   decision?

03:56-03:57     Page 207

1   A. I don't, honestly. I'm sorry, I don't. If
2   you know it and you tell me, I can tell you
3   if it's right.
4   (Exhibit 11 was marked.)
5   BY MR. MILLS:
6   Q. Okay. I've handed you a document that we've
7   marked as Exhibit 11. It appears to be an
8   email from you to Marie Smith dated
9   September 13, 2013, correct?
10   A. Yes.
11   Q. Could you tell me what this email is about.
12   A. Yes. This is me reaching out to Marie
13   Smith. Marie would have been part of the
14   process of the position elimination for
15   Brandy.
16   This is probably about the time
17   that we decided the specific date, so it
18   would have been the middle of September, and
19   just talking about her role in recruiting
20   and whether or not there was going to be a
21   permanent offer and, again, asking for her
22   advice as the employee relations manager.
23   Q. What advice were you asking her for?
24   A. So, we had decided the date, that it would
25   be a couple of weeks out from here. I was

03:59-04:00     Page 209

1   A. It would have probably been Theresa
2   Schneider, who was the director responsible
3   for all of recruiting, probably Michael
4   Hammond, maybe others.
5   Q. Do you know whether they made her -- made
6   Brandy an offer of permanent employment?
7   A. Yes.
8   Q. What do you know about that?
9   A. I know that they did not.
10   Q. Do you know why?
11   A. I know that they were not comfortable making
12   a permanent offer at this point, and so --
13   or at the point where this, kind of,
14   happened, so based on that, potentially
15   based on whatever Marie responded, that it
16   didn't make sense to try to have her stay on
17   in a temporary role after eliminating the
18   position. I don't know how that would have
19   worked.
20   Q. Did they hire anybody in a permanent
21   position in recruiting at the time that they
22   let Brandy go?
23   MS. PARKER: Objection:
24   Foundation.
25   THE WITNESS: I don't know.

| 04:00-04:18 | Page 210 |
| --- | --- |

1      MR. MILLS: Give me a couple
2  minutes. I'll look through my notes.
3      THE VIDEOGRAPHER: We're off the
4  video record. The time on the monitor is
5      4:01 p.m.
6      (A recess was taken.)
7      THE VIDEOGRAPHER: We're back on
8  video record. The time on the monitor is
9      4:17 p.m.
10      BY MR. MILLS:
11  Q.  Okay. At the time of the restructuring that
12  occurred in late 2012 effective in February
13  2013, did you have any involvement in the
14  decision to have HR generalists as opposed
15  to HR representatives?
16  A.  No.
17  Q.  Do you know who was involved in making that
18  decision?
19  A.  It was -- it was just, sort of, we went into
20  the project knowing that we weren't going to
21  have, kind of, that traditional HR
22  representative role anymore, so that was
23  sort of the goal is to figure out how to
24  restructure, but having the HR at the end
25  was never an option.

| 04:18-04:19 | Page 211 |
| --- | --- |

1  Q.  Do you know who was involved in making the
2  decision to go with HR generalists going
3  forward?
4  A.  I don't know if it was Randy who -- Randy
5  Ross who made the decision, or if it was
6  more of a collective group of us that
7  discussed how the model should look.
8  Q.  And do you know who was involved in the
9  decision as to how many HR generalists there
10  needed to be going forward?
11  A.  I do.
12  Q.  Who was that?
13  A.  It was a combination of the HR leadership
14  team between all the functions and all of
15  the field directors and Randy and our
16  consultant and all sorts of people.
17  Q.  Were you involved in that decision?
18  A.  Yes.
19  Q.  Was Eric involved in that decision, Eric
20  McNaul?
21  A.  I don't know if he was involved in the
22  decision per se. He had an opinion.
23  Q.  And do you recall what his opinion was?
24  A.  That we felt that we wanted to have more
25  than we were allotted, so to speak, or that

| 04:19-04:21 | Page 212 |
| --- | --- |

1  we wanted to have three instead of the
2  recommended two.
3  Q.  Who had recommended two?
4  A.  So, all the other regions had two, and we
5  pushed hard to have three, just based on our
6  feelings about HR, that HR is good.
7  Q.  Were there more plants or more branches in
8  the Northwest Region as opposed to other
9  regions?
10  A.  That, I don't know.
11  Q.  And did you personally push for three
12  HR generalists in the Northwest Region?
13  A.  I did.
14  Q.  What was that based on?
15  A.  We had eight HR representatives or HR
16  administrators, so each of our plants had
17  their own person, and it was -- our
18  leadership in the Northwest Region valued
19  their HR partners having their person, and
20  so we were concerned that, if we went to
21  two, in a completely new role, in a
22  different model, and the way access to HR
23  services changed, that it would have a
24  detrimental effect on our leaders and on our
25  employees being able to not access HR.

| 04:21-04:22 | Page 213 |
| --- | --- |

1      So, before you had an HRR with a
2  very general set of duties, but a much
3  smaller span of control, maybe 300
4  employees, 400 max, and now we're going to a
5  space where you have several hundred to more
6  than a thousand, so it's very different.
7      And we wanted to make sure that we
8  didn't limit our employees being able to
9  access the HR organization.
10  Q.  How many regions are there within G & K?
11  A.  The same thing I said this morning, I don't
12  know, four or five and Canada, but I don't
13  really remember how many there were then.
14  Q.  Do you know how many -- strike that.
15      Do you know how many HR generalists
16  there are within each region now?
17      MS. PARKER: Objection:
18  Foundation.
19      THE WITNESS: Other than the
20  Northwest, I don't.
21      BY MR. MILLS:
22  Q.  Do you know whether any region has more than
23  one?
24  A.  I don't.
25      MS. PARKER: Give me a second.

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 392 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

---

04:23-04:24                                    Page 214

1     (Discussion off the record.)
2     MR. MILLS: Okay.  I think we're
3  done.  Thank you very much.
4     MS. PARKER: I have a few
5  questions.
6     EXAMINATION
7     BY MS. PARKER:
8  Q.  This will be pretty short.
9     Ms. Raskovich, earlier today you
10  were -- you testified about the timing of
11  the decision to eliminate the position and
12  the decision to eliminate Ms. Williams'
13  position being in June, and you testified
14  that there was a period of delay when you
15  did not know that -- the time when that
16  elimination would occur.
17     Do you recall why there was no date
18  set initially for the elimination of the
19  position?
20  A.  I don't recall specifically, but it's not
21  atypical.
22  Q.  Do you recall any factors that went into the
23  decision to not set a decision at the
24  moment?
25  A.  No, I don't.

---

04:26-04:27                                    Page 216

1     Ms. Williams permission to have a medical
2     appointment subsequent to this email?
3  A.  No.  Well, I do remember, but I did not.
4  Q.  You're saying you did not ever deny her
5     permission to attend an appointment?
6  A.  Correct, yes.
7  Q.  Prior to this email, had you denied her
8     permission to attend an appointment?
9  A.  No.
10  Q.  Did you ever enforce the eight-hour
11     suggestion that you had in this email?
12  A.  No.
13          MS. PARKER:  No further questions.
14          MR. MILLS:  Nothing.
15          THE VIDEOGRAPHER:  We are off video
16     record.  The time is approximately 4:27 p.m.
17          (At 4:27 p.m. the deposition was
18     recessed.)
19
20
21
22
23
24          _____
                 Rachael Siggerud Raskovich
25

---

04:24-04:26                                    Page 215

1  Q.  I'd like to direct your attention back to
2  Exhibit 5.  I'm sorry, strike that.
3     I will go there, but just to follow
4  up, do you recall also testifying that, at
5  the end of August, you still did not have a
6  date for Ms. Williams -- for the position
7  elimination?
8  A.  Yes, that's correct.
9  Q.  At the end of August, were there any
10  considerations going into the timing of the
11  elimination and not having set a date?
12  A.  I think we were hopeful that the recruiting
13  role would be something that Brandy would
14  find success in and that she would
15  ultimately transition into.
16  Q.  All right.  Let's go to Exhibit 5.
17     MR. MILLS: Go ahead.  We'll find
18  it.
19     BY MS. PARKER:
20  Q.  And do you recall being asked some questions
21  about your statement in here that you wanted
22  to manage the request closely and determine
23  the best way of doing so?
24  A.  Yes.
25  Q.  Do you recall whether you ever denied

---

                                                Page 217

1     STATE OF MINNESOTA
2                                    CERTIFICATE
   COUNTY OF WASHINGTON
3
        I, Kelly A. Herrick, hereby
4  certify that I reported the deposition of
   RACHAEL SIGGERUD RASKOVICH on the 11th day
5  of May, 2016 in Minneapolis, Minnesota, and
   that the witness was by me first duly sworn
6  to tell the truth and nothing but the truth
   concerning the matter in controversy
7  aforesaid;
8        That I was then and there a notary
   public in and for the County of Washington,
9  State of Minnesota; that by virtue thereof I
   was duly authorized to administer an oath;
10
        That the foregoing transcript is a
11  true and correct transcript of my
   stenographic notes in said matter,
12  transcribed under my direction and control;
13        That the cost of the original has
   been charged to the party who noticed the
14  deposition and that all parties who ordered
   copies have been charged at the same rate
15  for such copies;
16        That the reading and signing of
   the deposition was not waived;
17
        That I am not related to any of
18  the parties hereto, nor interested in the
   outcome of the action and have no contract
19  with any parties, attorneys or persons with
   an interest in the action that has a
20  substantial tendency to affect my
   impartiality;
21
        WITNESS MY HAND AND SEAL this 20th
22  day of May, 2016.
23
24     _____
        Kelly A. Herrick
25      Notary Public

---

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 393 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

**[**

**[sic] (1)** 174:23

**A**

**Abercrombie (1)** 11:24
**able (6)** 98:9;129:20;
135:19;185:4;212:25;
213:8
**above (1)** 138:17
**above-entitled (1)** 5:10
**absent (1)** 110:4
**absolutely (4)** 96:18;
149:15;151:8;180:20
**acceptable (1)** 158:22
**accepted (1)** 208:19
**access (4)** 27:10;
212:22,25;213:9
**accessibility (1)** 63:13;
135:8;179:13
**accessible (1)** 188:11
**accommodation (18)**
147:23;149:8,13;
151:5,25;153:10;
154:23;155:8;156:12;
158:9;159:2,4,9,11,18;
180:10;181:9;204:9
**accommodations (1)**
183:12
**accomplish (1)** 76:3
**according (3)** 73:25;
106:10;143:3
**accurate (2)** 74:15;
172:17
**accurately (2)** 74:10;
191:7
**achieve (2)** 98:10;
99:25
**acquisition (2)** 23:15;
169:3
**act (29)** 79:23;89:6;
148:1;150:11;195:1,2,
3,5,6,7,8,9,10,11,12,13,
14,15,16,17,18,19,20,
21,22,23,24,25;196:2
**acting (2)** 20:5;117:5
**action (1)** 5:10
**activities (4)** 81:10;
138:11;201:13,15
**actual (1)** 191:8
**actually (19)** 16:16;
28:11;58:9;60:10;
72:11;82:21;100:18;
102:11;126:17;146:1;
147:7;163:12;166:5;
176:22;178:10;183:21;
188:11;194:16;205:9
**ADA (29)** 147:23,25;
148:3,7,9,21;149:5,8,
12,25;151:4,11,21,25;
154:22;155:3,6,8,13,

15;156:2,6,9,11,13;
158:9;180:9;181:8;
204:9
**adding (1)** 64:2
**addition (2)** 21:12;
32:15
**additional (2)** 114:25;
122:11
**address (1)** 115:5
**addressed (1)** 144:12
**Adjustment (1)** 195:13
**administrator (1)** 17:7
**administrators (1)**
212:16
**advice (5)** 153:6;160:7;
161:21;207:22,23
**affect (1)** 187:5
**afternoon (2)** 101:3;
177:10
**again (33)** 31:5;36:1;
44:11;46:14;47:13;
48:9;49:20;52:5;64:5,
12;70:14;77:15;82:5;
91:11;93:20;95:18;
96:25;100:7;101:21;
102:19;111:18;114:12;
126:25;138:16;143:2;
144:14;149:24;157:6;
163:6;173:4;184:14;
200:7;207:21
**against (5)** 97:21;
98:14;104:2,3;127:15
**Age (1)** 195:4
**ago (2)** 128:1;151:10
**agree (7)** 87:7;88:11;
93:11,14;94:2;111:6;
187:2
**agreed (2)** 66:16,25
**Agreement (5)** 192:19;
193:2,17;194:2,8
**agreements (2)** 107:9;
196:9
**ahead (5)** 136:25;
180:11,14;201:9;
215:17
**ahold (1)** 52:23
**airplane (1)** 107:16
**al (1)** 4:12
**allegations (1)** 7:5
**alleviate (1)** 114:21
**allotted (1)** 211:25
**alone (3)** 96:3;192:2;
204:7
**along (2)** 159:10;186:9
**although (2)** 109:13;
190:13
**always (2)** 31:10;
115:21
**amended (1)** 195:5
**America (1)** 11:20
**American (1)** 195:22
**Americans (2)** 147:25;
195:16

**among (1)** 25:1
**amount (5)** 60:2;61:12,
13;69:21;146:24
**Angeles (6)** 33:6;84:19,
20;108:12;175:5;206:4
**Angie (5)** 84:21,22;
85:3,8;131:11
**Angie's (1)** 85:11
**angry (1)** 149:12
**annoy (1)** 149:7
**annual (1)** 62:5
**answered (8)** 31:22;
70:20;71:3;98:12;99:8;
161:15;162:4;178:2
**anymore (9)** 17:21;
61:16;73:16;126:10,
15;183:17;184:12;
199:24;210:22
**apart (2)** 136:2;178:23
**apologize (3)** 65:12;
77:10;123:4
**appear (2)** 90:19;
104:20
**appearing (1)** 99:4
**appears (10)** 75:3;
77:19;113:16;165:5,7;
166:21;189:9;198:25;
199:3;207:7
**applied (1)** 200:8
**appointment (9)**
158:18;159:13,15,17;
160:2;161:5,8,13;
162:2
**appointments (5)** 146:7,
11;158:16;159:1,7
**approach (1)** 25:7
**approached (2)** 25:10;
55:24
**appropriate (3)** 69:18;
162:6;181:13
**Approximately (3)**
10:22;188:15;190:25
**April (7)** 10:13;41:23;
42:5;127:9;167:4,6;
168:8
**area (2)** 110:23;176:20
**argumentative (3)**
151:7;157:17;161:15
**arise (1)** 194:25
**Arizona (4)** 4:14;14:17
**around (8)** 54:19;
75:15,17;83:11,18;
135:18;136:1;176:16
**art (1)** 172:16
**Asbestos (1)** 195:24
**assesses (1)** 85:7
**assigned (4)** 23:11;
62:8;80:17;82:10
**assistance (3)** 150:23;
152:4;153:1
**associated (2)** 106:25;
139:19
**assume (5)** 9:3;66:9;

128:9;168:13;202:10
**assuming (1)** 95:6
**attached (2)** 39:15;
77:11
**attend (1)** 159:7
**attention (6)** 46:23;
74:18;112:3;122:11;
173:17;215:1
**attorney (1)** 48:25
**attorney/client (10)**
42:17;43:13;44:13;
46:14;47:14,23;48:10,
17;49:22;196:16
**atypical (1)** 214:21
**Aubin (1)** 131:23
**audio (5)** 173:11,23;
174:9;179:22;180:3
**August (8)** 58:19;59:2;
143:20;164:9,11;
189:11;215:5,9
**aunt (1)** 154:4
**aunt/cancelled (1)**
153:25
**average (1)** 34:5
**awarded (1)** 8:13
**aware (19)** 71:14,15;
107:24;127:7,14;
144:19,24;146:4,6,9,
22;169:15,25;171:10,
13;187:21;203:17,25;
204:1
**away (7)** 30:17;125:22;
126:1,8;144:22;187:3;
199:9

**B**

**babysitter (1)** 153:24
**baby-sitter (1)** 154:4
**Bachelor's (1)** 12:14
**back (42)** 12:24;15:1;
21:2;42:3;44:4;51:16;
62:25;63:6;64:8,14;
74:16;76:13;77:8;
81:14;100:25;101:7,8,
11,19;102:17;120:9;
126:6;127:9;138:15;
141:6;142:2,13,14,20;
151:19;162:12;163:2;
169:9;171:2;174:7;
179:8;186:19;188:12,
18;200:17;210:7;215:1
**background (1)** 73:16
**bad (2)** 26:9;37:8
**balancing (1)** 89:6
**base (6)** 93:2,15;95:9,
16;97:12,14
**based (23)** 16:14,21;
47:18;75:22;81:10;
86:22;94:12,21;95:1;
96:1;98:6,8,24;103:20;
106:19;118:9;140:23,
23;143:11;209:14,15,

212:5,14
**basement (1)** 126:14
**basically (2)** 29:9;86:7
**basis (6)** 34:15;48:23;
79:25;81:4;82:12;
184:22
**Bates (16)** 112:5;
113:14;123:15;124:13;
133:13;138:16;139:14;
144:8;189:1,5,8,9;
190:9;192:17;194:14;
198:24
**Bayer (1)** 131:15
**became (6)** 15:5;28:22;
32:10;36:5;56:8,17
**become (4)** 10:21;
28:21;37:1;127:14
**becomes (1)** 164:7
**begin (3)** 139:25;
140:1;163:24
**beginning (18)** 13:22;
15:12;19:11,12,16;
76:8;89:15;94:22;
95:11;125:2;173:18;
174:18;183:8;186:4,5;
189:2;194:20;199:6
**begins (5)** 4:9;58:16;
167:10;183:9;194:17
**belong (1)** 119:16
**below (3)** 85:18,23;
99:4
**benefit (2)** 107:21;
195:6
**benefits (1)** 62:4
**best (13)** 15:19;43:9;
54:8;56:23;59:21;
60:20;65:8;68:25;69:2;
105:2;145:15;150:24;
215:23
**better (4)** 70:2;128:17;
162:17;172:20
**beyond (1)** 170:8
**big (1)** 186:10
**biggest (3)** 135:15,17,
18
**bike (1)** 154:6
**birth (4)** 144:20;145:6,
23;146:16
**bit (2)** 69:23;123:4
**blob (1)** 92:16
**block (3)** 85:25;86:5;
163:16
**Bob (2)** 4:24;73:15
**body (1)** 144:17
**Bonacua (2)** 19:22;
77:20
**bored (10)** 69:14;
113:25;114:11,16;
116:1,2;117:18,20;
162:10,16
**boredom (2)** 114:21;
162:23
**both (3)** 25:9;67:24;

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 394 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

87:3
**bottom (1)** 164:3
**box (1)** 102:21
**branch (12)** 20:16;
21:13;25:12,23,24;
26:24;29:17;32:7;
110:20;111:14;135:6;
205:12
**Branches (13)** 20:14,
18,19,21;21:9;65:7;
107:1;108:12;110:7,
12,22;111:3;212:7
**Brandy (185)** 4:11;5:1;
19:21;26:21;27:20,23;
29:5,9;31:1;32:1,2,10,
14;34:9,17,19;35:15;
36:5,14,20,25;38:2,20,
24;39:17;41:20;42:12;
45:4,6,10,12,15,20;
46:4;48:6;50:23;51:3;
52:23;53:24;54:13;
55:2,13,19;56:5,8,13;
57:2;58:2,10;62:18,23;
64:7;70:25;71:7,17;
72:10;73:6;74:2;76:11,
15,24,24;79:5,8;81:15;
82:12,20;83:9,16;
84:24;85:22;86:18;
88:24;91:7;97:9,15;
98:22;101:5;102:6,10;
103:6,17;105:4,11,20;
106:11;108:14;109:25;
110:3,9,25;111:8;
117:17,21;118:12;
123:5,18;124:4,23;
125:4;127:15;129:7,
17;133:19;134:8,21;
136:21;137:13,23;
138:25;139:24;140:2,
8;142:6,10;143:11;
144:11,24;145:7;
146:23;147:17,22;
149:7;150:4;151:4;
153:15;156:14;158:14;
159:4,21;161:3,11;
162:1,9;163:6,22;
164:12;169:16;170:1,
11;171:7;173:16;
176:4,14,21;177:13,19;
179:25;180:6;181:19,
23;182:7;183:10;
184:10,13;185:22;
189:10,17,23;190:7,21;
191:13,19;192:11,23;
196:20;197:12,21;
198:2,12,13,17;199:1;
201:25;202:7;203:10,
17;205:3;206:10;
207:15;208:11,21;
209:6,22;215:13
**Brandy's (31)** 28:21;
33:22;35:19;63:13;
72:4;77:10;87:9,17;

88:9;89:25;98:25;
100:4;101:14;108:18;
149:24;151:25;155:6;
163:11;179:13;181:5;
186:5,20;187:10;
192:8;201:22;202:15;
203:13;204:9,21;
205:15,21
**break (3)** 9:6,10;51:24
**briefly (1)** 8:21
**bringing (2)** 78:4,25
**Briscoe (13)** 52:16;
55:12;56:9,12,24;
62:17;63:4;64:25;
84:11;129:9,16;
131:14;176:11
**Briscoe's (2)** 56:3;
63:12
**broaden (1)** 12:6
**broke (1)** 101:4
**brought (5)** 7:1;46:22;
59:22;66:17;122:10
**bucket (3)** 85:1;99:19,
21
**buckets (1)** 61:15
**budgeting (1)** 60:1
**Building (3)** 11:10;
39:15;84:4
**business (60)** 10:3;
12:14;17:5;20:10;25:7,
9;55:20,20;59:24;
64:14;65:10;68:7;
82:25;87:4;89:12,14,
19,21;90:10,23,24;
96:17;104:10;105:2;
107:6,10,11;112:19,23;
115:1,3;118:5;132:18;
136:7,8;137:2,24;
138:4;144:22;160:25;
175:19,20;178:21;
179:4;180:18;181:11,
25;184:20;186:10;
199:10,13,14,17,18,19,
23;200:5,6,10,16
**businesses (1)** 107:8
**business's (1)** 104:7

**C**

**calculated (1)** 95:22
**calendar (4)** 154:8,10;
180:24;181:1
**California (17)** 14:17;
33:8,10,14;106:23,25;
107:20,22,25,25;108:3,
5,7,11;110:9,23;206:2
**call (11)** 27:6,6;108:2;
112:3;133:20;145:19;
147:8;182:4,8;189:21;
196:15
**called (5)** 11:1;54:14;
74:6;77:9;189:19
**calls (16)** 27:3,5;39:4;

42:15;43:12;44:20;
45:25;46:14;47:13,16;
49:21;51:7;63:14;
96:13;97:1;113:7
**came (9)** 15:17;48:20;
60:3;69:7;84:6;104:12;
161:25;196:13;206:21
**can (74)** 6:6;9:1;43:9,
9;47:21;49:2,9,23;
50:9;54:8;61:18;66:9;
69:1;73:19;80:18;85:9;
86:12;88:24;89:23;
92:9,11,13,13;94:3,16;
99:12;100:9;101:22;
103:10,13;108:1;
115:20,20;119:3,18;
121:16,25;122:20;
123:11;124:7;126:6;
128:19;131:18;132:1,
2,14;133:15;136:15;
139:14,16;140:3;
145:15,15;149:20;
151:18;156:16;163:3,
11;164:21;166:1;
170:7,20;184:4,16;
185:15;186:8,11;
194:4;197:2,8;200:9;
201:14;204:2;207:2
**Canada (3)** 22:14,15;
213:12
**cancelled (1)** 154:4
**candid (1)** 115:18
**capacity (3)** 32:2,19;
36:15
**capturing (1)** 123:21
**career (1)** 12:6
**carefully (2)** 158:2,5
**Carrie (1)** 5:5
**case (7)** 6:7,8,13;7:10,
11;8:17;183:22
**categories (1)** 104:10
**categorize (1)** 60:20
**category (4)** 85:15;
98:6;104:5;145:24
**causing (1)** 134:22
**cc (1)** 189:10
**cell (2)** 61:24;175:9
**centers (1)** 16:22
**certain (3)** 24:1;64:6;
139:12
**Certainly (1)** 48:22;
64:15;71:23;73:12;
80:8;180:21;181:16
**certified (1)** 4:17
**cetera (1)** 154:5
**challenging (1)** 184:2
**chance (4)** 102:9;
169:13,23;172:12
**change (8)** 5:22;15:22;
51:10;100:19;141:22;
179:1;199:5,8
**changed (7)** 19:14,14;
29:22;105:16;116:2;

155:11;212:23
**changes (2)** 16:13;
199:9
**changing (1)** 27:9
**characterization (2)**
54:2;64:11
**charge (7)** 14:11;
41:19;42:11;46:21;
49:25;50:3;128:2
**Charles (1)** 131:5
**chart (1)** 74:6
**Chastang (9)** 19:1;
59:20;65:23,24,25;
66:13;67:1,17;191:9
**checking (1)** 102:21
**checkmark (1)** 89:1
**choice (1)** 45:22
**chose (2)** 152:12;208:7
**chronological (2)**
121:20;124:16
**circumstance (1)** 97:2
**circumstances (1)**
154:25
**Cities (1)** 107:14
**Civil (2)** 195:1,20
**claim (1)** 141:12
**claims (3)** 156:6;
194:24;196:5
**clarify (1)** 201:14
**clarity (4)** 60:19;61:4;
130:10;178:4
**classroom (1)** 75:20
**cleaned (2)** 126:2,13
**clear (3)** 98:20;99:9;
100:17
**Clearly (3)** 92:21;
155:11;190:4
**client (1)** 10:6
**close (1)** 48:9
**closed (1)** 181:18
**closely (14)** 150:23;
151:3,25;152:3,7,17;
153:5,7,12;155:7;
157:1,8;201:7;215:22
**Cloud (3)** 18:20;
107:14;131:17
**coach (5)** 75:15,21;
83:12,14,18
**coaching (2)** 103:2;
132:23
**coach-to-win (1)** 83:22
**Coash (2)** 4:18,18
**COEs (2)** 16:22;23:14
**collective (1)** 211:6
**collectively (1)** 107:4
**college (5)** 12:1,7,9,20;
15:3
**combination (1)** 211:13
**combined (1)** 110:22
**comfortable (2)** 179:3;
209:11
**coming (15)** 53:24;
84:8;134:19,22,25;

150:14;153:15,22;
175:21,24;176:1,5;
177:15,21;178:23
**commencing (1)** 4:5
**comment (1)** 199:24
**comments (6)** 102:11,
16;105:5,8,12;186:5
**common (1)** 89:9
**communicating (1)**
190:2
**communication (1)**
27:15;47:15
**communications (6)**
44:14;46:15;47:23;
48:11;49:23;51:6
**company (14)** 11:1,3;
15:20;16:8;64:3;95:4,
14,20,24;168:21;
185:12,23;193:11,16
**compare (1)** 172:12
**comparison (1)** 39:13
**complaining (1)** 200:25
**Complaint (3)** 45:20;
53:8;201:4
**complaints (4)** 30:3;
177:12,17;179:11
**complete (3)** 102:12;
104:4;194:23
**completed (2)** 69:22;
164:12
**completely (3)** 69:24;
117:2;212:21
**compound (5)** 24:7;
38:15;39:3;57:5;
132:10
**computer-based (1)**
11:18
**concern (21)** 26:12;
52:22;53:8;54:19,25;
57:2,12;58:2;62:18;
63:12;83:16;115:14;
118:19;120:1;129:22;
135:10,17,18;181:6;
200:25;201:3
**concerned (5)** 26:2;
52:2;182:11,25;212:20
**concerns (21)** 25:11,
16;26:14,16,19;30:4,8;
53:3,21;54:4,9,12;
55:18;58:10;135:14;
141:7;145:23;177:12,
20;179:11;182:17
**conclusions (1)** 84:9
**condition (2)** 123:7;
153:24;169:17;170:2,
12;181:7,12
**conditions (1)** 145:17
**conducting (1)** 62:12
**conference (1)** 192:16
**confidence (1)** 183:16
**confidential (3)** 120:19;
122:24;192:19
**confirm (1)** 80:18

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 395 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

**confusing (1)** 74:6
**confusion (1)** 25:1
**conjunctively (2)** 110:13,14
**connect (1)** 136:7
**connected (1)** 51:9
**connection (5)** 49:13; 86:18;92:25;114:1; 133:16
**considerations (1)** 215:10
**considered (2)** 89:8,13
**consist (2)** 14:14;27:7
**consisted (1)** 16:2
**consistent (1)** 135:3
**consistently (3)** 150:14; 153:21;174:20
**consists (1)** 14:15
**constitute (1)** 125:14
**consultant (1)** 211:16
**consultation (1)** 204:5
**consulted (1)** 203:15
**consultive (1)** 153:6
**Consumer (2)** 195:9,22
**consumers (1)** 11:10
**contact (4)** 42:10;51:3, 6;52:3
**contain (1)** 122:23
**containing (1)** 119:4
**contains (2)** 120:18; 122:16
**content (3)** 48:10,13; 50:12
**contest (1)** 9:7
**context (4)** 183:25; 185:17;199:21;200:14
**continuation (1)** 194:16
**continue (2)** 114:24; 182:20
**continued (1)** 208:16
**contributing (1)** 118:5
**Control (2)** 195:19; 213:3
**conversation (40)** 42:19,22;43:2,10,16; 48:5;50:10;85:12; 123:17,19;129:15; 130:21;131:1,5; 136:17;139:23;140:2; 141:16;145:13;147:6; 158:13;171:7,10; 172:4,23;173:5,15; 176:13;177:1;178:8, 11;179:23,25;180:4; 181:20;184:10;192:14; 198:5,12;204:20
**conversations (24)** 27:11;42:17;43:7; 49:18,24;50:5,11,25; 55:11,14,15,16;83:6; 127:8;130:13;131:8, 11;133:11;150:4; 176:8;204:25;205:2;

206:7,13
**conveying (2)** 152:17, 20
**copy (8)** 90:7;92:3,5; 95:7;104:12,22;121:3; 165:24
**corner (2)** 187:17,18
**corporate (4)** 10:5; 16:6;45:2;92:19
**corrected (1)** 172:6
**correctly (11)** 47:8; 52:6,7;58:22;71:5; 75:24;138:22;158:23; 178:12;184:14;199:15
**corrupted (1)** 172:5
**Counsel (7)** 4:22;45:2; 49:12,13;51:1;125:11; 204:5
**counsel's (1)** 43:23
**country (1)** 108:2
**couple (8)** 8:21;65:1; 92:1;127:19;128:1; 145:10;207:25;210:1
**course (5)** 68:7;81:11; 112:19,23;149:10
**Court (8)** 4:13,16;5:7; 7:16,17,18;101:6; 151:19
**covered (1)** 11:25
**covering (1)** 33:20
**created (3)** 115:7; 163:17;164:3
**creation (1)** 166:19
**Credit (2)** 195:10,22
**criteria (7)** 100:3; 101:14;103:5;105:19; 108:15,16,20
**criterion (2)** 102:5; 106:15
**criticism (1)** 83:16
**criticize (1)** 84:3
**cross (1)** 75:23
**cross-over (1)** 80:23
**crystal (2)** 98:20;99:9
**culture (1)** 132:24
**curious (1)** 199:7
**currently (1)** 9:14
**curriculum (1)** 82:24
**Customer (2)** 92:25; 199:18
**customers (1)** 20:20

**D**

**Dakota (2)** 14:16,16
**date (33)** 4:15;121:18; 122:4;124:11,19; 126:2;127:9;133:15, 17,21;139:13;140:7; 143:8,12,14,16;144:14; 147:1,5;149:24;165:9; 166:24;167:4;190:21; 191:5,10,11;207:17,24;

208:3;214:17;215:6,11
**dated (9)** 41:23;44:24; 113:21;144:12;189:11; 190:10,10;199:1;207:8
**dating (1)** 127:9
**Dave's (1)** 11:20
**day (13)** 4:2;39:11; 112:25;113:1;121:15; 135:6;176:17;186:22; 191:1,15;192:8; 201:11,12
**days (2)** 69:22;201:12
**day-to-day (1)** 34:15
**de (1)** 131:23
**dealing (1)** 122:7
**debated (1)** 12:24
**December (1)** 12:22
**decide (1)** 12:23
**decided (11)** 15:17; 59:7,12;70:25;71:8; 139:4,6;143:17; 186:14;207:17,24
**decision (29)** 68:14; 69:3,8;70:11,17;71:16; 72:3,8,9;74:1;143:22; 190:20;191:8;197:24; 201:21;208:20,25; 210:14,18;211:2,5,9, 17,19,22;214:11,12,23, 23
**defeat (2)** 159:2,17
**define (2)** 103:10; 116:24
**defined (3)** 111:12; 132:10;141:10
**degree (1)** 12:13
**Deinard (1)** 6:23
**delay (2)** 208:10; 214:14
**deliver (1)** 20:19
**delivery (1)** 144:21
**denied (1)** 215:25
**department (9)** 11:17; 15:8;16:15,20;18:12; 29:20,25;39:2;154:19
**depended (2)** 34:6; 39:21
**depending (1)** 62:10
**depends (1)** 46:8
**DEPOSITION (8)** 4:1, 10,19;6:1,11;8:22; 121:6,10
**depth (1)** 145:13
**describe (1)** 16:1
**description (21)** 6:6; 13:25;23:20,24;75:10; 76:9;77:24;81:21; 85:16;87:8,10;92:17; 98:25;99:5;100:15; 102:2;165:6;166:22; 167:17;168:7,17
**descriptions (6)** 97:16, 20;167:25;168:21,24;

169:5
**design (3)** 14:5;23:13; 132:21
**designed (1)** 156:23
**detail (1)** 88:9
**detailed (3)** 87:18; 88:12;145:11
**determination (9)** 58:25;59:3,17,22; 60:5;68:9;106:9,16; 191:5
**determine (5)** 15:19; 105:20;108:18;172:12; 215:22
**determined (4)** 13:2; 58:19;143:4,9
**determining (5)** 150:24; 203:12
**detrimental (1)** 212:24
**develop (3)** 83:1;89:11; 103:3
**developed (1)** 78:16
**developing (2)** 75:19, 20
**development (22)** 14:5; 23:13,14;75:10,19; 76:9;77:25;79:18;81:7, 16,22;82:15,21;85:6; 87:8,11;98:7,21;99:5, 20;103:2;132:23
**Diego (2)** 33:4;205:20
**differ (1)** 28:9
**difference (2)** 20:15; 110:19
**different (27)** 12:5;13:2; 17:22,25;25:8;27:10; 31:14;66:7;69:25; 72:11;87:10,14;94:3; 117:3,4,5,6;160:3; 164:15;165:14,16; 172:22;184:8;194:7; 200:11;212:22;213:6
**differently (10)** 25:10; 37:9;102:25;140:19, 23;141:2,8,8,13,19
**difficult (1)** 88:13
**dilemma (1)** 186:25
**direct (10)** 28:1,3,21, 25;30:5,16;34:20;56:9; 74:18;215:1
**direction (1)** 49:13
**directly (7)** 22:25;28:4; 29:19;67:8,17,25; 137:7
**director (16)** 10:20,21; 13:23;14:19;15:6; 18:21;19:3;20:6;22:18; 47:3;129:1,2;155:1; 170:15;189:22;209:2
**directors (2)** 28:15; 211:15
**dis- (1)** 186:10
**Disabilities (2)** 147:25;

195:16
**disconnect (1)** 186:11
**discrepancies (1)** 172:13
**discrimination (3)** 41:20;42:11;195:4
**discuss (2)** 177:19; 181:4
**discussed (4)** 69:11; 122:13;199:10;211:7
**discussion (9)** 85:21; 120:8,13;123:6;124:4; 127:1;174:6;188:16; 214:1
**discussions (4)** 48:18; 49:11;73:2;133:1
**disjunctively (1)** 110:13
**displeasure (1)** 62:18
**distributed (2)** 62:25
**distributes (1)** 20:18
**District (2)** 4:13,13
**divide (1)** 108:10
**doctor's (2)** 159:13,15
**document (57)** 40:22; 41:5,9,18;44:6;46:19; 48:1,21;53:3,9;58:14; 71:23;74:17,22;77:8, 11,16,23;81:1;83:6; 85:11;90:8,14,17,19; 95:5,7;97:17;100:11; 101:10,24;104:15,20; 112:1,4;118:25;119:3, 7;122:10;144:9; 149:18;154:1;163:8,9, 16;164:22;165:3,5; 166:16,19;167:21; 179:19;189:1,5; 192:18;193:7;207:6
**documentation (2)** 71:15;123:17
**documented (4)** 55:7; 204:24;205:24;206:12
**documenting (1)** 138:24
**Dodd-Frank (1)** 195:8
**done (10)** 35:24;36:18; 38:24;84:24;109:10; 160:24;163:21;169:15; 171:23;214:3
**door (2)** 181:17;182:21
**double (1)** 144:1
**doubt (1)** 145:25
**down (16)** 76:9;85:15; 88:14;93:22;94:22; 96:11,19,23,23;103:7, 17;133:24;145:12; 163:4;167:9;194:20
**downhill (1)** 186:14
**draft (2)** 44:5,8
**drafted (2)** 44:18; 105:11
**draw (1)** 173:17
**drive (1)** 75:18

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

**driving (1)** 132:23
**Dubiel (1)** 8:5
**D-U-B-I-E-L (1)** 8:7
**due (1)** 109:11
**duly (1)** 5:11
**during (34)** 19:2;22:23;
28:24;29:12;32:1;
33:12,16,18,22;34:8,
17,19;38:1;39:24;56:5;
70:7;110:9,24;111:6;
112:16,22;134:8,10;
146:5;168:1,19,22;
170:14;181:19;182:7;
184:9;192:10;197:12;
202:25
**duties (8)** 10:4;13:25;
23:5;24:2,13,18;25:2;
213:2
**duty (1)** 200:3

### E

**earlier (6)** 80:25;
121:18;151:18;162:16;
204:16;214:9
**earliest (1)** 124:19
**early (13)** 53:25;127:9;
134:19,22;135:1;
175:13,22,24;176:2,5;
177:9,15,22
**education (1)** 15:3
**EEOC (5)** 48:2,22;49:3,
4;128:2
**effect (1)** 212:24
**effective (4)** 15:11;
165:8;166:24;210:12
**effectiveness (1)** 79:19
**egregious (1)** 109:14
**eight (16)** 14:21,22;
19:15,18;20:7,8;159:1,
16;160:1,11,15;161:3,
7,12;162:1;212:15
**eight-hour (3)** 159:20,
23;160:22
**either (12)** 67:1,8;
90:15;92:18;115:5;
129:21;156:19;158:16;
161:5,8;202:4;205:17
**elevating (1)** 138:11
**elicit (1)** 172:22
**eliminate (18)** 59:12;
68:9;69:4;70:12,18,25;
71:8,17;72:4;139:4,7;
143:4,10,18;197:25;
201:22;214:11,12
**eliminated (12)** 68:18;
105:22;106:12,17;
108:19;193:19,22;
196:4;198:7,9;203:14;
208:14
**eliminating (1)** 209:17
**elimination (6)** 143:9;
207:14;214:16,18;

215:7,11
**Ellison (3)** 19:22;39:8;
113:19
**else (35)** 14:7;24:16;
27:14,18;35:18,23;
40:7,10;50:19,23;
63:19;65:11,13;68:13;
70:15;84:15;94:25;
97:24,25;98:17;
100:12;101:25;108:17;
131:18,22;132:1;
145:20;154:2;181:14;
192:10;198:11,15;
200:18;203:14;204:14
**email (9)** 54:15;92:19;
149:20;150:19;189:9,
17;199:1;207:8,11
**emails (2)** 51:7;119:12
**Emergency (1)** 195:24
**employed (2)** 9:14;
10:18
**employee (35)** 7:1,2;
14:6;16:23;43:5;62:8;
76:10;78:3,24;86:22,
23;87:6;88:11,14;93:4,
12,16;94:12;95:10;
96:10,18;109:11;
113:7,11;115:17;
123:24;148:15,17,20;
151:16;155:9;159:21;
195:3,25;207:22
**employees (40)** 15:20;
16:7;18:6;21:1;22:22;
35:13;62:6,7;70:9;
79:16;86:6;92:20;94:3;
113:5;114:1;115:17;
148:3,6,23,24;151:23;
156:11;158:7;159:19;
160:3,10,21,21,23;
188:6;193:10,15,21;
194:1;196:3,22;
198:19;212:25;213:4,8
**employee's (9)** 93:2;
94:10,19;95:9,17;96:2;
123:6,8,10
**employment (15)** 6:8;
86:19;108:1,5,7;
191:13,16,20;192:12,
24;195:2,5;196:1;
197:13;209:6
**empty (2)** 128:23,24
**encouraged (2)** 115:17;
208:23
**end (18)** 19:11,17,24;
52:5;72:24;73:12;
74:17;77:9,13;81:16,
19;91:25;144:23;
163:7;198:25;210:24;
215:5,9
**ending (1)** 99:1
**endurance (1)** 9:7
**engage (2)** 114:25;
115:2

**enhance (1)** 13:3
**enough (12)** 60:8,13,
15;65:17;66:2,14,18,
23;67:4;69:13;162:13;
178:17
**enrollment (2)** 62:4,5
**ensuring (1)** 169:5
**entire (4)** 19:2;116:21;
140:1;168:22
**entitled (4)** 73:17,19;
77:15;192:18
**entity (1)** 158:4
**Equal (1)** 195:7
**Eric (23)** 19:5;59:20;
68:11;70:14;131:9;
191:9,21;192:4;
197:11;198:12;201:7,
21,25;202:4,5,6,14,19,
22;203:15;204:8;
211:19,19
**escorted (2)** 198:17,19
**essential (6)** 10:4;
167:10,14;169:10;
170:3,13
**essentially (1)** 201:5
**estimate (1)** 21:6
**et (2)** 4:12;154:5
**etc (2)** 153:25;199:11
**evaluate (4)** 15:18;
97:8;100:4;101:14
**evaluated (2)** 37:18;
38:13
**evaluating (1)** 37:10
**evaluation (9)** 75:9;
76:14;77:19;87:9,12;
89:25;93:3;96:4;
105:14
**evaluations (2)** 74:25;
86:21
**even (11)** 31:5;45:9;
73:25,25;152:24;
163:24;172:6;200:7;
205:9,12;206:20
**everyone (2)** 183:14;
186:22
**exact (4)** 20:24;128:10;
133:17;139:13
**exactly (8)** 28:16;
91:12;99:18;127:13;
139:8;159:25;186:3;
196:10
**EXAMINATION (2)**
5:13;214:6
**example (1)** 98:6
**examples (2)** 61:18;
132:14
**exceed (1)** 96:16
**exceeded (1)** 96:17
**exceeds (2)** 81:5;96:21
**excellence (1)** 16:22
**except (1)** 100:1
**excerpts (1)** 184:3
**Exempt (6)** 159:19,21;

160:3,10,21,22
**exhaustive (1)** 93:21
**Exhibit (60)** 40:20,23;
44:6,10;46:12;49:19;
51:20;58:14;74:4,5;
77:9,11;81:2,2;91:25;
111:24;112:2;113:14;
118:23;119:1,11;
120:15,25;125:15;
126:12;133:14;138:15;
144:5,8;149:16,19,25;
163:4,8;164:18,21;
165:13,21,23,25;166:3,
4,6,15;169:11;171:1,
20,25;172:3;173:13;
179:17,20;183:21;
188:17,23,23;207:4,7;
215:2,16
**exist (1)** 154:15
**existing (1)** 115:6
**expect (5)** 46:5;89:10;
103:1;133:20;202:24
**expectation (3)** 96:16;
136:3;138:10
**expectations (16)** 81:6;
82:1,13;83:10,17;
85:23;89:3;93:25;
96:17,21;98:24;
102:23;108:24;137:21,
22;138:3
**expected (3)** 91:9;
137:24;160:23
**expenses (1)** 60:2
**experience (1)** 75:22
**experienced (1)** 158:17
**experiences (2)** 12:6;
67:3
**experiencing (6)**
144:19,25;145:4;
146:1,24;147:19
**explain (6)** 15:14;
19:13;26:25;28:24;
42:10;63:12
**explaining (1)** 145:7
**explore (1)** 72:14
**exposure (2)** 47:14;
75:22
**express (10)** 62:17;
63:21;64:1,5;67:2;
116:17;117:8;118:8;
129:21;140:17
**expressed (14)** 25:11,
16,18;26:14,15;30:4;
53:4,8;54:9;57:1;58:1,
10;65:15;118:19
**expressing (9)** 26:11,
18;52:22;54:12;61:5;
83:15;118:2;200:25;
201:3
**expressions (2)** 54:24;
57:12
**extended (1)** 175:5
**extent (9)** 42:15;43:12;

44:12;47:13,22,24;
49:21;121:7;196:15
**extremely (1)** 109:14

### F

**facilitator (1)** 136:4
**facilities (1)** 32:14
**facility (4)** 32:5;176:16;
187:24;205:8
**fact (8)** 70:4;71:11;
98:23;104:3;127:1;
159:8;175:23;177:7
**factors (1)** 214:22
**fair (10)** 9:13;34:8;
63:8;66:8,8;179:10;
193:14;195:10,14,15
**familiar (2)** 41:11;108:5
**Family (3)** 150:10,10;
195:11
**Famous (1)** 11:20
**far (6)** 80:22;86:12;
87:17;92:11;156:16;
158:10
**fault (1)** 55:25
**favorably (2)** 138:14;
181:7
**favored (1)** 63:2
**February (13)** 19:16;
23:4,6,19;24:25;28:7;
39:7,24;70:7;155:18,
21;201:17;210:12
**Federal (1)** 7:16
**feedback (24)** 16:5;
47:5;48:6;52:1;59:23,
24,25;60:4;69:11;84:1;
85:4;116:8,14;129:8,
16,23;130:2,9;132:6,
12,17;137:1,4;189:18
**feel (9)** 114:1;116:9;
118:4;147:3;153:11;
173:3;179:3;183:11,14
**feeling (1)** 184:16
**feelings (1)** 212:6
**fell (1)** 154:6
**felt (17)** 55:23;116:7;
117:8;118:3,13;129:8;
135:24;140:14,22;
181:3,24;184:23;
185:1,1,11;186:24;
211:24
**few (5)** 7:8;65:2;112:8;
151:10;214:4
**field (2)** 16:6;211:15
**Fifth (3)** 4:3;74:19;
81:18
**figure (1)** 210:23
**file (3)** 154:2;172:5,6
**filed (5)** 42:12;48:1,22;
127:15;128:7
**filling (1)** 69:22
**final (3)** 143:12;187:25;
190:25

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 397 of 505

Williams vs. G & K Services, Inc.                                                    Rachael Siggerud Raskovich
2:15-CV-01744-DJH                                                                               May 11, 2016

**find (12)** 48:20;55:25;
84:23;89:23;104:11;
134:17;174:10;184:16;
186:6,23;215:14,17
**finding (1)** 136:9
**fine (3)** 9:7;91:19;92:2
**finished (1)** 24:8
**Firm (1)** 4:20
**first (33)** 5:11;8:23;
10:14;14:23;40:25;
41:8,24;44:9;45:21;
46:12;59:16;65:20;
76:14;90:3;105:5;
112:3,8;120:3;122:23;
123:10;144:17;147:11;
150:2;153:13;155:12,
15,19,23,25;156:13;
158:18;172:8;189:5
**fiscal (8)** 77:5;93:5;
94:4,11;95:11;96:12;
99:1;103:19
**fit (8)** 72:15;182:15,22;
183:1,16;184:11,18,21
**Fitch (1)** 11:24
**five (4)** 11:6;22:14;
34:7;213:12
**fix (1)** 115:21
**flat (2)** 153:25;154:5
**flight (2)** 153:25;154:4
**fly (1)** 191:25
**FMLA (2)** 150:8,10
**focus (5)** 75:18;89:25;
92:25;112:8;199:18
**focused (3)** 87:22;
91:24;188:9
**folks (1)** 177:13
**follow (3)** 43:23;186:9;
215:3
**following (5)** 19:16;
60:7;155:14,17;156:5
**follows (3)** 5:12;101:12,
20
**forcing (1)** 160:1
**forgot (1)** 163:5
**form (104)** 17:16;24:6;
26:4;30:10,19;32:16;
37:13;39:4;45:24;46:7;
53:10,16;54:1,10,21;
55:3,8;57:4,14,18;
58:3;59:13;60:17;61:1,
8;62:21;63:7;64:10,20;
69:5;71:19,24;72:7,25;
73:8,14;74:24;75:2;
80:9;81:8;82:16;83:20;
84:12;85:7;86:1;87:13,
19,24;88:3,16;89:15;
91:3;93:7,18;94:7,14;
95:19;96:5;97:18;
98:11;99:2;100:6,8;
101:16,21;103:9;
109:20;110:11;111:1,
10,19;117:14;118:15;
130:6,17,22;132:9,16;

133:4;134:24;135:12;
136:22;140:20;141:3;
144:1;146:13;149:9;
151:6,13;152:22;
156:21;157:2,9,16,21;
160:5,13;162:20;
169:20;180:12;183:3,
20;193:1,2
**formal (1)** 15:3
**former (1)** 7:2
**formerly (1)** 5:20
**forms (1)** 194:7
**forward (6)** 39:8;78:4,
25;208:3;211:3,10
**found (11)** 121:12;
126:14,20,21;127:4,20,
21,23,25;128:8;186:7
**foundation (25)** 30:20;
36:8;37:4,14,21;38:8;
56:15;67:11,20;68:20;
76:21;78:11;79:2;
86:12;148:13;169:20;
170:18;196:7,15,25;
197:8;200:21;203:4;
209:24;213:18
**four (9)** 20:25;22:14;
34:6;41:8;44:9;46:12;
106:21;112:4;213:12
**fourth (2)** 81:18;133:25
**FOX (1)** 174:12
**Frank (1)** 190:1
**free (1)** 147:3
**frequently (8)** 34:3;
39:16,19;64:24;
114:18;137:9,11;
202:19
**friction (1)** 134:23
**front (7)** 171:20;
173:13;184:15;186:16,
16;188:10,22
**full (2)** 72:13;152:24
**function (1)** 30:24
**functional (1)** 75:23
**functions (9)** 27:16;
63:23;64:6;167:11,15;
169:10;170:4,13;
211:14
**future (1)** 27:10

## G

**gain (1)** 75:16
**gave (9)** 80:24;82:4;
100:10;101:23;102:15,
18;127:11;137:1;
165:13
**general (50)** 6:6;10:5;
13:25;14:9;21:22,23,
25;22:2,19,24;28:12,
14;29:4,5,14,16;30:4,
17;35:25;36:1,10,11,
19;37:12;38:3,6,20,23;
54:25;56:4;57:1;113:7;

114:8,8;116:14;
177:16;182:3,4;
187:17;188:7;192:20;
193:3,17;194:2,8;
196:20,23;198:5;
199:16;213:2
**generalist (68)** 18:1;
23:2,5,19,24;25:14;
26:13;27:1;28:10,22;
31:2;32:10,20;33:15,
17,19;34:10,20,24;
35:16,20;36:2,6,15;
37:1;40:12;55:21;56:6,
8,18;58:21;61:23;
63:22;68:10,18;70:3,
12;71:18;72:5;81:12;
102:24;105:22;106:20,
22;108:22;110:10;
111:7;116:3,10,16,19;
117:11;118:14;129:17;
130:5;133:7;140:10;
142:13,15,20;165:9;
166:25;167:18,22;
168:4,7;170:14;182:13
**generalists (66)** 16:24;
18:2;20:2;24:5,12,18;
25:2,25;26:5,10;27:17;
29:24;35:1;40:1,7;
59:8,18,23;60:3,4,6,12,
12,23;61:11,20,25;
62:14;64:2,13;65:14,
16;66:1,3,4,5,14,18,23;
67:3,9,18;68:1;69:12;
70:8;74:7,11,12;75:1;
76:19;77:4;78:15;
89:10;130:16;132:8;
133:2;138:1;200:4,17;
201:1,4;210:14;211:2,
9;212:12;213:15
**generalist's (2)** 136:12,
14
**generalizing (1)** 66:4
**generally (10)** 16:1;
30:8;49:25;64:4;79:25;
117:13;132:2;139:16;
145:18;187:7
**Genetic (1)** 195:17
**geographically (1)**
107:17
**geography (1)** 143:11
**George (2)** 206:17,20
**Gibson (1)** 131:19
**given (3)** 6:1;92:18;
94:10
**giving (1)** 129:16
**GK (8)** 74:22;77:16;
89:17,21;90:2;92:10,
14;199:8
**goal (4)** 75:18;76:2;
99:21;210:23
**goals (4)** 80:13;96:19;
199:16;200:13
**goes (2)** 76:1;147:22

**Gomez (1)** 190:1
**Good (11)** 5:15,16;
20:23;72:15;101:3;
104:23;174:15;178:20;
183:16;184:11;212:6
**goodness (1)** 7:6
**GP (2)** 97:17;102:12
**grab (1)** 40:17
**Graczyk (2)** 84:21;
131:11
**graduate (2)** 12:11,21
**granted (1)** 159:8
**granting (1)** 159:10
**granular (1)** 48:15
**great (3)** 108:2;122:21;
190:2
**Greg (1)** 131:19
**grid (1)** 86:6
**ground (1)** 8:21
**group (11)** 79:15;85:1;
92:17;138:1;148:15,
17,20,22,24;188:11;
211:6
**groups (1)** 10:6
**guess (6)** 53:17;
111:23;128:17;168:11;
178:3;189:3
**guessing (1)** 107:24
**guide (1)** 136:8
**guys (2)** 143:17;183:15

## H

**half (1)** 121:15
**hallway (1)** 187:19
**Hammond (4)** 189:11,
13,14;209:4
**hand (1)** 40:22
**handed (6)** 112:1;
144:7;149:18;164:20;
165:15;207:6
**handing (3)** 118:25;
119:7;179:19
**handle (1)** 149:5
**handled (2)** 148:9,20
**handling (1)** 151:20
**hands (1)** 75:21
**handwriting (1)** 112:9
**handwritten (2)** 119:4;
121:3
**happen (3)** 13:21;
126:11;143:13
**happened (6)** 28:17;
31:9;38:6,9;125:20;
209:14
**happening (2)** 73:3;
197:17
**happy (4)** 63:5;64:6;
118:6;189:24
**hard (2)** 123:4;212:5
**harsh (1)** 100:2
**hate (1)** 114:3
**hated (4)** 115:10,15,24;

117:22
**Hazard (1)** 195:24
**head (1)** 206:21
**heading (5)** 76:8;
77:24;85:19;99:5;
169:6;192:21
**headings (2)** 92:11;
104:25
**headway (1)** 182:19
**health (16)** 144:20,25;
145:3,9,17,19,24;
146:1;147:14,19;
180:8;182:17;183:12;
185:2,3;195:21
**hear (4)** 30:3;52:8;
60:11;174:2
**heard (7)** 60:10;84:10;
116:8,11,13;135:10;
179:12
**hearing (6)** 60:16,22;
118:10;133:3;135:21;
174:21;175:1,12
**Heavens (1)** 201:6
**heavy (1)** 70:2
**held (5)** 29:8,12;
159:20,23;160:22
**help (10)** 40:8;76:2;
89:19;99:15;136:6,7,8;
153:4;179:2;190:4
**helpful (2)** 91:18;178:9
**helping (1)** 132:22;
185:16
**Herrick (1)** 4:16
**herself (13)** 82:25;
86:24;93:4,17;94:22;
96:24;98:3;100:5;
101:15;102:7,18;
103:6,17
**hey (3)** 73:6;136:10,15
**Hi (1)** 189:17
**higher (2)** 23:8;132:18
**high-potential (1)** 79:17
**hire (1)** 209:20
**hired (2)** 10:15;29:7
**history (1)** 108:6
**hold (2)** 10:17;174:23
**Honestly (13)** 24:14;
50:20;121:22;129:24;
137:19;147:20;163:23;
164:13,16;179:6;
182:5;186:13;207:1
**hope (1)** 75:16
**hopeful (1)** 215:12
**hosting (1)** 139:22
**hour (1)** 159:12
**hours (13)** 69:20;
158:15;159:1,16;
160:1,11,15,24;161:1,
3,7,12;162:1
**house (1)** 126:2
**housed (1)** 38:16
**HR (185)** 10:5,20,20;
11:18;12:6,25;13:3,17;

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 398 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

14:3,9;15:8,16,22,24; 16:4,11,12,15,20,24; 17:3,6,6,9,13,21;18:1, 2,11;20:2;22:21;23:2, 5,8,17,19,24;24:5,12, 18;25:2,9,14,25;26:5, 10,13,25;27:3,8,17; 28:8,9,10,13,15,22; 29:3,10,20,24,25;30:6, 16,22,23,24;31:2,2,6; 32:10,19;33:15,16,19; 34:10,20,24;35:1,16, 20;36:2,5,15;37:1,19; 38:2,25;39:1;40:1,7, 12;47:3;56:6,8,18; 58:21;59:8,18;60:7,23; 61:10,11,19,23,25; 62:1,2,20;63:22;64:2; 66:14;67:9,18;68:10, 18;70:3,8,12;71:18; 72:5;75:1;77:4;81:11; 105:17;107:22;110:10; 111:7;116:4,10,18,22; 117:10;118:14;129:17; 130:4,16;132:8,19; 133:2,7;136:12,14; 140:10;142:13,15,20; 155:1,1,12,14;165:9; 166:25;167:18,22; 168:4,7,25;170:14; 182:13;199:16;200:4, 8,14,17;201:1,4,24; 210:14,15,21,24;211:2, 9,13;212:6,6,12,15,15, 19,22,25;213:9,15
**HRR (2)** 188:2;213:1
**human (9)** 9:21;10:3, 16,19;12:15;13:23; 14:19;15:6;18:22
**HUND (2)** 5:5,6
**hundred (1)** 213:5
**hypothetically (2)** 96:18,19

## I

**idea (11)** 35:23;52:9; 125:21;154:14;161:11, 19,25;164:16;194:12; 196:18;202:12
**identified (2)** 78:15; 83:3
**identify (8)** 4:22;79:16, 17;82:23;119:3; 149:20;164:22,23
**immediate (1)** 21:20
**Immigration (1)** 195:19
**impact (2)** 114:2;190:4
**implying (1)** 157:11
**important (3)** 108:8; 178:17;185:2
**Improvement (6)** 109:1, 6,8,15,19;110:1

**inaccessibility (1)** 178:1
**inaccessible (3)** 57:3; 58:2,11
**inaccurate (2)** 173:2,8
**include (3)** 108:12; 199:8;200:16
**included (1)** 85:1
**includes (4)** 58:18; 88:12;194:23;198:5
**including (4)** 14:3;47:5; 116:1;137:23
**income (3)** 90:10,25; 195:3
**incomplete (1)** 90:8
**Incorporated (2)** 11:8, 12
**increased (1)** 189:25
**indicated (2)** 41:13; 101:9
**indicating (7)** 81:5; 85:2;91:13;167:1; 171:18;203:20;204:1
**individual (5)** 94:19; 120:18;123:23;196:9; 204:15
**industrial (1)** 12:15
**ineffective (1)** 52:5
**inform (1)** 191:22
**information (20)** 42:13, 15,16;43:12;45:19,23; 47:10;48:16,20; 120:19;122:17,23,24; 123:15;129:20;145:11; 180:17;181:16;195:18; 198:6
**informed (4)** 191:19; 197:13;198:13,20
**Infrequently (1)** 137:10
**initially (1)** 214:18
**input (1)** 24:2;193:6
**inquires (1)** 44:12
**inquiry (2)** 49:22; 196:16
**insert (1)** 82:25
**insight (1)** 163:20
**instance (2)** 99:22; 129:19
**instances (1)** 122:12
**instead (5)** 16:24;56:2; 63:19;84:8;212:1
**instruct (2)** 43:15;48:14
**instructing (2)** 43:19; 48:12
**instructions (1)** 43:24
**intent (1)** 155:6
**interact (1)** 138:5
**interacting (1)** 186:21
**intern (2)** 11:14,16
**internal (1)** 78:13
**into (19)** 47:22;49:22; 70:1;82:25;135:20; 138:2;141:12;142:7, 11;143:20;171:24;

174:18;188:12;196:16; 206:21;210:19;214:22; 215:10,15
**introduced (3)** 23:3,6, 19
**introduction (1)** 27:6
**investigate (1)** 141:20
**investigation (2)** 49:6; 141:12
**involve (1)** 6:9
**involved (28)** 6:22,24; 59:16;68:8,11,11,12; 70:11,15;151:11,17,20; 152:21;156:2,6,8; 191:4;201:21;204:8, 12,17;208:24;210:17; 211:1,8,17,19,21
**involvement (2)** 208:20; 210:13
**irrelevant (1)** 13:18
**issue (4)** 46:22;136:11; 174:23;186:19
**issues (9)** 108:7; 134:12;140:24;141:9, 14;147:19;180:9,19; 183:12
**items (1)** 20:17

## J

**Jacob (10)** 52:16; 55:12;56:3,9,12,24; 62:17;63:4;64:24; 84:10
**Jake (14)** 55:18;129:9, 16;131:13,14;137:1, 11;176:10,14;177:2; 181:4;186:14;187:22; 202:22
**James (1)** 8:5
**Janelle (19)** 19:22,24; 39:17;77:19;78:21; 79:10,11,13,20,24; 80:11;81:5;166:23; 107:19,21;108:10; 110:8,24;129:21
**Janelle's (4)** 87:12; 88:2,7,23
**Jenny (1)** 121:13
**job (50)** 9:25;10:4,14; 23:5,6,20,24;24:2,12, 18;28:6;34:14;72:5; 73:7,23;105:16,17; 114:3;115:10,15,24; 116:2,3,4;117:18,22; 136:5,6,12,14;165:5; 166:21;167:11,14,17, 25;168:6,17,20,24,25; 169:1,5,10;170:3,13; 185:8;190:2;200:3; 208:2
**jobs (2)** 12:1;168:1
**Joe (1)** 4:17

**Jude (8)** 9:17,22;10:7, 10,15;12:4;72:12,19
**Julie (1)** 129:6
**July (17)** 72:24;140:6; 143:20;144:13,15,21; 146:5,23;149:21,24; 155:22;156:8;162:16; 164:4;180:1;199:2; 204:10
**jumping (2)** 84:9; 178:25
**June (24)** 47:2;59:4,5, 7,11;68:15;70:21,24; 71:7,16;72:3;99:1; 106:10;113:21;133:19, 22;139:3,7,10;143:18; 171:8;173:16;178:8; 214:13
**jurisdictions (1)** 13:13
**jury (2)** 8:8,12

## K

**Kaela (22)** 19:21,25; 26:18,20;39:8;107:5, 18;108:14;113:16,19; 114:6,10,15;115:8; 116:17;117:8;118:19; 120:18;129:21;162:9, 15,19
**keep (2)** 126:4,4
**Kelly (1)** 4:16
**Kietzer (2)** 149:3; 156:20
**kind (36)** 17:1;27:5; 69:20;82:25;107:3; 114:8;116:22,23; 117:3,4;122:3,5;126:4; 128:1;130:8,11;135:4, 19;136:1,6;137:24; 141:17;144:1;145:22, 24;178:14,22;182:18, 21;185:16;188:8; 199:15;200:9,12; 209:13;210:21
**kinda (1)** 183:11
**kitty (2)** 187:17,18
**knew (3)** 107:10; 181:12;186:22
**knowing (3)** 56:19; 168:9;210:20
**knowledge (8)** 45:7,10; 59:21;75:17;105:11; 110:3;165:2;166:18
**known (2)** 5:20;80:7
**knows (2)** 49:10; 186:17
**Kristin (2)** 5:2;121:13
**K's (3)** 32:5;41:18; 109:17

## L

**LA (2)** 107:3;139:21
**labor (4)** 62:9;107:9; 194:25;195:14
**lack (1)** 130:10
**laid (2)** 18:12;106:20
**language (2)** 196:11,13
**lapse (1)** 13:19
**larger (1)** 16:10
**last (19)** 8:6;65:22; 74:18,19;122:16,18; 123:8;137:5;147:10; 158:13;163:15,17; 164:1,8;172:5;183:24; 191:15;192:8;206:19
**lasted (1)** 43:7
**late (20)** 53:25;55:22; 134:19,22,25;150:15; 153:15,22;175:12,21, 24;176:1,5;177:14,15, 22;178:15,16;208:4; 210:12
**lately (1)** 150:4
**later (2)** 126:1;147:6
**Law (13)** 4:20;12:17, 19,20,23;13:1,4,5,7,16; 15:2;108:1,6
**lawsuit (5)** 6:15;7:1,5; 127:15;128:7
**lawyers (1)** 6:19
**layoffs (1)** 18:6
**lead (2)** 73:18,19
**leaders (12)** 15:21; 25:17;75:15,16;83:11, 18;84:5;85:24;89:11; 136:8;175:4;212:24
**leadership (26)** 16:4; 75:10,19;76:9;77:25; 79:15;81:6,16,22; 82:14,21;85:6;87:8,11; 98:7,19,21;99:5,20; 103:2;132:23;136:16; 201:8,24;211:13; 212:18
**leading (2)** 73:15;138:1
**learn (2)** 25:6;127:18
**learned (2)** 128:6; 204:4
**least (4)** 111:3;149:1; 158:15,25
**leave (7)** 12:3;125:23; 128:19;150:11;177:9; 195:12;204:7
**leaves (1)** 175:12
**leaving (10)** 53:25; 134:19,22;135:1; 175:21,24;176:2,5; 177:15,22
**led (3)** 60:5;67:3; 187:20
**Ledbetter (1)** 195:15
**left (13)** 39:25;42:25; 50:22;51:4;125:25; 128:11,12,14,18,22;

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 399 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

167:19,23;200:15
**lengthy (1)** 146:19
**Leonard (5)** 4:3,20;5:3;
6:21,23
**Less (2)** 137:11;181:6
**letter (8)** 144:11,18;
146:23;147:9,10,18,22;
149:25
**level (2)** 23:8;132:19
**liaison (4)** 78:3,23;
79:24;88:7
**license (1)** 13:19
**licensed (3)** 13:5,7,15
**light (1)** 158:13
**likely (4)** 139:10;
143:11;205:25;206:12
**Lily (1)** 195:14
**limit (1)** 213:8
**limitation (1)** 194:24
**limited (1)** 66:10
**line (11)** 45:3;122:16,
18;164:7;173:18,18;
174:19;183:8,9;186:5,
7
**line-by-line (1)** 174:13
**lines (3)** 30:23;122:23;
194:20
**Linked (1)** 51:9
**list (7)** 76:5;88:24;
93:21,23;99:24;100:1;
167:14
**listed (6)** 82:14;85:5;
89:14;100:12;101:25;
115:25
**listen (1)** 136:3
**listened (2)** 171:15;
180:3
**listening (3)** 84:9;
172:21;179:2
**lists (1)** 76:1
**literally (1)** 122:17
**little (5)** 8:20;65:9;
69:23;108:1;123:4
**located (6)** 21:23;22:6;
32:3;33:23;39:13;
45:17
**location (15)** 16:25;
17:4,7;18:16;33:25;
52:12;62:10,25;175:4;
176:15;187:14,25;
188:1,10;205:19
**locations (15)** 14:15;
17:23;18:3;20:10;
23:10,16;32:22;33:14,
20;34:23;55:1;61:22;
62:8;111:9,11
**location's (1)** 92:18
**logical (1)** 107:17
**long (9)** 9:22;11:5;
31:19;43:6,6;108:6;
121:14;194:15;199:25
**longer (6)** 13:15;30:5;
63:23;64:18;72:15;

208:15
**look (37)** 40:24;41:8;
51:21;74:4,9,16;76:13;
77:22;82:23;85:15;
89:6;101:9;104:9;
105:5;112:6;119:2;
121:20,23;126:6,18;
133:24;138:15;147:1;
154:17;158:14;162:12;
163:3;166:14;169:9;
183:7;186:4;192:17;
194:14;196:8;198:24;
210:2;211:7
**looked (6)** 16:9,13;
84:3;103:16;108:9;
114:12
**looking (19)** 12:5;
15:21;42:3;45:19;46:9;
51:20,22;60:1;73:7,23;
80:22;81:15;90:1;
114:24;121:16;126:16;
164:17;165:16;172:8
**looks (3)** 121:4;139:21;
192:25
**Loren (1)** 131:15
**Los (6)** 33:6;84:19,20;
108:12;175:5;206:4
**losing (1)** 185:8
**lot (7)** 46:5;73:15;80:3;
132:2;178:13;183:24;
185:15
**Lots (3)** 14:8;41:6;
200:11
**Lotus (2)** 154:8,10
**lunch (1)** 106:7

## M

**ma'am (5)** 9:14;112:1;
123:15;149:18;171:6
**Macy's (2)** 11:12,13
**main (2)** 76:2;199:15
**major (1)** 12:15
**making (10)** 114:6,9;
140:14;149:25;182:10;
191:4,8;209:11;
210:17;211:1
**manage (19)** 150:22;
151:2,25;152:2,6,16;
153:7,11;154:22;
155:6,7;156:25;157:4,
7,12;158:2,5,8;215:22
**managed (4)** 61:23,25;
155:3;203:1
**Management (4)** 75:17;
76:3;85:16;175:3
**manager (46)** 10:20;
21:7,10,25;22:2;28:12;
29:4,5,14,16;35:25;
36:1,10,11;38:4,20,23,
23;43:5;53:8;54:25;
55:1;56:4;58:1;64:9;
78:3,24;80:14;81:25;

83:15;86:21;92:19;
113:6;136:10,13;
151:16,16,22;181:14;
187:19;188:7,8;
189:16;205:5,16;
207:22
**managers (90)** 21:12,
13,14,15,19,21,22,23;
22:20,20,24,25;25:12,
13,19,20,22,23,24;
26:2,12,24;27:15;
28:14;30:4,18;36:19,
19;47:6;48:7;52:2,4,9,
11,18,21,25;53:23;
54:12;55:24;56:25;
57:1,8,13;61:5;63:1,6;
65:6;76:2;84:2,18,19;
85:4;114:2;115:2;
116:5,8,12,14;117:9;
118:13,20;129:23;
130:14,20;132:7;
133:3;134:12,23;
135:11,22;136:20;
137:1;176:3,17;
177:20;179:12;181:5;
187:4;188:12;200:19,
24;201:5;202:23;
204:21;205:3,14,21;
206:8,16
**manager's (3)** 128:24;
187:11,17
**managing (4)** 62:11;
153:4;156:6,10
**many (34)** 6:4;10:7;
14:18;18:9;19:7;20:4,
21;21:1,4;22:13;34:5;
35:1,4;42:7;50:5;
52:15;70:5;110:7,7,22;
125:13,13;137:16;
148:24;151:23;155:3;
175:25;193:13,24;
211:9;213:10,13,14,15
**Marie (32)** 43:3,4;
45:12,14,17;48:5;
50:14,17,24;127:8,25;
149:3,21;150:13;
152:18,25;153:4;
156:19;157:20,23,25;
158:10;160:7;161:6,
10,20;204:15,17;207:8,
12,13;209:15
**Marie's (3)** 152:3;
153:6;161:11
**mark (3)** 44:1;111:22;
179:15
**marked (19)** 40:20,23;
111:24;112:2;118:23;
119:1;144:5,7;149:16,
19;164:18,20;165:23;
171:1;179:17,20;
188:17;207:4,7
**master (1)** 17:1
**Master's (1)** 12:24

**matched (1)** 196:10
**materials (8)** 11:10;
24:5,11,17,22;82:24;
83:1;103:3
**matrix (1)** 31:10
**matter (2)** 4:11;178:17
**max (1)** 213:4
**May (31)** 4:2,15;18:8;
24:1;28:11,18,20;
35:25;46:21;48:16,16;
50:10;53:5,18,18;55:9;
79:22;85:13;116:13;
124:21,25;125:2,5,25;
155:23;165:9;166:24;
172:22;205:1,10;
206:14
**maybe (13)** 8:7;38:18;
65:1;91:1;106:2,3;
119:5;149:1;166:4;
185:2;205:11;209:4;
213:3
**McNaul (13)** 19:5;
59:20;66:22;67:1,25;
131:9;191:9,21;
197:11;201:7,21;
204:8;211:20
**mean (27)** 14:8;39:22;
40:9;41:9;51:6;61:4;
73:18;78:23;88:10;
90:15;92:6,13;110:13,
14;121:17,21;125:9;
130:8;141:18;152:14;
164:17;175:16;186:1,
13;199:19,22;201:14
**Meaning (2)** 28:4;
147:25
**means (6)** 92:23;
158:19;161:1;185:18;
199:12;200:11
**meant (5)** 79:5,14,20;
141:17;200:14
**measures (1)** 90:11
**Medical (27)** 9:17,23;
10:8,10,15;12:4;72:12,
19;122:17,23;123:7;
140:24;141:9,14;
145:23;146:7,10;
150:10,11;153:24;
169:16;170:1,12;
180:19;181:7,12;
195:12
**meet (5)** 26:23;89:3;
93:23;115:1;121:14
**Meeting (17)** 81:25;
82:12;83:10,17;85:24;
88:13;93:25;98:23;
108:24;113:5,10,12;
138:8;180:25;192:11,
23;197:12
**meetings (4)** 55:22;
177:14,22;180:24
**member (1)** 189:14
**memorandum (2)**

190:10,15
**memorized (1)** 121:8
**Menard's (1)** 11:8
**mental (3)** 146:25;
147:13,19
**mentally (1)** 147:12
**mentioned (2)** 102:19;
204:16
**mentor (1)** 75:21
**met (5)** 16:3;45:9;
86:22;103:21;121:13
**mic (1)** 173:21
**Michael (4)** 189:10,13,
14;209:3
**microphone (1)** 173:25
**middle (6)** 46:19;58:15;
77:23;167:9;169:10;
207:18
**midyear (1)** 105:12
**Mid-year (1)** 105:8
**might (12)** 35:24;77:12;
80:4;81:4;95:24;
102:24;129:20;136:17;
142:16;183:13,15;
187:4
**Mildenberger (1)** 4:17
**MILLS (223)** 4:24,24,
25;5:14;8:3,11,16;
17:18,24;24:8,10;26:7;
30:14,25;31:25;32:18;
36:12;37:7,17,22;
38:11,19;39:6;40:18,
21;41:16;42:21;43:22;
44:1,3,17,25;46:3,10,
17;47:17,25;48:19;
49:2,8,15;50:4,18;
51:10,19;53:13,20;
54:6,18,23;55:6,10;
56:16;57:10,16,22;
58:7;59:15;60:21;61:2,
17;63:3,10,20;64:16,
23;67:12,22;68:5,24;
69:6;70:6,23;71:6,22;
72:2,18;73:4,11,17,24;
75:4;77:1;78:17;79:7;
80:10;81:13;82:18;
83:24;84:14;85:10;
86:4,16;87:16,21,25;
88:6,18;91:19,22;
93:10;94:1,9;98:95:2,
23;96:9,15;97:6,23;
98:16;99:3,11;100:13,
18;101:3;102:3;
103:12;104:8;105:25;
106:5;109:24;110:14,
16;111:5,13,20,22,25;
117:16;118:18,24;
119:8,13,17;120:21,24;
121:1;122:2,14,19;
123:1,11,14;124:6,12;
127:5;130:12,19,24;
132:13,25;133:5,10;
135:9,16;136:24;

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 400 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

140:25;141:11,21;
142:5,24;144:2,6;
146:15,21;148:18;
149:11,17;151:9,14;
153:2,3;156:24;157:5,
13,19,24;160:9,16;
161:18;162:7,22;
164:19;165:15,21;
166:1,5,8,11,13;
169:22;170:10,20;
171:5;172:24;173:12,
21;174:14,17;177:25;
178:6;179:15,18;
180:13;183:6;184:7;
188:21;194:6,13;
196:12,19;197:5,10;
200:23;203:6;204:3;
207:5;210:1,10;
213:21;214:2;215:17
**mind (1)** 165:17
**mind-set (1)** 117:3
**mine (1)** 165:10
**Minneapolis (6)** 4:4,21;
9:18;131:21,25;192:4
**Minnesota (15)** 4:4,21;
6:14;12:10,25;13:9,16;
14:15;18:20;22:7;
33:23;39:9;45:18;
106:21,22
**minor (1)** 93:24
**minute (1)** 112:6
**minutes (5)** 92:1;
178:15,15,16;210:2
**mischaracterizes (7)**
94:15;96:6;99:8;
103:24;105:24;151:7;
152:23
**mischaracterizing (1)**
141:4
**miss (3)** 113:25;
146:10;173:9
**missed (1)** 154:3
**misses (1)** 99:22
**missing (11)** 46:24;
54:19;90:16;92:5,8,9;
95:4;150:14;153:15,
22;177:22
**misstating (1)** 99:13
**Mitch (6)** 137:3,7,13;
138:12;176:12;177:4
**Mitchell (1)** 12:20
**Mitch's (1)** 137:5
**model (8)** 15:18;16:21;
75:15;83:12,19,22;
211:7;212:22
**models (1)** 132:22
**modified (1)** 164:8
**moment (1)** 214:24
**moments (1)** 151:10
**money (1)** 8:12
**monitor (15)** 4:7;51:13,
18;100:22;101:1;
120:6,10;141:24;

142:4;170:23;171:3;
174:4;188:19;210:4,8
**month (1)** 65:2
**monthly (1)** 85:24
**months (3)** 11:6;42:7;
127:19
**more (49)** 16:21;30:21;
39:16,19;46:5;55:25;
61:9;63:17;65:9;68:7,
22;69:18,23;76:3;
87:17,22;88:1,9,10,12,
13;91:15;102:20;
108:21;111:4,9,16;
129:18,20;132:19;
135:1,20;137:18;
149:1;155:7;163:20;
172:16;178:4;179:1,3;
180:17;183:24;188:11;
211:6,24;212:7,7;
213:5,22
**morning (4)** 5:15,16;
110:18;213:11
**morning' (1)** 158:19
**most (2)** 14:21;201:12
**move (6)** 111:21;
120:24;132:20;186:14;
187:22;208:3
**moved (3)** 176:15,24;
187:22
**moving (1)** 176:19
**much (12)** 8:12;39:19;
46:24;54:19;62:11;
107:13;114:19;133:12;
162:16;197:22;213:2;
214:3
**multiple (10)** 17:14,23;
18:3;25:17;102:14;
118:2;131:8;148:23;
155:5;176:7
**must (1)** 199:17
**Myself (6)** 59:20;70:13;
130:1;157:4,11;191:8

## N

**name (19)** 4:16;5:17,
22;7:25;8:4,6;35:7;
57:25;65:20,22;123:8,
8,10;129:6;137:5;
139:19;206:19,24,25
**named (1)** 52:16
**names (10)** 52:15,15,
20;56:25;57:7,9;58:6;
149:2;163:23;206:15
**National (1)** 194:25
**near (2)** 188:6,7
**necessarily (13)** 17:9;
25:22;63:1;88:10;
102:21;108:24;115:16;
135:23;141:15;143:15;
159:3,19;184:19
**necessary (1)** 78:5
**need (13)** 9:6;51:10;

63:22;73:7;91:14;
100:18;115:22;126:5,
10;138:19;153:11;
159:12;165:24
**needed (10)** 62:10;
70:5;73:22;101:9;
107:15;132:18;159:14;
160:24;177:11;211:10
**needing (1)** 69:21
**needle (1)** 132:20
**needs (5)** 16:7;79:18;
115:3,5;178:22
**negative (1)** 144:1
**negotiations (1)** 14:4
**neighbor (1)** 107:25
**new (15)** 15:16,24;
25:5;55:21;62:6,7;
75:16;77:25;78:14;
82:23;118:20;125:2;
138:2;158:10;212:21
**next (9)** 85:15;150:17,
21;158:12;164:7;
167:3;187:19;190:9;
192:17
**nice (1)** 70:2
**night (2)** 172:5;183:24
**Nikki (4)** 149:3;156:20;
204:16,17
**Nondiscrimination (1)**
195:18
**none (1)** 180:20
**noon (1)** 158:20
**North (1)** 14:16
**Northern (5)** 106:23,24;
107:20;110:8,23
**Northwest (31)** 14:12,
14;15:7;18:14;20:5,22;
21:4;22:11,16;35:2;
40:12;58:20,25;59:9,
19;66:6,11;67:13,18;
68:1,22;74:13,14;
111:8;170:15;189:19,
20;212:8,12,18;213:20
**Note (2)** 114:13;123:5
**notebook (8)** 121:11;
125:1,3,17;127:12,20,
21,24
**notebooks (4)** 125:14,
20;126:9;128:12
**noted (1)** 50:2
**notes (43)** 42:3;53:5;
85:13;112:13,15,18,20,
22;113:1,3,4,6;119:4;
121:3,12,16,18;123:20;
124:16,20,21;125:4,13,
14;126:3,4;127:4,10;
129:13;130:1;133:16;
134:20;139:17,21,22;
147:2;154:1,8,10;
172:11;178:11;179:9;
210:2
**notice (2)** 153:16,23
**Notification (1)** 195:13

**notified (2)** 127:3,7
**notify (1)** 127:6
**NPS (1)** 90:25
**nuances (1)** 145:14
**Number (16)** 4:10;
20:24;50:11;107:22;
114:13;124:13;133:13;
138:16;144:8;153:14;
160:23;189:8,9;
192:17;193:14;194:14
**numbered (10)** 112:5;
113:14,24;120:17;
123:16;139:14;189:1,
6;190:9;198:24
**numbers (1)** 123:3

## O

**object (15)** 43:11;
44:12;46:7,13;47:12,
15;48:9;49:21;93:6;
94:6;97:1;103:23;
135:12;143:25;183:19
**Objection (140)** 8:1,10,
14;17:16;24:6;26:4;
30:10,19;31:21;32:16;
36:7;37:3,13,20;38:7,
15;39:3;41:12;42:14;
44:20;45:24;53:10,16;
54:1,10,21;55:3,8;
56:14;57:4,14,18;58:3;
59:13;60:17;61:1,8;
62:21;63:7,14;64:10,
20;67:10,19;68:3,19;
69:5,9;70:19;71:2,19,
24;72:7,25;73:8,14;
75:2;76:20;78:10;79:1;
80:9;81:8;82:16;83:20;
84:12;85:7;86:1,11;
87:13,19,24;88:3,16;
93:18;94:14,24;95:18;
96:5,13;97:18;99:2;
100:7;101:21;103:9;
105:23;109:20;110:11;
111:1,10,18;117:14;
118:15;130:6,17,22;
132:9;16;133:4,8;
134:24;136:22;140:20;
141:3;142:22;146:13,
18;148:12;149:9,14;
151:6,13;152:22;
156:21;157:2,9,16,21;
160:5,13;161:14;
162:3,20;169:19,20;
170:17;172:1;177:24;
180:12;183:3;194:3,
10;196:6,14,24;197:7;
200:20;203:3,24;
209:23;213:17
**objections (4)** 73:20;
87:17;170:5;183:20
**objective (15)** 81:6;
88:12,13,15,21,23;

93:12,17,20;96:3;
98:14,15,18;103:5,11
**objectives (52)** 76:17,
18;77:5;82:13;86:23;
87:4,5,9,11;89:7,12,14,
17,22;90:3,6,9,18,22;
92:14;93:4,16;94:4,13,
21;95:4,11,13,14,17,
21,24;96:2,11,22;
97:16,21;98:2,9,10,25;
100:5;101:15;102:6,
17;103:6,16,21;104:2,
6,10;105:3
**observing (1)** 34:14
**obviously (2)** 107:20;
182:16
**occasions (4)** 102:14;
114:15;118:3;145:10
**Occupational (1)**
195:21
**occur (3)** 190:24;191:6;
214:16
**occurred (5)** 42:23;
172:23;187:1;204:25;
210:12
**October (1)** 9:24
**off (19)** 18:12;51:12;
100:21;102:21;119:20;
120:5,8;141:23;154:6;
156:19;159:6;170:20,
22;174:3,6;188:14,16;
210:3;214:1
**offensive (1)** 84:7
**offer (6)** 207:21;208:2,
21,23;209:6,12
**offered (2)** 208:11,17
**offhand (2)** 6:20;24:23
**office (27)** 39:13;54:13;
128:16,20;139:21;
158:15;171:23;176:15,
19,20,23;186:12,15,17;
187:3,10,18,18,22,25;
188:1,3,6,10;198:17,
20;201:10
**offices (1)** 187:11
**official (1)** 31:9
**offsite (1)** 180:25
**off-the-record (1)**
120:13
**old (1)** 173:5
**Older (1)** 195:6
**onboarding (2)** 61:25;
62:6
**Once (1)** 6:5
**one (57)** 8:18,23;9:5;
15:1;18:14;20:25;35:5;
50:14;58:20;61:22;
66:17;68:9;69:2;80:19;
89:2,20;90:1;91:4;
93:23;99:23;100:1;
103:25;107:19;108:19;
112:3;113:10;117:1;
124:10;125:16;126:12;

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 401 of 505

Rachael Siggerud Raskovich
May 11, 2016

133:24;135:13,15;
137:18;138:17;139:18;
147:6;149:4;155:23,
25;156:25;161:22,25;
165:14,19;168:15,16;
175:20;179:16;186:15,
16,17;197:16;200:1;
205:7,11;213:23
**one-on-one (10)** 113:9,
10,12,17;115:16;
123:5;124:22;133:18;
134:8,10
**one-on-ones (1)** 113:4
**onerous (3)** 88:1,5,10
**ones (1)** 88:1
**ongoing (6)** 60:18;
61:3;79:25;145:22;
153:10;184:22
**only (9)** 9:5,8;28:21;
33:14;40:1,4;103:25;
124:10;193:18
**onsite (2)** 34:14,21
**Ontario (3)** 33:8;206:1,
16
**open (1)** 181:17
**opened (1)** 182:21
**open-ended (2)** 143:14,
15
**operating (2)** 90:10,25
**operations (1)** 189:22
**opinion (5)** 79:4;161:6,
10;211:22,23
**opportunities (1)**
114:25
**opportunity (4)** 72:10,
13;100:20;121:5
**opposed (2)** 210:14;
212:8
**option (1)** 210:25
**order (6)** 102:8;121:20,
24;124:10,17;179:7
**org (1)** 132:21
**organization (11)**
11:18;15:22;16:4,7,
14;27:8;158:4;189:15;
199:16;201:24;213:9
**organizational (3)** 14:5;
23:12;79:19
**organizations (2)**
16:10;30:22
**original (1)** 208:3
**originally (1)** 91:6
**others (9)** 35:22;76:4;
105:19;106:15;108:21;
141:7;155:24;182:25;
209:4
**Otherwise (1)** 9:3
**out (34)** 7:19;32:5,8;
34:3;48:20;56:1;69:22;
84:7;99:15;106:20;
115:1;122:20;123:19;
124:7;125:15;126:12;
127:23;135:25;136:3;

150:8;179:3;181:20,
24;185:11,23;186:15,
24;191:25;198:17,19;
202:19;207:12,25;
210:23
**outlier (1)** 108:13
**out-of-office (1)** 135:5
**outside (3)** 57:13;58:1,
9
**over (8)** 8:21;30:6;
121:11;127:22;128:21;
142:12;169:13,23
**overall (6)** 60:1;69:16;
87:1;95:14,21;102:15
**overestimated (1)** 70:4
**overly (1)** 100:2
**oversaw (2)** 201:13,14
**overseen (1)** 201:1
**overstaffed (5)** 58:20;
59:1,8,18;60:6
**overtures (1)** 182:10
**own (6)** 16:13;77:5;
94:13;98:8,10;212:17

## P

**packet (1)** 91:20
**page (45)** 41:24;46:18,
19;51:21;58:13,15;
74:19,19,21;75:8;
76:14;77:15,22,23;
81:14,18,21;90:3;
105:6;113:13;120:14;
122:15,18,21;123:1,15;
124:13;133:13;138:16;
139:14;163:15;164:1;
167:9;169:11;173:18;
183:7;186:4;189:8,8;
190:9;192:17;194:14,
16,18;198:24
**pages (11)** 41:6,8;44:7,
9;46:12;77:13;112:4,8;
122:4;172:4;189:5
**paper (1)** 117:2
**paragraph (21)** 51:23;
58:15;113:23;115:25;
120:17;122:16,22,25;
123:16,24;133:25;
138:17;147:11;150:2,
17,21;153:13;164:2;
177:18;194:15,17
**Pardon (2)** 11:15;41:3
**PARKER (202)** 5:2,2;
8:1,10,14;17:16;24:6;
26:4;30:10,19;31:21;
32:16;36:7;37:3,13,20;
38:7,15;39:3;40:16;
41:12;42:14;43:11,19;
44:11,20;45:24;46:7,
13;47:12,21;48:8,25;
49:5,9,20;50:9;53:10,
16;54:1,10,21;55:3,8;
56:14;57:4,14,18;58:3;

59:13;60:17;61:1,8;
62:21;63:7,14;64:10,
20;67:10,19;68:3,19;
69:5,9;70:19;71:2,19,
24;72:7,25;73:8,14;
75:2;76:20;78:10;79:1;
80:9;81:8;82:16;83:20;
84:12;85:7;86:1,11;
87:13,19,24;88:3,16;
91:14;93:6,18;94:6,14,
24;95:18;96:5,13,25;
97:18;98:11;99:2,7;
100:7;101:17,21;
103:9,23;105:23;
106:3;109:20;110:11;
111:1,10,18;117:14;
118:15;119:5,10,15,20;
120:1,12,23;121:25;
122:9,15,21;123:3,13;
124:8;126:25;130:6,
17,22;132:9,16;133:4,
8;134:24;135:12;
136:22;140:20;141:3;
142:22;143:25;146:13,
18;148:12;149:9,14;
151:6,13;152:22;
156:21;157:2,9,16,21;
160:5,13;161:14;
162:3,20;165:14,19,24;
166:3,7,10;169:19;
170:5,17;171:24;
173:4,9,19,22;174:10,
16;177:24;178:2;
180:12;183:3,19;
194:3,10;196:6,14,24;
197:2,7;200:20;203:3,
20,23;209:23;213:17,
25;214:4,7;215:19
**part (21)** 23:15,25;
27:3;31:12;50:2;65:15;
77:11;90:23;91:1;
95:14,21;103:25;
163:8;168:20;169:7;
182:12;201:8,23;
202:12;203:12;207:13
**participate (1)** 138:4
**particular (7)** 105:21;
114:14;129:10;176:8;
191:10,11;200:13
**partner (4)** 10:3;
132:19;138:8;178:20
**partnering (5)** 23:9,13;
56:2;132:21;178:20
**partners (4)** 16:5;134:1,
5;212:19
**partners/ (1)** 134:1
**partnership (1)** 135:19
**party (1)** 6:15
**pass (1)** 156:19
**past (5)** 23:9;117:7;
127:19;130:9;175:8
**Paul (9)** 9:19;22:7,9;
39:15;65:10;107:5,18;

131:8;192:5
**Pay (2)** 195:7,15
**payroll (1)** 62:3
**Pelham (12)** 19:1;
59:20;65:19,22;68:11;
70:13;191:9;201:19;
202:2;203:9,15;204:12
**pelvic (2)** 145:19,24
**penalize (1)** 99:24
**pending (2)** 6:13;9:9
**people (19)** 10:7;
14:18;19:7;40:1,4;
69:17;84:6;109:7;
118:3,10;132:2;
140:16,18,22;174:22;
176:23;185:15;186:11;
211:16
**per (3)** 45:2;134:20;
211:22
**perceive (3)** 134:2,5;
186:18
**perceived (5)** 52:4;
134:15;180:8;181:6;
183:14
**perceiving (1)** 141:8
**percent (2)** 50:15;
124:11
**perception (5)** 134:14,
15,18;178:16;187:5
**perceptions (5)** 174:20;
175:19,20;178:13,13
**perfect (1)** 100:19
**perform (8)** 62:3;74:22;
77:16;92:10,14;97:17;
102:12;199:8
**performance (59)**
34:14;35:12,15,17,19;
36:6,14,17;37:2,11,18;
40:11,13;46:22;47:5;
55:13;56:12;74:22,25;
75:17;77:16;86:7,10;
90:2,22;91:3,6,24;93:3,
11;94:5,10,20;97:9,14,
21;100:4;101:14;
102:7,8,20;104:7;
105:6;108:22,23,25;
109:6,8,12,15,18,22;
110:1;150:3;200:19;
202:15;204:22;205:15,
22
**performed (1)** 208:7
**performing (6)** 63:23;
64:7;109:7;169:18;
170:3,13
**perhaps (1)** 65:9
**perilously (1)** 48:9
**period (11)** 19:2;21:18;
29:12;36:22;38:1;
39:24;146:19;147:14;
160:15;202:25;214:14
**periods (1)** 28:25
**permanent (8)** 207:21;
208:2,11,18,21;209:6,

12,20
**permanently (1)** 142:16
**person (12)** 7:24;
16:25;18:16;23:10;
57:20;96:20;102:23;
137:3;186:21;187:6;
212:17,19
**personally (3)** 98:4;
201:25;212:11
**personnel (2)** 120:19;
154:2
**person's (2)** 136:13;
187:3
**perspective (3)** 16:11;
22:21;23:17
**pertaining (1)** 167:22
**Perusing (5)** 92:3;
112:7;122:8;166:9;
169:21
**Phoenix (43)** 32:3,5,15;
33:25;34:21;36:19;
52:11;53:1,24;57:8,13;
58:1,9;84:18;85:3,8;
107:2;108:13,14;
110:25;129:9;134:23;
135:7,11,22;137:2;
175:4;176:4,16;
177:13,20;179:12;
180:8,18;181:5;
182:19;187:14;191:24,
25;192:3,16;202:20,23
**phone (8)** 51:7;61:24;
65:3;134:13,16;175:9,
10;182:7
**photocopy (1)** 104:23
**physical (1)** 205:8
**physically (3)** 34:13;
38:10;176:22
**pick (5)** 108:11,14;
136:2;173:20,25
**picked (1)** 173:24
**picking (2)** 84:7;178:22
**picture (1)** 23:16
**pieces (1)** 48:16
**place (7)** 4:20;83:2;
84:6;86:6;115:6;
187:23;192:15
**placed (2)** 109:8;
188:22
**Plaintiff (3)** 4:25;7:25;
8:4
**Plan (3)** 109:9;110:1;
151:24
**Pland (1)** 131:1
**plant (25)** 17:7,10;
20:15,17,25;21:7,13,
19,21,25;22:24;25:12,
19,20,22;29:17;32:7,9;
107:3,3;110:19;
111:14;187:20;188:7;
192:16
**plants (20)** 17:14;20:4,
8,11;21:24;22:20;

**Williams vs. G & K Services, Inc.**
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

26:24;65:6;69:17;
106:21,24;107:14,14,
20;110:7,12,22;111:2;
212:7,16
**play (5)** 23:23;165:1;
166:18;168:18,20
**played (1)** 174:9
**playing (1)** 55:19
**please (5)** 4:22;5:8,17;
100:14;102:1
**plenty (1)** 70:2
**pm (13)** 101:2;120:7,
11;141:25;142:4;
170:24;171:4;174:5,8;
188:15,20;210:5,9
**point (28)** 14:22;15:5;
17:12,17;22:23;28:12,
14;29:8,22;36:2;54:5;
55:25;56:11;66:8,8,17;
127:14;129:10;156:1;
168:14;187:21;190:19,
20;201:16,19;202:10;
209:12,13
**policy (1)** 109:18
**Polygraph (1)** 195:25
**poor (1)** 109:22
**portion (7)** 44:6,9,19;
52:1;64:13;79:8;
194:20
**posed (1)** 161:22
**position (51)** 23:2,18,
21;29:9,13;41:19;
59:12;69:4;70:12,18;
71:1,9,17;72:4,14,21,
21,23;105:21;106:11,
17;108:18;128:21,24;
129:3;139:5,7;142:12;
143:5,9,18;167:18;
197:25;198:6,6,13,22;
201:22;203:13,18;
207:14;208:12,14,18,
21;209:18,21;214:11,
13,19;215:6
**positions (6)** 10:17;
68:10,18;193:18,21;
196:4
**positive (1)** 190:4
**possession (2)** 125:9,
18
**possibility (1)** 142:16
**possible (20)** 24:20,24;
28:18,20;30:12;35:21;
44:18;53:12;57:15;
82:6,8;119:22;128:11,
13;129:13;168:6,10,
11;202:17,18
**post-implementation (1)**
116:23
**posting (1)** 169:5
**potential (1)** 86:8
**potentially (8)** 7:7,
15:21;20:25;69:20;
72:15;92:12;96:21;

209:14
**practice (4)** 13:5,7,16,
17
**precisely (1)** 49:11
**preferable (1)** 172:17
**pre-HR (1)** 169:1
**preparation (9)** 49:14,
19;133:18;165:2;
168:20;193:6
**prepare (4)** 56:12;
121:9;190:15;193:5
**prepared (4)** 91:7;
167:2;172:18;208:1
**preparing (2)** 23:23;
134:9
**Prescott (2)** 32:25;
205:13
**present (5)** 5:5;176:22;
192:10;193:9,20
**presented (2)** 192:22,
25
**president (5)** 15:16,24;
19:6;22:4,5
**presidents (1)** 22:8
**Presumably (1)** 208:19
**pretty (6)** 62:11;107:13;
114:19;196:11,11;
214:8
**prevented (3)** 169:17;
170:2,12
**previous (1)** 194:17
**previously (3)** 65:12;
156:6;158:17
**primary (1)** 108:20
**principal (1)** 179:10
**Prior (9)** 17:2;27:20,
24,24;28:7;36:5,25;
56:17;59:2;64:11;
94:15;96:6;99:9,10;
105:24;121:6;125:4;
139:10;141:4;147:17;
152:23;155:1,11;
167:18,22;168:7;
188:2;190:25;203:2
**privilege (3)** 43:14,14;
196:17
**privileged (9)** 42:17;
44:13;46:15;47:15,23;
48:11,17;49:7,22
**Probably (18)** 13:22;
14:9;45:21;65:9;70:4;
121:15;125:21;126:1;
135:14;168:15;173:7;
179:6;193:14,25;
199:24;207:16;209:1,3
**problem (1)** 40:18
**problems (8)** 136:6;
144:20,25;145:4;146:2
**process (13)** 27:4;60:1;
62:5;65:15;69:7;76:23;
109:16;155:11;156:23;
158:10;203:12;204:1;
207:14

**processes (2)** 20:17;
62:12
**processing (1)** 62:3
**produce (1)** 90:13
**product (4)** 43:14;49:1,
3,6
**products (1)** 20:19
**program (5)** 61:23,24;
109:1,6,19
**programs (3)** 62:12;
75:20;82:23
**progress (1)** 140:14
**project (4)** 14:6;15:12,
19;16:3;23:25;210:20
**projects (2)** 23:12;
67:24
**prompt (1)** 113:2
**proper (1)** 49:11
**proposing (1)** 161:2
**protect (7)** 199:17,18,
19,22;200:5,6,10
**protected (1)** 43:13
**protecting (4)** 199:10,
13,14;200:16
**Protection (4)** 195:6,9,
22,25
**Provide (6)** 10:5;24:4,
11;78:5;105:4;178:4
**provided (2)** 24:2,17
**provider (1)** 147:14
**providing (1)** 47:5
**public (1)** 119:24
**published (1)** 119:25
**purportedly (1)** 175:1
**purpose (4)** 159:2,18;
191:25;192:2
**purposes (1)** 23:11
**push (1)** 212:11
**pushed (4)** 181:24;
185:11,22;212:5
**put (11)** 63:5;64:8;
94:3;96:11;109:17,18,
25;171:20,25;173:13;
180:23
**puts (2)** 88:14;93:21
**putting (2)** 84:6;88:24

---

## Q

**quality (3)** 92:5;104:23;
174:1
**quick (2)** 119:2,19
**quite (1)** 7:8
**quote (20)** 51:25;52:5;
58:18;75:14;76:1;78:2;
113:25;138:18;144:18,
23;147:11;150:3,21;
151:24;152:5;158:13;
183:10;186:9;194:22;
199:7
**quote-unquote (3)**
157:14;199:22;200:5

---

## R

**RACHAEL (8)** 4:1,10;
5:9,19,20;47:3;91:14;
164:8
**raised (1)** 66:20
**Randy (4)** 15:25;211:4,
4,15
**RASKOVICH (6)** 4:1,
11;5:4,9,19;214:9
**rate (7)** 96:10;97:19,
25;98:1,1;102:8,10
**rated (6)** 97:20;98:14,
22;99:18;103:20;104:1
**Rating (24)** 76:10;
80:11,14,20;81:25;
82:4,7;86:21;87:1;
90:24;92:17;93:12,15;
94:11,20;95:9,15,22;
97:9,15;98:5,23;
102:15;103:8
**ratings (8)** 80:17,24;24;
82:10;86:10,20;
100:10;101:23
**rationale (1)** 30:15
**RDO (3)** 189:19,20,21
**reaching (1)** 207:12
**reacted (1)** 197:21
**reaction (1)** 197:23
**read (34)** 47:8;52:6,7;
58:22;75:24;78:7;
91:15;92:1;100:14,16;
101:7,11,19;102:1;
114:4;123:4;134:3;
138:22;150:25;151:19;
158:23;169:12,13,23;
174:18;175:14;179:6;
182:23;183:4,18;
185:24;186:8;194:19;
199:5
**reading (7)** 137:3;
152:24;174:16;175:15;
181:21;182:1;208:8
**reads (5)** 51:25;74:21;
75:14;113:24;194:22
**real (1)** 190:3
**realignment (12)**
116:22;155:2,12,14,
16,17,18,21;156:5,7,
13;169:1
**reality (1)** 178:14
**realize (1)** 126:13
**realized (1)** 70:3
**really (25)** 17:21;34:6;
39:22;51:2;61:6;82:24;
90:16;91:23;97:7;
99:23;107:11;108:8;
116:24;126:14;128:18;
135:18;136:11;141:19;
145:12;174:22;191:12;
197:22;199:25;205:12;
213:13

**realm (1)** 186:24
**reapplying (1)** 203:18
**re-ask (1)** 102:4
**reason (5)** 139:17;
145:25;151:2;180:18,
22
**reasons (4)** 153:17,19,
23;181:3
**recall (207)** 6:19,20,25;
7:12,19,25;8:12;21:1;
23:22;24:14,21,25;
25:4,5,11,24;26:17,18;
27:2,11;28:6;30:7,8,11,
13,15;31:8,19;36:17,
23,24;39:19,23;40:15;
41:14;42:18,19,22;
43:6;46:11;48:4;49:17;
50:1;52:14,16,21;53:5,
21,23;54:3,8,11;55:4,
11,16,18,23;56:20,25;
57:11,17,19,25;58:12,
24,24;59:3;62:22,24;
63:4,25;64:21;65:1,19,
25;66:13,20;67:6;
68:12,21;69:1;70:16;
71:4,25;73:1,5,10,21;
77:3;78:19;79:22;81:4;
82:5,11,19,20;83:8,13,
15,25;84:1;85:9,14,20,
21;86:3;90:20,22;
108:25;111:4;113:1;
115:9,13,23;116:11;
117:19,21;118:1,2,11,
12;127:11;129:7,12,15,
24;130:20;131:18;
132:1,2;137:16,19,20;
138:12;140:8,12;
142:6,14;145:7,16;
147:17;148:19;156:1;
158:11;166:20;167:20,
24;168:3,5;171:6;
176:3,6,10,14,18,19,
21;178:12;179:24;
180:6;181:19,21,23;
184:9,13,23;185:6,9,
10,13;189:7;191:11,
18;192:1,7,9;197:15,
20,21,22;198:1,2,8,10,
11,15,18;200:24;
201:3;202:16;203:11,
16;204:13,23;205:2,16,
23;206:6,15,19;
211:23;214:17,20,22;
215:4,20,25
**recalling (1)** 28:16
**receive (2)** 54:24;60:5
**received (7)** 41:18;
84:1;155:13;156:14;
172:5,7;183:23
**receiving (1)** 57:12
**recently (1)** 140:19
**recess (5)** 51:15;
100:24;142:1;170:25;

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 403 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

210:6
**recognize (2)** 112:9;
166:15
**recollect (1)** 190:13
**recollection (8)** 7:4;
56:23;65:8;69:2;105:2;
172:22;182:3,4
**recommended (2)**
212:2,3
**record (28)** 4:7;5:18;
51:13,17;82:9;98:20;
100:22;101:1;119:20;
120:6,8,10,22;141:24;
142:3;170:21,23;
171:3;172:1;174:4,6,
18;188:15,16,19;210:4,
8;214:1
**recorded (3)** 133:20;
140:4;171:11
**recording (16)** 134:7;
171:15,17,22;172:10,
11,18,21;173:11,20,24;
174:11,13;179:22;
180:3;184:2
**recover (1)** 185:4
**recovering (1)** 185:3
**Recovery (1)** 195:23
**recruited (1)** 168:14
**Recruiting (21)** 11:4;
16:23;62:7;72:21;
132:21;142:7,11,17,19;
169:2;189:15,16,25;
207:19;208:1,11,17,22;
209:3,21;215:12
**redact (2)** 120:16;123:9
**redacted (3)** 104:14,19;
123:9
**redaction (2)** 120:2;
122:12
**redesign (1)** 139:22
**Reemployment (1)**
196:2
**refer (4)** 147:3;150:2;
169:9;179:8
**reference (1)** 172:25
**referenced (1)** 123:23
**referred (3)** 80:1,5;
178:11
**referring (17)** 36:22;
50:6;52:10;66:5;74:13;
78:9;21;79:24;86:25;
87:1,3;105:13;113:19;
157:15,25;158:1;163:6
**refers (2)** 92:21;166:25
**reflected (1)** 69:15
**reflecting (1)** 95:7
**reflects (2)** 74:10;
124:22
**Reform (2)** 195:9,19
**refresh (1)** 130:1
**refuse (1)** 197:6
**regard (1)** 85:12
**regarding (22)** 27:16;

36:20;42:16;47:4,14;
48:6,18;49:18;50:23;
55:12;58:2;63:12;
83:11,17;85:5;91:7;
101:5;120:17;125:4;
162:8;204:21;205:3
**regardless (1)** 96:22
**region (34)** 14:2,12,14;
15:7;18:15;20:5,22;
21:5;22:11,15,16;35:2;
40:12;58:20;59:1,9,19;
66:6,11;67:13,18;68:2;
106:19;108:10;111:8;
116:14;155:14;170:16;
190:1;212:8,12,18;
213:16,22
**region! (1)** 190:5
**regional (27)** 10:20,21;
13:23;14:19;15:6;
18:21;19:3,5;20:6;
21:12,14,14,15;22:4,5,
8,18;47:3;128:24;
129:1,2;155:1;170:15;
189:22;201:8,23,24
**regions (7)** 22:13;
68:17,23,25;212:4,9;
213:10
**Rehabilitation (2)**
195:11,17
**Reinvestment (1)**
195:23
**relate (1)** 90:9
**related (6)** 104:6;
107:9;145:6,18,23;
177:17
**relation (1)** 187:11
**relations (9)** 12:16;
14:6;43:5;62:9;148:15,
17,20;195:1;207:22
**relationship (3)** 22:19;
27:23;31:11
**relationships (2)** 84:5;
182:20
**relatively (1)** 146:19
**Release (9)** 192:20;
193:3,17;194:2,9,23;
196:5,20,23
**Relevance (9)** 8:1,10,
14;194:4,11;196:7,14,
24;197:7
**relevant (3)** 105:17;
113:8;126:5
**reliant (2)** 27:4;60:7
**relied (1)** 107:11
**remember (54)** 7:7;
23:25;29:4;44:16;
50:15,16,19,21,22;
52:18,19;54:17;55:14;
57:7,9;58:5,6,8;65:18;
69:24;80:4;81:1;83:21;
114:14;115:22;116:3,
20;117:15;118:16;
126:7;128:8,9;129:14,

18,25;140:11;145:10,
18;147:20;149:2;
156:16;182:6;184:14;
185:19,21,24;191:7;
197:19;199:14;200:13,
22;206:24,25;213:13
**remotely (1)** 34:11
**renew (1)** 183:20
**repeat (2)** 43:17;94:16
**rephrase (7)** 9:1;16:17;
24:9;26:8;38:21;
162:25;199:20
**report (4)** 21:19;22:3;
28:1,3
**reported (10)** 19:4;
21:21;22:25;28:4,11,
13,15;29:3,5;172:4
**reporter (4)** 4:16;5:8;
101:7;151:19
**reporting (7)** 29:13,19,
24;30:23;36:11;
195:10;200:17
**reports (1)** 113:11
**represent (5)** 4:23,25;
41:17;171:21;179:21
**representation (1)**
74:15
**representative (22)**
10:16,19;17:3,4,6,9,
13,21;28:8,9;29:3,10;
31:3,6;38:2,25;62:20;
64:8;105:18;116:4;
168:25;210:22
**representatives (11)**
28:13;30:6,17;37:19;
61:10,19;62:1,2;63:24;
210:15;212:15
**represented (1)** 173:14
**representing (2)** 4:18;
5:3
**request (30)** 72:12;
149:5,25;150:22;
151:3,5;152:1,6,17,21;
153:5,7,9,9,12;155:4,7,
8,13,15,22;156:14;
157:8;158:2,5;159:9;
181:8;204:9,18;215:22
**requested (7)** 101:11,
19;128:4,6;149:8,12;
156:11
**requesting (1)** 120:16
**requests (12)** 147:23;
148:4,7,9,21;151:12,
21;154:23;156:3,9;
158:10;180:9
**require (1)** 161:2
**required (2)** 160:11,14
**requirement (1)** 160:20
**resign (2)** 182:8,9
**resolution (1)** 136:9
**resource (1)** 135:24
**resources (9)** 9:21;
10:3,16,19;12:15;

13:24;14:20;15:6;
18:22
**respect (13)** 43:15;
48:13,15;49:24;60:22;
65:5;82:13;85:24;93:9;
120:13;146:14;164:23;
200:12
**respond (3)** 49:23;
50:9;180:16
**responded (4)** 138:12,
14;185:15;209:15
**responding (1)** 42:11
**response (8)** 41:19;
47:2;58:16,18;101:8;
114:10;115:9;195:24
**responses (1)** 62:9
**responsibilities (2)**
14:1;63:5
**responsibility (1)** 200:4
**responsible (4)** 17:14;
18:2;169:2;209:2
**responsive (2)** 54:15;
134:17
**restructure (1)** 210:24
**restructured (1)** 16:16
**restructuring (16)** 15:8,
14;16:2,20;17:2,8,19;
18:5,13;19:19;21:18;
31:13;39:7;203:2,7;
210:11
**result (4)** 16:19;18:12;
19:19;72:16
**resulted (1)** 18:6
**resume (1)** 14:9
**Retirement (2)** 195:2,3
**Retraining (1)** 195:13
**revenue (2)** 90:10,25
**review (34)** 35:15,17,
19;36:14;38:3,6,20,24;
39:1;40:8,9;41:7;
46:12;77:10;80:2,14;
85:25;91:3,6;94:5;
100:11;101:5,24;
102:7,9;104:4;105:6;
121:5;163:7,11,21;
164:12,14;172:10
**reviewed (2)** 40:4;
79:13
**reviewing (1)** 122:10
**reviews (13)** 35:12;
36:6,18;37:2,11,18;
40:6,11,13,14;56:13;
90:21;91:24
**Rich (1)** 131:1
**ride (1)** 138:7
**ride-alongs (3)** 55:24;
84:2;115:2
**rides (1)** 135:25
**right (99)** 29:17,20;
32:3,15,20;36:3;39:9;
45:23;46:6,19;56:10;
58:11;65:9,20;71:23;
72:24;74:16,22;76:6,

11,15,19;77:23,25;
78:7;79:9;85:9;87:12,
18,22;88:2,5,8;91:3,23;
92:14;94:5,13,23;95:5;
96:4,24;99:17;103:22;
104:21;106:6,12;
110:20;113:17;114:4;
120:12;124:9;132:5;
133:22;134:3;139:1,
11;142:21;145:1;
146:25;150:5,8,15,18,
25;151:21;152:10,12,
21;155:9,18,22;
156:20;157:1,20;
159:9,13,24;161:3,19,
23;162:2,14;166:14,
25;168:11;173:24;
178:13;179:15;182:15,
22;183:1,18;184:17,
21;200:10;206:17;
207:3;215:16
**Rights (3)** 195:1,20;
196:2
**Robert (1)** 131:23
**role (63)** 14:23;17:22,
25;18:1;22:18;23:8,23;
25:5,13;26:3,13,25;
27:16;29:7;33:15;
55:19,21;60:19;61:4,7;
69:25;72:11;77:25;
108:22;116:10,16,18;
117:10;118:14,21;
129:17;130:4,10;
132:3,4,19;133:7;
135:20;137:24;138:3;
139:22;140:9,15;
142:7,11,17,19;151:22;
165:1;166:18;169:4,8;
182:13;184:18,20;
200:9;207:19;208:6,6;
209:17;210:22;212:21;
215:13
**roles (6)** 25:10;27:9,10;
31:2;116:25;168:13
**roll (2)** 30:23;158:19
**roll-up (2)** 27:3,6
**room (4)** 188:4,4,13;
192:16
**Ross (2)** 15:25;211:5
**route (4)** 135:25;138:7;
205:7,11
**Rubinoff (2)** 137:3,6
**rules (1)** 8:22
**Ruth (8)** 45:1,2,4,6,9,
21;46:6;48:4

---

**S**

**Sacramento (1)** 131:3
**Safety (1)** 195:21
**sales (1)** 11:10
**same (20)** 29:9;51:22;
65:5;68:3;69:9;85:1;

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

90:24;92:24;94:24;
102:23;110:9,24;
123:6;133:8,12;
146:18;162:9;170:5;
201:10;213:11
**San (2)** 33:4;205:20
**Sarbanes-Oxley (1)**
195:8
**sat (5)** 107:5,12;
145:12;188:5;201:10
**saw (2)** 39:17;119:22
**saying (18)** 48:23;
53:24;61:19;66:13;
73:6;82:12;129:12;
158:3;176:18;178:25;
182:21,24;184:10;
185:9,10,13,19,21
**schedule (6)** 39:21,22;
135:4;159:20,24;
160:22
**scheduled (1)** 208:4
**Schneider (1)** 209:2
**school (6)** 12:17,19,23;
13:1,4;15:2
**science (1)** 12:14
**scope (1)** 17:23
**se (1)** 211:22
**Search (2)** 11:2;174:12
**second (13)** 15:1;
40:16;44:4;46:18;
51:21,25;58:17;75:8;
77:22;113:13;170:21;
199:6;213:25
**Secondary (1)** 108:20
**Section (6)** 92:10;
105:8,10;167:10,13;
195:7
**sections (1)** 87:2
**Security (1)** 195:3
**seeing (6)** 24:21;36:17,
23;41:14;81:1;168:3
**seeking (3)** 42:16,16;
116:24
**selected (2)** 191:10,12
**sending (1)** 164:14
**Senior (2)** 10:19;45:2
**sense (5)** 15:18;69:16;
107:18;108:9;209:16
**sent (2)** 39:1;149:21
**sentence (8)** 51:25;
58:17;144:17;147:11;
152:24;158:12;183:8;
199:6
**separate (1)** 119:6
**Separation (5)** 192:19;
193:2,16;194:2,8
**September (1)** 71:12;
72:6;73:12;190:11;
191:2,17;192:7;
203:19;207:9,18;208:4
**Serve (3)** 78:2,23;88:7
**server (1)** 11:22
**service (4)** 188:4,5,9,13

**service-excellence (1)**
132:24
**Services (9)** 4:12;5:4;
10:11;14:3;16:23;
72:20;170:9;196:1;
212:23
**servicing (3)** 18:17;
110:24,25
**serving (1)** 18:21
**set (18)** 12:5;13:3;
86:23;93:4,16;94:12;
95:10;97:22;98:2;
120:4;137:21,22;
143:8,12;213:2;
214:18,23;215:11
**sets (1)** 87:6
**setting (1)** 138:2
**Several (4)** 34:4;76:6;
81:3;213:5
**share (3)** 181:14,17;
189:18
**shared (1)** 181:15
**sharing (3)** 123:21,22;
145:11
**sharpening (1)** 76:4
**shift (1)** 117:3
**shoe (1)** 61:23
**short (2)** 198:16;214:8
**shortly (1)** 200:14
**showing (1)** 117:4
**sick (2)** 153:24;154:4
**side (1)** 161:5
**SIGGERUD (6)** 4:1;5:9,
20;47:3;122:9;164:8
**sign (5)** 44:22;193:16;
194:1;196:20,22
**signal (1)** 203:24
**signature (1)** 45:3
**significant (3)** 60:2;
144:20;146:24
**similar (4)** 117:24;
118:19;122:12;205:18
**simply (1)** 69:10
**single (3)** 99:25;
186:21,22
**singularly (1)** 188:9
**sit (6)** 65:1;100:14,16;
102:1;105:3;147:20
**sitting (2)** 107:19;
156:16
**situations (2)** 153:14;
158:18
**Six (1)** 42:8
**size (1)** 16:10
**skill (1)** 13:3
**skills (2)** 76:5;136:16
**slightly (1)** 13:2
**small (4)** 61:12,12;
64:13;205:19
**smaller (1)** 213:3
**Smith (16)** 43:3,4;
45:12,14,17;48:5;
50:14,17,24;127:9,25;

149:3,21;156:19;
207:8,13
**solely (9)** 93:3,15;
94:12;95:10,13,16;
96:2;98:8,24
**solicited (1)** 16:5
**solve (2)** 69:20;136:5
**somebody (7)** 93:21;
99:22,25;108:4;
109:13;132:20;148:22
**somehow (1)** 53:9
**someone (9)** 29:19,25;
39:1;45:22;52:16;
63:19;109:18,21;
113:11
**someplace (1)** 187:23
**sometimes (1)** 55:25
**somewhere (1)** 133:21
**son (4)** 144:21;145:6,
24;146:16
**sorry (23)** 6:20;37:16,
24;38:17;41:15;50:20;
52:8;57:6;58:4;65:20;
72:20;79:10;123:1;
129:2;134:1;136:23;
141:21;165:24;166:17;
184:5;201:9;207:1;
215:2
**sort (4)** 177:16;196:16;
210:19,23
**sorts (1)** 211:16
**sound (4)** 133:22;
173:20,23;174:1
**Sounds (1)** 9:13
**South (2)** 4:3;14:16
**space (3)** 14:3;138:2;
213:5
**span (1)** 213:3
**speak (5)** 27:18;47:4;
88:24;137:9;211:25
**speaking (6)** 48:4;
50:16,19;64:4;183:10;
187:7
**special (1)** 23:12
**specific (20)** 27:9;
55:11,14;57:20;76:6;
83:22;99:24;117:23;
129:19;130:3;136:20;
139:9;141:6,20;145:5;
168:4;173:8;178:4;
184:15;207:17
**specifically (51)** 24:14;
27:2,12;30:7,12;39:23;
41:15;42:19;43:10;
50:2;52:21;54:4;57:17;
60:14;62:23;66:20;
73:2;79:23;80:4,7;
83:13;86:2;97:8;107:9;
114:13;116:11;117:12;
118:17;135:21;136:18;
144:12;145:8,16;
148:19;176:3,7,18;
181:10;185:13;186:3;

190:1,14,18;192:1,14;
197:15,20;198:1,4;
204:23;214:20
**specifics (3)** 43:16;
181:3;182:6
**speculate (2)** 47:19;
155:10
**speculating (1)** 78:22
**speculation (7)** 39:4;
44:21;45:25;47:16;
63:15;96:14;97:1
**Spell (1)** 8:6
**spending (1)** 179:4
**Spent (1)** 167:11
**spirit (2)** 88:20,22
**split (1)** 107:4
**spoke (3)** 50:13;
126:23;186:2
**spying (1)** 201:5
**St (21)** 9:17,19,22;10:7,
10,15;12:4;18:20;22:7,
9;39:15;65:10;72:12,
19;107:5,14,18;131:8,
17,23;192:5
**staff (1)** 138:8
**staffing (2)** 23:15;
132:22
**stamp (2)** 149:23;
163:13
**standard (2)** 74:24;
196:11
**Standards (1)** 195:14
**standing (1)** 138:21
**start (8)** 10:12;19:12;
73:7,22;117:4;121:17;
124:25;202:5
**started (9)** 14:23;15:12;
19:4;29:2;73:2;102:15;
107:7;162:15;182:10
**state (9)** 4:23;5:17;
7:16,18;76:25;150:13;
174:19;175:11;189:17
**stated (3)** 97:16;98:10;
141:9
**statement (9)** 41:19;
46:20;49:14;58:18;
63:9;98:8;115:9;164:3;
215:21
**statements (4)** 94:3;
114:6,9;185:17
**States (4)** 4:13;13:11;
147:10;153:13
**stating (1)** 46:23
**stationed (1)** 192:4
**status (2)** 128:2;164:15
**statutes (1)** 196:5
**stay (4)** 107:18;142:16,
19;209:16
**step (1)** 135:19
**stick (1)** 21:17
**still (11)** 143:21,21;
154:11,15;166:17;
176:19;182:11;201:23;

208:3,12;215:5
**Stinson (4)** 4:3,20;5:3;
6:21
**stipulate (3)** 120:21;
122:19;124:6
**stipulation (1)** 120:20
**stood (1)** 177:7
**straight (1)** 178:25
**strategic (3)** 23:16;
132:19;135:20
**strategically (1)** 23:9
**Street (6)** 4:3,4,20;5:3;
6:23;195:9
**strengthen (1)** 136:16
**stress (4)** 140:17;
146:25;185:1,5
**stressed (6)** 140:9,11,
13;181:20;185:1,7
**strike (24)** 7:10;16:17;
28:19;32:13;33:17;
34:18;53:22;57:23;
71:14;80:11;95:25;
97:13;108:15;110:17;
112:20;140:16;151:23;
168:18;185:20;190:19;
193:1;202:4;213:14;
215:2
**strikes (1)** 173:2
**strong (1)** 150:3
**structure (4)** 17:12;
30:22;69:15;74:10
**structured (2)** 15:23;
16:12
**struggled (3)** 82:20;
84:4;108:21
**struggles (1)** 182:18
**struggling (2)** 136:11;
175:7
**studied (1)** 30:23
**stuff (1)** 92:7
**submitted (1)** 158:9
**subtleties (1)** 173:10
**succeeding (1)** 78:6
**success (1)** 215:14
**successful (1)** 138:19
**sudden (1)** 178:23
**suggesting (1)** 117:13
**suggestions (1)** 115:4
**Suite (1)** 4:4
**summer (1)** 142:8
**Sun (4)** 33:10;206:6,8,
16
**super (1)** 119:19
**Superior (1)** 11:1
**supervise (7)** 10:7;
14:18;19:7;31:1;45:4,
12;201:15
**supervised (1)** 31:6
**supervising (7)** 33:19;
34:9;10;35:9;40:2;
60:24;70:8
**supervision (2)** 30:6,16
**supervisor (10)** 18:23;

Coash & Coash, Inc.
602-258-1440    www.coashandcoash.com

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 405 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Rachael Siggerud Raskovich
May 11, 2016

28:21;29:1;32:2;33:13,
23;34:21;36:3;46:4;
56:9
**supervisors (1)** 21:20
**support (16)** 10:5;
14:22;15:20;25:7;70:3;
75:14,16;76:2;78:4,24;
83:11,17;103:3;136:7;
147:14;189:25
**supported (9)** 14:2,21;
22:21;32:13,14,22;
47:7;55:20;107:6
**supporting (7)** 34:24;
35:2;55:2;69:17;110:8;
111:9,16
**supposed (5)** 50:8;
61:14;84:25;119:6,12
**Sure (29)** 14:2;17:17;
19:15;31:5;37:5,15;
39:18;40:18;61:22;
87:15;96:8;98:20;
103:18;110:12;123:13;
132:15;135:5;163:12;
172:6;173:23;175:5;
182:15;184:16,17;
185:14;186:1;200:2,7;
213:7
**surprise (1)** 118:17
**surprised (1)** 138:6
**swear (1)** 5:8
**sworn (1)** 5:11
**system (5)** 38:17;82:9;
96:20;163:13,25

---

**T**

**talent (9)** 23:14,14;
76:3;78:4,25;79:17;
85:16;132:22;169:2
**talk (16)** 64:24;83:4,9;
134:10,11,21;136:15,
17;137:7,13;138:20,
25;177:2,11;205:14,20
**talked (14)** 66:21;
83:13;102:13;110:18;
130:8;132:3;145:22;
175:7;176:25;178:12,
19;179:8;180:23;
202:22
**Talking (8)** 27:8;50:22;
51:23;85:2;138:18;
175:18;184:13;207:19
**talks (1)** 182:17
**tape (3)** 51:11;100:19;
141:22
**tardy (1)** 110:4
**tasks (2)** 76:6;169:18
**team (15)** 16:4,23,24;
24:1;25:9;76:4;82:22;
103:4;182:12,19;
188:5,9;201:8;202:12;
211:14
**teams (1)** 16:12

---

**telephone (4)** 171:6;
173:15;179:23,24
**telling (25)** 26:1;73:22;
85:22;114:10;117:21;
118:12;129:7;136:20;
138:13;140:8,12;
147:17;162:10,15;
173:7;176:4,14,21;
180:7;181:19,23;
182:24;184:23;185:6;
198:2
**template (1)** 164:4
**temporary (7)** 142:7,12;
199:5,7;208:6,6;
209:17
**tenure (6)** 22:23;
112:16;168:1,19,22;
170:14
**term (1)** 72:15
**terminate (1)** 72:17
**terminated (16)** 71:11;
72:6;109:11,22;
143:23;190:22;191:14,
20;192:12,24;193:10,
15;197:14;198:14,22;
208:12
**terminating (2)** 86:18;
109:19
**termination (5)** 7:8;
143:14,15;191:6;
193:21
**terms (3)** 133:6;162:23;
172:13
**testified (7)** 8:17;106:6;
143:17;151:10,18;
214:10,13
**testifies (1)** 5:12
**testify (1)** 7:14
**testifying (1)** 215:4
**testimony (17)** 64:11;
70:24;74:1;94:15;96:6;
99:9,10;101:19;
103:15,24,25;105:24;
106:10;141:4;143:3,
22;152:23
**texts (1)** 75:13
**Therefore (1)** 87:22
**Theresa (1)** 209:1
**thinking (1)** 70:1
**third (3)** 58:13;120:14;
164:1
**thoroughly (1)** 91:16
**though (8)** 41:7;86:25;
89:9;121:8;139:11;
168:12;176:8,20
**thought (5)** 69:19;
113:8;132:7;138:3;
203:21
**thoughts (1)** 126:5
**thousand (1)** 213:6
**three (23)** 19:16,19,21;
20:2;24:23;26:15,17;
34:6;35:9;50:16;58:5;

---

60:10,23;69:17;107:4,
13;111:9,16;112:4;
133:25;212:1,5,11
**three-year (1)** 173:5
**threw (1)** 126:1
**throughout (1)** 81:10
**thrown (2)** 125:21;
126:8
**tie (1)** 102:17
**timeframe (5)** 70:22;
122:6;139:8;146:5;
178:5
**timeline (1)** 162:12
**times (12)** 6:4;34:4;
55:22;65:2,2;137:16;
155:3,5;175:25;176:1;
193:13,24
**timing (4)** 72:9;128:10;
214:10;215:10
**Timm (8)** 45:1,2,4,6,9,
21;46:6;48:4
**tire (2)** 153:25;154:5
**title (5)** 9:25;10:14;
28:6;56:3;195:1
**today (10)** 65:1;70:16;
85:14;129:25;130:9;
147:21;156:17;172:19;
189:19;214:9
**Today's (1)** 4:15
**together (1)** 119:16
**told (16)** 60:9;95:3;
99:19;114:15;115:23;
134:8;136:18,19;
142:18;143:2;145:16;
153:20;160:19;180:20;
192:23;197:16
**toll (1)** 147:12
**tone (1)** 173:10
**Tony (1)** 189:24
**took (2)** 126:1;128:21
**tools (10)** 78:5,9,13,15,
20;83:1;89:8,9;115:6,7
**top (11)** 41:24;74:21;
75:9;81:21;140:7;
163:16;164:2,2;165:8;
194:15,21
**topic (2)** 124:3;176:9
**total (3)** 21:1;110:22;
194:22
**totality (1)** 102:20
**totally (1)** 206:21
**toward (2)** 77:8;198:25
**towards (4)** 74:17;
81:16;164:2;165:8
**trades (1)** 17:1
**traditional (1)** 210:21
**training (7)** 11:18;
62:13;75:20,21,22,23;
103:3
**transcribed (1)** 172:14
**transcript (17)** 140:5;
171:17,18,22;172:3,8;
174:8;179:6,22;

---

181:22;182:1,16,23;
183:5,22,23;185:25
**transcription (3)** 172:2,
15;173:14
**transition (4)** 28:17;
31:9,12;215:15
**transpire (1)** 137:25
**travel (2)** 39:21,22
**treated (3)** 141:13,18;
146:4
**treating (5)** 140:18,22;
141:2,7;160:2
**trial (3)** 7:11,14;8:8
**tricky (1)** 108:1
**tried (2)** 141:15,16
**true (10)** 92:24;139:5;
151:5,12;153:8;156:9;
160:4;162:11;168:10;
206:1
**try (5)** 8:25;72:11;
136:1;163:24;209:16
**trying (7)** 25:6;48:19;
90:16;99:16,17;
137:22;178:20
**Tucson (3)** 32:22;
204:21;206:23
**turn (13)** 46:18;58:13;
75:8;81:14;113:13;
133:13;136:1;138:5;
139:14;163:15;164:1;
189:8;190:9
**turned (4)** 7:19;121:11;
127:22,23
**Twin (1)** 107:14
**Two (20)** 10:9;19:9,17;
69:2,18;106:24;
107:19;111:2,3;112:3;
122:11,23;133:24;
149:1;190:25;205:11;
212:2,3,4,21
**type (3)** 62:8;9:82:20
**types (2)** 40:14;113:2
**typical (3)** 30:21;76:23;
135:10
**typically (28)** 36:10;
53:7,11,14,14,17,18;
65:3,4;77:4;109:10,13,
22;112:20,22;113:11;
143:13;148:9;149:5;
151:11,17,20;156:18;
160:25;198:4,19,21,23

---

**U**

**ultimately (2)** 13:1;
215:15
**umbrella (1)** 200:6
**Um-hmm (4)** 25:21;
59:6;160:17;177:5
**unable (1)** 181:2
**unclear (2)** 79:4;97:5
**under (17)** 49:12;
80:13;81:15;82:14;

---

85:6;87:8,11;89:17;
92:10,13,24;98:6,19,
21;154:25;194:25;
196:5
**underlined (2)** 46:20;
58:16
**underlying (2)** 49:5,6
**underneath (1)** 92:15
**understood (2)** 9:3;
116:9
**undertook (2)** 15:19;
16:3
**unfold (1)** 137:25
**unfortunate (1)** 70:5
**unfortunately (6)** 20:24;
31:24;35:7;52:19;54:5;
80:3
**unhappiness (1)** 118:9
**unhappy (2)** 117:9;
151:4
**Uniformed (1)** 196:1
**union (1)** 14:4
**unions (1)** 107:10
**unique (1)** 107:8
**United (1)** 4:12
**University (2)** 12:10,25
**unless (2)** 129:25;
180:20
**unquote (4)** 78:6;
138:21;147:15;150:4
**unrelated (3)** 153:16,
18,23
**unsure (1)** 128:2
**up (26)** 15:1;39:25;
44:4;66:17;72:23;77:8;
108:10,11,14;110:4;
115:4;117:4;135:20;
141:6;156:1,7;161:25;
163:2;164:1;173:20,
24,25;186:16,16;
196:13;215:4
**Update (5)** 75:14;
83:11,18;85:25
**updated (2)** 163:17;
168:24;169:6
**updating (1)** 164:15
**upon (1)** 86:22
**upwards (1)** 193:14
**USC (1)** 195:7
**use (5)** 86:9;105:20;
106:15;172:17;173:21
**used (13)** 61:13,20;
62:2,4,19;74:25;86:15,
17;102:8;103:7;
108:17;193:3;194:7
**using (8)** 83:1;100:3,9;
101:13,22;117:19;
172:1;173:25

---

**V**

**vague (1)** 88:14
**Valley (6)** 32:25;33:10;

---

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 406 of 505

Rachael Siggerud Raskovich
May 11, 2016

205:13;206:6,8,16
**value (2)** 64:3;84:23
**valued (1)** 212:18
**varied (1)** 14:21
**variety (3)** 52:14;78:13;
132:11
**various (2)** 80:13;94:2
**vastly (1)** 87:10
**version (1)** 171:19
**versus (4)** 4:12;61:14;
80:24;136:2
**vice (6)** 15:16,24;19:5;
22:4,5,8
**video (28)** 4:7,9,19;
51:13,13,17,17;100:21,
22;101:1,1;120:6,10;
141:23,24;142:3,3;
170:23;171:3,3;174:4,
4,8;188:14,19,19;
210:4,8
**VIDEOGRAPHER (19)**
4:6,17;5:7;51:12,16;
100:21,25;120:5,9;
141:23;142:2;170:22;
171:2;174:3,7;188:14,
18;210:3,7
**VII (1)** 195:1
**visibility (1)** 181:1
**visit (1)** 33:25
**Vocational (1)** 195:11
**Volume (1)** 4:9

**W**

**wait (2)** 208:5,9
**waiver (1)** 194:23
**Wall (1)** 195:8
**wants (2)** 138:7,8
**water (1)** 40:17
**way (29)** 13:3;15:20,
22;25:8;55:23;56:19;
60:20;67:23;68:6;86:6;
96:20;106:19;109:17;
117:5,5,6;121:9;
138:21;150:24;156:22;
168:9;172:14;173:7;
181:3;184:24;189:3;
204:8;212:22;215:23
**ways (2)** 15:22;82:24
**week (1)** 161:1
**weekly (1)** 114:19
**weeks (2)** 190:25;
207:25
**weren't (10)** 29:19;
34:13;61:14,15;84:8;
109:7;129:22;135:5;
152:18;210:20
**what's (18)** 7:4;11:3;
12:13;20:15;50:5,6;
65:22;80:1;86:5;90:16,
20;113:9;121:17;
124:13,19;144:7;
164:20;166:5

**whereby (2)** 17:13;69:7
**whole (3)** 127:1;179:6;
183:25
**whomever (1)** 158:5
**whose (4)** 70:17;
193:18,21;196:3
**wider (1)** 188:11
**William (1)** 12:20
**Williams (55)** 4:11;5:1;
19:21;27:21,24;31:1;
34:9;36:20;38:21,24;
41:21;42:12;45:4,6,10,
12,15,20;47:4,6;48:6;
50:24;51:4;52:3;57:2;
71:7;76:11,15;81:15;
91:7;97:9,15;98:5,22;
101:6;109:25;110:3;
111:8;117:17,21;
123:18;127:15;137:14;
142:6;144:11;149:7;
156:15;163:7;171:7;
173:16;179:25;186:9;
189:10;205:4;215:6
**Williams' (14)** 32:2;
35:15;46:4,23;55:13;
70:25;71:17;86:18;
105:20;106:11;169:16;
170:1,11;214:12
**Williams-000088 (1)**
189:2
**Wilson (1)** 131:6
**win (7)** 7:22,23,24;
75:15;83:12,14,18
**Wisconsin (1)** 14:16
**withdrawn (1)** 166:12
**within (15)** 16:4,13;
27:24;29:20,25;37:2;
57:1;72:11;127:19;
175:4;176:15;187:23;
200:18;213:10,16
**without (8)** 82:9;
107:15;125:1;153:16,
22;178:22;188:12;
194:24
**witness (151)** 5:8,10;
8:2,15;17:20;26:5;
30:11,21;31:23;32:17;
36:9;37:5,15;38:9,16;
39:5;41:14;42:18;
43:17,21;44:15,22;
46:1,8,16;47:20;50:1,
13;53:11,17;54:3,11,
22;55:4,9;57:6,15,19;
58:4;59:14;60:18;61:9;
62:22;63:8,16;64:12,
21;67:21;68:4,21;
69:10;70:21;71:4,20,
25;72:8;73:1,9,18,21;
75:3;76:22;78:12;79:3;
81:9;82:17;83:21;
84:13;85:8;86:2,14;
87:14,20;88:4,17;
91:17,20;93:8,19;94:8,

16,25;95:20;96:7;97:4,
19;98:13;100:9;
101:22;103:10;104:1;
109:21;111:2,11;
117:15;118:16;119:18,
21;120:3;123:11;
124:9;126:23;127:3;
130:7,18,23;132:11,17;
133:9;134:25;135:13;
136:23;140:21;141:5;
142:23;148:14;149:10,
15;151:8;156:22;
157:3,10,18,22;160:6,
14;161:16;162:5,21;
165:18;166:9;169:21;
170:6,19;173:6;178:3;
183:4;184:5;194:5,12;
196:8,18;197:1,4,9;
200:22;203:5,21,25;
209:25;213:19
**wonder (1)** 119:11
**Woods (1)** 4:25
**word (2)** 88:5;117:19
**words (12)** 29:8;34:13;
117:23,24;118:7;
152:8,10,12,14;157:7,
10;184:15
**work (70)** 9:21;10:10,
23,25;11:5;13:17;14:6,
10;15:12;16:14;22:15;
27:20;35:19;43:14;
44:23;45:6;46:24;49:1,
3,6;54:20;60:8,13,15;
61:15;62:24;65:17;
66:2,15,18,23;67:5,8,
17,25;69:13,21,21;
84:23,24;85:2;89:5,10;
103:1;115:20;146:10;
150:14;153:16,22;
154:3;156:23;158:15,
25;159:16;160:1,11,15,
23,24;161:3,4,7,12;
162:1,13;175:8,9;
201:7,9,11
**worked (13)** 9:22;11:1,
8,12,20,24;32:5,7;
45:14;75:5;107:22;
170:8;209:19
**Workers (2)** 195:6,12
**working (10)** 10:12;
18:11;23:11;39:8;
49:12;79:15;108:6;
117:6;147:13;208:16
**works (4)** 89:4;96:20;
163:13,25
**worried (1)** 185:7
**write (10)** 77:2,5;78:18;
79:8;85:18;102:10,24;
133:25;138:18;150:21
**writes (1)** 144:18
**writing (2)** 113:16;
150:18
**written (18)** 23:20,23;

24:4,11,17,21;36:17;
38:3;76:10,18;96:19;
99:18;109:8;110:4;
152:9;163:4;167:17;
168:6
**wrong (10)** 56:1;93:2,8;
103:14;113:25;136:2;
165:13;178:24;205:17;
206:22
**wrongful (1)** 7:8
**wrote (14)** 76:24;79:5;
94:22;96:23,23;99:23;
100:5;101:16;102:6;
103:7,17;104:3;
150:19;190:7

**X**

**XYZ (1)** 136:11

**Y**

**year (16)** 13:22;19:8;
34:4,6;77:6;80:23,25;
93:5;94:4,11,20,23;
95:12;96:12;99:1;
103:19
**year-end (1)** 105:13
**years (7)** 7:9;24:23;
50:16;58:5;81:3;
107:23;128:1
**yep (3)** 13:20,20;164:6
**Yuma (6)** 33:2;205:3,5,
6,8,18

**0**

**000310 (1)** 122:15
**000437 (1)** 144:8
**000450 (1)** 120:14

**1**

**1 (23)** 4:9,10;40:19,20,
23;41:23;42:5;44:6,10;
46:12;49:19;51:20;
58:14;74:5;81:2,25;
113:24;114:13;122:22,
25;123:16,24;163:4
**1,800 (1)** 21:6
**1:01 (1)** 120:7
**1:04 (1)** 120:11
**1:39 (1)** 141:25
**1:52 (1)** 142:4
**10 (6)** 46:21;93:23;
102:22;188:17,23;
194:20
**10:20 (1)** 51:14
**10:37 (1)** 51:18
**100 (3)** 50:15;124:11;
190:9
**101 (1)** 192:18
**103 (1)** 194:14

**11 (4)** 4:15;144:21;
207:4,7
**11:37 (1)** 100:23
**11th (1)** 4:2
**12 (1)** 77:13
**12:37 (1)** 101:2
**126 (1)** 198:24
**128 (1)** 189:2
**13 (3)** 113:21;183:7;
207:9
**14 (1)** 189:11
**15 (2)** 77:13;178:15
**150 (2)** 4:3;193:14
**17 (4)** 140:6;165:9;
166:24;180:1
**1964 (1)** 195:2
**1967 (1)** 195:5
**1973 (1)** 195:17
**1974 (1)** 195:4
**1981 (1)** 195:7
**1986 (1)** 195:19
**1991 (1)** 195:20
**1st (1)** 124:21

**2**

**2 (7)** 92:10;111:22,24;
112:2;119:11;120:15,
17
**2,000 (1)** 21:6
**2:29 (1)** 170:24
**2:51 (1)** 171:4
**2:55 (1)** 174:5
**2:56 (1)** 174:8
**20 (2)** 178:15;193:25
**2004 (1)** 12:12
**2005 (1)** 10:13
**2009 (2)** 195:15,23
**2010 (4)** 5:23,24;6:12;
12:22
**2011 (2)** 10:22;124:24
**2012 (3)** 15:13;144:21;
210:12
**2013 (60)** 9:24;15:12;
19:8,11,17,17,24;21:2;
23:4,7,20;24:25;27:20,
25;28:7;35:17;39:7,25;
46:21;47:2;58:19;59:7,
11;68:15;70:7,21,24;
71:7,16;72:3,6;74:11;
99:1;113:21;124:21,
25;125:5;140:6;142:8;
144:13,15;146:5,23;
149:22;155:18;156:8;
164:4,9;171:8;173:16;
180:1;189:11;190:11;
191:2;199:2;201:17;
203:19;204:10;207:9;
210:13
**2014 (7)** 41:23;42:5;
165:9;166:24;167:4,7;
168:8
**2016 (2)** 4:2,15

**21 (2)** 186:5,7
**2300 (1)** 4:4
**23rd (1)** 191:17
**24 (1)** 190:11
**24th (1)** 191:17
**26 (3)** 164:4;171:8;
  173:16
**26th (4)** 133:22;139:3,
  10;178:8
**28 (2)** 164:9;172:4
**28th (1)** 164:11
**29 (4)** 167:4,6;168:8;
  199:2
**29th (1)** 192:7

### 3

**3 (8)** 118:23;119:1;
  120:25;123:2;125:15;
  126:12;133:14;138:15
**3:16 (1)** 188:15
**3:27 (1)** 188:20
**30 (3)** 99:1;186:4;
  193:25
**300 (1)** 213:3
**313 (2)** 124:14,15
**314 (2)** 133:13;138:16
**319 (3)** 122:22;123:3,
  16
**322 (1)** 139:14
**37-page (1)** 183:23
**38-page (1)** 183:22

### 4

**4 (3)** 144:5,8;149:25
**4:01 (1)** 210:5
**4:17 (1)** 210:9
**400 (1)** 213:4
**42 (1)** 195:7
**448 (1)** 112:5
**449 (1)** 113:14
**451 (2)** 112:5,7

### 5

**5 (6)** 149:16,19;
  173:18;178:15;215:2,
  16
**50 (1)** 44:7
**50-page (1)** 91:20
**55 (1)** 161:1

### 6

**6 (5)** 164:18,21;166:7,
  11;183:8
**6/26 (1)** 147:5

### 7

**7 (10)** 122:16;165:22,
  23,25;166:4,6,10,11,

15;169:11
**7,800 (1)** 21:3
**7/17 (1)** 147:7
**7/2/13 (1)** 123:5

### 8

**8 (13)** 144:13,15;
  146:23;149:21;158:15;
  171:1,20,25;172:3;
  173:13,18;174:19;
  183:21
**88 (1)** 189:6
**8th (2)** 149:24;162:16

### 9

**9 (4)** 85:25;86:5;
  179:17,20
**9:22 (2)** 4:5,8
**93 (1)** 189:6
**99 (2)** 189:8,9

EXHIBIT I



**G&K SERVICES**

Exhibit B

**Brandy Williams**
**Compensation Summary Statement**

Pay Rate Change
Effective 5/4/2013

|  | Current Compensation | New Compensation |
|---|---|---|
| Title | HR Generalist | HR Generalist |
| Base Pay Rate | $871.00 per week | $968.56 per week |
| Annualized Base Pay | $45,305 | $50,365 |
| Pay Change % |  | 11.2% |
| Grade | Corporate - K | Corporate - K |
| Benefits Level | S | S |

This is only a summary of some of the benefits available to you.  Please reference your specific benefits summary for your new benefit level for the
details of your complete benefits package.  (Lotus Notes: HR Matters > Benefits > Benefits > Benefits Summaries)

| Contribution Level | Contr Level 1 | Contr Level 1 |
|---|---|---|
| Vacation | Standard Schedule | Standard Schedule |
| Non-Compete Agreement | 18 Months - Nationwide | 18 Months - Nationwide |

Signatures:

_____     _____
Rachael Siggerud - Regional HR Director       Date
Manager

_____     _____
Pelham Chastang - Sr Director Human Resources   Date
HR Approval

_____     _____
Brandy Williams                               Date
Employee Acceptance

This offer supersedes all other written or verbal offers.  Your employment at G&K will be for an indefinite term.  Nothing in this statement modifies the
at-will relationship between yourself and G&K.  All program eligibility is subject to change and is subject to the terms and conditions of the programs in
place at the time of award.

WILLIAMS-000096

EXHIBIT J

Exhibit M

| | |
|---|---|
| From | Brandy L Williams/GKS |
| To | Rachael M Siggerud/GKS@gks |
| Date | 06/14/2013 03:67 PM |
| Subject | In office today |

Hi there,

I just wanted to let you know that I'm in the office today. I'm doing ok. I do have restrictions of no lifting, pulling, pushing over 10 pounds, no prolonged standing, no climbing stairs for 2 weeks. I will follow up with my surgeon and Doc for the next two weeks. Hope your having a great Friday!

**Brandy L Williams**
Human Resources Generalist
Arizona and Southern California
G&K Services
4804 W. Roosevelt
Phoenix, AZ 85043
Phone: 602-353-3100 Cell 602-768-3952
Fax: 602-278-7074
www.gkservices.com

# EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Court File No. 2:15-cv-01744-DJH

- - - - - - - - - - - - - - - - - - - - - - -

Brandy Williams,

Plaintiff,

vs.

G & K Services, Inc., a Minnesota
corporation, Jane and John Does 1-100,
Black Corporations 1-100, White
Partnerships 1-100,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - - - -
VIDEOTAPED DEPOSITION OF
ERIC McNAUL
May 12, 2016
- - - - - - - - - - - - - - - - - - - - - - -

Prepared by:
By Kelly A. Herrick
Notary Public

**Coash & Coash, Inc.**
602-258-1440          www.coashandcoash.com

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 414 of 505

Eric McNaul
May 12, 2016

Page 2

1  APPEARANCES:

2

3  MILLS + WOODS LAW PLLC
   5055 N. 12th Street
   Suite 101
4  Phoenix, Arizona  85014
   Phone:  80.999.4556
5  Email: Rmills@millsandwoods.com

6  By:  Robert T. Mills
        For the Plaintiff

7

8  STINSON, LEONARD, STREET
   150 South Fifth Street
9  Suite 2300
   Minneapolis, Minnesota  55402
10 Phone:  612.335.1770
   Email:  Kristin.parker@stinson.com

11

12 By:  Kristin Parker
        For the Defendant

13

14 Also present: Joe Mildenberger,
                 Videographer
15               Donna Fox

16

17

18

19

20

21

22

23

24

25

---

Page 3

1                 I N D E X

2  Examination by Mr. Mills               5
   Examination by Ms. Parker             93
3

4
   INDEX OF EXHIBITS
5
   NUMBER    DESCRIPTION
6
   (None marked.)
7

8  PREVIOUSLY MARKED EXHIBITS REFERENCED:

9  Siggerud 1, Siggerud 7

10

11 CERTIFIED QUESTION:  Page 62

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

01:04-01:06                                    Page 4

1  THE DEPOSITION OF ERIC McNAUL is taken on

2  this 12th day of May, 2016, at Stinson,

3  Leonard, Street, 150 South Fifth Street,

4  Suite 2300, Minneapolis, Minnesota,

5  commencing at 1:04 p.m.

6      THE VIDEOGRAPHER: We are on the

7  record. The time on the video monitor is

8      1:04 p.m. Here begins Volume 1, Video

9  Number 1, in the deposition of Eric McNaul

10 in the matter of Brandy Williams versus

11 G & K Services, Inc., et al., filed in the

12 United States District Court for the

13 District of Arizona, Case Number

14     2:15-cv-01744-DJH.

15     Today's date is May 12, 2016.  Our

16 court reporter is Kelly Herrick.  My name is

17 Bob Buchman, certified videographer

18 representing Coash & Coash.  This video

19 deposition is taking place in Minneapolis,

20 Minnesota.

21     Counsel, please identify yourself

22 and state whom you represent.

23     MR. MILLS: Bob Mills of Mills +

24 Woods on behalf of Plaintiff, Brandy

25 Williams.

---

01:06                                          Page 5

1      MS. PARKER: Kristin Parker of

2  Stinson, Leonard, Street on behalf of G & K,

3  Inc.

4      THE VIDEOGRAPHER: Would the court

5  reporter please swear in the witness.

6      ERIC McNAUL,

7  A witness in the above-entitled action,

8  after having been first duly sworn,

9      testifies and says as follows:

10     EXAMINATION

11     BY MR. MILLS:

12 Q. Good afternoon.

13     Could you go ahead and state your

14  name for the record?

15 A. Yeah, Eric McNaul.

16 Q. Have you ever given a deposition before,

17  Mr. McNaul?

18 A. Yes.

19 Q. How many times?

20 A. Twice.

21 Q. And could you -- or have you ever been a

22  party to a lawsuit before?

23 A. No.

24 Q. Okay.  And could you tell me a little bit

25  about the cases that you've given

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

| 01:07 | Page 6 |
|---|---|

1  depositions in.
2  A.  Both of them were customer-related incidents
3  with regard to early termination of
4  services.
5  Q.  Okay.  And these related to G & K Services?
6  A.  Yes.
7  Q.  And were those cases in Minnesota?
8  A.  Yes.
9  Q.  Do you know if they were in State or Federal
10  Court?
11  A.  State.
12  Q.  And how long ago was that?
13  A.  Nine years ago.
14  Q.  They are both nine years ago?
15  A.  Yeah, approximate timeframe, yeah.
16  Q.  These were, basically, breach of contract
17  cases?
18  A.  Yes.
19  Q.  And who was representing G & K in those
20  cases?
21  A.  I don't recall.  I don't remember who the
22  specific --
23  Q.  Are you currently employed by G & K
24  Services?
25  A.  Yes, sir.

| 01:07-01:09 | Page 7 |
|---|---|

1  Q.  And what's your job title?
2  A.  Regional vice president.
3  Q.  And how long have you been a regional vice
4  president?
5  A.  Seven and a half years.
6  Q.  And what region do you cover?
7  A.  US-1.
8  Q.  And what does that mean?  What does that
9  encompass?
10  A.  Geographically?
11  Q.  Yes.
12  A.  It covers all of Minnesota, Western
13  Wisconsin, the Dakotas, Montana, all of
14  California, Reno, all of Arizona.
15  Q.  Okay.  How long have you been with G & K
16  Services?
17  A.  I'm in my 12th year.
18  Q.  And what other positions have you held at
19  G & K?
20  A.  General manager.
21  Q.  What's a general manager do?
22  A.  Responsible for geographic business,
23  ownership of a specific business comprised
24  of a production company that does our
25  processing of our garments and facility

| 01:09-01:10 | Page 8 |
|---|---|

1  service products, mats, bulk products,
2  towels, and it encompasses a geographic
3  region that would have -- geographic area
4  that would have, not only the processing
5  area, but also branch responsibility.
6  Q.  Where were you located when you were general
7  manager?
8  A.  St. Paul, Minnesota.
9  Q.  Where are you located as a regional vice
10  president?
11  A.  St. Paul, Minnesota.
12  Q.  Have you ever been located anywhere else in
13  connection with any work you've done for
14  G & K?
15  A.  No.
16  Q.  What other positions have you held at G & K?
17  A.  Only those two.
18  Q.  And where did you work before you went to
19  work for G & K?
20  A.  I worked for a company called Brady
21  Corporation out of Milwaukee, Wisconsin.
22  Q.  What did Brady Corporation do?
23  A.  They were an industrial identification
24  barcoding systems, software, die cut pieces
25  and facility identification.

| 01:10-01:11 | Page 9 |
|---|---|

1  Q.  What did you do for Brady Corp.?
2  A.  Last position was managing director of Latin
3  America.
4  Q.  Where were you located in that job?
5  A.  Well, Milwaukee, Wisconsin, San Paulo,
6  Brazil in two separate occasions, Manaus,
7  Brazil on another occasion, Buenos Aires,
8  Argentina on another occasion, and Mexico
9  City.
10  Q.  Did you go to college?
11  A.  Yes.
12  Q.  Okay.  Where did you go?
13  A.  Miami University.
14  Q.  When did you graduate?
15  A.  '83.
16  Q.  Did you get a degree?
17  A.  Yes.
18  Q.  What in?
19  A.  Marketing with an emphasis in international
20  marketing, supported by a management degree
21  with an English language focus.
22  Q.  Any postgraduate studies?
23  A.  None.
24  Q.  Any formal education beyond Miami
25  University?

| 01:11-01:12 | Page 10 |
| --- | --- |

1  A.  No.
2  Q.  Could you just briefly walk me through what
3  jobs you've held since you graduated from
4  college up until you started Brady Corp.?
5  A.  Yeah, sure.  Started my career working for
6  the HJ Heinz Company as a sales
7  representative based in Cincinnati, Ohio,
8  where I had 120 retail stores and several
9  headquarter stores, most notably Kroeger
10  Corporation.
11      Left that, went to work for Avery
12  in a division out of New Brunswick,
13  New Jersey called Permacel.  They do
14  industrial tape, electronic tape, electrical
15  tape, aeronautical tape.
16      I served in that capacity as a
17  market specialist in Marietta, Georgia
18  covering 17 states.
19      From there I took on the
20  responsibility of national accounts manager
21  for Permacel, at which point in 1988 I left
22  and went to work for the Brady Corporation,
23  which at that point was the WH Brady
24  Company.
25  Q.  Do you have an immediate supervisor at

| 01:12-01:14 | Page 11 |
| --- | --- |

1  G & K?
2  A.  I do.
3  Q.  Who is that?
4  A.  His name is Ian Davis.
5  Q.  And what's his job title?
6  A.  He is senior vice president, US operations.
7  Q.  And how long has Mr. Davis been your
8  immediate supervisor?
9  A.  15 months.
10  Q.  And prior to that, who was your immediate
11  supervisor?
12  A.  Timm Curran.
13  Q.  Can you spell the last name, please.
14  A.  C-U-R-R-A-N.
15  Q.  Thank you.
16      How long was he your supervisor?
17  A.  Six and a half years.
18  Q.  In your capacity as regional vice president,
19  how many people do you supervise directly?
20  A.  Well, let's see, seven, eight, nine -- nine
21  people directly reporting to me.
22  Q.  And what are their titles?
23  A.  I have one senior general manager, I have
24  one director of sales, I have one
25  administrative assistant, and the rest hold

| 01:14-01:15 | Page 12 |
| --- | --- |

1  the position of general manager.
2  Q.  And are the general managers located at
3  various locations?
4  A.  Yes.
5  Q.  Are any of them in Arizona?
6  A.  Yes.
7  Q.  Okay.  Who is in Arizona right now?
8  A.  A gentleman by the name of Mike Malloy.
9  Q.  Is he the only individual in Arizona that
10  reports directly to you now?
11  A.  Yes.
12  Q.  Is he located in Phoenix?
13  A.  Yes.
14  Q.  And do you have general managers reporting
15  directly to you from California?
16  A.  Yes.
17  Q.  How many?
18  A.  Two.
19  Q.  And who are they?
20  A.  A gentleman by the name of Richard Pland,
21  P-L-A-N-D, and Angie Grazyk, G-R-A-Z-Y-K.
22  Q.  Where are they located?
23  A.  Richard is in Sacramento.  Angie is in
24  Santa Fe springs.
25  Q.  What department of G & K are you with?

| 01:16-01:17 | Page 13 |
| --- | --- |

1  A.  US operations.
2  Q.  That's separate from the human resources
3  department, right?
4  A.  Yes.
5  Q.  Have you ever been in the human resources
6  department?
7  A.  No.
8  Q.  Was there ever a time when people in the
9  human resources department reported directly
10  to you?
11  A.  Not directly to me -- well, yes.  I had a
12  regional human resources director that
13  reported to me.
14  Q.  When was that?
15  A.  Up until mid 2012.
16  Q.  Do you recall that there was a restructuring
17  of the human resources department in 2012?
18  A.  There was a restructuring of the HR
19  department, yes, but the official
20  restructure was not in 2012.
21      The preliminary work was done in
22  2012.  The execution of the plan to
23  restructure actually occurred in February of
24  2013.
25  Q.  Were any of the other departments or

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 417 of 505
Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

01:17-01:18                                          Page 14

1    divisions of G & K restructured at that
2    time?
3    A.   No.
4    Q.   Did you play any role in the restructuring
5    of the human resources department in
6    February 2013?
7    A.   I was a field representative to the HR
8    organization to provide insight in a field
9    perspective to help provide guidance to what
10   the new structure would look like.
11   Q.   What guidance did you provide them?
12   A.   The guidance that I provided them was that
13   we needed to have people in the field that
14   would be able to provide support to the
15   local business managers as opposed to a
16   completely centralized approach, and that
17   was the guidance I provided them.
18   Q.   Had there been a centralized approach prior
19   to February 2013?
20   A.   No.
21   Q.   What had it been before that?
22   A.   Decentralized.
23   Q.   How did the HR department differ after the
24   restructuring than before?
25   A.   The HR department was structured in such a

01:18-01:20                                          Page 15

1    fashion that the day-to-day tactical,
2    mundane things that an HR generalist in a
3    business was assigned to do was centralized
4    with regard to payroll function, time and
5    attendance function, employee relations
6    functions, more the mundane administrative
7    tasks that were assigned to our generalists
8    were centralized here in Minnetonka in our
9    corporate headquarters.
10       The generalists were designed to be
11   field partners, HR business partners, to
12   support the local general managers in regard
13   to the people side of the equation, people
14   development, more actions that would be more
15   strategic in their design.
16   Q.   These administrative tasks that you were
17   just talking about, these are tasks that had
18   formerly been performed by HR
19   representatives?
20   A.   Yes.
21   Q.   And after the restructuring, who was
22   performing those tasks?
23       MS. PARKER: Objection:
24   Foundation.  You can answer as far as you
25   know.

01:20-01:21                                          Page 16

1        THE WITNESS: It was a centralized
2    function at our corporate office.
3        BY MR. MILLS:
4    Q.   Did those tasks fall on the local managers?
5    A.   Some aspect of it did, such as the time and
6    attendance reporting fell into the
7    individual functional managers in their
8    respective locations, of which that would be
9    transmitted to a corporate centralized
10   function.
11   Q.   Did you ever hear any complaints or concerns
12   from the managers that you were supervising
13   about having to take on tasks that were
14   formerly being performed by HR
15   representatives?
16       MS. PARKER: Objection:  Form.
17       THE WITNESS: Yes.
18       BY MR. MILLS:
19   Q.   And what were the nature of those complaints
20   or concerns that you heard?
21   A.   That this was a task that was formerly taken
22   on by the HR generalist, that there were
23   certain functions that, because of the
24   organization change, that they would be
25   required to do their job differently and,

01:21-01:22                                          Page 17

1    just in general, anytime there's change,
2    you're never going to get 100 percent
3    buy-in.
4        I had some managers that absolutely
5    loved the change.  They felt that it
6    provided them a greater degree of intimacy
7    with regard to how they were able to work
8    with and manage their team members.  I had
9    others that, for lack of a better word,
10   resisted change.
11   Q.   How many managers were you supervising back
12   in 2013 after the restructuring?
13       MS. PARKER: Objection to form.
14       THE WITNESS: The same number that
15   I manage right now.
16       BY MR. MILLS:
17   Q.   And how many of those --
18   A.   Excuse me, let me take that back.  I had one
19   additional general manager.
20   Q.   Okay.  Where was that?
21   A.   It was in our Pittsburgh, California
22   operation.  We subsequently consolidated the
23   businesses.
24   Q.   And how many of the managers that you were
25   supervising back in 2013 were resistant to

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 418 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

---

 1   the change brought about by the
 2   restructuring?
 3       MS. PARKER: Objection to form.
 4       THE WITNESS: Specific to the ones
 5   I manage, none were resistant to the change.
 6       I mean, resistance is a very
 7   subjective word. There were discussions
 8   with regard to how we were to do our job
 9   differently.
10       BY MR. MILLS:
11   Q.  Were you -- in 2013 after the restructuring,
12   did you supervise a gentleman named Jake
13   Briscoe in Phoenix?
14   A.  I did, yes.
15   Q.  Did he ever express to you any concerns or
16   complaints about the restructuring?
17       MS. PARKER: Objection to form.
18       THE WITNESS: Nothing specific
19   relative to the restructuring itself.
20       BY MR. MILLS:
21   Q.  Did he ever express to you that he was
22   unhappy about having to take on tasks that
23   had formerly been performed by HR
24   representatives?
25   A.  No.

 1   Q.  How frequently did you talk to Jake Briscoe?
 2   A.  Frequently. Minimum of once a week, if not
 3   more.
 4   Q.  And did you ever go out to Phoenix to visit
 5   the G & K facilities there?
 6   A.  Yes.
 7   Q.  How frequently did you do that?
 8   A.  Minimum of once a quarter.
 9   Q.  What was the purpose of traveling to Phoenix
10   or any other location? Was it --
11       MS. PARKER: Object to form. What
12   timeframe are we talking about?
13       BY MR. MILLS:
14   Q.  Let's focus -- yeah, let me restate that.
15       Focusing on the 2013 timeframe
16   after the restructuring, what would have
17   been the purpose for traveling to Phoenix?
18   A.  As my role as regional vice president, I
19   perform quarterly business reviews with each
20   of our general managers and their teams.
21   Q.  Does that encompass traveling to the
22   locations of the managers that you're
23   supervising?
24   A.  Yes.
25   Q.  Once a quarter?

 1   A.  Yes. I also travel specifically to meet
 2   with key prospects that we're trying to win
 3   business, meet with current customers that
 4   we have business relationships with.
 5   Q.  Are you familiar with the Northwest Region
 6   of the human resources department?
 7   A.  I'm familiar with the Northwest Region
 8   because US-1 is also known as Northwest
 9   Region from a geographic --
10   Q.  Okay. What I'm getting at is:  Are the HR
11   department structured than US-1 in terms of
12   the geographic areas that are covered?
13       MS. PARKER: Objection to form.
14       THE WITNESS: No.  Is it covered
15   different than any other region?  In theory,
16   no.  Are you talking specifically about
17   2013?
18       BY MR. MILLS:
19   Q.  Yeah, let's talk about 2013.
20   A.  Before or after?
21   Q.  After the restructuring.
22   A.  We were different.
23   Q.  And in what way?
24       MS. PARKER: Objection to form.
25       THE WITNESS: We had, to support

 1   our region, three HR generalists.  The
 2   design was to have two HR generalists.
 3       BY MR. MILLS:
 4   Q.  Okay.  And why were there three if the
 5   design was to have two?
 6   A.  I was very concerned about being
 7   underrepresented from our HR organization
 8   relative to what the design of the role
 9   would be -- or to be, and selfishly I
10   wanted to have, in my opinion, some degree
11   of overrepresentation.
12       And I asked for that and they
13   acquiesced and they gave me the opportunity
14   to have three generalists.
15   Q.  Are you the one who proposed having three
16   generalists in the Northwest Region?
17   A.  Yes.
18   Q.  Did you believe, at the time you proposed
19   that, that you needed three generalists in
20   that region?
21   A.  Yes.
22   Q.  When was the -- when was the position of
23   HR generalist introduced at G & K?
24       MS. PARKER: Object to foundation.
25       THE WITNESS: Post-restructure --

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 419 of 505

Eric McNaul
May 12, 2016

01:27-01:29 | Page 22

1  actually, it was part of the restructuring
2  organizational design.
3     BY MR. MILLS:
4  Q.  And prior to that, what did you have, rather
5  than HR generalists?
6  A.  Well, we had the same term.  It was an HR
7  generalist role -- actually, it was an HR
8  representative, HRR is what we called it,
9  the acronym for it, and we had one HRR
10  assigned to each respective business, with
11  the exception of, here in the Twin Cities,
12  we only had one HRR for three businesses.
13  Q.  But typically you would have one HRR at each
14  location where G & K was doing business?
15  A.  Yes.
16  Q.  And, then, after the restructuring -- after
17  the restructuring, G & K had HR generalists
18  who would service a number of locations; is
19  that right?
20  A.  Yes.
21  Q.  Did you supervise any of the HR generalists
22  after the restructuring?
23  A.  No.
24  Q.  Did you decide who any of the HR generalists
25  were going to be serving the Northwest

01:29-01:30 | Page 23

1  Region?
2  A.  Can you -- I didn't hear that.
3  Q.  Let me rephrase that.
4     Did you decide who the
5  HR generalists were going to be to serve the
6  Northwest Region after the restructuring?
7  A.  Not specifically.
8  Q.  Did you have any input in that at all?
9  A.  Yes.
10  Q.  What was your input?
11  A.  Knowing the design of the HR generalist
12  position, we felt that -- I felt that there
13  were certain individuals that were going to
14  be better suited for a generalist role
15  versus roles in recruiting, which was the
16  other assigned task, and there were also
17  roles that were eliminated at that time,
18  positions that were eliminated.
19  Q.  When -- when the HR generalists, again,
20  working after the restructuring in 2013 --
21  let me withdraw that question and rephrase
22  it.  It was very bad.
23     Right after the restructuring in
24  2013, the three HR generalists that you had
25  working in the Northwest Region were Brandy

01:30-01:31 | Page 24

1  Williams, right?
2  A.  Um-hmm.
3  Q.  Is that a yes?
4  A.  Yes.
5  Q.  Okay.
6  A.  Brandy Williams was a generalist, yes.
7  Q.  And Kaela Ellison?
8  A.  Yes.
9  Q.  And who else?
10  A.  Janelle Bonacua.
11  Q.  Okay.  And did you play any role in hiring
12  any of those three for their position?
13  A.  I did not specifically interview Kaela.  She
14  came over because she was a human resources
15  representative with our St. Paul, a very
16  highly competent HR representative.
17     Janelle, I interviewed at the onset
18  of her career, and I can't recall whether I
19  actually interviewed Brandy or not.
20  Q.  Did you know Brandy Williams prior to the
21  restructuring?
22  A.  Yes.
23  Q.  How did you know her?
24  A.  She was the HR representative in our Phoenix
25  operation.

01:31-01:32 | Page 25

1  Q.  Prior to restructuring, who did the HR
2  representatives report to?
3  A.  The local general manager.
4  Q.  And, in Phoenix in 2013, that would have
5  been Jake Briscoe?
6  A.  Yes.
7  Q.  So, prior to the restructuring, Brandy
8  Williams would have been reporting directly
9  to him?
10  A.  Yes.
11  Q.  Then, after the restructuring, who did she
12  report to?
13  A.  Rachael Siggerud.
14  Q.  What was Rachael's title?
15  A.  Human resources director.
16  Q.  Was there -- strike that.
17     At the time of the restructuring in
18  2013, was there a written job description
19  for an HR generalist at G & K?
20     MS. PARKER: Objection to form.
21     THE WITNESS: Can you repeat that,
22  please.
23     BY MR. MILLS:
24  Q.  Yeah.  At the time of the restructuring in
25  2013, was there a written job description

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 420 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

01:32-01:33 — Page 26

1  for an HR generalist?
2  A.  No.
3  Q.  Has there ever been a written job
4  description for an HR generalist?
5  A.  Yes.
6  Q.  And when was that job description issued?
7     MS. PARKER: Objection:
8  Foundation.
9     THE WITNESS: I don't know.
10     BY MR. MILLS:
11  Q.  Was it sometime after the restructuring?
12  A.  Yes.
13  Q.  Do you know how long after the
14  restructuring?
15  A.  I don't know.
16  Q.  Have you ever seen it?
17  A.  Yeah, I have seen work in process.  I don't
18  know if I've actually seen the finalized
19  document.
20  Q.  Do you remember when you saw the work in
21  process?
22  A.  After the restructuring.
23  Q.  Did you play any role in developing the job
24  description for an HR generalist?
25  A.  Other than providing feedback to the

01:33-01:35 — Page 27

1  directors -- yes.
2  Q.  Okay.  And can you tell me what that is.
3  A.  I felt that the HR generalist role was
4  designed -- needed to be aligned with
5  business partnership with the local managers
6  in the field to focus on developmental
7  plans, culture change, training support,
8  people development, succession planning, and
9  to a lesser extent, some degree of
10  performance evaluation of our management --
11  of our team members in our field, and not
12  specifically exempt, but also non-exempt
13  personnel.
14  Q.  I'll show you a document that we marked
15  yesterday as Exhibit 7.
16  A.  Would you like me to read it?
17  Q.  Could you -- I'm going to first ask if
18  you've seen that before.  You can -- yeah,
19  you can look at it.
20  A.  (Perusing.)  I don't recall specifically
21  seeing this document in this form, no.
22  Q.  Okay.  The document at the top purports to
23  be a G & K job description, right?
24  A.  Yes.
25  Q.  And it's for an HR generalist; is that

01:35-01:36 — Page 28

1  right?
2  A.  I don't necessarily see where it says
3  HR generalist, what --
4  Q.  Go down --
5  A.  Sure, sure.
6  Q.  The effective date is May 17, 2014?
7  A.  Yes.
8  Q.  And, then, if you look down to the right of
9  that, there's -- there's a date that says
10  April 29, 2014.
11  A.  Can you show me?
12  Q.  (Indicating.)  Yeah, right here.
13  A.  April -- yeah, okay, good, all right.
14  Q.  Do you know who prepared this?
15  A.  I do not.
16  Q.  Is it possible that G & K didn't have a
17  written job description for an HR generalist
18  prior to April 2014?
19     MS. PARKER: Objection:
20  Foundation; calls for speculation.
21     THE WITNESS: I don't know.
22     BY MR. MILLS:
23  Q.  It's possible?
24  A.  I don't know.
25     MS. PARKER: Objection:  Calls for

01:36-01:37 — Page 29

1  speculation.
2     BY MR. MILLS:
3  Q.  You can't testify that you saw a written job
4  description for an HR generalist prior to
5  April 2014?
6  A.  No, I did not.
7  Q.  All right.  Did you ever have any -- any
8  discussions with the plant managers that you
9  were supervising about the role of
10  HR generalist after the restructuring?
11  A.  Sure, yes.
12  Q.  What were the nature of those discussions?
13  A.  Ways that we could potentially bring the
14  HR generalist in to align with our goals of
15  performance enhancement and people
16  development.
17  Q.  Did you get any feedback from the managers
18  as to what they -- what they expected of
19  HR generalists?
20  A.  Yes.
21  Q.  What kind of feedback did you get?
22  A.  Can you be more specific, when you say
23  "managers"?
24  Q.  The managers that you were supervising.
25  A.  Oh, my managers?

01:37-01:39                                              Page 30

1  Q.  Yes.
2  A.  Okay.  Yeah, I think the feedback is very,
3  very important in that they were looking to
4  have a business partner that could help them
5  with regard to the people development side
6  of their business, how to create individual
7  development plans, how to enhance the career
8  opportunities of our employees, how to
9  better prepare them and educate them, and
10  train them, to take on more additional tasks
11  in their career progression.
12      We have a goal of trying to promote
13  as many people from within, and we recognize
14  that, in order to do that, we needed to
15  improve the overall competency of the people
16  within our organization and team members at
17  every level of the organization.
18  Q.  Did you ever hear any concerns from any of
19  the managers that you were supervising after
20  the restructuring that they didn't
21  understand what the HR generalists were
22  doing?
23      MS. PARKER: Object to form.
24      THE WITNESS: Only one.
25      BY MR. MILLS:

01:39-01:40                                              Page 31

1  Q.  What was that?
2  A.  Excuse me?
3  Q.  And who was that?
4  A.  It was from Angie Grazyk, general manager in
5  Santa Fe Springs, Los Angeles.
6  Q.  What specifically did Angie say?
7  A.  Angie shared with me her frustration with
8  the position after Brandy Williams had
9  visited her.
10  Q.  What do you mean by that, "after Brandy
11  Williams had visited her"?
12  A.  Specifically, she felt that Brandy had no
13  clue as to what she was going to do, she
14  didn't understand her role, she was not
15  interested, really, in supporting the
16  direction we had been providing to her, and
17  that Brandy was incapable of providing any
18  value whatsoever to her team.
19  Q.  Did you talk to Angie about what Brandy's
20  role was supposed to be?
21  A.  Yes.
22  Q.  And what did you say?
23  A.  Told her specifically what I previously
24  addressed, Brandy is there to design
25  individual development plans for your team

01:40-01:41                                              Page 32

1  members, to identify needs of -- areas of
2  opportunities for further development,
3  opportunities or strengths that an
4  individual have that we could leverage in a
5  greater extent, and to be a strategic
6  business partner working with the general
7  manager and department managers to further
8  develop and enhance the people within their
9  teams.
10  Q.  Did -- did you document anywhere Angie's --
11  what Angie told you about Brandy?
12  A.  No.
13  Q.  Would you typically document those types of
14  complaints?
15  A.  No.
16  Q.  Why not?
17  A.  I have weekly one-on-one discussions with my
18  general managers and they are more verbal
19  conversation feedback.  Nothing -- we do not
20  memorialize every conversation we have.
21  Q.  Any of the managers that you supervised
22  other than Angie express to you that they
23  didn't understand the role of an HR
24  generalist?
25  A.  No.

01:41-01:43                                              Page 33

1  Q.  Did you ever have any discussions with
2  Brandy Williams about her performance as an
3  HR generalist?
4  A.  No.
5  Q.  Did you ever observe Brandy Williams working
6  as an HR generalist?
7  A.  Not directly.
8  Q.  Did you ever do a performance review of
9  Brandy Williams?
10  A.  No.
11  Q.  How long had you known Brandy Williams?
12  A.  Probably -- maybe two years.  I can't
13  specifically recall when she came on to our
14  team, but approximately two years.
15  Q.  Prior to the restructuring, had you ever
16  heard any complaints about Brandy's
17  performance in the HR department?
18  A.  Nothing specific, no.
19  Q.  And prior to the restructuring, who would
20  have been -- who would have been doing
21  Brandy's performance review?
22      MS. PARKER: Object to foundation.
23      THE WITNESS: Jacob Briscoe.
24      BY MR. MILLS:
25  Q.  Anybody else?

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 422 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

01:43-01:45                              Page 34

1    MS. PARKER: Same objection.
2    THE WITNESS: Jacob would have
3  worked with the director of human resources
4  to provide feedback and observational
5  feedback with regard to her performance.
6    BY MR. MILLS:
7  Q.  Do you have any personal knowledge of Brandy
8  Williams' performance as an HR generalist,
9  anything other than what's been told to you
10  by others?
11  A.  Nothing personal that I had direct
12  interaction with Brandy of, no.
13  Q.  So, whatever understanding you have about
14  Brandy Williams' performance as an HR
15  generalist is based on what others have told
16  you?
17    MS. PARKER: Objection.
18    BY MR. MILLS:
19  Q.  Is that fair to say?
20  A.  Yes.
21  Q.  How closely did you work with Rachael
22  Siggerud back in the 2013 timeframe?
23  A.  We had an office in the same regional
24  office.
25  Q.  Did you see her every day?

01:45-01:46                              Page 35

1  A.  When we were in the office, yes.
2  Q.  How frequently were you traveling back then?
3  How frequently were you traveling back then?
4  A.  60, 70 percent of the time, typically out of
5  the office Tuesday through Thursday.
6  Q.  Did Rachael ever have conversations with you
7  regarding Brandy Williams?
8  A.  Yes.
9  Q.  And what were the nature of those
10  conversations?
11    MS. PARKER: Object to form.
12    BY MR. MILLS:
13  Q.  What did she tell you?
14  A.  Well, the conversations started during the
15  restructuring process when we were going
16  through the process of looking at our HR
17  representatives and determining those that
18  would potentially be suited to be a
19  generalist, those that would go into
20  recruiting, those that would potentially
21  be -- positions would be eliminated, so
22  those were discussions that we had relative
23  to Brandy, post-discussion,
24  post-transformation, conversations primarily
25  surrounding Brandy were centered on Brandy's

01:46-01:47                              Page 36

1  lack of performance.
2  Q.  At least initially, though, you had
3  determined that Brandy would be a good fit
4  for an HR generalist?
5    MS. PARKER: Objection:
6  Mischaracterizes prior testimony.
7    THE WITNESS: I'd say a fit.  I
8  don't know if it would be considered a good
9  fit, but it was a fit.
10    BY MR. MILLS:
11  Q.  Well, you wouldn't have recommended someone
12  for that position unless you thought it
13  would be a good fit, would you?
14    MS. PARKER: Objection:  Form.
15    THE WITNESS: I wouldn't recommend
16  it if they weren't -- if they would be a bad
17  fit.
18    You know, ultimately, when you say
19  a good fit, that bodes, you know, something
20  that would happen in the future.  I would
21  think that she would be adequately -- she
22  could fulfill the responsibilities of the
23  position in an adequate manner.
24    BY MR. MILLS:
25  Q.  Yeah, did you recommend Brandy Williams for

01:47-01:49                              Page 37

1  the position of HR generalist?
2  A.  I did not recommend Brandy for that role.
3  Q.  Do you know who did?
4  A.  I do not.
5  Q.  Was HR generalist considered to be a
6  promotion from HR representative?
7    MS. PARKER: Object to foundation.
8    THE WITNESS: No.
9    BY MR. MILLS:
10  Q.  Okay.  And, then, when you had indicated you
11  had discussions with Rachael Siggerud after
12  the restructuring regarding Brandy's
13  performance, what specifically did Rachael
14  say to you?
15    MS. PARKER: Object to form.
16    THE WITNESS: Well, I'm going back
17  almost three years.  The feedback -- the
18  feedback from Rachael was that she was
19  hearing complaints from the local business
20  team there with regard to Brandy's
21  unresponsiveness to the business needs of
22  the people within that business in that
23  there were times when they would reach out
24  specifically to Brandy for help from a
25  business partnership role, and they would

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 423 of 505
Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

01:49-01:50                                    Page 38

1  either not get a response or, if she did
2  respond, it would be days later.
3       Her general lack of responsiveness
4  was very frustrating to the local business
5  team there in the management staff in
6  Arizona.
7       BY MR. MILLS:
8  Q.   When we're talking about the people there,
9  "there" means the Phoenix location?
10 A.   Yes, or Phoenix business, yes.
11 Q.   Do you know who in particular Rachael said
12 was complaining?
13 A.   Jacob Briscoe in particular, because he was
14 the general manager, and that's who she
15 primarily interfaced with, but there would
16 be other managers within that organization,
17 from a department head standpoint, that
18 Rachael would interface with, and there was
19 a high degree of dissatisfaction with regard
20 to Brandy's performance and responsiveness
21 to the business needs.
22 Q.   And a high degree of dissatisfaction from
23 whom?
24 A.   General manager in particular, director of
25 sales -- excuse me, the district sales

01:50-01:51                                    Page 39

1  manager.
2  Q.   Who was that?
3  A.   Gary Lehrer.
4  Q.   Do you know anything particular that
5  Mr. Lehrer had to say about Brandy?
6       MS. PARKER: Object, no foundation.
7       THE WITNESS: Sure, I know one
8  incident in particular in that we had a
9  sales team, brand new, 7 of the 10 sellers
10 were brand new, under six months, and they
11 were struggling.
12      And there was a meeting that was
13 specifically called to address this, and it
14 was with Brandy, the general manager, and
15 the district sales manager, and she
16 confirmed her attendance at that meeting and
17 she actually did not show up.  She didn't
18 come in for the meeting.
19      And that was specifically part of
20 her job function, and that's just one
21 example in that there was a general lack of
22 responsiveness to the business needs.
23      BY MR. MILLS:
24 Q.   Any other comments from Mr. Lehrer other
25 than that she missed the meeting?

01:51-01:52                                    Page 40

1       MS. PARKER: Objection to form.
2       THE WITNESS: I'm not privy to any
3  specifics because he did not share them with
4  me, but the general lack -- the general
5  overall frustration that was expressed to
6  Jake from his management team with regard to
7  her availability, whether it be in the sales
8  department, service department, office.
9       BY MR. MILLS:
10 Q.   Was Jake expressing that to you or to
11 Rachael?
12 A.   Both.
13 Q.   What exactly did Jake tell you about Brandy
14 Williams?
15 A.   As I previously noted, she was unresponsive,
16 difficult to reach out to and get feedback
17 from, she was missing meetings, she was
18 unaccounted for during specific times of the
19 week.
20      We had -- and have -- a shared
21 calendar where people are to identify, you
22 know, their blocks of time when they are
23 unavailable and when they are available, and
24 the team specifically would reach out to
25 Brandy in areas of time when she was

01:52-01:53                                    Page 41

1  available, and yet there was no Brandy to be
2  found, nor would she call back, nor would
3  she literally inform anybody of her lack of
4  availability.
5  Q.   Can you give me very specific examples of
6  that.
7       MS. PARKER: Objection:  Form.
8       THE WITNESS: I can't give specific
9  examples.
10      BY MR. MILLS:
11 Q.   Can you give me a specific example of Brandy
12 being unresponsive?
13      MS. PARKER: Objection:
14 Foundation.
15      THE WITNESS: I can't give you a
16 specific example, other than what Jake
17 shared with me, a general pattern of
18 unresponsiveness.
19      BY MR. MILLS:
20 Q.   Can you describe for me a specific example
21 of Brandy being unavailable to get ahold of?
22      MS. PARKER: Objection:  Foundation
23 and asked and answered.
24      THE WITNESS: I cannot.
25      BY MR. MILLS:

| 01:53-01:54 | Page 42 |
| --- | --- |

1 Q. Can you describe for me a specific example
2 of Brandy being difficult to get ahold of.
3    MS. PARKER: Same objections.
4    THE WITNESS: Not for me directly,
5 only through the feedback that I received
6 through my general manager.
7    BY MR. MILLS:
8 Q. You never personally experienced Brandy
9 being unresponsive?
10 A. I did not.
11 Q. And you never personally experienced her
12 being difficult to get ahold of, right?
13 A. I did not, but I would never really have a
14 need to reach out to Brandy directly.
15 Q. Any other individuals at Phoenix who were
16 expressing any complaints or concerns about
17 Brandy Williams?
18    MS. PARKER: Objection to form.
19    THE WITNESS: I don't know
20 specifically.
21    BY MR. MILLS:
22 Q. Do you know the names of anybody else at
23 Phoenix who was expressing a complaint or a
24 concern about --
25 A. Nobody voiced a concern directly to me.

| 01:54-01:55 | Page 43 |
| --- | --- |

1 Q. Did Rachael tell you that there was anybody
2 else --
3 A. I don't recall.
4 Q. -- other than Jacob and Gary?
5 A. I don't recall.
6 Q. And, then, we talked about -- Angie?
7 A. Yes.
8 Q. Did Angie ever say anything to you other
9 than what we've already discussed about
10 Brandy?
11 A. No, no. She only went out there one time.
12 Q. When was that?
13 A. Post-restructuring.
14 Q. Do you know how far after?
15 A. No.
16 Q. Were there any other specific complaints or
17 expressions of concern about Brandy from any
18 of the other managers of any of the other
19 locations that she was supporting?
20    MS. PARKER: Objection to form.
21    THE WITNESS: She only had two
22 locations.
23    BY MR. MILLS:
24 Q. What do you mean, "she only had two
25 locations"?

| 01:55-01:56 | Page 44 |
| --- | --- |

1 A. Well, Phoenix, and then we attempted to get
2 her involved in Southern California.
3 Q. What do you mean you attempted to get her
4 involved in Southern California?
5 A. We provided her the opportunity to take
6 responsibility of the generalist role in
7 Southern California.
8 Q. She was assigned to locations in Southern
9 California, right?
10 A. She was.
11 Q. And those included Los Angeles, right?
12 A. Yes.
13 Q. And San Diego?
14 A. Yes.
15 Q. And Ontario?
16 A. Yes.
17 Q. And Sun Valley?
18 A. Yes.
19 Q. And she also was assigned to multiple
20 locations in Arizona, right?
21 A. Yes.
22 Q. Phoenix, right?
23 A. Yes.
24 Q. And Tucson?
25 A. Yes.

| 01:56-01:57 | Page 45 |
| --- | --- |

1 Q. And Prescott Valley?
2 A. Yes.
3 Q. And Yuma, right?
4 A. Yes.
5 Q. And were there managers at each of those
6 locations?
7 A. Yes.
8 Q. And other than Jake and Gary and Angie, did
9 you ever hear a complaint or a criticism
10 about Brandy from any of the other
11 locations?
12 A. I don't think the other locations ever met
13 Brandy.
14 Q. What basis do you have to say that?
15 A. I've never heard any feedback one way or
16 another. I'm unaware of her visiting any of
17 the Ontario locations or Sun Valley
18 locations. I'm not --
19 Q. How about Los Angeles?
20 A. Santa Fe Springs?
21 Q. Um-hmm.
22 A. I believe she went there, yes.
23 Q. San Diego?
24 A. She may have gone there.
25 Q. She went to Tucson, didn't she?

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 425 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

01:57-01:58                                    Page 46

1  A.  Yeah, but Tucson is an hour away from
2  Phoenix so -- I don't even really consider
3  it as a geographic -- it's so close to the
4  business.
5  Q.  So, when you just testified that she didn't
6  go to any other locations, that was not
7  true, was it?
8     MS. PARKER: Objection: Form;
9  argumentative; mischaracterizes prior
10  testimony.
11     MR. MILLS: No, let's find it.  I
12  want to find it because it's important.
13  Back up a little bit.
14     (Question and answer read back by
15  Mr. Mills as follows:
16     "Q.  And other than Jake and Gary and
17  Angie, did you ever hear a complaint or a
18  criticism about Brandy from any of the other
19  locations?
20     "A.  I don't think the other locations
21  ever met Brandy.")
22     MS. PARKER: Objection to form.
23     THE WITNESS: Okay, Bob, let's get
24  this straight.  I don't know whether or not
25  they actually met Brandy.

01:58-01:59                                    Page 47

1     BY MR. MILLS:
2  Q.  You said: I don't think they ever met
3  Brandy.
4  A.  I don't think --
5  Q.  You don't have a basis for saying that, do
6  you?
7     MS. PARKER: Objection to form.
8     THE WITNESS: So, let me make sure
9  I can be very clear.
10     BY MR. MILLS:
11  Q.  Please.
12  A.  I am unsure as to whether or not they met
13  Brandy or not.
14  Q.  Okay.  Okay.
15  A.  Clear?  Did I make myself clear?
16  Q.  Yes.
17  A.  Okay.
18  Q.  But when you said "I don't think the other
19  locations ever met her," you didn't have a
20  basis for saying that, did you?
21     MS. PARKER: Objection to form;
22  argumentative.
23     THE WITNESS: Okay, let's figure
24  out, do we want to go into literal context
25  of our conversation now?

01:59-02:00                                    Page 48

1     BY MR. MILLS:
2  Q.  I just want to be clear.
3  A.  Fine, fine.  I just want to know the degree
4  of literacy or literal interpretation of the
5  word that we need to get into, and if you
6  want to go to the far end of the extreme, I
7  can do that.
8  Q.  Have you ever talked to any of the managers
9  at the other locations as to whether they
10  met Brandy?
11  A.  No.
12  Q.  You have no idea whether they have or not,
13  do you?
14     MS. PARKER: Object to form;
15  mischaracterizes prior testimony.
16     THE WITNESS: I am unsure as to
17  whether they met Brandy or not.
18     BY MR. MILLS:
19  Q.  Okay.  That's fine.
20     I'm going to hand you an exhibit
21  that was marked yesterday, Exhibit 1.
22     I'd ask you to take a look at the
23  first one, two, three, four pages of the
24  exhibit, and I'm going to ask if you've ever
25  seen this before.

02:00-02:04                                    Page 49

1     And you can take your time and read
2  it if you want.
3  A.  (Perusing.)
4     MS. PARKER: Do we have a Bates
5  numbered copy of this?
6     MR. MILLS: I think the one we
7  marked was not Bates numbered.
8     THE WITNESS: (Perusing.)  Okay.
9     BY MR. MILLS:
10  Q.  Have you ever seen this before?
11  A.  I have seen the document, but this is really
12  the first time I've read the document.
13  Q.  Did you -- did you draft any portion of this
14  document?
15  A.  No.
16  Q.  Did you provide any input into the
17  information that's in there?
18     MS. PARKER: Objection.  I'll
19  instruct you not to answer with respect to
20  the content of any attorney/client
21  privileged communications that you may have
22  had with Ruth Timm, who is senior corporate
23  counsel with G & K, with respect to the
24  investigation of this or any other
25  investigation done at her direction.

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 426 of 505

Eric McNaul
May 12, 2016

02:04-02:05                                                Page 50

1    THE WITNESS: So, I don't know
2  what -- do I answer now, or what?  I mean --
3    MS. PARKER: You can answer to the
4  extent whether you had a conversation but
5  not any of the content of the conversation.
6    THE WITNESS: Yes, I had a
7  conversation.
8    BY MR. MILLS:
9  Q.  With whom?
10 A.  Ruth Timm.
11 Q.  And who is Ruth Timm?
12 A.  Actually, not Ruth Timm.  Sarah Murdock.
13 Q.  Who is Sarah Murdock?
14 A.  She works in our human resources department
15   at G & K.
16 Q.  Is she an attorney?
17 A.  No.
18 Q.  And when was that conversation?
19 A.  I don't recall specifically.
20 Q.  Was it sometime after Brandy Williams had
21   been terminated?
22 A.  Yes.
23 Q.  Was it sometime after Rachael Siggerud had
24   left the company?
25 A.  Yes.

02:05-02:06                                                Page 51

1  Q.  Do you recall how long after?
2  A.  I do not recall.
3  Q.  Was it your understanding that the
4    conversation was in connection with an
5    investigation being conducted by the
6    company?
7  A.  No.
8  Q.  And what was the conversation?
9    MS. PARKER: And, again, I'm going
10 to object to the extent that my
11 understanding is this conversation would
12 have been in connection with investigation
13 of this charge, and that Mr. McNaul may not
14 fully understand the bounds of the privilege
15 but that privilege can only be waived by the
16 company.
17   MR. MILLS: Okay.  Well, I think he
18 just testified that the conversation was
19 with someone in the HR department and was
20 not a lawyer?
21   MS. PARKER: And that that
22 conversation could have, and most likely was
23 in connection with gathering information for
24 this response, which would have been
25 directed by Ruth Timm, and that that person

02:06-02:07                                                Page 52

1  in the HR department, considering we know it
2  was after Ms. Williams' termination and
3  after Ms. Siggerud was gone, that -- I
4  believe that would have been in connection
5  with this investigation for purposes of
6  responding to the EEOC charge and would fall
7  within the attorney/client privilege or work
8  product privileges.
9    MR. MILLS: I don't see the basis
10 for the privilege attaching under the
11 circumstances but --
12   MS. PARKER: I am having a hard
13 time imagining where that conversation
14 wouldn't have been privileged.  A discussion
15 had with somebody in the organization at the
16 direction of counsel, whether this
17 information was gathered by an attorney or
18 non-attorney is still going --
19   MR. MILLS: G & K has in-house
20 counsel, and they could have conducted it
21 with an in-house attorney, right?
22   MS. PARKER: But attorneys are also
23 entitled to use agents that have these
24 discussions.  I --
25   MR. MILLS: I don't even know

02:07-02:21                                                Page 53

1  whether this person was an agent of the
2  attorney.  I don't know enough
3  information --
4    MS. PARKER: Why don't we go off
5  the record and Mr. McNaul and I can have a
6  conversation so that I can make a more
7  informed objection.
8    MR. MILLS: If you want to do that,
9  that's fine.
10   THE VIDEOGRAPHER: We are off the
11 record.  The time on the video monitor is
12 2:07 p.m.  This ends Tape Number 1.
13 (A recess was taken.)
14   THE VIDEOGRAPHER: We are on the
15 record.  The time on the video monitor is
16 2:20 p.m.  This begins Tape Number 2.
17   BY MR. MILLS:
18 Q.  Okay.  Mr. McNaul, before the break, we were
19 talking about Exhibit Number 1, and you had
20 mentioned that you had had a conversation
21 with -- what was her name again, Sarah --
22   MS. PARKER: You can answer this
23 part, that it's with Sarah.
24   THE WITNESS: Murdock.
25   BY MR. MILLS:

02:21-02:22                                          Page 54

1  Q.  Murdock?  And that Sarah was in the HR
2  department?
3  A.  Yes.
4  Q.  And Sarah is not an attorney?
5  A.  She is not -- I don't believe she is an
6  attorney.
7  Q.  Do you believe that the conversation you had
8  with her has something to do with the
9  document that you looked at,
10 Exhibit Number 1?
11    MS. PARKER: I'm going to object to
12 this line of inquiry.  As you know, we went
13 out to determine whether this conversation
14 was, in fact, within the privilege, and
15 based on conversations we had with G & K's
16 corporate counsel, I believe that my
17 objection was proper, that this is
18 attorney/client and work product privilege
19 and I'm instructing Mr. McNaul not to
20 answer.
21    MR. MILLS: You're instructing him
22 not to answer that question?  Because
23 one thing I think -- just, as you know, one
24 thing I think I need to do is lay a little
25 bit of foundation so I will have some basis

02:22-02:23                                          Page 55

1  for challenging the privilege.
2     MS. PARKER: That's -- that's fair.
3     MR. MILLS: -- privilege, rather.
4     MS. PARKER: So, if --
5     MR. MILLS: It doesn't violate the
6  privilege for me to ask him whether he
7  thinks that the conversation had something
8  to do with this document.
9     MS. PARKER: Fair enough, as long
10 as it's a yes-or-no question.
11    BY MR. MILLS:
12 Q.  Do you believe that your conversation with
13 Sarah had something to do with the document
14 that's Exhibit Number 1?
15 A.  No.
16 Q.  Okay.  And do you have an understanding of
17 what the conversation had to do with?
18    MS. PARKER: Object to the extent
19 that it goes into the nature of the
20 conversation.  You can answer as to whether
21 you had an understanding of what your
22 conversation was about.
23    THE WITNESS: Can you repeat that,
24 please.
25    MS. PARKER: The question was a

02:23-02:24                                          Page 56

1  little convoluted, but it was whether you
2  understood what your conversation with
3  Ms. Murdock was about.  Did I get that
4  right?
5     THE WITNESS: I understand what she
6  was asking me, yes.
7     BY MR. MILLS:
8  Q.  Did you understand why you were having this
9  conversation with Ms. Murdock?
10    MS. PARKER: Objection to form.
11    THE WITNESS: I -- I'm not sure --
12 I don't understand the question.
13    BY MR. MILLS:
14 Q.  Did you initiate the conversation or did
15 Ms. Murdock initiate it?
16 A.  Ms. Murdock initiated the conversation.
17 Q.  And it was a conversation regarding Brandy
18 Williams?
19 A.  Yes.
20 Q.  Do you know why she initiated that
21 conversation with you?
22    MS. PARKER: Objection.
23    THE WITNESS: I do now.
24    BY MR. MILLS:
25 Q.  And what's your understanding as to why she

02:24                                                Page 57

1  did it?
2     MS. PARKER: Objection.  This
3  inquiry is going too far into what the
4  purpose of the conversation from an
5  attorney/client privilege and work product
6  standpoint was.
7     MR. MILLS: I don't think it was
8  asking -- I hadn't gotten into the content
9  of it.  It's, like, does the witness have an
10 understanding as to what -- as to why they
11 were having this conversation.
12    MS. PARKER: You can answer that
13 yes or no.
14    BY MR. MILLS:
15 Q.  Let me ask it that way.
16    Do you have an understanding as to
17 why you were having this conversation?
18 A.  Yes.
19 Q.  What's that understanding?
20    MS. PARKER: I'm going to object to
21 this.
22    MR. MILLS: As to his understanding
23 as to why they are having the conversation?
24    MS. PARKER: Well, I think it gets
25 dangerously close to what the content of the

02:24-02:25                                    Page 58

1  conversation was, whether it gets into
2  strategy with respect to the litigation.
3      MR. MILLS: I think I'm entitled to
4  ask what his understanding was as to why the
5  conversation was occurring.
6      MS. PARKER: I'm going to object to
7  form.  You know that we're objecting, that
8  this is getting into attorney/client
9  privileged conversation.  Your question is
10  open-answered and improperly eliciting a
11  response from a non-attorney who doesn't
12  fully understand the contours of the
13  attorney/client privilege.  You can ask --
14      MR. MILLS: I know, but --
15      MS. PARKER: -- manner.
16      MR. MILLS: Even if there was a
17  conversation with an attorney, though, I'm
18  entitled to ask:  Was the conversation in
19  connection with the litigation?
20      You just didn't ask
21  that question.  You just asked him what the
22  open-ended and eliciting a response --
23      MR. MILLS: I can ask the witness:
24  What was the conversation about?  And they
25  can say it was about this lawsuit, and then

02:25-02:26                                    Page 59

1  I can say, okay, fine, let's stop, it was
2  attorney/client privilege.
3      MS. PARKER: My point is that the
4  form of the question eliciting a response
5  that's more broad.  You can ask whether it
6  was about this litigation and I'll permit
7  him to answer yes or no.
8      BY MR. MILLS:
9  Q.  Was your conversation with Ms. Murdock about
10  the current litigation?
11  A.  Yes.
12  Q.  Was it about Brandy Williams' lawsuit
13  against G & K?
14  A.  Yes.
15  Q.  You're aware -- were you aware that Brandy
16  Williams had filed a complaint with the
17  Equal Employment Opportunity Commission
18  prior to filing the lawsuit?
19      MS. PARKER: Objection:  This goes
20  to the content of the conversation and it
21  goes into the discussion of what
22  specifically was discussed.
23      Mr. McNaul has already testified
24  that it was about this litigation and it's
25  an attorney/client or work product

02:26-02:27                                    Page 60

1  privileged conversation and I'm instructing
2  him not to answer any further.
3      MR. MILLS: The EEOC Complaint is a
4  public document.
5      BY MR. MILLS:
6  Q.  Were you aware that she had filed an EEOC
7  complaint against G & K?
8      MS. PARKER: You can answer with
9  respect to your knowledge preceding the
10  conversation but nothing you would have
11  learned in the conversation.
12      THE WITNESS: No, I was unaware.
13      BY MR. MILLS:
14  Q.  Did Ms. Murdock tell you that --
15      MS. PARKER: Objection.
16      BY MR. MILLS:
17  Q.  -- your conversation was in connection with
18  Brandy Williams' lawsuit against G & K?
19  A.  Can you repeat the question?
20  Q.  Did Ms. Williams [sic] tell you or indicate
21  to you in any way that her conversation with
22  you was in connection with Brandy Williams'
23  lawsuit?
24      (Discussion off the record.)
25      BY MR. MILLS:

02:27-02:28                                    Page 61

1  Q.  Strike that.
2      Did Ms. Murdock tell you or
3  indicate to you in any way that her
4  conversation with you was in connection with
5  Brandy Williams' lawsuit against G & K?
6      MS. PARKER: Object to form; object
7  because --
8      MR. MILLS: He can answer that.
9      MS. PARKER: Well, I'm objecting
10  that this was an attorney/client or work
11  product privileged conversation.
12      MR. MILLS: Clearly, it wasn't
13  attorney/client, we know that.
14      MS. PARKER: You can absolutely
15  have an attorney/client privileged
16  conversation that's done with an agent of
17  the attorney.
18      I'm not waiving that objection.
19  I'm asserting that objection.  Mr. McNaul is
20  a non-attorney.  I -- the privilege belongs
21  to G & K, and I'm not allowing any more
22  discussion into what the conversation or the
23  content of the conversation was.
24      I'll terminate the deposition if
25  you continue down this road.

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 429 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

02:28-02:29                                              Page 62

1       MR. MILLS: Okay.  Can you read
2   back -- just read back the last question.
3   One thing -- my last question to the
4   witness.
5       (Question read back as requested as
6   follows:
7       "Q.  Did Ms. Murdock tell you or
8   indicate to you in any way that her
9   conversation with you was in connection with
10  Brandy Williams' lawsuit against G & K?")
11      MR. MILLS: Are you going to
12  instruct the witness not to answer that
13  question?
14      MS. PARKER: To the extent that the
15  question doesn't go into the content of the
16  conversation any more than permitted, it's
17  been asked and answered, so I'm going to
18  instruct him not to answer it any further.
19      He's already indicated that his
20  understanding was that this was with respect
21  to the litigation.
22      MR. MILLS: Let's certify that
23  question.
24  BY MR. MILLS:
25  Q.  Do you know whether any of the information

02:29-02:30                                              Page 63

1   that's contained in Exhibit 1 is information
2   that you provided?
3       MS. PARKER: I'll object to the
4   extent that this goes into any
5   attorney/client privileged communications.
6       THE WITNESS: Do you want me to
7   answer?  I haven't read it thoroughly so
8   I'll probably need a good 30 minutes to go
9   through it and read it.
10      MS. PARKER: And give me a second
11  because I don't see how we can talk about
12  what specific pieces that he provided
13  without talking about what his
14  attorney/client privileged conversations
15  were, and we also haven't even established
16  that he had a conversation prior to the
17  preparation of this.  So, you can ask him
18  what he knows.
19      BY MR. MILLS:
20  Q.  Let me ask you this: Do you know -- strike
21  that.
22      Did your conversation with
23  Ms. Murdock happen prior to April 1, 2014?
24  A.  No.
25  Q.  Do you recall when the first time you saw

02:30-02:32                                              Page 64

1   this document, Exhibit 1, was?
2   A.  Last -- well, last week -- a week ago
3   Friday.
4   Q.  Had you ever seen drafts of it?
5   A.  No.
6   Q.  Do you know whether you had any -- strike
7   that.
8       Do you remember whether you had any
9   input into the preparation of this document,
10  Exhibit 1?
11  A.  I did not.
12  Q.  Were you involved in the decision to
13  eliminate an HR generalist position in 2013?
14  A.  Yes.
15  Q.  In the Northwest Region?
16  A.  Yes.
17  Q.  Who else was involved in that decision?
18  A.  Rachael Siggerud, and I believe her manager
19  was informed as well.
20  Q.  And that was Pelham?
21  A.  Yes.
22  Q.  What's his last name?
23  A.  Chastang, C-H-A-S-T-A-N-G.
24  Q.  And when was the decision made to eliminate
25  an HR generalist position in the Northwest

02:32-02:33                                              Page 65

1   Region?
2       MS. PARKER: Object to form.
3       THE WITNESS: It would have been
4   mid -- probably mid June timeframe.
5       BY MR. MILLS:
6   Q.  And how -- how did that decision come about?
7   What was the process?
8   A.  Well, we started down the path of having
9   three generalists, and it was probably three
10  months into it -- I'm trying to remember,
11  February March April -- April/May timeframe,
12  probably in Mayish, May timeframe -- that
13  Rachael first came to me and stated that she
14  felt that we may have been -- we may be
15  overstaffed in the generalist role.
16      I inquired why because I previously
17  thought, okay, we need three.  She explained
18  to me that we had overcapacity with regard
19  to the generalist role and the execution of
20  the job as it had been designed, and that we
21  had more generalists than what the work was
22  demanding.
23      And she broached the subject with
24  me because she knew I was very sensitive
25  about, you know, having adequate

**02:33-02:34**                                                    Page 66

1    representation, and that it was my region
2    that, you know, she was managing from an HR
3    perspective.
4         I said, okay, you know, let's give
5    it a little bit more time.  Let me try to
6    figure this out.  Let me get a sense.
7         And during the next four, five, six
8    weeks, you know, she continued to provide
9    feedback to me with regard to the fact that,
10   you know, we've got more generalist capacity
11   than what we've originally thought, and that
12   the concept of having a reduction in force
13   was something that we felt, and I agreed to
14   in June, that, yes, this is something that
15   feels like we need to do.
16        It would be a good, prudent
17   business decision based on the capacity and
18   the overcapacity in the generalist role, and
19   we needed to right-size it relative to the
20   rest of the regions.
21   Q.  So, it was Rachael who initially proposed
22   doing away with an HR generalist position?
23   A.  Yes.
24   Q.  And were you relying on what she was telling
25   you in connection with making your decision

**02:34-02:35**                                                    Page 67

1    as to whether to get rid of an HR
2    generalist?
3         MS. PARKER: Objection to form.
4         THE WITNESS: Yes, for the most
5    part.
6         BY MR. MILLS:
7    Q.  In other words, you weren't doing an
8    independent investigation of your own as to
9    whether you were overstaffed in that way?
10   A.  No.
11   Q.  And once the decision was made to -- or
12   strike that.
13        Were you also involved in the
14   decision to do away with Brandy Williams'
15   position in particular?
16        MS. PARKER: Objection to form.
17        THE WITNESS: Yes.
18        BY MR. MILLS:
19   Q.  Okay.  In other words, you were involved in
20   the decision of which one of the three
21   HR generalists would go?
22   A.  Yes.
23   Q.  And what was your involvement in that
24   process?
25        MS. PARKER: Objection to form.

**02:35-02:36**                                                    Page 68

1         THE WITNESS: My concern was that
2    we aligned the most competent, capable
3    generalists with the businesses in such a
4    fashion so as to provide adequate
5    representation of the generalist role in the
6    application of their duties.
7         BY MR. MILLS:
8    Q.  And how was that concern of yours brought to
9    bear on the decision as to which one would
10   be eliminated?
11        MS. PARKER: Objection to form.
12        THE WITNESS: There were several
13   factors that went into the decision that
14   Rachael shared with me and we had
15   discussions about.
16        First and foremost was we need to
17   clearly establish the fact that we had
18   overcapacity and that a reduction in force
19   and/or position elimination is going to be
20   required.
21        Once we clearly established that
22   fact, we knew that we then needed to reduce
23   one person.
24        Second came in to the question with
25   regard to geographic coverage, and we were

**02:37-02:38**                                                    Page 69

1    able to ascertain that the best structure
2    for that was to have one person that would
3    be able to handle the Minnesota market and
4    our Phoenix operations, and another person
5    to handle our California operations.
6         Third, the next element came to the
7    selection of the individuals.  We had Kaela
8    Ellison here in Minnesota, and we had
9    Janelle Bonacua, who was residing in
10   California.
11        Fourth, I then looked at the
12   overall competencies of the people and
13   ascertained that Kaela had very high
14   performance ratings, very positive feedback
15   from the team members that she was
16   supporting, and demonstrated a capacity to
17   embrace the role and really succeed in it.
18        Janelle, having previous California
19   experience, situated in California, and was
20   performing very well in the role as well.
21        Lastly, Brandy Williams in Phoenix,
22   underperforming in the role, struggling in
23   the role, expressing a desire that she did
24   not like the role and she did not want to
25   get into the role.

**Coash & Coash, Inc.**                **(17) Pages 66 - 69**

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 431 of 505

Eric McNaul
May 12, 2016

02:38-02:39                                           Page 70

1      We, basically, made the decision
2   based on those four factors that Brandy
3   would be the person that we would eliminate.
4      BY MR. MILLS:
5   Q.  How do you know that Brandy Williams didn't
6   want the role of HR generalist?
7   A.  Rachael has expressed to me in our
8   conversations that Brandy had expressed
9   frustration, not knowing what to do with the
10  role, was not taking feedback that Rachael
11  was providing to her, not executing in the
12  role, coupled with the feedback that I was
13  getting concurrently from the general
14  manager about her lack of involvement in the
15  business and responsiveness to the business,
16  and the business needs, and that Brandy had,
17  basically, said, you know, she wasn't happy
18  in the position that it was -- as it was
19  structured.
20  Q.  How do you know that she was struggling in
21  that position?
22  A.  Twofold:  From feedback that her direct
23  manager provided to me.
24  Q.  That's Jake Briscoe?
25  A.  No, her direct manager was Rachael Siggerud.

02:39-02:40                                           Page 71

1   Q.  Okay.
2   A.  She had provided that information to me, and
3   the fact that she was unresponsive to the
4   business needs clearly demonstrated a lack
5   of performance expectations or meeting
6   performance expectations to service the
7   business.  She was unresponsive to the
8   business needs.
9   Q.  How did you know that she was unresponsive
10  to the business needs?
11  A.  Jacob Briscoe shared that with me, Rachael
12  shared that with me.  I know that Jacob and
13  Rachael had had conversations as well with
14  regard to Brandy's performance.
15  Q.  Did you look at Brandy's performance reviews
16  in connection with whether to --
17  A.  I did not specifically look at her reviews.
18  Q.  Did you look at the reviews of any -- of
19  Kaela or Janelle?
20  A.  I did not.
21  Q.  To what extent were you relying on Rachael
22  for evaluating which one would be
23  eliminated?
24      MS. PARKER: Objection to form.
25      THE WITNESS: Yes, Rachael had

02:40-02:41                                           Page 72

1   shared with me during our discussion what
2   her performance reviews were.
3      BY MR. MILLS:
4   Q.  What did she tell you?
5   A.  That, as I previously just shared, and want
6   to go back, that Kaela was performing well
7   in the job, exceeding expectations, doing an
8   exceptional job, demonstrated a capacity and
9   a bandwidth to be able to take on more
10  responsibility.  She was a rock star.
11      Janelle had performed well in the
12  organization design as well, and she too was
13  doing exceedingly well, taking the position
14  and running with it.
15      And that Brandy, for a multitude of
16  reasons, which I think I've previously
17  articulated, was failing miserably in her
18  job.
19  Q.  Rachael told you that she was failing
20  miserably?
21  A.  Not only Rachael did, but Jacob did as well.
22  Q.  Did anybody else tell you that?
23  A.  Not specifically, that I can recall.  There
24  may have been others, but I don't recall the
25  specifics -- you know, it gets to a point

02:41-02:42                                           Page 73

1   where you hear so much negative feedback
2   about someone's performance where you go,
3   okay.
4   Q.  Were you aware that Brandy had health
5   problems?
6   A.  I was not aware of that.
7   Q.  Have you ever become aware of the fact that
8   she had health problems?
9   A.  I became aware of that in reading the
10  documents.  That was the first time --
11  Q.  In connection with this lawsuit, right?
12  A.  Yes, that's the first time I actually became
13  aware of it.
14  Q.  And Rachael had never said anything to you
15  about --
16  A.  No.
17  Q.  -- having health problems?
18  A.  Absolutely not.  You know, one of the things
19  that we pride ourselves in at G & K is the
20  confidentiality of any of our team members
21  as it pertains any related -- health-related
22  issues.
23      There's things that, by law, that
24  you can and cannot share, and they abide by
25  the law like you wouldn't believe in every

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

02:42-02:43                                    Page 74

1  instance.
2  Q.  When was the decision made to terminate
3  Brandy's employment?
4      MS. PARKER: Objection to form.
5      THE WITNESS: I believe it was late
6  September is when the actual decision was
7  made.
8      BY MR. MILLS:
9  Q.  So, if I understand your testimony
10  correctly, there was a period in June, I
11  believe, in which the decision was made that
12  a position has to be eliminated?
13  A.  Yes.
14  Q.  And, then, it was not until September that
15  you decided it was going to be Brandy
16  Williams?
17      MS. PARKER: Objection to form and
18  mischaracterizes prior testimony.
19      THE WITNESS: That is incorrect.
20      BY MR. MILLS:
21  Q.  Correct me, then.
22  A.  We made a decision in June that a position
23  needed to be eliminated.  We made a decision
24  in June that that person would be Brandy
25  Williams.  Based on the fact that she had

02:44-02:46                                    Page 76

1  fulfill the role of the generalist in
2  Janelle's absence.
3      So, we knew that we were going to
4  do a riss [ph] in June, we just didn't know
5  the specific timeframe.
6      And as it turned out, concurrent to
7  that timeframe, a couple of things happened,
8  and that goes into the fact that a position
9  in our recruiting area came about.
10      And she had expressed a desire and
11  an interest to Rachael that she wanted to go
12  and go into recruiting, and so we
13  facilitated that opportunity for Brandy to
14  go into recruiting on a temporary basis.
15  Q.  She did go into recruiting for some period
16  of time, right?
17  A.  She did.
18  Q.  If recruiting had offered Brandy a permanent
19  position, would she have been allowed to
20  stay at G & K?
21      MS. PARKER: Objection:  Calls for
22  speculation.
23      THE WITNESS: I can't answer that.
24      BY MR. MILLS:
25  Q.  Did you ever talk --

02:43-02:44                                    Page 75

1  expressed a desire to not be in the
2  position, she had expressed frustration with
3  the job, and that we had overcapacity in the
4  position.
5      She was the least qualified to
6  handle the position in comparison with her
7  peers, and she was not geographically
8  situated to be able to perform the role as
9  we designed with two HR generalists.
10  Q.  She wasn't actually terminated until late
11  September, correct?
12  A.  I believe that was the timeframe, yes.
13  Q.  So, why -- why was it that there was this
14  delay from June until September?
15  A.  Well, we actually left it in limbo and,
16  actually, I want to explain that.  We had
17  budgeted for the position for the entire
18  year, knowing that Janelle Bonacua was
19  pregnant and she was going to be going on
20  maternity leave sometime in the late fall
21  quarter sometime, and we felt that,
22  dependent on her timeframe when she would go
23  out on maternity leave, we believed that,
24  you know, perhaps Brandy, with some further
25  guidance and direction, would be able to

02:46-02:47                                    Page 77

1  A.  I don't know the answer.
2  Q.  Did you ever talk to anybody in the
3  recruiting department about Brandy?
4  A.  I did not specifically.
5  Q.  Do you know who she was working with over
6  there?
7  A.  I believe Michael Hammond was her direct
8  supervisor and Theresa Schneider was head of
9  the recruiting, but I believe her interface
10  was with those individuals.
11  Q.  And at what point did you tell Brandy that
12  her job at G & K was terminated?
13  A.  Late September timeframe, I don't remember
14  the specific date, and I did not tell her
15  that.
16  Q.  Were you present when she was told that?
17  A.  I was present.
18  Q.  And who told her that?
19  A.  Rachael Siggerud.
20  Q.  Did you say anything to Brandy at that
21  meeting?
22  A.  I don't recall.  If I did, it was very
23  minimal, nothing relative to the position
24  elimination.
25  Q.  Do you remember what Rachael said to her?

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

02:47-02:49                                                  Page 78

1  A.  I don't remember word-for-word, but I know
2  the -- what transpired was Rachael explained
3  to her that we were going to eliminate a
4  position and that, unfortunately, the
5  position was going to be her's.
6     During that timeframe, Brandy
7  expressed what I perceived as being a little
8  bit of relief, she stated that this would be
9  good, that it would afford her the
10 opportunity to spend more time with her
11 family.
12    Brandy conducted herself in a very
13 professional manner.  You know, terminations
14 and position eliminations are never a
15 pleasant environment, and Brandy, in my
16 opinion, handled herself exceedingly
17 professionally, as did Rachael Siggerud.
18    It was a short meeting, all of 10
19 minutes at that, and there was no further
20 discussion beyond that.  There were no
21 questions from Brandy as to why or reasons
22 for.
23 Q.  What was Pelham Chastang's input in
24 connection with the determination to
25 eliminate Brandy's position?

02:49-02:50                                                  Page 79

1  A.  I do not know.
2  Q.  Did you ever talk to him about it?
3  A.  Not specifically, no.
4  Q.  Did you ever -- did you ever talk to him
5  about eliminating a general -- or an HR
6  generalist position at G & K?
7  A.  Yes.
8  Q.  What was that discussion -- or was there
9  more than one discussion?
10 A.  It probably went something along the lines
11 of, Pelham, you were right, I was wrong, I
12 know I wanted three but we've got one too
13 many.
14    And Pelham probably said, I knew
15 you would come around to the correct way of
16 thinking.
17 Q.  Was Pelham, from the very beginning,
18 resistant to having three HR generalists?
19 A.  Yes.
20 Q.  Did he tell you why?
21 A.  He felt we would be overstaffed and have
22 overcapacity, and as much as I hate to admit
23 it, he was right.
24 Q.  How long had Pelham been at G & K, do you
25 know?

02:50-02:51                                                  Page 80

1  A.  28 years, maybe.  He's a long-time employee
2  of G & K.
3  Q.  Did he ever say anything to you about Brandy
4  Williams or her performance?
5  A.  No.
6  Q.  So, do you know whether he had any input
7  into the decision whether to terminate her
8  job at G & K?
9  A.  I do not know.
10 Q.  Was there anybody, to your knowledge, other
11 than you and Rachael, that had any input
12 into that decision?
13 A.  I don't know.
14 Q.  If Rachael had told you, "I think we should
15 keep Brandy," would you have gone along with
16 that?
17    MS. PARKER: Objection:  Calls for
18 speculation.
19    THE WITNESS: Wow, I don't know.
20 If Rachael had told me that we should keep
21 Brandy, would I have gone along with that?
22    Ultimately, I probably would have,
23 other than the fact that, you know, for the
24 primary reason that I trust all of my team
25 members emphatically, and we have a very

02:51-02:52                                                  Page 81

1  strong belief in empowering our decisions --
2  our managers to make decisions, and it was
3  her team member.
4     And I would have felt that it would
5  have been out of place for me to juxtapose
6  my belief one way or the other.
7     BY MR. MILLS:
8  Q.  Were you aware that Brandy Williams had made
9  a request for accommodation under the
10 Americans With Disabilities Act?
11    MS. PARKER: Objection:  Asked and
12 answered.  You can answer.
13    THE WITNESS: I was unaware.
14    BY MR. MILLS:
15 Q.  Unaware during the time period that she --
16 that Brandy Williams was an HR generalist --
17 let me rephrase the question so it's a
18 little more clear.
19    Were you aware at any time frame
20 during Brandy Williams' tenure at G & K that
21 she had made a request for accommodation
22 under the Americans With Disabilities Act?
23 A.  I was unaware of any request whatsoever.
24    MR. MILLS: Can we take like a
25 five-minute break.

---

02:52-03:11                                                Page 82

1    THE VIDEOGRAPHER: We are going off
2  record. The time now is 2:52 p.m.
3    (A recess was taken.)
4    THE VIDEOGRAPHER: We are going
5  back on the record. The time now is
6    3:10 p.m.
7    BY MR. MILLS:
8  Q. Is Janelle Bonacua still with G & K?
9  A. She is not.
10  Q. When did she leave the company?
11  A. I don't remember.
12  Q. Did she --
13  A. Sorry. I don't recall.
14  Q. Did she leave voluntarily?
15    MS. PARKER: Objection:
16  Foundation.
17    THE WITNESS: We had another
18  reduction in force and we eliminated a
19  second generalist position.
20    BY MR. MILLS:
21  Q. In the Northwest Region?
22  A. Yes.
23  Q. And that was her position?
24    MS. PARKER: Objection:
25  Foundation.

---

03:11-03:12                                                Page 83

1    THE WITNESS: Yes.
2    BY MR. MILLS:
3  Q. And do you recall when that happened?
4  A. I do not recall.
5  Q. Was it sometime after Brandy Williams had
6  left?
7  A. Yes.
8  Q. Is Kaela Ellison still with G & K?
9  A. She is no longer with G & K.
10  Q. When did she leave?
11    MS. PARKER: Objection:
12  Foundation.
13    THE WITNESS: Probably a year and a
14  half ago, year ago, yeah, it's been a while.
15    BY MR. MILLS:
16  Q. Did she leave voluntarily?
17  A. She did, yeah, she actually got a really
18  nice job promotion with an external company.
19  Q. Just to be clear, Janelle was laid off due
20  to a reduction in force?
21    MS. PARKER: Objection:
22  Foundation.
23    THE WITNESS: Yes.
24    BY MR. MILLS:
25  Q. How many HR generalists are there currently

---

03:12                                                      Page 84

1  servicing the Northwest Region?
2  A. One. Let me -- no, no, no, no, I've got to
3  go back on this one. Can we strike that,
4  strike that, strike that.
5    I believe Janelle was laid off for
6  performance-related issues, not a reduction
7  in force.
8  Q. Okay.
9  A. Because I remember at the time we had
10  considered backfilling her role.
11  Q. Do you know what the performance-related
12  issues were?
13    MS. PARKER: Objection:
14  Foundation.
15    THE WITNESS: I don't know the
16  specifics.
17    BY MR. MILLS:
18  Q. Were you involved in the decision to
19  terminate her?
20  A. Minimally, more from an advisory standpoint
21  and, you know, feedback that I had received.
22  Q. Do you recall anything that anybody said to
23  you about Janelle's performance in
24  connection with that?
25    MS. PARKER: Objection: Form.

---

03:12-03:14                                                Page 85

1    THE WITNESS: I do.
2    BY MR. MILLS:
3  Q. What do you recall?
4  A. She would not travel. She had travel
5  restrictions was the only thing that I can
6  recall, but I'm sure there were a multitude
7  of other performance-related issues that I'm
8  not privy to.
9  Q. Who did you hear that -- strike that.
10    Who told you that she would not
11  travel?
12  A. The general manager, Richard Pland, and the
13  human resources director, Julie Pfieffer,
14  P-F-I-E-F-F-E-R.
15  Q. And did you actually provide any advice with
16  respect to the termination of Janelle?
17  A. No.
18  Q. Do you recall who it was that actually told
19  her that she was being terminated from the
20  company?
21    MS. PARKER: Objection:
22  Foundation.
23    THE WITNESS: I believe it was
24  Julie Pfieffer.
25    BY MR. MILLS:

---

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

03:14-03:15                                    Page 86

1  Q.  What is Julie Pfieffer's title?
2  A.  Director of human resources, or to be more
3  accurate, human resources director.
4  Q.  Had Julie taken over the role that Rachael
5  Siggerud had previously had?
6  A.  Yes.
7  Q.  Okay.  Anything else you can recall about
8  any complaints or concerns about Janelle's
9  performance other than that she would not
10 travel?
11      MS. PARKER: Object to form.
12      THE WITNESS: I don't remember any
13 of the specific details.
14      BY MR. MILLS:
15 Q.  Did you personally ever observe Janelle's
16 performance?
17      MS. PARKER: Object to form.
18      THE WITNESS: No, nor would I have
19 any real opportunity to.
20      BY MR. MILLS:
21 Q.  Did Rachael Siggerud ever say anything to
22 you -- or strike that.
23      Did Rachael Siggerud ever relate to
24 you any complaints or concerns about
25 Janelle's performance?

03:15-03:16                                    Page 87

1      MS. PARKER: Object to form.
2      THE WITNESS: Not that I can
3  recall.
4      BY MR. MILLS:
5  Q.  And who is currently the HR generalist for
6  the Northwest Region?
7  A.  A gentleman by the name of Chris Iverson.
8  Q.  And how long has he been the sole
9  HR generalist?
10 A.  Probably 18 months, maybe -- maybe a little
11 bit longer.  He was hired to backfill for
12 Kaela Ellison when she left.
13 Q.  How many regions does G & K have?
14 A.  Five in the United States.
15 Q.  Is there any of those regions that have more
16 than one HR generalist?
17 A.  I don't believe so.
18 Q.  Were there in the past?
19      MS. PARKER: Objection:  Relevance.
20      THE WITNESS: Were there -- can you
21 be more specific?
22      BY MR. MILLS:
23 Q.  Let me just really briefly back up and do
24 this -- at the time of the restructuring
25 back in 2013 --

03:16-03:18                                    Page 88

1  A.  Yes.
2  Q.  -- I know that you testified there were
3  three HR generalists in the Northwest
4  Region.
5  A.  Yes.
6  Q.  Were there more than one generalist in any
7  of the other regions?
8      MS. PARKER: Objection:  Relevance.
9      THE WITNESS: I don't know
10 specifically -- I don't know the specifics
11 of the other regions.
12      BY MR. MILLS:
13 Q.  Did your responsibilities' job duties extend
14 to any of the regions other than the
15 Northwest Region?
16 A.  No, no.
17 Q.  Did any of the managers that you were
18 supervising express to you any -- any
19 complaints or concerns about Janelle's
20 performance other than the travel
21 restrictions?
22 A.  Not that I can recall.
23 Q.  What did you do to prepare for this
24 deposition?
25 A.  I went and met with our general counsel.  He

03:18-03:19                                    Page 89

1  shared with me some correspondence, and we
2  had an hour-and-a-half, two-hour meeting,
3  and, basically, talked to me primarily about
4  the deposition and what would take place,
5  and that was pretty much it.
6      Other than that, I left the next
7  day to go to Washington, D.C. on vacation
8  for eight days and a lovely wedding with
9  Newt Gingrich.
10 Q.  Did you look at any documents in preparation
11 for the deposition?
12 A.  I did.
13 Q.  What did you look at?
14 A.  I looked at two documents, relatively
15 innocuous, that I was copied on, that I
16 couldn't make heads nor tails as to why they
17 were even presented.
18 Q.  Could you be a little bit more descriptive
19 as to what they were.  Were they emails?
20 A.  They were emails, and so -- that was it,
21 couple of emails, one that I looked at, and
22 I went, like, this doesn't even make sense.
23 I couldn't even figure out -- my first
24 question was:  Why is this document in here?
25 Q.  Do you remember who the emails were from?

Williams vs. G & R Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 436 of 505

Eric McNaul
May 12, 2016

03:19-03:20                                                      Page 90

1  A.  Oh, I do remember one email in particular
2  because it did -- because in my particularly
3  very curt way of answering questions was one
4  that was from Rachael Siggerud that had
5  expressed a desire --
6       MS. PARKER: You know, I'll
7  interject here.  Why do we need to get into
8  the specific documents?
9       MR. MILLS: What do you mean, why
10 do we need to get into them?
11      MS. PARKER: I mean, the fact that
12 he met with the GC and looked at documents,
13 I mean, to the extent that there are
14 specific documents that you haven't asked
15 him about or discussed in this deposition --
16      MR. MILLS: I can ask him what
17 documents he looked at in preparation for
18 the deposition.  That's always asked that
19 question in a deposition.
20      THE WITNESS: The only document
21 that I can recall is one that Rachael had
22 sent to me, her game plan, with regard to
23 how we could potentially keep Brandy as an
24 employee of the company.
25      Please understand, Bob, we all

03:20-03:21                                                      Page 91

1  cared for Brandy very much.  We liked her,
2  she was a nice person, and for me as a -- as
3  a vice president, I have a profound interest
4  in providing employment -- long-term career
5  opportunity for our team members, and
6  Rachael had shared with me that there was a
7  temporary position that was available in
8  recruiting, and that, during her
9  conversation with Brandy, Brandy had
10 expressed an interest to go into recruiting.
11      And she sent a document saying,
12 here's an opportunity where we might be able
13 to find a home for Brandy that would fit
14 better within her skill sets with regard to
15 her desire as to what she wanted to do, and
16 that if she performed well in that role, she
17 could potentially fill a need in our
18 recruiting department.
19      And my response to her was, I think
20 it's a neat idea, it's a good idea.
21      And I thought that was a great way,
22 because, keep in mind, the last thing I
23 really want to do is reduce our force.  It's
24 painful enough when you have to say good-bye
25 to people, but if I can find another

03:21-03:22                                                      Page 92

1  opportunity and provide somebody the
2  opportunity to succeed, so be it, great,
3  win-win for the company.
4       We had a need and she was going to
5  get the opportunity to do something that she
6  really expressed an interest in.
7       BY MR. MILLS:
8  Q.  Have you had any communications with Brandy
9  Williams since the time she left?
10 A.  No, no.
11 Q.  Okay.  Have you had any communications with
12 Janelle since she left?
13 A.  No.
14 Q.  Or any communications with Kaela since she
15 left?
16 A.  Yes.
17 Q.  Just, in general, what was those?
18      MS. PARKER: Objection:  Relevance.
19      THE WITNESS: Kaela got a brand new
20 puppy, and she knows I'm a dog lover, and so
21 she sent me a picture of her puppy.
22      And so I called her and
23 congratulated her on the adoption of her new
24 puppy, and we had a nice conversation.  And
25 to the extent of it, I guess Kaela and puppy

03:22-03:23                                                      Page 93

1  are doing fine, yes, other than the fact she
2  had a puppy birthday party and I wasn't
3  invited so I feel a little remiss from that.
4       MR. MILLS: Okay.  I think that's
5  all I have.  Thank you.
6       MS. PARKER: I'll ask two questions
7  just to clear up something that I think
8  there's some confusion on.
9       EXAMINATION
10      BY MS. PARKER:
11 Q.  You testified earlier today that you
12 received a call from Ms. Murdock at some
13 point, and that she left you a voicemail.
14      At that point when she left you a
15 voicemail, were you aware that her call was
16 about litigation?
17 A.  I was unaware of that.
18 Q.  When you later had a conversation with her,
19 did you become aware that the call was about
20 litigation?
21 A.  I then became aware of the litigation
22 aspect -- the purpose of her call.
23      MS. PARKER: No further questions.
24      MR. MILLS: Thank you.
25      THE VIDEOGRAPHER: We are off the

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 437 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

03:23                                                          Page 94

```
 1     record.  The time on the monitor is
 2     5:23 p.m. [sic].  This ends Video Number 2
 3     and the deposition of Eric McNaul.
 4             (At 3:23 p.m. the deposition was
 5     recessed.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18                      _____
                              Eric McNaul
19
20
21
22
23
24
25
```

                                                              Page 95

```
 1     STATE OF MINNESOTA
 2                               CERTIFICATE
       COUNTY OF WASHINGTON
 3
 4             I, Kelly A. Herrick, hereby
       certify that I reported the deposition of
       ERIC McNAUL on the 12th day of May, 2016 in
 5     Minneapolis, Minnesota, and that the witness
       was by me first duly sworn to tell the truth
 6     and nothing but the truth concerning the
       matter in controversy aforesaid;
 7
 8             That I was then and there a notary
       public in and for the County of Washington,
       State of Minnesota; that by virtue thereof I
 9     was duly authorized to administer an oath;
10             That the foregoing transcript is a
       true and correct transcript of my
11     stenographic notes in said matter,
       transcribed under my direction and control;
12
13             That the cost of the original has
       been charged to the party who noticed the
       deposition and that all parties who ordered
14     copies have been charged at the same rate
       for such copies;
15
16             That the reading and signing of
       the deposition was not waived;
17             That I am not related to any of
18     the parties hereto, nor interested in the
       outcome of the action and have no contract
19     with any parties, attorneys or persons with
       an interest in the action that has a
20     substantial tendency to affect my
       impartiality;
21             WITNESS MY HAND AND SEAL this 21st
       day of May, 2016.
22
23
24     _____
          Kelly A. Herrick
25            Notary Public
```

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 438 of 505

Eric McNaul
May 12, 2016

**[**

**[ph] (1)** 76:4
**[sic] (1)** 60:20

**A**

**abide (1)** 73:24
**able (8)** 14:14;17:7;
69:1,3;72:9;75:8,25;
91:12
**above-entitled (1)** 5:7
**absence (1)** 76:2
**absolutely (3)** 17:4;
61:14;73:18
**accommodation (2)**
81:9,21
**accounts (1)** 10:20
**accurate (1)** 86:3
**acquiesced (1)** 21:13
**acronym (1)** 22:9
**Act (2)** 81:10,22
**action (1)** 5:7
**actions (1)** 15:14
**actual (1)** 74:6
**actually (15)** 13:23;
22:1,7;24:19;26:18;
39:17;46:25;50:12;
73:12;75:10,15,16;
83:17;85:15,18
**additional (2)** 17:19;
30:10
**address (1)** 39:13
**addressed (1)** 31:24
**adequate (3)** 36:23;
65:25;68:4
**adequately (1)** 36:21
**administrative (3)**
11:25;15:6,16
**admit (1)** 79:22
**adoption (1)** 92:23
**advice (1)** 85:15
**advisory (1)** 84:20
**aeronautical (1)** 10:15
**afford (1)** 78:9
**afternoon (1)** 5:12
**again (3)** 23:19;51:9;
53:21
**against (5)** 59:13;60:7,
18;61:5;62:10
**agent (2)** 53:1;61:16
**agents (1)** 52:23
**ago (6)** 6:12,13,14;
64:2;83:14,14
**agreed (1)** 66:13
**ahead (1)** 5:13
**ahold (3)** 41:21;42:2,12
**Aires (1)** 9:7
**al (1)** 4:11
**align (1)** 29:14
**aligned (2)** 27:4;68:2
**allowed (1)** 76:19

**allowing (1)** 61:21
**almost (1)** 37:17
**along (3)** 79:10;80:15,
21
**always (1)** 90:18
**America (1)** 9:3
**Americans (2)** 81:10,22
**and/or (1)** 68:19
**Angeles (3)** 31:5;
44:11;45:19
**Angie (12)** 12:21,23;
31:4,6,7,19;32:11,22;
43:6,8;45:8;46:17
**Angie's (1)** 32:10
**answered (3)** 41:23;
62:17;81:12
**application (1)** 68:6
**approach (2)** 14:16,18
**approximate (1)** 6:15
**approximately (1)** 33:14
**April (6)** 28:10,13,18;
29:5;63:23;65:11
**April/May (1)** 65:11
**area (3)** 8:3,5;76:9
**areas (3)** 20:12;32:1;
40:25
**Argentina (1)** 9:8
**argumentative (2)** 46:9;
47:22
**Arizona (7)** 4:13;7:14;
12:5,7,9;38:6;44:20
**around (1)** 79:15
**articulated (1)** 72:17
**ascertain (1)** 69:1
**ascertained (1)** 69:13
**aspect (2)** 16:5;93:22
**asserting (1)** 61:19
**assigned (6)** 15:3,7;
22:10;23:16;44:8,19
**assistant (1)** 11:25
**attaching (1)** 52:10
**attempted (2)** 44:1,3
**attendance (3)** 15:5;
16:6;39:16
**attorney (8)** 50:16;
52:17,21;53:2;54:4,6;
58:17;61:17
**attorney/client (13)**
49:20;52:7;54:18;
57:5;58:8,13;59:2,25;
61:10,13,15;63:5,14
**attorneys (1)** 52:22
**availability (2)** 40:7;
41:4
**available (3)** 40:23;
41:1;91:7
**Avery (1)** 10:11
**aware (13)** 59:15,15;
60:6;73:4,6,7,9,13;
81:8,19;93:15,19,21
**away (3)** 46:1;66:22;
67:14

**B**

**back (18)** 17:11,18,25;
34:22;35:2,3;37:16;
41:2;46:13,14;62:2,2,
5;72:6;82:5;84:3;
87:23,25
**backfill (1)** 87:11
**backfilling (1)** 84:10
**bad (1)** 23:22;36:16
**bandwidth (1)** 72:9
**barcoding (1)** 8:24
**based (6)** 10:7;34:15;
54:15;66:17;70:2;
74:25
**basically (4)** 6:16;70:1,
17;89:3
**basis (6)** 45:14;47:5,
20;52:9;54:25;76:14
**Bates (2)** 49:4,7
**bear (1)** 68:9
**became (3)** 73:9,12;
93:21
**become (2)** 73:7;93:19
**beginning (1)** 79:17
**begins (2)** 4:8;53:16
**behalf (2)** 4:24;5:2
**belief (2)** 81:1,6
**belongs (1)** 61:20
**best (1)** 69:1
**better (4)** 17:9;23:14;
30:9;91:14
**beyond (2)** 9:24;78:20
**birthday (1)** 93:2
**bit (7)** 5:24;46:13;
54:25;66:5;78:8;87:11;
89:18
**blocks (1)** 40:22
**Bob (4)** 4:17,23;46:23;
90:25
**bodes (1)** 36:19
**Bonacua (4)** 24:10;
69:9;75:18;82:8
**Both (3)** 6:2,14;40:12
**bounds (1)** 51:14
**Brady (6)** 8:20,22;9:1;
10:4,22,23
**branch (1)** 8:5
**brand (3)** 39:9,10;
92:19
**Brandy (90)** 4:10,24;
23:25;24:6,19,20;25:7;
31:8,10,12,17,24;
32:11;33:2,5,9,11;34:7,
12,14;35:7,23,25;36:3,
25;37:2,24;39:5,14;
40:13,25;41:1,11,21;
42:2,8,14,17;43:10,17;
45:10,13;46:18,21,25;
47:3,13;48:10,17;
50:20;56:17;59:12,15;
60:18,22;61:5;62:10;

67:14;69:21;70:2,5,8,
16;72:15;73:4;74:15,
24;75:24;76:13,18;
77:3,11,20;78:6,12,15,
21;80:3,15,21;81:8,16,
20;83:5;90:23;91:1,9,
9,13;92:8
**Brandy's (11)** 31:19;
33:16,21;35:25;37:12,
20;38:20;71:14,15;
74:3;78:25
**Brazil (2)** 9:6,7
**breach (1)** 6:16
**break (2)** 53:18;81:25
**briefly (2)** 10:2;87:23
**bring (1)** 29:13
**Briscoe (7)** 18:13;19:1;
25:5;33:23;38:13;
70:24;71:11
**broached (1)** 65:23
**broad (1)** 59:5
**brought (2)** 18:1;68:8
**Brunswick (1)** 10:12
**Buchman (1)** 4:17
**budgeted (1)** 75:17
**Buenos (1)** 9:7
**bulk (1)** 8:1
**business (31)** 7:22,23;
14:15;15:3,11;19:19;
20:3,4;22:10,14;27:5;
30:4,6;32:6;37:19,21,
22,25;38:4,10,21;
39:22;46:4;66:17;
70:15,15,16;71:4,7,8,
10
**businesses (3)** 17:23;
22:12;68:3
**buy-in (1)** 17:3

**C**

**calendar (1)** 40:21
**California (11)** 7:14;
12:15;17:21;44:2,4,7,
9;69:5,10,18,19
**call (5)** 41:2;93:12,15,
19,22
**called (5)** 8:20;10:13;
22:8;39:13;92:22
**calls (4)** 28:20,25;
76:21;80:17
**came (6)** 24:14;33:13;
65:13;68:24;69:6;76:9
**Can (49)** 11:13;15:24;
23:2;25:21;27:2,18,19;
28:11;29:22;41:5,11,
20;42:1;47:9;48:7;
49:1;50:3;51:15;53:5,
6,22;55:20,23;57:12;
58:13,23,25;59:1,5;
60:8,19;61:8,14;62:1;
63:11,17;72:23;73:24;
81:12,24;84:3;85:5;

67:14;69:21;70:2,5,8,
16;72:15;73:4;74:15,
24;75:24;76:13,18;
77:3,11,20;78:6,12,15,
21;80:3,15,21;81:8,16,
20;83:5;90:23;91:1,9,
9,13;92:8
86:7;87:2,20;88:22;
90:16,21;91:25
**capable (1)** 76:9
**capacity (6)** 10:16;
11:18;66:10,17;69:16;
72:8
**cared (1)** 91:1
**career (5)** 10:5;24:18;
30:7,11;91:4
**Case (1)** 4:13
**cases (4)** 5:25;6:7,17,
20
**centered (1)** 35:25
**centralized (6)** 14:16,
18;15:3,8;16:1,9
**certain (2)** 16:23;23:13
**certified (1)** 4:17
**certify (1)** 62:22
**challenging (1)** 55:1
**change (7)** 16:24;17:1,
5,10;18:1,5;27:7
**charge (2)** 51:13;52:6
**Chastang (1)** 64:23
**C-H-A-S-T-A-N-G (1)**
64:23
**Chastang's (1)** 78:23
**Chris (1)** 87:7
**Cincinnati (1)** 10:7
**circumstances (1)**
52:11
**Cities (1)** 22:11
**City (1)** 9:9
**clear (7)** 47:9,15,15;
48:2;81:18;83:19;93:7
**Clearly (4)** 61:12;
68:17,21;71:4
**close (2)** 46:3;57:25
**closely (1)** 34:21
**clue (1)** 31:13
**Coash (2)** 4:18,18
**college (2)** 9:10;10:4
**commencing (1)** 4:5
**comments (1)** 39:24
**Commission (1)** 59:17
**communications (5)**
49:21;63:5;92:8,11,14
**company (12)** 7:24;
8:20;10:6,24;50:24;
51:6,16;82:10;83:18;
85:20;90:24;92:3
**comparison (1)** 75:6
**competencies (1)** 69:12
**competency (1)** 30:15
**competent (2)** 24:16;
68:2
**complaining (1)** 38:12
**complaint (6)** 42:23;
45:9;46:17;59:16;60:3,
7
**complaints (11)** 16:11,
19;18:16;32:14;33:16;
37:19;42:16;43:16;
86:8,24;88:19

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 439 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

**completely (1)** 14:16
**comprised (1)** 7:23
**concept (1)** 66:12
**concern (5)** 42:24,25;
43:17;68:1,8
**concerned (1)** 21:6
**concerns (8)** 16:11,20;
18:15;30:18;42:16;
86:8,24;88:19
**concurrent (1)** 76:6
**concurrently (1)** 70:13
**conducted (3)** 51:5;
52:20;78:12
**confidentiality (1)** 73:20
**confirmed (1)** 39:16
**confusion (1)** 93:8
**congratulated (1)** 92:23
**connection (8)** 8:13;
51:4,12,23;52:4;58:19;
60:17,22;61:4;62:9;
66:25;71:16;73:11;
78:24;84:24
**consider (1)** 46:2
**considered (3)** 36:8;
37:5;84:10
**considering (1)** 52:1
**consolidated (1)** 17:22
**contained (1)** 63:1
**content (7)** 49:20;50:5;
57:8,25;59:20;61:23;
62:15
**context (1)** 47:24
**continue (1)** 61:25
**continued (1)** 66:8
**contours (1)** 58:12
**contract (1)** 6:16
**conversation (57)**
32:19,20;47:25;50:4,5,
7,18;51:4,8,11,18,22;
52:13;53:6,20;54:7,13;
55:7,12,17,20,22;56:2,
9,14,16,17,21;57:4,11,
17,23;58:1,5,9,17,18,
24;59:9,20;60:10,11,
17,21;61:4,11,16,22,
23;62:9,16;63:16,22;
91:9;92:24;93:18
**conversations (8)** 35:6,
10,14,24;54:15;63:14;
70:8;71:13
**convoluted (1)** 56:1
**copied (1)** 89:15
**copy (1)** 49:5
**Corp (2)** 9:1;10:4
**corporate (5)** 15:9;16:2,
9;49:22;54:16
**Corporation (4)** 8:21,
22;10:10,22
**correctly (1)** 74:10
**correspondence (1)**
89:1
**Counsel (6)** 4:21;
49:23;52:16,20;54:16;

88:25
**couple (2)** 76:7;89:21
**coupled (1)** 70:12
**Court (4)** 4:12,16;5:4;
6:10
**cover (1)** 7:6
**coverage (1)** 68:25
**covered (2)** 20:12,14
**covering (1)** 10:18
**covers (1)** 7:12
**create (1)** 30:6
**criticism (2)** 45:9;46:18
**culture (1)** 27:7
**Curran (1)** 11:12
**C-U-R-R-A-N (1)** 11:14
**current (2)** 20:3;59:10
**currently (5)** 6:23;
83:25;87:5
**curt (1)** 90:3
**customer-related (1)**
6:2
**customers (1)** 20:3
**cut (1)** 8:24

## D

**Dakotas (1)** 7:13
**dangerously (1)** 57:25
**date (4)** 4:15;28:6,9;
77:14
**Davis (1)** 11:4,7
**day (3)** 4:2;34:25;89:7
**days (2)** 38:2;89:8
**day-to-day (1)** 15:1
**DC (1)** 89:7
**Decentralized (1)** 14:22
**decide (2)** 22:24;23:4
**decided (1)** 74:15
**decision (20)** 64:12,17,
24;65:6;66:17,25;
67:11,14,20;68:9,13;
70:1;74:2,6,11,22,23;
80:7;12;84:18
**decisions (2)** 81:1,2
**degree (8)** 9:16,20;
17:6;21:10;27:9;38:19,
22;48:3
**delay (1)** 75:14
**demanding (1)** 65:22
**demonstrated (3)**
69:16;71:4;72:8
**department (22)** 12:25;
13:3,6,9,17,19;14:5,23,
25;20:6,11,12;7;33:17;
38:17;40:8,8;50:14;
51:19;52:1;54:2;77:3;
91:18
**departments (1)** 13:25
**dependent (1)** 75:22
**DEPOSITION (11)** 4:1,
9,19;5:16,61:24;88:24;
89:4,11;90:15,18,19
**depositions (1)** 6:1

**describe (2)** 41:20;42:1
**description (8)** 25:18,
25;26:4,6,24;27:23;
28:17;29:4
**descriptive (1)** 89:18
**design (8)** 15:15;21:2,
5,8;22:2;23:11;31:24;
72:12
**designed (4)** 15:10;
27:4;65:20;75:9
**desire (5)** 69:23;75:1;
76:10;90:5;91:15
**details (1)** 86:13
**determination (1)** 78:24
**determine (1)** 54:13
**determined (1)** 36:3
**determining (1)** 35:17
**develop (1)** 32:8
**developing (1)** 26:23
**development (7)** 15:14;
27:8;29:16;30:5,7;
31:25;32:2
**developmental (1)** 27:6
**die (1)** 8:24
**Diego (2)** 44:13;45:23
**differ (1)** 14:23
**different (2)** 20:15,22
**differently (2)** 16:25;
18:9
**difficult (3)** 40:16;42:2,
12
**direct (4)** 34:11;70:22,
25;77:7
**directed (1)** 51:25
**direction (4)** 31:16;
49:25;52:16;75:25
**directly (11)** 11:19,21;
12:10,15;13:9,11;25:8;
33:7;42:4,14,25
**director (9)** 9:2;11:24;
13:12;25:15;34:3;
38:24;85:13;86:2,3
**directors (1)** 27:1
**Disabilities (2)** 81:10,22
**discussed (3)** 43:9;
59:22;90:15
**discussion (8)** 52:14;
59:21;60:24;61:22;
72:1;78:20;79:8,9
**discussions (9)** 18:7;
29:8,12;32:17;33:1;
35:22;37:11;52:24;
68:15
**dissatisfaction (2)**
38:19,22
**District (4)** 4:12,13;
38:25;39:15
**division (1)** 10:12
**divisions (1)** 14:1
**document (18)** 26:19;
27:14,21,22;32:10,13;
49:11,12,14;54:9;55:8,
13;60:4;64:1,9;89:24;

90:20;91:11
**documents (7)** 73:10;
89:10,14;90:8,12,14,17
**dog (1)** 92:20
**done (4)** 8:13;13:21;
49:25;61:16
**down (4)** 28:4,8;61:25;
65:8
**draft (1)** 49:13
**drafts (1)** 64:4
**due (1)** 83:19
**duly (1)** 5:8
**during (8)** 35:14;40:18;
66:7;72:1;78:6;81:15,
20;91:8
**duties (2)** 68:6;88:13

## E

**earlier (1)** 93:11
**early (1)** 6:3
**educate (1)** 30:9
**education (1)** 9:24
**EEOC (3)** 52:6;60:3,6
**effective (1)** 28:6
**eight (2)** 11:20;89:8
**either (1)** 38:1
**electrical (1)** 10:14
**electronic (1)** 10:14
**element (1)** 69:6
**eliciting (3)** 58:10,22;
59:4
**eliminate (5)** 64:13,24;
70:3;78:3,25
**eliminated (8)** 23:17,
18;35:21;68:10;71:23;
74:12,23;82:18
**eliminating (1)** 79:5
**elimination (2)** 68:19;
77:24
**eliminations (1)** 78:14
**Ellison (4)** 24:7;69:8;
83:8;87:12
**else (8)** 8:12;24:9;
33:25;42:22;43:2;
64:17;72:22;86:7
**email (1)** 90:1
**emails (4)** 89:19,20,21,
25
**embrace (1)** 69:17
**emphasis (1)** 9:19
**emphatically (1)** 80:25
**employed (1)** 6:23
**employee (3)** 15:5;
80:1;90:24
**employees (1)** 30:8
**Employment (3)** 59:17;
74:3;91:4
**empowering (1)** 81:1
**encompass (2)** 7:9;
19:21
**encompasses (1)** 8:2
**end (1)** 48:6

**ends (1)** 53:12
**English (1)** 9:21
**enhance (2)** 30:7;32:8
**enhancement (1)** 29:15
**enough (3)** 53:2;55:9;
91:24
**entire (1)** 75:17
**entitled (3)** 52:23;58:3,
18
**environment (1)** 78:15
**Equal (1)** 59:17
**equation (1)** 15:13
**ERIC (4)** 4:1,9;5:6,15
**establish (1)** 68:17
**established (2)** 63:15;
68:21
**et (1)** 4:11
**evaluating (1)** 71:22
**evaluation (1)** 27:10
**even (7)** 46:2;52:25;
58:16;63:15;89:17,22,
23
**exactly (1)** 40:13
**EXAMINATION (2)**
5:10;93:9
**example (5)** 39:21;
41:11,16,20;42:1
**examples (2)** 41:5,9
**exceeding (1)** 72:7
**exceedingly (2)** 72:13;
78:16
**exception (1)** 22:11
**exceptional (1)** 72:8
**Excuse (5)** 17:18;31:2;
38:25
**executing (1)** 70:11
**execution (2)** 13:22;
65:19
**exempt (1)** 27:12
**Exhibit (10)** 27:15;
48:20,21,24;53:19;
54:10;55:14;63:1;64:1,
10
**expectations (3)** 71:5,6;
72:7
**expected (1)** 29:18
**experience (1)** 69:19
**experienced (2)** 42:8,
11
**explain (1)** 75:16
**explained (2)** 65:17;
78:2
**express (4)** 18:15,21;
32:22;88:18
**expressed (10)** 40:5;
70:7,8;75:1,2;76:10;
78:7;90:5;91:10;92:6
**expressing (4)** 40:10;
42:16,23;69:23
**expressions (1)** 43:17
**extend (1)** 88:13
**extent (10)** 27:9;32:5;
50:4;51:10;55:18;

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

62:14;63:4;71:21;
90:13;92:25
**external** (1) 83:18
**extreme** (1) 48:6

**F**

**facilitated** (1) 76:13
**facilities** (1) 19:5
**facility** (2) 7:25;8:25
**fact** (11) 54:14;66:9;
68:17,22;71:3;73:7;
74:25;76:8;80:23;
90:11;93:1
**factors** (2) 68:13;70:2
**failing** (2) 72:17,19
**fair** (3) 34:19;55:2,9
**fall** (3) 16:4;52:6;75:20
**familiar** (2) 20:5,7
**family** (1) 78:11
**far** (4) 15:24;43:14;
48:6;57:3
**fashion** (2) 15:1;68:4
**Fe** (3) 12:24;31:5;
45:20
**February** (4) 13:23;
14:6,19;65:11
**Federal** (1) 6:9
**feedback** (19) 26:25;
29:17,21;30:2;32:19;
34:4,5;37:17,18;40:16;
42:5;45:15;66:9;69:14;
70:10,12,22;73:1;
84:21
**feel** (1) 93:3
**feels** (1) 66:15
**fell** (1) 16:6
**felt** (10) 17:5;23:12,12;
27:3;31:12;65:14;
66:13;75:21;79:21;
81:4
**field** (6) 14:7,8,13;
15:11;27:6,11
**Fifth** (1) 4:3
**figure** (3) 47:23;66:6;
89:23
**filed** (3) 4:11;59:16;
60:6
**filing** (1) 59:18
**fill** (1) 91:17
**finalized** (1) 26:18
**find** (4) 46:11,12;91:13,
25
**Fine** (6) 48:3,3,19;
53:9;59:1;93:1
**first** (10) 5:8;27:17;
48:23;49:12;63:25;
65:13;68:16;73:10,12;
89:23
**fit** (8) 36:3,7,9,9,13,17,
19;91:13
**five** (2) 66:7;87:14
**five-minute** (1) 81:25

**focus** (3) 9:21;19:14;
27:6
**Focusing** (1) 19:15
**follows** (3) 5:9;46:15;
62:6
**force** (6) 66:12;68:18;
82:18;83:20;84:7;
91:23
**foremost** (1) 68:16
**Form** (38) 16:16;17:13;
18:3,17;19:11;20:13,
24;25:20;27:21;30:23;
35:11;36:14;37:15;
40:1;41:7;42:18;43:20;
46:8,22;47:7,21;48:14;
56:10;58:7;59:4;61:6;
65:2;67:3,16,25;68:11;
71:24;74:4,17;84:25;
86:11,17;87:1
**formal** (1) 9:24
**formerly** (4) 15:18;
16:14,21;18:23
**found** (1) 41:2
**Foundation** (16) 15:24;
21:24;26:8;28:20;
33:22;37:7;39:6;41:14,
22;54:25;82:16,25;
83:12,22;84:14;85:22
**four** (3) 48:23;66:7;
70:2
**Fourth** (1) 69:11
**frame** (1) 81:19
**frequently** (5) 19:1,2,7;
35:2,3
**Friday** (1) 64:3
**frustrating** (1) 38:4
**frustration** (4) 31:7;
40:5;70:9;75:2
**fulfill** (2) 36:22;76:1
**fully** (2) 51:14;58:12
**function** (5) 15:4,5;
16:2,10;39:20
**functional** (1) 16:7
**functions** (2) 15:6;
16:23
**further** (7) 32:2,7;60:2;
62:18;75:24;78:19;
93:23
**future** (1) 36:20

**G**

**game** (1) 90:22
**garments** (1) 7:25
**Gary** (4) 39:3;43:4;
45:8;46:16
**gathered** (1) 52:17
**gathering** (1) 51:23
**gave** (1) 21:13
**GC** (1) 90:12
**General** (29) 7:20,21;
8:6;11:23;12:1,2,14;
15:12;17:1,19;19:20;

25:3;31:4;32:6,18;
38:3,14,24;39:14,21;
40:4,4;41:17;42:6;
70:13;79:5;85:12;
88:25;92:17
**generalist** (46) 15:2;
16:22;21:23;22:7;
23:11,14;24:6;25:19;
26:1,4,24;27:3,25;28:3,
17;29:4,10,14;32:24;
33:3,6;34:8,15;35:19;
36:4;37:1,5;44:6;
64:13,25;65:15,19;
66:10,18,22;67:2;68:5;
70:6;76:1;79:6;81:16;
82:19;87:5,9,16;88:6
**generalists** (24) 15:7,
10;21:1,2,14,16,19;
22:5,17,21,24;23:5,19,
24;29:19;30:21;65:9,
21;67:21;68:3;75:9;
79:18;83:25;88:3
**gentleman** (4) 12:8,20;
18:12;87:7
**geographic** (7) 7:22;
8:2,3;20:9,12;46:3;
68:25
**Geographically** (2)
7:10;75:7
**Georgia** (1) 10:17
**gets** (3) 57:24;58:1;
72:25
**Gingrich** (1) 89:9
**given** (2) 5:16,25
**goal** (1) 30:12
**goals** (1) 29:14
**goes** (5) 55:19;59:19,
21;63:4;76:8
**Good** (5) 5:12;28:13;
36:3,8,13,19;63:8;
66:16;78:9;91:20
**good-bye** (1) 91:24
**graduate** (1) 9:14
**graduated** (1) 10:3
**Grazyk** (2) 12:21;31:4
**G-R-A-Z-Y-K** (1) 12:21
**great** (2) 91:21;92:2
**greater** (2) 17:6;32:5
**guess** (1) 92:25
**guidance** (5) 14:9,11,
12,17;75:25

**H**

**half** (3) 7:5;11:17;
83:14
**Hammond** (1) 77:7
**hand** (1) 48:20
**handle** (3) 69:3,5;75:6
**handled** (1) 78:16
**happen** (2) 36:20;
63:23
**happened** (2) 76:7;

83:3
**happy** (1) 70:17
**hard** (1) 52:12
**hate** (1) 79:22
**head** (2) 38:17;77:8
**headquarter** (1) 10:9
**headquarters** (1) 15:9
**heads** (1) 89:16
**health** (3) 73:4,8,17
**health-related** (1) 73:21
**hear** (6) 16:11;23:2;
30:18;45:9;46:17;73:1;
85:9
**heard** (3) 16:20;33:16;
45:15
**hearing** (1) 37:19
**Heinz** (1) 10:6
**held** (3) 7:18;8:16;10:3
**help** (3) 14:9;30:4;
37:24
**here's** (1) 91:12
**Herrick** (1) 4:16
**her's** (1) 78:5
**herself** (2) 78:12,16
**high** (3) 38:19,22;69:13
**highly** (1) 24:16
**hired** (1) 87:11
**hiring** (1) 24:11
**HJ** (1) 10:6
**hold** (1) 11:25
**home** (1) 91:13
**hour** (1) 46:1
**hour-and-a-half** (1)
89:2
**HR** (71) 13:18;14:7,23,
25;15:2,11,18;16:14,
22;18:23;20:10;21:1,2,
7,23;22:5,6,7,17,21,24;
23:5,11,19,24;24:16,
24;25:1,19;26:1,4,24;
27:3,25;28:3,17;29:4,
10,14,19;30:21;32:23;
33:3,6,17;34:8,14;
35:16;36:4;37:1,5,6;
51:19;52:1;54:1;64:13,
25;66:2,22;67:1,21;
70:6;75:9;79:5,18;
81:16;83:25;87:5,9,16;
88:6
**HRR** (4) 22:8,9,12,13
**human** (14) 13:2,5,9,
12,17;14:5;20:6;24:14;
25:15;34:3;50:14;
85:13;86:2,3

**I**

**Ian** (1) 11:4
**idea** (3) 48:12;91:20,20
**identification** (2) 8:23,
25
**identify** (3) 4:21;32:1;
40:21

**imagining** (1) 52:13
**immediate** (3) 10:25;
11:8,10
**important** (2) 30:3;
46:12
**improperly** (1) 58:10
**improve** (1) 30:15
**Inc** (2) 4:11;5:3
**incapable** (1) 31:17
**incident** (1) 39:8
**incidents** (1) 6:2
**included** (1) 44:11
**incorrect** (1) 74:19
**independent** (1) 67:8
**indicate** (3) 60:20;61:3;
62:8
**indicated** (2) 37:10;
62:19
**Indicating** (1) 28:12
**individual** (5) 12:9;
16:7;30:6;31:25;32:4
**individuals** (3) 23:13;
42:15;69:7;77:10
**industrial** (2) 8:23;
10:14
**inform** (1) 41:3
**information** (7) 49:17;
51:23;52:17;53:3;
62:25;63:1;71:2
**informed** (2) 53:7;64:19
**in-house** (2) 52:19,21
**initially** (2) 36:2;66:21
**initiate** (2) 56:14,15
**initiated** (2) 56:16,20
**innocuous** (1) 89:15
**input** (7) 23:8,10;49:16;
64:9;78:23;80:6,11
**inquired** (1) 65:16
**inquiry** (2) 54:12;57:3
**insight** (1) 14:8
**instance** (1) 74:1
**instruct** (3) 49:19;
62:12,18
**instructing** (3) 54:19,21;
60:1
**interaction** (1) 34:12
**interest** (4) 76:11;91:3,
10;92:6
**interested** (1) 31:15
**interface** (2) 38:18;77:9
**interfaced** (1) 38:15
**interject** (1) 90:7
**international** (1) 9:19
**interpretation** (1) 48:4
**interview** (1) 24:13
**interviewed** (2) 24:17,
19
**intimacy** (1) 17:6
**into** (27) 16:6;35:19;
47:24;48:5;49:16;
55:19;57:3,8;58:1,8;
59:21;61:22;62:15;
63:4;64:9;65:10;68:13;

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH    Document 76-1    Filed 10/26/16    Page 441 of 505

Eric McNaul
May 12, 2016

69:25;76:8,12,14,15;
80:7,12;90:7,10;91:10
**introduced (1)** 21:23
**investigation (6)** 49:24,
25;51:5,12;52:5;67:8
**invited (1)** 93:3
**involved (7)** 44:2,4;
64:12,17;67:13,19;
84:18
**involvement (2)** 67:23;
70:14
**issued (1)** 26:6
**issues (4)** 73:22;84:6,
12;85:7
**Iverson (1)** 87:7

## J

**Jacob (7)** 33:23;34:2;
38:13;43:4;71:11,12;
72:21
**Jake (10)** 18:12;19:1;
25:5;40:6,10,13;41:16;
45:8;46:16;70:24
**Janelle (12)** 24:10,17;
69:9,18;71:19;72:11;
75:18;82:8;83:19;84:5;
85:16;92:12
**Janelle's (6)** 76:2;
84:23;86:8,15,25;
88:19
**Jersey (1)** 10:13
**job (23)** 7:1;9:4;11:5;
16:25;18:8;25:18,25;
26:3,6,23;27:23;28:17;
29:3;39:20;65:20;72:7,
8,18;75:3;77:12;80:8;
83:18;88:13
**jobs (1)** 10:3
**Julie (4)** 85:13,24;86:1,
4
**June (7)** 65:4;66:14;
74:10,22,24;75:14;
76:4
**juxtapose (1)** 81:5

## K

**Kaela (11)** 24:7,13;
69:7,13;71:19;72:6;
83:8;87:12;92:14,19,
25
**keep (4)** 80:15,20;
90:23;91:22
**Kelly (1)** 4:16
**key (1)** 20:2
**kind (1)** 29:21
**knew (4)** 65:24;68:22;
76:3;79:14
**Knowing (3)** 23:11;
70:9;75:18
**knowledge (3)** 34:7;
60:9;80:10

**known (2)** 20:8;33:11
**knows (2)** 63:18;92:20
**Kristin (1)** 5:1
**Kroeger (1)** 10:9
**K's (1)** 54:15

## L

**lack (8)** 17:9;36:1;38:3;
39:21;40:4;41:3;70:14;
71:4
**laid (2)** 83:19;84:5
**language (1)** 9:21
**Last (8)** 9:2;11:13;62:2,
3;64:2,2,22;91:22
**Lastly (1)** 69:21
**late (4)** 74:5;75:10,20;
77:13
**later (2)** 38:2;93:18
**Latin (1)** 9:2
**law (2)** 73:23,25
**lawsuit (9)** 5:22;58:25;
59:12,18;60:18,23;
61:5;62:10;73:11
**lawyer (1)** 51:20
**lay (1)** 54:24
**learned (1)** 60:11
**least (2)** 36:2;75:5
**leave (6)** 75:20,23;
82:10,14;83:10,16
**Left (12)** 10:11,21;
50:24;75:15;83:6;
87:12;89:6;92:9,12,15;
93:13,14
**Lehrer (3)** 39:3,5,24
**Leonard (2)** 4:3;5:2
**lesser (1)** 27:9
**level (1)** 30:17
**leverage (1)** 32:4
**liked (1)** 91:1
**likely (1)** 51:22
**limbo (1)** 75:15
**line (1)** 54:12
**lines (1)** 79:10
**literacy (1)** 48:4
**literal (2)** 47:24;48:4
**literally (1)** 41:3
**litigation (9)** 58:2,19;
59:6,10,24;62:21;
93:16,20,21
**little (10)** 5:24;46:13;
54:24;56:1;66:5;78:7;
81:18;87:10;89:18;
93:3
**local (7)** 14:15;15:12;
16:4;25:3;27:5;37:19;
38:4
**located (7)** 8:6,9,12;
9:4;12:2,12,22
**location (3)** 19:10;
22:14;38:9
**locations (19)** 12:3;
16:8;19:22;22:18;

43:19,22,25;44:8,20;
45:6,11,12,17,18;46:6,
19,20;47:19;48:9
**long (11)** 6:12;7:3,15;
11:7,16,26:13;33:11;
51:1;55:9;79:24;87:8
**longer (2)** 83:9;87:11
**long-term (1)** 91:4
**long-time (1)** 80:1
**look (9)** 14:10;27:19;
28:8;48:22;71:15,17,
18;89:10,13
**looked (6)** 54:9;69:11;
89:14,21;90:12,17
**looking (2)** 30:3;35:16
**Los (3)** 31:5;44:11;
45:19
**loved (1)** 17:5
**lovely (1)** 89:8
**lover (1)** 92:20

## M

**making (1)** 66:25
**Malloy (1)** 12:8
**manage (3)** 17:8,15;
18:5
**management (4)** 9:20;
27:10;38:5;40:6
**manager (21)** 7:20,21;
8:7;10:20;11:23;12:1;
17:19;25:3;31:4;32:7;
38:14,24;39:1,14,15;
42:6;64:18;70:14,23,
25;85:12
**managers (28)** 12:2,14;
14:15;15:12;16:4,7,12;
17:4,11,24;19:20,22;
27:5;29:8,17,23,24,25;
30:19;32:7,18,21;
38:16;43:18;45:5;48:8;
81:2;88:17
**managing (2)** 9:2;66:2
**Manaus (1)** 9:6
**manner (3)** 36:23;
58:15;78:13
**many (10)** 5:19;11:19;
12:17;17:11,17,24;
30:13;79:13;83:25;
87:13
**March (1)** 65:11
**Marietta (1)** 10:17
**marked (3)** 27:14;
48:21;49:7
**market (2)** 10:17;69:3
**Marketing (2)** 9:19,20
**maternity (2)** 75:20,23
**mats (1)** 8:1
**matter (1)** 4:10
**May (10)** 4:2,15;28:6;
45:24;49:21;51:13;
65:12,14,14;72:24
**maybe (4)** 33:12;80:1;

87:10,10
**Mayish (1)** 65:12
**McNAUL (11)** 4:1;9:5;6,
15,17;51:13;53:5,18;
54:19;59:23;61:19
**mean (9)** 7:8;18:6;
31:10;43:24;44:3;50:2;
90:9,11,13
**means (1)** 38:9
**meet (2)** 20:1,3
**meeting (8)** 39:12,16,
18,25;71:5;77:21;
78:18;89:2
**meetings (1)** 40:17
**member (1)** 81:3
**members (8)** 17:8;
27:11;30:16;32:1;
69:15;73:20;80:25;
91:5
**memorialize (1)** 32:20
**mentioned (1)** 53:20
**met (10)** 45:12;46:21,
25;47:2,12,19;48:10,
17;88:25;90:12
**Mexico (1)** 9:8
**Miami (2)** 9:13,24
**Michael (1)** 77:7
**mid (3)** 13:15;65:4,4
**might (1)** 91:12
**Mike (1)** 12:8
**MILLS (107)** 4:23,23,
23;5:11;16:3,18;17:16;
18:10,20;19:13;20:18;
21:3;22:3;25:23;26:10;
28:22;29:2;30:25;
33:24;34:6,18;35:12;
36:10,24;37:9;38:7;
39:23;40:9;41:10,19,
25;42:7,21;43:23;
46:11,15;47:1,10;48:1,
18;49:6,9;50:8;51:17;
52:9,19,25;53:8,17,25;
54:21;55:3,5,11;56:7,
13,24;57:7,14,22;58:3,
14,16,23;59:8;60:3,5,
13,16,25;61:8,12;62:1,
11,22,24;63:19;65:5;
67:6,18;68:7;70:4;
72:3;74:8,20;76:24;
81:7,14,24;82:7,20;
83:2,15,24;84:17;85:2,
25;86:14,20;87:4,22;
88:12;90:9,16;92:7;
93:4,24
**Milwaukee (2)** 8:21;9:5
**mind (1)** 91:22
**minimal (1)** 77:23
**Minimally (1)** 84:20
**Minimum (2)** 19:2,8
**Minneapolis (2)** 4:4,19
**Minnesota (8)** 4:4,20;
6:7;7:12;8:8,11;69:3,8
**Minnetonka (1)** 15:8

**minutes (2)** 63:8;78:19
**Mischaracterizes (4)**
36:6;46:9;48:15;74:18
**miserably (2)** 72:17,20
**missed (1)** 39:25
**missing (1)** 40:17
**monitor (3)** 4:7;53:11,
15
**Montana (1)** 7:13
**months (2)** 11:9;39:10;
65:10;87:10
**more (24)** 15:6,14,14;
19:3;29:22;30:10;
32:18;53:6;59:5;61:21;
62:16;65:21;66:5,10;
72:9;78:10;79:9;81:18;
84:20;86:2;87:15,21;
88:6;89:18
**most (4)** 10:9;51:22;
67:4;68:2
**much (4)** 73:1;79:22;
89:5;91:1
**multiple (1)** 44:19
**multitude (2)** 72:15;
85:6
**mundane (2)** 15:2,6
**Murdock (14)** 50:12,13;
53:24;54:1;56:3,9,15,
16;59:9;60:14;61:2;
62:7;63:23;93:12
**myself (1)** 47:15

## N

**name (9)** 4:16;5:14;
11:4,13;12:8,20;53:21;
64:22;87:7
**named (1)** 18:12
**names (1)** 42:22
**national (1)** 10:20
**nature (4)** 16:19;29:12;
35:9;55:19
**neat (1)** 91:20
**necessarily (1)** 28:2
**need (11)** 42:14;48:5;
54:24;63:8;65:17;
66:15;68:16;90:7,10;
91:17;92:4
**needed (7)** 14:13;
21:19;27:4;30:14;
66:19;68:22;74:23
**needs (8)** 32:1;37:21;
38:21;39:22;70:16;
71:4,8,10
**negative (1)** 73:1
**New (7)** 10:12,13;
14:10;39:9,10;92:19,
23
**Newt (1)** 89:9
**next (3)** 66:7;69:6;89:6
**nice (3)** 83:18;91:2;
92:24
**Nine (4)** 6:13,14;11:20,

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 442 of 505

Eric McNaul
May 12, 2016

20
**Nobody (1)** 42:25
**non-attorney (3)** 52:18;
58:11;61:20
**None (2)** 9:23;18:5
**non-exempt (1)** 27:12
**nor (4)** 41:2,2;86:18;
89:16
**Northwest (14)** 20:5,7,
8;21:16;22:25;23:6,25;
64:15,25;82:21;84:1;
87:6;88:3,15
**notably (1)** 10:9
**noted (1)** 40:15
**Number (9)** 4:9,13;
17:14;22:18;53:12,16,
19;54:10;55:14
**numbered (2)** 49:5,7

---

**O**

**Object (21)** 19:11;
21:24;30:23;33:22;
35:11;37:7,15;39:6;
48:14;51:10;54:11;
55:18;57:20;58:6;61:6,
6;63:3;65:2;86:11,17;
87:1
**objecting (2)** 58:7;61:9
**Objection (55)** 15:23;
16:16;17:13;18:3,17;
20:13,24;25:20;26:7;
28:19,25;34:1,17;36:5,
14;40:1;41:7,13,22;
42:18;43:20;46:8,22;
47:7,21;49:18;53:7;
54:17;56:10,22;57:2;
59:19;60:15;61:18,19;
67:3,16,25;68:11;
71:24;74:4,17;76:21;
80:17;81:11;82:15,24;
83:11,21;84:13,25;
85:21;87:19;88:8;
92:18
**objections (1)** 42:3
**observational (1)** 34:4
**observe (2)** 33:5;86:15
**occasion (2)** 9:7,8
**occasions (1)** 9:6
**occurred (1)** 13:23
**occurring (1)** 58:5
**off (7)** 53:4,10;60:24;
82:1;83:19;84:5;93:25
**offered (1)** 76:18
**office (6)** 16:2;34:23,
24;35:1,5;40:8
**official (1)** 13:19
**Ohio (1)** 10:7
**once (5)** 19:2,8,25;
67:11;68:21
**one (33)** 11:23,24,24;
17:18;21:15;22:9,12,
13;30:24;39:7,20;

43:11;45:15;48:23;
49:6;54:23,23;62:3;
67:20;68:9,23;69:2;
71:22;73:18;79:9,12;
81:6;84:2,3;87:16;
88:6;89:21;90:1,3,21
**one-on-one (1)** 32:17
**ones (1)** 18:4
**only (13)** 8:4,17;12:9;
22:12;30:24;42:5;
43:11,21,24;51:15;
72:21;85:5;90:20
**onset (1)** 24:17
**Ontario (2)** 44:15;45:17
**open-answered (1)**
58:10
**open-ended (1)** 58:22
**operation (2)** 17:22;
24:25
**operations (4)** 11:6;
13:1;69:4,5
**opinion (2)** 21:10;78:16
**opportunities (3)** 30:8;
32:2,3
**opportunity (11)** 21:13;
44:5;59:17;76:13;
78:10;86:19;91:5,12;
92:1,2,5
**opposed (1)** 14:15
**order (1)** 30:14
**organization (8)** 14:8;
16:24;21:7;30:16,17;
38:16;52:15;72:12
**organizational (1)** 22:2
**originally (1)** 66:11
**others (4)** 17:9;34:10,
15;72:24
**ourselves (1)** 73:19
**out (16)** 8:21;10:12;
19:4;35:4;37:23;40:16,
24;42:14;43:11;47:24;
54:13;66:6;75:23;76:6;
81:5;89:23
**over (3)** 24:14;77:5;
86:4
**overall (3)** 30:15;40:5;
69:12
**overcapacity (5)** 65:18;
66:18;68:18;75:3;
79:22
**overrepresentation (1)**
21:11
**overstaffed (3)** 65:15;
67:9;79:21
**own (1)** 67:8
**ownership (1)** 7:23

---

**P**

**pages (1)** 48:23
**painful (1)** 91:24
**PARKER (100)** 5:1,1;
15:23;16:16;17:13;

18:3,17;19:11;20:13,
24;21:24;25:20;26:7;
28:19,25;30:23;33:22;
34:1,17;35:11;36:5,14;
37:7,15;39:6;40:1;
41:7,13,22;42:3,18;
43:20;46:8,22;47:7,21;
48:14;49:4,18;50:3;
51:9;21;52:12,22;53:4,
22;54:11;55:2,4,9,18,
25;56:10,22;57:2,12,
20,24;58:6,15;59:3,
19;60:8,15;61:6,9,14;
62:14;63:3,10;65:2;
67:3,16,25;68:11;
71:24;74:4,17;76:21;
80:17;81:11;82:15,24;
83:11,21;84:13,25;
85:21;86:11,17;87:1,
19;88:8;90:6,11;92:18;
93:6,10,23
**part (4)** 22:1;39:19;
53:23;67:5
**particular (7)** 38:11,13,
24;39:4,8;67:15;90:1
**particularly (1)** 90:2
**partner (2)** 30:4;32:6
**partners (2)** 15:11,11
**partnership (2)** 27:5;
37:25
**party (2)** 5:22;93:2
**past (1)** 87:18
**path (1)** 65:8
**pattern (1)** 41:17
**Paul (3)** 8:8,11;24:15
**Paulo (1)** 9:5
**payroll (1)** 15:4
**peers (1)** 75:7
**Pelham (6)** 64:20;
78:23;79:11,14,17,24
**people (17)** 11:19,21;
13:8;14:13;15:13,13;
27:8;29:15;30:5,13,15;
32:8;37:22;38:8;40:21;
69:12;91:25
**perceived (1)** 78:7
**percent (2)** 17:2;35:4
**perform (2)** 19:19;75:8
**performance (25)**
27:10;29:15;33:2,8,17,
21;34:5,8,14;36:1;
37:13;38:20;69:14;
71:5,6,14,15;72:2;
73:2;80:4;84:23;86:9,
16,25;88:20
**performance-related (3)**
84:6,11;85:7
**performed (5)** 15:18;
16:14;18:23;72:11;
91:16
**performing (3)** 15:22;
69:20;72:6
**perhaps (1)** 75:24

**period (3)** 74:10;76:15;
81:15
**Permacel (2)** 10:13,21
**permanent (1)** 76:18
**permit (1)** 59:6
**permitted (1)** 62:16
**person (8)** 51:25;53:1;
68:23;69:2,4;70:3;
74:24;91:2
**personal (2)** 34:7,11
**personally (3)** 42:8,11;
86:15
**personnel (1)** 27:13
**perspective (2)** 14:9;
66:3
**pertains (1)** 73:21
**Perusing (3)** 27:20;
49:3,8
**Pfieffer (2)** 85:13,24
**P-F-I-E-F-F-E-R (1)**
85:14
**Pfieffer's (1)** 86:1
**Phoenix (16)** 12:12;
18:13;19:4,9,17;24:24;
25:4;38:9,10;42:15,23;
44:1,22;46:2;69:4,21
**picture (1)** 92:21
**pieces (2)** 8:24;63:12
**Pittsburgh (1)** 17:21
**place (3)** 4:19;81:5;
89:4
**Plaintiff (1)** 4:24
**plan (2)** 13:22;90:22
**Pland (2)** 12:20;85:12
**P-L-A-N-D (1)** 12:21
**planning (1)** 27:8
**plans (3)** 27:7;30:7;
31:25
**plant (1)** 29:8
**play (3)** 14:4;24:11;
26:23
**pleasant (1)** 78:15
**please (7)** 4:21;5:5;
11:13;25:22;47:11;
55:24;90:25
**pm (5)** 4:5,8;53:12,16;
82:2,6
**point (7)** 10:21,23;59:3;
72:25;77:11;93:13,14
**portion (1)** 49:13
**position (34)** 9:2;12:1;
21:22;23:12;24:12;
31:8;36:12,23;37:1;
64:13,25;66:22;67:15;
68:19;70:18,21;72:13;
74:12,22;75:2,4,6,17;
76:8,19;77:23;78:4,5,
14,25;79:6;82:19,23;
91:7
**positions (4)** 7:18;8:16;
23:18;35:21
**positive (1)** 69:14
**possible (2)** 28:16,23

**post-discussion (1)**
35:23
**postgraduate (1)** 9:22
**Post-restructure (1)**
21:25
**Post-restructuring (1)**
43:13
**post-transformation (1)**
35:24
**potentially (5)** 29:13;
35:18,20;90:23;91:17
**preceding (1)** 60:9
**pregnant (1)** 75:19
**preliminary (1)** 13:21
**preparation (4)** 63:17;
64:9;89:10;90:17
**prepare (2)** 30:9;88:23
**prepared (1)** 28:14
**Prescott (1)** 45:1
**present (2)** 77:16,17
**presented (1)** 89:17
**president (7)** 7:2,4;
8:10;11:6,18;19:18;
91:3
**pretty (1)** 89:5
**previous (1)** 69:18
**previously (6)** 31:23;
40:15;65:16;72:5,16;
86:5
**pride (1)** 73:19
**primarily (3)** 35:24;
38:15;89:3
**primary (1)** 80:24
**prior (17)** 11:10;14:18;
22:4;24:20;25:1,7;
28:18;29:4;33:15,19;
36:6;46:9;48:15;59:18;
63:16,23;74:18
**privilege (13)** 51:14,15;
52:7,10;54:14,18;55:1,
3,6;57:5;58:13;59:2;
61:20
**privileged (8)** 49:21;
52:14;58:9;60:1;61:11,
15;63:5,14
**privileges (1)** 52:8
**privy (2)** 40:2;85:8
**Probably (10)** 33:12;
63:8;65:4,9,12;79:10,
14;80:22;83:13;87:10
**problems (3)** 73:5,8,17
**process (6)** 26:17,21;
35:15,16;65:7;67:24
**processing (2)** 7:25;8:4
**product (5)** 52:8;54:18;
57:5;59:25;61:11
**production (1)** 7:24
**products (2)** 8:1,1
**professional (1)** 78:13
**professionally (1)** 78:17
**profound (1)** 91:3
**progression (1)** 30:11
**promote (1)** 30:12

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 443 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

**promotion (2)** 37:6;
83:18
**proper (1)** 54:17
**proposed (3)** 21:15,18;
66:21
**prospects (1)** 20:2
**provide (10)** 14:8,9,11,
14;34:4;49:16;66:8;
68:4;85:15;92:1
**provided (8)** 14:12,17;
17:6;44:5;63:2,12;
70:23;71:2
**providing (5)** 26:25;
31:16,17;70:11;91:4
**prudent (1)** 66:16
**public (1)** 60:4
**puppy (5)** 92:20,21,24,
25;93:2
**purports (1)** 27:22
**purpose (4)** 19:9,17;
57:4;93:22
**purposes (1)** 52:5

## Q

**qualified (1)** 75:5
**quarter (3)** 19:8,25;
75:21
**quarterly (1)** 19:19

## R

**Rachael (39)** 25:13;
34:21;35:6;37:11,13,
18;38:11,18;40:11;
43:1;50:23;64:18;
65:13;66:21;68:14;
70:7,10,25;71:11,13,
21,25;72:19,21;73:14;
76:11;77:19,25;78:2,
17;80:11,14,20;86:4,
21,23;90:4,21;91:6
**Rachael's (1)** 25:14
**rather (2)** 22:4;55:3
**ratings (1)** 69:14
**reach (4)** 37:23;40:16,
24;42:14
**read (9)** 27:16;46:14;
49:1,12;62:1,2,5;63:7,9
**reading (1)** 73:9
**real (1)** 86:19
**really (9)** 31:15;42:13;
46:2;49:11;69:17;
83:17;87:23;91:23;
92:6
**reason (1)** 80:24
**reasons (2)** 72:16;
78:21
**recall (25)** 6:21;13:16;
24:18;27:20;33:13;
43:3,5;50:19;51:1,2;
63:25;72:23,24;77:22;
82:13;83:3,4;84:22;

85:3,6,18;86:7;87:3;
88:22;90:21
**received (3)** 42:5;
84:21;93:12
**recess (2)** 53:13;82:3
**recognize (1)** 30:13
**recommend (2)** 36:15,
25;37:2
**recommended (1)**
36:11
**record (8)** 4:7;5:14;
53:5,11,15;60:24;82:2,
5
**recruiting (12)** 23:15;
35:20;76:9,12,14,15,
18;77:3,9;91:8,10,18
**reduce (2)** 68:22;91:23
**reduction (5)** 66:12;
68:18;82:18;83:20;
84:6
**regard (16)** 6:3;15:4,
12;17:7;18:8;30:5;
34:5;37:20;38:19;40:6;
65:18;66:9;68:25;
71:14;90:22;91:14
**regarding (3)** 35:7;
37:12;56:17
**region (20)** 7:6;8:3;
20:5,7,9,15;21:1,16,20;
23:1,6,25;64:15;65:1;
66:1;82:21;84:1;87:6;
88:4,15
**Regional (7)** 7:2,3;8:9;
11:18;13:12;19:18;
34:23
**regions (6)** 66:20;
87:13,15;88:7,11,14
**relate (1)** 86:23
**related (2)** 6:5;73:21
**relations (1)** 15:5
**relationships (1)** 20:4
**relative (5)** 18:19;21:8;
35:22;66:19;77:23
**relatively (1)** 89:14
**Relevance (3)** 87:19;
88:8;92:18
**relief (1)** 78:8
**relying (2)** 66:24;71:21
**remember (12)** 6:21;
26:20;64:8;65:10;
77:13,25;78:1;82:11;
84:9;86:12;89:25;90:1
**remiss (1)** 93:3
**Reno (1)** 7:14
**repeat (3)** 25:21;55:23;
60:19
**rephrase (3)** 23:3,21;
81:17
**report (2)** 25:2,12
**reported (2)** 13:9,13
**reporter (2)** 4:16;5:5
**reporting (1)** 11:21;
12:14;16:6;25:8

**reports (1)** 12:10
**represent (1)** 4:22
**representation (2)** 66:1;
68:5
**representative (7)** 10:7;
14:7;22:8;24:15,16,24;
37:6
**representatives (5)**
15:19;16:15;18:24;
25:2;35:17
**representing (2)** 4:18;
6:19
**request (3)** 81:9,21,23
**requested (1)** 62:5
**required (2)** 16:25;
68:20
**residing (1)** 69:9
**resistance (1)** 18:6
**resistant (3)** 17:25;
18:5;79:18
**resisted (1)** 17:10
**resources (14)** 13:2,5,9,
12,17;14:5;20:6;24:14;
25:15;34:3;50:14;
85:13;86:2,3
**respect (6)** 49:19,23;
58:2;60:9;62:20;85:16
**respective (2)** 16:8;
22:10
**respond (1)** 38:2
**responding (1)** 52:6
**response (6)** 38:1;
51:24;58:11,22;59:4;
91:19
**responsibilities (1)**
36:22
**responsibilities' (1)**
88:13
**responsibility (4)** 8:5;
10:20;44:6;72:10
**Responsible (1)** 7:22
**responsiveness (4)**
38:3,20;39:22;70:15
**rest (2)** 11:25;66:20
**restate (1)** 19:14
**restrictions (2)** 85:5;
88:21
**restructure (2)** 13:20,23
**restructured (1)** 14:1
**restructuring (35)**
13:16,18;14:4,24;
15:21;17:12;18:2,11,
16,19;19:16;20:21;
22:1,16,17,22;23:6,20,
23;24:21;25:1,7,11,17,
24;26:11,14,22;29:10;
30:20;33:15,19;35:15;
37:12;87:24
**retail (1)** 10:8
**review (2)** 33:8,21
**reviews (5)** 19:19;
71:15,17,18;72:2
**Richard (3)** 12:20,23;

85:12
**rid (1)** 67:1
**right (24)** 12:7;13:3;
17:15;22:19;23:23;
24:1;27:23;28:1,8,12,
13;29:7;42:12;44:9,11,
20,22;45:3;52:21;56:4;
73:11;76:16;79:11,23
**right-size (1)** 66:19
**riss (1)** 76:4
**road (1)** 61:25
**rock (1)** 72:10
**role (33)** 14:4;19:18;
21:8;22:7;23:14;24:11;
26:23;27:3;29:9;31:14,
20;32:23;37:2,25;44:6;
65:15,19;66:18;68:5;
69:17,20,22,23,24,25;
70:6,10,12;75:8;76:1;
84:10;86:4;91:16
**roles (2)** 23:15,17
**running (1)** 72:14
**Ruth (5)** 49:22;50:10,
11,12;51:25

## S

**Sacramento (1)** 12:23
**sales (1)** 10:6;11:24;
38:25,25;39:9,15;40:7
**same (5)** 17:14;22:6;
34:1,23;42:3
**San (3)** 9:5;44:13;
45:23
**Santa (3)** 12:24;31:5;
45:20
**Sarah (7)** 50:12,13;
53:21,23;54:1,4;55:13
**saw (3)** 26:20;29:3;
63:25
**saying (3)** 47:5,20;
91:11
**Schneider (1)** 77:8
**second (3)** 63:10;
68:24;82:19
**seeing (1)** 27:21
**selection (1)** 69:7
**selfishly (1)** 21:9
**sellers (1)** 39:9
**senior (3)** 11:6,23;
49:22
**sense (2)** 66:6;89:22
**sensitive (1)** 65:24
**sent (3)** 90:22;91:11;
92:21
**separate (2)** 9:6;13:2
**September (5)** 74:6,14;
75:11,14;77:13
**serve (1)** 23:5
**served (1)** 10:16
**service (4)** 8:1;22:18;
40:8;71:6
**Services (5)** 4:11;6:4,5,

24;7:16
**servicing (1)** 84:1
**serving (1)** 22:25
**sets (1)** 91:14
**Seven (2)** 7:5;11:20
**several (2)** 10:8;68:12
**share (2)** 40:3;73:24
**shared (10)** 31:7;
40:20;41:17;68:14;
71:11,12;72:1,5;89:1;
91:6
**short (1)** 78:18
**show (3)** 27:14;28:11;
39:17
**side (2)** 15:13;30:5
**Siggerud (13)** 25:13;
34:22;37:11;50:23;
52:3;64:18;70:25;
77:19;78:17;86:5,21,
23;90:4
**situated (2)** 69:19;75:8
**Six (3)** 11:17;39:10;
66:7
**skill (1)** 91:14
**software (1)** 8:24
**sole (1)** 87:8
**somebody (2)** 52:15;
92:1
**someone (2)** 36:11;
51:19
**someone's (1)** 73:2
**sometime (6)** 26:11;
50:20,23;75:20,21;
83:5
**Sorry (1)** 82:13
**South (1)** 4:3
**Southern (4)** 44:2,4,7,8
**specialist (1)** 10:17
**specific (21)** 6:22;7:23;
18:4,18;29:22;33:18;
40:18;41:5,8,11,16,20;
42:1;43:16;63:12;76:5;
77:14;86:13;87:21;
90:8,14
**specifically (23)** 20:1,
16;23:7;24:13;27:12,
20;31:6,12,23;33:13;
37:13,24;39:13,19;
40:24;42:20;50:19;
59:22;71:17;72:23;
77:4;79:3;88:10
**specifics (4)** 40:3;
72:25;84:16;88:10
**speculation (4)** 28:20;
29:1;76:22;80:18
**spell (1)** 11:13
**spend (1)** 78:10
**springs (3)** 12:24;31:5;
45:20
**St (3)** 8:8,11;24:15
**staff (1)** 38:5
**standpoint (3)** 38:17;
57:6;84:20

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 444 of 505

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Eric McNaul
May 12, 2016

**star (1)** 72:10
**started (4)** 10:4,5;
35:14;65:8
**state (4)** 4:22;5:13;6:9,
11
**stated (2)** 65:13;78:8
**States (3)** 4:12;10:18;
87:14
**stay (1)** 76:20
**still (3)** 52:18;82:8;83:8
**Stinson (2)** 4:2;5:2
**stop (1)** 59:1
**stores (2)** 10:8,9
**straight (1)** 46:24
**strategic (2)** 15:15;32:5
**strategy (1)** 58:2
**Street (3)** 4:3,3;5:2
**strengths (1)** 32:3
**strike (10)** 25:16;61:1;
63:20;64:6;67:12;84:3,
4,4;85:9;86:22
**strong (1)** 81:1
**structure (2)** 14:10;69:1
**structured (3)** 14:25;
20:11;70:19
**struggling (3)** 39:11;
69:22;70:20
**studies (1)** 9:22
**subject (1)** 65:23
**subjective (1)** 18:7
**subsequently (1)** 17:22
**succeed (2)** 69:17;92:2
**succession (1)** 27:8
**Suite (1)** 4:4
**suited (2)** 23:14;35:18
**Sun (2)** 44:17;45:17
**supervise (3)** 11:19;
18:12;22:21
**supervised (1)** 32:21
**supervising (8)** 16:12;
17:11,25;19:23;29:9,
24;30:19;88:18
**supervisor (5)** 10:25;
11:8,11,16;77:8
**support (4)** 14:14;
15:12;20:25;27:7
**supported (1)** 9:20
**supporting (3)** 31:15;
43:19;69:16
**supposed (1)** 31:20
**sure (8)** 10:5;28:5,5;
29:11;39:7;47:8;56:11;
85:6
**surrounding (1)** 35:25
**swear (1)** 5:5
**sworn (1)** 5:8
**systems (1)** 8:24

**T**

**tactical (1)** 15:1
**tails (1)** 89:16
**talk (8)** 19:1;20:19;

31:19;63:11;76:25;
77:2;79:2,4
**talked (3)** 43:6;48:8;
89:3
**talking (6)** 15:17;19:12;
20:16;38:8;53:19;
63:13
**tape (6)** 10:14,14,15,
15;53:12,16
**task (2)** 16:21;23:16
**tasks (8)** 15:7,16,17,22;
16:4,13;18:22;30:10
**team (6)** 17:8;27:11;
30:16;31:18,25;33:14;
37:20;38:5;39:9;40:6,
24;69:15;73:20;80:24;
81:3;91:5
**teams (2)** 19:20;32:9
**telling (1)** 66:24
**temporary (2)** 76:14;
91:7
**tenure (1)** 81:20
**term (1)** 22:6
**terminate (4)** 61:24;
74:2;80:7;84:19
**terminated (4)** 50:21;
75:10;77:12;85:19
**termination (3)** 6:3;
52:2;85:16
**terminations (1)** 78:13
**terms (1)** 20:11
**testified (5)** 46:5;51:18;
59:23;88:2;93:11
**testifies (1)** 5:9
**testify (1)** 29:3
**testimony (5)** 36:6;
46:10;48:15;74:9,18
**theory (1)** 20:15
**Theresa (1)** 77:8
**thinking (1)** 79:16
**Third (1)** 69:6
**thoroughly (1)** 63:7
**though (2)** 36:2;58:17
**thought (4)** 36:12;
65:17;66:11;91:21
**three (17)** 21:1,4,14,15,
19;22:12;23:24;24:12;
37:17;48:23;65:9,9,17;
67:20;79:12,18;88:3
**Thursday (1)** 35:5
**timeframe (13)** 6:15;
19:12,15;34:22;65:4,
11,12;75:12,22;76:5,7;
77:13;78:6
**times (3)** 5:19;37:23;
40:18
**Timm (6)** 11:12;49:22;
50:10,11,12;51:25
**title (4)** 7:1;11:5;25:14;
86:1
**titles (1)** 11:22
**today (1)** 93:11
**Today's (1)** 4:15

**Told (11)** 31:23;32:11;
34:9,15;72:19;77:16,
18;80:14,20;85:10,18
**took (1)** 10:19
**top (1)** 27:22
**towels (1)** 8:2
**train (1)** 30:10
**training (1)** 27:7
**transmitted (1)** 16:9
**transpired (1)** 78:2
**travel (6)** 20:1;85:4,4,
11;86:10;88:20
**traveling (5)** 19:9,17,
21;35:2,3
**true (1)** 46:7
**trust (1)** 80:24
**try (1)** 66:5
**trying (3)** 20:2;30:12;
65:10
**Tucson (1)** 44:24;
45:25;46:1
**Tuesday (1)** 35:5
**turned (1)** 76:6
**Twice (1)** 5:20
**Twin (1)** 22:11
**two (13)** 8:17;9:6;
12:18;21:2,5;33:12,14;
43:21,24;48:23;75:9;
89:14;93:6
**Twofold (1)** 70:22
**two-hour (1)** 89:2
**types (1)** 32:13
**typically (3)** 22:13;
32:13;35:4

**U**

**ultimately (2)** 36:18;
80:22
**Um-hmm (2)** 24:2;
45:21
**unaccounted (1)** 40:18
**unavailable (2)** 40:23;
41:21
**unaware (6)** 45:16;
60:12;81:13,15,23;
93:17
**under (4)** 39:10;52:10;
81:9,22
**underperforming (1)**
69:22
**underrepresented (1)**
21:7
**understood (1)** 56:2
**unfortunately (1)** 78:4
**unhappy (1)** 32:7
**United (2)** 4:12;87:14
**University (2)** 9:13,25
**unless (1)** 36:12
**unresponsive (6)**
40:15;41:12;42:9;
71:3,7,9
**unresponsiveness (2)**

37:21;41:18
**unsure (2)** 47:12;48:16
**up (6)** 10:4;13:15;
39:17;46:13;87:23;
93:7
**US-1 (3)** 7:7;20:8,11
**use (1)** 52:23

**V**

**vacation (1)** 89:7
**Valley (3)** 44:17;45:1,
17
**value (1)** 31:18
**various (1)** 12:3
**verbal (1)** 32:18
**versus (2)** 4:10;23:15
**vice (7)** 7:2,3;8:9;11:6,
18;19:18;91:3
**video (5)** 4:7,8,18;
53:11,15
**VIDEOGRAPHER (8)**
4:6,17;5:4;53:10,14;
82:1,4;93:25
**violate (1)** 55:5
**visit (1)** 19:4
**visited (2)** 31:9,11
**visiting (1)** 45:16
**voiced (1)** 42:25
**voicemail (2)** 93:13,15
**Volume (1)** 4:8
**voluntarily (2)** 82:14;
83:16

**W**

**waived (1)** 51:15
**waiving (1)** 61:18
**walk (1)** 10:2
**Washington (1)** 89:7
**way (11)** 20:23;45:15;
57:15;60:21;61:3;62:8;
67:9;79:15;81:6;90:3;
91:21
**Ways (1)** 29:13
**wedding (1)** 89:8
**week (4)** 19:2;40:19;
64:2,2
**weekly (1)** 32:17
**weeks (1)** 66:8
**weren't (2)** 36:16;67:7
**Western (1)** 7:12
**WH (1)** 10:23
**what's (7)** 7:1,21;11:5;
34:9;56:25;57:19;
64:22
**whatsoever (2)** 31:18;
81:23
**Williams (29)** 4:10,25;
24:1,6,20;25:8;31:8,
11;33:2,5,9,11;35:7;
36:25;40:14;42:17;
50:20;56:18;59:16;

60:20;69:21;70:5;
74:16,25;80:4;81:8,16;
83:5;92:9
**Williams' (10)** 34:8,14;
52:2;59:12;60:18,22;
61:5;62:10;67:14;
81:20
**win (1)** 20:2
**win-win (1)** 92:3
**Wisconsin (3)** 7:13;
8:21;9:5
**withdraw (1)** 23:21
**within (8)** 30:13,16;
32:8;37:22;38:16;52:7;
54:14;91:14
**without (1)** 63:3
**witness (71)** 5:5,7;16:1,
17;17:14;18:4,18;
20:14,25;21:25;25:21;
26:9;28:21;30:24;
33:23;34:2;36:7,15;
37:8,16;39:7;40:2;
41:8,15,24;42:4,19;
43:21;46:23;47:8,23;
48:16;49:8;50:1,6;
53:24;55:23;56:5,11,
23;57:9;58:23;60:12;
62:4,12;63:6;65:3;
67:4,17;68:1,12;71:25;
74:5;19;76:23;80:19;
81:13;82:17;83:1,13,
23;84:15;85:1,23;
86:12,18;87:2,20;88:9;
90:20;92:19
**Woods (1)** 4:24
**word (3)** 17:9;18:7;
48:5
**word-for-word (1)** 78:1
**words (2)** 67:7,19
**work (16)** 8:13,18,19;
10:11,22;13:21;17:7;
26:17,20;34:21;52:7;
54:18;57:5;59:25;
61:10;65:21
**worked (1)** 8:20;34:3
**working (6)** 10:5;23:20,
25;32:6;33:5;77:5
**works (1)** 50:14
**Wow (1)** 80:19
**written (5)** 25:18,25;
26:3;28:17;29:3
**wrong (1)** 79:11

**Y**

**year (4)** 7:17;75:18;
83:13,14
**years (8)** 6:13,14;7:5;
11:17;33:12,14;37:17;
80:1
**yes-or-no (1)** 55:10
**yesterday (2)** 27:15;
48:21

Williams vs. G & K Services, Inc.
2:15-CV-01744-DJH

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 445 of 505

Eric McNaul
May 12, 2016

**Yuma (1)** 45:3

## 1

**1 (11)** 4:8,9;48:21;
53:12,19;54:10;55:14;
63:1,23;64:1,10
**1:04 (2)** 4:5,8
**10 (2)** 39:9;78:18
**100 (1)** 17:2
**12 (1)** 4:15
**120 (1)** 10:8
**12th (2)** 4:2;7:17
**15 (1)** 11:9
**150 (1)** 4:3
**17 (2)** 10:18;28:6
**18 (1)** 87:10
**1988 (1)** 10:21

## 2

**2 (1)** 53:16
**2:07 (1)** 53:12
**2:15-cv-01744-DJH (1)**
4:14
**2:20 (1)** 53:16
**2:52 (1)** 82:2
**2012 (4)** 13:15,17,20,
22
**2013 (17)** 13:24;14:6,
19;17:12,25;18:11;
19:15;20:17,19;23:20,
24;25:4,18,25;34:22;
64:13;87:25
**2014 (5)** 28:6,10,18;
29:5;63:23
**2016 (2)** 4:2,15
**2300 (1)** 4:4
**28 (1)** 80:1
**29 (1)** 28:10

## 3

**3:10 (1)** 82:6
**30 (1)** 63:8

## 6

**60 (1)** 35:4

## 7

**7 (2)** 27:15;39:9
**70 (1)** 35:4

## 8

**83 (1)** 9:15

EXHIBIT L

# In The Matter Of:

*Brandy Williams vs. G&K Services, Inc.*
*Case No. 15-cv-01744-PHX-DDD*

---

*Conversation /  Brandy Williams and Rachael Siggerud*
*July 17, 2013*

---

*Arizona Reporting Service, Inc.*
*2928 North Evergreen Street*
*Phoenix, AZ  85014-5508*
*(602) 274-9944*
*www.az-reporting.com*



Original File 07-17-2013 Conversation Brandy Williams and Rachel Siggerud.txt
**Min-U-Script® with Word Index**

Brandy Williams vs. G&K Services, Inc.
Case No. 15-cv-01744-PHX-DDD

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

---

Page 1

```
 (1)              UNITED STATES DISTRICT COURT
 (2)                 DISTRICT OF ARIZONA
 (3)   Brandy Williams,        )
                               )
 (4)             Plaintiff,    )
                               )
 (5)        vs.                ) Case No. 15-cv-01744-PHX-DDD
 (6)   G&K Services, Inc., a   )
       Minnesota corporation,  )
 (7)   Jane and Johns Doe 1-100;)
       Black Corporation 1-100; )
 (8)   White Partnership 1-100, )
                               )
 (9)             Defendant.    )
 (10)  _____) Telephonic Conversation
 (11)
 (12)        TRANSCRIPT OF AUDIO RECORDED PROCEEDINGS
 (13)                 Phoenix, Arizona
                      July 17, 2013
 (14)
 (15)        TELEPHONIC CONVERSATION BETWEEN
             BRANDY WILLIAMS AND RACHEL SIGGERUD
 (16)
 (17)        (File name:  WILLIAMS-000317 - 130717
 (18)             Recorded Phone Call (1))
 (19)
 (20)               ARIZONA REPORTING SERVICE, INC.
                    Audio Transcription Specialists
 (21)               2928 North Evergreen Street
                    Phoenix, Arizona  85014-5508
 (22)
 (23)
 (24)               Deanna C. Bakurza, RPR
                         Certified Reporter
 (25)               Certification Number 50412
```

---

Page 2

(Commencement of audio file:  00:37:03.01)

**MS. WILLIAMS:** Uh-huh.

**MS. SIGGERUD:** The person who's currently in postings is gonna have to move to customer service. Is somebody that has good customer service skills or has demonstrated that -- has an interest in working with our customers. Because if they don't and they, you know, would rather just kind of do individual work --

**MS. WILLIAMS:** Uh-huh.

**MS. SIGGERUD:** -- we don't want to just shove somebody into a job that they might not like.

**MS. WILLIAMS:** Right.  Okay.

**MS. SIGGERUD:** So I think there's -- I think there's a good opportunity to look at the entire office and evaluate their skill sets.

**MS. WILLIAMS:** Okay.

**MS. SIGGERUD:** If it's a position that somebody might perceive as better than there's, then I think there's a good opportunity to post it --

**MS. WILLIAMS:** Okay.

**MS. SIGGERUD:** -- and see who falls where.  Um, that being said, if nobody applies for either, then I think we probably need to talk about -- let's look at, maybe, moving people.

---

Page 3

**MS. WILLIAMS:** Okay.

**MS. SIGGERUD:** And I think the -- one of the ways that she could, maybe, get folks to apply for them or be interested in them, and I don't think that it's necessarily an outside posting, I think it's maybe more of an internal.

**MS. WILLIAMS:** Right.  Yeah, we did talk about that.  And I did ask her, you know, would you like this to be internal, external?  I said, it sounds as if, you know, it maybe just could -- could just be an internal posting.  She goes, no, definitely.  I only want to offer it internally.

**MS. SIGGERUD:** Yeah.

**MS. WILLIAMS:** As, you know, she felt that she would be able to just appropriately move around everyone.  But she did say she was gonna post for the receptionist position portion.  Because that's the one that she was gonna replace.  But she felt the other two, that she could move individuals around to better benefit the business.

**MS. SIGGERUD:** Sure.  It's, um -- it's -- if it's helpful.  I mean, because she could do it either way.  I mean, she's entitled to -- you know, in her position, she's able to go up to each of these people and say, hey, this is the way, you know, business needs

---

Page 4

are changing.  I would like you to move into this position.  You know, ultimately the easiest way to do that would be to take the receptionist, put the receptionist in the customer service position.  Leave the poster where she is.

**MS. WILLIAMS:** Uh-huh.

**MS. SIGGERUD:** Um, she can approach it from a trying to round out your skill set, make sure you've got, you know, some other things in your toolbox.  There'll be a raise included with it.  But then the other piece of that is the:  Do we have other people who would be also in need of rounding out their skill set?

**MS. WILLIAMS:** Uh-huh.

**MS. SIGGERUD:** It's a good time to, maybe, make more changes.  So aside of just these two, do we look at broadening everybody's skill set, doing more cross-training, having everybody kind of rotate?

**MS. WILLIAMS:** She said she does have everyone cross-trained and that everyone can do all the other positions.

**MS. SIGGERUD:** So then why these two?

**MS. WILLIAMS:** Um, she said she felt that the one that she wants to move into this open space of this employee leaving, that she -- her skills best fit this position.  And she said, then, the reason why she wants

---

Brandy Williams vs. G&K Services, Inc.
Case No. 15-cv-01744-PHX-DDD

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

---

Page 5

(1) to move the receptionist, is because she feels that she
(2) still needs some improvement because her English is
(3) still not all that great, but she feels like if she
(4) moves her into this customer services role, that she'll
(5) be able to gain more experience with talking to people
(6) and working with customers and it'll prepare her to be
(7) able to be more cross-trained on all the other
(8) positions.
(9)     MS. SIGGERUD: Is this because she talks in
(10) Spanish to employees in the plant?
(11)     MS. WILLIAMS: Um, I think sh-  -- yeah, I think
(12) that's a portion of it.  I think she said that her
(13) English was a little -- a little rusty.  And she said
(14) that she does do pretty well at it, she said, but
(15) sometimes she kind of struggles with some understanding.
(16) And she said she thinks that, um, she could improve.
(17)     Because that was part of the discussion when we
(18) had the discussion around their IDPs also.  Was that,
(19) you know, she did come from the plant and she did work
(20) her way up, and you know she did learn English and we
(21) did kinda talk about maybe, like, um, having
(22) conversations with her around, you know, improving her
(23) English or going to a learning center or, um, someplace
(24) like that to help, like, improve her knowledge around
(25) it.

---

Page 6

(1)     MS. SIGGERUD: I think we need to be very, very
(2) careful.
(3)     MS. WILLIAMS: No. No.  Well, I -- I told her --
(4) just her and I -- I talked about that, we didn't -- we
(5) didn't -- she didn't have that discussion with her
(6) but . . .
(7)     MS. SIGGERUD: English is not a bona fide
(8) occupational qualification for any --
(9)     MS. WILLIAMS: Right.
(10)     MS. SIGGERUD: -- position here.
(11)     MS. WILLIAMS: Yeah.
(12)     MS. SIGGERUD: So the question I would have --
(13) she comes from the plant?
(14)     MS. WILLIAMS: Uh-huh.
(15)     MS. SIGGERUD: Does -- where are -- where do her
(16) computer skills lie?  On a spectrum of doesn't know how
(17) to turn it on to -- office job here because we've done
(18) that before in other locations where we've promoted
(19) people from the plant and we've had some folks that have
(20) struggled significantly with being able to, you know,
(21) write good e-mails, to writing at all, use the
(22) technology.
(23)     MS. WILLIAMS: Uh-huh.
(24)     MS. SIGGERUD: So that would be something that
(25) she should probably be aware of too.

---

Page 7

(1)     MS. WILLIAMS: Okay.
(2)     MS. SIGGERUD: If it's somebody who's a
(3) receptionist and doesn't really need to use much in the
(4) way of computers right now.  Because she'll be needing
(5) to be able to accurately use multiple different systems
(6) as a poster.
(7)     MS. WILLIAMS: Okay.
(8)     MS. SIGGERUD: So we should definitely look at
(9) assessing her, um . . .
(10)     MS. WILLIAMS: Computer skills.
(11)     MS. SIGGERUD: Computer skills.
(12)     MS. WILLIAMS: Okay.
(13)     MS. SIGGERUD: So . . .  And the first thing I
(14) think to do would be for -- so I -- I think
(15) there's quali- -- or I think there's value in posting
(16) the position.
(17)     MS. WILLIAMS: Okay.
(18)     MS. SIGGERUD: Um, and then I think there's
(19) value in having Melissa approach both of these
(20) individuals to say, Hey, you know what, here's the
(21) thing.  I'd really like you to think about applying for
(22) this role.
(23)     Um, I think what we'd want to do is post one
(24) first and then the other.  So we've got the customer
(25) service position opening up.

---

Page 8

(1)     MS. WILLIAMS: Uh-huh.
(2)     MS. SIGGERUD: So I think that we would open
(3) that one first, see who applies, and it doesn't have
(4) to -- maybe just a few days even.  Reach out to the --
(5) the person that she's interested -- the poster, say,
(6) hey, I'd really like you to apply for this.  This is why
(7) I think it's a great fit, and it's gonna be a very
(8) positive thing.  Ultimately, if the employee says
(9) absolutely not, I don't want to do it, so be it.
(10)     MS. WILLIAMS: Okay.
(11)     MS. SIGGERUD: You know, if it's a position with
(12) more responsibilities then I think that we should look
(13) about giving them a bump.  Not to $17, but maybe it's a
(14) $0.50 raise.
(15)     MS. WILLIAMS: Uh-huh.
(16)     MS. SIGGERUD: You know, and then from the
(17) receptionist to the poster, same thing.  And then if
(18) she's interested, you know, $0.50 raise, whatever.  Then
(19) we can backfill the receptionist.  But regardless if
(20) either of these folks really say, I really don't want to
(21) do that.  What we don't want to do is just move 'em into
(22) it anyway.
(23)     MS. WILLIAMS: Okay.
(24)     MS. SIGGERUD: So. . .  Make sense?
(25)     MS. WILLIAMS: Yep.

---

ARIZONA REPORTING SERVICE, INC.
(602) 274-9944     www.az-reporting.com

Brandy Williams vs. G&K Services, Inc.
Case No. 15-cv-01744-PHX-DDD

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

Page 9

(1)      **MS. SIGGERUD:** All righty.

(2)      **MS. WILLIAMS:** That makes great sense.

(3)      **MS. SIGGERUD:** Okay. Yeah, let me know how
(4) it -- how it goes. I think -- I'm trying to think if we
(5) wanna -- I don't know -- I would work with Marissa. I
(6) think she does office, doesn't she?

(7)      **MS. WILLIAMS:** Yep.

(8)      **MS. SIGGERUD:** I would work with her to see if
(9) we even need to post it into --

(10)      **MS. WILLIAMS:** Okay.

(11)      **MS. SIGGERUD:** Either way it would be internal
(12) but, um, I would ask her whether she thinks we need to
(13) or not. Since pretty much all of the jobs feel like are
(14) very equivalent. It sort of feels like we're working
(15) with, you know, in the plant if we have a level 2 job
(16) open.

(17)      **MS. WILLIAMS:** Uh-huh.

(18)      **MS. SIGGERUD:** We don't necessarily put it into
(19) [unintelligible], we post it in the plant.

(20)      **MS. WILLIAMS:** Okay.

(21)      **MS. SIGGERUD:** All right. Like on a piece of
(22) paper. So I would work with her to see what she
(23) thinks -- which means she should probably reach out to
(24) Michael Shipman to determine the best way to post it.

(25)      **MS. WILLIAMS:** Okay. All righty. I will do

Page 10

(1) that.

(2)      **MS. SIGGERUD:** Okay?

(3)      All righty. And I want to make sure that we do
(4) one at a time, again.

(5)      **MS. WILLIAMS:** Okay.

(6)      **MS. SIGGERUD:** Because the poster hasn't applied
(7) for the other job yet and so we don't want to post her
(8) job --

(9)      **MS. WILLIAMS:** Okay.

(10)      **MS. SIGGERUD:** -- until she's not it anymore.

(11)      **MS. WILLIAMS:** Okay. Right. All righty that
(12) makes sense.

(13)      **MS. SIGGERUD:** Okay. Sounds good.

(14)      Jump to -- all right.

(15)      Then you had mentioned in your e-mail that you
(16) wanted to touch base on something else?

(17)      **MS. WILLIAMS:** Yeah. Um . . . I just kinda
(18) wanted to have a pretty open conversation, I guess,
(19) around, you know, where -- where things are at. Um, I
(20) guess 'cause I'm just -- I'm just trying to make sure
(21) that I'm doing everything, you know, that I need to be
(22) doing 'cause I -- I mean, as I mentioned before, you
(23) know, I really enjoy being here, and so I just -- you
(24) know, in our last conversation, in our one-on-one the
(25) last week, I kinda felt a little, you know, blind sided,

Page 11

(1) I guess, by some things. But, um, you know, I just want
(2) to make sure that I'm very clear of, you know, how
(3) things are. So I just -- I just, basically -- I guess,
(4) am looking for a little bit of candidness around, you
(5) know, my position here. My position and my
(6) relationship, where it stands with Jake and the Phoenix
(7) team, and also -- with you also.

(8)      I feel like, you know, I'm doing everything that
(9) I can do, you know, to be successful. You know,
(10) definitely I take, you know, all constructive criticism
(11) into consideration and, you know, try to make sure I'm
(12) completing everything that's been suggested and then
(13) also making sure that I'm coming up and being creative
(14) with other things too. But also I kinda just, you know,
(15) with the continuing, you know, I guess communication
(16) back and forth between us, I still kinda feel like
(17) there's a little communication lost. So I just wanna
(18) make sure, you know, I'm on the -- the clear
(19) understanding, kinda of, of where things are at.

(20)      I mean, because you know, professionally, you
(21) know, I -- being in HR, Rachael, you know, we've had
(22) conversations with employees before and I just want to
(23) be very clear that, you know, I want this to be
(24) beneficial for me as an employee but also beneficial for
(25) the company as well. And I want to be very -- very

Page 12

(1) professional and I don't want to waste my time or the
(2) companies time so I just want to make sure of clearly
(3) where I stand. If -- you know, I've -- I have always
(4) felt that I have been an asset to the business here
(5) because I've always done any and everything that, you
(6) know, has ever been asked of me. I feel like I've gone
(7) above and beyond. I have supported employees, I've
(8) always felt that I've had a great relationship with
(9) everyone, but I just kinda wanted to get a clear picture
(10) of what -- what -- what it really is, I guess, is the
(11) best way to say it.

(12)      **MS. SIGGERUD:** So -- so what is -- when you say
(13) "what it is," what - what is "it" that you're kinda
(14) referring to?

(15)      **MS. WILLIAMS:** I guess -- I mean, 'cause I -- I
(16) feel like, you know, I'm getting kinda mixed signals. I
(17) mean, I -- I feel like the last couple of meetings and
(18) conversations, and the last little bit of information I
(19) received is kinda like, you know, I'm -- I feel like I
(20) kinda being put on, you know, the spot, you know, about
(21) things and, like I said, I felt blind sided because I
(22) didn't really think that the things that were being
(23) brought up were happening.

(24)      You know, I -- when I -- like, the
(25) misunderstanding or miscommunication of, you know, me

Brandy Williams vs. G&K Services, Inc.
Case No. 15-cv-01744-PHX-DDD

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

Page 13

(1) not being engaged or me not communicating with everyone
(2) or -- like you said before, everyone's perception.  So
(3) I'm just trying to make sure that if those things are
(4) changing, are they gonna change for the better or -- you
(5) know, is this just to the point of where you and Jake
(6) don't feel that I'm a good fit anymore?  Because I kinda
(7) feel like with, you know, my health issues and the
(8) accomodation that I've asked for might not be that well
(9) perceived by everyone.  And then I feel, like, with
(10) that, that you guys might not have confidence in me that
(11) I'm a good fit anymore.
(12)      MS. SIGGERUD:  Well, with respect to your
(13) accom- -- the accommodation, I mean, it's
(14) [unintelligible] that you're gonna use us in a way,
(15) and -- I mean, it's an hour a week, and that's certainly
(16) not anything.  And like you and I talked about, I think
(17) it was last week, nobody in that business, in Phoenix,
(18) should really know much of anything about it.
(19)      MS. WILLIAMS:  Right.
(20)      MS. SIGGERUD:  And so that -- you know, that's
(21) your private information.  And we had talked about just
(22) putting on your calender that you've got an off-site
(23) meeting or appointment or whatever.  So Jake doesn't
(24) know anything about it unless you've told him.
(25)      MS. WILLIAMS:  No.

Page 14

(1)      MS. SIGGERUD:  Right.  So I certainly haven't
(2) and I know that Marie hasn't.
(3)      MS. WILLIAMS:  Right.
(4)      MS. SIGGERUD:  So, with respect to that, that
(5) certainly has nothing bearing on anything.  It's -- it's
(6) an hour a week and it's -- it's -- you know, it's us, in
(7) a way, not a big deal.
(8)      And the conversation that you and I had, was,
(9) you know, before any of that even came forward, so . . .
(10)      Um, you know, with respect to the conversation
(11) from last week, are you talking about the one from a
(12) couple of weeks ago or the one from last week?  Because
(13) we have our one-on-one from 7/9, our one-on-one from
(14) 7/12 and we talked mostly about -- um, we talked, like,
(15) your letter to Monica, we talked about the
(16) [unintelligible] that you and Mitch were gonna -- you
(17) and Mitch and Jake were gonna have, kinda how to show up
(18) for that.
(19)      MS. WILLIAMS:  Right.  No, I think I'm talking
(20) about the one from 7/9 where we had the conversation
(21) around the lack of engagement and support and . . .
(22)      MS. SIGGERUD:  Sure.
(23)      MS. WILLIAMS:  Just the relationship here around
(24) the business with Phoenix.
(25)      MS. SIGGERUD:  Okay.  And -- and -- so is your

Page 15

(1) question -- you know, is it too late?  Or is it, you
(2) know, what -- you know, as far as where it stands,
(3) perception is something that -- it -- it takes a while
(4) to change perception.  So if your question is:  Has it
(5) changed since we talked?  I don't know.  Jake is on
(6) vacation.  I haven't talked to him.  I haven't heard
(7) anything.
(8)      Um, what I can speak to is I know, you know, it
(9) was -- it was frustrating to me that you weren't at our
(10) one-on-one yesterday and didn't call, didn't cancel.  I
(11) certainly understand that things come up.  They come up
(12) with me, too, but it's just the, you know -- we had
(13) talked about being on time, having people know where
(14) you're at.  Um, I got some feedback about the work comp
(15) sharp shooters meeting, and that you were late for that
(16) one.  About 15 minutes.
(17)      And I -- I totally understand that -- that
(18) meetings happen and you get caught up, but -- but you
(19) gotta live by your calender because that's -- you know,
(20) it's a commitment.
(21)      MS. WILLIAMS:  I was late because the code that
(22) I got wasn't correct.  So I did call Melissa to let her
(23) know that it -- it wasn't the appropriate . . .
(24)      That's what I'm saying.  So, you know, like,
(25) I -- I wanna be -- make sure that I'm judged by what I'm

Page 16

(1) actually doing and not someone's perception.  Because in
(2) all -- in all -- in all reality here, you know, I live
(3) off of reality and I can't live off of perception.  So
(4) if -- if that's everyone's perception of me and not what
(5) I'm actually doing, then I think that everyone needs to
(6) decide whether this is a good fit for me or not.
(7) Because, honestly, all these things, I feel, like, they
(8) didn't come up until I started having health issues and
(9) then I needed -- um, I needed assistance with that.  So,
(10) you know, that's why I did put that letter in writing
(11) because it's not like it has been unknown that I have
(12) needed assistance with that.  I've had numerous
(13) conversations around that I did need -- need assistance
(14) with that, but to me at this point I feel like I'm
(15) starting to get, um, a little micromanaged around the
(16) fact of "do a calender" and then I am doing a calender
(17) but then I get an email of, well, you know it's not
(18) reasonable to ask people to look and see if you're gonna
(19) be doing something on your calendar.
(20)      So I'm a little lost between what I should be
(21) doing and what I shouldn't.  Because I'm really trying
(22) my best here, but I'm just asking for some clear
(23) guidelines around what it is that needs to be done and,
(24) you know, I don't -- I -- I do have health issues and
(25) health concerns and the business is very important to

Brandy Williams vs. G&K Services, Inc.
Case No. 15-cv-01744-PHX-DDD

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

Page 17

(1) me. But in all reality, on top of that, my own health
(2) is very important as well. And dealing with the stress
(3) of these, to me, minor things that can be worked out, is
(4) not worth me taking on the stresses of dealing with
(5) this. Because to me, these minor things are dropping my
(6) morale with the company, with the business, and it's
(7) also putting undue stress on me which, in further, is
(8) not gonna help to support my health and my wellbeing
(9) here in order for me to improve.
(10)     So I kinda feel like I'm set up for failure. So
(11) I'm trying to just make sure if that's the case, then we
(12) can just come to a, um, compromise on things, um, or,
(13) you know, they can continue to improve and I can move
(14) forward. I'm just really trying to get a candid answer
(15) of, yes, we -- we would love to have you here and, you
(16) know, time will tell that things are gonna get better
(17) or, no, with the things that have occurred, we don't
(18) feel like you're a good fit.
(19)     MS. SIGGERUD: So -- so -- I'd love to have you
(20) engaged and work -- work -- you know, let's work to
(21) en- -- kinda get things back on track. So that's my
(22) goal. And in these -- you know, I think what you're
(23) perceiving as micromanaging, that's me trying to stay
(24) real close to the situation to make sure that I know
(25) what's going on; that I can help keep you on track so we

Page 18

(1) can start changing the perception with your partners.
(2)     So Jake doesn't know about the conversation that
(3) you and I had, Angie doesn't know about the conversation
(4) that you and I had. So that's -- I'm staying close to
(5) you, because I want to make sure that I can help you be
(6) successful. So . . .
(7)     MS. WILLIAMS: In turn I would need for you to
(8) be supportive of me though and respond. And it's
(9) like -- I feel like it's a double-edged sword here
(10) because it's like I'm held to these things, but then,
(11) like, when I ask -- reach out to you, like, I don't hear
(12) back from you for, like, you know, a couple days or, you
(13) know, I'm still waiting on an answer from someone, or
(14) I'm still working on things, but I don't get anything
(15) back from you.
(16)     MS. SIGGERUD: Did you mean your e-mail from
(17) today? Because I'm not quite sure what --
(18)     MS. WILLIAMS: Just the past couple. And then
(19) it's, like, you know, then I'm logged for the Phoenix
(20) group. I mean, I've been waiting on that for --
(21)     MS. SIGGERUD: So what are you waiting on?
(22)     MS. WILLIAMS: -- like, two months now. To find
(23) out, like, you know, where you and Jake decided to place
(24) everyone. I mean --
(25)     MS. SIGGERUD: But it's not -- you mean, the

Page 19

(1) leaders?
(2)     MS. WILLIAMS: Yeah.
(3)     MS. SIGGERUD: It's --
(4)     MS. WILLIAMS: I mean, I don't know who to work
(5) on an IDP with, and I don't know whether to have
(6) continuing further conversations --
(7)     MS. SIGGERUD: That's sort of the --
(8)     MS. WILLIAMS: -- around --
(9)     MS. SIGGERUD: And I've talked to the whole
(10) team -- our regional team about that. I work with Jake
(11) on his people leaders.
(12)     MS. WILLIAMS: Okay.
(13)     MS. SIGGERUD: And then your -- you are working
(14) with them on their direct reports.
(15)     MS. WILLIAMS: Well, that's what I'm saying. So
(16) I sent you an e-mail asking if you're gonna work on the
(17) ones with Angie or if I should reach out to her and work
(18) with her on them. But I never got a response to, okay,
(19) no, you're gonna do those with her, and I shouldn't
(20) worry about them . . .
(21)     MS. SIGGERUD: But these are things -- so,
(22) Brandy, that's -- part of where I get frustrated is that
(23) these are things that we've talked about. So if I say
(24) I'm working with the GM's on their people leaders, and
(25) you guys are working with their leaders on everything

Page 20

(1) below, that's the -- so where -- I guess I don't
(2) understand where the question comes in on that?
(3)     MS. WILLIAMS: Okay. I've reached out to
(4) Janelle and Kayla and they didn't seem to know either.
(5) So I guess I'm not the only one that didn't hear that.
(6)     MS. SIGGERUD: None of the others have -- Yeah.
(7) It's not been a question from anyone else.
(8)     So, you know, that aside, you know, with respect
(9) to the calendars, the -- your Phoenix drive is one that
(10) nobody has access to except people from Phoenix.
(11)     MS. WILLIAMS: And that was maybe a mistake on
(12) my part that I didn't know about. So I apologize for
(13) that portion.
(14)     MS. SIGGERUD: So -- but -- but regardless it's
(15) the -- you know, it's you put on there that you're
(16) gonna, you know, attend, you know -- who knows. Like,
(17) the payroll call for Los Angeles that you received an
(18) invite for.
(19)     MS. WILLIAMS: Uh-huh.
(20)     MS. SIGGERUD: If you accept the Lotus invite
(21) and then don't attend the meeting, it's not reasonable
(22) to expect that whoever organized that meeting goes out
(23) to -- you know, a random, you know, hard drive and check
(24) their calender to see if you were or weren't going to be
(25) there. What is an appropriate and reasonable outcome is

Brandy Williams vs. G&K Services, Inc.
Case No. 15-cv-01744-PHX-DDD

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

Page 21

(1) that you say okay, I've got XYZ conflict, I can't attend
(2) it, period, so I'm not gonna accept the invite I'll
(3) decline it. Or if something comes up unexpectedly, that
(4) you go back in and you decline it and let the -- the
(5) organizer know why. And just let 'em know that you're
(6) not gonna be there.
(7)     MS. WILLIAMS: Okay. So my question is --
(8)     MS. SIGGERUD: The client --
(9)     MS. WILLIAMS: -- I'm not aware that that has
(10) happened, because I don't think that's been a conflict,
(11) because I just put that calender up --
(12)     MS. SIGGERUD: Well, it happened yesterday.
(13)     MS. WILLIAMS: -- a week ago.
(14)     MS. SIGGERUD: No, it happened -- it happened
(15) yesterday for our one-on-one.
(16)     MS. WILLIAMS: Yeah, but I didn't have on the
(17) Phoenix calendar that I was attending the one-on-one,
(18) that was in the Lotus notes. So I think that was just a
(19) miscommunication between you and I, because I think that
(20) there's too many different calendars going on here now.
(21)     MS. SIGGERUD: On your Lotus calenders do you
(22) not have the one-on-one on there.
(23)     MS. WILLIAMS: I do. And that's a recurring
(24) thing that is always on there. And it's -- I mean, it's
(25) not anything new. It's a recurring thing that is done

Page 22

(1) every single week. And sometimes we have them and
(2) sometimes we don't, so I -- you know, honestly, I'm --
(3) to be honest, I didn't think there was that much
(4) emphasis around it because sometimes if we have them
(5) great or if you're traveling and we don't then we
(6) reschedule, so I mean --
(7)     MS. SIGGERUD: But if I'm traveling I'll let you
(8) know. If I get hung up at the airport or something,
(9) I'll let you know that I won't be there and that's
(10) the -- it's the letting someone know that you can't make
(11) it. So if you had said, hey, I'm in Tucson today, can
(12) we reschedule our one-on-one? Or, Hey, just realized
(13) our one-on-one is scheduled for 1:00 o'clock. I'm in
(14) Tucson, I'm in a meeting, can we reschedule it for
(15) tomorrow. That's not a big deal.
(16)     MS. WILLIAMS: Well, I had my cell phone, so,
(17) honestly, I didn't think that I was gonna miss it
(18) because I thought that you would call me on my cell and
(19) not just my desk phone. So I was waiting for the call
(20) at 11:00 and I was just thinking that when I didn't get
(21) the call that -- at 11:00 that maybe you just had a
(22) meeting or you had something come up. So I was, like,
(23) okay, well, you know -- that's when I e-mailed you to,
(24) you know, kinda let you know where I was at. That
(25) way -- you know, I was just touching base. Because,

Page 23

(1) honestly, it was an honest mistake. And that's what I
(2) kinda feel like it is at this point. That these things
(3) are taken a little to the extreme instead of just, like,
(4) an understanding that it was, like, an honest mistake.
(5)     MS. SIGGERUD: So . . .
(6)     MS. WILLIAMS: So that's where I get to the --
(7) to the point of feeling, like, I'm not wanted or needed
(8) here anymore because of the minor things that are coming
(9) up.
(10)     MS. SIGGERUD: So you're certainly wanted. And
(11) I, you know, I want you as a part of my team. But what
(12) I'm -- I'm hearing is that I don't know if you want it.
(13) And if you don't, it's not -- your passion's not here,
(14) your heart's not in it, I get that.
(15)     This job had changed an awful lot and it's not
(16) what everybody wants. Not everybody says, gosh, this
(17) is -- you know, when I started working in HR this is the
(18) type of job I really aspired to have, or this is what I
(19) imagined it would be and -- and that's okay. And if
(20) that's where you're at, I'd like you to kinda think
(21) about it for the next couple of days. Because the
(22) staying close to you, holding you to the -- we gotta be
(23) on the calls, things like that, that's me trying to make
(24) sure that I'm close to you, so I can help make sure that
(25) you're on track. If that's not kinda what you're

Page 24

(1) looking for, I can assure you it has absolutely nothing
(2) to do with any medical condition, you know, and I think
(3) it's a -- a little unfair to say that because we had the
(4) conversation about expectations before anything came up
(5) and --
(6)     MS. WILLIAMS: What do you mean before anything
(7) came up? I've been dealing with these issues since the
(8) birth of my son. Since I came back.
(9)     MS. SIGGERUD: And it's never been any kind of
(10) an issue.
(11)     MS. WILLIAMS: None of the things with -- None
(12) of the things or the issues with me came up until about
(13) two months ago.
(14)     MS. SIGGERUD: So the -- your medical concerns
(15) have been ongoing and it's not changed.
(16)     MS. WILLIAMS: Right.
(17)     MS. SIGGERUD: And so what came up about a month
(18) ago is a performance conversation. It had nothing to do
(19) with anything related to your medical condition. It has
(20) everything to do with performance and expectations.
(21)     MS. WILLIAMS: But the performance was around
(22) you getting the feedback of the perception that I wasn't
(23) here.
(24)     MS. SIGGERUD: That's not the only thing that
(25) was part of that conversation. That was one small piece

Brandy Williams vs. G&K Services, Inc.
Case No. 15-cv-01744-PHX-DDD

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

Page 25

(1) of it. And so that's kinda the --
(2)     MS. WILLIAMS: I do want to be here, Rachael, I
(3) do. I'll be honest about that. And I definitely had
(4) high expectations up- -- upon coming to G & K, and I
(5) never planned on leaving the company, but I'm -- I -- I
(6) feel, like, you know, I shouldn't continue to stress
(7) myself considering the health situation that I'm in, um,
(8) if, um, it's not gonna be beneficial to me.
(9)     If I'm -- if I feel that my morale has dropped
(10) due to the situation, and I feel that, um, I'm not
(11) wanted, then I don't feel like I should continue to make
(12) an effort. But if I am wanted here then by all means I
(13) am gonna be the utmost professional. I do enjoy my job.
(14) This is something that I've done for years and, um, I
(15) would love to stay with the company because I'm not an
(16) individual that's gonna quit or give up. But like I
(17) said, I -- I'm not gonna continue to be stressed or to
(18) deal with minor, you know, issues if it's not gonna be
(19) beneficial to G & K or to myself.
(20)     MS. SIGGERUD: Well, as far as being beneficial
(21) to G & K, these are things that are important. The
(22) things that we have talked about, those are important.
(23) Being a good partner, being on time, meeting
(24) commitments, those are extremely important. And if
(25) that's kinda not where your head's at and you say, gosh,

Page 26

(1) I would rather have a different type of, you know, work
(2) environment. I'd rather have a different kinda
(3) schedule, you know, I understand that. You know, I'd
(4) love to have you here, but if you say, gosh, this isn't
(5) the right thing for me, let me know.
(6)     MS. WILLIAMS: No, I don't want this to be put
(7) back off on me because I haven't expressed that I didn't
(8) want to be here. I've never expressed an issue with
(9) being here. An issue, you know, with not wanting to be
(10) in HR. I feel like this issue has come up and was
(11) brought to me, so that's why I'm trying to make sure
(12) that I'm addressing it. So I think the question is: Am
(13) I wanted here? And if so, are things going to continue
(14) to improve?
(15)     MS. SIGGERUD: Brandy, I just told you that
(16) you're wanted here, and whether they improve or not is
(17) up to you.
(18)     MS. WILLIAMS: Not necessarily. It takes two.
(19)     MS. SIGGERUD: So --
(20)     MS. WILLIAMS: It's a 50-50 relationship. So I
(21) can do as much as I want to do, but if I'm not wanted
(22) here by Jake or other individuals on this group or this
(23) team here, or yourself, then I'm not gonna be
(24) successful.
(25)     MS. SIGGERUD: So, again, I've told you that I

Page 27

(1) want you on my team. But the performance piece is --
(2) it's -- it's up to you. And I'm hear to help ya and I'm
(3) here to work with ya, but ultimately it sounds to me
(4) what you're saying, like, you're not quite sure that
(5) this is what you want.
(6)     MS. WILLIAMS: No. Because if I felt that way,
(7) Rachael, I would tell you.
(8)     MS. SIGGERUD: Well, you just -- you did just
(9) say it. You said if the -- if my morale is gonna
(10) continue to be low and if I'm gonna feel like I'm not
(11) wanted, then I don't want -- then let's make -- let's
(12) come to an agreement. And so if what you're asking for
(13) is for transition support --
(14)     MS. WILLIAMS: Yes. Because I'm telling you at
(15) this point I feel like I'm being pushed out of the
(16) business. I'm feeling pushed to quit, because of the
(17) things that are being brought to you that I feel are not
(18) true. And here I am trying to work harder to make sure
(19) that I'm changing everyone's perception, even though I
(20) guess we should go back to Jody's term of, it's really
(21) not the reality, you know.
(22)     MS. SIGGERUD: Perceptions have to do with
(23) reality.
(24)     MS. WILLIAMS: I'm working hard to change
(25) everyone --

Page 28

(1)     Okay. Well, your answer to me always was,
(2) again, Brandy, we're talking about people's perceptions.
(3) We're talking about people's perceptions here and how
(4) they perceive you, so. . . Then, again, is it
(5) perception or reality then?
(6)     MS. SIGGERUD: But, Brandy, perception is
(7) reality.
(8)     MS. WILLIAMS: Okay. But -- no, you never said
(9) that. Because I asked you before. Okay. So these are
(10) things that people are saying, but I'm not actually
(11) doing these things, and you said, again, we're talking
(12) about people's perceptions and how they view you and
(13) what they think.
(14)     MS. SIGGERUD: People's perceptions are their
(15) reality.
(16)     MS. WILLIAMS: Okay. And so -- so that's what I
(17) was asking for you to make clear then. So -- so now,
(18) that's put out there, that people's receptions
(19) [sic] are reality because that's not --
(20)     MS. SIGGERUD: Brandy, I think your mis- --
(21) maybe --
(22)     MS. WILLIAMS: -- our conversation.
(23)     MS. SIGGERUD: So it's the -- have you -- have
(24) you -- have you heard that phrase in the past? So it's
(25) a phrase that basically is, if I perceive that the sky

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 455 of 505

Brandy Williams vs. G&K Services, Inc.
Case No. 15-cv-01744-PHX-DDD

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

Page 29

(1) is blue, then to me the sky is blue. So --

(2) **MS. WILLIAMS:** Oh, yes, I have heard that.

(3) **MS. SIGGERUD:** Well, perceptions -- I'm not
(4) saying that what people are perceiving is what you are
(5) actually doing. It is not literal.

(6) **MS. WILLIAMS:** Okay. Thanks for making that
(7) clear. Because that's what -- that's the point I was
(8) getting to. Is that that's how you're coming across to
(9) me. Is that people's perception is reality, and that's
(10) what I am doing.

(11) **MS. SIGGERUD:** But the issue is that their
(12) perception will guide their relationship with you. It
(13) will govern the relationship with you. And so these
(14) perceptions come from somewhere. And I don't believe
(15) that everybody has conspired to have -- you know, a
(16) perception of this or that or the other thing.

(17) **MS. WILLIAMS:** So, you're basically coming out
(18) and telling me that you believe everything they're
(19) telling you is absolutely true.

(20) **MS. SIGGERUD:** That is not what I said, Brandy.

(21) **MS. WILLIAMS:** No, I'm asking you.

(22) **MS. SIGGERUD:** I don't know if it's true or not
(23) I'm not there, I didn't experience it. But what I am --
(24) what I am experiencing is the perceptions and that
(25) people's -- if someone says I don't perceive that

Page 30

(1) somebody is a good partner. I don't perceive that that
(2) there's value.

(3) **MS. WILLIAMS:** That's -- that's --

(4) **MS. SIGGERUD:** That --

(5) **MS. WILLIAMS:** -- the point I'm trying to bring
(6) across to you though, Rachael, is that I kinda feel
(7) attacked because you came at me like this is what
(8) they're telling me, and you kinda came out and told me
(9) that you believe Jake, and I kinda feel that I didn't
(10) get the fair understanding and I didn't get the fair
(11) opportunity to give you my feedback of how I felt. And
(12) it was, like, you're doing this, this is what's
(13) happening, you need to change it. If that makes sense?

(14) **MS. SIGGERUD:** But you did give me your
(15) feedback. And your feedback was that you don't believe
(16) that it's true.

(17) **MS. WILLIAMS:** No, I know for a fact that it's
(18) not true.

(19) **MS. SIGGERUD:** So then the issue is a very big
(20) disconnect.

(21) **MS. WILLIAMS:** Yes. It's a very big dis- -- a
(22) very big disconnect. Because how can people not know
(23) I'm here if they never come to this office.

(24) I mean, you know, honestly, this all went
(25) downhill when Jake decided to move me out of this office

Page 31

(1) because no one comes up front. And if no one comes up
(2) front, no one knows that I'm here in this office and
(3) they perceive that I'm not here. But when I was in the
(4) back it was never an issue of whether Brandy's here
(5) because I was there, I was interacting with every single
(6) person, every single day. Everyone knew where to find
(7) me. And it's like since I've been taken out of the
(8) realm of things, I felt like that's where this dilemma
(9) has occurred.

(10) **MS. SIGGERUD:** I'll say again, that piece about
(11) being in the office is a very small piece. That's just
(12) one -- one tiny little piece of the bigger picture.

(13) **MS. WILLIAMS:** And that's where I talk about I
(14) get back to the micromanaging piece. You know, because
(15) it's, like, what am I supposed to do then? Copy you on
(16) every single interaction I have with everybody just to
(17) prove that I'm doing the same thing that I've always
(18) done in this business? Or is everyone gonna -- gonna
(19) continue to give their perception.

(20) **MS. SIGGERUD:** So it's been, what, two weeks
(21) since you and I had that conversation?

(22) **MS. WILLIAMS:** Uh-huh.

(23) **MS. SIGGERUD:** And I haven't heard anything from
(24) anybody about not -- you know, not being able to work
(25) with you, not being able to find you or anything like

Page 32

(1) that. So . . .

(2) **MS. WILLIAMS:** Because I made an, extra effort
(3) to go above and beyond and go walk back there and say hi
(4) to them when I got here. I got out of my office to go
(5) back there and say hi to them during the midday. I got
(6) out of my office to go back there to say hi to them
(7) during the afternoon. Even though I was here.

(8) And so it's like, I think that proved the point
(9) of their perception that -- because I actually made it a
(10) point the go walk around and peep in and say, Hey, how
(11) are you? Hey, how are you? Like, consistently
(12) throughout the day, all day long, then it wasn't an
(13) issue that I'm -- I'm not here. Even though I was.

(14) That's what I'm saying. That's -- that's the
(15) point that I'm trying to prove to you. That that's why
(16) I don't feel that it is true. Because before I was, but
(17) by me changing their way of thinking by actually going
(18) around to them consistently throughout the day, and
(19) me -- I'm feeling like I'm micromanaged because I have
(20) to walk around to every single one of them and say, hey,
(21) how are you? How's it going? I'm here. They don't do
(22) that to me. And I don't feel like I should have to be
(23) to the point to where I do that to them. If they leave
(24) they don't come and say, Hey, HR I'm leaving. Or, you
(25) know, if Mitch misses his meeting with me that I had

Brandy Williams vs. G&K Services, Inc.
Case No. 15-cv-01744-PHX-DDD

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

Page 33

(1) scheduled with him about IDP's and I go in there looking
(2) for him and he says, oh, yeah, I don't have time to do
(3) that, because I have customer issues to handle so, um,
(4) I'll get with you when I can. But, you know, I'm not
(5) coming back and saying those things to you because I'm
(6) really trying to work through things with them. I'm
(7) like, okay, you know, I'm trying to be easy going and
(8) say, well, just let me know when you're available. But
(9) yet, if I do anything like that, that come to you
(10) immediately and say, hey, Brandy didn't do this. Or
(11) Brandy didn't do that. So that's where I get to the
(12) point of I'm feeling like I'm being micromanaged, and
(13) they're not gonna be held to the same standard. But I'm
(14) going to be held to a higher standard and I'm gonna have
(15) to make sure I'm doing -- going above and beyond and
(16) doing everything I'm doing. But yet they're not gonna,
(17) you know, participate. And it's, like, as long as
(18) they're happy, then that's okay.
(19)        MS. SIGGERUD: So, you know, as it pertains to,
(20) I just want to handle it, I don't wanna say anything.
(21) I've -- I -- every time we have a conversation about, so
(22) and so's not doing this. So and so says no biggy. So
(23) and so's, you know, they don't have time. Copy me.
(24) Work with me on it. Let me know if you need me to reach
(25) out.

Page 34

(1)        MS. WILLIAMS: But that's what I'm just saying
(2) though. You know, two years before that I never had to
(3) do that.
(4)        MS. SIGGERUD: But the job wasn't the same,
(5) Brandy. So the activities that we're trying to do now,
(6) of -- we're not getting them done, because people
(7) aren't -- they're not making it to meetings, they're too
(8) busy, they're whatever, that's what your job is now.
(9) Before your job was different. It was, we're doing
(10) payroll, we're doing benefits, we're hiring people,
(11) we're recruiting. It wasn't the same types of
(12) activities. And so it's -- it wasn't so based on other
(13) people.
(14)        MS. WILLIAMS: Okay.
(15)        MS. SIGGERUD: But here it is. So kinda -- I'll
(16) leave you with this. You know, I want you on my team.
(17) I wanna help change the perception. And I think we're
(18) on the right track, but I want you to think over the
(19) next few days if this is what you want. And if it's not
(20) what you want, I'm not gonna hold it against ya, we will
(21) come up with a transition plan. I'll support ya. We
(22) can either look for something else within G & K, I can
(23) help you with a transition plan to find something else
(24) outside of G & K, but I'll work with ya to figure it
(25) out.

Page 35

(1)        MS. WILLIAMS: Okay.
(2)        MS. SIGGERUD: So, I want you on my team. And
(3) I'll continue working with you to make sure that we're
(4) successful. But if that's not what you want -- I'm not
(5) gonna change your mind, so . . .
(6)        MS. WILLIAMS: No, I appreciate that. You know,
(7) and the whole point of this conversation was to be
(8) professional and to have just a very candid conversation
(9) and just lay it out on the table of, you know, the facts
(10) and the reality of the situation. If that makes sense?
(11) You know, I mean, no -- no getting emotional or
(12) getting, you know, upset about it but, honestly, just to
(13) be very professional and just have a very open
(14) conversation with you about it. You know, that --
(15) that's all I really wanted to accomplish, honestly,
(16) today, so I -- I appreciate you, you know, talking to me
(17) and listening to me about it. And I -- I, honestly,
(18) really appreciate that so . . .
(19)        MS. SIGGERUD: Absolutely. Any time. And I
(20) still look forward to being there next week and sitting
(21) down with Jake and putting together a plan.
(22)        MS. WILLIAMS: Okay.
(23)        MS. SIGGERUD: So. All righty?
(24)        MS. WILLIAMS: All right. Well, thanks I
(25) appreciate your time.

Page 36

(1)        MS. SIGGERUD: Have a good night.
(2)        MS. WILLIAMS: Okay. Bye-bye.
(3)        MS. SIGGERUD: Bye-bye.
(4)
(5)        (End of audio recorded conversation with Rachael
(6) Siggerud.)
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Case 2:15-cv-01744-DJH  Document 76-1  Filed 10/26/16  Page 457 of 505

Brandy Williams vs. G&K Services, Inc.                    Conversation / Brandy Williams and Rachael Siggerud
Case No. 15-cv-01744-PHX-DDD                                                                July 17, 2013

Page 37

(1)                    C E R T I F I C A T E

(2)

(3)          I, Deanna C. Bakurza, RPR, a Certified Reporter

(4)     in the State of Arizona, do hereby certify that the

(5)     foregoing pages 1 - 36 constitute a full, true, and

(6)     accurate transcript of the audio recording produced in

(7)     the foregoing matter, all done to the best of my skill

(8)     and ability.

(9)              SIGNED and dated this 5th day of May, 2016.

(10)

(11)

(12)

(13)                    _____
                        Deanna C. Bakurza, RPR
(14)                       Certified Reporter
                        Certification Number 50412

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 458 of 505

**Brandy Williams vs. G&K Services, Inc.**
**Case No. 15-cv-01744-PHX-DDD**

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

**$**

**$0.50 (2)**
8:14,18
**$17 (1)**
8:13

**[**

**[sic] (1)**
28:19
**[unintelligible] (3)**
9:19;13:14;14:16

**A**

**able (8)**
3:15,24;5:5,7;6:20;7:5;
31:24,25
**above (3)**
12:7;32:3;33:15
**absolutely (4)**
8:9;24:1;29:19;35:19
**accept (2)**
20:20;21:2
**access (1)**
20:10
**accom- (1)**
13:13
**accommodation (1)**
13:13
**accomodation (1)**
13:8
**accomplish (1)**
35:15
**accurately (1)**
7:5
**across (2)**
29:8;30:6
**activities (2)**
34:5,12
**actually (6)**
16:1,5;28:10;29:5;32:9,17
**addressing (1)**
26:12
**afternoon (1)**
32:7
**again (6)**
10:4;26:25;28:2,4,11;31:10
**against (1)**
34:20
**ago (4)**
14:12;21:13;24:13,18
**agreement (1)**
27:12
**airport (1)**
22:8
**always (6)**
12:3,5,8;21:24;28:1;31:17
**Angeles (1)**
20:17
**Angie (2)**

18:3;19:17
**anymore (4)**
10:10;13:6,11;23:8
**apologize (1)**
20:12
**applied (1)**
10:6
**applies (2)**
2:23;8:3
**apply (2)**
3:3;8:6
**applying (1)**
7:21
**appointment (1)**
13:23
**appreciate (4)**
35:6,16,18,25
**approach (2)**
4:7;7:19
**appropriate (2)**
15:23;20:25
**appropriately (1)**
3:15
**around (18)**
3:15,19;5:18,22,24;10:19;
11:4;14:21,23;16:13,15,23;
19:8;22:4;24:21;32:10,18,20
**aside (2)**
4:15;20:8
**aspired (1)**
23:18
**assessing (1)**
7:9
**asset (1)**
12:4
**assistance (3)**
16:9,12,13
**assure (1)**
24:1
**attacked (1)**
30:7
**attend (3)**
20:16,21;21:1
**attending (1)**
21:17
**audio (2)**
2:1;36:5
**available (1)**
33:8
**aware (2)**
6:25;21:9
**awful (1)**
23:15

**B**

**back (14)**
11:16;17:21;18:12,15;
21:4;24:8;26:7;27:20;31:4,
14;32:3,5,6;33:5
**backfill (1)**
8:19
**base (2)**

10:16;22:25
**based (1)**
34:12
**basically (3)**
11:3;28:25;29:17
**bearing (1)**
14:5
**below (1)**
20:1
**beneficial (5)**
11:24,24;25:8,19,20
**benefit (1)**
3:19
**benefits (1)**
34:10
**best (4)**
4:24;9:24;12:11;16:22
**better (3)**
2:19;3:19;13:4;17:16
**beyond (3)**
12:7;32:3;33:15
**big (5)**
14:7;22:15;30:19,21,22
**bigger (1)**
31:12
**biggy (1)**
33:22
**birth (1)**
24:8
**bit (2)**
11:4;12:18
**blind (2)**
10:25;12:21
**blue (2)**
29:1,1
**bona (1)**
6:7
**both (1)**
7:19
**Brandy (9)**
19:22;26:15;28:2,6,20;
29:20;33:10,11;34:5
**Brandy's (1)**
31:4
**bring (1)**
30:5
**broadening (1)**
4:16
**brought (3)**
12:23;26:11;27:17
**bump (1)**
8:13
**business (9)**
3:20,25;12:4;13:17;14:24;
16:25;17:6;27:16;31:18
**busy (1)**
34:8
**Bye-bye (2)**
36:2,3

**C**

**calendar (2)**

16:19;21:17
**calendars (2)**
20:9;21:20
**calender (6)**
13:22;15:19;16:16,16;
20:24;21:11
**calenders (1)**
21:21
**call (6)**
15:10,22;20:17;22:18,19,
21
**calls (1)**
23:23
**came (8)**
14:9;24:4,7,8,12,17;30:7,8
**can (21)**
4:7,19;8:19;11:9;15:8;
17:3,12,13,13,25;18:1,5;
22:11,14;23:24;24:1;26:21;
30:22;33:4;34:22,22
**cancel (1)**
15:10
**candid (2)**
17:14;35:8
**candidness (1)**
11:4
**careful (1)**
6:2
**case (1)**
17:11
**caught (1)**
15:18
**cause (3)**
10:20,22;12:15
**cell (2)**
22:16,18
**center (1)**
5:23
**certainly (5)**
13:15;14:1,5;15:11;23:10
**change (6)**
13:4;15:4;27:24;30:13;
34:17;35:5
**changed (3)**
15:5;23:15;24:15
**changes (1)**
4:15
**changing (5)**
4:1;13:4;18:1;27:19;32:17
**check (1)**
20:23
**clear (7)**
11:2,18,23;12:9;16:22;
28:17;29:7
**clearly (1)**
12:2
**client (1)**
21:8
**close (4)**
17:24;18:4;23:22,24
**code (1)**
15:21
**coming (6)**

**Brandy Williams vs. G&K Services, Inc.**
**Case No. 15-cv-01744-PHX-DDD**

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

11:13;23:8;25:4;29:8,17;
33:5
**Commencement (1)**
  2:1
**commitment (1)**
  15:20
**commitments (1)**
  25:24
**communicating (1)**
  13:1
**communication (2)**
  11:15,17
**comp (1)**
  15:14
**companies (1)**
  12:2
**company (4)**
  11:25;17:6;25:5,15
**completing (1)**
  11:12
**compromise (1)**
  17:12
**computer (3)**
  6:16;7:10,11
**computers (1)**
  7:4
**concerns (2)**
  16:25;24:14
**condition (2)**
  24:2,19
**confidence (1)**
  13:10
**conflict (2)**
  21:1,10
**consideration (1)**
  11:11
**considering (1)**
  25:7
**consistently (2)**
  32:11,18
**conspired (1)**
  29:15
**constructive (1)**
  11:10
**continue (8)**
  17:13;25:6,11,17;26:13;
  27:10;31:19;35:3
**continuing (2)**
  11:15;19:6
**conversation (17)**
  10:18,24;14:8,10,20;18:2,
  3;24:4,18,25;28:22;31:21;
  33:21;35:7,8,14;36:5
**conversations (5)**
  5:22;11:22;12:18;16:13;
  19:6
**Copy (2)**
  31:15;33:23
**couple (5)**
  12:17;14:12;18:12,18;
  23:21
**creative (1)**
  11:13

**criticism (1)**
  11:10
**cross-trained (2)**
  4:19;5:7
**cross-training (1)**
  4:17
**currently (1)**
  2:4
**customer (6)**
  2:5,6;4:4;5:4;7:24;33:3
**customers (2)**
  2:8;5:6

## D

**day (4)**
  31:6;32:12,12,18
**days (4)**
  8:4;18:12;23:21;34:19
**deal (3)**
  14:7;22:15;25:18
**dealing (3)**
  17:2,4;24:7
**decide (1)**
  16:6
**decided (2)**
  18:23;30:25
**decline (1)**
  21:3,4
**definitely (4)**
  3:11;7:8;11:10;25:3
**demonstrated (1)**
  2:7
**desk (1)**
  22:19
**determine (1)**
  9:24
**different (5)**
  7:5;21:20;26:1,2;34:9
**dilemma (1)**
  31:8
**direct (1)**
  19:14
**dis- (1)**
  30:21
**disconnect (1)**
  30:20,22
**discussion (3)**
  5:17,18;6:5
**done (7)**
  6:17;12:5;16:23;21:25;
  25:14;31:18;34:6
**double-edged (1)**
  18:9
**down (1)**
  35:21
**downhill (1)**
  30:25
**drive (2)**
  20:9,23
**dropped (1)**
  25:9
**dropping (1)**

17:5
**due (1)**
  25:10
**during (2)**
  32:5,7

## E

**easiest (1)**
  4:2
**easy (1)**
  33:7
**effort (2)**
  25:12;32:2
**either (6)**
  2:23;3:22;8:20;9:11;20:4;
  34:22
**else (4)**
  10:16;20:7;34:22,23
**em (2)**
  8:21;21:5
**email (1)**
  16:17
**e-mail (3)**
  10:15;18:16;19:16
**e-mailed (1)**
  22:23
**e-mails (1)**
  6:21
**emotional (1)**
  35:11
**emphasis (1)**
  22:4
**employee (3)**
  4:24;8:8;11:24
**employees (3)**
  5:10;11:22;12:7
**en- (1)**
  17:21
**End (1)**
  36:5
**engaged (2)**
  13:1;17:20
**engagement (1)**
  14:21
**English (5)**
  5:2,13,20,23;6:7
**enjoy (2)**
  10:23;25:13
**entire (1)**
  2:15
**entitled (1)**
  3:23
**environment (1)**
  26:2
**equivalent (1)**
  9:14
**evaluate (1)**
  2:16
**even (6)**
  8:4;9:9;14:9;27:19;32:7,13
**everybody (5)**
  4:17;23:16,16;29:15;31:16

**everybody's (1)**
  4:16
**everyone (11)**
  3:16;4:18,19;12:9;13:1,9;
  16:5;18:24;27:25;31:6,18
**everyone's (3)**
  13:2;16:4;27:19
**except (1)**
  20:10
**expect (1)**
  20:22
**expectations (3)**
  24:4,20;25:4
**experience (2)**
  5:5;29:23
**experiencing (1)**
  29:24
**expressed (2)**
  26:7,8
**external (1)**
  3:9
**extra (1)**
  32:2
**extreme (1)**
  23:3
**extremely (1)**
  25:24

## F

**fact (2)**
  16:16;30:17
**facts (1)**
  35:9
**failure (1)**
  17:10
**fair (2)**
  30:10,10
**falls (1)**
  2:22
**far (2)**
  15:2;25:20
**feedback (5)**
  15:14;24:22;30:11,15,15
**feel (28)**
  9:13;11:8,16;12:6,16,17,
  19;13:6,7,9;16:7,14;17:10,
  18;18:9;23:2;25:6,9,10,11;
  26:10;27:10,15,17;30:6,9;
  32:16,22
**feeling (4)**
  23:7;27:16;32:19;33:12
**feels (3)**
  5:1,3;9:14
**felt (10)**
  3:14,18;4:22;10:25;12:4,8,
  21;27:6;30:11;31:8
**few (2)**
  8:4;34:19
**fide (1)**
  6:7
**figure (1)**
  34:24

**ARIZONA REPORTING SERVICE, INC.**
**(602) 274-9944     www.az-reporting.com**

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 460 of 505

Brandy Williams vs. G&K Services, Inc.
Case No. 15-cv-01744-PHX-DDD

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

**file (1)**
2:1
**find (4)**
18:22;31:6,25;34:23
**first (3)**
7:13,24;8:3
**fit (6)**
4:24;8:7;13:6,11;16:6;
17:18
**folks (3)**
3:3;6:19;8:20
**forth (1)**
11:16
**forward (3)**
14:9;17:14;35:20
**front (2)**
31:1,2
**frustrated (1)**
19:22
**frustrating (1)**
15:9
**further (2)**
17:7;19:6

## G

**gain (1)**
5:5
**giving (1)**
8:13
**GM's (1)**
19:24
**goal (1)**
17:22
**goes (3)**
3:11;9:4;20:22
**gonna (32)**
2:5;3:16,18;8:7;13:4,14;
14:16,17;16:18;17:8,16;
19:16,19;20:16;21:2,6;22:17;
25:8,13,16,17,18;26:23;27:9,
10;31:18,18;33:13,14,16;
34:20;35:5
**good (13)**
2:6,15,20;4:14;6:21;10:13;
13:6,11;16:6;17:18;25:23;
30:1;36:1
**gosh (3)**
23:16;25:25;26:4
**gotta (2)**
15:19;23:22
**govern (1)**
29:13
**great (5)**
5:3;8:7;9:2;12:8;22:5
**group (2)**
18:20;26:22
**guess (10)**
10:18,20;11:1,3,15;12:10,
15;20:1,5;27:20
**guide (1)**
29:12
**guidelines (1)**

16:23
**guys (2)**
13:10;19:25

## H

**handle (2)**
33:3,20
**happen (1)**
15:18
**happened (4)**
21:10,12,14,14
**happening (2)**
12:23;30:13
**happy (1)**
33:18
**hard (2)**
20:23;27:24
**harder (1)**
27:18
**head's (1)**
25:25
**health (7)**
13:7;16:8,24,25;17:1,8;
25:7
**hear (3)**
18:11;20:5;27:2
**heard (4)**
15:6;28:24;29:2;31:23
**hearing (1)**
23:12
**heart's (1)**
23:14
**held (3)**
18:10;33:13,14
**help (8)**
5:24;17:8,25;18:5;23:24;
27:2;34:17,23
**helpful (1)**
3:22
**here's (1)**
7:20
**hey (10)**
3:25;7:20;8:6;22:11,12;
32:10,11,20,24;33:10
**hi (3)**
32:3,5,6
**high (1)**
25:4
**higher (1)**
33:14
**hiring (1)**
34:10
**hold (1)**
34:20
**holding (1)**
23:22
**honest (4)**
22:3;23:1,4;25:3
**honestly (8)**
16:7;22:2,17;23:1;30:24;
35:12,15,17
**hour (2)**

13:15;14:6
**How's (1)**
32:21
**HR (4)**
11:21;23:17;26:10;32:24
**hung (1)**
22:8

## I

**IDP (1)**
19:5
**IDPs (1)**
5:18
**IDP's (1)**
33:1
**imagined (1)**
23:19
**immediately (1)**
33:10
**important (5)**
16:25;17:2;25:21,22,24
**improve (6)**
5:16,24;17:9,13;26:14,16
**improvement (1)**
5:2
**improving (1)**
5:22
**included (1)**
4:10
**individual (2)**
2:9;25:16
**individuals (3)**
3:19;7:20;26:22
**information (2)**
12:18;13:21
**instead (1)**
23:3
**interacting (1)**
31:5
**interaction (1)**
31:16
**interest (1)**
2:7
**interested (3)**
3:4;8:5,18
**internal (4)**
3:6,9,10;9:11
**internally (1)**
3:12
**into (8)**
2:12;4:1,23;5:4;8:21;9:9,
18;11:11
**invite (3)**
20:18,20;21:2
**issue (8)**
24:10;26:8,9,10;29:11;
30:19;31:4;32:13
**issues (7)**
13:7;16:8,24;24:7,12;
25:18;33:3

## J

**Jake (12)**
11:6;13:5,23;14:17;15:5;
18:2,23;19:10;26:22;30:9,25;
35:21
**Janelle (1)**
20:4
**job (11)**
2:12;6:17;9:15;10:7,8;
23:15,18;25:13;34:4,8,9
**jobs (1)**
9:13
**Jody's (1)**
27:20
**judged (1)**
15:25
**Jump (1)**
10:14

## K

**Kayla (1)**
20:4
**keep (1)**
17:25
**kind (4)**
2:9;4:17;5:15;24:9
**kinda (26)**
5:21;10:17,25;11:14,16,19;
12:9,13,16,19,20;13:6;14:17;
17:10,21;22:24;23:2,20,25;
25:1,25;26:2;30:6,8,9;34:15
**knew (1)**
31:6
**knowledge (1)**
5:24
**knows (2)**
20:16;31:2

## L

**lack (1)**
14:21
**last (7)**
10:24,25;12:17,18;13:17;
14:11,12
**late (3)**
15:1,15,21
**lay (1)**
35:9
**leaders (4)**
19:1,11,24,25
**learn (1)**
5:20
**learning (1)**
5:23
**Leave (1)**
4:4;32:23;34:16
**leaving (3)**
4:24;25:5;32:24
**letter (2)**

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 461 of 505

Brandy Williams vs. G&K Services, Inc.          Conversation / Brandy Williams and Rachael Siggerud
Case No. 15-cv-01744-PHX-DDD                                              July 17, 2013

14:15;16:10
**letting (1)**
    22:10
**level (1)**
    9:15
**lie (1)**
    6:16
**listening (1)**
    35:17
**literal (1)**
    29:5
**little (11)**
    5:13,13;10:25;11:4,17;
    12:18;16:15,20;23:3;24:3;
    31:12
**live (3)**
    15:19;16:2,3
**locations (1)**
    6:18
**logged (1)**
    18:19
**long (2)**
    32:12;33:17
**look (8)**
    2:15,24;4:15;7:8;8:12;
    16:18;34:22;35:20
**looking (3)**
    11:4;24:1;33:1
**Los (1)**
    20:17
**lost (2)**
    11:17;16:20
**lot (1)**
    23:15
**Lotus (3)**
    20:20;21:18,21
**love (4)**
    17:15,19;25:15;26:4
**low (1)**
    27:10

**M**

**makes (4)**
    9:2;10:12;30:13;35:10
**making (3)**
    11:13;29:6;34:7
**many (1)**
    21:20
**Marie (1)**
    14:2
**Marissa (1)**
    9:5
**maybe (11)**
    2:25;3:3,5,10;4:14;5:21;
    8:4,13;20:11;22:21;28:21
**mean (18)**
    3:22,23;10:22;11:20;12:15,
    17;13:13,15;18:16,20,24,25;
    19:4;21:24;22:6;24:6;30:24;
    35:11
**means (2)**
    9:23;25:12

**medical (3)**
    24:2,14,19
**meeting (8)**
    13:23;15:15;20:21,22;
    22:14,22;25:23;32:25
**meetings (3)**
    12:17;15:18;34:7
**Melissa (2)**
    7:19;15:22
**mentioned (2)**
    10:15,22
**Michael (1)**
    9:24
**micromanaged (3)**
    16:15;32:19;33:12
**micromanaging (2)**
    17:23;31:14
**midday (1)**
    32:5
**might (4)**
    2:12,19;13:8,10
**mind (1)**
    35:5
**minor (4)**
    17:3,5;23:8;25:18
**minutes (1)**
    15:16
**mis- (1)**
    28:20
**miscommunication (2)**
    12:25;21:19
**miss (1)**
    22:17
**misses (1)**
    32:25
**mistake (3)**
    20:11;23:1,4
**misunderstanding (1)**
    12:25
**Mitch (3)**
    14:16,17;32:25
**mixed (1)**
    12:16
**Monica (1)**
    14:15
**month (1)**
    24:17
**months (2)**
    18:22;24:13
**morale (3)**
    17:6;25:9;27:9
**more (6)**
    3:5;4:15,16;5:5,7;8:12
**mostly (1)**
    14:14
**move (9)**
    2:5;3:15,19;4:1,23;5:1;
    8:21;17:13;30:25
**moves (1)**
    5:4
**moving (1)**
    2:25
**much (5)**

7:3;9:13;13:18;22:3;26:21
**multiple (1)**
    7:5
**myself (2)**
    25:7,19

**N**

**necessarily (3)**
    3:5;9:18;26:18
**need (7)**
    2:24;4:12;6:1;7:3;9:9,12;
    10:21;16:13,13;18:7;30:13;
    33:24
**needed (4)**
    16:9,9,12;23:7
**needing (1)**
    7:4
**needs (4)**
    3:25;5:2;16:5,23
**new (1)**
    21:25
**next (3)**
    23:21;34:19;35:20
**night (1)**
    36:1
**nobody (3)**
    2:23;13:17;20:10
**None (3)**
    20:6;24:11,11
**notes (1)**
    21:18
**numerous (1)**
    16:12

**O**

**occupational (1)**
    6:8
**occurred (2)**
    17:17;31:9
**o'clock (1)**
    22:13
**off (3)**
    16:3,3;26:7
**offer (1)**
    3:12
**office (9)**
    2:15;6:17;9:6;30:23,25;
    31:2,11;32:4,6
**off-site (1)**
    13:22
**one (19)**
    3:2,17;4:23;7:23;8:3;10:4;
    14:11,12,20;15:16;20:5,9;
    24:25;31:1,1,2,12,12;32:20
**one-on-one (9)**
    10:24;14:13,13;15:10;
    21:15,17,22;22:12,13
**ones (1)**
    19:17
**ongoing (1)**
    24:15

**only (3)**
    3:11;20:5;24:24
**open (5)**
    4:23;8:2;9:16;10:18;35:13
**opening (1)**
    7:25
**opportunity (3)**
    2:15,20;30:11
**order (1)**
    17:9
**organized (1)**
    20:22
**organizer (1)**
    21:5
**others (1)**
    20:6
**out (21)**
    4:8,12;8:4;9:23;17:3;
    18:11,23;19:17;20:3,22;
    27:15;28:18;29:17;30:8,25;
    31:7;32:4,6;33:25;34:25;35:9
**outcome (1)**
    20:25
**outside (2)**
    3:5;34:24
**over (1)**
    34:18
**own (1)**
    17:1

**P**

**paper (1)**
    9:22
**part (5)**
    5:17;19:22;20:12;23:11;
    24:25
**participate (1)**
    33:17
**partner (2)**
    25:23;30:1
**partners (1)**
    18:1
**passion's (1)**
    23:13
**past (2)**
    18:18;28:24
**payroll (2)**
    20:17;34:10
**peep (1)**
    32:10
**people (16)**
    2:25;3:24;4:11;5:5;6:19;
    15:13;16:18;19:11,24;20:10;
    28:10;29:4;30:22;34:6,10,13
**people's (7)**
    28:2,3,12,14,18;29:9,25
**perceive (6)**
    2:19;28:4,25;29:25;30:1;
    31:3
**perceived (1)**
    13:9
**perceiving (2)**

17:23;29:4

**perception (17)**
13:2;15:3,4;16:1,3,4;18:1;
24:22;27:19;28:5,6;29:9,12,
16;31:19;32:9;34:17

**Perceptions (8)**
27:22;28:2,3,12,14;29:3,
14,24

**performance (4)**
24:18,20,21;27:1

**period (1)**
21:2

**person (3)**
2:4;8:5;31:6

**pertains (1)**
33:19

**Phoenix (7)**
11:6;13:17;14:24;18:19;
20:9,10;21:17

**phone (2)**
22:16,19

**phrase (2)**
28:24,25

**picture (2)**
12:9;31:12

**piece (8)**
4:11;9:21;24:25;27:1;
31:10,11,12,14

**place (1)**
18:23

**plan (3)**
34:21,23;35:21

**planned (1)**
25:5

**plant (6)**
5:10,19;6:13,19;9:15,19

**point (13)**
13:5;16:14;23:2,7;27:15;
29:7;30:5;32:8,10,15,23;
33:12;35:7

**portion (3)**
3:17;5:12;20:13

**position (12)**
2:18;3:17,24;4:2,4,25;6:10;
7:16,25;8:11;11:5,5

**positions (2)**
4:20;5:8

**positive (1)**
8:8

**post (7)**
2:20;3:16;7:23;9:9,19,24;
10:7

**poster (5)**
4:5;7:6;8:5,17;10:6

**posting (3)**
3:5,11;7:15

**postings (1)**
2:5

**prepare (1)**
5:6

**pretty (3)**
5:14;9:13;10:18

**private (1)**

13:21

**probably (3)**
2:24;6:25;9:23

**professional (4)**
12:1;25:13;35:8,13

**professionally (1)**
11:20

**promoted (1)**
6:18

**prove (2)**
31:17;32:15

**proved (1)**
32:8

**pushed (2)**
27:15,16

**put (8)**
4:3;9:18;12:20;16:10;
20:15;21:11;26:6;28:18

**putting (3)**
13:22;17:7;35:21

## Q

**quali- (1)**
7:15

**qualification (1)**
6:8

**quit (2)**
25:16;27:16

**quite (2)**
18:17;27:4

## R

**Rachael (5)**
11:21;25:2;27:7;30:6;36:5

**raise (3)**
4:10;8:14,18

**random (1)**
20:23

**rather (3)**
2:9;26:1,2

**Reach (5)**
8:4;9:23;18:11;19:17;
33:24

**reached (1)**
20:3

**real (1)**
17:24

**reality (11)**
16:2,3;17:1;27:21,23;28:5,
7,15,19;29:9;35:10

**realized (1)**
22:12

**really (16)**
7:3,21;8:6,20,20;10:23;
12:10,22;13:18;16:21;17:14;
23:18;27:20;33:6;35:15,18

**realm (1)**
31:8

**reason (1)**
4:25

**reasonable (3)**

16:18;20:21,25

**received (2)**
12:19;20:17

**receptionist (7)**
3:17;4:3,4;5:1;7:3;8:17,19

**receptions (1)**
28:18

**recorded (1)**
36:5

**recruiting (1)**
34:11

**recurring (2)**
21:23,25

**referring (1)**
12:14

**regardless (2)**
8:19;20:14

**regional (1)**
19:10

**related (1)**
24:19

**relationship (6)**
11:6;12:8;14:23;26:20;
29:12,13

**replace (1)**
3:18

**reports (1)**
19:14

**reschedule (3)**
22:6,12,14

**respect (4)**
13:12;14:4,10;20:8

**respond (1)**
18:8

**response (1)**
19:18

**responsibilities (1)**
8:12

**Right (15)**
2:13;3:7;6:9;7:4;9:21;
10:11,14;13:19;14:1,3,19;
24:16;26:5;34:18;35:24

**righty (5)**
9:1,25;10:3,11;35:23

**role (2)**
5:4;7:22

**rotate (1)**
4:17

**round (1)**
4:8

**rounding (1)**
4:12

**rusty (1)**
5:13

## S

**same (5)**
8:17;31:17;33:13;34:4,11

**saying (8)**
15:24;19:15;27:4;28:10;
29:4;32:14;33:5;34:1

**schedule (1)**

26:3

**scheduled (2)**
22:13;33:1

**seem (1)**
20:4

**sense (5)**
8:24;9:2;10:12;30:13;
35:10

**sent (1)**
19:16

**service (4)**
2:5,6;4:4;7:25

**services (1)**
5:4

**set (4)**
4:8,12,16;17:10

**sets (1)**
2:16

**sh- (1)**
5:11

**sharp (1)**
15:15

**Shipman (1)**
9:24

**shooters (1)**
15:15

**shove (1)**
2:11

**show (1)**
14:17

**sided (2)**
10:25;12:21

**SIGGERUD (96)**
2:4,11,14,18,22;3:2,13,21;
4:7,14,21;5:9:6:1,7,10,12,15,
24;7:2,8,11,13,18;8:2,11,16,
24;9:1,3,8,11,18,21;10:2,6,
10,13;12:12;13:12,20;14:1,4,
22,25;17:19;18:16,21,25;
19:3,7,9,13,21;20:6,14,20;
21:8,12,14,21;22:7;23:5,10;
24:9,14,17,24;25:20;26:15,
19,25;27:8,22;28:6,14,20,23;
29:3,11,20,22;30:4,14,19;
31:10,20,23;33:19;34:4,15;
35:2,19,23;36:1,3,6

**signals (1)**
12:16

**significantly (1)**
6:20

**single (5)**
22:1;31:5,6,16;32:20

**sitting (1)**
35:20

**situation (4)**
17:24;25:7,10;35:10

**skill (4)**
2:16;4:8,12,16

**skills (5)**
2:6;4:24;6:16;7:10,11

**sky (2)**
28:25;29:1

**small (2)**

**ARIZONA REPORTING SERVICE, INC.**
**(602) 274-9944     www.az-reporting.com**

Case 2:15-cv-01744-DJH   Document 76-1   Filed 10/26/16   Page 463 of 505

Brandy Williams vs. G&K Services, Inc.
Case No. 15-cv-01744-PHX-DDD

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

**24:25;31:11**
**somebody (5)**
  2:6,12,18;7:2;30:1
**someone (3)**
  18:13;22:10;29:25
**someone's (1)**
  16:1
**someplace (1)**
  5:23
**sometimes (4)**
  5:15;22:1,2,4
**somewhere (1)**
  29:14
**son (1)**
  24:8
**sort (2)**
  9:14;19:7
**so's (2)**
  33:22,23
**sounds (3)**
  3:9;10:13;27:3
**space (1)**
  4:23
**Spanish (1)**
  5:10
**speak (1)**
  15:8
**spectrum (1)**
  6:16
**spot (1)**
  12:20
**stand (1)**
  12:3
**standard (2)**
  33:13,14
**stands (2)**
  11:6;15:2
**start (1)**
  18:1
**started (2)**
  16:8;23:17
**starting (1)**
  16:15
**stay (2)**
  17:23;25:15
**staying (1)**
  18:4;23:22
**still (6)**
  5:2,3;11:16;18:13,14;35:20
**stress (3)**
  17:2,7;25:6
**stressed (1)**
  25:17
**stresses (1)**
  17:4
**struggled (1)**
  6:20
**struggles (1)**
  5:15
**successful (4)**
  11:9;18:6;26:24;35:4
**suggested (1)**
  11:12

**support (4)**
  14:21;17:8;27:13;34:21
**supported (1)**
  12:7
**supportive (1)**
  18:8
**supposed (1)**
  31:15
**Sure (23)**
  3:21;4:8;10:3,20;11:2,11,
  13,18;12:2;13:3;14:22;15:25;
  17:11,24;18:5,17;23:24,24;
  26:11;27:4,18;33:15;35:3
**sword (1)**
  18:9
**systems (1)**
  7:5

**T**

**table (1)**
  35:9
**talk (1)**
  2:24;3:7;5:21;31:13
**talked (12)**
  6:4;13:16,21;14:14,14,15;
  15:5,6,13;19:9,23;25:22
**talking (7)**
  5:5;14:11,19;28:2,3,11;
  35:16
**talks (1)**
  5:9
**team (8)**
  11:7;19:10,10;23:11;
  26:23;27:1;34:16;35:2
**technology (1)**
  6:22
**telling (4)**
  27:14;29:18,19;30:8
**term (1)**
  27:20
**Thanks (2)**
  29:6;35:24
**There'll (1)**
  4:10
**thinking (2)**
  22:20;32:17
**though (6)**
  18:8;27:19;30:6;32:7,13;
  34:2
**thought (1)**
  22:18
**throughout (2)**
  32:12,18
**tiny (1)**
  31:12
**today (3)**
  18:17;22:11;35:16
**together (1)**
  35:21
**told (5)**
  6:3;13:24;26:15,25;30:8
**tomorrow (1)**

**22:15**
**toolbox (1)**
  4:9
**top (1)**
  17:1
**totally (1)**
  15:17
**touch (1)**
  10:16
**touching (1)**
  22:25
**track (4)**
  17:21,25;23:25;34:18
**transition (1)**
  27:13;34:21,23
**traveling (2)**
  22:5,7
**true (6)**
  27:18;29:19,22;30:16,18;
  32:16
**try (1)**
  11:11
**trying (16)**
  4:8;9:4;10:20;13:3;16:21;
  17:11,14,23;23:23;26:11;
  27:18;30:5;32:15;33:6,7;34:5
**Tucson (1)**
  22:11,14
**turn (2)**
  6:17;18:7
**two (8)**
  3:18;4:15,21;18:22;24:13;
  26:18;31:20;34:2
**type (2)**
  23:18;26:1
**types (1)**
  34:11

**U**

**ultimately (3)**
  4:2;8:8;27:3
**Um (28)**
  2:22;3:21;4:7,22;5:11,16,
  21,23;7:9,18,23;9:12;10:17,
  19;11:1;14:10,14;15:8,14;
  16:9,15;17:12,12;25:7,8,10,
  14;33:3
**undue (1)**
  17:7
**unexpectedly (1)**
  21:3
**unfair (1)**
  24:3
**unknown (1)**
  16:11
**unless (1)**
  13:24
**up (27)**
  3:24;5:20;7:25;11:13;
  12:23;14:17;15:11,11,18;
  16:8;17:10;21:3,11;22:8,22;
  23:9;24:4,7,12,17;25:16;

**26:10,17;27:2;31:1,1;34:21**
**up- (1)**
  25:4
**upon (1)**
  25:4
**upset (1)**
  35:12
**use (4)**
  6:21;7:3,5;13:14
**utmost (1)**
  25:13

**V**

**vacation (1)**
  15:6
**value (3)**
  7:15,19;30:2
**view (1)**
  28:12

**W**

**waiting (4)**
  18:13,20,21;22:19
**walk (3)**
  32:3,10,20
**wanna (5)**
  9:5;11:17;15:25;33:20;
  34:17
**wants (3)**
  4:23,25;23:16
**waste (1)**
  12:1
**way (13)**
  3:23,25;4:2;5:20;7:4;9:11,
  24;12:11;13:14;14:7;22:25;
  27:6;32:17
**ways (1)**
  3:3
**week (9)**
  10:25;13:15,17;14:6,11,12;
  21:13;22:1;35:20
**weeks (2)**
  14:12;31:20
**wellbeing (1)**
  17:8
**weren't (2)**
  15:9;20:24
**what's (2)**
  17:25;30:12
**whole (2)**
  19:9;35:7
**who's (2)**
  2:4;7:2
**WILLIAMS (95)**
  2:3,10,13,17,21;3:1,7,14;
  4:6,13,18,22;5:11;6:3,9,11,
  14,23;7:1,7,10,12,17;8:1,10,
  15,23,25;9:2,7,10,17,20,25;
  10:5,9,11,17;12:15;13:19,25;
  14:3,19,23;15:21;18:7,18,22;
  19:2,4,8,12,15;20:3,11,19;

Brandy Williams vs. G&K Services, Inc.
Case No. 15-cv-01744-PHX-DDD

Conversation / Brandy Williams and Rachael Siggerud
July 17, 2013

21:7,9,13,16,23;22:16;23:6;
24:6,11,16,21;25:2;26:6,18,
20;27:6,14,24;28:8,16,22;
29:2,6,17,21;30:3,5,17,21;
31:13,22;32:2;34:1,14;35:1,
6,22,24;36:2
**within (1)**
  34:22
**work (20)**
  2:9;5:19;9:5,8,22;15:14;
  17:20,20,20;19:4,10,16,17;
  26:1;27:3,18;31:24;33:6,24;
  34:24
**worked (1)**
  17:3
**working (10)**
  2:7;5:6;9:14;18:14;19:13,
  24,25;23:17;27:24;35:3
**worry (1)**
  19:20
**worth (1)**
  17:4
**write (1)**
  6:21
**writing (2)**
  6:21;16:10

---

## X

**XYZ (1)**
  21:1

---

## Y

**ya (5)**
  27:2,3;34:20,21,24
**years (2)**
  25:14;34:2
**Yep (2)**
  8:25;9:7
**yesterday (3)**
  15:10;21:12,15

---

## 0

**00:37:03.01 (1)**
  2:1

---

## 1

**1:00 (1)**
  22:13
**11:00 (2)**
  22:20,21
**15 (1)**
  15:16

---

## 2

**2 (1)**
  9:15

---

## 5

**50-50 (1)**
  26:20

---

## 7

**7/12 (1)**
  14:14
**7/9 (2)**
  14:13,20

EXHIBIT N



**Fwd: Request**
Rachael M Siggerud   to: Marie A Smith                           07/08/2013 06:58 PM

History:        This message has been replied to.

2 attachments

  

1887_001.pdf   0.352.jpg

Hi Marie,

I know she copied Nikki but I think you mentioned she is out this week. Can we talk through this? I've had some strong performance conversations with Brandy lately as she is not meeting my expectations. I also believe that she is out of FMLA time, although that's obviously not a bar to an accommodation, but she has been consistently missing work or coming in late without notice and for reasons unrelated to her medical condition. (No babysitter, sick aunt/cancelled flight, flat tire, etc) and I let her know that she must be more consistent and present in the office because she is damaging her relationships with the Phoenix business team by being unreliable and uncommunicative.

I would like to manage this request very closely and would like your assistance in determining the best way of doing so. In light of my last conversation with Brandy, I would like to look at having her work at least 8 hours in the office either before or after her appointments because I have previously experienced situations where an appointment "first thing in the morning" means she doesn't roll in until noon. Think that is acceptable?
R.

Sent from my iPhone

Begin forwarded message:

> **From:** "Brandy L Williams" <Brandy.Williams@gkservices.com>
> **Date:** July 8, 2013, 6:43:04 PM CDT
> **To:** "Rachael M Siggerud" <RSiggerud@gkservices.com>,"Nikki L Kietzer" <
> NKietzer@gkservices.com>
> **Subject: Request**

**Brandy L Williams**
Human Resources Generalist
Arizona and Southern California
G&K Services
4804 W. Roosevelt
Phoenix, AZ 85043



# EXHIBIT O

G 0 1 2014

July 29, 2014

Mr. Raul Menchaca
Equal Employment Opportunity Commission
Phoenix District Office
3300 North Central Avenue, Suite 690
Phoenix, AZ 85012

     RE:  Brandy Williams vs.  G & K Services
       Charge Number: 540-2014-01051

Dear Mr. Menchaca:

This letter constitutes the rebuttal statement of Brandy Williams in response to the position statement of G & K Services, Inc. ("G&K"). I, Brandy Williams, have carefully reviewed G&K's position statement and find there are discrepancies and untrue responses. I, Brandy Williams, do believe that I was terminated due to requesting an ADA accommodation and utilizing Intermittent FLMA.

Factual Background Rebuttal

I, Brandy Williams, informed Ms. Rachael Siggerud and Mr. Jacob Briscoe on December 11, 2012 that I was continuing to deal with ongoing health problems from the complications of the birth and delivery of my infant son on July 11, 2012. At the time of informing Ms. Siggerud and Mr. Briscoe of my ongoing health issues it was recommended by Ms. Siggerud that I request a non-FMLA leave due to I had utilized my FMLA leave from July 11, 2012 to October 3, 2012. I was informed at the time that there would be an HR Realignment call on Thursday, December 13, 2012 at 10:30 AM CST (See Exhibit A). On December 13, 2012 I attended the HR Realignment call at which time I was made aware that my role with the company would be changing from a Human Resource Representative to a Human Resource Generalist. I myself along with other HR Employees were made aware that the company had reviewed the needs of the HR Department and had made layoffs as necessary and that at that time everyone on the call was part of the new HR organization and our titles and roles would officially change in February of 2013 when the transition began.  On December 13, 2012 I also received a phone call from Ms. Siggerud informing me that I was being offered a position of an HR Generalist with G&K that was to begin in February 2013 and I was asked to review the job offer and sign and return it to her via email and we would further discuss upon my return in January. While on leave I continued to support the Phoenix office locations via telephone and company email and answered calls and provided assistance and guidance on issues surrounding  the Phoenix business.

The responding Party's position statement



WILLIAMS-000088

Response: Ms. Williams requested and was granted various medical leaves during her tenure with G&K. From July 10, 2012 to October 3, 2012, Ms. Williams was on FMLA leave. Additionally, from December 12, 2102 to January 11, 2013, Ms. Williams was on non-FMLA medical leave. Finally, beginning on August 5, 2013 Ms. Williams was granted intermittent FLMA leave.

Rebuttal: I, Brandy Williams, requested FMLA leave on July 11, 2012 due to the complicated birth and delivery of my infant son. On December 11, 2012 I informed Ms. Rachael Siggerud and Mr. Jacob Briscoe that I was continuing to deal with challenging health and mental problems and needed assistance to attend medical and counseling sessions. At that time it was instructed by Ms. Siggerud that I request a non-FMLA medical leave to meet my requested needs. Upon returning from the 30 day non-FMLA medical leave on January 11, 2013 I made Ms. Siggerud aware that all of my health concerns had not been resolved but that I had been cleared by my doctor to return and that I was continuing to attend doctor appointments and counseling sessions and I was told by Ms. Siggerud that she would continue to work with me and to just let her know dates and times of my scheduled appointments. On July 8, 2013 I requested in writing an ADA accommodation due to new continued alarming allegations beginning in May 2013 that I was not engaged or perceived to not be engaged in the business due to my time away from work due to medical appointments, testing, and procedures. Although, G&K is stating that there were performance issues I was given an increase to come to the standard salary of an 11.2% increase from $45,305 to $50,365 on May 4, 2013 (see exhibit B ) On July 9, 2013 I received a phone call from Ms. Siggerud informing me that she received my written request for an ADA accommodation and forwarded it to the employee relations management team and I was instructed by Ms. Siggerud to request a FMLA medical leave due to my ADA accommodation request. I was asked to complete and return the medical certification portion with my doctor and return so that G&K would know what type and for what period of time I needed accommodation. I completed and returned forms to G&K on August 5, 2013.

Response: In June of 2013, Rachael Siggerud, Regional HR Director, did speak with Ms. Williams regarding her performance, including providing feedback from the managers that Ms. Williams supported. A portion of the feedback was that the managers perceived her as being ineffective. Ms. Siggerud never told Ms. Williams that she was missing too much work. Instead, Ms. Siggerud advised Ms. Williams to keep others notified as to when she would be absent so that those individuals she supported would know who to contact for assistance, and so that other HR employees would know when she required backup. Importantly, this conversation occurred during a time when Ms. Williams was actively working (i.e., not on medical leave) prior to Ms. Williams requesting any accommodation.

Rebuttal: Ms. Siggerud was aware that I was having continued health issues that had been ongoing and they were not a concern or addressed as a performance issue. I, Brandy Williams, never was put on written Performance Improvement Plan. (See Exhibit C )

Response: In July 2013, Ms. Williams advised Ms. Siggerud that she wanted to resign because she did not want to work as a HR Generalist and preferred to work on the Talent Acquisition team as a recruiter. Ms. Siggerud actually tried to persuade Ms. Williams not to make any rash decisions. Ms. Siggerud suggested that Ms. Williams should think about her decision over the weekend. Shortly thereafter, Ms. Siggerud learned that the Talent Acquisition team was planning to hire a temporary contract recruiter to assist with the team's workload. Rather than hire the temporary contract worker, and to honor Ms. Williams' desire to move to the Talent Acquisition team, effective July 29, 2013, Ms. Siggerud placed Ms. Williams on the Talent Acquisition team, Ms. Williams' title did not change, as the work in the Talent Acquisition area was temporary. The move was unrelated to Ms. Williams' FMLA leave, but was done because Ms. Williams herself indicated she desired to work in that area. Ultimately, the Talent Acquisition team determined that Ms. Williams' performance during her temporary assignment was below that required to consider offering Ms. Williams a permanent position, and because G&K had

determined the HR Generalist role was overstaffed, as is more fully discussed below, Ms. Williams was terminated.

Rebuttal: I, Brandy Williams, had a conversation with Ms. Siggerud on 7/17/2013 to where I expressed my concern and stress of feeling forced to quit/resign from the business due to my health concerns. I expressed to Ms. Siggerud that this what they were labeling a performance issue was all due to my time away from work to attend doctor's appointments, procedures, testing, surgeries, etc. At no time were any performance issues explained specifically other than I was being perceived to not be engaged due to me being away from the business. Ms. Siggerud twisted every conversation into a performance issue although all we ever discussed was me being away from the business which gave managers a perception that I was not engaged or supportive. I made Ms. Siggerud aware that all allegations were completely untrue and I knew for a fact that they were due to that I was continuously in the business on a daily basis other than attending appointments that she was aware of. Ms. Siggerud suggested that she felt that I didn't want to any longer be in the business and that she would give me three days to think about it. Ms. Siggerud stated that she would like me to think about whether I wanted to continue being in the company over the next couple of days to decide whether I wanted to stay in the business. At no time did I ever state to Ms. Siggerud that I wanted to resign from the business.   (See Voice Recording from 07/17/2013) On July 26, 2013 I was granted Intermittent FMLA and I received a phone call from Ms. Siggerud that she was placing me in a temporary position on the Talent Acquisition team for 2 to 3 months which was to begin effective immediately the following Monday on July 29, 2013. I asked Ms. Siggerud if I should continue to perform my role as an HR Generalist and attend meetings etc and she stated no that I should focus on recruiting for Michael Hammond on the Talent Acquisition Team. I asked Ms. Siggerud if I would be allowed to return to my role after the temporary role was exhausted and she stated that we would discuss that at the time of the end of the temporary role in Talent Acquisition. I was never made aware that my performance was below that required due to that I received numerous compliments and thank you's for doing such a great job of communicating with managers in real time and making a great impact on recruiting for the business (See Exhibit D )  Immediately nearing the end of the temporary assignment in Talent Acquisition I received a phone call from Ms. Siggerud on September 23, 2013 asking me to meet her in the Phoenix business to have a discussion with herself and Mr. Eric McNaul, Regional Vice President.  At the time of the meeting with Ms. Siggerud and Mr. McNaul I was made aware that I would not be returning to my regular role with the company and that they had decided that the generalist role was overstaffed for that region.  I was presented with a Notice of Separation (See Exhibit F )  and made aware that my last day would be Friday September 27, 2013.  I was also given a Confidential Separation Agreement and General Release which contained a Release of Legal Rights had I accepted separation pay in the amount of $3,913.00 equal to four weeks within 7 days of signing the agreement.  (See Exhibit H )

Response:  Following the Hr realignment in early 2013, G&K's Northwest Region had three HR Generalists reporting to Ms. Siggerud-Janelle Bonocua, Kaela Ellison and Brandy Williams.  In August 2013, it was determined that the Northwest Region was overstaffed by one HR Generalist, as HR leadership concluded that during the alignment process, HR had overestimated the HR Generalist resources necessary for the Northwest Region. Ms. Siggerud and Pelham Chastang, Senior Director Human Resources, reviewed the three HR Generalist performance reviews for the most recent fiscal year, which ended on June 29, 2013 (see Exhibit I ).  As a part of the performance review, each G&K employee creates up to five objectives at the beginning of each fiscal year, and those objectives are then rated on a scale from on through five, with 1 being the lowest rank of "Not Meeting Expectations" and 5 being the highest rank of "Outstanding." Any rank below a 3 indicates that an employee is below expectation.

Along with reviewing past performance, Ms. Siggerud and Mr. Chastang also considered the locations each HR Generalist covered.  Ms. Bonacua lived in California, supported seven locations and had

knowledge and expertise regarding California's complex employment laws. Ms. Ellision lived in Minnesota and supported eleven locations. Ms. Williams lived in Arizona and supported three locations.

G&K made the decision to retain Ms. Bonacua and Ms. Ellison due to their higher performance ratings and higher number of locations they were able to support. Thus, G&K eliminated Ms. Williams' HR Generalist position. Notably, Ms. Williams has not been replaced, as Ms. Ellison is now supporting the locations previously supported by Ms. Williams.

On September 24, 2013 Ms. Siggerud, and Eric McNaul, Regional Vice President, met with Ms. Williams to inform her that her position had been eliminated. During the meeting, Ms. Williams did not state that she had concerns with the job elimination, and she did not claim that she was target of disability discrimination. Rather, Ms. Williams sincerely thanked Ms. Siggerud for all of the help and support that she provided.

Rebuttal:  I was not made aware in August of 2013 that it was determined that my position was overstaffed. I was not made of aware of the determination of overstaffing until the end of my temporary assignment and notice of Separation on September 24, 2013. My objectives were never completed and reviewed due to my being on Maternity Leave in July of 2012 at the beginning of the Fiscal year. I asked Ms. Siggerud when we would complete these objectives and she stated when I returned we would discuss them, also the goals for the fiscal year changed mid-year due to the HR Realignment in which we were place in new roles on February 23, 2013. Ms. Siggerud did not state to complete objectives until June of 2013 at which time I emailed her requesting advice of what to include in the objectives and goals due to the role change. (See Exhibit J ).  My Fiscal Year Objectives nor my Performance Rating was completed until after June 28, 2013. I feel that the Performance Rating was subjective due to me taking time away from work to attend doctor's appoinments, surgeries, procedures, testing, etc. During the HR Relignment notification and placement into new roles I was notified on February 23, 2013 that I would be given additional locations in Southern California to support along with my current locations in Arizona. At that time I began to support Southern California and began to travel to support all of these locations.

The structure of the location support is inaccurate as to whom each location was assigned.  (Also, please see Exhibit K with company email signature stating HR Generalist of Arizona and Southern California)

Please see corrected chart showing location assignments:

| Northwest Region | HR Generalist Coverage Before | HR Generalist Coverage After |
|---|---|---|
| Los Angeles, CA / 4 locations | Brandy Williams | Janelle Bonacua |

WILLIAMS-000091

| Sacramento, CA /2 locations | Janelle Bonacua | Janelle Bonacua |
|---|---|---|
| Pittsburg, CA / 2 Locations | Janelle Bonacua | Janelle Bonacua |
| Phoenix, AZ / 4 locations | Brandy Williams | Kaela Ellison |
| St. Cloud, MN / 6 locations | Kaela Ellison | Kaela Ellison |
| St. Paul, MN / 5 locations | Kaela Ellison | Kaela Ellison |

I, Brandy Williams, supported all previously assigned locations in Arizona including Phoenix Plant, Prescott Valley, Tucson, and Yuma, AZ and also locations in Southern California of Los Angeles Plant, Sun Valley, Ontario, and San Diego, CA. I supported a total of 8 locations before being placed into a temporary assignment the end of July 2013. These locations were always allocated to myself for support from the enactment of the HR Realignment and were not delegated to others until after my termination. (Kaela Ellison and Janelle Bonacua can attest to this fact) On September 24, 2013 I did meet with Ms. Siggerud and Mr. McNaul in the Phoenix location at which time I was notified of my separation with the company effective September 27, 2013. At the time of the notice I was very cordial with Ms. Siggerud and Mr. McNaul and thanked them for the opportunity of working for G&K as to not present as a disgruntled employee and to continue my professional demeanor due to I had already expressed on numerous occasions to Ms. Siggerud that I was being retaliated against and forced to resign and leave the company (See Voice Recording dated July 17, 2013) I felt at this time that my concerns were not taken seriously and decided I would obtain an attorney and file a charge with the EEOC immediately following discharge, at which time I obtained Phillip Dayes Law Group PC on October 8, 2013 to originally to represent me in this matter (See Exhibit L )

Response:  Ms. Williams was not discriminated and retaliated against for requesting ADA accomodation and for taking FMLA leave. G&K granted Ms. Williams leave when it was requested. Ms. Williams' termination was unrelated to her medical leave or medical status. Instead, G&K made a business decision to eliminate one of it's HR Generalist positions in the Northwest Region. Based on performance, Ms. Williams was terminated. Additionally, although G&K granted Ms. Williams' request for intermittent FMLA leave, G&K's records indicate that while Ms. Williams did request time off for various reasons, she never actually availed herself of FMLA intermittent leave after July 15, 2013.

Rebuttal:  I, Brandy Williams, do feel that I was discriminated and retaliated against for requesting an ADA accommodation and taking FMLA leave due to being placed in a temporary role of Talent Acquisition and never being allowed to return to my original position after requesting an ADA accommodation and utilizing FMLA Leave. I, Brandy Williams, was never placed on a written Performance Improvement Plan or ever given any written warnings. The concern and issues did not arise until after me taking time away from work which Ms. Siggerud approved and was fully aware of due to my health concerns (See exhibit M ) I decided to document in writing on July 8, 2013 the need for an ADA accommodation due to issues continuing to arise after me expressing a verbal need to Ms. Siggerud for support for ongoing health issues at which she had been previously accommodating since December of 2012. The HR Department and my immediate supervisor were lacking in adequately documenting my need for support or any other issues based around my time away from G&K at which time I began to do so myself. I, Brandy Williams, was never place on a Performance Improvement Plan or given any written warnings, I feel I received a subjective Performance Rating due to my ADA accommodation request and FMLA utilization which Ms. Siggerud did not complete until August 28, 2014 well after my ADA accommodation request and utilization of Intermittent FLMA (See exhibit N ). The findings in the previous responses are untrue where as it is stated I supported less locations and that my performance was below that required to obtain a position with G&K due to me receiving positive feedback of managers being very happy with the increased recruiting support in the region from myself and specifically stating

WILLIAMS-000092

# EXHIBIT P

Exhibit D

From:       Rachael M Siggerud/GKS
To:         Brandy L Williams/GKS@GKS
Cc:         Michael J Hammond/GKS@GKS
Date:       08/14/2013 02:22 PM
Subject:    Recruiting Feedback

Hi Brandy,
I just wanted to share some feedback from the NorthWest RDO call today! Tony said that
he has been very happy with the increased recruiting support in the region and Frank
Gomez specifically said that you do a great job of communicating with him in real time.
Thank you for your help - it's clearly having a positive impact on our region!
Rachael

Rachael M Siggerud
Regional Director of Human Resources
G&K Services
685 Olive St
St Paul, MN 55130
Phone: 651.855.7002 Cell: 952.232.0305
Fax: 651.855.7007

# EXHIBIT Q

GK Job Attributes        GK Job Rager

New Window   ? Help   Customize Page   http

## Job Description

G&K Confidential

Set ID:      GKSRA          Job Code:      5775

Jobcode Table                                    Find | View All   1 of 1   Last
                                                 Printer Friendly Version

Effective Date    05/17/2014      HR Generalist

Manager Level:    9      FLSA Status  Professnl    Salary Administration Plan: CRP    Salary Grade: K

GK Job Description                                Find | View All   First   1 of 1   Last

Prepared By:                                      Date:   04/29/2014

Department

Reports To:

Supervises (# of employees)

**Job Summary:**
(Main Job purpose/function, major objectives and key  working /business relationships)
Work as a Business Partner supporting a Region, covering multiple locations in multiple states, in an industry leading uniform and facility services business.  Responsible for partnering with the Regional Human Resources Director to drive business results by successful implementation of a human capital plan and programs.  Specific duties include implementation of company wide and regional human resources programs, plans, and services including: talent development, work force planning, succession planning, labor and employee relations, rewards, training and leadership development, and performance management.

**Essential Job Functions and % of Time Spent On Each:**
(For each job function, describe what is expected to be  completed, how often, and expected results)      % of Time

Serves as a key HR business partner in a region to ensure human capital objectives are achieved.

Partners with the Business to provide proactive, client oriented solutions in areas such as workforce and succession planning, organizational design and leadership development.

Provides HR functional consultation and expertise to regional leaders.

Supports Talent Management for the region: staffing, recruiting, people development, succession planning, training and high potential leadership development.

Supports in the development of High Potential and Emerging Talent leaders including assessment, coaching and development planning throughout the region and the company.

Consults on region wide organizational development interventions to drive strategic company initiatives and region specific business programs.

Work with leaders to create positive, safe and productive work environments.

Responsible for coaching and developing leaders to create high performance accountability cultures and highly engaged work teams.

Build and maintain a strong working knowledge of the business: the financial position, business plan and culture.

Analyze trends and metrics in partnership with the HR team to develop solutions, programs and policies.

**Non-Essential Job Functions and % of Time Spent on Each:**
(For each job function, describe what is expected to be  completed, how often, and expected results)      % of Time

**Minimum Qualifications:**
Education Requirement: 3 Rows                     View All |   First   1 of 1   Last

Bachelor's degree Human Resources management, psychology, business or related field.

Work Experience Requirements: 3 rows             View All |   First   1-2 of 3   Last

A minimum of 3 to 5 years of progressive human resource generalist experience.
Experience in managing multiple business units in multiple locations.

Specific Skills and Competencies: 5 rows        View All |   First   1-5 of 5   Last

Proven experience with performance management, succession planning, talent management, leadership


EXHIBIT
7
Sigserud

G&K000259

coaching and consulting.  Strong business acumen.

Strong conflict management skills.  Ability to manage conflicting priorities.  Be self directed and motivated.  Strong interpersonal, facilitation, and negotiation skills.

Excellent written, verbal and presentation skills.  Experience in creative problem solving, influencing, change management, and eliminating barriers at any organizational level.

Ability to develop trusting relationships to gain support and achieve results at all levels of the organization.  Experience in coaching, training, and developing employees in a high performance culture.

Ability to take the initiative to identify and anticipate client needs and recommend solutions.  Knowledge of and experience with employment laws, labor relations and practices including: FMLA, ADA, AAP, FLSA, DOT, EEOC, litigation, issue and dispute resolution, pre-employment drug testing, etc.

Specialized Knowledge, Licenses, etc: 5 rows                     View All |       First     1-2 of 2     Last

PHR and SPHR preferred.

Experience with Organizational Development interventions and consultation.


**Working Conditions, Hazard & Physical Work Demands:**
(Intensity, Duration and Frequency):




Last Update Date/Time      04/28/2014 9:23:23AM      by      RBAILEY

Return to Jobcode table

G&K000260

# EXHIBIT R

Exhibit F



# Memorandum

**To:**     Brandy Williams

**Date:**   September 24, 2013

**RE:**     SEPARATION AGREEMENT AND GENERAL RELEASE

---

Enclosed you will find copies of the Separation Agreement and General Release. Please review the information carefully and consider the agreement fully utilizing any resources you feel necessary prior to signing the agreement.

There are certain items to note in connection with your separation. They are:

- Your employment termination date is September 27, 2013.

- You were provided original copies of the Separation Agreement and General Release for consideration. Please sign all copies and return to the Employee Solution Center at 5995 Opus Parkway Suite 500; Minnetonka, MN 55343. A signed copy will be returned to you after the designated waiting period.

- Information concerning your benefits such as medical, dental and 401K can be referenced on the benefits overview. Rights to continuation of certain benefits under COBRA will also be sent to you soon. Any questions regarding benefits can be answered by calling the HR Solution Center at 1.855.GK.HR4ME, or by email at hrsolutions@gkservices.com.

- Your final paycheck and any unused vacation has been paid to you.

- Please verify your address.

Feel free to contact The Employee Relations team by calling the Employee Solution Center at 1.855.GK.HR4ME (1.855.454.7463), or by email at hrsolutions@gkservices.com.

WILLIAMS-000100



**THIS CONFIDENTIAL SEPARATION AGREEMENT AND GENERAL RELEASE
CONTAINS A RELEASE OF LEGAL RIGHTS. G&K SERVICES, INC.
RECOMMENDS THAT YOU CONSULT WITH AN ATTORNEY BEFORE SIGNING
THIS AGREEMENT AND RELEASE. YOU MAY NOT SIGN THIS AGREEMENT AND
RELEASE UNTIL AFTER YOUR SEPARATION DATE.**

**CONFIDENTIAL SEPARATION AGREEMENT AND GENERAL RELEASE**

THIS CONFIDENTIAL SEPARATION AGREEMENT AND GENERAL RELEASE
("Agreement and Release") is made as of the 24th day of September, 2013 by and between G&K
SERVICES, INC., a Minnesota corporation, maintaining its principal offices at 5995 Opus
Parkway, Suite 500, Minnetonka, Minnesota 55343 ("Employer"), and Brandy Williams, an
individual residing at 2870 W Webster Ct., Phoenix, AZ 85086 ("Employee").

As used in this Agreement and Release, the term:

"Company" means Employer, its subsidiaries, affiliates, divisions and related entities,
successors, assigns, and its and their respective past and present owners, officers, employees,
directors, agents, consultants, and representatives, both individually and in their official
capacities, and any employment-related pension, welfare or other employee benefit plan and its
trustees and administrators.

"Confidential Information" means information of Employer which is not generally
known to the public, including customer lists or routes, pricing, purchasing, inventory, business
methods, strategies, financial information, training manuals or other materials developed by or
for Employer, and any other non-public material information relating to the business of
Employer.

In consideration of the mutual covenants and promises hereinafter set forth, Employer
and Employee hereby agree that:

1.      **Separation of Employment.** Employee's last day of employment with Employer was
September 27, 2013 (the "Separation Date"). Employer has paid Employee all wages, salary and
other compensation and benefits due and owing to Employee as of the Separation Date.

2.      **Consideration.** In exchange for Employee's general release and waiver of all claims
against the Company as provided in this Agreement and Release, Employer will provide
Employee with the following consideration at the time and in the manner set forth below,
provided Employee does not exercise Employee's revocation right under Section 12 herein (if
applicable):

Employer will pay to Employee, as separation pay, which Employee has not
earned and to which Employee is not otherwise entitled, the amount of $3,913.00,
equal to four (4) weeks of Employee's weekly base compensation in effect as of
the Separation Date, less applicable withholdings, payable in one (1) equal
weekly installment, in accordance with Employer's normal payroll practices,
beginning on the first regular payroll date of Employer following seven (7)
calendar days after Employee signs this Agreement and Release provided that

9901128v1

WILLIAMS-000101

Exhibit H

Employee has not exercised Employee's right to revoke or rescind the release of claims as provided in Section 12 herein (if applicable).

G&K will pay for all reasonable expenses of outplacement services provided by Right Management, but not to exceed $2,400.00 in the aggregate, that are incurred during the three (3) month period commencing as of the date of termination, by direct payment to such provider.

3.     **No Admission of Liability.**  The consideration to be provided to Employee by Employer pursuant to this Agreement and Release is not and shall not be construed or represented to be an admission of liability of any kind by the Company.

4.     **No Other Entitlement.**  Employee confirms that no monies or compensation other than those provided for in this Agreement and Release are due to Employee from the Company (other than vested benefits under any employee benefit plan of Employer in which Employee is currently a participant) and that the consideration provided in Section 2 hereof is in full satisfaction of any and all claims that Employee may have as to salary, expense reimbursement, compensation or claims of any kind, including, without limitation, sick and vacation time.

5.     **Company Property, Confidential and Financial Information.**  Employee recognizes and acknowledges that the performance of Employee's services for the Company has resulted in its disclosure to Employee of certain Confidential Information.  Employee represents and agrees that Employee will not disclose or directly or indirectly use any Confidential Information for Employee's own or any other person's or entity's benefit.  Employee has returned to Employer all documents and material containing Confidential Information, including, but not limited to, original copies and all other copies of customer lists, prospective customer lists, contracts, books, records, training manuals, correspondence, business and financial records, operations reports or any part thereof acquired by Employee in the course of employment by the Company.

Employee acknowledges that irreparable harm will result to the Company, its business and property, in the event of a breach of this Section 5 by Employee, and that any remedy at law would be inadequate; and therefore, in the event this Section 5 is breached by Employee, the Company shall be entitled, in addition to all other remedies or damages at law or in equity, to temporary and permanent injunctions and orders to restrain the violation hereof by Employee and all persons or entities acting for or with Employee.

6.     **Other Agreements Superseded.**  This Agreement and Release replaces, supersedes and nullifies any prior oral or written agreements between Employee and Employer, except that certain Non-Competition and Confidentiality Agreement previously entered into between Employee and Employer which such agreement shall remain in full force and effect.

7.     **General Waiver.**     In exchange for the consideration set forth in Section 2 of this Agreement, Employee, for Employee and Employee's dependents, heirs, creditors, executors, administrators, representatives, successors and assigns, and anyone claiming by or through Employee or such other persons, hereby covenants not to sue and releases and forever discharges the Company from and against any and all actions, causes of action, damages, claims, debts, demands, obligations, costs, expenses, and liabilities for any reason whatsoever, including, but

2

9901128v1

WILLIAMS-000102

Exhibit H

not limited to, those for bonuses, wages, salary, benefits or other forms of compensation, or any other complaints and demands whatsoever, in law or equity, including any claim for attorneys' fees, whether accrued or not accrued, whether known or unknown, foreseen or unforeseen, including, but not limited to, all claims regarding wrongful termination, breach of express or implied contract, discrimination, retaliation, harassment, defamation, negligent or intentional infliction of emotional distress, violation of public policy, promissory estoppel, fraud, misrepresentation, good faith and fair dealing, negligence, invasion of privacy, or any other common law, statutory, or equitable causes of action which have or that may later arise out of the relationship between Employee and the Company to date, including, without limitation, the separation of Employee's employment. This total and complete release and waiver includes, without limitation, claims which have or could arise under the National Labor Relations Act, Title VII of the Civil Rights Act of 1964, the Employee Retirement Income Security Act of 1974, the Age Discrimination in Employment Act of 1967 as amended by the Older Workers Benefit Protection Act, the Equal Pay Act, 42 U.S.C. § 1981, the Sarbanes-Oxley Act, the Dodd–Frank Wall Street Reform and Consumer Protection Act, the Fair Credit Reporting Act, the Vocational Rehabilitation Act, the Family and Medical Leave Act, the Worker Adjustment and Retraining Notification Act, the Fair Labor Standards Act, the Lily Ledbetter Fair Pay Act of 2009, the Americans With Disabilities Act, the Rehabilitation Act of 1973, the Genetic Information Nondiscrimination Act, the Immigration Reform and Control Act of 1986, the Civil Rights Act of 1991, the Occupational Safety and Health Act, the Consumer Credit Protection Act, the American Recovery and Reinvestment Act of 2009, the Asbestos Hazard Emergency Response Act, the Employee Polygraph Protection Act, the Uniformed Services Employment and Reemployment Rights Act, the Arizona Civil Rights Act, the Arizona Employment Protection Act, the Arizona Equal Pay Law, the Arizona Wage Act, the Arizona Occupational Safety and Health Law, the Arizona Medical Marijuana Act, the Arizona Consumer Reporting Agencies and Fair Credit Reporting Law, the Arizona Blacklisting Law, the Arizona Right to Work Act, the Arizona Victims' Leave Law, the Arizona National Guard Leave Law, the Arizona Drug Testing of Employees Act, the Arizona Minimum Wage Act, the Arizona Wage Payment Law, the Arizona Occupational Health and Safety Act, the Arizona Genetic Privacy Law, the Arizona Workers' Compensation Law, Arizona Revised Statutes Section 23-1501, the Arizona Constitution, Arizona common law, and all other applicable state, county and local ordinances, statutes and regulations, each as may have been amended, and any other federal, state or local discrimination, bias, human or civil rights, wage, hour, pension or labor laws and any other rule and/or regulation, or public policy, contract (whether oral or written, expressed or implied from any source), tort, including, assault, battery, or any other claim, whether known or unknown, of any kind whatsoever, subject only to the exceptions set forth in Section 8 below.

8.     **No Claims; Exceptions.**     Employee represents that Employee has not caused or permitted to be filed on Employee's behalf any charge, complaint, grievance, or proceeding before any federal, state or local administrative agency or court, or any other forum, against the Company. Employee agrees that this Agreement and Release shall act as a total and complete bar to any recovery of monetary damages by Employee should Employee ever elect to exercise the right to file an administrative charge with a government agency. Nothing in this Agreement and Release shall prohibit either party from bringing any administrative or judicial action to enforce this Agreement and Release or to determine whether the provisions of this Agreement and Release comply with the requirements of the Age Discrimination in Employment Act.

3

WILLIAMS-000103

Exhibit H

Further, nothing in this Agreement and Release shall prohibit Employee from bringing any claims that may arise after the date on which Employee signs this Agreement and Release.

9.     **Non-Disclosure.**  Employee agrees that this Agreement and Release is confidential and Employee shall not publicize or disclose (unless required to do so by judicial order or process) to any other person or entity that Employee received any separation pay or the terms of or amount of any payment made by Employer pursuant to this Agreement and Release.  The only other exceptions to this non-disclosure requirement are that Employee may disclose this Agreement and Release: (i) to Employee's attorneys, accountant, and spouse, provided that any such recipient shall first agree to be bound by this section to the same extent as Employee, or (ii) if required by law.

10.    **Construction.**  This Agreement and Release shall be binding on the parties, their heirs, executors, administrators, successors and assigns, and shall be construed and interpreted under the laws of the State of Minnesota, without regard to conflicts of law provisions, to preserve its enforceability.  Each of the parties hereto agrees that any action for the enforcement of this Agreement shall be brought in any court in the state of Minnesota or any federal court sitting therein and consents to the jurisdiction of any such court.  If any one or more of the terms of this Agreement are deemed to be invalid or unenforceable by a court of law, the validity, enforceability, and legality of the remaining provisions hereof will not in any way be affected or impaired thereby, and it is the intent of the parties that a court should modify or otherwise deem unenforceable any clause set forth herein to render this Agreement and Release enforceable to the maximum extent possible.

11.    **Taxes.**  Employee is solely responsible for any federal, state or local income taxes and other taxes imposed on Employee with respect to any payments made under this Agreement.  Employer shall be entitled to withhold on and report the making of such payments as may be required by law as determined in the reasonable discretion of Employer.

12.    **Revocation.**

*THE FOLLOWING PROVISION IS ONLY APPLICABLE TO EMPLOYEES 40 YEARS OF AGE OR OLDER:*

Employee understands that Employee may revoke Employee's execution of this Agreement and Release within the seven (7) calendar day period following the day Employee executes this Agreement and Release.  Employee understands that this Agreement and Release shall not become effective or enforceable until the revocation period has expired and no consideration as set forth in Section 2 hereof will be paid during that time.  Any revocation must be:

          (i)     postmarked within seven (7) calendar days of Employee's execution of this Agreement and Release,

          (ii)    must be submitted, in writing, to the attention of Payroll, G&K Services, Inc., 5995 Opus Parkway, Suite 500, Minnetonka, MN 55343, and

4

9901128v1

WILLIAMS-000104

Exhibit H

(iii)    may be delivered by hand or by mail; and if delivered by mail, sent by certified mail, return receipt requested.

13.    **Older Workers Benefit Protection Act.**

### THE FOLLOWING PROVISION IS ONLY APPLICABLE TO EMPLOYEES 40 YEARS OF AGE OR OLDER:

Employee acknowledges that Employee has been informed pursuant to the Older Workers Benefit Protection Act that Employee:

(i)    has the right to consult with an attorney before signing this Agreement and Release;

(ii)    has twenty-one (21) calendar days to consider whether to sign this Agreement and Release;

(iii)    has seven (7) calendar days after the date Employee signs this Agreement and Release to revoke it and that this Agreement and Release will not be effective until that revocation period has expired;

(iv)    does not waive rights or claims under the Age Discrimination in Employment Act that may arise after the date this Agreement and Release is executed;

(v)    does not waive any rights or claims that Employee may have that this Agreement and Release failed to conform to the legal requirements under the Age Discrimination in Employment Act; and

(vi)    has the right to review all aspects of this Agreement and Release with an attorney of Employee's choice, that Employee has been advised to consult with an attorney, that Employee has had an opportunity to consult with an attorney of Employee's choice, and that Employee has fully and carefully read and understands all provisions of this Agreement and Release.

14.    **Post-Employment Cooperation.**  Employee agrees that at the request of the Company following the separation of Employee's employment, Employee will faithfully cooperate in connection with any and all matters (including actual or potential claims that have been asserted or threatened against the Company) that relate to alleged facts that arose during Employee's employment with the Company. As part of Employee's commitment to cooperate with the Company, Employee will promptly respond to all questions and cooperate with all inquiries from the Company's agents and attorneys regarding any matters raised by the Company as deemed necessary by the Company in its full discretion, and such obligation shall include, but is not limited to, answering questions, preparing truthful testimony, and providing truthful testimony in pending or future litigated matters.

5

9901128v1

Exhibit H

15.   **Employee's Representations.**  Employee represents that Employee is legally able and entitled to receive the consideration being provided to Employee pursuant to this Agreement and Release; that Employee has not been involved in any personal bankruptcy or other insolvency proceedings at any time since Employee began employment with Employer; and that no child support orders, garnishment orders, or other orders requiring that money owed to Employee by Employer be paid to any other person or entity are now in effect.

THE PARTIES HAVE READ AND FULLY CONSIDERED THE FOREGOING AGREEMENT AND RELEASE AND ARE MUTUALLY DESIROUS OF ENTERING INTO THIS AGREEMENT AND RELEASE.  EMPLOYEE HAS BEEN AFFORDED A REASONABLE OPPORTUNITY TO CONSIDER THE MEANING AND PRECLUSIVE EFFECT OF THIS AGREEMENT AND RELEASE AND WAS ENCOURAGED BY EMPLOYER TO CONSULT WITH AN ATTORNEY.

HAVING ELECTED TO EXECUTE THIS AGREEMENT AND RELEASE, TO FULFILL THE PROMISES SET FORTH HEREIN, AND TO RECEIVE HEREBY THE CONSIDERATION SET FORTH IN SECTION 2 ABOVE, EMPLOYEE FREELY AND KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS AGREEMENT AND RELEASE INTENDING TO WAIVE, SETTLE AND RELEASE ALL CLAIMS THAT EMPLOYEE HAS OR MAY NOW HAVE AGAINST EMPLOYER.

**DIRECT DEPOSIT: (only if currently enrolled)** ☐

**LIVE CHECK MAILED TO MY HOME:** ☐

**CURRENT ADDRESS:** _____

_____

**[EMPLOYEE NAME]** _____     **Date** _____

**G&K SERVICES, INC.**

By_____

**Date** _____

Its:_____

6

WILLIAMS-000106

Exhibit H

9901128v1

WILLIAMS-000107

EXHIBIT S

## Document info

| | |
|---|---|
| Result type: | Fam Med Limited H&P |
| Result date: | Jul 15, 2013, 10:12 a.m. |
| Result status: | authenticated |
| Performed by: | Linda Pachuta |
| Modified by: | Linda Pachuta |

# Multiple issues

| Patient: | **BRANDY WILLIAMS** | DOB: | **Jun 28, 1981** |
|---|---|---|---|

Patient: **WILLIAMS, BRANDY L**     MRN: 7-724-009-1     FIN: 3325329
Age: **32 years**   Sex: **Female**   DOB: **28-Jun-1981**
Author: **Pachuta R.N., C.N.P., Linda**

**Chief Complaint**
.
Multiple concerns
**History of Present Illness**
.
This is a pleasant 32-year-old female who presents today stating that she was evaluated at John C. Lincoln Hospital recently with return of extreme migraine. Patient with history of migraines in the past and last migraine being in March. Her most recent migraine was more severe than usual. She went to urgent care at John C. Lincoln and was given injections of Toradol and Phenergan. She was then given an injection of Stadol which caused patient to have increased tremors, convulsions and disorientation. She was then sent to the emergency department at John C. Lincoln-North where MRI and other labs were done which were normal. She states the migraines have resolved. In the past, she prescription for Relpax which she used one migraine with start. She does not have this medication on hand at this time.

She is also concerned regarding recent weight loss. She states that she's not exercising regularly and has not modified her diet to lose weight, although she seems to be losing weight fairly fast. She also states on June 21 she had polyps removed from her uterus secondary to menorrhagia. Since having these polyps removed, she states she continues to have spotting from one. 2 the next. Denies any pelvic or abdominal pain. She also continues to have intermittent issues with soreness in her mouth. She was seen by ORL recently and biopsy was done which was not suggestive of autoimmune disease, Sjogren's. However, she does have an appointment pending with rheumatology that was requested at the advice of ORL.

Because of all her issues and problems, she has had tetanus and increased time off of work. She is concerned about the security of her job with so much time off. She is requesting intermittent FMLA paperwork to be completed.
**Histories**
.

# Document info

| | |
|---|---|
| Result type: | Allergy Consult |
| Result date: | Jul 31, 2015, 12:00 a.m. |
| Result status: | authenticated |
| Performed by: | John Lewis |
| Modified by: | John Lewis |

| **Patient:** | **BRANDY WILLIAMS** | **DOB:** | **Jun 28, 1981** |
|---|---|---|---|

**Mayo Clinic in Arizona**
**CLINICAL NOTES**

Patient Name:  Williams, Brandy L Mrs.
Medical Record Number: 77240091
DOB:  June 28, 1981
Age:  34
Service:  Allergy

Service Date:  07/31/2015
Facility Name:  MCA
Provider Name:  John Christopher Lewis, M.D.
Account Number:  3325329
Visit Type: Consultation

REFERRAL SOURCE:
Elizabeth Winscott.

REASON FOR CONSULTATION:
Mrs. Williams is a 34-year-old young lady referred by Dr. Winscott for evaluation of a history of chronic oral and vaginal irritation and concerns regarding autoimmune disease and immunodeficiency.

HISTORY OF PRESENT ILLNESS:
Unfortunately, she went to the wrong campus today so our visit was somewhat foreshortened on account of that, but I did have a chance to review ENT notes of PA Mendez who performed a minor salivary gland biopsy for Sjögren's 08/05/2013 which was negative for Sjögren's, and Dr. Yiannias' consult note from 12/16/2013 regarding her burning mouth syndrome.  His advice at that time and the finding is a low zinc and iron level and supplementation recommended.  She also had a history of atopic dermatitis, possible allergic contact dermatitis, keratosis pilaris, and she has a history of rosacea, and she believes that she has had a history of oral and vaginal lichen planus.  She has not had an oral biopsy of this.  She has had a vaginal biopsy done elsewhere that she said was consistent with lichen planus.  She has also had problems with chronic glabrata infections.  With regard to her oral symptoms, she said she gets a burning and red appearance inside her cheeks, gums, and on her tongue.  The vaginal and oral symptoms tend to flare and remit.  Joseph Brooks is her gynecologist.

She said that many of her symptoms seemed to occur when she was preeclamptic with her second pregnancy.  Since then she feels like she has been left with chronic inflammation and pain of varying intensities.

She said she has had positive connective tissue disease tests.  For instance, here she had a positive ANA, and they were worried about Sjogren's.  She said one of the other connective tissue tests was

WILLIAMS-000306 CONFIDENTIAL

| | |
|---|---|
| Height | 161.3 cm |
| Weight | 65.2 kg |
| Body Mass Index | 25.1 kg/m2 |
| Vital Signs Activity | Doctor Visit |
| Temperature Mode | Tympanic |
| Temperature Value | 36.9 DegC |
| Heart Rate | 82 bpm |
| Heart Rate/Pulse Rate Source | Radial |
| Non-Invasive SBP | 104 mmHg |
| Non-Invasive DBP | 64 mmHg |
| Patient Position/Activity Level | Sitting |
| NIBP Source/Cuff Location | Arm, Manual Cuff |
| Respiratory Rate | 16 Br/min |
| Pain Intensity | 4 |
| Pain Location | vaginal and mouth |

.
The patient was anxious, tearful and expressed frustration throughout the visit.

**Impression and Plan**
.
1. Burning mouth pain of uncertain etiology.
2. Recurrent vaginal pain.
3. Suicidality.
4. Depression and anxiety.

Patient reported that she did not feel safe leaving the clinic (due to suicidal thoughts) and I was
    concerned to have her leave the clinic as well. We had a long discussion. She initially did not feel
    that she wanted to call her husband. She mentioned that they are having difficulties in their
    relationship and she did not want to call him out of work, that it would "only make things worse". The
     Banner Crisis Hotline was contacted and we were advised by them that she could present there.
    However, transportation was an issue and I did not feel comfortable having her drive there. As such,
    911 was called. She was monitored in the clinic until paramedics arrived and transported her and
    her son to the Emergency Room. She eventually asked to have her husband called so that he could
    pick up their son. He was notified by nursing staff and was advised to present to the Emergency
    Room to meet up with her. I will place orders and consultation for Dermatology as well as
    Gynecology in regards to her burning mouth pain, as well as her recurrent vaginal symptoms.


kl
DD: 09/20/2013  17:35
DT: 09/20/2013  19:49

WILLIAMS-000300 CONFIDENTIAL

EXHIBIT T

 **G&K SERVICES**

**Join Our Talent Network**

Stay Connected.  **Why?**

| Home | Core Values | Diversity | Working at G&K Services | Featured Careers ▾ | All Jobs |

G&K Services > Human Resources

# Human Resources Jobs at G&K Services

Share With  g+1  🐦  in  ✉  *Pin it*  f Like  ‹ 0

## Search Jobs

**Keyword** [Human resources]   **Location** [            ]   **Search**

| Job Title | Location | Date Posted |
|---|---|---|
| **HR Generalist (Business Partner)**<br>with the Regional Human Resources Director to drive business results by successful implementation of a ... | MN - Minnetonka | 28/12/2014 |
| **HR Generalist (Business Partner)**<br>with the Regional Human Resources Director to drive business results by successful implementation of a ... | MN - Minnetonka | 02/12/2014 |
| **HR Coordinator (ESC Analyst!)**<br>inquiries across all areas of Human Resources. Analysts will support the generalist and functional teams of ... | MN - Minnetonka | 23/12/2014 |
| **Branch Manager - Sales**<br>◆Participates in the appropriate and fair resolution of human resources issues when necessary ◆Responsible for ... | FL - Orlando | 23/12/2014 |
| **Branch Manager**<br>resources issues when necessary - Responsible for or actively participates in the recruitment, hiring ... | AL - Mobile | 23/12/2014 |
| **HR Compliance Manager**<br>degree in Human Resources, General Business, Management or similar required. (S)PHR and/or Compensation ... | MN - Minnetonka | 19/12/2014 |

WILLIAMS-000052

# EXHIBIT U

**Preliminary Expert Report of Caren B. Goldberg, Ph.D.**

**05/30/16**

I have been asked by Mills & Woods Law, PLLC, to provide an expert report in the matter *Williams v. G&K Services, Inc.*.  My testimony is based on my broad knowledge of the field of Human Resource Management and my experience as an expert witness in similar cases. I reserve the right to modify my opinion, as additional information becomes available at subsequent points in time or in response to a request by counsel to opine on additional issues that have not been addressed in this report.

## SUMMARY OF QUALIFICATIONS AND EXPERIENCE

I am currently an Associate Professor of Management at Bowie State University.  Prior to that, I spent the seventeen years in the Management Departments at American University and George Washington University and one year in the Industrial-Organizational Psychology Department at George Mason University.  During two of my nine years at George Washington University, I served as the Program Director for Human Resources.  For the past two decades, I have taught undergraduate, masters and doctoral level courses in Human Resource Management, Industrial Psychology, Organizational Behavior, and Research Design.

I have written more than 50 articles for peer-reviewed journals and conferences.  I have also authored seven invited book chapters.  My research has been published in *Journal of Applied Psychology, Human Resource Management, Human Relations, Group and Organization Management, Journal of Organizational Behavior, Psychology of Women Quarterly, Academy of Management Best Paper Proceedings, Sex Roles, Assessment, Journal of Business Research, Representative Research in Social Psychology, Journal of Career Planning and Development, Business Journal of Hispanic Research,* and *Journal of Managerial Psychology*.  I have also

conducted numerous media interviews, including several television, radio, and print news pieces.

I have engaged in a variety of important leadership roles in my profession, including a three-year term as an Associate Editor of *Group and Organization Management*, an editorial board member of *Group and Organization Management, Human Resource Management, Journal of Business and Psychology,* and *Journal of Management*, and Track Chair for the Human Resource Division of the Southern Management Association. I served on a joint taskforce created by the Society for Human Resource Management (SHRM) and the American National Standards Institute (ANSI), charged with creating workplace standards for Diversity and Inclusion.  In addition, I am currently serving as Treasurer of the Academy of Management's Gender and Diversity in Organizations Division, where I recently completed a three-year term as an Executive Committee Member.

I received my B.A. degree in Psychology from the State University of New York at Stony Brook in 1987, my M.B.A. degree from the State University of New York at Binghamton in 1990, and my Ph.D. degree in Human Resource Management from Georgia State University in 1997.

From 1988 to 1989, I worked in the compensation department at United Health Services.

In February, 2008 I provided expert testimony (deposition) in Sullivan v. Brodsky, Kayne, and Morgan Stanley, United States District Court, Southern District of New York Index No. 07-CV-00003 (BSJ) (KNF).  In March, 2009, I provided expert testimony (deposition) in Apsley, et al. v. The Boeing Company, The Onex Corporation, and Spirit Aerosystems, United States District Court, District of Kansas Case No.: 05-1368-MLB-KMH.  I provided expert testimony in the matter of Prentice and Francis v. OfficeMax North America, Inc. and

OfficeMax, Inc., District Court of the Virgin Islands.  Civil No.:  2009/5 and in the matter of Desir v. Hovensa, LLC., District Court of the Virgin Islands.  Civil Action No.: 2007/97 (both depositions March 2011; both Daubert hearings October, 2011).  In August, 2011, I was deposed in the matter of Bennett v. CSX Transportation, Inc. United States District Circuit for the Eastern District of North Carolina Western Division, Civil Action No:  5:10-CV-00493-BO.  In September, 2011, I provided expert testimony (deposition) in the matter of EEOC v. Xerxes Corporation, Untied States District Court for the District of Maryland Northern Division, Civil Action No: CCB-008-1882.  In February, 2012, I was deposed in the matters of Paul v. Hovensa (District Court of the Virgin Islands, Civil No. 1:07-CV-00051-RLF-GWC) and Gautier-James v. Hovensa (District Court of the Virgin Islands, Civil No. 2006/106 F/C).  In March, 2013 and May 2013, I was deposed in the matter or Marini v. Costco Wholesale Corp. (United States District Court for the District of Connecticut, Civil Action No:  3:11-CV-00331-MRK).  In the matter of Seguin vs. Northrop Grumman Corporation (2012-SOX-00037), I was deposed in July, 2013 and testified at a hearing in July, 2014.

Included with this report is a current copy of my *curriculum vitae*, which contains a more detailed description of my professional background, including a list of my publications.

## MATERIALS CONSIDERED

In preparing this report, I considered all documents provided to date, by both Plaintiff and Defendant (see Disclosure Statements), the transcript of the deposition of Rachel Siggerud Raskovich, and the official investigation of the Federal Equal Employment Opportunity Commission.  Additionally, throughout my report, I reference some of the scholarly literature on Human Resource Management. The full references for these works appear at the end of this

report.

**Compensation**

For my time working on this matter, I am paid $400.00 per hour, plus actual or estimated travel and expenses.  For depositions and trials, a nonrefundable payment of $3,200 per day, plus estimated travel time and estimated travel costs, is required two weeks prior to the scheduled date of testimony.  In the event that the deposition and/or trial is cancelled, postponed, or rescheduled, no refund will be issued.  In the event that the deposition, hearing, or trial exceeds 8 hours in a day, I bill at the $400 per hour rate, with the terms set forth in my retention agreement.

## EXPERT OPINION

1. The stated reason for eliminating Ms. Williams' position was pretextual.  Although G & K asserted that Ms. Williams position was eliminated because of overstaffing, from an HR perspective, this claim is untenable.

   a. G & K claimed that the creation new HR Generalist position was the result of a restructuring which entails long-range planning.  Henneman & Judge (2006) note that Human Resource Planning includes long-term (three years or more), intermediate (one to three years), and short-term (one year or less).  Given that G & K purports to have mechanisms in place to address short-term staffing needs,[1] the creation of the new HR Generalist position was clearly part of a longer-term strategy to restructure

---

[1] That G & K had distinct mechanisms for addressing short-term human resource planning is evidenced by the fact that in G & K's response to the EEOC charge, they noted, "Siggerud learned that the Talent Acquisition team was planning to hire a temporary contract recruiter."

the HR function. However, there is a disconnect, in that G & K created Ms. Williams

position in February, 2013 and eliminated it in September, 2013.

b.   When Ms. Williams was put into a temporary recruiting role in summer, 2013, she

was told that if she didn't stay in the recruiting role, she could come back as an HR

Generalist.  Again, considering the time-frames involved in HR planning, it is hard to

imagine that G & K would not have foreseen the need to eliminate her position in the

two months between when she started the recruiting role in July and when it was

eliminated in September.

c.   It bears noting that in contrast to what the response to the EEOC complaint stated

(that the decision to eliminate the position was made in August), Ms. Siggerud

testified that the decision to eliminate the position had been made in June.  However,

from an HR perspective (or business perspective, in general), it makes no sense to

continue to pay an employee for two months, knowing that her position will be

eliminated, as soon as the temporary assignment ends.  Further, given that import of

eliminating a position or terminating an employee, from an HR perspective, it is

unlikely that there would be no contemporaneous mention of such a decision in *any*

of the discovery materials, had the decision, in fact, been made prior to Ms. Williams'

ADA accommodation request.

d.   During the time during which Ms. Williams occupied the Human Resource Generalist

role, there was no job description for this position (the record reflects that the job

description was created in April, 2014, several months after Ms. Williams was

terminated).  As noted in the Society for Human Resource Management's (SHRM's)

Instructor Materials, "job performance must be evaluated with an understanding of

the assigned duties and at the prescribed level. The job description and performance standards that flow from job analysis provide a common framework for employees and supervisors to assess work performance."[2]  Without a description of the job, G & K's contention that Ms. Williams performance was below expectations is without foundation.

e.   Even if G & K had deemed Ms. Williams' job performance to fall below expectations, the company violated its own policy and practice, by not putting her on a Performance Improvement Plan. Ms. Siggerud testified (107) that unless they did something egregious, when a performance problem was documented, employees were typically put on a Performance Improvement Plan. However, Ms. Williams was denied this opportunity.

f.   It is also noteworthy that there is no evidence that Ms. Williams did, in fact, have a performance problem.  Given that G&K does have a process for documenting performance and/or attendance problems, it makes no sense that they would choose to refrain from using such a vehicle.  Ms. Siggerud's testimony reveals that the crux of the alleged performance problem was attributable to the fact that Mr. Briscoe did not understand what the functions of the HR Generalist role were and vague "perceptions" that Ms. Williams was not engaged in her job.  Given that there was no job description for the position (per my point 1d, above), it is not at all surprising that managers (or the HR Generalists, themselves) would not understand what the job functions were.

---

[2] Although I use SHRM's instructor materials as an example, nearly every introductory HR textbook would say something to this effect.

2.   G & K's performance appraisal system was an invalid basis for making decisions regarding

Ms. Williams' termination.

    a.   As noted above in point 1c., the performance appraisal could not reflect the key duties

       of the HR Generalist position, given that the key duties of the position were never

       specified during the time when Ms. Williams occupied the position.  Further evidence

       of this is provided in Ms. Siggerud's testimony (p. 25), as she indicated that, "there

       were questions from both business and from the HR team as to how we approached

       our roles differently."

    b.   The performance appraisals were largely based on employee's own personal

       objectives.  This is problematic in that it precludes comparability.  Gomez-Mejia,

       Balkin, and Cardy (2010) define comparability as, "the degree to which the

       performance ratings… in an organization are based on similar standards."  Given that

       each HR Generalist created her own goals, it would be impossible to use the same

       yardstick to assess performance.

    c.   Beyond the content of the objectives that were being appraised, there was also lack of

       comparability in the supervisors' assessments.  Whereas Ms. Siggerud added several

       comments in the open-ended sections on each of the criteria listed on Janelle

       Benacua's and Kaela Elliston's forms, the open-ended sections for each of the criteria

       on Ms. Williams' performance appraisal were left entirely blank, contrary to the

       standard that appraisers take great care to do the appraisals thoughtfully, accurately,

       and fairly (Latham & Wexley, 1994; Gomez-Mejia, Balkin, & Cardy, 2010[3]).

---

[3] Although I cite these texts as examples, one would be hard-pressed to find an introductory HR text that would indicate otherwise.

d.  Although the rating system purports to create a weighted average, as indicated above, the criteria, themselves, are problematic because most of them stem from employee-generated objectives.  Moreover, although a weighted average of ratings across the criteria seems like a good idea in principal, in practice, the weighted average score is entirely separate from the evaluation that is used.  Bates 146 has a box for Ms. Williams' weighted average score, which the manager indicated as a 3.  After this, however, there is a box for 'Year-End Overall Review Summary', which is entirely separate.  In this section, there is a lot of harsh criticism of Ms. Williams' performance, followed by a 2 (below expectations).  Essentially, it appears that there is a very well-articulated formula for creating a weighted average, but that a manager can just ignore that and give whatever s/he wants.[4]

e.  By Ms. Siggerud's own admission in multiple places throughout her deposition, she made little effort to document Ms. Williams' performance throughout the appraisal period.  This is problematic for a number of reasons.  First, the Society for Human Resource Management's Performance Management module states, "Managers need to maintain records and documentation of each employee's performance. If performance appraisals are done once a year and the manager has kept no records of employee performance, it is difficult to remember what happened, and it is impossible to appraise appropriately. Most likely, the manager will remember and appraise only the most recent behavior, leading to an incomplete and possibly inaccurate assessment of the employee's work."  In addition to the limits on human memory, documentation serves an important role of evidencing that the employee was made

---

[4] Given that G & K noted in its response to the EEOC charge that Ms. Williams' performance was below expectations, Ms. Williams' ratings on the GK Perform criteria and her own objectives were ostensibly disregarded.

aware of a perceived problem with his/her performance.  As noted in Gomez-Mejia, Balkin, and Cardy (2010), failing to do so suggests that the employer's actions may have been arbitrary or unwanted.

3.  G & K failed to investigate Ms. Williams' claim of disparate treatment.  The Defendant's Employee Handbook (Bates 225) states, "All incidents or concerns will be investigated thoroughly and promptly.  The company will be as discreet as possible consistent with the need to conduct a thorough investigation."  Likewise, G & K's Individual Treatment Policy (Bates 23t) states, "All inquiries and/or complaints will be investigated thoroughly and promptly."  However, that is not what happened when Ms. Williams expressed concerns to Ms. Siggerud about being treated differently because of her medical issues.  Rather than attempt to investigate, Ms. Siggerud testified (137), "I tried to understand, not necessarily this conversation, but tried to understand kind of what that meant, so what did she mean by she was being treated differently and she couldn't really give me any specific things to investigate."  Simply saying that she tried to understand, does not constitute an investigation. After Ms. Williams expressed that she felt that she was being treated differently because of her disability, the burden was on Ms. Siggerud to actively seek more information.

4.  G & K retaliated against Ms. Williams for seeking ADA accommodations.  Section 8 (Retaliation) of the EEOC's Compliance Manual indicates there are three essential elements in a retaliation claim; protected activity, adverse action, and causal connection between the protected activity and the adverse action.  Direct evidence of retaliatory intent is rare; thus, EEOC provides a framework for establishing circumstantial evidence of retaliation.

According to The Compliance Manual, an initial inference of retaliation arises when: "(1) the adverse action occurred shortly after the protected activity, and (2) the person who undertook the adverse action was aware of the complainant's protected activity before taking the action."

Shortly after receiving Ms. Williams' request on July 7, 2013, for an accommodation of missing a few hours per week for medical appointments, Ms. Siggerud e-mailed Marie Smith, who normally handles ADA requests, and told her "I would like to manage this request very closely," even though Ms. Siggerud testified (153) that, "the way the process, I believe, was designed to work," was that she would pass along the request to Ms. Smith or Ms. Kietzer. The message to Ms. Smith further indicated, "I would like to look at having her work at least eight hours in the office either before or after her appointments because I have previously experienced situations where an appointment 'first thing in the morning' means she doesn't roll in until noon." However, forcing her to work eight hours before or after her appointments would not only deny Ms. Williams the accommodation to which she is entitled, it would punish her for it. Per Ms. Siggerud's testimony, Ms. Williams was an exempt employee, and therefore, not beholden to a formal eight-hours-per-day schedule. However, given that she further testified that the HR Generalists were complaining that they were bored in their new role, requiring that Ms. Williams put in eight hours before or after her appointments was punitive. Moreover, Ms. Siggerud was unable to provide a rationale for doing so. This is noteworthy, as the EEOC's Compliance Manual states that, "a violation is established if… the respondent fails to produce evidence of a legitimate, non-retaliatory reason for the challenged action, or if the reason advanced by the respondent is a pretext to hide the retaliatory motive."

**Conclusion**

In summary, it is my professional opinion that:  1.  G & K's claim that Ms. Williams'
position was being eliminated due to overstaffing is pretextual; 2. G & K's performance
appraisal of Ms. Williams was an invalid basis for making a decision about terminating her;
3. G & K failed to investigate Ms. Williams' claim that she was being treated differently, due
to her medical condition; and 4. G & K retaliated against Ms. Williams for requesting ADA
accommodations.

*Caren Goldberg, Ph.D.*

Signed on 5/30/2016

Works Cited

Gomez-Mejia, L. R., Balkin, D. B., & Cardy, R. L.  (2010).  Managing Human Resources, 6th Ed.  Pearson/Prentice-Hall Publishing.

Heneman, H. G., & Judge, T. A.  (2006).  Staffing Organizations, 5th Ed.  McGraw-Hill/Irwin Publishing.

Latham, G. P., & Wexley, K. N.  (1994).  Increasing Productivity through Performance Appraisal, 2nd Ed.  Addison-Wesley Publishing.

Society for Human Resource Management (2009).  Performance Management and Appraisal Learning Module.
https://www.shrm.org/academicinitiatives/universities/teachingresources/pages/performancemanagementandappraisal.aspx.

United States Equal Employment Opportunity Commission (1998).  EEOC Compliance Manual, Section 8:  Retaliation.  https://www.eeoc.gov/policy/docs/retal.html.